UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David W. Lynas, as Trustee for the
next-of-kin of James C. Lynas,

                        Plaintiff,                          Case No._____

v.                                                          COMPLAINT

Linda S. Stang, acting in her individual capacity as
a Sherburne County correctional officer; Michael          JURY TRIAL DEMANDED
D. Wise, acting in his individual capacity as a
Sherburne County correctional officer; Alyssa
Pfeifer, acting in her individual capacity as medical
staff in the Sherburne County Jail; Jennie Thompson,
acting in her individual capacity as medical staff in
the Sherburne County Jail; Todd Leonard, MD, acting
in his individual and official capacity as the Medical
Director and Jail Physician at the Sherburne County
Jail and as the sole owner of MEnD Correctional
Care, PLLC; MEnD Correctional Care, PLLC; John
Does 1-2, acting in their individual capacities as
supervisory Sherburne County officers; and
Sherburne County,

                        Defendants.

---

For his Complaint, Plaintiff David W. Lynas ("Plaintiff"), as Trustee for the next-of-kin of James C. Lynas, hereby states and alleges as follows:

1.      This is an action for money damages for the wrongful death of James C. Lynas ("James") on November 12, 2017, resulting from the deliberate indifference of the Defendants from November 1, 2017 to November 9, 2017. The money damages sought are those attributable to the deprivation of James's civil rights under federal common law and not the state wrongful death measure of damages.

2.      The deliberate indifference of Sherburne County and the individual Defendants proximately caused James's death, thereby violating his well-settled federal civil rights while acting under the color of state law.

3.      This action arises purely out of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the Constitution.  State law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

4.      Plaintiff was appointed Trustee for the Next-of-Kin of James on December 21, 2017, by Sherburne County District Judge Brianne Buccicone.  Plaintiff is James's father. A copy of that Order is attached hereto as Exhibit A.

5.      Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action.

6.      James was at all times material herein a citizen of the United States and a resident of Zimmerman, Minnesota.  He was born on October 10, 1986, making him 31 years old at the time of his death.

7.      James suffered from mental illness, including depression and anxiety, as well as substance abuse.

8.      Defendant Sherburne County is a "public corporation," suable under Minn. Stat. § 373.01, subd. 1(a)(1).  Sherburne County is, and at all times material herein was, a political entity charged with control and supervision of all personnel of the Jail.  The Jail has 667 beds and is the second largest county correctional facility in the state of Minnesota.

9.      Upon information and belief, Defendant Linda S. Stang ("Stang") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Jail.  Stang is sued in her individual capacity.

10.     Upon information and belief, Defendant Michael D. Wise ("Wise") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Jail.  Wise is sued in his individual capacity.

11.     Upon information and belief, Defendant Alyssa Pfeifer ("Pfeifer") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a Jail medical staff employee.  Pfiefer is sued in her individual capacity as a registered nurse ("RN") employed by MEnD and Sherburne County to provide constitutionally required medical services at the Jail.

12.     Upon information and belief, Defendant Jennie Thompson ("Thompson") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a Jail medical staff employee.  Thompson is sued in her individual capacity as a registered nurse ("RN") employed by MEnD and Sherburne County to provide constitutionally required medical services at the Jail.

13.     Defendant MEnD Correctional Care, PLLC ("MEnD") is a limited liability company organized under the laws of Minnesota with its principal place of business in Sartell, Minnesota.  MEnD was at all times material herein acting under color of state law as

3

a company that contracted to provide constitutionally required medical care to inmates at the Jail.

14.     Defendant Sherburne County contracted with MEnD to provide the Jail's health-care services at all times material herein. The individual Jail medical employee Defendants were selected by MEnD and its sole owner, Defendant Todd Leonard, to provide constitutionally required medical and mental-health care at the Jail under the County's contractual relationship with MEnD.

15.     Defendant Todd Leonard, MD ("Leonard") was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as the owner of MEnD and the supervising medical provider at the Jail. Additionally, upon information and belief, Leonard was a policy maker and was specifically involved in creating and implementing the Jail's suicide prevention plan. Leonard is sued in his individual, supervisory and official capacity.

16.     Upon information and belief, Defendants John Does 1-2 were at all times material herein citizens of the United States, residents of the State of Minnesota, and acting under color of state law as supervisors of the Jail's correctional staff. Does 1-2 are sued in their individual capacities.

## JAMES'S JULY 2017 ENCOUNTER
## WITH SHERBURNE COUNTY JAIL

17.     Upon information and belief, James was incarcerated at the Jail beginning on July 5, 2017.

18.     James's undated and unsigned July 2017 Chemical Withdrawal Questionnaire from the Jail noted that he had been using a half gram of opioids daily for one year. He had

reportedly last used on July 4, 2017, and his urine drug screening results were positive for

oxycodone, opiates, methamphetamine and amphetamine.

19.     James's July 2017 Chemical Withdrawal Flow Sheet also noted that his July 5,

2017 urine drug screening test was positive for bupropion – an antidepressant.

20.     Throughout his time at the Jail in July 2017, James endorsed severe withdrawal

symptoms, including nausea, tremors and cold sweats.  These symptoms were described and

noted by MEnD correctional medical staff.

21.     On July 5, 2017, James was put on a 30-minute chemical withdrawal watch by

MEnD nurse Andrea Kretsch and his housing unit was notified.  He was to follow up with

nursing the next day.

22.     James was released on July 6, 2017, after only a two-day stay at the Jail.

## JAMES'S NOVEMBER 2017 INCARCERATION
## AT SHERBURNE COUNTY JAIL

23.     On October 31, 2017, James was arrested in Anoka for a driving under the

influence ("DWI").

24.     James was on probation for a prior DWI and the events of October 31, 2017,

were violations of that probation.  As such, James was taken to the Anoka County

Workhouse on October 31, 2017.

25.     The conditions of James's sentencing noted that he was to serve 120 days and

that he was approved for an in-patient program.

26.     On James's Medical Questionnaire at the Anoka County Workhouse, he

admitted the following: 1) using alcohol, methadone or street drugs; 2) last using drugs on

October 30, 2017; 3) daily drug use; 4) using half of a gram; 5) smoking drugs; 6) opiate use; and 7) that he has had withdrawal from alcohol or drugs.

27.     James was declared an urgent referral to jail medical staff due to withdrawal concerns, but he was cleared for general population.

28.     According to Anoka County records, James was scheduled for a medical appointment on November 1, 2017, due to opiate withdrawal.

29.     Upon information and belief, James was not treated by medical personnel at the Anoka County Workhouse.

30.     On November 1, 2017, James was transferred from the Anoka County Workhouse to the Jail, where he was to be housed.

31.     On November 1, 2017, at 5:38 p.m., a jail mental health screening form was completed for James by correctional officer Refugio Leandro.  James reported he had received inpatient and/or outpatient psychiatric treatment for alcohol abuse.  While officer Leandro did not clear James for housing in general population, he determined that medical personnel did not need to be notified for assistance in James's housing assignment.

32.     Upon information and belief, despite not being cleared for general population housing, James was housed in general population at the Jail.

33.     MEnd nurse Andrea Kretsch ("AK, 4321") completed a Chemical Withdrawal Questionnaire for James on November 1, 2017, at 11:00 p.m.  The Questionnaire noted the following: 1) that James had been using ½ - 1 gram of heroin per day for one year; 2) he last used heroin on October 31, 2017; 3) that James also had been using 1 gram of

methamphetamine weekly for one year; and 4) he last used methamphetamine on October 31, 2017.

34.     James's urine drug screen results were positive for methamphetamine, amphetamine, and benzodiazepines.

35.     A Chemical Withdrawal Flow Sheet was initiated by MEnD nurse "AK, 4321" for James on November 1, 2017.  As of that date, James reported having withdrawal symptoms.

36.     The electronic form of the withdrawal assessment purportedly performed by Andrea Kretsch on November 1, 2017, lists an encounter note date of November 2, 2017. The note was not electronically signed by Kretsch until November 11, 2017.  Leonard did not sign her note until November 13, 2017, the day after James died.

37.     MEnD's record keeping is littered with similar inconsistencies that make it impossible to determine what was done, when it was done, and by whom.  This is by design.

38.     A Suicide Risk Screening Form was also completed for James by MEnD nurse "AK, 4321" on November 1, 2017, due to his "altered mental status."  On the form, it was noted he was feeling low or blue.  However, he was scored at a 2 out of 100 on the Total Risk Assessment.

39.     The on-call medical staff was not notified about James's altered mental status, drug use or risk of severe withdrawal symptoms due to his increased use of heroin and the added use of methamphetamine since his July 2017 incarceration.

40.      On the November 2, 2017 entry on James's Chemical Withdrawal Flow Sheet, "JT, 4323" noted James was experiencing nausea, diarrhea, sleep issues, agitation and eating disturbances.

41.      Upon information and belief, "JT, 4323" is Defendant Jennie Thompson, RN.

42.      On the November 3, 2017 entry on James's Chemical Withdrawal Flow Sheet, "JT, 4323" again noted James's withdrawal symptoms, including eating disturbances and sleep issues due to stomach pain.

43.      Despite multiple red flags, James's initial health assessment was not completed by MEnD medical personnel until November 3, 2017 – three days after he arrived at the Jail.

44.      James's November 3, 2017 MEnD health and chemical withdrawal assessments were completed by Defendant Thompson.  The Health Assessment form noted the following: 1) mental health diagnosis of depression and anxiety; 2) suicidal ideations on November 2, 2017 due to pain associated with withdrawal; 3) chemical dependency with heroin; and 4) continued stomach pain.  James also endorsed other and continuing withdrawal symptoms.

45.      Due to the answers he provided, James was to be monitored with MEnD's Suicide Risk Screening Form.  Further, he was started on a mental-health process and was to follow up in the clinic as needed.

46.      Defendant Thompson incredibly scored James a 16 out of 100 on what is believed to be James's November 3, 2017 Suicide Risk Screening Form.[1]  She did note on the Care Plan that the health assessment would be reviewed with the mental-health provider.

_____

[1] The handwritten date on this form is altered.

8

47.     Defendant Leonard reportedly reviewed the "emeds" sheet completed by Thompson on November 3, 2017, at 2:13:05 p.m.

48.     The suicidal ideations included on the November 3, 2017 handwritten health assessment form for James were left off the November 3, 2017 "emeds" sheet.

49.     Nonetheless, the "emeds" sheet from November 3, 2017 noted that James's health assessment was reviewed with a "mental-health" provider.

50.     There is no indication as to who that "mental-health" provider was, that the mental-health provider was a qualified mental-health provider or that the mental-health provider saw, assessed or monitored James after learning of the multiple red flags noted on his health assessment from November 3, 2017.

51.     On the November 4, 2017, entry on James's Chemical Withdrawal Flow Sheet, "BZ, RN" noted James was experiencing continued sleep issues – specifically, he was sleeping only 20 minutes at a time and reported "conscious sleeping" where he could hear everything everyone was saying.  Nonetheless, the use of Flow Sheets was discontinued at this time by "BZ, RN" believed to be Bailey Zweber, RN.

52.     On November 5, 2017, James met with Defendant Pfeifer.  During this encounter James described a prior time in his life when he felt like giving up, specifically when he was convicted of a felony.  Around that time he sold all of his guns as a precaution so that he would not shoot himself.

53.     James also discussed his use of opiates with Pfeifer and how he had to deal with his mental-health issues when he is sober.  When Pfeifer asked how he was coping, James stated: "honestly I'm suffering and not coping with it."

54.     James reported to Pfeifer that he was in court recently and was sentenced to four months.  He noted he may be able to go to the workhouse after 30 days, but thought it was best if he served the four months and then went to a treatment facility that could address both his drug use and mental-health issues.

55.     James confessed to Pfeifer that the last time he was in treatment, his mental health was not addressed and he blamed that for his return to drug use.

56.     James told Pfeifer that he was "definitely" feeling depressed and that his "anxiety [was] through the roof."

57.     Further, James expressed being very stressed about being locked in his cell for 20 hours a day while housed in Gamma.

58.     James also explained to Pfeifer that his insomnia was maddening, that his mind was going crazy with thoughts and he was experiencing many emotions such as frustration, irritation and was emotional.

59.     James verbally "contracted" with Pfeifer that he would tell a correctional officer or the clinic if he had suicidal thoughts.  Such a contract cannot be relied upon by medical and mental-health providers.

60.     The note of Defendant Pfiefer's November 5, 2017 meeting with James described an individual in a severe mental-health crisis and one that would only get worse when he was off the drugs he normally consumed, likely as a means self-medication for his mental-health issues.

61.     Pfeifer's November 5, 2017 note was not signed by Defendant Leonard until November 6, 2017.

62.     Though James was purportedly "supervised" by Leonard, Leonard did not see James during his stay at the Jail in November 2017.

63.     Pfeifer also completed a Beck Depression Inventory for James on November 5, 2017.  He scored a 43.  Any score over 40 indicates "extreme depression."

64.     James's Beck Depression Inventory score further confirmed his mental-health crisis during his time at the Jail.

65.     The November 5, 2017 "emeds" indicates that Pfeifer reviewed James's health assessment visit, previous suicide risk assessment and Beck Depression Inventory with family nurse practitioner, "C.W."

66.     A family nurse practitioner is not a qualified mental-health provider.

67.      "C.W." asked Pfeifer to meet with James and get more information.

68.     It is unclear from the records whether the requested meeting with "C.W." occurred.

69.     Despite significant mental-health issues, James's substances-abuse issues, the continuing withdrawal symptoms including severe pain, and his extremely high Beck Depression Inventory score, Pfeifer scored James at only a 12 out of 100 on his November 5, 2017 suicide risk assessment.

70.     Pfeifer did note that James had chronic depression, several concurrent stressors and she and the family nurse practitioner initiated a 15 minute mental-health watch.

71.     Yet, James was to be housed in general population and was able to have regular clothing items, linens, diversion items, dietary provisions and all regularly issued hygiene items except for a razor.

11

72.     James was not on suicide watch or close observation/mental-health watch. Nor was he placed into secured housing or special management.  Instead, James's November 5, 2017 Special Precautions sheet notes that he was in general population with a miscellaneous and unattainable observation status, described as: "15 min watch for mental-health."

73.     According to Defendant Pfeifer, James was supposedly started on Hydroxyzine – an antihistamine that treats anxiety – on November 5, 2017.  Additionally, she reportedly sent in a mental-health referral.

74.     James's Hydroxyzine prescription notes Dr. Leonard as his prescribing physician.  However, from the record it appears the order was made by the family nurse practitioner, "C.W."

75.     From the Medical Administration Record for James, it is unclear when the Hydroxyzine was started and administered as there are two identical prescriptions with differing start times from Defendant Pfeifer's records – November 6 and November 7, 2017, respectively.  The administration records and physical evidence appear to contradict Pfeifer's account and other MEnD records regarding the Hydroxyzine.

76.     From the physical evidence, James was only provided three tablets of Hydroxyzine during his stay at the Jail.  Based on the prescription information and their start dates of November 6 and November 7, James should have received between 5 and 7 tablets of Hydroxyzine prior to his suicide at the Jail.

77.     A handwritten note on the Mental Health Referral sheet stated that James was not scheduled to see "mental-health" until November 16, 2017.

78.     On November 6, 2017, just one day after James's extremely high BDI score noted he was suffering from "extreme depression," James was given a suicide risk assessment score of 16 out of 100 by Defendant Thompson.

79.     On a November 7, 2017 Grievance Form from James, he noted his cell mate was going through severe withdrawals and requested to be moved due to the inmate throwing up, defecating in his pants and spitting everywhere.  James described frustration that correctional officers were not listening to his concerns about his own health and that his kites and grievances were being ignored or thrown away.

80.     On November 8, 2017, James was notified of a rule violation by correctional officer Adam Walkley.  James reportedly became very upset and yelled "Just send me to Gamma!  I'll give you a reason."  Walkley took the statement as a veiled threat and James became increasingly agitated, swore and kicked his cell door repeatedly.

81.     On November 8, 2017 at 9:43 p.m., James was moved to Special Housing, apparently due to his failure to comply promptly with lockdown and for the perceived threat to Walkley.

82.     The move was reportedly not discussed or communicated to medical personnel.

83.     Admittedly, James did not receive his antidepressant medication the morning of November 9, 2017.

84.     On a November 9, 2017 Grievance Form, James expressed that he did not understand what he had done to receive the lack of care while at the Jail and felt that he was

put into special housing because of his desire for a cellmate that did not have hepatitis and one who was not spreading bodily fluids all over his cell.

85.     James' desperation, agitation, stress and frustration are apparent in the Grievance Form.

## THE SUICIDE

86.     Defendants Wise and Stang were assigned to Special Housing on November 9, 2017.

87.     Video surveillance captured the hallway leading to James's cell and the catwalk behind his cell, as well as the dayroom of S5 and James's cell, S52.

88.     As such, video surveillance captured the well-being checks that occurred by way of the catwalk and dayroom and some of the movements of James within his cell S52 on November 9, 2017.

89.     From approximately 9:00:21 to 9:00:57 on surveillance video from the Special Housing Hall, Defendant Wise performed a well-being check through the catwalk behind the cells of the Special Housing Unit.  At that time, he observed James lying underneath his bed and went into the cell block and advised him that he could not do this.

90.     At approximately 9:01:29 on surveillance video from the Special Housing Hall, Defendant Wise entered the day room of Special Housing unit.  From approximately 9:01:29 to 9:02:14 on surveillance video from the Special Housing Hall, Defendant Wise performed a well-being check in the day room area of Special Housing.

91.     Defendant Wise checked specifically on James from approximately 9:01:47 to 9:02:03 and went back to his cell door three times over that time period.

92.     The CMS Activity Log report does not include this check by Defendant Wise. Instead, a check for Special Housing was logged by Defendant Stang at 9:04.  From the surveillance video, it is clear Defendant Stang did not perform a well-being check at 9:04. Nonetheless, she logged the check and noted: "All appears ok at this time."

93.     From approximately 9:07:15 to 9:10:38 on the Special Housing surveillance video, James got out from under the bottom bunk bed, placed the blanket on the top bunk and blocked out the window of his cell.

94.     James then pulled additional bedding out from under the bottom bunk, rolled a white sheet and set it next to him as he sat on the lower bunk, pulled the blanket from the top bunk down and covered himself with it as he laid down on the bottom bunk.

95.     Additionally, James can be seen moving under the dark-colored blanket.

96.     At approximately 9:10:38 on the Special Housing surveillance video, James got up off the bottom bunk with a sheet in his hand and walked toward the back of his cell.

97.     James never came back into direct video of the Special Housing surveillance camera.

98.     From approximately 9:15:48 to 9:15:53 on the surveillance video from the Special Housing Hall, Defendant Wise performed a well-being check on Special Housing, including James's cell, by way of the "catwalk."

99.     Defendant Wise reported to Jail Investigator Michele Vlasak ("Vlasak") that on this check through the catwalk, he had observed the corner of James's head near the wall light and "**believed** he was using the restroom or reading."

15

100.    James had hanged himself with the white sheet from the light grate prior to the 9:15 well-being check by Defendant Wise.

101.    This check by Defendant Wise was not logged on the CMS Activity Log.

102.    From approximately 9:35:42 to 9:36:12 on the surveillance video from the Special Housing Hall, Defendant Stang performed a well-being check on Special Housing, including James's cell, by way of the "catwalk."

103.    Defendant Stang reported to Vlasak that on this check through the catwalk, she also saw the top of James's head near the light and "**believe[d]** he was reading."

104.    Upon information and belief, this check was logged into the CMS Activity log as the check performed at 9:32 a.m.  Defendant Stang noted that "all appears ok at this time."

105.    At approximately 9:47:21 on the surveillance video from the Special Housing Hall, Defendant Stang performed another well-being check on Special Housing, including James's cell, by way of the "catwalk."

106.    Defendant Stang reported to Vlasak that during this check she again saw the top of James's head in the same position as the last two checks and something did not appear right.  Defendant Stang looked up and could see in the reflection of the glass that there was a sheet hanging in the light.

107.    At 9:47:32 on the surveillance video from the Special Housing Hall, Stang exited the catwalk and flagged down Defendant Wise and Sergeant Travis Lindstrom ("Lindstrom").

108.    Defendant Wise and Lindstrom entered cell S52 and found James hanging from the light grate on the back wall of the cell by a white sheet that was tied around his neck.

109.    James was facing the rear of his cell and his knees were off the ground.

110.    Lindstrom lifted James up and cut the sheet with a pair of scissors provided by Defendant Stang.

111.    Chest compressions were initiated after James was brought to the ground.

112.    James's eyes were partially open and fixed, he was unresponsive, had no pulse and there were abrasions around his neck.

113.    An automated external defibrillator was used to analyze James's heart rhythm and advised no shock.  Chest compressions were continued.

114.    Jail medical staff arrived to the Special Housing unit and assisted Jail correctional staff in continued life-saving efforts.

115.    Eventually, paramedics arrived to assess James.

116.    James's pulse was eventually detected.

117.    James was put on a back board and stretcher and transported by the paramedics via ambulance to Mercy Hospital in Coon Rapids, Minnesota.

118.    In the emergency department at Mercy, James remained comatose.

119.    James was admitted by the trauma service and an initial CT of his brain showed diffuse cerebral swelling and patchy areas of loss of gray matter/white matter differentiation – believed to show a diffuse anoxic injury.  A CT of James's spine showed there was significant motion artifact at the foramen magnum down to the level of C2.

120.    James was admitted to the intensive care unit.

121.    James never had any spontaneous movement or withdrawal to painful stimuli and he never regained consciousness.

122.    An MRI of James's brain showed diffuse acute ischemic injury involving much of the cortex of the cerebral hemispheres and deep gray nuclei, consistent with hypoxic injury and there was partial effacement of the sulci over the cerebral convexities.

123.    Because of James's extremely poor prognosis, there was very little hope for any type of meaningful recovery.  After careful consideration, James was taken off life support.  He died at 1:53 p.m. on November 12, 2017, three days after he hanged himself at the Jail.

124.    The Ramsey County Medical Examiner noted that the immediate cause of James's death was hanging and the manner of death was suicide.

125.    Throughout James's confinement at the Jail, he displayed and reported obvious signs of experiencing a serious mental-health crisis.

126.    James admitted to suicidal ideations.

127.    James's painful withdrawal symptoms and sleep disturbances continued, increasing his anxiety.

128.    Further, James explained that he was forced to deal with his mental-health issues – including, but not limited to, depression and anxiety – when he was off of the street drugs he normally took.

129.    Defendants deliberately ignored all of the warnings James provided to them upon his arrival to and throughout his stay at the Jail, including his substance-abuse issues,

severe withdrawal symptoms, suicidal ideations, diagnoses of depression and anxiety, sleep and eating disturbances, and his increasing anxiety. These warnings mandated further evaluation of James's mental-health, immediately, but the evaluation did not occur prior to James hanging himself on November 9, 2017.

130.    While he was prescribed some medication to help address his anxiety, it is clear from the illegible and incoherent medication-administration records from the Jail that James was not provided the medication at least on the date of his suicide.

131.    James was not seen or assessed by a qualified mental-health provider while at the Sherburne County Jail. Apparently, he was scheduled for a mental-health appointment on November 16, 2017. The appointment was to occur four days after he died at Mercy Hospital. It was constitutionally too little, too late.

132.    Instead, Defendants permitted unqualified individuals, including correctional officers and the unqualified MEnD Defendants, to assess and ignore inmates' serious mental health needs, leading to the violation of James's constitutional rights.

133.    Further, James's "prescribing physician" – Defendant Leonard – never even saw James during his time at the Jail.

134.    Defendants also failed to ensure that James, who was suffering from a mental-health crisis, did not have the means and opportunity to commit suicide during his incarceration at the Jail on November 9, 2017.

135.    Additionally, from the review of the video footage, the description of James's head in the same location during three checks, and guesses as to what they *believed* he was doing, it is clear Defendants Stang and Wise acted with deliberate indifference to James's

19

constitutional rights by failing to determine the "well-being" that forms the essence and purpose of such checks.

136. James incurred special damages prior to his death, including but not limited to ambulance and EMS charges and medical bills from Mercy Hospital and physicians associated therewith, totaling over $67,525.00

137. James suffered a loss of economic opportunity.

138. James suffered extreme physical and mental pain and suffering from October 31, 2017, until November 12, 2017.

139. James suffered a loss of future enjoyment of his life.

140. Plaintiff is entitled to recover these damages for James.

## COUNT ONE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendants Stang and Wise*

141. Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

142. Severe mental illness, suicidal ideations and drug withdrawal are serious medical needs.

143. Defendants Stang and Wise had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of James, including protecting him from himself, as an inmate at the Jail.

144. Defendants Stang and Wise, under the color of state law, acted with deliberate indifference to James's life-threatening medical needs and his seirous risk of suicide during

confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

145.    Defendants Stang and Wise, under color of state law, knew of and disregarded an obvious and serious risk to James's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

146.    Defendants Stang and Wise subjected James to these deprivations of his rights either maliciously or by acting with reckless disregard for whether James's rights would be violated by their actions.

147.    James died as a direct and proximate result of the acts and omissions of Defendants Stang and Wise and Plaintiff was thereby damaged in an amount yet to be determined.

148.    Punitive damages are available against Defendants Stang and Wise and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

149.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT TWO

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendants Pfeifer and Thompson*

150.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

151.    Severe mental illness, suicidal ideations and drug withdrawal are serious medical needs.

152.    Defendants Pfeifer and Thompson had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of James, including protecting him from himself, as an inmate at the Jail.

153.    Defendants Pfeifer and Thompson, under the color of state law, acted with deliberate indifference to James's life-threatening medical needs and serious risk of suicide during his confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

154.    Defendants Pfeifer and Thompson, under the color of state law, knew of and disregarded an obvious and serious risk to James's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

155.    Defendants Pfeifer and Thompson subjected James to these deprivations of his rights either maliciously or by acting with reckless disregard for whether James's rights would be violated by their actions.

156.    James suffered and died as a direct and proximate result of the acts and omissions of Defendants Pfeifer and Thompson, and Plaintiff was thereby damaged in an amount as yet to be determined.

157.    Defendants Pfeifer and Thompson, as nurses employed by the private medical provider, MEnD, are not entitled to qualified immunity under *Richardson v. McKnight*, 521 U.S. 399 (1997), and *Harrison v. Ash*, 539 F.3d 510 (6th Cir. 2008).

158.    Punitive damages are available against Defendants Pfeifer and Thompson and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

159.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### COUNT THREE

**42 U.S.C. § 1983**
**EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS**
***Plaintiff v. Defendant Todd Leonard, MD***

160.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

161.    Severe mental illness, suicidal ideations, and drug withdrawal are serious medical needs.

162.    Defendant Leonard, as the Jail Medical Director, the Jail Physician, policy maker and sole owner of MEnD Correctional Care had a constitutional duty to provide for

the safety and general well-being, and to treat the medical and mental-health needs, of James, including protecting him from himself, as an inmate at the Jail.

163.    Defendant Leonard, under the color of state law, acted with deliberate indifference to James's life-threatening medical needs and serious risk of suicide during his confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

164.    Defendant Leonard, under the color of state law, knew of and disregarded an obvious and serious risk to James's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

165.    Defendant Leonard subjected James to these deprivations of his rights either maliciously or by acting with reckless disregard for whether James's rights would be violated by Defendant Leonard's actions.

166.    James suffered and died as a direct and proximate result of Defendant Leonard's acts and omissions, and Plaintiff was thereby damaged in an amount as yet to be determined.

167.    Defendant Leonard, as the Jail Medical Director and Jail Physician employed by the private medical provider, MEnD, is not entitled to qualified immunity under *Richardson v. McKnight*, 521 U.S. 399 (1997) and *Harrison v. Ash*, 539 F.3d 510 (6th Cir. 2008).

168.    Punitive damages are available against Defendant Leonard and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

169.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FOUR

### CIVIL RIGHTS VIOLATIONS – SUPERVISORY LIABILITY
### *Plaintiff v. Defendant Todd Leonard, MD*

170.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

171.    Severe mental illness, suicidal ideations, and drug withdrawal are serious medical needs.

172.    Defendant Todd Leonard, MD had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of James, including protecting him from himself, as an inmate at the Jail.

173.    Defendant Todd Leonard, MD was a supervisory employee as the owner of MEnD and the Jail Medical Director and Jail Physician at the Sherburne County Jail, and he, with callous or reckless indifference to the rights of inmates, failed to properly supervise, instruct, and train correctional and medical staff in the recognition of inmates with serious mental-health needs, inmates who are suicidal, and in the prevention of suicide in correctional facilities.

174.    Defendant Todd Leonard, MD, under the color of state law, acted with deliberate indifference to James's life-threatening medical needs and serious risk of suicide during his confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

175.    Defendant Todd Leonard, MD subjected James to these deprivations of his rights either maliciously or by acting with reckless disregard for whether James's rights would be violated by Defendant Leonard's actions.

176.    James suffered and died as a direct and proximate result of Defendant Todd Leonard's acts and omissions, and Plaintiff was thereby damaged in an amount as yet to be determined.

177.    Punitive damages are available against Defendant Todd Leonard and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

178.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FIVE

### CIVIL RIGHTS VIOLATIONS
### *MONELL V. DEP'T OF SOCIAL SERVICES*
### *Plaintiff v. MEnD Correctional Care*

179.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

180.    Before November 9, 2017, MEnD Correctional Care, PLLC, with deliberate indifference to the rights of inmates at the Sherburne County Jail, and the other jails that it contracts with including but not limited to Stearns and Todd County, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern or practice on the part of its medical staff, including Defendants Pfeifer, Thompson and Leonard, of failing to

provide for the safety and general well-being of inmates and failing to protect inmates from themselves and/or risks of suicide.

181.    MEnD staffed Sherburne County Jail and the other jails that it contracts with, including but not limited to Stearns and Todd County, with individuals unqualified to assess James's serious medical needs and/or incentivized them to ignore his serious medical needs.

182.    There is a direct and causal link between MEnD's maintenance of a systemic, dangerous and unconstitutionally deficient medical-care system and James's suicide.

183.    James's suffering and wrongful death and the violation of his civil rights were directly and proximately caused by the aforementioned acts and omissions by MEnD's policies, customs, patterns or practices, and MEnD is thereby liable in an amount as yet to be determined.

184.    Punitive damages are available against Defendant MEnD Correctional Care, PLLC, and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 20 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20. *See Woodward v. Correctional Medical Services*, 368 F.3d 917 (7th Cir. 2004); *Revilla v. Glanz*, 8 F. Supp. 3d 1336 (N.D. Okla. 2014).

185.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT SIX

### CIVIL RIGHTS VIOLATIONS
### *Plaintiff v. Supervisory Defendants John Does 1-2*

186.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

27

187.     Severe mental illness, suicidal ideations, and drug withdrawal are serious medical needs.

188.     Defendants John Does 1-2 had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of James, including protecting him from himself, as an inmate at the Jail.

189.     Defendants, as supervisory employees, with callous or reckless indifference to the rights of inmates, failed to properly supervise, instruct and train correctional and medical staff in the recognition of inmates with serious mental-health needs, inmates who are suicidal, and in the prevention of suicide in correctional facilities.

190.     Defendants John Does 1-2, under the color of state law, acted with deliberate indifference to James's life-threatening medical needs and serious risk of suicide during his confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

191.     Defendants John Does 1-2 subjected James to these deprivations of his rights either maliciously or by acting with reckless disregard for whether James's rights would be violated by Defendants John Does 1-2 actions.

192.     James died as a direct and proximate result of Defendants John Does 1-2 acts and omissions, and Plaintiff was thereby damaged in an amount as yet to be determined.

193.     Punitive damages are available against Defendants John Does 1-2 and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

194.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT SEVEN

### CIVIL RIGHTS VIOLATIONS
### *MONELL V. DEP'T OF SOCIAL SERVICES*
### *Plaintiff v. Sherburne County*

195.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

196.    Before November 9, 2017, Sherburne County, with deliberate indifference to the rights of inmates at the Sherburne County Jail, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern or practice on the part of its correctional officers, including Defendants Stang and Wise, of failing to provide for the safety and general well-being of inmates and failing to protect inmates from themselves and/or risks of suicide.

197.    By contracting with Defendants MEnD and Leonard, who were unfit to provide Sherburne County inmates with constitutionally mandated mental-health care, Stearns County itself was deliberately indifferent to the serious medical needs of its inmates.

198.    James's wrongful death and the violation of his civil rights were directly and proximately caused by the aforementioned acts and omissions and the customs, patterns or practices of Sherburne County itself or MEnD, the agent of Sherburne County, and Sherburne County is thereby liable in an amount as yet to be determined.

199.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT EIGHT

### FAILURE TO TRAIN
### *CITY OF CANTON V. HARRIS*
### *Plaintiff v. Sherburne County*

200.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

201.    Sherburne County, with deliberate indifference to inmates at the Sherburne County Jail, failed to properly train correctional and medical staff and failed to adopt, implement or require adherence to appropriate policies to provide timely and appropriate care for inmates with serious mental illness.

202.    Defendant Sherburne County, by such conduct, demonstrated deliberate indifference and a protracted failure to care for the safety of James who had an obvious and serious medical need in the form of a severe mental-health crisis at the Sherburne County Jail.

203.    James's death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by Sherburne County's customs, patterns, and/or practices, and Sherburne County is thereby liable in an amount as yet to be determined.

204.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David W. Lynas, as trustee for the next-of-kin of James C. Lynas, prays for judgment against Defendants as follows:

1.      That this Court find that the Defendants committed acts and omissions constituting violations of the Eighth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count I, a money judgment against Defendants Stang and Wise for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Defendants Pfeifer and Thompson for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendant Todd Leonard, MD for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendant Todd Leonard, MD for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against Defendant MEnD Correctional Care, PLLC for compensatory and punitive damages in an amount to be determined by the

jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

7.    As to Count VI, a money judgment against Defendants John Does 1-2 for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

8.    As to Count VII, a money judgment against Sherburne County for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

9.    As to Count VIII, a money judgment against Sherburne County for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

10.    For an order mandating changes in the policies and procedures of the Sherburne County Jail requiring, among other things, policy/training measures in the recognition of serious mental illness and suicidal ideation in correctional facilities and in the prevention of suicide among inmates in correctional facilities; and

11.    For such other and further relief as this Court may deem just and equitable.

**GASKINS BENNETT & BIRRELL L.L.P.**

Date: 8|7|18

Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
333 South Seventh Street, #3000
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
anoel@gaskinsbennett.com
kbennett@gaskinsbennett.com
*Attorneys for Plaintiff*