# EXHIBIT 4

1

UNITED STATES DISTRICT COURT
STATE OF MINNESOTA
------------------------------------------------------
Case No. 18-cv-2301 (JRT/KMM)

David W. Lynas, as Trustee for the
next-of-kin of James C. Lynas,

                              Plaintiff,

     vs.

Linda S. Stang, et al.,

                              Defendants.
------------------------------------------------------

VIDEO DEPOSITION TRANSCRIPT OF

SHERBURNE COUNTY SHERIFF JOEL L. BROTT


May 24, 2019
9:11 a.m.

at the


Sherburne County Jail
13880 Business Center Drive Northwest
Elk River, MN 55330










Court Reporter:  Janet D. Winberg, RPR

Videographer:  Pat Curto for Envision Video

## 2

1   APPEARANCES:
2      On Behalf of Plaintiff David W. Lynas:
3        Robert Bennett, Attorney at Law
         Kathryn H. Bennett, Attorney at Law
4        Gaskins, Bennett & Birrell, L.L.P.
         333 South Seventh Street
5        Suite 3000
         Minneapolis, MN  55402
6        rbennett@gaskinsbennett.com
         kbennett@gaskinsbennett.com
7
8      On Behalf of the Sherburne County Defendants:
9        Jason M. Hiveley, Attorney at Law
         Iverson Reuvers Condon
10       9321 Ensign Avenue South
         Bloomington, MN 55438
11       jasonh@irc-law.com
12
13
      On Behalf of the MEnD Defendants:
13
        Carolin J. Nearing, Attorney at Law
14       Larson King, LLP
         30 East Seventh Street
15       Suite 2800
         St. Paul, MN 55101
16       cnearing@larsonking.com
17
18
19
20
21
22
23   NOTE: Original transcript will be delivered to the
      noticing party, Gaskins, Bennett & Birrell, L.L.P.
24
25   NOTE: Exhibits 1-8 were marked.

## 3

1             P R O C E E D I N G S
2        (Exhibits 1 & 2 marked.)
3        VIDEOGRAPHER:  This is the video
4   deposition of Sheriff Joel Brott, taken by the
5   Plaintiff in the matter of "Lynas versus Stang,
6   et al.," United States District Court, District
7   of Minnesota, Civil No. 8-2301.
8        We are located at the Sherburne County Jail,
9   13880 Business Center Drive, Elk River,
10   Minnesota.
11       Today's date is May 24, 2019.  The time is
12   9:12 a.m.
13       The court reporter is Janet Winberg, from
14   the firm of Doby Professional Reporters.
15       My name is Pat Curto.  I'm a certified legal
16   video specialist in association with Envision
17   Video.
18       Would counsel please state their appearances
19   for the record.
20       MR. BENNETT:  Robert Bennett, for the
21   Plaintiff.
22       And I just -- either I heard the case number
23   wrong, but it's zero -- it's 018-CV-2301.
24       VIDEOGRAPHER:  Thank you.
25       MS. BENNETT:  Kathryn Bennett, for the

## 4

1   Plaintiff.
2       MS. NEARING:  Carrie Nearing, for the
3   MEnD Defendants.
4       MR. HIVELEY:  Jason Hiveley, for the
5   Sherburne County Defendants.
6       VIDEOGRAPHER:  Thank you.
7       Sheriff, you may remain seated, and the
8   court reporter will swear you in.
9             *  *  *
10   (Witness sworn.)
11           JOEL L. BROTT,
12   called as a witness, being first duly sworn,
13   was examined and testified as follows:
14             *  *  *
15          EXAMINATION
16   BY MR. BENNETT:
17   Q.  Sheriff, would you state your full name for the
18      record, please.
19   **A.  Joel Louis Brott.**
20   Q.  How old are you, sir?
21   **A.  Forty-seven.**
22   Q.  And can you describe briefly your educational
23      background, please.
24   **A.  You bet.  I graduated from St. Cloud Apollo High**
25      **School.  Attended Alexandria Technical College;**

## 5

1   **received an associate of applied science degree**
2   **in law enforcement.  Attended the FBI National**
3   **Academy in 2007.**
4   Q.  Okay.  So you have a two-year degree?
5   **A.  I do.**
6   Q.  Okay.  And the only other postgraduate work is
7      with the FBI National Academy?
8   **A.  That's true.**
9   Q.  How long is that?
10   **A.  A ten-week program.**
11   Q.  Do you get a certificate for that?
12   **A.  Correct.**
13   Q.  And can you describe your work history after
14      your -- you get your law enforcement degree?
15   **A.  Sure.  I started my law enforcement career in a**
16   **small community, Minneota, Minnesota.  I spent**
17   **about a year and a half to two years there.  I**
18   **started out as a police officer.  And after**
19   **about a year, the chief there left, and the city**
20   **council thought it was a good idea to make me**
21   **the chief of police for about a year.  Being**
22   **that it was a small community, I wanted**
23   **something a little bit larger.**
24   **I went to the City of Redwood Falls as a**
25   **police officer.  I spent, I don't know, a year**

## 6

1  and a half, two years there, before coming to
2  Sherburne County in -- it would probably be -- I
3  think it was the fall of 1996 or so.
4      So I've been in Sherburne County for over 20
5  years. I started here as a patrol deputy. I
6  kind of worked my way around the department.
7  School liaison officer. Some time on the
8  emergency response unit. Got promoted to
9  investigator, promoted to investigative
10  sergeant, promoted to investigative captain.
11  Later, appointed by the board of commissioners
12  in 2009 as sheriff. Won my first election in
13  2010, '14 and '18.
14  Q.  And the only thing I, at least, noticed kind of
15  missing from the sheriff's department résumé, is
16  you didn't do anything in corrections. You
17  didn't do any stint in the jail?
18  A.  Correct. No, I never was a correctional
19  officer.
20  Q.  Part of your job is to supervise correctional
21  officers, though, as sheriff: is that true?
22  A.  Yeah. The sheriff, by statute, is responsible
23  for the county jail, correct. Yeah, uh-huh.
24  Q.  Okay. And describe the -- the command and
25  control assignments under you: in other words,

## 7

1  your org chart, for the jail part of it.
2  A.  You bet. And so, kind of, our organizational
3  structure, it -- as it flows downward, the chief
4  deputy is also very involved in jail operations.
5  Q.  And who is that?
6  A.  Don Starry.
7  Q.  Okay.
8  A.  We have jail commander, Patrick Carr. Jail
9  administrator, Brian Frank. Assistant jail
10  administrator, Dave Isais. Two captains: Tom
11  Zerwas, Chris Bloom. And then part of the
12  administration would be Mark Fritel, who is in
13  charge of programs. And then I think we have 13
14  sergeants that are day-to-day operations inside
15  of the jail.
16  Q.  Uh-huh. The -- you understand as sheriff, that
17  the inmates in the jail have a constitutional
18  right to adequate health care?
19  A.  Correct.
20  Q.  And that's a function that is -- or excuse me,
21  is a duty that is the county's duty?
22  A.  It's our responsibility to make sure that they
23  get those services.
24  Q.  And you can't -- do you understand, you cannot
25  delegate that duty to a third party, that that

## 8

1  remains your duty as sheriff?
2      MR. HIVELEY: I'll object. Calls for a
3  legal conclusion.
4      Go ahead and answer, if you know.
5  BY MR. BENNETT:
6  Q.  If you don't -- if that's your understanding,
7  let me know. If it isn't, let me know.
8  A.  We have a shared responsibility, I think, with
9  -- with our partners that -- within the jail
10  facility.
11  Q.  And who are your partners within the jail
12  facility?
13  A.  Currently our -- our contracted partner is MEnD
14  Correctional Care.
15  Q.  Okay. And you're familiar with the term
16  "well-being check"?
17  A.  I am, yes.
18  Q.  What is the ultimate purpose of a well-being
19  check?
20  A.  For correctional officers to -- when they're
21  doing them, whether it's a 15-minute well-being
22  check or a 30-minute well-being check, is for
23  them to look for indications that person is
24  okay, that they're doing well.
25  Q.  All right. They be alive?

## 9

1  A.  Correct.
2  Q.  Breathing?
3  A.  Correct.
4  Q.  And in certain circumstances, able to follow
5  commands and instructions?
6  A.  Yes.
7  Q.  You also have counts; correct?
8  A.  Like head counts?
9  Q.  Yes.
10  A.  Yes.
11  Q.  How often do they occur, do you know?
12  A.  Um, I can't give you the exact time. I think
13  generally at shift change they do head counts.
14  Q.  What's your understanding of the term "special
15  housing"?
16  A.  Special housing is for inmates that need
17  different type of detention, whether it's for
18  poor behavior, max segregation. Whether it's
19  for medical segregation; so, like, TB might be
20  an example. Administrative segregation; so,
21  like, protective custody, where an inmate
22  perhaps feels threatened based on what they've
23  been charged with. We see it oftentimes with
24  individuals that are charged with sex crimes.
25  And so there's a different variety of reasons

10

1     that an inmate would be put in segregation.
2   Q.   Included in there, and among the reasons, would
3     be persons who were at an elevated suicide risk;
4     correct?
5   **A.   Not in our Special Housing Unit. Those**
6     **individuals should be in our booking area.**
7   Q.   They should be -- so if you're on suicide watch,
8     you're actually kept not in special housing?
9   **A.   You should be in booking.**
10   Q.   Okay. And what would -- what would be -- what
11     would that entail in booking, what sort of
12     observation?
13   **A.   Right. And so somebody that -- we don't -- we**
14     **don't call it "suicide watch," but I understand**
15     **that purpose of it. They'd be put in a Kevlar**
16     **gown. They would be put in a cell that is**
17     **camera'd, monitored. There's a feed that goes**
18     **in our sergeant's office, there's a feed that**
19     **goes in our master control. And we would get a**
20     **-- what we would call a "Special Precautions**
21     **Form," that -- from a mental health provider,**
22     **medical provider, indicating things that they**
23     **shouldn't have, such as clothing, such as**
24     **blankets, such as toilet paper. There's a host**
25     **of things on --**

11

1   Q.   Razors?
2   **A.   -- there.**
3     **Anybody on a special -- or a 15-minute**
4     **watch, regardless of where they are located in**
5     **the facility, razors are always eliminated,**
6     **regardless of the reason why they're on that**
7     **watch.**
8   Q.   Okay. And special housing also has 15-minute
9     watch criteria as well for various inmates;
10     correct?
11   **A.   For sure.**
12   Q.   And in this case, David Lynas was under a
13     15-minute watch criteria?
14   **A.   He was.**
15     MS. BENNETT: James.
16 BY MR. BENNETT:
17   Q.   James. David is the father. I apologize.
18     The -- now, we were just back in special
19     housing. Have you been back there recently?
20     When was the last time you were back there,
21     other than ten minutes ago?
22   **A.   Right. It's probably been a few months.**
23   Q.   Okay.
24   **A.   Yep.**
25   Q.   Now, the -- those cells are camera'd?

12

1   **A.   No, they're not. The dayroom is camera'd.**
2     **Where the, kind of, outside area is camera'd.**
3   Q.   Well, you can -- for example, what -- what cell
4     was James Lynas in?
5   **A.   S52, I believe.**
6   Q.   And you can -- the cameras will show, for
7     example, the inmate in the -- in the -- in S52
8     in the bunk?
9   **A.   I don't believe that's the case, no.**
10   Q.   You don't think that's true?
11   **A.   No.**
12   Q.   The cameras will record when well-being checks
13     are made in that area, the -- the non-catwalk
14     area, the main area of the entrance?
15   **A.   Right. So when we were back to these -- you**
16     **know, the series of cells, and then there's this**
17     **kind of small dayroom, and that area does have a**
18     **camera in it, and so that's the area that the**
19     **housing officer -- you saw the -- kind of that**
20     **desk in the hallway, that they can view that**
21     **camera'd area from that location.**
22   Q.   Who -- where does the camera feed go?
23   **A.   The camera feed would go to the special housing**
24     **officer desk, in that hallway. There's also a**
25     **camera feed, it would be in master control, that**

13

1     **-- and then is recorded.**
2   Q.   So there's -- is it monitored as well as
3     recorded?
4   **A.   It's -- it's monitored to the extent that the --**
5     **that the feed is up, yes, and the officers have**
6     **the ability to -- to monitor it from the housing**
7     **desk.**
8   Q.   In other words, it can be seen on the screen?
9     That's what I'm hearing.
10   **A.   Yes, sir. Yes.**
11   Q.   Whether they're looking at it all day, every
12     day, is a different matter?
13   **A.   Yes, sir. They have the ability to do that.**
14   Q.   Okay. And the purpose of having that screen
15     there, is so that a second set of eyes is on
16     that, at least available to be on that, on that
17     screen?
18   **A.   For those -- for those dayrooms, correct.**
19   Q.   Now, the catwalk area, what is the main
20     purpose of that area?
21   **A.   So that is to do watch tours, and to look inside**
22     **of those individual cells when -- when the**
23     **dayroom may not be available. And so the**
24     **housing officer will do, you know, the --**
25   Q.   Can I ask you -- I don't mean -- when you say,

14

```
 1    "when the dayroom may not be available," what do
 2    you mean by that?
 3  A.  Yep.  And so if somebody is getting -- get their
 4    hour out -- so, you know, so certain inmates,
 5    they get time out of that cell, and so if
 6    there's an inmate in that dayroom area, that
 7    inmate is potentially in special housing for bad
 8    behavior and potentially could be assaultive
 9    towards staff, and so they wouldn't go in that
10    dayroom area with that inmate.  They'd use an
11    alternative way to do the watch tour, which
12    would be the catwalk.
13  Q.  Okay.
14  A.  So there's two -- two ways to do the watch tour.
15  Q.  So the person we heard in the cell, it wasn't
16    the cell where James Lynas was.  But if the
17    person we heard, who seemed a little agitated
18    and a little upset with the administration, was
19    out in the dayroom, you wouldn't enter that --
20    the correctional officers wouldn't enter that
21    while that person had their hour out?
22  A.  Right.
23  Q.  Okay.
24  A.  Yes.
25  Q.  Okay.  And it might depend on who was in -- in
```

15

```
 1    those rooms, about whether they entered in the
 2    hour out or not?
 3  A.  No.
 4  Q.  Or is there just straight protocol?
 5  A.  Just straight protocol.
 6  Q.  Okay.
 7  A.  Yep.
 8  Q.  The observation qualities of the catwalk are
 9    limited; correct?
10  A.  It is the oldest part of our facility.  I would
11    agree with you, that they are limited.
12  Q.  And you cannot see all of the interior of the
13    cell through the one-way glass?  It's a mirror
14    on the other side; correct?
15  A.  Correct.  It's more difficult to see it, the
16    wall that you're actually going -- looking
17    through; right?
18  Q.  Uh-huh.
19  A.  Closest to you.  Yep.
20  Q.  And have you reviewed the video of the period,
21    say the hour before and the hour after -- or the
22    hour before James Lynas was discovered?
23  A.  Um, I don't know that I reviewed an entire hour.
24  Q.  Okay.  Thirty minutes?  Forty minutes?
25  A.  Yes.  Back -- back, like the day or two after
```

16

```
 1    the event, but not since then.
 2  Q.  But you'd agree with me, that there was nobody
 3    in their hour out, in the dayroom, during that
 4    period?
 5  A.  Um, I don't know that I can answer that.
 6  Q.  Okay.  If we watched that entire thing, and
 7    there wasn't anybody in the -- just assume that
 8    there's no person -- that the video is meant to
 9    capture people in that -- in the day area for
10    certain; correct?
11  A.  Correct.
12  Q.  And it captures some other things?
13  A.  Uh-huh.
14  Q.  But --
15        (Sotto voce discussion between
16         Mr. Bennett and Ms. Bennett.)
17  BY MR. BENNETT:
18  Q.  Do you have the authority to limit the hours out
19    for the inmates?
20  A.  You mean decide when they do them?
21  Q.  Uh-huh.
22  A.  Yes, of course administration would have the
23    ability to -- to decide when those hours out
24    occur.
25  Q.  If you needed for a safety check or well-being
```

17

```
 1    check, you can order that person back into their
 2    cell; correct?
 3  A.  Sure.  You could order them to lockdown.
 4  Q.  All right.
 5  A.  Yep.
 6  Q.  All right.
 7        (Sotto voce discussion between
 8         Mr. Bennett and Ms. Bennett.)
 9  BY MR. BENNETT:
10  Q.  In the dayroom is -- is there ability to
11    separate, make it essentially two dayrooms?
12    Shut the one door?  In other words, limit the
13    size of the dayroom?
14  A.  Well, we were just back there.  I'm not sure how
15    we would do that.
16  Q.  Isn't there a second -- isn't there a door
17    opposite S2 [sic] on the -- if you -- if you
18    stood in the -- in the doorway of S2, to your
19    right in back, isn't there another door that --
20    that forms -- forms an entry into another
21    dayroom area?
22  A.  I'm having a hard time visualizing what you're
23    speaking of, but...
24  Q.  Well --
25        MR. BENNETT:  Should we mark this one?
```

5 (Pages 14 to 17)

18

```
1        (Sotto voce discussion between
2        Mr. Bennett and Ms. Bennett.)
3        MR. BENNETT:  Yeah, that's it.
4    Would you mark this?
5        (Exhibit 3 marked.)
6    BY MR. BENNETT:
7    Q.   Showing you what's been marked as Exhibit 3, do
8         you see another door?
9    A.   Yes, sir.
10   Q.   What does that -- that door enter into?
11   A.   Well, it's -- it's a dayroom area.  What it
12        doesn't show and -- and what I hesitate to say
13        is, I don't know if there's cells on the other
14        side of this --
15   Q.   That's --
16   A.   -- as well.
17   Q.   That's the cell --
18   A.   I understand.  But I don't know if there's
19        additional cells in this -- in this additional
20        area.
21   Q.   Well, there were -- as we walked down the
22        catwalk, there were additional places to look to
23        the right?
24   A.   Right.  It's just that the photograph doesn't
25        depict that; right?
```

19

```
1    Q.   Okay.
2    A.   I don't want to say something that's inaccurate.
3    Q.   Okay.  But as you -- that catwalk has
4         observation, cell observation places, and I
5         don't know the direction --
6    A.   Keep going down, right.  Yep.
7    Q.   -- that -- that extend down the hallway --
8    A.   Yep.
9    Q.   -- of the catwalk?
10   A.   Yep.  And so there could be somebody in the hour
11        out here, and there could be somebody in an hour
12        out here --
13   Q.   Okay.
14   A.   -- in the two locations.  You can see the camera
15        here, up in the corner --
16   Q.   Yep.
17   A.   -- is kind of what I was referring to earlier.
18   Q.   There's cameras in both dayroom sections?
19   A.   Correct.
20   Q.   All right.  And they can be separated, is what I
21        was trying to get at.
22   A.   Yes, sir.
23   Q.   Okay.
24   A.   Yeah.
25   Q.   And let's -- it's not the world's greatest
```

20

```
1         picture, but...
2         (Exhibit 4 marked.)
3    BY MR. BENNETT:
4    Q.   Exhibit 4 shows the picture of the catwalk?
5    A.   Yes, sir.
6    Q.   And it shows cell observation areas down the
7         length of the hallway of that catwalk?
8    A.   Correct.
9    Q.   All right.
10   A.   Yeah.
11   Q.   Okay.  What did you understand James Lynas'
12        status to be on the date that he died, housing
13        status?
14   A.   Of his watch status?
15   Q.   First of all, housing status.
16   A.   How did he die?
17   Q.   On the day that he died.
18   A.   He hung himself.
19   Q.   I know that.
20   A.   Oh.
21   Q.   What was his housing status?  What was his
22        housing category?
23   A.   So he was put back in special housing for a
24        behavioral issue.
25   Q.   Okay.
```

21

```
1    A.   And so he was on a 15-minute watch that was put
2         on by the MEnD nurse.
3    Q.   Okay.  What was your first experience with Todd
4         Leonard?
5    A.   Um, you mean -- well, he was employed here as
6         the medical provider when I became the sheriff.
7    Q.   At the time of, or before you became the
8         sheriff?
9    A.   Long before I became the sheriff.
10   Q.   Okay.
11   A.   Yep.
12   Q.   So you, sort of, inherited him as a medical
13        provider?
14   A.   True.  Yes.
15   Q.   How much interaction -- and when -- when you
16        first became sheriff, it was 2009?
17   A.   January of '09, yes.
18   Q.   And what sort of interaction did you have with
19        him from '09 to -- through the first term of
20        your being sheriff?  Or first elected term?
21        Let's just use that for...
22   A.   Uh-huh.  Professional relationship here at the
23        jail.  I would communicate occasionally with
24        him.
25   Q.   How often was he here, to your knowledge?
```

6 (Pages 18 to 21)

22

1   A.  I'd have to look at what the contract called
2     for. I don't know how many hours a week he was
3     supposed to be here at that time.
4   Q.  Okay.
5   A.  I don't remember.
6   Q.  And is -- is he someone that you know only in
7     the professional context?
8   A.  Correct, yeah.
9   Q.  You've never done anything socially with him?
10   A.  I've been out to dinner one time with him, years
11     ago.
12   Q.  Okay.
13   A.  Yeah.
14   Q.  Before he was -- before your being sheriff here?
15     I mean, how many --
16   A.  No, no.
17   Q.  Some time after --
18   A.  Yes.
19   Q.  -- you were appointed sheriff?
20   A.  Yes.
21   Q.  Any other -- any other social interactions with
22     him? Professional sports games?
23   A.  No.
24   Q.  Parties? Anything like that?
25   A.  No.

23

1   Q.  So he's not -- he's not a friend of yours?
2   A.  No, he's -- I call him a friend, but he's an
3     acquaintance. He's a professional acquaintance.
4   Q.  Okay. You have not been to his house, he's not
5     been to your house?
6   A.  No, he has not.
7   Q.  Okay. And did he provide medical services,
8     either personally or through his company MEnD,
9     from the time you were sheriff through the
10     present date? Or was there some interruption?
11   A.  There was some interruption. So from -- from
12     whenever he started, until about 2000 -- I'm
13     going to say '14 -- '13 or '14, he was with us.
14     And then he -- he decided that -- at least the
15     reason that he gave me, was just personal
16     reasons. I don't know that he expounded any
17     more, that he decided that he was going to leave
18     Sherburne County. And -- and so he gave his
19     notice, and we hired another company.
20   Q.  He was still at MEnD -- he was at MEnD at that
21     time?
22   A.  Um, I don't know if MEnD was created at that
23     time. I think he was in the process of that
24     being established. Let me back up. I think --
25     I think about the time he left, that was

24

1     starting to evolve, that -- where he was getting
2     other contracts, and where he was -- his own
3     staff, all the clinic staff were under his
4     umbrella, where we were a little bit different
5     at that time.
6   Q.  How so?
7   A.  We had our -- all the staff in our clinic,
8     whether it was RNs, med techs, those types of
9     positions were county employees at that time.
10   Q.  And then by "at that time," you mean when?
11     Until when?
12   A.  Until when? Well, we hired -- after Dr. Leonard
13     had decided to leave, we hired Advanced
14     Correctional Health, ACH, and we had them for
15     about a year, and we discovered that we were not
16     getting the service that we had hoped to get
17     from them.
18   Q.  How did you discover that?
19   A.  Through some auditing. That the inmates weren't
20     receiving timely access to medical care, timely
21     access to mental health care, and -- and I fired
22     them. It happened pretty quickly. I had made a
23     phone call to Dr. Leonard and asked him to come
24     back as the medical provider. Correctional
25     clinic staff are very difficult positions to

25

1     find and hire. He was somebody that was known
2     to me, and so I'd asked him to come back, and he
3     did.
4   Q.  Did -- did you do any sort of due diligence on
5     Dr. Leonard and -- and MEnD?
6     MR. HIVELEY: I'm going to object to the
7     form.
8     Go ahead and answer.
9     THE WITNESS: Do --
10     MR. HIVELEY: You can answer.
11     THE WITNESS: Okay.
12     Well, all of -- all of the staff that we
13     have in the facility, we do background checks
14     on --
15     MR. BENNETT: Okay.
16     THE WITNESS: -- whether they are our
17     employees or MEnD employees.
18   BY MR. BENNETT:
19   Q.  And what does that constitute?
20   A.  We do a criminal history check.
21   Q.  So MNCIS?
22   A.  Yes.
23   Q.  And other databases for criminal activity?
24   A.  There are. We look at -- you know, we ask them,
25     you know, where they might have had law

26

1  enforcement contact. Where they've lived for
2  the previous five years. We would check with
3  those law enforcement agencies to see what kind
4  of law enforcement contact that they might have
5  had. We have -- we have assigned people that
6  just do background investigations, so we try to
7  be pretty thorough, whether it's a clinic staff,
8  our own staff, kitchen staff, so we kind of go
9  through that process.
10 Q.  Did you do that with Dr. Leonard?
11 A.  You know, I don't think that we ever did with
12 Dr. Leonard. I don't recall doing that with
13 Dr. Leonard.
14 Q.  Okay. Do you remember doing any sort of due
15 diligence on Dr. Leonard, at the time you --
16 A.  Not -- not when he came back. But I wasn't part
17 of the process when he initially received the
18 contract under Sheriff Anderson. I would assume
19 that there was, but I can't -- I can't speak to
20 it today.
21 Q.  Uh-huh. Did you discover anything -- any
22 discipline or -- or any problematic behavior in
23 the -- in his records with the Minnesota Board
24 of Medical Practice?
25 A.  Uh-huh. So that was during the time that I was

27

1  the sheriff, that that information came to
2  light, I think it was in a Star & Tribune
3  article. I don't recall the year. You might be
4  able to refresh my memory. And I don't believe
5  it was during the time that he was employed
6  here. And I think he was employed after that
7  fact. I know that I talked to county
8  administration about that at the time, and which
9  was County Administrator Brian Benson at the
10 time. And I reached out to some other sheriffs
11 at the time; one that was a Stearns sheriff at
12 the time, asking if he had any questions or
13 concerns. We hadn't seen any concerns here with
14 Dr. Leonard. The other sheriff verified they
15 hadn't had other concerns -- they didn't have
16 other concerns either, so we decided to maintain
17 his employment here, but we did -- we did look
18 at it and talk about it.
19 Q.  Uh-huh. Did you look at the docket in the
20 United States District Court for the District of
21 Minnesota --
22 A.  No.
23 Q.  -- with regard to lawsuits regarding him and/or
24 MEnD?
25 A.  No, sir, I haven't.

28

1  Q.  Okay. Did you determine what problems he had
2  evidenced with the Minnesota Board of Medical
3  Practice?
4  A.  So this is going back a long time. I think it
5  had to do with prescribing medication, is what
6  my -- what my memory tells me.
7  Q.  Uh-huh. Is that the only thing that was noted,
8  or do you remember anything else?
9  A.  I don't remember anything else.
10 Q.  Do you remember anything with regard to
11 recordkeeping? Medical documentation?
12 A.  Related to?
13 Q.  His -- any deficits in that area from
14 Dr. Leonard?
15 A.  In -- in -- in what regard, I guess? I'm not --
16 Q.  In relationship to his disciplinary history with
17 the Minnesota Board of Medical Practice?
18 A.  I'm not aware of that.
19 Q.  So your initial contract with MEnD was sort of a
20 stopgap contract? It related to --
21     MR. BENNETT: And maybe we ought to mark
22 that.
23     (To Ms. Bennett) Is that marked? And this
24 would go the other way.
25 BY MR. BENNETT:

29

1  Q.  It related to the legitimacy of need after
2  firing ACH?
3  A.  Right.
4     (Exhibit 5 marked.)
5  BY MR. BENNETT:
6  Q.  Now, Exhibit 5 is a -- do you recognize that?
7  A.  I do, yes.
8     MR. BENNETT: (To Ms. Bennett) Can you
9  give me that folder?
10     MS. BENNETT: (Passing folder.)
11 BY MR. BENNETT:
12 Q.  That's the April 21, '14 contract?
13 A.  This is April -- oh, let me see here. This --
14 the first part is the April 17th. The second,
15 the amendment, is the 21st.
16 Q.  Okay. And the amendment is in writing and
17 signed by both parties in accordance with the
18 contractual terms; correct?
19 A.  Yes, sir.
20 Q.  Who drafted the -- the initial agreement?
21 A.  It would have been our general counsel for the
22 sheriff's office, Greg Wiley.
23 Q.  Is he a county employee, Mr. Wiley?
24 A.  He was at the time.
25 Q.  Okay. Is he a county employee now?

30

1  A.  He's a contracted employee.  He's -- he used to
2  be full time for the sheriff's office.  Now he's
3  half sheriff's office, half county
4  administration, so there's two separate contacts
5  -- contracts with him right now.
6  Q.  Okay.  But he is not under the county attorney,
7  per se?
8  A.  No, he's not.  No.
9  Q.  He's under your jurisdiction?
10  A.  Correct.  Yes.
11  Q.  And his contract now separates into two phases,
12  and they are both under your jurisdiction?
13  A.  No, sir.
14  Q.  Okay.  I'm misunderstanding then.  I apologize.
15  A.  I probably didn't explain it well.
16     So right now he falls under our
17  jurisdiction, you know, when we're dealing with
18  contracts, when we're dealing with labor issues.
19  He -- the contract with the county
20  administration is -- I can speak in general
21  terms --
22  Q.  Okay.
23  A.  -- I don't know what all he does for them, but a
24  lot of it has to do with labor negotiations.
25  But we still all fall underneath the umbrella of

31

1  the county attorney and coordinate and
2  collaborate closely with her, and generally they
3  review all the contracts as well that we -- that
4  we sign --
5  Q.  All right.
6  A.  -- if that makes sense.
7  Q.  Now, in the -- what number exhibit -- what
8  exhibit number is that?
9  A.  Number 5 here.
10  Q.  Exhibit 5, if you turn to page 3,
11  paragraph 1.11, it says (as read), "MEnD will
12  supply an on-site mental health specialist
13  (non-prescribing) for inmate/detainee care for
14  three days a week, who can perform on-site
15  mental health assessments."  Who was that, that
16  he provided --
17  A.  Um --
18  Q.  -- during that period?
19  A.  I don't -- I don't recall the name of the
20  individual that was here back then.
21  Q.  Do you know their qualifications?
22  A.  "Mental health specialist" is, I think, the term
23  that we used in the contract --
24  Q.  And --
25  A.  -- but I wouldn't know their specific

32

1  qualifications.
2  Q.  And you don't know who that was?
3  A.  I don't remember the name of the person, no,
4  sir.
5  Q.  And then it says (as read), "MEnD will refer
6  inmate/detainees to on-site crisis intervention
7  services when indicated"; correct?
8  A.  That's what the language says, yes.
9  Q.  What is "on-site crisis intervention," as far as
10  you know?
11  A.  Well, at that time we -- we still employed our
12  own staff in the clinic, and so they would make
13  those referrals out to -- to the community and
14  to the medical provider at times.
15  Q.  And what were their qualifications from -- what
16  sort of crisis -- well, what were their
17  qualifications?
18  A.  Sure.  So they're RNs.
19  Q.  All right.
20  A.  Uh-huh.
21  Q.  Any of them have any specialization in mental
22  health?
23  A.  I can't speak to that.  I wouldn't know that
24  back then.
25  Q.  "On-site crises."  What kind of crises are you

33

1  talking about?  Mental health?  Physical health?
2  Both?
3  A.  Right.  So they would deal with -- they would
4  deal with issues that are inmate issues, and
5  they would -- they would take care of what
6  needed to be taken care of, and provide the care
7  that needed to -- to happen, and then refer them
8  out if -- if they couldn't handle that in our
9  clinic setting.
10  Q.  Well, what constituted a, quote, "crisis," end
11  quote?
12  A.  Well, I -- I would think somebody that was
13  suffering from a medical condition.  Let's say,
14  chest pains would be, perhaps, a crisis.
15  Q.  Okay.
16  A.  And they would refer them out then to, you know,
17  the hospital.  And they would -- they have a
18  higher level of training then our correctional
19  officers and a better way of triaging those
20  things and making determinations where they
21  should go.
22  Q.  Did "crisis" also include mental health crisis?
23  A.  For sure.
24  Q.  It says there the (as read), "MEnD's medical
25  team will coordinate with the mental health and

Doby Professional Reporting, Inc.
952-943-1587

## 34

1      substance abuse services in the facility."
2  **A.  Uh-huh.**
3  Q.  What was the -- what did the facility provide in
4     terms of mental health and substance abuse
5     services?
6  **A.  Um, I'm trying to think of the name of the**
7     **substance abuse services that we had at the**
8     **time.**
9  Q.  How about mental health, too?
10  **A.  Well, under this contract, we had the mental**
11     **health specialist come in.  And then we had a**
12     **contract -- I think it was still in place at**
13     **this time, I'd have to double-check, with**
14     **Central Minnesota Mental Health Center; we did**
15     **for years.  But that's what it would mean to me.**
16  Q.  Nowhere in this contract is Central -- say it
17     again.
18  **A.  Central Minnesota Mental Health Center.**
19  Q.  Yeah, they're not mentioned in this contract?
20  **A.  They are not, no, sir.**
21  Q.  The word "Constitution" or "constitutional"
22     isn't mentioned in this contract either, is it?
23  **A.  I don't think so.**
24  Q.  Okay.  It says that they will (as read), "Use an
25     integrated and multidisciplinary team to develop

## 35

1     treatment plans for inmates and detainees
2     displaying manipulative behavior."  What did
3     that mean?
4  **A.  Well, it would be coordination between clinic**
5     **staff, which happened to be county staff at that**
6     **time; and our medical provider.  And to me, it**
7     **means that they -- they come up with a treatment**
8     **plan of sorts.**
9  Q.  "For inmates/detainees displaying manipulative
10     behavior."  I don't understand what that means.
11     Are you talking about sick inmates, or inmates
12     who are just manipulative?  Or -- those are
13     different categories, it seems to me, aren't
14     they?
15  **A.  We oftentimes have inmates that, I guess,**
16     **display manipulative behavior, whether it's, you**
17     **know, to -- to get out of the jail for the day,**
18     **to go to the hospital, to go to the clinic, a**
19     **change of scenery.  And we see all kinds of**
20     **things within a correctional facility.**
21  Q.  But you've been a sheriff for about a decade
22     now, correct, or a little more than a decade;
23     right?
24  **A.  Correct.**
25  Q.  And you'd agree with me, that the jails are --

## 36

1     have a high percentage of people,
2     inmates/detainees, with severe and persistent
3     mental illness?
4  **A.  I would agree with you, that mental health in**
5     **correctional facilities is an issue for -- for**
6     **all jails, yes, sir.**
7  Q.  And then, unfortunately, in the last decade
8     we've had -- in addition to the mental health
9     aspect of the inmate/detainee population, you
10     have a situation where many of the
11     inmates/detainees arrive at your facility in a
12     -- in a condition either ripe for or evidencing
13     opioid withdrawal behavior?
14  **A.  That's true, they do come to us like that.**
15  Q.  And those inmates are at particular risk for
16     self-harm, aren't they?
17  **A.  I don't know that I -- I'm not a mental health**
18     **specialist.  I don't know that I could answer**
19     **that.**
20  Q.  Well, isn't that generally regarded as such in
21     the correctional community?
22  **A.  That somebody that's withdrawing from opioids is**
23     **at a higher risk of suicide?**
24  Q.  Uh-huh.
25  **A.  I can't answer that.  I haven't seen any data to**

## 37

1     **support that.**
2  Q.  Okay.  This agreement was meant to be
3     short-term, Exhibit 5?
4  **A.  Well, we were -- we were in a transition period**
5     **when -- when Dr. Leonard came back.  I had made**
6     **a decision that -- that I didn't think that it**
7     **was appropriate for jail administration to**
8     **oversee medical personnel.  Whether that's**
9     **dealing with medical problems or mental health**
10     **problems, direct oversight.  And so there was a**
11     **desire that MEnD would take control of those**
12     **responsibilities in regards to them being their**
13     **employees.  It's highlighted, I think, on**
14     **page 5, where we talk about kind of this**
15     **transition, on 1.17.2 Nursing and Support Staff,**
16     **and make a note, "if approved by the County**
17     **Board of Commissioners."  So we were in this**
18     **transitionary period of restructuring and making**
19     **the mental health professionals and the medical**
20     **professionals under the direct supervision of**
21     **the medical provider, who had a higher level of**
22     **education, expertise, to provide a better**
23     **quality of care and access to care for medical**
24     **and mental health situations.  So we were doing**
25     **this to improve our facility.**

Doby Professional Reporting, Inc.
952-943-1587

### 38

1  Q.  Well, before, historically, prior to the advent
2  of private correctional mental health -- or
3  medical providers, the counties typically
4  provided both medical and mental health services
5  at the jails, isn't that true?
6  **A.  Probably true.  In my opinion, probably a bad**
7  **idea.  That's why we made the change.**
8  Q.  Well, whether it's a bad idea or good idea, at
9  least constitutionally it's required of the --
10  of the county?
11  **A.  To provide treatment; correct?  Yep.**
12  Q.  And in fact, as far as I can tell, the only
13  constitutionally guaranteed health care in the
14  United States is in correctional institutions;
15  would you agree?
16  **A.  You're probably right, yeah.  I don't know.**
17  Q.  The -- I mean, Sherburne County had mental
18  health providers of its own, didn't it, at some
19  point?
20  **A.  No.  We -- we never had anybody that was a**
21  **mental health provider.  We contracted those**
22  **services out.  Like --**
23  Q.  To?
24  **A.  Like Central Minnesota Mental Health Center.**
25  Q.  But they were -- they had actual psychiatrists

### 39

1  and psychologists?
2  **A.  I don't know what the level of training or**
3  **education those people had that were coming**
4  **here.**
5  Q.  If you contracted with them, wouldn't it be
6  incumbent upon you to know what their
7  qualifications were?
8  **A.  Yes.  And -- and I'm sure jail administration**
9  **had a much better handle on it than I did.**
10  Q.  Okay.  But traditionally, mental health services
11  are provided by psychiatrists and psychologists;
12  correct?
13  **A.  Um --**
14      MS. NEARING:  I'll object.  Lacking in
15  foundation.
16  BY MR. BENNETT:
17  Q.  You can answer.
18  **A.  I think -- my understanding is psychiatrists**
19  **prescribe medication.  And there's a whole host**
20  **of individuals that can provide mental health**
21  **services, depending on the level of training.**
22  **I -- I don't know what -- what levels all of**
23  **those are, and what requirements to meet that**
24  **standard is.**
25  Q.  Well, do you know if Central Minnesota Mental

### 40

1  Health Services had on-staff psychiatrists?
2  **A.  I would assume so.**
3  Q.  How about on-staff psychologists?
4  **A.  I'm guessing.**
5  Q.  How about on-staff other mental health --
6  qualified mental health providers under the
7  statute?
8  **A.  I -- I'd be guessing.  I mean, you're asking me**
9  **to answer a question that's going back way in**
10  **time, and who had what qualifications back then.**
11  **I just can't -- it's impossible for me to**
12  **accurately answer that question.**
13  Q.  Well, to provide adequate mental health care to
14  the inmates, you'd have to send -- they'd have
15  to be seen by qualified mental health
16  professionals; correct?  Doesn't that stand to
17  reason?
18  **A.  True, but I don't believe that means**
19  **psychiatrists or psychologists.**
20  Q.  It can mean psychiatrists and --
21  **A.  It can be, but doesn't need to be.**
22  Q.  It's not an exhaustive list?
23  **A.  Correct.**
24  Q.  I agree.  But you realize that psychiatrists are
25  medical doctors, and they prescribe medicines?

### 41

1  **A.  Correct.**
2  Q.  And you have to have a prescribing medical
3  doctor or someone under that doctor to prescribe
4  medical -- psychotropic medications for the
5  mentally ill?  I mean, is that -- is that your
6  general understanding?
7  **A.  Yes.**
8  Q.  Okay.  So you can't have an RN, just a regular
9  RN prescribe medications?
10  **A.  Correct.**
11  Q.  Okay.  And even if it's -- even if it's someone
12  who isn't a psychiatrist, they have to do it
13  under the auspices of a medical doctor to
14  prescribe medications?
15  **A.  Yes.**
16  Q.  All right.  Showing you Exhibit 1, can you tell
17  me what that is?
18  **A.  Yeah, so -- so this is where these contracts**
19  **start to kind of tie together.  So -- and maybe**
20  **it goes to -- can I look at Exhibit 2 here?**
21  Q.  Sure.
22  **A.  Okay.**
23  Q.  That goes with -- Exhibit 2 and Exhibit 1 go
24  together; correct?
25  **A.  Correct, yeah.  And so we're in this**

42

1 transitionary period between Exhibit 5 and
2 Exhibit 2. And Exhibit 1 is the request for
3 board action for --
4 Q. On Exhibit 2; correct?
5 A. Correct. For a restructuring, basically
6 eliminating the clinic staff under the direction
7 of Sherburne County. No longer county staff.
8 That -- that they would either be absorbed by
9 MEnD, or -- or they wouldn't be employees.
10 Q. It doesn't say that in the contract, does it,
11 Exhibit 2?
12 A. It doesn't say what?
13 Q. It doesn't say that the -- that MEnD will absorb
14 the county staff?
15 A. Um, well --
16 Q. In Exhibit 2?
17 A. Well, I thought we reference it in Exhibit 5,
18 though, don't we? I think -- so again, I think
19 if we go back to that 1.17.2, you know, we
20 talked about this interim period of nursing
21 service and support staff be provided by the
22 county, and eventually transferred if approved
23 by the county board of commissioners.
24 Q. Okay.
25 A. So --

43

1 Q. So then you signed a different contract that
2 supersedes that contract; right?
3 A. Right. And this language does not then exist in
4 Exhibit 2, because that transition took place.
5 Q. Okay. Exhibit 2 indicates, for example -- let's
6 just -- let's kind of start with the beginning
7 of it.
8 The recital says (as read), "The county
9 desires to provide professional and responsive
10 healthcare services to the inmates/detainees."
11 Correct?
12 A. Where am I at here? Okay, yes.
13 Q. I take it, it was also the understanding you had
14 to do the level of care that's required by the
15 United States Constitution and the case law
16 surrounding it; correct?
17 A. Correct, yeah.
18 Q. Okay. Now, you talk about off-site services and
19 specialty services, and they're both defined on
20 page 2 of the contract; correct?
21 MR. HIVELEY: You're in Exhibit 2 now?
22 MR. BENNETT: Yep.
23 THE WITNESS: Yes, sir.
24 BY MR. BENNETT:
25 Q. And specialty services also calls for mental

44

1 health; right?
2 A. Yes.
3 Q. So who did you refer -- who -- who was the
4 mental health specialty service that you used?
5 A. Um, well, I think -- I think that probably would
6 be a question for -- for MEnD. I don't know
7 that we had one -- one location where we would
8 send people out, whether it would be to
9 different -- different clinics or different
10 hospitals. You know, sometimes it would be an
11 emergency transfer out, so I --
12 Q. But "Specialty Services" is defined as (as
13 read), "Medical services that require a
14 physician to be board certified in his
15 specialty, including, but not limited to
16 dermatology, gynecology, and mental health";
17 correct?
18 A. Correct.
19 Q. Do you know what "board certification" means?
20 A. Uh-huh.
21 Q. What does it mean to you?
22 A. Licensed.
23 Q. Well, -- doesn't that mean board certified by
24 the particular specialty? "Board certified"
25 means certified by the Board of Gynecology, the

45

1 Board of Psychiatry and Neurology, the Board of
2 Dermatology.
3 A. Okay.
4 MR. HIVELEY: Object to form.
5 Foundation.
6 Answer if you know.
7 THE WITNESS: Okay.
8 BY MR. BENNETT:
9 Q. Well, I -- who's negotiating this contract with
10 MEnD? You, right, and your lawyer?
11 A. Correct, yes.
12 Q. So I'm assuming you know what the contract
13 means. Am I right?
14 A. Yes.
15 Q. Okay. Now, it says, if you look at 1.12.
16 A. What page are you on, sir? Four?
17 Q. Four, yeah. It says that (as read), "MEnD will
18 supply an on-site mental health specialist
19 (non-prescribing)" -- so it's not a doctor;
20 right?
21 A. Right.
22 Q. -- "for inmate/detainee care three days a week,
23 who can perform on-site mental health
24 assessments." And "assessments" are essentially
25 a diagnostic assessment?

12 (Pages 42 to 45)

46

1   A.   Yes.
2   Q.   So you find out is the person, you know,
3       suffering anxiety, is the person having a major
4       depressive disorder, is the person
5       schizophrenic; that sort of --
6   A.   Yes.
7   Q.   -- thing?  All right.  And it then says (as
8       read), "MEnD will refer inmates/detainees to the
9       on-site crisis intervention services when
10      indicated."  Now, who -- at the time of this
11      contract, who's the on-site crisis intervention
12      service?
13  A.   MEnD.
14  Q.   Well, the crisis intervention -- read the next
15      sentence.
16  A.   Where are you at, sir?
17  Q.   After -- it says (as read), "The crisis
18      intervention services will be provided by the
19      facility staff."
20  A.   Uh-huh.  Yes, sir.
21  Q.   It says that; right?
22  A.   It does say that.
23  Q.   So at least under this contract, under the
24      written terms of this contract, Sherburne County
25      is going to provide the crisis intervention

47

1       services?
2   A.   I believe, my opinion, that that had changed
3       when we went to this contract, and that should
4       say "MEnD," or it should have been eliminated
5       completely.
6   Q.   But it wasn't?
7   A.   You're right, it wasn't --
8   Q.   And --
9   A.   -- unfortunately.
10  Q.   -- there was no written amendment, like there
11      was on Exhibit 5?
12  A.   Correct.  This is similar language that was seen
13      in the ACH contract and was used as a template.
14      You're correct, it should have been.
15  Q.   So is this a mistake of fact?
16  A.   Yes, it was a mistake.
17  Q.   And is it a mistake of fact on MEnD's part?  I
18      mean, it's written and signed by both parties.
19      It says this -- this isn't -- this isn't
20      unclear, is it?  "The crisis intervention
21      services will be provided by the FACILITY," in
22      caps, "staff"?
23          MS. NEARING:  Objection.  Foundation, if
24      you're answering the first part of the question,
25      "mistake on the part of MEnD."

48

1          THE WITNESS:  I can't -- I can't speak
2       to MEnD.  I can speak to what our practice is,
3       and what we currently are doing since the
4       signing of this contract, and that's their role.
5   BY MR. BENNETT:
6   Q.   So you -- you contend that's MEnD's role, and
7       not the Sherburne County's role?
8   A.   Correct.
9   Q.   Under the terms of this contract?
10  A.   With the explanation of that sentence, correct.
11  Q.   Well, contracts usually don't need outside
12      explanation.  That's the point.
13          The other thing it says, is the -- look at
14      the next sentence.  (As read), "MEnD will
15      provide the management of psychotropic
16      medication in conjunction with the
17      inmate/detainee's ordering provider."  What does
18      that mean?
19  A.   Well, in conjunction with the ordering provider.
20  Q.   Yeah.  Who is that?
21  A.   So the provider would be Dr. Leonard, or the
22      person that they refer the inmate or detainee
23      to.
24  Q.   Well, it says the inmate or detainee's, and
25      that's a possessive, inmate "ordering provider";

49

1       correct?
2   A.   Uh-huh.
3   Q.   It's a matter of accepted fact for you, isn't
4       it, that most of the inmates are not insured?
5          MR. HIVELEY:  I'll object.  Calls for
6       speculation.
7   BY MR. BENNETT:
8   Q.   Well, they -- they don't have their own ordering
9       provider, do they?
10         MR. HIVELEY:  Objection.  Object to
11      form.
12         THE WITNESS:  I can't give you a
13      percentage, but there's a good number of inmates
14      or detainees that come here with already
15      prescribed medications.
16         MR. BENNETT:  Okay.
17  BY MR. BENNETT:
18  Q.   And what do you do with them?  Continue it, or
19      take it away?
20  A.   Well, that's the assessment of the provider, not
21      me.  I mean --
22  Q.   Which -- which provider?
23  A.   The clinic provider.  MEnD provider.
24  Q.   You're talking about MEnD, not the prescribing
25      doctor?

13 (Pages 46 to 49)

## 50

1   A.   **They -- they coordinate those efforts.**
2   Q.   Okay. But many of the inmate/detainees don't
3   have their own doctor? Would you agree with me?
4   A.   **I would --**
5       MR. HIVELEY: Objection. Calls for
6   speculation. Lack of foundation. And asked and
7   answered.
8      Go ahead and answer, if you can.
9      THE WITNESS: Okay. I would agree with
10   you, that there's a percentage of
11   inmates/detainees that don't come with a doctor.
12   BY MR. BENNETT:
13   Q.   And in fact, that's another health challenge in
14   the correctional industry, that they -- you get
15   a bunch of -- you get a high percentage of
16   inmates with systemic untreated diseases?
17   A.   **That's true, yeah.**
18   Q.   And they're systemic untreated diseases because
19   the people don't go to doctors, or have doctors,
20   or have insurance; correct?
21   A.   **True.**
22   Q.   And in fact, you have inmates that come with
23   mental health problems that are self-medicating
24   with anything from, say, marijuana to heroin, to
25   methamphetamine, to any other op- -- many other

## 51

1   opioids; is that true?
2   A.   **I would say that's true.**
3   Q.   And you don't let them self-medicate when
4   they --
5   A.   **No, sir.**
6   Q.   -- come to this facility?
7   A.   **No, sir.**
8   Q.   And I understand that.
9   A.   **Yeah.**
10   Q.   But that causes another problem, and that is the
11   withdrawal?
12   A.   **Uh-huh.**
13   Q.   Yes?
14   A.   **Yes.**
15   Q.   I'm not trying to --
16   A.   **No, I -- I'm not -- I forget I'm being recorded.**
17     **I'll say "yes" instead of nod.**
18   Q.   And then it says (as read), "MEnD's medical team
19   will coordinate with the mental health and
20   substance abuse services at the facility."
21   A.   **Uh-huh.**
22   Q.   Who, at the time of the execution of Exhibit 5,
23   was the mental health and substance abuse
24   services -- at the time that Exhibit 2 was
25   signed, who was the mental health and substance

## 52

1   abuse services at the facility?
2   A.   **Uh-huh. So under this contract, we had a mental**
3   **health specialist for the 24 hours a week. And**
4   **then, you know, what other services they**
5   **coordinated with in the community. I could find**
6   **it for you in two seconds if I went to my**
7   **office. I just don't remember the name of the**
8   **substance abuse company that had come in here on**
9   **a day-to-day basis that also helped provide care**
10   **for the inmates. I just don't remember.**
11   Q.   Were they prescribers as well?
12   A.   **No, certainly not.**
13   Q.   These were chemical dependency counselors?
14   A.   **Correct. Yes.**
15   Q.   All right. It says there that (as read), "MEnD
16   will not be responsible for the cost of mental"
17   -- on Exhibit 2, again the same paragraph, 1.12,
18   the second-to-the-last sentence, "MEnD will not
19   be responsible for the cost of mental health
20   medications or services prescribed or provided
21   by non-MEnD employees." Do you see that?
22   A.   **Yes, sir.**
23   Q.   It said (as read), "MEnD will also be
24   responsible for providing urgent mental health
25   tele-medicine services of inmates and detainees

## 53

1   as appropriate."
2      Now, that's -- that's one -- as I see this
3   paragraph, MEnD has to do two things: It has to
4   supply an on-site mental health specialist for
5   three days a week to perform mental health
6   assessments, and it has to provide urgent mental
7   health tele-medicine services. And then there's
8   some coordination work with on-site facility
9   staff and substance -- mental health substance
10   abuse counselors. Is that different than your
11   understanding of this paragraph?
12   A.   **It is.**
13   Q.   Okay. So where do you -- what language does --
14   supports your understanding of the paragraph?
15   A.   **It's -- it's taking what I know of the whole**
16   **situation, and putting the whole situation in**
17   **context. And as we went through the process of**
18   **getting rid of ACH and signing the first**
19   **contract with Dr. Leonard, the amendment with**
20   **Dr. Leonard, going to the county board and**
21   **transitioning those staff away from being county**
22   **employees, and under the umbrella of MEnD, you**
23   **know, the -- the one sentence that you referred**
24   **to, I don't think is in a vacuum. It's -- I'm**
25   **putting it all in context, because we were here,**

54

1　　we lived it, and the purpose and the intent of
2　　what we were doing.
3　Q.　Article 5, paragraph -- page 11 of the agreement
4　　has a number of terms and conditions --
5　A.　Five.
6　Q.　-- correct?
7　A.　You're at Exhibit 5, sir?
8　Q.　Exhibit -- Exhibit 2.
9　A.　Exhibit 2.
10　Q.　Article 5.
11　A.　Article 5.
12　Q.　Page 11.
13　A.　Okay.
14　Q.　5.0 says, "Amendments." (As read) "This
15　　agreement may be amended at any time only by the
16　　written consent of both parties." Do you see
17　　that?
18　A.　I do.
19　Q.　Do you understand what that means?
20　A.　I do.
21　Q.　It means you got -- you have to use a written
22　　amendment procedure like you used on the prior
23　　contract --
24　A.　Uh-huh.
25　Q.　-- correct, with MEnD?

55

1　A.　Yes.
2　Q.　And as far as I have been able to determine, in
3　　requests from both MEnD and from you, there is
4　　no amendment to this contract?
5　A.　Correct.
6　Q.　Then 5.4 says -- is entitled, "Effect on Prior
7　　Agreements." It says (as read), "This agreement
8　　will supersede and take precedence over prior
9　　agreements, including the April twenty -- the
10　　April 17, 2014 agreement and the April 21, 2014
11　　agreement." Is that right?
12　A.　Yes.
13　Q.　So those other agreements fall away in relation
14　　to the language of this agreement, Exhibit 2?
15　A.　Yes.
16　Q.　And the next paragraph says, paragraph 5.5 says
17　　(as read), "This agreement constitutes the
18　　entire agreement of the parties and is intended
19　　as a complete and extensive statement of the
20　　promises, representations, negotiations,
21　　discussions, and agreements that have been made
22　　in connection with the subject matter hereof."
23　　The subject matter of the contract --
24　A.　Uh-huh.
25　Q.　-- correct?

56

1　A.　Correct.
2　Q.　But if I understand correctly, you're telling me
3　　that this contract is wrong in terms of the
4　　practice, and the promises made by MEnD to you;
5　　is that right?
6　A.　Correct. Our agreement, how we provide
7　　services -- honestly, not aware of the language
8　　error until we started reviewing this case. So
9　　it had been in place a long time.
10　　And I understand what you're saying about
11　　5.0. And we perhaps should -- should be more
12　　attentive and do a better job, but we've amended
13　　the contract, I guess, in a gentleman agreement
14　　way. We've -- we've increased the mental health
15　　services over the years from 24 hours a day, I
16　　think it went to 32. It went to --
17　Q.　Twenty-four hours a week?
18　A.　I'm sorry, yes. A week. To now 40 hours a
19　　week. And -- and I don't remember the last time
20　　we increased it, so we're over 40 hours a week
21　　now. And so, you know, we don't -- we haven't
22　　signed a quick amendment for each alteration
23　　either.
24　Q.　But you make additions to the payments to MEnD
25　　accordingly?

57

1　A.　Correct, yeah. We track the hours and we make
2　　the additional payments, yes.
3　Q.　Have you talked to -- when this was discovered,
4　　did you talk to Dr. Leonard?
5　A.　No.
6　Q.　Because this was news to you, when I pointed it
7　　out to your counsel --
8　A.　Yes.
9　Q.　-- and it became -- this is -- this contractual
10　　anomaly, if you will, is something you learned
11　　in the last 30 days or so?
12　A.　Yeah. It's not our practice, yeah.
13　Q.　Okay. When you presented it to the board, how
14　　did you explain it?
15　A.　The contract?
16　Q.　Yeah.
17　A.　Um, I don't know. I mean --
18　Q.　Is that on tape?
19　A.　No, it's not. We don't record -- it will be
20　　here shortly, but we never recorded anything
21　　back then. I'm sure I went through the issues
22　　that we were having, and the reasons for why we
23　　wanted to make the change. You know, any time
24　　that there's a potential for a county staff
25　　layoff. We had no control, whether or not MEnD

15 (Pages 54 to 57)

## 58

1 would absorb them all. I don't remember if they
2 did or didn't, but you know --
3 Q. Did you actually lay the people off?
4 A. Yeah, that was the intent; that if MEnD didn't
5 absorb them, then they would not be employees.
6 That's what the restructuring was about, the
7 workforce adjustment.
8 Q. Exhibit 1 says (as read), "The proposed contract
9 with MEnD Correctional Care has been reviewed by
10 County Attorney Kathleen Heaney" --
11 A. Uh-huh.
12 Q. I hope I'm saying that right.
13 A. You are, yes.
14 Q. -- "Sheriff" -- you?
15 A. Yeah.
16 Q. -- and "Sheriff Legal Counsel Greg Wiley, and
17 County Administrator Steve Taylor."
18 A. Yeah. We all missed it.
19 Q. And this workforce adjustment, is that what
20 you're talking about, the layoff?
21 A. Yes, sir. Yeah. That they were not going to be
22 county employees.
23 Q. Did you make a side deal with MEnD, that they
24 would hire those people, though?
25 A. No, absolutely not.

## 59

1 Q. Were they hired?
2 A. I know some of them were. I can't tell you how
3 many were and were not.
4 Q. Do you remember anybody who wasn't?
5 A. No. But I don't think everybody was absorbed.
6 I think maybe some got other jobs. They may
7 have chose not to. But Dr. Leonard could tell
8 you. But I don't think they were all taken
9 on --
10 Q. All right.
11 A. -- if my memory serves me right.
12 I can tell you, that the director of nursing
13 at the time was replaced by his director of
14 nursing, so that's one thing that sticks in my
15 mind.
16 Q. Who -- who was the director of nursing that was
17 replaced?
18 A. Her name was Jen Thompson at the time, but she
19 -- she was, I believe, absorbed, but not the
20 director of nursing.
21 Q. She became some other -- because she's -- she's
22 in the records.
23 A. Yeah, she's -- I think she's still with us -- or
24 with MEnD, yeah.
25 Q. But she was a prior director of nursing and got,

## 60

1 essentially, demoted?
2 A. Well, Dr. Leonard set up that structure as to
3 who he wanted where. Demoted would be -- I
4 would demote her, but she wasn't my employee to
5 demote.
6 Q. But it's -- it's a lesser title and duties and
7 responsibilities, if you go from director of
8 nursing --
9 A. Yes.
10 Q. -- to something under that, like nurse?
11 A. Yes, sir.
12 Q. But you understood when you did this contract,
13 that it didn't absolve you from your
14 constitutional duties?
15 A. Yes.
16 Q. So do you have to be watchful and mindful that
17 MEnD, then, is meeting your constitutional
18 duties?
19 A. Yes.
20 Q. How do you do that?
21 A. Well, we do it in a number of ways. We have
22 peer reviews, so we'll contract anything -- I
23 can give you a contract -- I remember the name
24 of the medical provider that will come in and do
25 a peer review, do an audit so to speak, pull a

## 61

1 number of files --
2 Q. Well, I understand peer reviews and audits to
3 be different things. Can you explain to me
4 what -- who did whatever? Who did what?
5 A. Yeah. So we would do the peer reviews; right?
6 So they'd pull a number of files and look at
7 those files to see that things are in order. We
8 would -- Mr. Norberg from ICE, who is also a
9 nurse, he would come in and do reviews
10 periodically. Of course, it's with ICE
11 detainees, although they all receive the same
12 care through our clinic, it doesn't matter if
13 you're an ICE detainee or a county inmate, or --
14 we would have ACA audits. We would have ICE
15 audits. We'd have Minnesota Department of
16 Corrections audits, so there's -- there's a lot
17 of eyes on, in particular, medical and mental
18 health. It's probably the most sensitive issues
19 and most scrutinized reviews that we receive
20 when we receive facility audits.
21 Q. Well, because you are -- you have federal
22 prisoners, you are required to follow the
23 Federal Performance-Based Detention Standards?
24 A. I'm not sure what you're referring to. I'd like
25 to learn more.

16 (Pages 58 to 61)

## 62

1  Q.   Well, it's the -- the Federal Performance-Based
2  Detention Standards are based on the American
3  Correctional Association standards as designed
4  for implementation of policies and procedures in
5  reviewing non-federal facilities that house
6  federal detainees.  That applies to you; right?
7  **A.   Yes, we -- we started our ACA Accreditation**
8  **process in late 2017, I think, and were**
9  **accredited in 2018.**
10  Q.   You have to follow their suicide prevention
11  section as well?
12  **A.   I don't -- I don't know what that section calls**
13  **for that you're referring to.**
14  Q.   Well, your jail has to follow the federal
15  standards, correct, because of the federal
16  detainees that you house?
17  **A.   We -- we are under Minnesota Department of**
18  **Corrections standards, and we're under the 2011**
19  **-- I'm sorry, 2000 standards for ICE detainees.**
20  Q.   It is 2011, you're right.
21  **A.   No.**
22  Q.   2011 --
23  **A.   No.  So --**
24  Q.   -- is the last time they did the Federal
25  Performance-Based --

## 63

1  **A.   You're right, that's true, but we still operate**
2  **under the 2000 standards per our contract that**
3  **we just recently signed.  A lot of that has to**
4  **do with -- you know, there's some change in**
5  **standards, like outdoor recreation for ICE**
6  **detainees.  Our facility doesn't comply with**
7  **that and our physical structure makes it, at**
8  **this time, unable to comply, so we're under**
9  **2000 standards.**
10  Q.   You understand --
11  MR. BENNETT:  Well, I'd request a copy
12  of that contract, Jason.
13  THE WITNESS:  Uh-huh.
14  MR. HIVELEY:  Are we able to produce
15  that?  Or do they have to make a Freedom of
16  Information Act to request?
17  THE WITNESS:  I think we can produce
18  that.
19  MR. HIVELEY:  I know in another case I
20  have, the feds have said if -- if someone wants
21  copies of their materials, you have to go -- you
22  have to make a FOIA request.  But we can check
23  on that, and if that's not the case, we'll get
24  it to you.
25  MR. BENNETT:  My understanding from our

## 64

1  expert is that, you know, who's sort of the
2  expert on this, is that that -- that would
3  apply.  And if they -- if they have an exception
4  of the 2011 standard, I can't believe they would
5  give an exception from the 2000 --
6  MR. HIVELEY:  I don't know anything
7  about it.  I'm just telling you how to get the
8  document.
9  MR. BENNETT:  All right.  Well --
10  THE WITNESS:  I can assure you, we are
11  under the 2000 federal government standard for
12  ICE detainees.  I can absolutely assure you.  We
13  just submitted an RFP that they requested for
14  us, or our facilities responding to 2011 with
15  the 2015 revisions.  I'm pretty well aware of
16  those standards and what we're required to do.
17  MR. BENNETT:  Okay.  Well, I want to see
18  if they have to follow the suicide prevention
19  plan policy.
20  MR. HIVELEY:  I'm telling you all I
21  can --
22  MR. BENNETT:  Okay.
23  MR. HIVELEY:  -- about the document.
24  MR. BENNETT:  If you can give it to me,
25  I'd expect you to give it to me.  If not, let me

## 65

1  know, will you?  We can make a FOIA request.
2  BY MR. BENNETT:
3  Q.   Who was the responsible health authority under
4  Exhibit 2?
5  **A.   Medical provider?**
6  Q.   Yeah.
7  **A.   Well --**
8  Q.   No.  The responsible health provider.  Is that
9  Dr. Leonard?
10  **A.   Yes.  Or --**
11  Q.   And who was the medical provider under -- if
12  they were -- that MEnD gave you?
13  **A.   Um, I'm not sure who is in working, at the time.**
14  **I mean, we've had some different ones over time.**
15  **Sometimes it's Dr. Leonard, sometimes it's**
16  **somebody else.  Um --**
17  Q.   Do you remember Crystal Waagmeester?
18  **A.   No, sir.**
19  Q.   That doesn't ring a bell, at all?
20  **A.   When they -- when they're not county staff, it's**
21  **-- I don't know them as well.**
22  Q.   Okay.  So you don't -- you don't know or claim
23  to know all of the medical providers?
24  **A.   No.  No, sir.**
25  Q.   In terms of the -- the people designated as

66

1     medical providers, do you have minimum criteria
2     that you care about, since it's your duty?
3 **A.  Uh-huh. We -- we do care that -- like we talked**
4     **about earlier, that the people that are coming**
5     **through our door, that we feel comfortable**
6     **coming through our door, and that we do an**
7     **assessment and a background investigation.**
8         **We -- we rely on MEnD to make sure that the**
9     **medical standards or licensing is -- is met.**
10 Q.  Did you inquire at the time that this contract
11     was formed, about the number of suicides in
12     facilities that MEnD was the contracted medical
13     provider?
14 **A.  No, sir.**
15 Q.  Why not?
16 **A.  I guess I didn't think to -- to do that. My**
17     **primary focus was improving the access to**
18     **medical and mental health care, and that's why I**
19     **fired ACH and -- and insisted on an increase in**
20     **mental health hours here, and improving that.**
21     **It was -- it was to make an improvement. I -- I**
22     **didn't -- I wasn't aware there was an issue, if**
23     **there is one.**
24 Q.  You didn't -- for example, do you know how many
25     suicides in Stearns County --

67

1     That's just up the road a bit; right?
2 **A.  Uh-huh.**
3 Q.  -- that happened on MEnD's watch?
4 **A.  I do not.**
5 Q.  Do you know if any did?
6 **A.  Um --**
7         MS. NEARING: Objection. Foundation and
8     form.
9         THE WITNESS: I would have to know the
10     dates that the -- that they were -- they were
11     actually providing the services there, and then
12     I could probably take a better swing at it.
13 BY MR. BENNETT:
14 Q.  Do you know of any suicides in Stearns County,
15     your neighboring county?
16 **A.  I know of one, and it's because we -- we did a**
17     **conflict-of-interest investigation and I**
18     **authorized that investigation. They didn't --**
19     **they don't want their own investigators doing**
20     **it, and so we conducted that investigation.**
21 Q.  Do you remember the name of the decedent?
22 **A.  Sorry, sir, I don't.**
23 Q.  Does the name "Kyle Baxter-Jensen" ring a bell?
24 **A.  No.**
25 Q.  Okay. How many suicides have occurred in the

68

1     Sherburne County jail in the last five years?
2 **A.  Two, I believe.**
3 Q.  James Lynas is one of them; right?
4 **A.  Uh-huh.**
5 Q.  What's the other person?
6 **A.  I'd have to retrieve my records.**
7 Q.  Both hanging?
8 **A.  Yes.**
9 Q.  Did both occur in special housing?
10 **A.  No.**
11 Q.  Where did the other one occur?
12 **A.  In a different housing unit. I can't tell you**
13     **from memory what the housing unit was.**
14 Q.  What is the housing unit described as "Gamma"?
15 **A.  So "Gamma" is our intake unit. And so all**
16     **inmates arriving at the Sherburne County Jail**
17     **would go to Gamma for a period of time, an**
18     **observation period, an orientation period, if**
19     **you will, for a classification period. And so**
20     **we are --**
21 Q.  Is that -- go ahead.
22 **A.  So we're placing them hopefully appropriately**
23     **within our facility, based on no contacts;**
24     **right? So if we're -- codefendants, we don't**
25     **want to be in the same housing care. We pair**

69

1     **with care, so we don't have, you know, a sex**
2     **offender paired with somebody they shouldn't be**
3     **paired with. So there's all kinds of different**
4     **reasons why we put them there until we get to**
5     **know them a little bit, and check the -- check**
6     **with other facilities and gain some background**
7     **information and hopefully do the best job we**
8     **can, putting them appropriately placed within**
9     **the facility.**
10 Q.  Is Gamma the unit that you would have suicide
11     watch in?
12 **A.  Well -- well, suicide watch is -- is done for**
13     **individuals in booking.**
14 Q.  Is booking different than intake?
15 **A.  Yes.**
16 Q.  Okay.
17 **A.  Yep.**
18 Q.  So booking is what? What does booking refer to?
19     Just booking?
20 **A.  It is. There's -- there's holding cells**
21     **right -- right off of the main intake area that**
22     **are camera'd cells --**
23 Q.  Okay.
24 **A.  -- where we would -- we would conduct those**
25     **suicide watches, if you will, in there.**

70

1  Q.   Okay.  Tell me how this workforce adjustment
2  reapplication with MEnD, or application for
3  essentially rehire with MEnD, or new hire with
4  MEnD -- that took place over what period of time
5  and what dates?
6  **A.   So let me see here, which is the first one.  So**
7  **we signed the first contract on what, the 17th.**
8  Q.   Yeah.  The 17th, 21st and then --
9  **A.   Yep.  And then the authorization by the county**
10  **board was July 30th of '14.  I believe the**
11  **transition took place shortly thereafter,**
12  **probably in August.**
13  Q.   Okay.  Would crisis intervention also be
14  associated with dealing with people in acute
15  withdrawal?
16  **A.   For -- for clinic staff to deal with, yes, and**
17  **for us to watch, yes.**
18  Q.   What's supposed to occur if the inmate/detainee
19  doesn't have his or her own ordering provider?
20  **A.   Can you be more specific, "what's to occur"?**
21  Q.   Well, if a person needs psychotropic medication,
22  it's -- it said that MEnD will provide
23  management in conjunction with the
24  inmate/detainee's ordering provider.  What if
25  they don't have their own?

71

1  **A.   Um --**
2  Q.   Do you see that they get an ordering provider?
3  **A.   Yes, they -- they take care of that aspect in**
4  **the clinic.  They -- they were to do a medical**
5  **and mental health assessment screening with**
6  **inmates coming into the facility.**
7  Q.   Special housing -- let me make sure I
8  understand.  That's 23 in/1 out, in the dayroom?
9  **A.   Correct.**
10  Q.   How long can an inmate spend in special housing?
11  Is there a limit?
12  **A.   I -- I don't know that there's a statutory -- a**
13  **statutory limit.**
14  Q.   Traditionally, how long in this institution will
15  a person spend?  What's the most a person will
16  spend in special housing?
17  **A.   Um, I don't know that I -- that we have -- we**
18  **have a set date.  It's based on a constant**
19  **review of those inmates and a way to transition**
20  **them back out of there, depending on the**
21  **circumstances.  I mean, there's a wide variety**
22  **of circumstances, like I said, that keep you**
23  **back there.  One could be infectious disease.**
24  **You know.  The length of time is, you know, till**
25  **they're able to integrate back with the**

72

1  **population and not infect the population.  It's**
2  **very difficult to answer -- a question to**
3  **answer.**
4  Q.   Did you review James Lynas' file in preparation
5  for the deposition?
6  **A.   Yep, I did read it over about a week ago.**
7  Q.   And it would be true to say that Mr. Lynas did
8  not -- or had not been receiving proper care on
9  the outside prior to being an inmate?
10       MR. HIVELEY:  Objection.  Foundation and
11  speculation.
12       THE WITNESS:  I don't know what his
13  medical care was on the outside.
14  BY MR. BENNETT:
15  Q.   Well, he -- he reported that he was
16  self-medicating; correct?
17  **A.   I don't have that in the criminal file.**
18  Q.   Well, you have it in your own jail file, that he
19  reported that he'd taken street drugs, both
20  opioids and others, daily --
21  **A.   Ah --**
22  Q.   -- prior to coming to the institution; correct?
23  **A.   I think from the booking information, I -- I**
24  **don't know that it was opioids.  I don't know**
25  **that I would agree with that.  That might have**

73

1  **been part of it.  I thought it was**
2  **methamphetamine and alcohol abuse, is what my**
3  **memory tells me.  I thought he was on a chemical**
4  **withdrawal watch for alcohol.**
5  Q.   Okay.
6  **A.   But my memory might be bad, too.**
7  Q.   He also had indicated he'd had mental health
8  issues, when he was clean, when he was sober;
9  correct?
10  **A.   Our intake, my memory tells me that he denied**
11  **any mental health issues.  And I believe the**
12  **information from Anoka County, previous to him**
13  **getting to us, he denied any mental health**
14  **issues.**
15  Q.   Should moves to special housing be communicated
16  to the medical staff?
17  **A.   Well, in this particular case, the -- the**
18  **medical staff were the ones that put him on the**
19  **15-minute watch.**
20  Q.   Well, the 15-minute-watch was imposed on
21  November 5th.  He was moved to special housing
22  on November 8th; correct?
23  **A.   Yes.**
24  Q.   The CO is the one that moved him to special
25  housing, not any MEnD --

**74**

1   **A.  Well, the physical movement of him, sure, but**
2   **the -- the -- to -- because of the -- the**
3   **behavior, is why he went to special housing.**
4   Q.  But -- was that a MEnD decision, or -- do you
5   contend that was a MEnD decision?
6   **A.  No, no, no.  The decision to put him on the**
7   **15-minute watch was the MEnD decision.**
8   Q.  And the decision to put him on special housing
9   was?
10  **A.  The sheriff's office, a correctional decision.**
11  Q.  Is the 15-minute watch consistent with being in
12  special housing?
13  **A.  No, not necessarily.  Meaning -- Lynas was on a**
14  **15-minute watch when he was in community release**
15  **as well.**
16  Q.  Community release is what, gen pop?
17  **A.  Yeah, general population.  It's just what we**
18  **call that particular housing unit.**
19  Q.  And isn't a 15 -- you know, I've -- I've taken a
20  lot of these depositions, too.  My understanding
21  is that a 15-minute watch is impractical and
22  almost impossible in a general population
23  setting: is that true?
24  **A.  No.  We do it all the time.**
25  Q.  Okay.  So your understanding is, that he came to

**75**

1   special housing with a requirement from MEnD of
2   a 15-minute watch?
3   **A.  Well, he had a 15-minute watch on him before he**
4   **had the behavioral issue, and so he came to**
5   **special housing, and that 15-minute watch was**
6   **still attached to him.  Corrections officers**
7   **can't take somebody off the 15-minute watch;**
8   **only -- only our clinic staff or medical/mental**
9   **health professionals can.**
10  Q.  Do you know what a Beck Depression Inventory is?
11  **A.  It's a mental health assessment.**
12  Q.  Do you know, is it considered an accurate and
13  sensitive assessment?
14  **A.  I don't know.**
15  Q.  Have you reviewed his MEnD file?
16  **A.  I have.**
17  Q.  And on November 5th he talked about a prior time
18  in his life when he felt like giving up, and
19  especially when he was convicted of a felony,
20  and that he'd sold all his guns as a precaution
21  so that he would not shoot himself?
22  **A.  I don't recall that.**
23  Q.  Do you remember that?  Do you remember him
24  telling -- on the 5th, telling Defendant
25  Pfeifer, "Honestly, I'm suffering and not coping

**76**

1   with it"?
2   **A.  No, sir.**
3   Q.  His first health assessment at the jail
4   indicated that he was having suicidal ideations
5   on November 2nd, due to associated -- pain
6   associated with withdrawal?
7   **A.  I'm not aware of that.**
8   Q.  Do you remember him endorsing significant
9   withdrawal symptoms; stomach pain, that sort of
10  thing?
11  **A.  When you asked me the question, if I reviewed**
12  **the file -- I did not read the file in its**
13  **entirety.**
14  Q.  Okay.  Okay.  Did -- so you didn't review the
15  file -- did you notice he was experiencing
16  nausea, diarrhea, sleep issues, agitation, and
17  eating disturbances?
18  **A.  No, sir.**
19  Q.  Do you know what an "altered mental status" is?
20  **A.  I do not.**
21  Q.  I bet you don't think it's a positive finding,
22  do you?
23  **A.  Excuse me?**
24  Q.  Altered mental status, that wouldn't be a good
25  finding, would it?

**77**

1   **A.  It doesn't sound like it.**
2       MS. NEARING:  Well, objection.
3   Foundation.
4       MR. BENNETT:  Why don't we take a
5   five-minute break and use the -- use the men's
6   room.
7       VIDEOGRAPHER:  Bob, I've got 25 minutes
8   left.  Should I start another?
9       MR. BENNETT:  Hmm...
10      VIDEOGRAPHER:  Might as well.
11      MR. BENNETT:  Yeah.
12      VIDEOGRAPHER:  We're going off the
13  record.
14   That will be the end of Disc 1 of the
15  deposition of Sheriff Joel Brott.  The time is
16  10:23 a.m.
17      (Recess taken.)
18      VIDEOGRAPHER:  We're back on the record.
19  This is the continuation of the deposition
20  of Sheriff Joel Brott.  The beginning of Disc 2.
21  The time is 10:52 a.m.
22      Go ahead.
23  BY MR. BENNETT:
24  Q.  The inmates get to make telephone calls at the
25  jail; right?

78

1  A.  They do, yeah.
2  Q.  They are recorded?
3  A.  They are.
4  Q.  For what purpose?
5  A.  Investigative purpose.  If we were to go back
6      and need to know what they're saying.  It could
7      be for following up on a criminal investigation.
8      It could be for safety and security of the
9      facility.
10 Q.  And the inmates?
11 A.  Oh, for sure, yeah.
12 Q.  Who -- how are they reviewed?
13 A.  Well, there's thousands and thousands and
14     thousands and thousands, as you can imagine;
15     right?  Our inmate population is averaging
16     600-plus, so it's -- it's reviewed, you know, on
17     a case-by-case basis, or as-needed basis,
18     depending on the information that we might
19     receive within the correctional facility, or
20     what a criminal investigator might be looking to
21     follow up on.  So it would be entirely
22     impossible to review each inmate phone call.
23 Q.  Most of them are never reviewed by anybody?
24 A.  Oh, that's true, yeah.
25 Q.  So you -- for the safety and security of the

79

1      insti-- of the jail itself, and the inmates
2      and the guards therein, you need to have a --
3      you wouldn't want to get information that's a
4      year old about an escape, would you?
5  A.  No.
6  Q.  Are there -- are there words that trigger a
7      review?
8  A.  Well, it would be based on information that, you
9      know, maybe a correctional officer heard, maybe
10     something that the jail investigator learned.
11     Oftentimes you'll get inmates/detainees that
12     want to provide information, for whatever
13     motivation they have.  Sometimes it's accurate,
14     sometimes it's not, but it's case by case.
15 Q.  Okay.  So if you get an inmate who is saying
16     goodbye to his loved ones, that would be
17     indicative of some potential danger in the
18     security -- or of the facility; correct?
19 A.  I guess it depends on the context.
20 Q.  Well, if they say, "I'm probably not going to
21     see you anymore," or, "Come get my belongings,"
22     or, "I've got a plan for suicide," or --
23 A.  Well, those are two separate things.
24 Q.  Well, they're three separate things, actually.
25 A.  Right.

80

1  Q.  You're right.  So --
2  A.  I mean, somebody who says, "I'm not going to see
3      you for a while," -- we -- we house U.S.
4      Marshall inmates here that are being sentenced
5      to 35 years, and being shipped off to a federal
6      penitentiary.  That might not cause us concern.
7  Q.  Uh-huh.
8  A.  Certainly, if we --
9  Q.  Ever?  How about ever?
10 A.  If we heard somebody say, you know, "I'm
11     thinking about suicide," that would cause
12     concern every time.
13 Q.  Uh-huh.  How about giving away your property?
14 A.  Well, I guess the best example I can give you:
15     There was -- the individual that was responsible
16     for Jacob Wetterling, was giving away his
17     property to his brother.
18 Q.  Uh-huh.
19 A.  I don't know if that was a suicide indication.
20     It was, "I'm not going to be around.  Take my
21     stuff."
22 Q.  Or it could be a fraudulent conveyance, or it
23     could be a lot of things; right?
24 A.  It could be, yeah.
25     MR. BENNETT:  Let's mark this.

81

1      (Exhibit 6 marked.)
2  BY MR. BENNETT:
3  Q.  This is a Sherburne County Jail form?
4  A.  It is.
5  Q.  And this is an "Inmate's Release of Personal
6      Property and/or Monies"; is that right?
7  A.  It is.
8  Q.  And that's -- this is the one from -- for James
9      Lynas; correct?
10 A.  It is.
11 Q.  And you -- you probably don't know this, but
12     that's his sister.
13 A.  The name is not familiar to me.
14 Q.  And -- but the officer and his badge number and
15     the date that she got the property are listed
16     there?
17 A.  It is, yes.
18 Q.  Does MEnD staff ever ask you to monitor
19     particular phone calls?  Do you ever recall that
20     occurring?
21 A.  It would be a great question for the jail
22     investigator.  I'm not aware of it.
23 Q.  Okay.
24 A.  It -- it could happen.
25 Q.  Would that --

1    A.   Doubtful.
2    Q.   -- typically get --
3    A.   Sorry.
4    Q.   Doubtful?
5    A.   I would think so, but it would be a better
6         question for the investigator.
7    Q.   Uh-huh.  When you have an event like a
8         suicide --
9    A.   Uh-huh.
10   Q.   -- or a homicide, or, you know, you have that --
11        that Moyle thing, I remember; right?
12   A.   Back in 2007?
13   Q.   A long time ago?
14   A.   Yeah, a long time ago.
15   Q.   I didn't take that case.
16        What's that?
17   Q.   The -- you go get the phone calls after the
18        fact, right, to look at what the inmates had
19        done, as part of the investigative process?
20   A.   It could be part of the investigative process,
21        yes.
22   Q.   I mean, they were provided to us in this case --
23   A.   Uh-huh.
24   Q.   -- so I assume that was something that is either
25        your normal protocol, or you or somebody under

1         you ordered it; correct?
2    A.   It would be very typical, yes.
3    Q.   For what purpose?
4    A.   To see what was going on.  What was the
5         person -- to have an accurate reflection of what
6         somebody might have been saying prior to the
7         event.
8    Q.   Okay.  So I mean -- and that happens?  It's sort
9         of the telephonic equivalent of your video
10        cameras?
11   A.   It's a -- it's a recording of history, yes.
12   Q.   Yeah.  And you can even look at them, monitor in
13        real time, or listen in real time, or listen
14        after the fact; right?
15   A.   Correct.
16   Q.   And watch?
17   A.   Yep.
18   Q.   But in any event, it might give you information
19        about what you were dealing with --
20   A.   Yes.
21   Q.   -- at the time?  Or what the inmate was dealing
22        with?
23   A.   Yes.
24   Q.   Have you listened to any of the phone calls?
25   A.   No.

1    Q.   So really, they're not addressed in real time,
2         but rather on an ex post facto, after-the-fact
3         basis, as an investigatory tool?
4    A.   Correct.  Are you talking with this case, or all
5         cases?
6    Q.   All cases, basically.
7    A.   No, I wouldn't -- I would disagree with that.
8    Q.   Okay.  Some cases you do proactively?
9    A.   For sure, yeah.
10   Q.   And they'd be what kinds of cases?
11   A.   Um, criminal cases.  It could be, like we talked
12        about, information that we received within the
13        facility.  Trying to gain additional
14        intelligence, safety, and security of the
15        facility, the staff, the inmates.  I mean, it's
16        -- it's a wide -- widespread --
17   Q.   And this is on the outside?  There have been --
18        I mean, I'm aware of instances where jail
19        inmates order hits on people and witnesses on
20        the outside.  That's occurred, too; correct?
21   A.   Uh-huh.
22   Q.   So you'd want to be as proactive as possible;
23        correct?
24   A.   If -- if you know of a threat, or if you know of
25        a worry, sure.

1    Q.   Okay.  And when you employed the -- and by "you"
2         I mean the sheriff and the county.
3    A.   Uh-huh.
4    Q.   "You," the second-person plural.
5         When the county and the sheriff was in
6         control of the staff, you knew who they were;
7         correct?
8    A.   Yeah.
9    Q.   And they had a direct line of communication,
10        direct or indirect to you, a way to get
11        information to you?
12   A.   Sure.  Yep.
13   Q.   And they didn't have to go back through the
14        filter of another company?
15   A.   Correct.
16   Q.   And the other company that's involved is a
17        for-profit organization?
18   A.   Are you -- ACH and MEnD?
19   Q.   ACH and MEnD?
20   A.   Yeah.
21   Q.   And that was different than when the county had
22        its own employees; correct?
23   A.   Meaning for profit?
24   Q.   Well, when they had -- when you had your own
25        employees, the profitability to the owners of

1      the company wasn't a concern; correct?
2   **A.**   Correct.
3   Q.   And like I say, you -- you already indicated
4      that you knew who they were and you could -- you
5      know, just like our jail tour, where you and --
6      and -- is it Captain Carr or --
7   **A.**   Commander Carr.
8   Q.   -- Commander Carr said "Hi" to everybody and
9      knew them all by name? All the COs, basically;
10      correct?
11   **A.**   I try to. There's -- there's 300 employees.
12   Q.   You did a pretty good job, when I saw it, but...
13   **A.**   Daytime staff are a little more seasoned staff,
14      **and did those shifts, yes.**
15   Q.   But -- and you had the -- a similar -- and I
16      would assume Commander Carr would have a similar
17      response to --
18   **A.**   Yes.
19   Q.   -- county-employed medical staff?
20   **A.**   Yes.
21   Q.   Now, your expectations of your correctional
22      officers are -- are what? Can you tell me
23      generally, your expectations?
24   **A.**   Yeah. The primary expectation is keep
25      **themselves and keep the inmates safe. That's**

1      **the primary goals each day.**
2   Q.   Well, I always thought of it as threefold: Keep
3      the community safe from the inmates --
4   **A.**   Well --
5   Q.   -- keep the guards safe from the inmates; and
6      keep the inmates safe as well?
7   **A.**   We hope to keep them on the inside.
8   Q.   Yeah.
9   **A.**   Yes.
10   Q.   The well-being checks is not an opportunity for
11      the correctional officer to guess what the
12      inmate is doing? They -- they need to see that
13      the inmate is essentially alive and well;
14      correct?
15   **A.**   Yes.
16   Q.   There's a need to visualize that, to actually
17      see it?
18   **A.**   Yes. Or hear it.
19   Q.   Or hear it? Use your senses?
20   **A.**   Yes.
21   Q.   So if he -- if he says -- if you call out and
22      the inmate responds, you know they're breathing
23      and audible and they're, you know --
24   **A.**   Uh-huh.
25   Q.   Okay. When well-being checks are doubled from

1      the state-mandated 30, to a 15-minute check,
2      that's even more important, isn't it?
3   **A.**   I wouldn't say it's more important. It's just
4      **as important.**
5   Q.   Well, but you're being told this is the person
6      with some heightened risk, that needs closer
7      observation; correct?
8   **A.**   Yes.
9   Q.   All right. And essentially -- in the 15-minute
10      watch, if placed by medical staff, is for the
11      safety of the inmate, for the most part?
12   **A.**   Yeah, there's a wide variety of reasons, but I
13      **think all watches, whether it's a chemical**
14      **withdrawal, whether it's a suicide, whether it's**
15      **-- you know, they're not eating properly, yeah,**
16      **it's for the safety of the inmate.**
17   Q.   And among things that you'd want to verify in a
18      well-being check, is that the person didn't have
19      a ligature around their neck?
20   **A.**   Yeah, that would be important.
21   Q.   And you wouldn't expect it to take three
22      well-being checks to determine that an
23      individual had a ligature around his neck?
24   **A.**   I would not expect that.
25   Q.   And if you do -- if you attempt a well-being

1      check on the catwalk, but can't visualize the
2      inmate, you need to do additional work, don't
3      you, to satisfy the well-being check?
4   **A.**   If that circumstance occurred, and they couldn't
5      **see the inmate, they need to make sure that the**
6      **inmate is doing well, yes.**
7   Q.   Okay. And you can't assume, or trust the luck,
8      on that sort of thing?
9   **A.**   We wouldn't want to do that, no.
10   Q.   Especially on a person on a 15-minute watch?
11   **A.**   I would say any watch.
12   Q.   Of course you wouldn't.
13   **A.**   Yeah.
14   Q.   But there's -- there's just a different level of
15      scrutiny that requires -- they're on a 15-minute
16      watch for a reason; right?
17   **A.**   They're -- they're on a 15-minute watch for a
18      **reason, but my expectation of staff is the same;**
19      **whether they're doing a 15-minute watch or a**
20      **30-minute watch, they're just doing it more**
21      **frequently. The expectation is that they're**
22      **alive and well, they're doing well.**
23   Q.   But you want to increase the observation -- you
24      want to decrease the observation interval to
25      prevent activity such as the construction of a

90

```
1      ligature and the affixation of the ligature to a
2      static -- something static in the cell that you
3      could use to hang yourself; correct?
4   A.   That would be one reason, yes.
5   Q.   Well, I'm referring to this case in particular,
6      but --
7   A.   Okay.
8   Q.   -- you can think of a number of reasons --
9   A.   Correct.
10  Q.   -- that you'd want to, and that being one --
11  A.   Correct.
12  Q.   -- in a case involving someone who was intent on
13     hanging themselves?
14  A.   Correct.
15  Q.   I mean, the things they have to do are, they
16     have to fashion some sort of ligature; correct?
17  A.   Yes.
18  Q.   They have to get it to a place where they can
19     affix it?
20  A.   Yes.
21  Q.   And they have to be able to have their weight
22     drop on it to accomplish the goal?
23  A.   Yes.
24  Q.   And unfortunately, in our line of work, we've
25     looked at a lot of hangings, and we have seen
```

91

```
1      that the construction of a ligature takes some
2      time; correct?
3   A.   It depends on the ligature, but...
4   Q.   I mean, but if you're not handed -- you know, if
5      you're not given a rope, or a belt or you
6      know -- I mean, if you have to make a ligature
7      out of something that's in the cell, it takes
8      some time; correct?
9   A.   I don't know how much time, but I agree it would
10     take time, yes.
11  Q.   All right.  It takes some time to affix it, so
12     that it will be secure and hold your weight?
13  A.   Yes.
14  Q.   And then it takes some time after the ligature
15     is applied and the weight is applied to the
16     ligature, for the hanging to occur until someone
17     is dead?  It takes a -- it's not, like, you're
18     being hung and your neck breaks and that kills
19     you?  It's a -- it's a strangulation death, that
20     takes some period of time; correct?
21  A.   Yes.
22  Q.   And it's a matter of -- it can go on for some
23     period of time --
24  A.   Uh-huh.
25  Q.   -- until there's actual cyanotic brain death?
```

92

```
1   A.   Uh-huh.
2   Q.   Yes?
3   A.   Yes.
4   Q.   And visualizing the mere top of a person's head
5      wouldn't rule out the fact that the person had
6      affixed a ligature to them, would it?
7   A.   That fact alone would not rule that out.
8   Q.   And to the extent that the head remains static,
9      it would continue to not rule that out?  You
10     don't know if the inmate is well or not well if
11     you just look at the top of their head; correct?
12  A.   I just -- I don't want to -- I want to be clear.
13     If we're talking in general terms, or if I'm
14     testifying specific to this case?
15  Q.   Well, testify specific to that catwalk.  And you
16     see the, you know, essentially the crown of a
17     person's head.
18  A.   Okay.  As long as I'm not testifying to what the
19     correctional officers observed and why they may
20     or may not have thought that Lynas was well.
21  Q.   Well, there's nothing in their notes that
22     indicates why they thought he was well, is
23     there?
24  A.   I thought I read in Correctional Officer Wise's
25     statement, that he believed that Lynas -- there
```

93

```
1      was some movement during a time or two in the --
2      on one of the watch tours.  So I just don't want
3      to testify for --
4   Q.   Okay.  Well --
5   A.   -- Correctional Officer Wise.
6   Q.   -- there can be movement and a ligature being
7      applied?  And the movement doesn't rule that out
8      either, does it?
9   A.   Again, I can't testify to why he thought or
10     didn't think that Lynas was well or not well.
11  Q.   The matter of fact was, that he wasn't well?
12  A.   At a point in time, correct.
13  Q.   There were three well-being checks where he
14     wasn't well?
15          MR. HIVELEY:  Object to form.
16     Speculation.  Foundation.
17          THE WITNESS:  I couldn't testify to
18     that.
19          MR. BENNETT:  Okay.
20  BY MR. BENNETT:
21  Q.   More than one?
22          MR. HIVELEY:  Same objection.
23          THE WITNESS:  He -- Correctional Officer
24     Stang at some point found him hanging there and
25     he was not well.
```

24 (Pages 90 to 93)

94

1      MR. BENNETT: Uh-huh.
2  BY MR. BENNETT:
3  Q.   And it could have been determined from a view
4      from the front of the cell, that he was not well
5      from whenever the ligature was starting to be
6      affixed until the actual death; correct? Until
7      he was cut down?
8  A.   I would agree with you that it's easier to see
9      in the cell from the front view than that
10     catwalk, for sure.
11 Q.   Well, it's --
12 A.   Easily. Yeah.
13 Q.   His well-being would be obvious from the front
14     of the cell?
15 A.   Under this circumstance, no question.
16 Q.   Okay.  And he'd been under the bed --
17 A.   Yes.
18 Q.   -- for a period of time?  In fact, I think
19     the -- if I remember the video correctly, the
20     officer -- it's Wise, isn't it?
21 A.   Wise.
22 Q.   He did a triple take when he was under the bed?
23 A.   I didn't watch the video, but I thought I
24     recalled seeing in his statement, that he told
25     him to lay on top of the bed instead of under,

95

1      so yes.
2  Q.   But I mean, you haven't looked at that video?
3  A.   I haven't.
4  Q.   He was back and forth and back and forth, I
5      think three times --
6  A.   I have not seen that tape.
7  Q.   -- before he orders him to get out from under
8      the bed.
9  A.   Okay.
10 Q.   If you see someone under the bed for a period of
11     time, would it be pertinent to maybe go inside
12     the cell and see what's going on?
13 A.   Again, I need to go back to what indicators if
14     that person is well; right?  Is it a rule
15     violation, and we don't want them laying on the
16     floor, or is it that they're not well?
17 Q.   Well, on the floor would be one thing.  I mean,
18     I could see laying on the floor to do sit-ups or
19     push-ups; right?
20 A.   Uh-huh.
21 Q.   Something like that?  Exercise?  Stretch?
22 A.   Uh-huh.
23 Q.   Under your bed, there's not a whole lot of
24     positive things you could do, is there?
25 A.   There's --

96

1      MR. HIVELEY:  You'd be surprised.
2      THE WITNESS:  Inmates do a lot of
3      things.  I can't say why he was there.
4  BY MR. BENNETT:
5  Q.   You don't want him under the bed?
6  A.   It's not our preference, no.
7  Q.   No.  You want to be able to see what he's doing?
8  A.   For sure.
9  Q.   And it's not quite as important as it would be
10     on patrol, but if you can visualize their hands,
11     you're a little safer too, aren't you?
12 A.   Well, I mean, we would have an assumption if
13     they're in a cell and in special housing that
14     they don't have weapons, but that's not to say
15     that we haven't found weapons.
16 Q.   That's what I mean.
17 A.   Yep.
18 Q.   And usually the weapons kind of go along with
19     the hands.  I mean, that's sort of general law
20     enforcement skills training 101, whether it's a
21     CO or a patrol officer; right?
22 A.   Yeah, but this isn't general population.  This
23     is special housing, where there's other
24     safeguards that take place if they were going to
25     have inmate contact.

97

1  Q.   You need multiple people to go in there?
2  A.   Right.  So that's why if they're in the dayroom,
3      that the officers don't enter the dayroom with
4      the inmate.
5  Q.   I got it.
6  A.   As they exit the cell, they are handcuffed
7      through the pass-through.
8  Q.   Uh-huh.
9  A.   So those are other factors.
10 Q.   Sure.  You'd rely on the manner of dealing with
11     withdrawal, methamphetamine or benzodiazepine
12     withdrawal, to medical personnel?  That's not
13     something you know about; correct?
14 A.   I -- no, that's not anything that I would --
15     that I would do.
16 Q.   Okay.
17     MR. BENNETT (to Ms. Bennett):  Can I see
18     the exhibits?  See what I haven't -- I haven't
19     reviewed.
20     MS. BENNETT:  (Passing folder.)
21     (Sotto voce discussion between
22     Mr. Bennett and Ms. Bennett.)
23     (Exhibit 7 marked.)
24     THE REPORTER:  Exhibit 7.
25     (Sotto voce discussion between

98

```
1          Mr. Bennett and Ms. Bennett.)
2      MR. BENNETT:  That's Exhibit No. 9?
3      THE REPORTER:  Seven.
4      THE WITNESS:  Seven.
5  BY MR. BENNETT:
6  Q.   Can you tell me what that is?
7  A.   "Inmate Medical & Mental Health Screening."
8      Sherburne County Sheriff's Office, Policy and
9      Procedure Manual.
10 Q.   So despite the fact that you have MEnD, you have
11     your own policies and procedures with regard to
12     inmate and -- medical and mental health
13     screening: correct?
14 A.   Yep.  As it relates to our mental health medical
15     providers, yes.
16 Q.   And you require that the mental health screening
17     at the time of admission to the facility be --
18     be mental health trained or qualified mental
19     health care professional?  What does that mean?
20     Or --
21 A.   Where are you reading?
22 Q.   Page 3 of 4, paragraph 5.
23 A.   Okay.  I'm going to get some cheaters.  In the
24     last six months --
25 Q.   Yeah, I --
```

99

```
1  A.   -- I'm struggling.
2  Q.   That's not the world's greatest lighting.
3  A.   (Reviewing exhibit.)  Yes.
4  Q.   And this is -- so by having observation of the
5      person's general appearance and behavior; in
6      other words, beyond the history you take, you
7      actually look at the person's affect and how
8      they present themselves; correct?
9  A.   Well, there's -- there's a couple of different
10     screenings that go on.  So there's the initial
11     intake by a booking officer, and then two of
12     this in-depth kind of screening that would be
13     done by the mental health or medical
14     professionals in our clinic.
15 Q.   But received by all inmates; right?
16 A.   Yes.
17 Q.   So it's not a -- it isn't just for some?  It's
18     for -- every inmate is supposed to get this by a
19     qualified mental healthcare professional or
20     someone who is mental health trained; right?
21 A.   Yeah.  So if we go back to -- (reviewing
22     exhibit).  What part of this...
23 Q.   So if paragraph 5, Point B says, "Observation
24     of:  General appearance and behavior; evidence
25     of abuse and/or trauma; and current symptoms of
```

100

```
1      psychosis, depression, anxiety and/or
2      aggression," and some of that -- those are by
3      observation, by a trained professional: correct?
4  A.   Could be, yes.  And, I mean, certainly if our
5      staff sees something that's way out of the
6      ordinary --
7  Q.   But this is for a mental health trained or
8      qualified mental healthcare personnel.
9  A.   Uh-huh.  I mean --
10 Q.   That isn't a CO?
11 A.   Well, our -- our COs, when -- have experience
12     dealing with individuals that -- that have
13     mental health conditions; right?  They live
14     within our facility.  They receive training,
15     things to look for.  People with schizophrenia,
16     things to look for.  You know, other -- other
17     mental health conditions.  So are they true
18     mental health professionals or licensed?  No.
19     But they -- but they certainly would -- could
20     recognize some of those conditions.
21 Q.   Well, I -- this is your policy, and it was in
22     effect --
23 A.   Yeah.
24 Q.   -- like, January 24, 2017, and was in effect at
25     the time of Lynas' arrival at and death in the
```

101

```
1      institution?
2  A.   Uh-huh.
3  Q.   Yes?  I know what you're saying, but --
4  A.   Yes, I understand.
5  Q.   Okay.  And then --
6      (Exhibit 8 marked.)
7  BY MR. BENNETT:
8  Q.   "Inmate Mental Health Care."  That's a policy of
9      yours that was enacted March 6, 2017, and was in
10     effect at the time of Lynas' arrival and death
11     in the facility --
12 A.   Yes.
13 Q.   -- correct?  And this says (as read), "Sherburne
14     County contracted medical authority shall employ
15     a licensed mental health professional to provide
16     mental health services for inmates housed in the
17     facility"; correct?
18 A.   Yes.
19 Q.   And then you want (as read), "To ensure that
20     inmates have access to qualified individuals to
21     address mental health needs while in custody"?
22 A.   Yes.
23 Q.   And in your view, that would be comporting with
24     your constitutional duty to provide adequate
25     medical care to the inmates?
```

26 (Pages 98 to 101)

102

1  **A.** We -- we contract that service through MEnD, and
2     they provide those individuals for -- for those
3     services.
4  Q.  But this is your policy, not MEnD's policy?
5  **A.** For sure. But we're in collaboration with the
6     people that we contract with.
7  Q.  And (as read), "Inmates who are referred as a
8     result of the mental health screening or by
9     staff referral, will receive a mental health
10    appraisal by a qualified mental health person
11    within 14 days of admission to the facility," in
12    accordance with this policy; correct?
13 **A.** Correct.
14 Q.  And you expect this policy to be followed?
15 **A.** I do. In fact, that was the language I was
16    looking for when I was taking my time.
17 Q.  It was just in another policy?
18 **A.** It was in a different policy.
19 Q.  One is the screening and one is the treatment --
20 **A.** Yeah.
21 Q.  -- correct?
22 **A.** Correct.
23 Q.  But these -- essentially, you're seeking to --
24    to follow your constitutional duty to provide
25    the inmate adequate mental health care?

103

1  **A.** We are collaborating with the mental health
2     professionals to provide that quality of care,
3     yes.
4  Q.  And you realize if they don't do it, it's still
5     your -- your issue?
6     MR. HIVELEY: I'll object. Calls for a
7  legal conclusion.
8     Answer if you know.
9     THE WITNESS: Excuse me?
10    MR. HIVELEY: I just made an objection,
11 that it's a legal conclusion.
12    THE WITNESS: Uh-huh.
13    MR. HIVELEY: So just answer if you know
14 how to answer the question that he asked.
15    THE WITNESS: Can you repeat the
16 question, please?
17 BY MR. BENNETT:
18 Q.  You understand that if the person you hired to
19    fulfill this job doesn't do it, it's still your
20    liability?
21    MR. HIVELEY: Same objection.
22    THE WITNESS: The -- I think it's a
23 liability of all persons involved.
24    MR. BENNETT: Okay.
25    THE WITNESS: We all have an expectation

104

1     to provide quality of care.
2  BY MR. BENNETT:
3  Q.  But the Constitution doesn't deal necessarily
4     with non-state actors? You're the state actor
5     in the constitutional construct of this case;
6     correct?
7     MR. HIVELEY: Same objection.
8     THE WITNESS: I would -- I would agree
9  that we --
10 BY MR. BENNETT:
11 Q.  And I'm not trying to make it personal. I'm
12    just --
13 **A.** It's not.
14 Q.  -- it's just that it requires state action as
15    opposed to some private company? You know,
16    Exxon can't violate your civil rights, for
17    example?
18 **A.** We -- we contract with professionals that
19    provide that care.
20 Q.  Okay.
21 **A.** We don't have people to do so ourself.
22 Q.  At this time? That's a decision you made?
23 **A.** Right.
24 Q.  Okay.
25 **A.** Yep.

105

1     MR. BENNETT: I don't have anything
2  further.
3     MS. NEARING: I have no questions.
4     MR. HIVELEY: No questions.
5  We'll read and sign.
6  You're done. Thank you.
7     THE WITNESS: Thank you.
8     VIDEOGRAPHER: We're going -- we're
9  going off the record. That will be the end of
10 Disc 2 and the conclusion of the deposition of
11 Sheriff Joel Brott.
12    The time is 11:26 a.m.
13 We're off the record.
14    (Concluded at 11:26 a.m.)
15       * * *
16
17
18
19
20
21
22
23
24
25

27 (Pages 102 to 105)

## 106

STATE OF MINNESOTA  )
:  ss  CERTIFICATE
COUNTY OF WASHINGTON )

I, Janet D. Winberg, hereby certify that I reported the video deposition of SHERIFF JOEL L. BROTT on the 24th day of May, 2019, in Elk River, Minnesota, and that the witness was, by me, first duly sworn to tell the truth:

That the testimony was transcribed by me and is a true record of the testimony of the witness:

That I am not a relative, or employee, or attorney, or counsel of any of the parties: or a relative or employee of such attorney or counsel:

That I am not financially interested in the action and have no contract with the parties, attorneys or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality:

That the right to read and sign the transcript by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 28th day of May, 2019.

_Janet D. Winberg_

JANET D. WINBERG
Registered Professional Reporter
Notary Public
Washington County, Minnesota.

## 107

STATE OF MINNESOTA  )
:  SS CERTIFICATE
COUNTY OF WASHINGTON)

I, SHERIFF JOEL L. BROTT, certify that I have read and examined the typewritten transcript of the video deposition taken of me in the matter of Lynas vs. Linda S. Stang, et al., on May 24, 2019, consisting of the preceding pages, and find the same to be true and correct (Except as follows):

Page  Line Correction        Reason for Change

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Dated this_____ day of_____

_____
SHERIFF JOEL L. BROTT

## 108

EXAMINATION INDEX
By Mr. Bennett: 4-105
-----------------------------------------------
EXHIBIT INDEX

Exhibit 1: Sherburne 1066
Sherburne County " Request For Board Action
Marked/Introduced...............................3, 41

Exhibit 2: Sherburne 1067-1081
Revised Agreement for the Provision of Inmate/Detainee
Health Services for Sherburne County, Minnesota
Marked/Introduced...............................3, 41

Exhibit 3
Photograph
Marked/Introduced...................................18

Exhibit 4
Photo
Marked/Introduced...................................20

Exhibit 5
Agreement for the Provision of Inmate/Detainee Health
Services - Sherburne County, Minnesota
Marked/Introduced...................................29

Exhibit 6: Sherburne 0075
Sherburne County Jail
Inmate's Release of Personal Property and/or Monies
Marked/Introduced.............................80, 81

Exhibit 7: Sherburne 0454-0458
Sherburne County Sheriff's Office
Sherburne County Jail Policy and Procedure Manual
Title:  Inmate Medical & Mental Health Screening
Marked/Introduced.............................97, 98

## 109

Exhibit 8:  Sherburne 0465-0467
Sherburne County Sheriff's Office
Sherburne County Jail Policy and Procedure Manual
Title:  Inmate Mental Health Care
Marked/Introduced.................................101

**A**

a.m 1:12 3:12 77:16,21 105:12,14
ability 13:6,13 16:23 17:10
able 9:4 27:4 55:2 63:14 71:25 90:21 96:7
absolutely 58:25 64:12
absolve 60:13
absorbed 42:8 59:5,19
abuse 34:1,4,7 51:20,23 52:1,8 53:10 73:2 99:25
ACA 61:14 62:7
Academy 5:3,7
accepted 49:3
access 24:20,21 37:23 66:17 101:20
accomplish 90:22
Accreditation 62:7
accredited 62:9
accurate 75:12 79:13 83:5
accurately 40:12
ACH 24:14 29:2 47:13 53:18 66:19 85:18 1,18
acquaintance 23:3,3
Act 63:16
action 42:3 104:14 106:10 106:11 108:6
activity 25:23 89:25
actor 104:4
actors 104:4
actual 38:25 91:25 94:6
acute 70:14
addition 36:8
additional 18:19,19,22 57:2 84:13 89:2
additions 56:24
address 101:21
addressed 84:1
adequate 7:18 40:13 101:24 102:25
adjustment 58:7,19 70:1
administration 7:12 14:18 16:22 27:8 30:4,20 37:7 39:8
Administrative 9:20
administrator 7:9,10 27:9 58:17
admission 98:17 102:11
Advanced 24:13
advent 38:1
affect 99:7 106:12
affix 90:19 91:11
affixation 90:1
affixed 92:6 94:6
after-the-fact 84:2
agencies 26:3
aggression 100:2
agitated 14:17
agitation 76:16
ago 11:21 22:11 72:6 82:13,14
agree 15:11 16:2 35:25 36:4 38:15 40:24 50:3,9 72:25 91:9 94:8 104:8
agreement 29:20 37:2 54:3,15 55:7,10,11,14 55:17,18 56:6,13 108:8 108:16
agreements 55:7,9,13,21
Ah 72:21
ahead 8:4 25:8 50:8 68:21 77:22
al 1:6 3:6 107:7
alcohol 73:2,4
Alexandria 4:25

alive 8:25 87:13 89:22
alteration 56:22
altered 76:19,24
alternative 14:11
amended 54:15 56:12
amendment 29:15,16 47:10 53:19 54:22 55:4 56:22
Amendments 54:14
American 62:2
and/or 27:23 81:6 99:25 100:1 108:20
Anderson 26:18
Anoka 73:12
anomaly 57:10
answer 8:4 16:5 25:8,10 36:18,25 39:17 40:9,12 45:6 50:8 72:2,3 103:8 103:13,14
answered 50:7
answering 47:24
anxiety 46:3 100:1
anybody 11:3 16:7 38:20 59:4 78:23
anymore 79:21
Apollo 4:24
apologize 11:17 30:14
appearance 99:5,24
appearances 2:1 3:18
application 70:2
applied 5:1 91:15,15 93:7
applies 62:6
apply 64:3
appointed 6:11 22:19
appraisal 102:10
appropriate 37:7 53:1
appropriately 68:22 69:8
approved 37:16 42:22
April 29:12,13,14 55:9,10 55:10
area 10:6 12:2,13,14,14,17 12:18,21 13:19,20 14:6 14:10 16:9 17:21 18:11 18:20 28:13 69:21
areas 20:6
arrival 100:25 101:10
arrive 36:11
arriving 68:16
article 27:3 54:3,10,11
as-needed 78:17
asked 24:23 25:2 50:6 76:11 103:14
asking 27:12 40:8
aspect 63:6 71:3
assaultive 14:8
assessment 45:25 49:20 66:7 71:5 75:11,13 76:3
assessments 31:15 45:24 45:24 53:6
assigned 26:5
assignments 6:25
Assistant 7:9
associate 5:1
associated 70:14 76:5,6
association 3:16 62:3
assume 16:7 26:18 40:2 82:24 86:16 89:7
assuming 45:12
assumption 96:12
assure 64:10,12
attached 75:6
attempt 88:25
Attended 4:25 5:2
attentive 56:12
attorney 2:3,3,9,13 30:6 31:1 58:10 106:8,8

attorneys 106:11
audible 87:23
audit 60:25
auditing 24:19
audits 61:2,14,15,16,20
August 70:12
auspices 41:13
authority 16:18 65:3 101:14
authorization 70:9
authorized 67:18
available 13:16,23 14:1
Avenue 2:10
averaging 78:15
aware 28:18 56:7 64:15 66:22 76:7 81:22 84:18

**B**

B 99:23
back 11:18,19,20 12:15 15:25,25 17:1,14,19 20:23 23:24 24:24 25:2 26:16 28:4 31:20 32:24 37:5 40:9,10 42:19 57:21 71:20,23,25 77:18 78:5 82:12 85:13 95:4,4 95:13 99:21
background 4:23 25:13 26:6 66:7 69:6
bad 14:7 38:6,8 73:6
badge 81:14
based 9:22 62:2 68:23 71:18 79:8
basically 42:5 84:6 86:9
basis 52:9 78:17,17 84:3
Baxter-Jensen 67:23
Beck 75:10
bed 94:16,22,25 95:8,10 95:23 96:5
beginning 43:6 77:20
Behalf 2:2,8,12
behavior 9:18 14:8 26:22 35:2,10,16 36:13 74:3 99:5,24
behavioral 20:24 75:4
believe 12:5,9 27:4 40:18 47:2 59:19 64:4 68:2 70:10 73:11
believed 92:25
bell 65:19 67:23
belongings 79:21
belt 91:5
Bennett 2:3,3,4,23 3:20,20 3:25,25 4:16 8:5 11:15 11:16 16:16,16,17 17:8 17:8,9,25 18:2,2,3,6 20:3 25:15,18 28:21,23 28:25 29:5,8,8,10,11 39:16 43:22,24 45:8 48:5 49:7,16,17 50:12 63:11,25 64:9,17,22,24 65:2 67:13 72:14 77:4,9 77:11,23 80:25 81:2 93:19,20 94:1,2 96:4 97:17,17,20,22,22 98:1 98:1,2,5 101:7 103:17 103:24 104:2,10 105:1 103:22
Benson 27:9
benzodiazepine 97:11
best 69:7 80:14
bet 4:24 7:2 76:21
better 33:19 37:22 39:9 56:12 67:12 82:5
beyond 99:6
Birrell 2:4,23

bit 5:23 24:4 67:1 69:5
blankets 10:24
Bloom 7:11
Bloomington 2:10
board 6:11 26:23 28:2,17 37:17 42:3,23 44:14,19 44:23,24,25 45:1,1 53:20 57:13 70:10 108:6
Bob 77:7
booking 10:6,9,11 69:13 69:14,18,18,19 72:23 99:11
brain 91:25
break 77:5
breaks 91:18
breathing 9:2 87:22
Brian 7:9 27:9
briefly 4:22
brother 80:17
Brott 1:10 3:4 4:11,19 77:15,20 105:11 106:4 107:3,25
bunch 50:15
bunk 12:8
Business 1:15 3:9

**C**

C 1:4 3:1
call 10:14,20 23:2 24:23 74:18 78:22 87:21
called 4:12 22:1
calls 8:2 43:25 49:5 50:5 62:12 77:24 81:19 82:17 83:24 103:6
camera 11:18,22,23,25 19:14
camera'd 10:17 11:25 12:1,2,21 69:22
cameras 12:6,12 19:18 83:10
caps 47:22
captain 6:10 86:6
captains 7:10
capture 16:9
captures 16:12
care 7:18 8:14 24:20,21 31:13 33:5,6,6 37:23,23 38:13 40:13 43:14 45:22 52:9 58:9 61:16 62:3 66:18 68:25 69:1 71:3 72:8,13 98:19 101:8,25 102:25 103:2 104:1,19 109:2
career 5:15
Carolin 2:13
Carr 7:8 86:6,7,8,16
Carrie 4:2
case 1:2 3:22 11:12 12:9 43:15 56:8 63:19,23 73:17 79:14,14 82:15,22 84:4 90:5,12 92:14 104:5
case-by-case 78:17
cases 84:5,6,8,10,11
categories 35:13
category 20:22
catwalk 13:19 14:12 15:8 18:22 19:3,9 20:4,7 89:1 92:15 94:10
cause 80:6,11
causes 51:10
cell 10:14,23 14:5,15,16 15:13 17:2 18:17 19:4 20:6 90:21 91:7 94:4,9,14 95:12 96:13 97:6
cells 11:25 12:16 13:22

center 1:15 3:9 34:14,18 38:24
central 34:14,16,18 38:24 39:25
certain 9:4 14:4 16:10
certainly 52:12 80:8 100:4 100:19
certificate 5:11 106:1 107:1
certification 44:19
certified 3:15 44:14,23,24 44:25
certify 106:3 107:3
challenge 50:13
change 9:13 35:19 38:7 57:23 63:4 107:10
changed 47:2
charge 7:13
charged 9:23,24
chart 7:1
cheaters 98:23
check 8:16,19,22,22 16:25 17:1 25:20 26:2 63:22 69:5,5 88:1,18 89:1,3
checks 12:12 25:13 87:10 87:25 88:22 93:13
chemical 52:13 73:3 88:13
chest 33:14
chief 5:19,21 7:3
chose 59:7
Chris 7:11
circumstance 89:4 94:15
circumstances 9:4 71:21 71:22
city 5:19,24
civil 3:7 104:16
claim 65:22
classification 68:19
clean 73:8
clear 92:12
clinic 24:3,7,25 26:7 32:12 33:9 35:4,18 42:6 49:23 61:12 70:16 71:4 75:8 99:14
clinics 44:9
closely 31:2
closer 88:6
Closest 15:19
clothing 10:23
Cloud 4:24
cnearing@larsonking.c... 2:16
codefendants 68:24
collaborate 31:2
collaborating 103:1
collaboration 102:5
College 4:25
come 24:23 25:2 34:11 35:7 36:14 49:14 50:11 50:22 51:6 52:8 60:24 61:9 79:21
comfortable 66:5
coming 6:1 39:3 66:4,6 71:6 72:22
command 6:24
commander 7:8 86:7,8,16
commands 9:5
commissioners 6:11 37:17 42:23
communicate 21:23
communicated 73:15
communication 85:9
community 5:16,22 32:13 36:21 52:5 74:14,16 87:3

company 23:8,19 52:8
  85:14,16 86:1 104:15
complete 55:19
completely 47:5
comply 63:6,8
comporting 101:23
concern 80:6,12 86:1
concerns 27:13,13,15,16
Concluded 105:14
conclusion 8:3 103:7,11
  105:10
condition 33:13 36:12
conditions 54:4 100:13,17
  100:20
Condon 2:9
conduct 69:24
conducted 67:20
conflict-of-interest 67:17
conjunction 48:16,19
  70:23
connection 55:22
consent 54:16
considered 75:12
consistent 74:11
consisting 107:7
constant 71:18
constitute 25:9
constituted 33:10
constitutes 55:17
Constitution 34:21 43:15
  104:3
constitutional 7:17 34:21
  60:14,17 101:24 102:24
  104:5
constitutionally 38:9,13
construct 104:5
construction 89:25 91:1
contact 26:1,4 96:25
contacts 30:4 68:23
contend 48:6 74:5
context 22:7 53:17,25
  79:19
continuation 77:19
continue 49:18 92:9
contract 22:1 26:18 28:19
  28:20 29:12 30:11,19
  31:23 34:10,12,16,19,22
  42:10 43:1,2,20 45:9,12
  46:11,23,24 47:3,13
  48:4,9 52:2 53:19 54:23
  55:4,23 56:3,13 57:15
  58:8 60:12,22,23 63:2
  63:12 66:10 70:7 102:1
  102:6 104:18 106:10
contracted 8:13 30:1
  38:21 39:5 66:12 101:14
contracts 24:2 30:5,18
  31:3 41:18 48:11
contractual 29:18 57:9
control 6:25 10:19 12:25
  37:11 57:25 85:6
conveyance 80:22
convicted 75:19
coordinate 31:13 33:25
  50:1 51:19
coordinated 52:5
coordination 35:4 53:8
copies 63:21
coping 75:25
copy 63:11
corner 19:15
correct 5:12 6:18,23 7:19
  9:1,3,7 10:4 11:10 13:18
  15:9,14,15 16:10,11
  17:2 19:19 20:8 22:8
  29:18 30:10 32:7 35:22

35:24 38:11 39:12 40:16
  40:23 41:1,10,24,25
  42:4,5 43:11,16,17,20
  44:17,18 45:11 47:12,14
  48:8,10 49:1 50:20
  52:14 54:6,25 55:5,25
  56:1,6 57:1 62:15 71:9
  72:16,22 73:3,22 79:18
  81:9 83:1,15 84:4,20,23
  85:7,15,22 86:1,2,10
  87:14 88:7 90:3,9,11,14
  90:16 91:2,8,20 92:11
  93:12 94:6 97:13 98:13
  99:8 100:3 101:13,17
  102:12,13,21,22 104:6
  107:9
correctional 6:18,20 8:14
  8:20 14:20 24:14,24
  33:18 35:20 36:5,21
  38:2,14 50:14 58:9 62:3
  74:10 78:19 79:9 86:21
  87:11 92:19,24 93:5,23
corrections 6:16 61:16
  62:18 75:6
correctly 56:2 94:19
COs 86:9 100:11
cost 52:16,19
council 5:20
counsel 3:18 29:21 57:7
  58:16 106:8,9
counselors 52:13 53:10
counties 38:3
counts 9:7,8,13
county 1:10,14 2:8 3:8 4:5
  6:2,4,23 23:18 24:9 27:7
  27:9 29:23,25 30:3,6,19
  31:1 35:5 37:16 38:10
  38:17 42:7,7,14,22,23
  43:8 46:24 53:20,21
  57:24 58:10,17,22 61:13
  65:20 66:25 67:14,15
  68:1,16 70:9 73:12 81:3
  85:2,5,21 98:8 101:14
  106:2,22 107:2 108:6,9
  108:17,19,22,23 109:1,2
county's 7:21 48:7
county-employed 86:19
couple 99:9
course 16:22 61:10 89:12
court 1:1,24 3:6,13 4:8
  27:20
created 23:22
crimes 9:24
criminal 25:20,23 72:17
  78:7,20 84:11
crises 32:25,25
crisis 32:6,9,16 33:10,14
  33:22,22 46:9,11,14,17
  46:25 47:20 70:13
criteria 11:9,13 66:1
crown 62:1
Crystal 65:17
current 99:25
currently 8:13 48:3
Curto 1:25 3:15
custody 9:21 101:21
cut 94:7
cyanotic 91:25

**D**

D 1:24 3:1 106:3,20
daily 72:20
danger 79:17
data 36:25
databases 25:23
date 3:11 20:12 23:10

71:18 81:15
Dated 107:23
dates 67:10 70:5
Dave 7:10
David 1:3 2:2 11:12,17
day 13:11,12 15:25 16:9
  20:17 35:17 56:15 87:1
  106:4,14 107:23
day-to-day 7:14 52:9
dayroom 12:1,17 13:23
  14:1,6,10,19 16:3 17:10
  17:13,21 18:11 19:18
  71:8 97:2,3
dayrooms 13:18 17:11
days 31:14 45:22 53:5
  57:11 102:11
Daytime 86:13
dead 91:17
deal 33:3,4 58:23 70:16
  104:3
dealing 30:17,18 37:9
  70:14 83:19,21 97:10
  100:12
death 91:19,25 94:6
  100:25 101:10
decade 35:21,22 36:7
decedent 67:21
decide 16:20,23
decided 23:14,17 24:13
  27:16
decision 37:6 74:4,5,6,7,8
  74:10 104:22
decrease 89:24
Defendant 75:24
Defendants 1:7 2:8,12 4:3
  4:5
deficits 28:13
defined 43:19 44:12
degree 5:1,4,14
deggle 7:25
delivered 2:23
demote 60:4,5
demoted 60:1,3
denied 73:10,13
department 6:6,15 61:15
  62:17
depend 14:25
dependency 54:7
depending 39:21 71:20
  78:18
depends 79:19 91:3
depict 18:25
deposition 1:9 3:4 72:5
  77:15,19 105:10 106:3
  107:5
depositions 74:20
depression 75:10 100:1
depressive 46:4
deputy 6:5 7:4
dermatology 44:16 45:2
describe 4:22 5:13 6:24
described 68:14
designated 65:25
designed 62:3
desire 37:11
desires 43:9
desk 12:20,24 13:7
despite 98:10
detainee 48:22 61:13
detainee's 14:4
detainees 35:1 49:14
  52:25 61:11 62:6,16,19
  63:6 64:12
detention 9:17 61:23 62:7
determinations 33:20
determine 28:1 55:2 88:22

determined 94:3
develop 34:25
diagnostic 45:25
diarrhea 76:16
die 20:16
died 20:12,17
different 9:17,25 13:12
  24:4 35:13 43:1 44:9,9,9
  53:10 61:3 65:14 68:12
  69:3,14 85:21 89:14
  99:9 102:18
difficult 15:15 24:25 72:2
diligence 25:4 26:15
dinner 22:10
direct 37:10,20 85:9,10
direction 59:1
director 59:12,13,16,20,25
  60:7
disagree 84:7
Disc 77:14,20 105:10
disciplinary 28:16
discipline 26:22
discover 24:18 26:21
discovered 12:24 24:15
  57:3
discussion 16:15 17:7
  18:1 97:21,25
discussions 55:21
disease 71:23
diseases 50:16,18
disorder 46:4
display 35:16
displaying 35:2,9
District 1:1 3:6,6 27:20,20
disturbances 76:17
Doby 3:14
docket 27:19
doctor 41:3,3,13 45:19
  49:25 50:3,11
doctors 40:25 50:19,19
document 64:8,23
documentation 28:11
doing 8:21,24 26:12,14
  37:24 48:3 54:2 67:19
  87:12 89:6,19,20,22
  96:7
Don 7:6
door 17:12,16,19 18:8,10
  66:5,6
doorway 17:18
double-check 34:13
doubled 87:25
Doubtful 82:1,4
downward 7:3
Dr 24:12,23 25:5 26:10,12
  26:13,15 27:14 28:14
  37:5 48:21 53:19,20
  57:4 59:7 60:2 65:9,15
drafted 29:20
Drive 1:15 3:9
drop 90:22
drugs 72:19
due 25:4 26:14 76:5
duly 4:12 106:13
dulia 60:6,14,18
duty 7:21,21,25 8:1 66:2
  101:24 102:24

**E**

E 3:1,1
earlier 19:17 66:4
easier 94:8
Easily 94:12
East 2:14
eating 76:17 88:15
education 37:22 39:3

educational 4:22
effect 55:6 100:22,24
  101:10
efforts 50:1
either 3:22 23:8 27:16
  34:22 36:12 42:8 56:23
  82:24 93:8
elected 21:20
election 6:12
elevated 10:3
eliminated 11:5 47:4
eliminating 42:6
Elk 1:15 3:9 106:4
emergency 6:8 44:11
employ 101:14
employed 21:5 27:5,6
  32:11 85:1
employee 29:23,25 30:1
  60:4 106:7,8
employees 24:9 25:17,17
  37:13 42:9 52:21 53:22
  58:5,22 85:22,25 86:11
employment 27:17
enacted 101:9
endorsing 57:8
enforcement 5:2,14,15
  26:1,3,4 96:20
Ensign 2:10
ensure 101:19
entail 10:11
enter 14:19,20 18:10 97:3
entered 15:11
entire 15:23 16:6 55:18
entirely 78:21
entirety 76:13
entitled 55:6
entrance 12:14
entry 17:20
Envision 1:25 3:16
equivalent 83:9
error 56:8
escape 79:4
especially 75:19 89:10
essentially 17:11 45:24
  60:1 70:3 87:13 88:9
  92:16 102:23
established 23:24
et 1:6 3:6 107:7
event 16:1 82:7 83:7,18
eventually 42:22
everybody 59:5 86:8
evidence 99:24
evidenced 28:2
evidencing 36:12
evolve 24:1
ex 84:2
exact 9:12
EXAMINATION 4:15 108:1
examined 4:13 107:4
example 9:20 12:3,7 43:5
  66:24 80:14 104:17
exception 64:3,5
excuse 7:20 76:23 103:9
execution 51:22
Exercise 95:21
exhaustive 40:22
exhibit 18:5,7 20:2,4 29:4
  29:6 31:7,8,10 37:3
  41:16,20,23,23 42:1,2,2
  42:4,11,16,17 43:4,5,21
  47:11 51:22,24 52:17
  54:7,8,8,9 55:14 58:8
  65:4 81:1 97:23,24 98:2
  99:3,22 101:6 108:4,5,8
  108:11,13,16,19,22
  109:1

exhibits 2:25 3:2 97:18
exist 43:3
exit 97:6
expect 64:25 88:21,24
102:14
expectation 86:24 89:18
89:21 103:25
expectations 86:21,23
experience 21:3 100:11
experiencing 76:15
expert 64:1,2
expertise 37:22
explain 30:15 57:14 61:3
explanation 48:10,12
expounded 23:16
extend 19:7
extensive 55:19
extent 13:4 92:8
Exxon 104:16
eyes 13:15 61:17

**F**

facilities 36:5 62:5 64:14
66:12 69:6
facility 8:10,12 11:5 15:10
25:13 34:1,3 35:20
36:11 37:25 46:19 47:21
51:6,20 52:1 53:8 61:20
63:6 68:23 69:9 71:6
78:9,19 79:18 84:13,15
98:17 100:14 101:11,17
102:11
fact 27:7 38:12 47:15,17
49:3 50:13,22 82:18
83:14 92:5,7 93:11
94:18 98:10 102:15
facto 84:2
factors 97:9
fall 6:3 30:25 55:13
falls 5:24 30:16
familiar 8:15 81:13
far 32:9 38:12 55:2
fashion 90:16
father 11:17
FBI 5:2,7
federal 61:21,23 62:1,6,14
62:15,24 64:11 80:5
feds 63:20
feed 10:17,18 12:22,23,25
13:5
feel 66:5
feels 9:22
felony 75:19
felt 75:18
file 72:4,17,18 75:15 76:12
76:12,15
files 61:1,6,7
filter 85:14
financially 106:10
find 25:1 46:2 52:5 107:8
finding 76:21,25
fired 24:21 66:19
firing 29:2
firm 3:14
first 4:12 6:12 20:15 21:3
21:16,19,20 29:14 47:24
53:18 70:6,7 76:3 106:5
five 26:2 54:5 68:1
five-minute 77:5
floor 95:16,17,18
flows 7:3
focus 66:17
FOIA 63:22 65:1
folder 29:9,10 97:20
follow 9:4 61:22 62:10,14
64:18 78:21 102:24

followed 102:14
following 78:7
follows 4:13 107:9
for-profit 85:17
forget 51:16
form 10:21 25:7 45:4
49:11 67:8 81:3 93:15
formed 66:11
forms 17:20,20
forth 95:4,4
Forty 15:24
Forty-seven 4:21
found 93:24 96:15
foundation 39:15 45:5
47:23 50:6 67:7 72:10
77:3 93:16
Four 45:16,17
Frank 7:9
fraudulent 80:22
Freedom 63:15
frequently 89:21
friend 23:1,2
Fritel 7:12
front 94:4,9,13
fulfill 103:19
full 4:17 30:2
function 7:20
further 105:2

**G**

G 3:1
gain 69:6 84:13
games 22:22
Gamma 68:14,15,17 69:10
Gaskins 2:4,23
gen 74:16
general 29:21 30:20 41:6
74:17,22 92:13 96:19,22
99:5,24
generally 9:13 31:2 36:20
86:23
gentleman 56:13
getting 14:3 24:1,16 53:18
73:13
give 9:12 29:9 49:12 60:23
64:5,24,25 80:14 83:18
given 91:5
giving 75:18 80:13,16
glass 15:13
go 8:4 12:22,23 14:9 25:8
26:8 28:24 33:21 35:18
35:18 41:23 42:19 50:8
50:19 60:7 63:21 68:17
68:21 77:22 78:5 82:17
85:13 91:22 95:11,13
96:18 97:1 99:10,21
goal 90:22
goals 87:1
goes 10:17,19 41:20,23
54:15 19:6 23:13,17
25:6 28:4 40:9 46:25
53:20 58:21 77:12 79:20
80:2,20 83:4 95:12
96:24 98:23 105:8,9
good 5:20 38:8 49:13
76:24 86:12
goodbye 79:16
government 64:11
gown 10:16
graduated 4:24
great 81:21
greatest 19:25 99:2
Greg 29:22 58:16
guaranteed 38:13
guards 79:2 87:5
guess 28:15 35:15 56:13

66:16 79:19 80:14 87:11
guessing 40:4,8
guns 75:20
gynecology 44:16,25

**H**

H 2:3
half 5:17 6:1 30:3,3
hallway 12:20,24 19:7
20:7
HAND 106:14
handcuffed 97:6
handed 91:4
handle 33:8 39:9
hands 96:10,19
hang 90:3
hanging 68:7 90:13 91:16
93:24
hangings 90:25
happen 33:7 81:24
happened 24:22 35:5 67:3
happens 83:8
hard 17:22
head 9:8,13 92:4,8,11,17
24:21 31:12,15,22 32:22
33:1,1,22,25 34:4,9,11
34:14,18 36:4,8,17 37:9
37:19,24 38:2,4,13,18
38:21,24 39:10,20 40:1
40:5,6,13,15 44:1,4,16
45:18,23 50:13,23 51:19
51:23,25 52:3,19,24
53:4,5,7,9 56:14 61:18
65:3,8 66:18,20 71:5
73:7,11,13 75:9,11 76:3
98:7,12,14,16,18,19
99:13,20 100:7,13,17,18
101:8,15,16,21 102:8,9
102:10,25 103:1 108:9
108:16,23 109:2
healthcare 43:10 99:19
100:8
Heaney 58:10
hear 87:18,19
heard 3:22 14:15,17 79:9
80:10
hearing 13:9
heightened 88:6
helped 52:9
hereof 55:22
heroin 50:24
hesitate 18:12
Hi 86:8
high 4:24 36:1 50:15
higher 33:18 36:23 37:21
highlighted 37:13
hire 25:1 58:24 70:3
hired 23:19 24:12,13 59:1
103:18
historically 38:1
history 5:13 25:20 28:16
83:11 99:6
hits 84:19
Hiveley 2:9 4:4,4 8:2 25:6
25:10 43:21 45:4 49:5
49:10 50:5 63:14,19
64:6,20,23 72:10 93:15
93:22 96:1 103:6,10,13
103:21 104:7 105:4
Hmm 77:9
hold 91:12
holding 69:20
homicide 82:10
honestly 56:7 75:25
hope 58:12 87:7

hoped 24:16
hopefully 82:22 69:7
hospital 33:17 35:18
hospitals 44:10
host 10:24 39:19
hour 14:4,21 15:2,21,21
15:22,23 16:3 19:10,11
66:20
hours 16:18,23 22:2 52:3
56:15,17,18,20 57:1
66:20
house 23:4,5 62:5,16 80:3
housed 101:16
housing 15:16 10:5,8
11:8,19 12:19,23 13:6
13:24 14:7 20:12,15,21
20:22,23 68:9,12,13,14
68:25 71:7,10,16 73:15
73:21,25 74:3,8,12,18
75:1,5 96:13,23
hung 20:18 91:18

**I**

ICE 61:8,10,13,14 62:19
63:5 64:12
idea 5:20 38:7,8,8
ideations 76:4
ill 41:5
illness 36:3
imagine 78:14
impartiality 106:12
implementation 62:4
important 88:2,3,4,20
96:9
imposed 73:20
impossible 40:11 74:22
78:22
impractical 74:21
improve 37:25
improvement 66:21
improving 66:17,20
in-depth 99:12
in/1 71:8
inaccurate 19:2
include 33:22
Included 10:2
including 44:15 55:9
increase 66:19 89:23
increased 56:14,20
incumbent 39:6
INDEX 108:1,4
indicated 32:7 46:10 73:7
76:4 86:3
indicates 43:5 92:22
indicating 10:22
indication 80:19
indications 8:23
indicative 79:17
indicators 95:13
indirect 85:10
individual 13:22 31:20
80:15 88:23
individuals 9:24 10:6
39:20 69:13 100:12
101:20 102:2
industry 50:14
infect 72:1
infectious 71:23
information 27:1 63:16
69:7 72:23 73:12 78:18
79:3,8,12 83:18 84:12
85:11
inherited 21:17
initial 28:19 29:20 99:10
initially 26:17
inmate 9:21 10:1 12:7
14:6,7,10 33:4 48:22,24

48:25 61:13 71:10 72:9
78:15,22 79:15 83:21
87:12,13,22 88:11,16
89:2,5,6 92:10 96:25
97:4 98:7,12 99:18
101:8 102:25 108:23
109:2
Inmate's 81:5 108:20
inmate/detainee 31:13
36:9 45:22 70:18 108:8
108:16
inmate/detainee's 48:17
70:24
inmate/detainees 32:6
50:2
inmates 7:17 9:16 11:9
14:4 16:19 24:19 35:1
35:11,11,15 36:15 40:14
49:4,13 50:16,22 52:10
52:25 68:16 71:6,19
77:24 78:10 79:1 80:4
82:18 84:15,19 86:25
87:3,5,6 96:2 99:15
101:16,20,25 102:7
inquire 66:10
inside 7:14 13:21 87:7
95:11
insisted 66:19
instances 84:18
insti- 79:1
institution 71:14 72:22
101:1
institutions 38:14
instructions 9:7
insurance 50:20
insured 49:4
intake 68:15 69:14,21
73:10 99:11
integrate 71:25
integrated 34:25
intelligence 84:14
intended 55:18
intent 54:1 58:4 90:12
interaction 21:15,18
interactions 22:21
interest 106:11
interested 106:10
interim 42:20
interior 15:12
interruption 23:10,11
interval 89:24
intervention 32:6,9 46:9
46:11,14,18,23,25 47:20
70:13
Inventory 75:10
investigation 66:7 67:17
67:18,20 78:7
investigations 26:6
investigative 6:9,10 78:5
82:19,20
investigator 6:9 78:20
79:10 81:22 82:6
investigators 67:19
investigatory 84:3
involved 7:4 85:16 103:23
involving 90:12
Isais 7:10
issue 20:24 36:5 66:22
75:4 103:5
issues 30:18 33:4,4 57:21
61:18 73:8,11,14 76:16
Iverson 2:9

**J**

J 2:13
Jacob 80:16
jail 1:14 3:8 6:17,23 7:1,4
7:8,8,9,15,17 8:9,11
21:23 35:17 37:7 39:8
62:14 68:1,16 72:18
76:3 77:25 79:1,10 81:3
81:21 84:18 86:5 108:19
108:23 109:2
jails 35:25 36:6 38:5
James 1:4 11:15,17 12:4
14:16 15:22 20:11 68:3
72:4 81:8
Janet 1:24 3:13 106:3,20
January 21:17 100:24
Jason 2:9 4:4 63:12
jasonh@irc-law.com 2:11
Jen 59:18
job 6:20 56:12 69:7 86:12
103:19
jobs 59:6
Joel 1:10 3:4 4:11,19
77:15,20 105:11 106:3
107:3,25
JRT/KMM 1:2
July 70:10
jurisdiction 30:9,12,17

**K**

Kathleen 58:10
Kathryn 2:3 3:25
kbennett@gaskinsben...
2:6
keep 19:6 71:22 86:24,25
87:2,5,6,7
kept 10:8
Kevlar 10:15
kills 91:18
kind 6:14 7:4,12 12:2,17,19
19:17 26:3,8 32:25
37:14 41:19 43:6 96:18
99:12
kinds 35:19 69:3 84:10
King 2:14
kitchen 26:8
knew 85:6 86:4,9
know 5:25 8:4,7,7 9:11
12:16 13:24 14:4 15:23
16:5 18:13,18 19:5
20:19 22:2,6 23:16,22
25:24,25 26:11 27:7
30:17,23 31:21,25 32:2
32:10,23 33:16 35:17
36:17,18 38:16 39:2,6
39:22,25 42:19 44:6,10
44:19 45:6,12 46:2 52:4
53:15,23 56:21 57:17,23
58:2 59:2 62:12 63:4,19
64:1,6 65:1,21,22,23
66:24 67:5,9,14,16 69:1
69:5 71:12,17,24,24
72:12,24,24 74:19 75:10
75:12,14 76:19 78:6,16
79:9 80:10,19 81:11
82:10 84:24,24 86:5
87:22,23 88:15 91:4,6,9
92:10,16 97:13 100:16
101:3 103:8,13 104:15
knowledge 21:25
known 25:1
Kyle 67:23

**L**

L 1:10 4:11 106:4 107:3,25
L.L.P 2:4,23
labor 30:18,24
Lack 50:6
Lacking 39:14
language 32:8 43:3 47:12
53:13 55:14 56:7 102:15
larger 5:23
Larson 2:14
late 62:8
law 2:3,3,9,13 5:2,14,15
25:25 26:3,4 43:15
96:19
lawsuits 27:23
lawyer 45:10
lay 58:3 94:25
laying 95:15,18
layoff 57:25 58:20
learn 61:25
learned 57:10 79:10
lease 23:17 24:13
left 5:19 23:25 77:8
legal 3:15 8:3 58:16 103:7
103:11
legitimacy 29:1
length 20:7 71:24
Leonard 21:4 24:12,23
25:5 26:10,12,15,17
27:14 28:14 37:5 48:21
53:19,20 57:4 59:7 60:2
65:9,15
lesser 60:6
let's 19:25 21:21 33:13
43:5,6 80:25
level 33:18 37:21 39:2,21
43:14 89:14
levels 39:22
liability 103:20,23
liaison 6:7
licensed 44:22 100:18
101:15
licensing 66:9
life 75:18
ligature 18:19,23 90:1,1
90:16 91:1,3,6,14,16
92:6 93:6 94:5
light 27:2
lighting 99:2
limit 16:18 17:12 71:11,13
limited 15:9,11 44:15
line 1:6 107:6
line 85:9 90:24
LineCorrection 107:10
list 40:22
listed 81:15
listen 83:13,13
listened 83:24
little 5:23 14:17,18 24:4
35:22 69:5 86:13 96:11
live 100:13
lived 26:1 54:1
LLP 2:14
located 3:8 11:4
location 12:21 44:7
locations 19:14
lockdown 17:3
long 5:3 21:9 28:4 56:9
71:10,14 82:13,14 92:18
longer 42:7
look 8:23 13:21 18:22 22:1
25:24 27:17,19 41:20
45:15 48:13 61:6 82:18
83:12 92:11 99:7 100:15
100:16
looked 90:25 95:2
looking 13:11 15:16 78:20
102:16

lot 30:24 61:16 63:3 74:20
80:23 90:25 95:23 96:2
Louis 4:19
loved 79:16
luck 89:7
Lynas 1:3,4 2:2 3:5 11:12
12:4,14 19:15 21:22 68:3
72:7 74:13 81:9 92:20
92:25 93:10 107:6
Lynas' 20:11 72:4 100:25
101:10

**M**

M 2:9
main 12:14 13:19 69:21
maintain 27:16
major 46:3
making 33:20 37:18
management 48:15 70:23
manipulative 35:2,9,12,16
manner 97:10
Manual 98:9 108:23 109:2
marijuana 50:24
March 101:9
mark 7:12 17:25 18:4
28:21 80:25
marked 2:25 3:2 18:5,7
20:2 28:23 29:4 81:1
97:23 101:6
Marked/Introduced 108:6
108:9,12,14,17,20,24
109:3
Marshall 80:4
master 10:19 12:25
materials 63:21
matter 3:5 13:12 49:3
55:22,23 61:12 91:22
93:11 107:6
max 9:18
mean 13:25 14:2 16:20
21:5 22:15 24:10 34:15
35:3 38:17 40:8,20 41:15
44:21,23 47:18 48:18
49:21 57:17 65:14 71:21
80:2 82:22 83:8 84:15
84:18 85:2 90:15 91:4,6
95:2,17 96:12,16,19
98:19 100:4,9
Meaning 74:3 85:23
means 35:7,10 40:18
44:19,25 45:13 54:19,21
med 9:18 37:2
meat 24:8
medical 9:19 10:22 21:6
21:12 23:7 24:20,24
26:24 28:2,11,17 32:14
33:13,24 35:6 37:8,9,19
37:21,23 38:3,4 40:5,15
41:2,4,13 44:13 51:18
60:24 61:17 65:5,11,23
66:1,9,12,18 71:4 72:13
73:16,18 86:19 88:10
97:12 98:7,12,14 99:13
101:14,25 108:23
medical/mental 75:8
medication 28:5 39:19
48:16 70:21
medications 41:4,9,14
49:15 52:20
medicines 40:25
meet 39:23
meeting 60:17
memory 27:4 28:6 59:11
68:13 73:3,6,10
men's 77:5
MEnD 2:12 4:3 8:13 21:2

23:8,20,20,22 25:5,17
27:24 28:19 31:11 32:5
37:11 42:9,13 44:6
45:10,17 46:8,13 47:4
47:25 48:2,14 49:23,24
52:15,18,23 53:3,22
54:25 55:3 56:4,24
57:25 58:4,9,23 59:24
60:17 65:12 66:8,12
70:2,3,4,22 73:25 74:4,5
74:7 75:1,15 81:18
85:18,19 98:10 102:1
MEnD's 33:24 47:17 48:6
51:18 67:3 102:4
mental 10:21 24:21 31:12
31:15,22 32:21 33:1,22
33:25 34:4,9,10,14,18
36:3,4,8,17 37:9,19,24
38:2,4,17,21,24 39:10
39:20,25 40:5,6,13,15
43:25 44:4,16 45:18,23
50:23 51:19,23,25 52:2
56:14 61:17 66:18,20
71:5 73:7,11,13 75:11
76:19,24 98:7,12,14,16
98:18,18 99:13,19,20
100:7,8,13,17,18 101:8
101:15,16,21 102:8,9,10
102:25 103:1 108:23
109:2
mentally 41:5
mentioned 34:19,22
mere 92:4
met 66:9
methamphetamine 50:25
73:2 97:11
mind 59:15
mindful 60:16
minimum 66:1
Minneapolis 2:5
Minneota 5:16
Minnesota 1:1 3:7,10 5:16
26:23 27:21 28:2,17
34:14,18 38:24 39:25
61:15 62:17 106:1,4,22
107:1 108:9,17
minutes 11:21 15:24,24
77:7
mirror 15:13
missed 58:18
missing 6:15
mistake 47:15,16,17,25
misunderstanding 30:14
MN 1:15 2:5,10,15
MNCIS 25:21
Monies 81:6 108:20
monitor 13:6 81:18 83:17
monitored 10:17 13:2,4
months 11:22 98:24
motivation 79:13
moved 73:21,24
movement 74:1 93:1,6,7
Moyle 82:11
multidisciplinary 34:25
multiple 97:1

**N**

N 3:1
name 3:15 4:17 31:19 32:3
34:6 52:7 59:18 63:20
67:21,23 81:13 86:9
National 5:2,7
nausea 76:16
Nearing 2:13 4:2,2 39:14

47:23 67:7 77:2 105:3
necessarily 74:13 104:3
neck 88:19,23 91:18
need 9:16 29:1 40:21
48:11 78:6 79:2 87:12
87:16 89:2,5 95:13 97:1
needed 16:25 33:6,7
needs 70:21 88:6 101:21
negotiating 45:9
negotiations 30:24 55:20
neighboring 67:15
Neurology 45:1
never 6:18 22:9 38:20
57:20 78:23
new 70:3
news 57:6
next-of-kin 1:4
nod 51:17
non-catwalk 12:13
non-federal 62:5
non-MEnD 52:21
non-prescribing 31:13
45:19
non-state 104:4
Norberg 61:8
normal 82:25
Northwest 1:15
Notary 106:21
note 2:23,25 37:16
noted 28:7
notes 92:21
notice 23:19 76:15
noticed 6:14
noticing 2:23
November 73:21,22 75:17
76:5
number 3:22 31:7,8,9
49:13 54:4 60:21 61:1,6
66:11 81:14 90:23
nurse 21:2 60:10 61:9
nursing 37:15 42:20 59:12
59:14,16,20,25 60:8

**O**

O 3:1
object 8:2 25:6 39:14 45:4
49:5,10 93:15 103:6
objection 47:23 49:10
50:5 67:7 72:10 77:2
93:22 103:10,21 104:7
observation 10:12 15:8
19:4,4 20:6 68:18 88:7
89:23,24 99:4,23 100:3
observed 92:10
obvious 94:13
occasionally 21:23
occur 9:11 16:24 68:9,11
70:18,20 91:16
occurred 67:25 84:20 89:4
occurring 81:20
off-site 43:18
offender 69:2
office 10:18 29:22 30:2,3
52:7 74:10 98:8 108:22
109:1
officer 5:18,25 6:7,19
12:19,24 13:24 79:9
81:14 87:11 92:24 93:5
93:23 94:20 96:21 99:11
officers 6:21 8:20 13:5
14:20 33:19 75:6 86:22
92:19 97:3
oftentimes 9:23 35:15
79:11
oh 20:20 29:13 78:11,24
okay 5:4,6 6:24 7:7 8:15

8:24 10:10 11:8,23
13:14,19 14:13,23,25
15:6,24 16:6 19:1,3,13
19:23 20:11,25 21:3,10
22:4,12 23:4,7 25:11,15
26:14 28:1 29:16,25
30:6,14,22 33:15 34:24
37:2 39:10 41:8,11,22
42:24 43:5,12,18 45:3,7
45:15 49:16 50:2,9
53:13 54:13 57:13 64:17
64:22 65:22 67:25 69:16
69:23 70:1,13 73:5
74:25 76:14,14 79:15
81:23 83:8 84:8 85:1
87:25 89:7 90:7 92:18
93:4,19 94:16 95:9
97:16 98:23 101:5
103:24 104:20,24
old 4:20 79:4
oldest 15:10
on-site 31:12,14 32:6,9,25
45:18,23 46:9,11 53:4,8
on-staff 40:1,3,5
one-way 15:13
ones 65:14 73:18 79:16
op- 50:25
operate 63:1
operations 7:4,14
opinion 38:6 47:2
opioid 36:13
opioids 36:22 51:1 72:20
72:24
opportunity 87:10
opposed 104:15
opposite 17:17
order 17:1,3 61:7 84:19
ordered 83:1
ordering 48:17,19,25 49:8
70:19,24 71:2
orders 95:7
ordinary 100:6
org 7:1
organization 85:17
organizational 7:2
orientation 68:18
Original 2:23
ought 28:21
ourself 104:21
outdoor 63:5
outside 12:2 48:11 72:9
72:13 84:17,20
oversee 37:8
oversight 37:10
owners 85:25

**P**

P 3:1
page 31:10 37:14 43:20
45:16 54:3,12 98:22
107:10
pages 107:8
pain 76:5,9
pains 33:14
pair 68:25
paired 69:2,3
paper 10:24
paragraph 31:11 52:17
53:3,11,14 54:3 55:16
55:16 98:22 99:23
part 6:20 7:1,11 15:10
26:16 29:14 47:17,24,25
73:1 82:19,20 88:11
99:22
particular 36:15 44:24
61:17 73:17 74:18 81:19

90:5
parties 22:24 29:17 47:18
54:16 55:18 106:8,10
partner 8:13
partners 8:9,11
party 2:23 7:25
pass-through 97:7
Passing 29:10 97:20
Pat 1:25 3:15
Patrick 7:8
patrol 6:5 96:10,21
Paul 2:15
payments 56:24 57:2
peer 60:22,25 61:2,5
penitentiary 80:6
people 16:9 26:5 36:1
39:3 44:8 50:19 58:3,24
65:25 66:4 70:14 84:19
97:1 100:15 102:6
104:21
percentage 36:1 49:13
50:10,15
perform 31:14 45:23 53:5
Performance-Based
61:23 62:1,25
period 15:20 16:4 31:18
37:4,18 42:1,20 68:17
68:18,19,19 70:4 91:20
91:23 94:18 95:10
periodically 61:10
persistent 36:2
person 8:23 14:15,17,21
16:8 17:1 32:3 46:2,3,4
48:22 68:5 70:21 71:15
71:15 83:5 88:5,18
89:10 92:5 95:14 102:10
103:18
person's 92:4,17 99:5,7
personal 23:15 81:5
104:11 108:20
personality 23:8
personnel 37:8 97:12
100:8
persons 10:3 103:23
106:11
pertinent 95:11
Pfeifer 75:25
phases 30:11
phone 24:23 78:22 81:19
82:17 83:24
Photo 108:14
photograph 18:24 108:11
physical 33:1 63:7 74:1
physician 44:14
picture 20:1,4
place 34:12 43:4 56:9 70:4
70:11 90:18 96:24
placed 69:8 88:10
places 18:22 19:4
placing 68:22
Plaintiff 1:15 2:2 3:5,21 4:1
plan 35:8 64:19 79:22
plans 35:1
please 3:18 4:18,23
103:16
plural 85:4
point 38:19 48:12 93:12
93:24 99:23
pointed 57:6
police 5:18,21,25
policies 62:4 98:11
policy 64:19 98:8 100:21
101:8 102:4,4,12,14,17
102:18 108:23 109:2
poor 9:18
pop 74:16

population 36:9 72:1,1
74:17,22 78:15 96:22
positions 24:9,25
positive 76:21 95:24
possessive 48:25
possible 84:22
post 84:2
postgraduate 5:6
potential 57:24 79:17
potentially 14:7,8
practice 26:24 28:3,17
48:2 56:4 57:12
precaution 75:20
Precautions 10:20
precedence 55:8
preceding 107:8
preference 96:6
preparation 72:4
prescribe 39:19 40:25
41:3,9,14
prescribed 49:15 52:20
prescribers 52:11
prescribing 28:5 41:2
49:24
present 23:10 99:8
presented 57:13
pretty 24:22 26:7 64:15
86:12
prevent 65:20
prevention 62:10 64:18
previous 26:2 73:12
primary 66:17 86:24 87:1
prior 38:1 54:22 55:6,8
59:25 72:9,22 75:17
83:6
prisoners 61:22
private 38:2 104:15
proactive 84:22
proactively 84:8
probably 6:2 11:22 30:15
38:6,6,16 44:5 61:18
67:12 70:12 79:20 81:11
problem 51:10
problematic 26:22
problems 28:1 37:9,10
50:23
procedure 54:22 98:9
108:23 109:2
procedures 62:4 98:11
process 23:23 26:9,17
53:17 62:8 82:19,20
produce 63:14,17
professional 3:14 21:22
22:7,22 23:3 43:9 98:19
99:19 100:3 101:15
106:21
professionals 31:19,20
40:16 75:9 99:14 100:18
103:2 104:18
profit 85:23
profitability 85:25
program 5:10
programs 7:13
promises 55:20 56:4
promoted 6:8,9,10
proper 72:18
properly 88:15
property 80:13,17 81:6,15
108:20
proposed 58:8
protective 9:21
protocol 15:4,5 82:25
provide 23:7 33:6 34:3
37:22 38:11 39:20 40:13
43:9 46:25 48:15 52:9
53:6 56:6 70:22 79:12

101:15,24 102:2,24
103:2 104:1,19
provided 31:16 38:4 39:11
42:21 46:18 47:21 52:20
82:22
provider 10:21,22 21:6,13
24:24 32:14 35:6 37:21
38:21 48:17,19,21,25
49:9,20,22,23,23 60:24
65:5,8,11 66:13 70:19
70:24 71:2
providers 38:3,18 40:6
65:23 66:1 98:15
providing 52:24 67:11
Provision 108:8,16
psychiatrist 41:12
psychiatrists 38:25 39:11
39:18 40:1,19,20,24
Psychiatry 45:1
psychologists 39:1,11
40:3,19
psychosis 100:1
psychotropic 41:4 48:15
70:21
Public 106:21
pull 60:25 61:6
purpose 8:18 10:15 13:14
13:20 54:1 78:4,5 83:3
push-ups 95:19
put 10:1,15,16 20:23 21:1
69:4 73:18 74:6,8
putting 53:16,25 69:8

**Q**

qualifications 31:21 32:1
32:15,17 39:7 40:10
qualified 40:6,15 98:18
99:19 100:8 101:20
102:10
qualities 15:8
quality 37:23 103:2 104:1
question 40:9,12 44:6
47:24 72:2 76:11 81:21
82:6 94:15 103:14,16
questions 27:12 105:3,4
quick 56:22
quickly 44:22
quite 96:9
quote 33:10,11

**R**

R 3:1
razors 11:1,5
rbennett@gaskinsbenn...
2:6
reached 27:10
read 31:11 32:5 33:24
34:24 43:8 44:13 45:17
46:8,14,17 48:14 51:18
52:15,23 54:14 55:7,17
58:8 72:6 76:12 92:24
101:13,19 102:7 105:5
106:13 107:4
reading 98:21
real 83:13,13 84:1
realize 40:24 103:4
really 84:1
reapplication 70:2
reason 11:6 23:15 40:17
89:16,18 90:4 107:10
reasons 9:25 10:2 23:16
57:22 69:4 88:12 90:8
recall 26:12 27:3 31:19
75:22 81:19
recalled 94:24

receive 61:11,19,20 78:19
100:14 102:9
received 5:1 26:17 84:12
99:15
receiving 24:20 72:8
Recess 77:17
recital 43:8
recognize 29:6 100:20
record 3:19 4:18 12:12
57:19 77:13,18 105:9,13
106:6
recorded 13:1,3 51:16
57:20 78:2
recording 83:11
recordkeeping 28:11
records 26:23 59:22 68:6
recreation 63:5
Redwood 5:24
refer 32:5 33:7,16 44:3
46:8 48:22 69:18
reference 42:17
referral 102:9
referrals 32:13
referred 32:23 102:7
referring 19:17 61:24
62:13 90:5
reflection 83:3
refresh 27:4
regard 27:23 28:10,15
98:11
regarded 36:20
regarding 27:23
regardless 11:4,6
regards 37:12
Registered 106:21
regular 41:8
rehire 70:3
related 28:12,20 29:1
relates 98:14
relation 55:13
relationship 21:22 28:16
relative 106:7,8
release 74:14,16 81:5
108:20
rely 66:8 97:10
remain 4:7
remains 8:1 92:8
remember 22:5 26:14 28:8
28:9,10 32:3 52:7,10
56:19 58:1 59:4 60:23
65:17 67:21 75:23,23
76:8 82:11 94:19
repeat 103:15
replaced 59:13,17
reported 72:15,19 106:3
reporter 1:24 3:13 4:8
97:24 98:3 106:21
Reporters 3:14
representations 55:20
request 42:2 63:11,16,22
65:1 108:6
requested 64:13
requests 55:3
require 44:13 98:16
required 38:9 43:14 61:22
64:16
requirement 75:1
requirements 39:23
requires 89:15 104:14
reserved 106:13
responding 64:14
responds 87:22
response 6:8 86:17
responsibilities 37:12
60:7
responsibility 7:22 8:8

**responsible** 6:22 52:16,19 52:24 65:3,8 80:15
**responsive** 43:9
**restructuring** 37:18 42:5 58:6
**result** 102:8
**résumé** 6:15
**retrieve** 68:6
**Reuvers** 2:9
**review** 31:3 60:25 71:19 72:4 76:14 78:22 79:7
**reviewed** 15:20,23 58:9 75:15 76:11 78:12,16,23 97:19
**reviewing** 56:8 62:5 99:3 99:21
**reviews** 60:22 61:2,5,9,19
**Revised** 108:8
**revisions** 64:15
**RFP** 64:13
**rid** 53:18
**right** 7:18 8:25 10:13 11:22 12:15 14:22 15:17 17:4,6,19 18:23,24,25 19:6,20 20:9 29:3 30:5 30:16 31:5 32:19 33:3 35:23 38:16 41:6 43:2 43:3 44:1 45:10,13,20 45:21 46:7,21 47:7 52:15 55:11 56:5 58:12 59:10,11 61:5 62:6,20 63:1 64:9 67:1 68:3,24 69:21,21 77:25 78:15 79:25 80:1,23 81:6 82:11,18 83:14 88:9 89:16 91:11 95:14,19 96:21 97:2 99:15,20 100:13 104:23 106:13
**rights** 104:16
**ring** 65:19 67:23
**ripe** 36:12
**risk** 10:3 36:15,23 88:6
**River** 1:15 3:9 106:4
**RN** 41:8,9
**RNs** 24:8 32:18
**road** 67:1
**Robert** 2:3 3:20
**role** 48:4,6,7
**room** 77:6
**rooms** 15:1
**rope** 91:5
**RPR** 1:24
**rule** 92:5,7,9 93:7 95:14

---

**S**

**S** 1:6 3:1 107:6
**S2** 17:17,18
**S52** 12:5,7
**safe** 86:25 87:3,5,6
**safeguards** 96:24
**safer** 96:11
**safety** 16:25 78:8,25 84:14 88:11,16
**satisfy** 89:3
**saw** 12:19 86:12
**saying** 56:10 58:12 78:6 79:15 83:6 101:3
**says** 31:11 32:5,8 33:24 34:24 43:8 45:15,17 46:7,17,21 47:19 48:13 48:24 51:18 52:15 54:14 55:6,7,16,16 58:8 80:2 87:21 99:23 101:13
**scenery** 35:19
**schizophrenia** 100:15
**schizophrenic** 46:5

**School** 4:25 6:7
**science** 5:1
**screen** 13:8,14,17
**screening** 71:5 98:7,13,16 99:12 102:8,19 108:23
**screenings** 99:10
**scrutinized** 61:19
**scrutiny** 89:15
**se** 30:7
**SEAL** 106:14
**seasoned** 86:13
**seated** 4:7
**second** 13:15 17:16 29:14
**second-person** 85:4
**second-to-the-last** 52:18
**seconds** 52:6
**section** 62:11,12
**sections** 19:18
**secure** 91:12
**security** 78:8,25 79:18 84:14
**see** 9:23 15:12,15 18:8 29:16 33:6 29:13 35:19 52:21 53:2 54:16 61:7 64:17 70:6 71:2 79:21 80:2 83:4 87:12,17 89:5 92:16 94:8 95:10,12,18 96:7 97:17,18
**seeing** 94:24
**seeking** 102:23
**seen** 13:8 27:13 36:25 40:15 47:12 90:25 95:6
**sees** 100:5
**segregation** 9:18,19,20 10:1
**self-harm** 36:16
**self-medicate** 51:3
**self-medicating** 50:23 72:16
**send** 40:14 44:8
**sense** 31:6
**senses** 87:19
**sensitive** 61:18 75:13
**sentence** 46:15 48:10,14 52:18 53:23
**sentenced** 80:4
**separate** 17:11 30:4 79:23 79:24
**separated** 19:20
**separates** 30:11
**sergeant** 6:10
**sergeant's** 10:18
**sergeants** 7:14
**series** 12:16
**serves** 59:11
**service** 24:16 42:21 44:4 46:12 102:1
**services** 7:23 23:7 32:7 34:1,5,7 38:4,22 39:10 39:21 40:1 43:10,18,19 43:25 44:12,13 46:9,18 47:1,21 51:20,24 52:1,4 52:20,25 53:7 56:7,15 67:11 101:16 102:3 108:9,17
**set** 13:15 60:21 71:18
**setting** 33:9 74:23
**Seven** 98:3,4
**Seventh** 2:4,14
**severe** 36:2
**sex** 9:24 69:1
**shared** 8:8
**Sherburne** 1:10,14 2:8 3:8 4:5 6:2,4 23:18 38:17 42:7 46:24 48:7 68:1,16 81:3 98:8 101:13 108:5

108:6,8,9,17,19,19,22 108:22,23 109:1,1,2
**sheriff** 1:10 3:4 4:7,17 6:12,21,22 7:16 8:1 21:6 21:8,9,16,20 22:14,19 23:9 26:18 27:1,11,14 35:21 58:14,16 77:15,20 85:2,5 105:11 106:3 107:3,25
**sheriff's** 6:15 29:22 30:2,3 74:10 98:8 108:22 109:1
**sheriffs** 27:10
**shift** 9:13
**shifts** 86:14
**shipped** 80:5
**shoot** 75:21
**short-term** 37:3
**shortly** 57:20 70:11
**show** 12:6 18:12
**Showing** 18:7 41:16
**shows** 20:4,6
**Shut** 17:12
**sic** 17:17
**sick** 35:11
**side** 15:14 18:14 58:23
**sign** 31:4 105:5 106:13
**signed** 29:17 43:17,18 51:25 56:22 63:3 70:7
**significant** 76:8
**signing** 48:4 53:18
**similar** 47:12 86:15,16
**si** 4:20 13:10,13 18:9 19:22 20:5 27:25 29:19 30:13 32:4 34:20 36:6 43:23 45:16 46:16,20 51:5,7 52:22 54:7 58:21 60:11 65:18,24 66:14 67:22 76:2,18
**sister** 81:12
**sit-ups** 95:18
**situation** 36:10 53:16,16
**situations** 37:24
**six** 98:24
**size** 17:13
**skills** 96:20
**sleep** 76:16
**small** 5:16,22 12:17
**sober** 73:8
**social** 22:21
**socially** 22:9
**sold** 75:20
**somebody** 10:13 14:3 19:10,11 25:1 33:12 36:22 65:16 69:2 75:7 80:2,10 82:25 83:6
**sorry** 56:18 62:10 67:22 82:3
**sort** 10:11 21:12,18 25:4 26:14 28:19 32:16 46:5 64:1 76:9 83:8 89:8 90:16 96:19
**sorts** 35:8
**Sotto** 16:15 17:7 18:1 97:21,25
**sound** 77:1
**South** 2:4,10
**speak** 26:19 30:20 32:23 48:1,2 60:25
**speaking** 17:23
**special** 9:14,16 10:5,8,20 11:3,8,18 12:23 14:7 20:23 68:9 71:7,10,16 73:15,21,24 74:3,8,12 75:1,5 96:13,23
**specialist** 3:16 31:11,22 34:11 36:18 45:18 52:3

53:4
**specialization** 32:21
**specialty** 43:19,25 44:4,12 44:15,24
**specific** 31:25 70:20 92:14 92:15
**speculation** 49:6 50:6 72:11 93:16
**spend** 71:10,15,16
**spent** 5:16,25
**sports** 22:22
**ss** 106:1 107:1
**St** 2:15 4:24
**staff** 14:9 24:3,3,7,25 25:12 26:7,8,8 32:12 35:5,5 37:15 42:6,7,14 42:21 46:19 47:22 53:9 53:21 57:24 65:20 70:16 73:16,18 75:8 81:18 84:15 85:6 86:13,13,19 88:10 89:18 100:5 102:9
**stand** 40:16
**standard** 39:24 64:4,11
**standards** 61:23 62:2,3,15 62:18,19 63:2,5,9 64:16 66:9
**Stang** 1:6 3:3 93:24 107:6
**Star** 27:2
**Starry** 7:6
**start** 41:19 43:6 77:8
**started** 5:15,18 6:5 23:12 56:8 62:7
**starting** 24:1 94:5
**state** 1:1 3:18 4:17 104:4 104:14 106:1 107:1
**state-mandated** 38:1
**statement** 55:19 92:25 94:24
**States** 1:1 3:6 27:20 38:14 43:15
**static** 90:2,2 92:8
**status** 20:12,13,14,15,21 76:19,24
**statute** 6:22 40:7
**statutory** 71:12,13
**Stearns** 27:11 66:25 67:14
**Steve** 58:17
**sticks** 59:14
**stiff** 6:17
**stomach** 76:9
**stood** 17:18
**stopgap** 28:20
**straight** 15:4,5
**strangulation** 91:19
**street** 2:4,14 72:19
**Stretch** 95:21
**structure** 73:4 60:2 63:7
**struggling** 99:1
**stuff** 80:21
**subject** 55:22,23
**submitted** 64:13
**substance** 34:1,4,7 51:20 51:23,25 52:8 53:9,9
**substantial** 106:11
**suffering** 33:13 46:3 75:25
**suicidal** 76:4
**suicide** 10:3,7,14 36:23 62:10 64:18 69:10,12,25 79:22 80:11,19 82:8 88:14
**suicides** 66:11,25 67:14 67:25
**Suite** 2:5,15
**supersede** 55:8
**supersedes** 43:2

**supervise** 6:20
**supervision** 37:20
**supply** 31:12 45:18 53:4
**support** 37:1,15 42:21
**supports** 53:14
**supposed** 22:3 70:18 99:18
**sure** 5:15 7:22 11:11 17:3 17:14 32:18 33:23 39:8 41:21 57:21 61:24 65:13 66:8 71:7 74:1 78:11 84:9,25 85:12 89:5 94:10 96:8 97:10 102:5
**surprised** 96:1
**surrounding** 43:16
**swear** 4:8
**swing** 67:12
**symptoms** 76:9 99:25
**systemic** 50:16,18

---

**T**

**take** 33:5 37:11 43:13 49:19 55:8 67:12 71:3 75:7 77:4 80:20 82:15 88:21 91:10 94:22 96:24 99:6
**taken** 3:4 33:6 59:8 72:19 74:19 77:17 107:5
**takes** 91:1,7,11,14,17,20
**talk** 27:18 37:14 43:18 57:4
**talked** 27:7 42:20 57:3 66:3 75:17 84:11
**talking** 33:1 35:11 49:24 58:20 84:4 92:13
**tape** 57:18 95:6
**Taylor** 58:17
**TB** 9:19
**team** 33:25 34:25 51:18
**Technical** 4:25
**techs** 24:8
**tele-medicine** 52:25 53:7
**telephone** 77:24
**telephonic** 83:9
**tell** 38:12 41:16 59:2,7,12 68:12 70:11 86:8 98:6 106:5
**telling** 56:2 64:7,20 75:24 75:24
**tells** 28:6 73:3,10
**template** 47:13
**ten** 11:21
**ten-week** 5:10
**tendency** 106:12
**term** 8:15 9:14 21:19,20 31:22
**terms** 29:18 30:21 34:4 46:24 48:9 54:4 56:3 65:25 92:13
**testified** 4:13
**testify** 92:15 93:3,9,17
**testifying** 92:14,18
**testimony** 106:6,6
**Thank** 3:24 4:6 105:6,7
**they'd** 10:15 14:10 40:14 61:6 84:10
**thing** 6:14 16:6 28:7 46:7 48:13 59:14 76:10 82:11 89:8 95:17
**things** 10:22,25 16:12 33:20 35:20 53:3 61:3,7 79:23,24 80:23 88:17 90:15 95:24 96:3 100:15 100:16
**think** 6:3 7:13 8:8 9:12

12:10 23:23,24,25 26:11
27:2,6 28:4 31:22 33:12
34:6,12,23 37:6,13
39:18 42:18,18 44:5,5
53:24 56:16 59:5,6,8,23
62:8 63:17 66:16 72:23
76:21 82:5 88:13 90:8
93:10 94:18 95:5 103:22
**thinking** 80:11
**third** 7:25
**Thirty** 15:24
**Thompson** 59:18
**thorough** 26:7
**thought** 5:20 42:17 73:1,3
87:2 92:20,22,24 93:9
94:23
**thousands** 78:13,13,14,14
**threat** 84:24
**threatened** 9:22
**three** 31:14 45:22 53:5
79:24 88:21 93:13 95:5
**threefold** 87:2
**tie** 41:19
**till** 71:24
**time** 3:11 6:7 9:12 11:20
14:5 17:22 21:7 22:3,10
22:17 23:9,21,23,25
24:5,9,10 26:15,25 27:5
27:8,10,11,12 28:4
29:24 30:2 32:11 34:8
34:13 35:6 40:10 46:10
51:22,24 54:15 56:9,19
57:23 59:13,18 62:24
63:8 65:13,14 66:10
68:17 70:4 71:24 74:24
75:17 77:15,21 80:12
82:13,14 83:13,13,21
84:1 91:2,8,9,10,11,14
91:20,23 93:1,12 94:18
95:11 98:17 100:25
101:10 102:16 104:22
105:12
**timely** 24:20,20
**times** 32:14 95:5
**title** 60:6 108:23 109:2
**today** 26:20
**Today's** 3:11
**Todd** 21:3
**toilet** 10:24
**told** 88:5 94:24
**Tom** 7:10
**tool** 84:3
**top** 92:4,11 94:25
**tour** 14:11,14 86:5
**tours** 13:21 93:2
**track** 57:1
**traditionally** 39:10 71:14
**trained** 98:18 99:20 100:3
100:7
**training** 33:18 39:2,21
96:20 100:14
**transcribed** 106:6
**transcript** 1:9 2:23 106:13
107:5
**transfer** 44:11
**transferred** 42:22
**transition** 37:4,15 43:4
70:11 71:19
**transitionary** 37:18 42:1
**transitioning** 53:21
**trauma** 99:25
**treatment** 35:1,7 38:11
102:19
**triaging** 33:19
**Tribune** 27:2
**trigger** 79:6

**triple** 94:22
**true** 5:8 6:21 12:10 21:14
36:14 38:5,6 40:18
50:17,21 51:1,2 63:1
72:7 74:23 78:24 100:17
106:6 107:8
**trust** 89:7
**Trustee** 1:3
**truth** 106:5
**try** 26:6 86:11
**trying** 19:21 34:6 51:15
84:13 104:11
**turn** 31:10
**twenty** 55:9
**Twenty-four** 56:17
**two** 5:17 6:1 7:10 14:14,14
15:25 17:11 19:14 30:4
30:11 52:6 53:3 68:2
79:23 93:1
**two-year** 5:4
**type** 9:17
**types** 24:8
**typewritten** 107:4
**typical** 83:2
**typically** 38:3 82:2

**U**

**U.S** 80:3
**uh-huh** 6:23 7:16 15:18
16:13,21 21:22 26:21,25
27:19 28:7 32:20 34:2
36:24 44:20 46:20 49:2
51:12,21 52:2 54:24
55:24 58:11 63:13 66:3
67:2 68:4 80:7,13,18
82:7,9,23 84:21 85:3
87:24 91:24 92:1 94:1
95:20,22 97:8 100:9
101:2 103:12
**ultimate** 8:18
**Um** 9:12 15:23 16:5 21:5
23:22 31:17 34:6 39:13
42:15 44:5 57:17 65:13
65:16 67:6 71:1,17
84:11
**umbrella** 24:4 30:25 53:22
**unable** 63:8
**unclear** 47:20
**underneath** 30:25
**understand** 7:16,24 10:14
18:18 20:11 35:10 51:8
54:19 56:2,10 61:2
63:10 71:8 101:4 103:18
**understanding** 8:6 9:14
39:18 41:6 43:13 53:11
53:14 63:25 74:20,25
**understood** 60:12
**unfortunately** 36:7 47:9
90:24
**unit** 6:8 10:5 68:12,13,14
68:15 69:10 74:18
**United** 1:1 3:6 27:20 38:14
43:15
**untreated** 50:16,18
**upset** 14:18
**urgent** 52:24 53:6
**use** 14:10 21:21 34:24
54:21 77:5,5 87:19 90:3
**usually** 48:11 96:18

**V**

**vacuum** 53:24
**variety** 9:25 71:21 88:12
**various** 11:9
**verified** 27:14

**verify** 88:17
**versus** 3:5
**video** 1:9,25 3:3,16,17
15:20 16:8 83:9 94:19
94:23 95:2 106:3 107:5
**Videographer** 1:25 3:3,24
4:6 77:7,10,12,18 105:8
**view** 12:20 94:3,9 101:23
**violate** 104:16
**violation** 95:15
**visualize** 87:16 89:1 96:10
**visualizing** 17:22 92:4
**voce** 16:15 17:7 18:1
97:21,25
**vs** 1:5 107:6

**W**

**W** 1:3 2:2
**Waagmeester** 65:17
**walked** 18:21
**wall** 15:16
**want** 19:2 64:17 67:19
68:25 79:3,12 84:22
88:17 89:9,23,24 90:10
92:12,12 93:2 95:15
96:5,7 101:19
**wanted** 5:22 57:23 60:3
**wants** 63:20
**Washington** 106:2,22
107:2
**wasn't** 14:15 16:7 26:16
47:6,7 59:4 60:4 66:22
86:1 93:11,14
**watch** 10:7,14 11:4,7,9,13
13:21 14:11,14 20:14
21:1 67:3 69:11,12
70:17 73:4,19 74:7,11
74:14,21 75:2,3,5,7
83:16 88:10 89:10,11,16
89:17,19,20 93:2 94:23
**watched** 16:6
**watches** 69:25 88:13
**watchful** 60:16
**way** 6:6 14:11 28:24 33:19
40:9 56:14 71:19 85:10
100:5
**ways** 14:14 60:21
**we'll** 60:22 63:23 105:5
**we're** 30:17,18 41:25
56:20 62:18 63:8 64:16
68:22,24 77:12,18 92:13
102:5 105:8,8,13
**we've** 36:8 56:12,14,14
65:14 90:24
**weapons** 96:14,15,18
**week** 22:2 31:14 45:22
52:3 53:5 56:17,18,19
56:20 72:6
**weight** 90:21 91:12,15
**well-being** 8:16,18,21,22
12:12 16:25 87:10,25
88:18,22,25 89:3 93:13
94:13
**went** 5:24 47:3 52:6 53:17
56:16,16 57:21 74:3
**weren't** 24:19
**Wetterling** 80:16
**wide** 71:21 84:16 88:12
**widespread** 84:16
**Wiley** 29:22,23 58:16
**Winberg** 1:24 3:13 106:3
106:20
**Wise** 93:5 94:20,21
**Wise's** 92:24
**withdrawal** 36:13 51:11
70:15 73:4 76:6,9 88:14

97:11,12
**withdrawing** 36:22
**witness** 4:10,12 25:9,11
25:16 43:23 45:7 48:1
49:12 50:9 63:13,17
64:10 67:9 72:12 93:17
93:23 96:2 98:4 103:9
103:12,15,22,25 104:8
105:7 106:4,6,13,14
**witnesses** 84:19
**Won** 6:12
**word** 34:21
**words** 6:25 13:8 17:12
79:6 99:6
**work** 5:6,13 53:8 89:2
90:24
**worked** 6:6
**workforce** 58:7,19 70:1
**working** 65:13
**world's** 19:25 99:2
**worry** 84:25
**wouldn't** 14:9,19,20 31:25
79:3 84:7 88:3,21 89:9
89:12 92:5
**writing** 29:16
**written** 46:24 47:10,18
54:16,21
**wrong** 3:23 56:3

**X**

**Y**

**yeah** 6:22,23 18:3 19:24
20:10 22:8,13 34:19
38:16 41:18,25 43:17
45:17 48:20 50:17 51:9
57:1,12,12,16 58:4,15
58:18,21 59:23,24 61:5
65:6 70:8 74:17 77:11
78:1,11,24 80:24 82:14
83:12 84:9 85:8,20
86:24 87:8 88:12,15,20
89:13 94:12 96:22 98:25
99:21 100:23 102:20
**year** 5:17,19,21,25 24:15
27:3 79:4
**years** 5:17 6:1,5 22:10
26:2 34:15 56:15 68:1
80:5
**Yep** 14:12 14:3 15:7,19
17:5 19:6,8,10,16 21:11
38:11 43:22 69:17 70:9
72:6 83:17 85:12 96:17
98:14 104:25

**Z**

**zero** 3:23
**Zerwas** 7:11

**0**

**0075** 108:19
**018-CV-2301** 3:23
**0454-0458** 108:22
**0465-0467** 109:1
**09** 21:17,19

**1**

**1** 3:2 41:16,23 42:2 58:8
77:14 108:5
**1-8** 2:25
**1.11** 31:11
**1.12** 45:15 52:17
**1.17.2** 37:15 42:19

**10:23** 77:16
**10:52** 77:21
**101** 96:20 109:3
**1066** 108:5
**1067-1081** 108:8
**11** 54:3,12
**11:26** 105:12,14
**13** 7:13 23:13
**13880** 1:15 3:9
**14** 6:13 23:13,13 29:12
70:10 102:11
**15** 74:19
**15-minute** 8:21 11:3,8,13
21:1 73:19 74:7,11,14
74:21 75:2,3,5,7 88:1,9
89:10,15,17,19
**15-minute-watch** 73:20
**17** 55:10
**17th** 29:14 70:7,8
**18** 6:13 108:12
**18-cv-2301** 1:2
**1996** 6:3

**2**

**2** 3:2 41:20,23 42:2,4,11
42:16 43:4,5,20,21
51:24 52:17 54:8,9
55:14 65:4 77:20 105:10
108:8
**20** 6:4 108:14
**2000** 23:12 62:19 63:2,9
64:5,11
**2007** 5:3 82:12
**2009** 6:12 21:16
**2010** 6:13
**2011** 62:18,20,22 64:4,14
**2014** 55:10,10
**2015** 64:15
**2017** 62:8 100:24 101:9
**2018** 62:9
**2019** 1:11 3:11 106:4,15
107:7
**21** 29:12 55:10
**21st** 29:15 70:8
**23** 71:8
**24** 1:11 3:11 52:3 56:15
100:24 107:7
**24th** 106:4
**25** 77:7
**2800** 2:15
**28th** 106:14
**29** 108:17
**2nd** 76:5

**3**

**3** 18:5,7 31:10 98:22 108:6
108:9,11
**30** 2:14 57:11 88:1
**30-minute** 8:22 89:20
**300** 86:11
**3000** 2:5
**30th** 70:10
**32** 56:16
**333** 2:4
**35** 80:5

**4**

**4** 20:2,4 98:22 108:13
**4-105** 108:2
**40** 56:18,20
**41** 108:6,9

**5**

**5** 29:4,6 31:9,10 37:3,14

42:1,17 47:11 51:22
54:3,7,10,11 98:22
99:23 108:16
**5.0** 54:14 56:11
**5.4** 55:6
**5.5** 55:16
**55101** 2:15
**55330** 1:15
**55402** 2:5
**55438** 2:10
**5th** 73:21 75:17,24

---

**6**

**6** 81:1 101:9 108:19
**600-plus** 78:16

---

**7**

**7** 97:23,24 108:22

---

**8**

**8** 101:6 109:1
**8-2301** 3:7
**80** 108:20
**81** 108:20
**8th** 73:22

---

**9**

**9** 98:2
**9:11** 1:12
**9:12** 3:12
**9321** 2:10
**97** 108:24
**98** 108:24