# EXHIBIT 7

Michael Robertson
6/20/2019

1

UNITED STATES DISTRICT COURT
STATE OF MINNESOTA
-----------------------------------------------------
                          Case No. 18-cv-2301 (JRT/KMM)

David W. Lynas, as Trustee for the
next-of-kin of James C. Lynas,

                          Plaintiff,

     vs.

Linda S. Stang, et al.,

                          Defendants.
-----------------------------------------------------

            VIDEO DEPOSITION TRANSCRIPT OF

            MICHAEL T. ROBERTSON, PsyD, LP


                 June 20, 2019
                  11:00 a.m.

                   at the


              Sherburne County Jail
       13880 Business Center Drive Northwest
               Elk River, MN 55330









Court Reporter:  Janet D. Winberg, RPR

Videographer:  Envision Video

Michael Robertson
6/20/2019

---

**2**

1  APPEARANCES:
2     On Behalf of Plaintiff David W. Lynas:
3        Robert Bennett, Attorney at Law
         Gaskins, Bennett & Birrell, L.L.P.
4        333 South Seventh Street
         Suite 3000
5        Minneapolis, MN 55402
         rbennett@gaskinsbennett.com
6
7     On Behalf of the Sherburne County Defendants:
8        Jason M. Hiveley, Attorney at Law
         Iverson Reuvers Condon
9        9321 Ensign Avenue South
         Bloomington, MN 55438
10       jasonh@irc-law.com
11
      On Behalf of the MEnD Defendants:
12
         Carolin J. Nearing, Attorney at Law
13       Larson King, LLP
         30 East Seventh Street
14       Suite 2800
         St. Paul, MN 55101
15       cnearing@larsonking.com
16
17
18
19
20
21
22
23    NOTE: Original transcript will be delivered to the
      noticing party, Gaskins, Bennett & Birrell, L.L.P.
24
25    NOTE: Exhibits referenced, not marked.

---

**3**

1               P R O C E E D I N G S
2
3        VIDEOGRAPHER:  This is the video
4  deposition of Dr. Michael Robertson.
5        Today's date is June 20, 2019.  The time is
6  approximately 11:00 a.m.
7        Would each attorney please state their name
8  for the record.
9        MR. BENNETT:  Robert Bennett, appearing
10  on behalf of the Plaintiff.
11        MS. NEARING:  Carrie Nearing, appearing
12  on behalf of the MEnD Defendants.
13        MR. HIVELEY:  Jason Hiveley, for the
14  Sherburne County Defendants.
15        VIDEOGRAPHER:  Thank you.
16        Would the court reporter please administer
17  the oath.
18                  *   *   *
19  (Witness sworn.)
20        MICHAEL T. ROBERTSON, PsyD, LP,
21  called as a witness, being first duly sworn,
22  was examined and testified as follows:
23                  *   *   *
24
25

---

**4**

1                   EXAMINATION
2  BY MR. BENNETT:
3  Q.   Dr. Robertson, did you have any discussions with
4       anyone regarding James Lynas, before he
5       committed suicide at the Sherburne County Jail?
6  A.   I don't recall having one specifically.  And
7       oftentimes, I think we'll review patients
8       without a name, so...
9  Q.   Well, do -- do you remember talking to anyone
10      about patient number -- what is it -- 12010?
11  A.   And not with a number, either; but with data and
12      history, typically it would be a consult.
13  Q.   I mean, that was the number you referred to him
14      on -- in your email in Exhibit 13.
15           I'm showing you Exhibit 13, and I direct
16      your attention to a December 10, 2018 email, so
17      about -- about 13 months after Mr. Lynas
18      committed the act that eventuated into his
19      suicide at the Sherburne County Jail; is that
20      correct?
21  A.   Wait.  I'm sorry, I was reading.  I wasn't
22      really paying --
23  Q.   Okay.
24  A.   -- attention.
25  Q.   Well, you -- you wrote that in -- you wrote that

---

**5**

1       in -- in -- on December 10 -- it was
2       December 10, 2018; right?
3  A.   Correct.
4  Q.   At 4:57 p.m.?
5  A.   Correct.
6  Q.   Are you aware that Mr. Lynas committed suicide
7       more than a year earlier?
8  A.   Yes, I wouldn't have known his name, or the case
9       in particular didn't -- it wasn't one that
10      registered for me at that time.
11  Q.   Well, it registered -- um, read your --
12  A.   In regards to who that was in particular, or --
13      I would have had to look those pieces up.
14  Q.   Did you?
15  A.   I think I did.
16  Q.   And you looked -- you say, "Regarding dates of
17      11/5/17"; right?  That's the beginning text of
18      your email?
19  A.   (Nodding head.)
20  Q.   And as to patient 12010?
21  A.   Yes.
22  Q.   Can you read the next sentence in parens?
23  A.   (As read), "It was not a case I was ever
24      involved in, but relayed that the patient was
25      placed on a Mental Health Watch-15 due to high

---

2 (Pages 2 to 5)

Michael Robertson
6/20/2019

**6**

1       BDI and risk factors" dash "when nursing met
2      with him about this and consulted with medical
3      provider."
4  Q.  And who was the medical provider?
5  A.  At the time, I'm not certain.  Um, it might have
6      just listed "and consulted with medical
7      provider" in the note.
8  Q.  And "medical provider" was not you?
9  A.  No.
10  Q.  It was someone with -- within the medical field
11      as opposed to the psychological --
12  A.  Right.  Typically --
13  Q.  Can we do --
14  A.  Yeah.
15  Q.  -- do this?  We need to speak one at time.
16      It just --
17  A.  Sorry.
18  Q.  -- works better for the court reporter, and
19      actually works better for the video --
20  A.  I --
21  Q.  -- too.
22  A.  -- didn't know you weren't done, sorry.
23  Q.  So the medical provider is someone with a
24      medical degree of some type; correct?
25  A.  Correct.

**7**

1  Q.  And you were not the medical provider at the
2      Sherburne County Jail?
3  A.  Correct.
4  Q.  You were -- what was your title at the --
5  A.  Mental Health Professional.
6  Q.  Okay.  All right.  And Mental Health Watch-15,
7      you go on to explain what that means at the
8      Sherburne County Jail at that time; is that
9      correct?
10  A.  Yes.
11  Q.  Do you remember having the discussion with Brian
12      Frank, and why he wanted this information?
13  A.  Um, it wasn't -- it wasn't clear precisely what
14      he was looking for, but since there was an
15      inquiry about a case that seemed that there were
16      legal issues around, I just forwarded that to
17      administration.
18  Q.  And the next paragraph, can you read that into
19      the record, please.
20  A.  Sure.  (As read), "Brian wanted clarification
21      about the difference between a 'mental health
22      watch' and 'suicide watch,' and I described it's
23      been my understanding that since before I
24      arrived here, the jail administration was not --
25      has not wanted the term, quote, 'suicide watch,'

**8**

1      unquote, used because it is confusing for cases
2      which are not suicidal."  In parenthesis, I
3      wrote, "actually, we previously had this
4      discussion," unparenthesis, "and we were
5      informed to call the watch as 'mental health
6      watches.'"
7  Q.  Can you stop there for a second?  And I'll go
8      on, but what did you mean by, "for cases which
9      are not suicidal"?  Is that in which an actual
10      suicide has occurred, or suicide attempt has
11      occurred?
12  A.  Um, you know, I don't know if that's -- there's
13      so many groups of behavior that are
14      self-injurious without being suicidal, or people
15      having ideation without suicidal or significant
16      suicidal things, so it was more about trying to
17      clarify -- it's hard to -- I don't want to
18      define that -- I think the issue it becomes
19      related to not confusing people.  There are many
20      individuals there with psychotic symptoms, with
21      other symptoms that aren't suicidal, that need
22      to be on watches.
23  Q.  So a Mental Health Watch-15, is that -- MHW-15
24      that you refer to the paragraph above, was the
25      highest mental -- the highest mental health

**9**

1      observation status that was used without using
2      full suicide precautions?
3  A.  I don't understand your question, or how to
4      break it apart.
5  Q.  Well, what was -- what was beyond -- you
6      understand that the rules require well-being
7      checks at 30 minutes regularly for everybody --
8  A.  Correct.
9  Q.  -- correct?  And when you elevate the check --
10      the checks by -- you essentially doubled them;
11      right?
12  A.  Sure.
13  Q.  What status is -- at -- at -- at Sherburne
14      County --
15  A.  So --
16  Q.  -- when you were there?
17  A.  So --
18  Q.  What status is above that, other than suicide
19      precautions -- suicide precautions?
20  A.  Well, 15-minute mental health watch checks, and
21      then the -- in addition, you had -- those other
22      precautions can be added.
23  Q.  Okay.  But the mental health watch is to alert
24      corrections facility -- corrections people that
25      this person has mental health risks associated

3 (Pages 6 to 9)

Michael Robertson
6/20/2019

**10**

1      with his being there?
2  **A.  Yes.  That's what it's intended for.**
3  Q.  And the decision not to use suicide watch, when
4      it might ordinarily be used, was Sherburne
5      County's?
6          MS. NEARING:  Objection.  Foundation.
7  BY MR. BENNETT:
8  Q.  Go ahead.
9  **A.  Oh.  That was my understanding.**
10 Q.  And that's what you put in plain English, in
11     this email; correct?
12 **A.  Yes.**
13 Q.  And --
14 **A.  And I think --**
15 Q.  Go ahead, finish your answer.
16 **A.  I think part of those discussions that were had**
17     **prior to this email, included the benefit of**
18     **having it identified as "suicide watch" versus**
19     **the general term, and I think that those -- all**
20     **those things were talked about.**
21 Q.  Well, "Mental Health Watch-15" is not a general
22     term, is it?
23 **A.  Ah, no.**
24 Q.  It's a specific term?
25 **A.  Sure.**

**11**

1  Q.  With specific requirements?
2  **A.  Yes.**
3  Q.  And it's added watches, to ensure the person's
4      physical and mental well-being?
5  **A.  But it's more general than suicide.**
6  Q.  Correct.  And if I understood what you were
7      saying, you know, a person might have suicide
8      ideations, but he didn't do anything actually
9      suicidal.  He might say he had a plan, but
10     didn't do anything to effectuate the plan.  He
11     might do something, you know, be self-injury,
12     like a head banger, and you wouldn't put him on
13     suicide watch because that would be confusing.
14     Is that what that means?
15 **A.  We would term it, "no health watch."  We'd still**
16     **put them on the same standard follow-up, it**
17     **would just have a different term.**
18 Q.  Okay.  And it would be true, though, that a head
19     banger, or someone with suicidal ideations, or
20     someone who said he had a plan, would be on
21     increasing levels of conduct towards a suicidal
22     status?
23         MS. NEARING:  Objection.  Foundation.
24     And incomplete hypothetical.
25         THE WITNESS:  I don't know if the

**12**

1      continuum of where the person is heading is
2      always that case, but -- where it was on a
3      continuum to a suicidal status, but certainly
4      that's one of the avenues that can happen.
5          MR. BENNETT:  Okay.
6  BY MR. BENNETT:
7  Q.  And then read the next sentence, the next -- the
8      next paragraph, starting with, "We briefly."
9  **A.  (As read), "We briefly discussed that many of**
10     **the mental health watches we place inmates on**
11     **are proactive and not after or subsequent to a**
12     **suicide gesture or suicide statement.  And many**
13     **of the mental health watches we start are**
14     **related to poorly regulated coping and**
15     **vulnerability to act out, or to be taken care**
16     **of.  This info seemed to suffice, but I thought**
17     **I would relay the information that the call --**
18     **[and] the call, as I suspect both questions are**
19     **related to legal issues."  That's a poor**
20     **sentence.**
21 Q.  And what does the "PS" say?
22 **A.  (As read), "PS.  I viewed this as simply**
23     **confirming fact data about known information and**
24     **dates, which would have been shared in the**
25     **placing him on mental health watch.  Nothing new**

**13**

1      **or different was shared, but upon reflection, it**
2      **seems important to know.**
3  Q.  Would you agree that opiate withdrawal symptoms
4      are an obvious and serious medical need?
5  **A.  Yes.**
6  Q.  Would you agree that severe depression generally
7      constitutes a serious medical need?
8  **A.  If it's -- yes, severe depression.**
9  Q.  Okay.  Now, you're aware -- were you aware that
10     James Lynas' Beck Depression Inventory score
11     was 43?
12 **A.  Upon review of it, yes, and probably at the**
13     **time.**
14 Q.  Let me ask you, Doctor.  In -- you've done a lot
15     of correctional work --
16 **A.  Yes.**
17 Q.  -- right?  In your correctional work, how many
18     individuals do you recall having a -- a BDI
19     score of 43 or higher?
20 **A.  Many.  Um, and I -- I don't know how to throw a**
21     **number on that, but...**
22 Q.  How many at the Sherburne County Jail?
23 **A.  Um, many.  Many would reach that high.**
24 Q.  Do you -- do you believe that that is --
25 **A.  I'm sure it's over a hundred.  Over, you know, I**

4 (Pages 10 to 13)

Michael Robertson
6/20/2019

14

1     don't know how many, though.
2 Q.  Do you believe that that view is consistent with
3     the statistics reported for Beck Depression
4     Inventory scores in correctional facilities?
5 **A.  I don't know -- I don't understand the question.**
6 Q.  Do you -- do you believe that -- that what your
7     opinion -- or what you recall, or say you
8     recall, is -- about Beck Inventory scores, is --
9     is a -- is substantiated in the literature?
10 **A.  I think all those tools need to be applied to a**
11     **certain -- certain circumstance that they're**
12     **being used at the time with the individual. Um,**
13     **and so the information that it gives you is a**
14     **tool that provides some -- some information.**
15     **There's a lot of face validity to it, so that...**
16 Q.  Well, the Beck Depression Inventory has been
17     used since about the mid-'90s -- '96; correct?
18 **A.  I suspect you're correct.**
19 Q.  And the psychometric testing is rated for both
20     sensitivity and specificity; correct?
21 **A.  At times, yes.**
22 Q.  And the Beck Depression Inventory II has -- has
23     a high sensitivity and specificity rating; is
24     that true?
25 **A.  In the general population, yes. Yes.**

15

1 Q.  Well --
2 **A.  And probably in many populations, yes.**
3 Q.  Okay. And it's one that's actually
4     cross-cultural? I mean, they use the Beck
5     Depression Inventory test in Korea and China,
6     for example: are you aware of that?
7 **A.  No, but I wouldn't doubt that.**
8 Q.  Are you aware that the literature suggests, that
9     in Korea and China it's just as sensitive and
10     specific as in the United States?
11 **A.  No.**
12 Q.  How do you typically -- what is your typical
13     practice in charting? If you get a document
14     that is for an individual detainee or inmate,
15     how will we know when you reviewed it?
16 **A.  Typically, a handwritten note and a computer**
17     **note would be my...**
18 Q.  And the computer would say that, "This was noted
19     or reviewed on such and such a date"?
20 **A.  Typically, yes.**
21 Q.  Okay. Did -- have you looked to see if you
22     noted when you reviewed anything with regard to
23     James Lynas, Patient 12010?
24 **A.  No, unless it was at this date of this email.**
25 Q.  Okay.

16

1 **A.  Um, my understanding, what I reviewed was with**
2     **staff at that time, who had done a consult, and**
3     **possibly with me.**
4 Q.  And you don't specifically recall that, though,
5     do you?
6 **A.  No.**
7 Q.  So you don't know if it was with you?
8 **A.  I presume it was with me, because I was working**
9     **that day --**
10 Q.  And what day was that?
11 **A.  -- to my understanding.**
12 Q.  The 5th of November?
13 **A.  Um --**
14 Q.  Is it referred to in that --
15 **A.  Yeah, I presume that I was working that day.**
16     **And I don't even know what day of the week it**
17     **is. During that time period, I know I was**
18     **working --**
19 Q.  Let's look at Exhibit 14. I think we're done
20     with 13.
21 **A.  Okay.**
22 Q.  Take a minute to review that, and let me know
23     when you're ready to be asked questions about
24     it.
25 **A.  (Reviewing exhibit.) Oh. Was there more**

17

1     attached to this?
2 Q.  Not as far as we can tell.
3 **A.  Okay. It looks like there's a staple, and it**
4     **says, "See eMDs note attached."**
5 Q.  Well, this is the document in the form in which
6     we received it in discovery.
7          MR. BENNETT: Do you know if there was
8     other pages to this, Carrie?
9          MS. NEARING: Everything that's
10     contained in the medical record is what -- what
11     exists. There's nothing supplemental to that.
12          MR. BENNETT: There's an eMD record too,
13     and I --
14          MS. NEARING: Right. That's part of the
15     record that was provided as well.
16          MR. BENNETT: That --
17          MS. NEARING: At the risk of testifying,
18     but just to clarify -- I want to clarify.
19          MR. BENNETT: Okay.
20          MS. NEARING: I believe Ms. Pfeifer had
21     testified that she gives this, along with the --
22     and it's in her notes, actually. And we can go
23     off the record, and I'll show you if you want.
24          MR. BENNETT: Okay.
25          MS. NEARING: Do you want to do that?

5 (Pages 14 to 17)

Michael Robertson
6/20/2019

18

1       MR. BENNETT:  We can go off the record.
2       VIDEOGRAPHER:  Off the video record at
3  11:20 a.m.
4       (Discussion held off the record.)
5       VIDEOGRAPHER:  This is File 2.  We're on
6  the record at 11:30 a.m.
7  BY MR. BENNETT:
8  Q.  Showing you Exhibit 14 again, does your
9     handwriting appear there?
10  A.  **Yes.**
11  Q.  And can you read it for me, please.
12  A.  **(As read), "Scheduled with mental health**
13     **11/16/2017," and then I circled my initials.**
14  Q.  And there's nothing in that note, that lets us
15     know when you did that, is there?
16  A.  **When I scheduled it?**
17  Q.  Yeah.
18  A.  **Ah, nothing that would indicate that except for**
19     **routine of how it's done.**
20  Q.  Well --
21  A.  **Right.**
22  Q.  -- it didn't -- it didn't -- you didn't --
23  A.  **Correct.**
24  Q.  There's no --
25  A.  **No.**

19

1  Q.  There's no writing that says, "Reviewed November
2     5th"?
3  A.  **Correct.**
4  Q.  "November 6th"?
5  A.  **Correct.**
6  Q.  "Seventh"?
7  A.  **Correct.**
8  Q.  "Eighth"?  "Ninth"?
9  A.  **Correct.  Correct.**
10  Q.  Okay.  And if you look at Exhibit 15, that's the
11     "Special Precautions/Management."  Does your
12     handwriting appear on that?
13  A.  **No.**
14  Q.  Exhibit 16, that's the -- that also has a staple
15     mark and an actual staple, but that's the -- can
16     you read that?  That is the note from Pfeifer;
17     correct?
18  A.  **I'm trying to find her name on there.  Oh, yes.**
19  Q.  Is it hers?
20  A.  **Yes.**
21  Q.  And can you read that for -- for the record,
22     please.
23  A.  **Yeah, I'll skip to the "Chief Complaint" part.**
24  Q.  Yeah.
25  A.  **(As read), "James Lynas is a 31-year-old male**

20

1     Anoka inmate.  Today's visit is a chemical
2     withdrawal assessment.  His primary language is
3     English.  He's completely fluent in English.
4     "The patient returned BDI with a score of 43
5     and No. 9 scored as 1.
6     "Writer reviewed patient's health assessment
7     visit, previous suicide risk assessment, and
8     BDI, with FNP CW, who asked for writer to meet
9     with patient and get more information.
10     "The patient was seen in clinic."
11     Do you want me to go on?
12  Q.  Yeah.
13  A.  (As read), "Patient denies suicidal thoughts,
14     and when writer asked if he had the opportunity
15     available to kill himself, would he do it, the
16     patient responded -- stated no, 'I couldn't do
17     that to my daughter.'  The patient denies
18     history of attempts or plans of suicide, but
19     reports in 2013, when he got his felony, he felt
20     like giving up, and he sold all his" -- excuse
21     me, "all his guns so he wouldn't shoot himself.
22     He reports he was having a rough time on the
23     outside.  About 1.5 months ago stated getting
24     his life back together, but still continued to
25     use opiates.  Reports now being in jail is the

21

1     first time in 1.5 years he's been sober, and is
2     having to deal with his mental health.  When
3     asked how he's currently coping with it, the
4     patient stated, 'Honestly, I'm suffering, and
5     not coping with it.'  The patient reports he
6     went to court on Tuesday and got four months,
7     but possibility of going to workhouse after 30
8     days, but thinks it's in his best interest to do
9     the four months and then go to treatment that
10     does dual diagnosis to get help with drug use
11     and mental health, like at Nystrom or Recovery
12     Plus.  Report the last time he went to treatment
13     his mental health was not addressed, and he
14     thinks he was -- he thinks that was part of the
15     issue of returning to drugs.  The patient
16     reports definitely feeling depressed and 'my
17     anxiety is through the roof.'  Reports feeling
18     very stressed about being locked in for 20 hours
19     a day in the Gamma Unit" -- or "while in Gamma,"
20     excuse me.  "But when he was -- when he has time
21     out of his cell, he watches TV or walks, which
22     helps.  Reports his insomnia is maddening.  His
23     mind is going crazy with thoughts, and going
24     through many emotions like frustration,
25     irritated, and than emotional.  The patient

6 (Pages 18 to 21)

Michael Robertson
6/20/2019

**22**

1   reports having current goal of getting life back
2   together, and future goals of going to treatment
3   and putting his life back together for his
4   daughter so she doesn't have to go through the
5   same thing he did.  The patient reports if he
6   did have suicidal thoughts, he would tell the CO
7   or the clinic."
8   Q.   Is that what you were referring to, by "other
9   risk factors" in your email?
10   A.   The one to Brian Frank?
11   Q.   Yes.
12   A.   I'm not sure.  That was, like, a year after
13   this, um, but --
14   Q.   Do you remember when you said was BDI, high
15   B- --
16   A.   Oh, and other risk factors?
17   Q.   Yeah.
18   A.   Um, probably, I guess, yeah, but I...
19   Q.   Yeah, you said (as read), "Placed on MHW-15 due
20   to high BDI and risk factors"; correct?
21   A.   (Nodding head.)
22   Q.   A score of 43 on the BDI indicates severe
23   depression, doesn't it?
24   A.   You can't base -- it indicates the possibility
25   of that, yes.  I mean, you can't take that score

**23**

1   simply as meaning that automatically.
2   Q.   Well, that's --
3   A.   But that's certainly what it can indicate.
4   Q.   If you -- that's what the BDI that -- is it
5   Aaron Beck that did the BDI?
6   A.   Yeah.
7   Q.   And he's like the king of cognitive therapy;
8   right?
9   A.   Well, I don't know -- I don't know how to
10   describe that.  He's very well known in that
11   area, yeah.
12   Q.   And the BDI scoring system that they put out,
13   has 29 to 63 indicates severe depression;
14   correct?  If you look at Exhibit 10?
15   A.   According to -- yeah.  And -- uh-huh.
16   Q.   Do you keep that scoring scale in the -- is it
17   kept in the Sherburne County Clinic?
18   A.   The scoring scale?
19   Q.   Yeah.
20   A.   I think they use a threshold, you need above a
21   certain number.  It's a good general indicator
22   that somebody is struggling; whether it actually
23   defines that or not, it needs to be further
24   explored, what's going on --
25   Q.   Uh-huh.

**24**

1   A.   -- I think that's why she met with him.
2   Q.   Well --
3   A.   Or part of --
4   Q.   -- there's --
5   A.   -- why she --
6   Q.   -- nothing about her note that would dissuade
7   you from the fact that he had -- a belief that
8   he had severe depression, is there?
9   A.   Um, there's multiple things that were going on,
10   it looks like.  It looks like he was going
11   through withdrawal and distress.  He had just
12   come into the jail.  Um, whether he was going
13   through severe depression, or whether he filled
14   that BDI out three or four days earlier, when he
15   was feeling like he wasn't getting things, and
16   was withdrawing, and trying to make a plea for
17   help to get more services by magnifying symptoms
18   or what was happening, is sometimes part of --
19   you know, I can't necessarily say just one tool
20   indicates this for a guy.
21   Q.   Well, I know.  And --
22   A.   Okay.
23   Q.   -- what I'm -- what I'm telling you, is one --
24   is one tool is that the Beck Depression
25   Inventory; correct?

**25**

1   A.   Sure.  Sure.
2   Q.   Another tool is you read this chart note and
3   there's an interview of the -- of the --
4   A.   Correct.
5   Q.   -- of the patient; correct?
6   A.   Yeah.  And he's --
7   Q.   And --
8   A.   -- got plans, forward thinking, you know.  He's
9   talking cooperatively and openly with staff.
10   Q.   The plan -- the interview note is not
11   inconsistent from a psychological perspective
12   with severe depression, is it?
13   A.   No, it's not inconsistent --
14   Q.   In --
15   A.   -- with --
16   Q.   -- fact, it is consistent, isn't it?
17   A.   It's consistent, yeah.
18   Q.   Okay.
19   A.   And, um...
20   Q.   But your -- your note doesn't appear on -- your
21   handwriting does not appear on Exhibit 16, does
22   it?
23   A.   No.
24   Q.   Does it appear on Exhibit 22, the -- any of the
25   flow charts?

7 (Pages 22 to 25)

Michael Robertson
6/20/2019

26

1    A.    No.
2    Q.    And that's the chemical withdrawal notes;
3          correct, Exhibit 22?  Does it appear on that?
4    A.    No.
5    Q.    How about the chemical withdrawal questionnaire?
6          Does it appear on that, Exhibit 23?
7    A.    No.
8    Q.    Exhibit 24, the chemical -- another chemical
9          withdrawal questionnaire?
10   A.    No.
11   Q.    Exhibit 25, the -- another chemical withdrawal
12         flow sheet?
13   A.    No.
14   Q.    Anywhere on eMDs?  Is there any notation in eMDs
15         that you -- that denotes when you saw him?
16         Exhibit 26, that is?
17   A.    No.
18   Q.    You've reviewed that prior to today, haven't
19         you?
20   A.    That specific note?
21   Q.    The eMD notes?  Well --
22   A.    Maybe at the time with Brian Frank, and I've
23         probably seen a couple notes, but I don't know
24         if I've seen all of this.
25   Q.    But is there any computer record --

27

1    A.    I don't think so --
2    Q.    -- of when you --
3    A.    -- no.
4    Q.    -- of when you reviewed and made the decision to
5          have him be seen on the 16th --
6    A.    No.
7    Q.    -- is there?
8    A.    No.
9    Q.    So you didn't make an eMD note of that?
10   A.    No --
11   Q.    Okay.
12   A.    -- probably not.
13   Q.    Exhibit 17 is the "Health Assessment," that is
14         your -- is that 17?  Nineteen, excuse me.  Is
15         there any handwriting of yours on that?
16   A.    I'm sure there's not.
17   Q.    How about any of the suicide risk screening
18         forms?
19   A.    No.
20   Q.    And how about the Beck Depression Inventory
21         itself?  Any notation that you reviewed that?
22   A.    No.
23   Q.    And no -- and nothing on there that indicates
24         when you saw Exhibit 14, the mental health
25         referral?

28

1    A.    No.
2    Q.    Did you understand the mental health referral to
3          be urgent?
4    A.    No.
5    Q.    Did -- did you ever talk to CW, Crystal
6          Waagmeester?
7    A.    No, I don't know who she is.
8    Q.    That was the person who actually made the
9          referral.
10   A.    I understand that.
11   Q.    And what does it say she is?
12   A.    Um, a -- a nurse practitioner.  So advanced
13         practice nurse.
14   Q.    And in fact, do you know that she is not a
15         practice nurse, that she's a PA, physician's
16         assistant?
17   A.    No, I don't.  I've never met her, I don't know
18         who she is.
19   Q.    Okay.  And you don't know whether she considered
20         her mental health referral urgent or not?
21   A.    Um, no.
22   Q.    You made a decision that it wasn't urgent?
23   A.    I made?  Um, I don't know.  I don't remember.  I
24         don't recall this, but I can tell you what I
25         typically do with -- with this.  Obviously, I

29

1          signed it and scheduled him.
2    Q.    Yeah.  And we know, on some particular time you
3          scheduled him for an actual clinical visit with
4          you: right?
5    A.    Correct.
6    Q.    And that -- the date of that was scheduled for
7          November 16th?
8    A.    Right.
9    Q.    Which was about a week after he hung himself;
10         right?
11   A.    Um, this was written on the 5th, so that was
12         ten, 11 days after that; right?  So I'm not
13         sure -- is the date that he hung himself on the
14         7th?  Um, is that what you're saying, or...
15   Q.    Did you review his full chart, the eMD charts?
16   A.    Well, on -- I don't know.  And I don't know
17         which date you're referring to.  I think at the
18         time, probably not.  I would have gone through a
19         consult, um, and scheduled him based on that.
20            A year later, when that other email from
21         Brian Frank occurred, I might have looked
22         through it, or skimmed through it.
23   Q.    What does Alyssa Pfeifer's note of 11/9/17 tell
24         you in Exhibit 26, the eMD records?
25   A.    Starting with "Chief Complaint."

Michael Robertson
6/20/2019

30

1   Q.   You can just read that and tell me --
2   A.   Oh.
3   Q.   -- if it alerts you to the fact that he's hung
4        himself by --
5   A.   Out loud?
6   Q.   No, you can just do it --
7   A.   Okay.
8   Q.   -- whatever you -- read it sufficiently, to make
9        that determination.
10  A.   (Reviewing exhibit.)  Okay, I'm sorry.  Now,
11       what's the question?
12  Q.   Does it look like he hung himself on
13       November 9th?
14  A.   Yes.
15  Q.   And that would be a week before his scheduled
16       visit with you?
17  A.   Yes.
18  Q.   And to the best of your knowledge, and -- and
19       after reviewing the file, is it true that no --
20       no antidepressant medication was ever provided
21       to James Lynas during his November 2017 stay in
22       the jail?
23  A.   No antidepressant.  He was getting an
24       antianxiety med.
25  Q.   Is it true that no psychotherapy or

31

1        psychological counseling was provided to James
2        Lynas during the November 2017 stay at the jail?
3   A.   Correct.  He had started a packet, to fill out.
4   Q.   Is it true that no DSM-V multiaxial diagnosis or
5        assessment for James Lynas was made during his
6        November 2017 stay at the jail?
7   A.   Correct.  True.
8   Q.   And in fact, James Lynas was only seen
9        face to face by nurses as far as you can tell?
10  A.   Yes.
11  Q.   And none of those nurses are qualified mental
12       health professionals; correct?
13  A.   Correct.
14  Q.   So he never saw a qualified mental health
15       professional during his 2017 -- November 2017
16       stay at the jail?
17  A.   Correct.  As far as I know, yes.
18  Q.   Did you understand it was the policy -- well,
19       was it -- let me reask it.  Was it MEnD's policy
20       to let the inmate himself decide whether to
21       start the mental health process?
22  A.   Not necessarily, but certainly that often
23       occurred.  Oftentimes they were placed on mental
24       health watches, or we initiated sooner
25       involvement based on a number of factors.

32

1   Q.   Do you remember who it was at Sherburne County
2        who directed you and other staff not to use
3        "suicide watch" as a terminology in the
4        Sherburne County Jail instead of "mental health
5        watch"?
6   A.   Um --
7   Q.   And instead to use "mental health watch"?
8        Excuse me.
9   A.   Yeah, I don't know -- you know, I think -- I
10       suspect that came from Linda Pantzke and/or the
11       -- the jail's administrative team.
12  Q.   And who would that be at that time?
13  A.   It would probably be Pat Carr, Brian Frank, Dave
14       Isais.
15  Q.   Ultimately approved by the sheriff?
16  A.   Um, yeah, I presume.  I -- I don't know.  That
17       was a discussion that was had and --
18  Q.   Who was present at the discussion?
19  A.   I know that it existed before I came, but we
20       also had the discussion while I was there at one
21       point.
22  Q.   Well, who --
23  A.   I'm --
24  Q.   Obviously you don't know who did it before -- or
25       maybe you know, but who did it while you were

33

1        there?
2   A.   I think it was -- there were a number of people.
3        Brian Frank.  Probably Chris Hansen.  Possibly
4        Heather Pickett.  Pat may have been involved.
5   Q.   Pat Carr?
6   A.   Yeah.  But he might not have been in that
7        meeting.
8   Q.   And do you know who had made the prior
9        pronunciation, prior to you being there?  Had
10       you been informed of that?
11  A.   Of how they would do -- label that?  I have no
12       idea.
13  Q.   When you worked at the Sherburne County Jail,
14       did you work at any other jails for MEnD?
15  A.   Yeah.  I was briefly employed by them prior to
16       that for a short period, and worked in Stearns
17       and Mille Lacs County.
18  Q.   While you were at -- and working at Sherburne
19       County Jail --
20  A.   Uh-huh.
21  Q.   -- did you work --
22  A.   No.
23  Q.   -- in any other MEnD facilities?
24  A.   No.
25  Q.   Did you have regular clinic hours?

9 (Pages 30 to 33)

Michael Robertson
6/20/2019

34

1  A.   Yeah, I was typically there by 7:00, 7:30, often
2       out by 4:00 or 5:00, so...
3  Q.   How many days a week in November of 2017?
4  A.   I -- I'd have to look, but I assume five days a
5       week, Monday through Friday.
6  Q.   Was there anybody at the jail in November of
7       2017 that had a BDI score of 43 or higher?
8  A.   Except for --
9  Q.   Other than Mr. Lynas?
10 A.   Yeah, I -- I presume, but I don't know.
11 Q.   Okay.  What did you mean by, "mental health
12      watches are proactive"?
13 A.   Some patients, um, they're going through a
14      number of symptoms.  They don't believe they
15      have serious symptoms, and they actually do.
16      And sometimes they have a lack of insight,
17      sometimes they're out of touch with, kind of,
18      social interactions and might provoke others
19      without realizing it.  Maybe they have
20      personality disorders that are likely to insight
21      some retaliatory or other kinds of things.  So
22      some of that is designed to -- would be designed
23      to alert staff, to be, kind of, mindful of this
24      guy or gal, and -- and be proactive; and if
25      something comes up, we'd like to be involved

35

1       quicker, if need be.
2  Q.   A lot of those things, like whether a person is
3       really a suicide risk, is something that should
4       be decided by a qualified mental health
5       provider, don't you think?
6  A.   No.  Because you would miss thousands of people
7       if you were looking at trying to -- I mean, if
8       people are at a risk, and they -- kind of
9       there's this -- I think the nurses there are
10      trained pretty well to identify a number of risk
11      factors to enable that first hurdle.  It would
12      be, like, I don't know every case going straight
13      to the supreme court.  We have to screen and
14      base it on, you know, what fits, because -- and
15      they're pretty good at sorting out the risk
16      factors, I think.
17 Q.   Well, they wouldn't be able to tell if a person
18      had a personality disorder, would they?  That's
19      a -- that's a very --
20 A.   That takes a minute to do that, so it's --
21      but -- but they can definitely see the more kind
22      of extravagant behaviors, the provocative
23      behaviors that alert them to concerns.
24          I don't mean to be hedging, or trying to --
25 Q.   Well, but you mentioned a number of things, you

36

1       know, if a person -- in your prior answer, you
2       know, personality disorders --
3  A.   Sure.  Sure.
4  Q.   -- a number of different things that I would
5       expect you to know, obviously.  And you'd expect
6       you to know those things; correct?
7  A.   And I -- and I definitely use that language to
8       describe the other issues, that they're placed
9       on these watches to kind of --
10 Q.   Sure.  But that -- those are decisions, like
11      whether a person has an actual personality
12      disorder, that are made by --
13 A.   To put -- to put that eventually --
14 Q.   Please let me finish.
15 A.   Oh, sorry.
16 Q.   -- that are made by qualified mental health
17      professionals, such as yourself, and others?
18 A.   When they're made, yes.
19 Q.   Yeah.  How many people would you see in clinic
20      from 7:00 to 4:30, five days a week?
21 A.   Um, it would depend on a lot of factors, but
22      maybe eight to 12 people per day, maybe.
23 Q.   So you're talking between 40 and 60 people a
24      week?
25 A.   Um, possibly.

37

1  Q.   Well --
2  A.   I --
3  Q.   I just did the math.
4  A.   Yeah.  I mean, there's another mental health
5       person that comes once a week versus, I think,
6       more recently twice a week, but I don't know if
7       that was during that time frame.
8  Q.   Do you remember anybody else being a mental
9       health professional at that time at the
10      Sherburne County Jail, November of 2017?
11 A.   Yeah, I don't, no.
12 Q.   So as far as you know, you were the only one?
13 A.   Yeah.  There might have been -- I don't know.  I
14      don't think so.  I think, yes, I'm the -- the
15      only one.
16 Q.   All right.
17 A.   Yeah.
18 Q.   But still, you could see 40 to 60 --
19 A.   Yeah.
20 Q.   -- inmates a week?
21 A.   Yeah.
22 Q.   Did anybody else commit suicide during the
23      period of November 9th to November 16th, other
24      than Mr. Lynas?
25 A.   I do not believe so.

10 (Pages 34 to 37)

Michael Robertson
6/20/2019

**38**

1  Q.   Did you know that Mr. Lynas had his nose cut
2       off?
3  A.   I was not aware of that.
4  Q.   Did you have any discussions with anyone
5       regarding James Lynas, after he committed
6       suicide, even during the time period between
7       when he did the act of hanging himself, until he
8       died?
9  A.   I probably did.  I probably talked to staff, how
10      -- what had occurred.  Tried to sort out how the
11      patient was doing, how they were doing, because
12      definitely the whole jail would have been on
13      lockdown during that.
14 Q.   The correctional officers have to know if a
15      person is on 15-minute mental health watch,
16      don't they?
17 A.   Yes.
18 Q.   And who makes them aware of that?
19 A.   They would log it into the -- nursing staff, or
20      the sergeants, or other folks, would log into
21      their computer to alert people.
22 Q.   What is that supposed to alert the correctional
23      officers to?
24 A.   That they're on a watch.  That form, with a
25      Special Precautions form, would get distributed

**39**

1       to alert them as well.
2  Q.   Okay.  Have you had any discussions with
3       anyone who's been deposed in this case, like
4       Dr. Leonard?
5  A.   No.
6  Q.   I mean, when's the last time you talked to
7       Dr. Leonard?
8  A.   Um, I don't know.  Um, I think he sent me an
9       email when I was contacted by the attorney about
10      this case.  And that was after my prompting,
11      because I didn't understand why -- what was
12      going on, that I was contacted.  And was this
13      person -- who is this person.
14 Q.   Were you -- were you deposed -- or were you --
15 A.   But I know I spoke with him.  Sorry.
16 Q.   Okay.  Are you aware of a -- a suicide that was
17      a few months earlier, at the Sherburne County
18      Jail?
19 A.   I have a vague recollection that somebody came
20      down from court, and I believe they were -- if I
21      recall forthwith, they kind of were -- might
22      have been surprised because they were
23      incarcerated immediately after court.  But I'd
24      heard about that case, yeah.
25 Q.   Had you seen that person in clinic?

**40**

1  A.   No.
2  Q.   So you had -- of the two suicides that happened
3       in 2017, you hadn't seen either person in
4       clinic?
5  A.   Correct.  The first one I wasn't informed about
6       in any way.  And it sounds like --
7  Q.   So you hadn't been scheduled to see him?
8  A.   I -- I don't even know if the clinic was
9       informed, or that he had -- I don't know.
10 Q.   Have you become familiar with the National Jail
11      Suicide Research?
12 A.   A little bit.
13 Q.   The research conducted by Lindsay Hayes?
14 A.   Yes.
15 Q.   Do you consider him to be an expert in the field
16      of jail suicides?
17 A.   Certainly.
18 Q.   Have you read about his -- have you read both
19      the -- the 1990 study, and the study that was
20      just done recently?
21 A.   In 2006 [sic]?  Twenty years later?
22 Q.   Yeah.
23 A.   Yes.
24 Q.   Is that something you keep in your office, or is
25      it a ready resource?

**41**

1  A.   I'm pretty familiar with the -- the information.
2  Q.   Uh-huh.  Are you aware that he's been a witness
3       against MEnD before?
4  A.   No.
5  Q.   Were you aware of the Stearns County suicide
6       that occurred with MEnD personnel?
7  A.   I had heard about that.
8  Q.   When you find out a person has been referred by
9       a medical provider to you --
10 A.   Yes.
11 Q.   -- do you call that person up and ask about it?
12 A.   Not necessarily.
13 Q.   Do you do it sometimes? or typically? or
14      unusually? not very often?
15 A.   If the information seems confusing or unclear,
16      or that I need to clarify something, I might.
17 Q.   But there was nothing confusing or unclear about
18      Mr. Lynas' information that was transmitted to
19      you?
20 A.   Not the information I had, no.
21 Q.   That was both -- it was clear enough and --
22      and -- and you understood what the problems were
23      being raised for the -- the reason for the
24      referral?
25 A.   I think I did.  I think -- yeah.

11 (Pages 38 to 41)

Michael Robertson
6/20/2019

42

1   Q.   Okay.  (Sotto voce speaking.)
2        I'd like to go over some things with you.
3   This is from your curriculum vitae.  So you got
4   a bachelor of arts in English in -- from Hamline
5   in 1986; right?
6   A.   Correct.
7   Q.   Then you had -- what did you do after that?
8   A.   Hmm, I was in the Rochester, Minnesota area,
9   working with probably PACE, which is an Olmsted
10  County program for juveniles.  Working with
11  juveniles as an alternative to jailing them.
12       And then I ended up doing a number of other
13  residential juvenile work; children who were
14  placed in residential juvenile facilities,
15  foster care, a number of other things like that.
16  Eventually running a bunch of small shelters and
17  residential programs for juveniles.
18  Q.   And what about -- was there anything about your
19  English degree that was helpful in that?
20  A.   At the time, I went to school part-time, while I
21  was doing those -- those jobs full-time, and was
22  getting a master's degree in counseling.  I
23  think what happened during that was, I was
24  writing some things for Olmsted County, for
25  their alternative to jailing juveniles, some

43

1   brochures, because of my writing skills.  And
2   eventually was doing work with the juveniles at
3   the same time, and kind of fell in love with the
4   work.
5   Q.   The work with the juveniles?
6   A.   Yeah, yeah.
7   Q.   When did you graduate from high school?
8   A.   In '81.
9   Q.   From -- where was that?
10  A.   Rochester.  Mayo.
11  Q.   Mayo?
12  A.   Yeah.
13  Q.   So were you a full-time student at Hamline?
14  A.   Yes.
15  Q.   Okay.  And "PACE" is an acronym for Protecting
16  Adolescents in the Community Environment?
17  A.   Community Environment.  Yeah, I think it was one
18  of the first juvenile alternative to jails, at
19  the time, in the state.
20  Q.   And then -- and you worked at other ones.
21  Gerard of Minnesota?
22  A.   Correct.
23  Q.   In Austin?
24  A.   Right.
25  Q.   And you were an assistant manager and a

44

1   therapist; right?
2   A.   Correct.
3   Q.   And that was after you received your master of
4   science in community counseling in the spring of
5   1990 from Winona State?
6   A.   Yes.  I might have worked there prior to, and
7   then became a therapist after, but yeah.
8   Q.   You had -- and you had more than one gig at
9   various times; right?  You also worked at the
10  Sheriffs Youth Programs of Minnesota,
11  Inver Grove Heights; correct?
12  A.   Right.  Well, that was the overseeing
13  organization of all the programs in Austin,
14  Isanti Boys' Ranch, St. Cloud, so...
15  Q.   And then you decided to go on your own?  LMI
16  Professional Services: is that right?
17  A.   Correct.  Well, I did that on the side.
18  Q.   Okay.
19  A.   That was intended to give me some sort of way to
20  get through graduate school.
21  Q.   Okay.  Then you got a doctoral degree of
22  clinical psychology; right --
23  A.   Correct.
24  Q.   -- in October of 2003 from Argosy University.
25  Is that -- is that in business anymore?

45

1   A.   Right.  They -- they've kind of gone through a
2   whole thing where they fell apart because they
3   didn't have some sort of insured funding
4   situation.  It was just remarkable, right.
5   Q.   Is that a for-profit?
6   A.   I believe so, yeah.
7   Q.   Now, you don't -- you're a PsyD, right, instead
8   of Ph.D.?
9   A.   Right.
10  Q.   What's the difference?
11  A.   One's more clinical work, application; kind of
12  working with clients focus.  And both are the
13  science, kind of, practitioner model.
14  Q.   And did you ever see James Lynas, even in
15  passing, during his time in Sherburne County in
16  November of 2017?
17  A.   Not that I'm aware of.
18  Q.   You didn't pass any -- you don't remember seeing
19  anybody without a nose, for example?
20  A.   I think I would have noticed that.
21  Q.   Yeah, that's why I asked that question.
22  A.   So I don't think so, yeah.
23  Q.   Did you have any involvement in the care and
24  treatment of James Lynas, during that same time
25  period?

Doby Professional Reporting, Inc.
952-943-1587

Michael Robertson
6/20/2019

46

1  A.  With the exception of possibly that consult, and
2     writing and scheduling him for a follow-up.
3  Q.  Well, the follow-up would be the care and
4     treatment; right?
5  A.  And I don't know how you're defining that, so I
6     just included that.
7  Q.  Okay.  But you didn't do anything affirmative to
8     care or treat?
9  A.  There was no face-to-face contact or anything.
10  Q.  You didn't make any orders, or give any
11     directives about James Lynas, other than that
12     note that said you'll see him a week after he
13     died?
14  A.  I don't think that's what I said in that note --
15     No.
16  A.  -- but I scheduled him after I was -- after I
17     consulted with the nurse.
18  Q.  And you don't even actually remember any nurse
19     consult regarding him, in particular?
20  A.  No.  Oftentimes it's all verbal, and a form
21     would be submitted like the one you showed me.
22     I would schedule, and it wouldn't -- the name
23     wasn't the relevant factor; it was more the
24     information.
25  Q.  Now, you ceased work -- you began working for

47

1     MEnD on May twenty -- in May of 2016; correct?
2  A.  Yes.
3  Q.  And you stopped working for MEnD in February of
4     2019; correct?
5  A.  Yes.
6  Q.  What were the circumstances of your stopping
7     work?  Did you resign?
8  A.  Yes.
9  Q.  Were you ever disciplined by MEnD?
10  A.  No.
11  Q.  Have you ever been disciplined by any board or
12     oversight committee of any type?
13  A.  No.
14  Q.  Why did you decide to leave MEnD?
15  A.  I think it's a population I love, and I like the
16     model that they have, but I think, um, I just
17     wanted to do broader things, and more work that
18     was related to some of my skill set with testing
19     and other things.  A lot of this had been done.
20     The daily dose of the numbers of people that
21     you're seeing, and sometimes it's better to have
22     diversity, just -- for work, so...
23  Q.  And by "testing," you're talking about
24     psychometric testing?
25  A.  Uh-huh.

48

1  Q.  Yes?
2  A.  Yes.  Sorry.
3  Q.  I didn't mean to --
4  A.  Sorry.  Sorry.
5  Q.  I was understanding your affirmative nod --
6  A.  Yes.
7  A.  -- but I wanted to turn it into English.
8  A.  I apologize.
9  Q.  Do you administer the Beck Depression Inventory
10     to patients?
11  A.  At times.
12  Q.  When you think they might be depressed?
13  A.  It's not a routine instrument I use.  Outside --
14  Q.  Which ones do you use for depression, for
15     example?
16  A.  There's a lot of different -- PHQ-9.  The
17     Hamilton.  There's -- a lot of those screening
18     tools are really designed to kind of further
19     them along the path to be assessed or screened
20     and detailed.  They're just kind of screening
21     tools and -- and -- and by the time I'm seeing
22     them, they usually have already gone through
23     that, or oftentimes they have.
24  Q.  Uh-huh.  Well, I thought you were -- testing was
25     part of the things that you liked to do?

49

1  A.  Well, yeah, I don't know if I would consider
2     that the type of testing that I would
3     typically --
4  Q.  What type of testing do you typically --
5  A.  -- involve.
6  Q.  -- do?
7  A.  There's -- there's different levels of testing,
8     and I would -- like, maybe, an MMPI kind of
9     testing, or other personality testing that are
10     more interesting to me.
11  Q.  Which personality testing?  The California
12     Personality Inventory?
13  A.  No, I don't use that.  Maybe the PAI, the
14     NEO PI, those -- those tools are interesting to
15     me.
16  Q.  Do you administer tests, just as a matter of
17     curiosity, for law enforcement pre-employment?
18  A.  No.
19  Q.  Okay.  Have you ever done any of that kind of
20     work?
21  A.  No.
22  Q.  And in your CV you list your license.  The fact
23     that you're a licensed psychologist with (as
24     read), "Competency working with children,
25     maltreatment, adolescents, families, sex

Doby Professional Reporting, Inc.
952-943-1587

Michael Robertson
6/20/2019

50

1  offenders, sex offender assessments, chemical
2  dependency, testing, residential treatment
3  program [sic]; clinical supervision, and
4  clinical behavior"; correct?
5  A.  Correct.
6  Q.  How often did you work with Allison Pfeifer?
7  A.  Alyssa? Um --
8  Q.  Alyssa Pfeifer, excuse me.  Allison.
9  A.  Pretty frequently.
10  Q.  Okay.
11  A.  I don't know if that's -- they run this rotating
12  schedule, so probably two to three days a week,
13  sometimes more.
14  Q.  She left MEnD shortly after the suicide of
15  Mr. Lynas; correct?
16  A.  Yeah, I think she had gone -- she'd been trying
17  to get into a neonatal place for nursing or
18  something.  I don't know.
19  Q.  Do you know where she went?  North Memorial?
20  Does that ring a bell?
21  A.  I'm not -- yeah.
22  Q.  Did you ever have a chance to observe her under
23  stressful conditions?
24  A.  Yeah, frequently.  I mean, a lot of the
25  conditions were stressful, yes.

51

1  Q.  How did she do?
2  A.  I thought she did well.  She -- she would get
3  more detailed and more -- take longer notes, and
4  she'd get more -- I thought she did well.
5  Q.  Uh-huh.
6  A.  I was impressed, for her age, to do that well.
7  Q.  Were you surprised when she left?
8  A.  Not necessarily.  I think -- because nurses are
9  often coming into that environment and -- and
10  they get a wide range of experiences there, and
11  then leaving.  It's hard to stay in those
12  environments for long periods of time.  It's
13  very stressful work.  It's like an emergency
14  room department.
15  Q.  And would you agree with -- with Alyssa Pfeifer,
16  when she testifies with regard to Mr. Lynas,
17  quote, "We were monitoring him.  He is at risk
18  for suicide, so he's on a 15-minute watch.  And
19  we're concerned for his mental health, and
20  that's why he's placed on a watch," end quote.
21  A.  I don't know what the context of all the
22  questioning was, but I assume that she said that.  I
23  mean, you've got it there.  You're reading it.
24  Q.  I can show it to you --
25  A.  I assume --

52

1  Q.  -- if you want.  Do you agree with that?
2  A.  I think he was on a mental health watch.  If she
3  used the word "suicide," whether that was a
4  label she put out there in the context after
5  the --
6  Q.  (Pointing to document.)
7  A.  Right.
8  -- after knowing what has happened, I don't
9  know.
10  Q.  "At risk for suicide" is a forward-looking --
11  A.  Yeah.
12  Q.  -- statement, isn't it?
13  A.  Yes.
14  Q.  And Dr. Hayes -- or I mean the jail suicide
15  studies, all -- both of them, the first one and
16  the second one, both indicate that a statement
17  by an individual inmate, that he will not commit
18  suicide, or will tell you if he intends to, is
19  not to be believed; correct?
20  A.  I don't know if he says it like that, but you
21  can't accept everything that an inmate says, or
22  any individual says about whether they're
23  suicidal or not.  There's all sorts of factors
24  you have to consider.
25  Q.  But that's one of the things that is in those

53

1  national jail suicide studies?
2  A.  Something to that effect, but I don't think he
3  worded it like that.
4  Q.  Okay.  But that's specific with regard to the
5  jail population; correct?
6  A.  Dr. Lindsay --
7  Q.  Dr. Hayes -- he's not a doctor, but --
8  A.  Oh, I thought he was.
9  Q.  But --
10  A.  He's very well-versed and studied and created
11  research, and some people have different
12  opinions of it, but...
13  Q.  Well, and -- and those studies are -- are for
14  many jails --
15  A.  Correct.
16  Q.  -- across --
17  A.  Correct.
18  Q.  -- the country?
19  A.  And they were kind of -- yes.
20  Q.  Do you know the qualifications of the medical
21  provider who made the mental health referral?
22  A.  I think you had asked me that before, and the --
23  I got the initials and what that meant, and we
24  clarified that she was a PA, a physician's
25  assistant or something; is that --

14 (Pages 50 to 53)

Michael Robertson
6/20/2019

54

1   Q.   Uh-huh.
2   A.   **So -- so I guess I know that now.**
3   Q.   Okay.  A physician's assistant would not be a
4        qualified mental health provider, either;
5        correct?
6   A.   **Not necessarily.  Sometimes they can have**
7        **specialty and qualifications in these areas,**
8        **just like advanced practice nurses.**
9   Q.   If they're psychiatric nurses?
10  A.   **Correct.**
11  Q.   Is that --
12  A.   **I don't know if they have to be labeled that,**
13       **but yes.**
14  Q.   Well, there's some kinds of public health nurses
15       that are --
16  A.   **That have that specialty, yes.**
17  Q.   You're aware there's a Minnesota law and rule
18       regarding who is and who is not a qualified
19       mental health professional?
20  A.   **Sure.  Yes.**
21  Q.   Does MEnD have a policy, if there's a BDI score
22       over 40, that the nurse is required to call a
23       provider, whether or not she knows what that
24       means?
25  A.   **Right.  So that's part of that, kind of,**

55

1        **threshold.  And maybe it's 36, maybe it's 40,**
2        **but yes, it's stop, get a consult.  It's one of**
3        **many hurdles.**
4   Q.   Did you know that mental health providers at
5        MEnD were on call for different facilities at a
6        distance from where they worked or lived?
7   A.   **Yeah, I don't know if they called it that, but**
8        **they were definitely available to those other**
9        **jails through telemedicine.**
10  Q.   Did you understand that Crystal Waagmeester
11       believed, at least under oath, that she sent an
12       urgent health -- mental health referral?
13  A.   **Um, I think -- yeah, I don't know if I saw**
14       **anything that she filled out.  I think when she**
15       **was referencing that, I don't know.  Was it that**
16       **she wanted that to go to Alyssa, and then it's**
17       **Alyssa's job to put her on that, and then screen**
18       **further, and probably consult with me or another**
19       **mental health person.**
20  Q.   Did you do suicide risk assessments?
21  A.   **Um, yes, I --**
22  Q.   Did you ever fill out those forms?
23  A.   **The -- the precaution forms, and those?**
24  Q.   Not the precaution forms.  The actual risk
25       assessment form, which is Exhibit 20.  Did you

56

1        ever fill out a Suicide Risk Screening Form?
2   A.   **Yes.**
3   Q.   Did you ever make any attempt to correlate the
4        Suicide Risk Screening Form with what was in the
5        notes, the eMD notes?
6   A.   **In some cases I would look at that and try to**
7        **understand that better.  If there was some**
8        **discrepancy, sometimes that was already**
9        **explained to me, but I think sometimes what they**
10       **end up measuring is this state versus trait kind**
11       **of thing, more of a fluctuating dynamic.**
12  Q.   Yeah.  Have you been involved in training the
13       RNs employed at MEnD to do the Suicide Risk
14       Screening Form?
15  A.   **No, I haven't been involved in training them to**
16       **do those forms.  And certainly offer input about**
17       **-- not any formal training, but on a pretty**
18       **regular basis about if there's any concerns, we**
19       **take precautions.**
20  Q.   What are the dates of the suicide risk screening
21       forms that were done for Mr. Lynas?
22  A.   **Well, the one you're showing me here is**
23       **11/1/7 [sic], it looks like.**
24  Q.   '17?
25  A.   **Oh, there's a whole bunch of them here.**

57

1   Q.   Yeah.
2   A.   **Oh.  So one is on 11/1/17.  One is on -- I can't**
3        **sort that date.**
4   Q.   The date looks -- was written over by someone;
5        right?
6   A.   **Yeah.  11/17.  And then there's an 11/5/17.**
7        **And -- no, I guess that's...**
8   Q.   Your eMD notes --
9   A.   **Do you mind if I take a break?**
10  Q.   Sure.
11            VIDEOGRAPHER:  Off the video record at
12       12:30 p.m.
13            (Recess taken.)
14            VIDEOGRAPHER:  This is File 3.  We're on
15       the record at 12:46 p.m.
16  BY MR. BENNETT:
17  Q.   Would you agree, that being severely distressed
18       is a risk factor for suicide?
19  A.   **Uh-huh.  Yes.  Sorry.**
20  Q.   Would you agree that talking directly or
21       indirectly about wanting to die, or "not being
22       around," end quote, would be a risk factor or a
23       warning sign for suicide?
24  A.   **Yes, it can be.**
25  Q.   How about increased social isolation?

15 (Pages 54 to 57)

Michael Robertson
6/20/2019

58

1  A.  Yes, it can be.
2  Q.  How about change in appetite and hygiene?
3  A.  Yes, it can be.
4  Q.  How about insomnia?
5  A.  Yes, it can be.
6  Q.  Not sleeping is a -- is a -- chronic insomnia is
7      a problem in mental health treatment, isn't it?
8  A.  Yes.
9  Q.  A person who's giving away his guns, so he won't
10     shoot himself, would be a risk factor; correct?
11 A.  Yes, it can be.
12 Q.  Were you aware of what James Lynas was saying in
13     his phone conversations that were taped by the
14     Sherburne County Jail?
15 A.  No, I was not.
16 Q.  Do you know what the purpose of listening to a
17     person's phone conversations and not doing
18     anything with the information, why that would be
19     done?
20 A.  No, I don't know what their decision-making
21     might be and what was said.
22 Q.  Well, what people at risk for suicide say to
23     their loved ones is important, isn't it?
24 A.  Oftentimes.
25 Q.  Sudden mood changes are a risk factor as well,

59

1      aren't they?
2  A.  I don't know about that.
3  Q.  Okay.  Previous suicide attempts would be a risk
4      factor for suicide?
5  A.  Yes.
6  Q.  A drug -- drug addiction and withdrawal --
7  A.  Yes.
8  Q.  -- would be --
9  A.  Both suffer.
10 Q.  Both?
11 A.  Uh-huh.
12 Q.  Feelings of hopelessness would be a risk factor?
13 A.  Yes.
14 Q.  And you don't prescribe any drugs?  That's not
15     within your purview; correct?
16 A.  Correct.
17 Q.  Do you make referrals to psychiatrists or other
18     medical providers that involve discussions about
19     what level and what -- what therapeutic level
20     and what drug to put people on for various
21     conditions?
22 A.  I will make referrals to the medical providers.
23 Q.  Uh-huh.
24 A.  And try to clarify the symptoms, and try to
25     clarify what type of -- sometimes symptoms look

60

1      like they're maybe psychotic symptoms, that they
2      really aren't, and I try to clarify my
3      understanding of where that symptom is coming
4      from so they can treat it.
5  Q.  So you're trying to give the best possible input
6      on -- on what you view the clinical symptoms, to
7      the medical provider, to make the best
8      pharmacological decision?
9  A.  Correct.
10 Q.  All right.  And you didn't get to do that for
11     James Lynas; correct?
12 A.  No.  It looks like he was withdrawing, and they
13     were -- maybe had him on hydroxyzine.
14 Q.  Do you know how effective hydroxyzine is for
15     withdrawal?
16 A.  I think it can temper a lot of anxiety and
17     stress, but I don't know at what point it was
18     administered.  I don't know how to answer the
19     question of how effective --
20 Q.  Well, I realize you're not a medical doctor --
21 A.  Yeah.
22 Q.  -- but do you understand that hydroxyzine is an
23     antihistamine, like Benadryl is an
24     antihistamine?
25 A.  I understand.

61

1  Q.  That, to be true?
2  A.  And it often gets used as an anti-anxiety
3      short-term --
4  Q.  Do --
5  A.  -- med.
6  Q.  -- you know what the therapeutic dose is for an
7      adult evidencing severe anxiety?
8  A.  Of that medicine?
9  Q.  Yeah.
10 A.  No, I'm not certain.
11 Q.  Okay.  You're from Rochester?
12 A.  Yes.
13 Q.  You've heard of this outfit they have down there
14     called the "Mayo Clinic"?
15 A.  Yeah.  They're pretty big, yeah.
16 Q.  And you consider them expert in medical
17     decision-making?
18         MS. NEARING:  Objection.  Overly broad.
19         THE WITNESS:  They're well-known and
20     famous for their care.
21         MR. BENNETT:  Okay.
22 BY MR. BENNETT:
23 Q.  Do you have any idea what a medical provider who
24     asks that you -- that refers you a patient --
25     what the expectations are of you, when you would

16 (Pages 58 to 61)

Michael Robertson
6/20/2019

62

1　see that patient?
2　A.　Depending upon the situation.  I mean,
3　oftentimes they'll refer to us to evaluate when
4　they should be seen.  They'll do the referral to
5　clarify more, but -- and I don't know if this is
6　the context, but when I'm thinking about your
7　question, I'm thinking of the medical provider
8　in this case who is off site, hearing
9　information, and referring back to this guy on
10　the -- to put him on the watch and have him
11　evaluated.  And then on site we would look at
12　the information and try to determine, you know,
13　what's best at that moment.
14　Q.　So you -- have you ever talked to referring
15　doctors about their expectations of when, if
16　they make a mental health referral to you, when
17　they expected the -- the patient to be seen?
18　A.　I have talked to doctors about that, medical
19　providers, but I don't know if I can say that
20　that occurred in this case.
21　Q.　You didn't talk to Crystal Waagmeester --
22　A.　No.
23　Q.　-- as I understand both her and your testimony?
24　A.　Right.
25　Q.　Do you know if she expected that he would be

63

1　seen much sooner than 11 days, for when she made
2　the referral?
3　A.　I'm sorry.  Did you say, do I know what he [sic]
4　expected?
5　Q.　Yeah.
6　A.　I'm not certain that I did or not.  I think that
7　Alyssa had met with him, I think was the -- and
8　clarified that he was filling out a packet.  And
9　usually at that time there's a pretty routine
10　process of explaining to them, you know, what
11　that consists of, that I'd be following up, or
12　another mental health professional.
13　Q.　Okay.  When you ask that something be done
14　urgently to a patient, what is your expectation?
15　Within one or two days?
16　A.　It depends.  I mean, if I'm asking somebody to
17　see them urgently, I might break that down
18　into -- my terminology for "urgent" might be
19　immediate that day, less than 24 hours.  Someone
20　else's might be one -- one to three days.  It
21　depends on what other scaffolding is in place
22　to -- to assure the person is doing okay.
23　Q.　I know you're supposed to give information to
24　the correctional officers about the watch.  Are
25　they -- are the correctional officers supposed

64

1　to let the jail medical staff and mental health
2　providers know if there's a change in housing?
3　A.　They would typically do that.
4　Q.　Okay.
5　A.　Yeah, um...
6　Q.　Well, you want to know if a person in a
7　15-minute mental health watch is in general
8　population, or special housing, or booking?
9　A.　Yes, those are helpful things to know.
10　Q.　Because the ability to do the watches is better
11　some places than others; right?
12　A.　I don't know if the -- if the watches are, in my
13　mind, what are the factors.  It's the ability to
14　be interacting with other patients, or other
15　people, and have other people in a cell with
16　them, or interacting with people, I think --
17　that's the way I think of it, versus more
18　isolated.  I don't know if the watches change
19　that much, but...
20　Q.　Well, the purpose of the watch is to make sure
21　the person's well-being is --
22　A.　Checked on.
23　Q.　-- intact?
24　A.　Yeah.  Checked on and monitored, yeah.
25　Q.　And you have to do it in a situation -- well,

65

1　let me ask you this.
2　A.　Okay.
3　Q.　Would you want to know if a person who is having
4　mental health issues and evidencing risk factors
5　for potential for suicide, are -- are moved to a
6　situation where they're not allowed out of their
7　cell except for an hour a day?
8　A.　Yeah, and I think I probably would have known
9　that.  When they first come in, they go through
10　a unit that's like that, and if they got
11　transferred to another unit that only lets out an
12　hour a day, that would be valuable information
13　to know, yeah.
14　Q.　Well, that would -- that could increase a person
15　who is having mental health issues --
16　A.　It can, yeah.
17　Q.　It would increase their -- it would increase
18　anxiety?
19　A.　Distress, frustration.
20　Q.　Hopelessness?
21　A.　Sure.  Yeah.  All of that.
22　Q.　Because when you go from gen pop to, say,
23　special housing, your freedom even within the
24　institution is much more severely limited?
25　A.　Much more restricted, correct.

17 (Pages 62 to 65)

Michael Robertson
6/20/2019

66

1  Q.   Is there a connection between starting someone
2       on -- on medication, like Crystal Waagmeester
3       did with James Lynas, and the urgency of the
4       mental health referral?
5  A.   I guess there's -- there's a connection.  Um, I
6       don't know if it -- it's just -- I don't know
7       how to speak to that.  I don't know if it
8       changes -- um, yeah, I don't know how to answer
9       that exactly.
10 Q.   Well, let me ask you this.  Jennie Thompson will
11      testify, and I can show you this, that she
12      filled out the screening form in Exhibit 20, the
13      one she filled out on the 3rd.
14 A.   Okay.
15 Q.   Now, I can't explain why it looks like that, but
16      that's what she says, on page 36 of her
17      deposition, and I can show you that.
18          But wouldn't it be important to know if you
19      start a person on a drug for anti- -- to combat
20      anxiety, how that drug is working for the
21      person?
22 A.   Yeah, that's valuable.  Yeah.
23 Q.   And wouldn't you want to know -- if there's been
24      a mental health referral, wouldn't you want the
25      suicide risk screening forms done more often

67

1       after the referral than before?
2  A.   Not necessarily.
3  Q.   Well, he didn't have any -- according to this
4       record, after the 5th, when the mental health
5       referral was made, there wasn't any done between
6       the 5th and the 9th, when he hung himself?
7  A.   I don't know how to respond to that.
8  Q.   Well, a person's suicide risk can go up
9       precipitously quickly; correct?
10 A.   Yes, it can.
11 Q.   And the idea is to make sure you know how that's
12      happening --
13 A.   Right.
14 Q.   -- or if that's happening?
15 A.   True.  Sure.
16 Q.   And if you don't do any, you're not going to
17      know, are you?
18 A.   No, that's not true.
19 Q.   Well, do you know if he was seen by anyone
20      between the 5th -- anybody in the medical staff,
21      or anybody in the mental health -- any mental
22      health or medical provider for the Sherburne
23      County Jail between the 5th and the 9th, when he
24      hung himself, realizing that Nurse Pfeifer
25      responded to the code blue, but he was -- you

68

1       know, that was -- the act was fait accompli by
2       then?
3  A.   Yeah, I don't know if I know that information or
4       those details, except for that -- that he was
5       being checked on every 15 minutes.
6  Q.   By people who were supposed to know if his
7       well-being is intact or not?
8  A.   By the officers, or just the routine on the
9       mental health watch.  And I think the nurse
10      techs were giving him meds or delivering meds,
11      and often they share information with nurse
12      techs and they alert people that there's other
13      things going on.  Am I answering?
14 Q.   Uh-huh.  I understood it.
15 A.   Okay.  I just -- sorry, I got confused.
16 Q.   How were you informed that Mr. Lynas had hung
17      himself?
18 A.   I think there was a -- must have been a code
19      called at that time, when the nurses had to go.
20      And I think the whole jail would have been shut
21      down.  I think I would have heard from staff,
22      probably through part of that relaying equipment
23      to that area.
24 Q.   Did you have any reaction or think any thoughts
25      when you were advised that this person you had

69

1       scheduled for -- to be seen on the 16th, had
2       committed suicide?
3  A.   I would have immediately been concerned as to
4       whether he is on my caseload, whether he was in
5       my purview, whether he had been referred, those
6       kinds of things.
7  Q.   Did you go check on those things right away?
8  A.   I presume that I -- that I did, but --
9  Q.   Did you have any -- oh, go ahead, I interrupted
10      you.
11 A.   I don't recall.
12 Q.   Did you have any reaction to the fact that you
13      had scheduled him for the 16th, but he didn't
14      get that far?
15 A.   I don't think I actually even knew his name at
16      the time, so I might not have even known that
17      that was the name of the individual that was --
18      that hung himself, even though the referral
19      might have been there.
20 Q.   The referral will list his name; correct, and
21      his prisoner number?
22 A.   Right.
23 Q.   So it would have been --
24 A.   So if they said an inmate has hung himself --
25 Q.   Okay.

18 (Pages 66 to 69)

Michael Robertson
6/20/2019

70

1  A.   -- if I had had this referral and looked and
2      scheduled him, and not known his name, I might
3      have talked to the staff, "Was he on my
4      caseload?  Is this one of the guys I'd seen?"
5      And if they said, "No," I might -- or I didn't
6      see a note, maybe they did give me a name, I
7      don't know, but --
8  Q.   Uh-huh.
9  A.   -- nothing surfaced at that time.
10 Q.   So when the 16th came and Mr. Lynas didn't show
11     up to his -- to see you, did you notice then?
12 A.   I think I would have noticed at that time.  I
13     don't know if that was -- the name was listed,
14     and the referral sheet taken after that point
15     because this had happened, and put in his file,
16     because he had gone to the hospital, I believe.
17     And he'd still be on the list of -- if that date
18     would come and go, he'd get moved forward
19     another day.  Um --
20 Q.   I don't understand the last part of that answer.
21 A.   Well, so if a date would come and go, when a
22     person was on a list to be seen; oftentimes
23     maybe the person is transferred, or they're in a
24     hospital, and they can't be seen because they're
25     gone from the facility, I would forward him to

71

1      another date on that list.
2  Q.   So do you recall when you made the connection
3      between the fact that you had scheduled this
4      person to be seen, and he had hung himself?
5  A.   The connection that I'm aware of, was only when
6      I got called for this case.
7  Q.   Okay.  So that was the first time you were aware
8      of the fact that you actually scheduled
9      Mr. Lynas to be seen on the 16th and he didn't
10     make it that far?
11 A.   Correct.
12         MR. BENNETT:  I think that's all the
13     questions I have.
14         MS. NEARING:  I have a couple, just to
15     clear up.
16             EXAMINATION
17 BY MS. NEARING:
18 Q.   On Exhibit 14, the Mental Health Referral, you
19     were asked about your notation and the fact that
20     there's not a date on that form.  And I can
21     represent to you that November 5, 2017 was a
22     Sunday.  So can you speak to the custom and
23     practice of the process of seeing this, then,
24     when you would come in on a Monday?
25 A.   Yes.  They would typically put the referral in

72

1      my box.  And there's three little bins on the
2      top box, so there might be ten of them; some are
3      urgent, some are less urgent.  I would typically
4      go through the urgent ones and get them
5      scheduled immediately, review all of them, to
6      peak at whether there's anything that stands
7      out.  And typically that day I schedule them
8      all.  Sometimes I wouldn't get to each of those
9      less urgent ones until the next day, and
10     schedule them another day, or the next day after
11     that, typically.  So...
12 Q.   Customarily, though, you would have all these in
13     your inbox on that Monday, then?
14 A.   Correct.  Yeah.
15 Q.   What -- what was your reasoning for waiting to
16     have Mr. Lynas receive a consult directly with
17     you until the 16th, as you put here?
18 A.   Um, so it would have been a scenario where
19     nurses and I would have talked, or done a
20     consult, I presume, where he was on the unit,
21     stabilized, getting the medication, forward
22     thinking.  There were probably lots of other
23     data that were verbalized, um, that established
24     that he's gone from this early kind of crisis
25     place and into a more stable spot, and he was on

73

1      a 15-minute watch, and it would -- it would
2      appear there's a lot of pieces in place.
3  Q.   And I know you don't recall specifically, but
4      you read Alyssa Pfeifer's note today, and
5      presuming that everything she wrote in there is
6      accurate and true, does that help inform what
7      your clinical judgment would have been at that
8      time?
9  A.   I think it -- if I was involved in that, and
10     that's the information we discussed, I'm sure
11     there's a lot of other -- more other pieces.
12         That's a horrible sentence, but...
13         She's very thorough and detailed.  And
14     typically our standard practice is to meet
15     face to face, consult, go through all the
16     issues, and if they are -- if they look like
17     they're stabilized, especially when they give
18     him that packet to begin the mental health
19     process, they're getting kind of a sense for how
20     stable they are at that time, whether they --
21     the patient wants more urgent referrals, or
22     they're in distress, that's more significant.
23     And oftentimes the information we get, like a
24     high BDI, is from days prior, and they're more
25     stabilized by the time she sees them, than it

19 (Pages 70 to 73)

Michael Robertson
6/20/2019

74

1  looks like there.  So I presume that was what
2  was happening in this case.
3  Q.  And you mentioned -- or you were asked about
4  there not being suicide assessment forms done
5  after Alyssa Pfeifer's on the 5th, but you
6  mentioned something called the "mental health
7  packet."
8  A.  Right.
9  Q.  Is there a correlation?  Or what does that mean?
10  A.  Well, they -- the "mental health packet" is
11  essentially a calendar where they describe moods
12  and activities to help get a sense for their
13  functioning.  And I think -- and we usually try
14  to get a couple weeks of that data and them kind
15  of participating and sharing that.
16     In addition, I think -- now I lost my train
17  of thought, but...
18  Q.  The purpose of the mental health packet is what
19  I was --
20  A.  Yeah.
21  Q.  -- asking about.
22     MS. NEARING:  Okay.  And that's all I
23  have.
24     MR. HIVELEY:  I have no questions.
25     FURTHER EXAMINATION

75

1  BY MR. BENNETT:
2  Q.  There's no notation by you, that this is going
3  to be handled either typically or customarily,
4  is there?  On any -- on any document?
5  A.  No.  Except for the fact that it's so routinely
6  in place when you look through history notes.
7  Q.  But when you said what do you do, you
8  normally -- you said you normally note the date
9  you do something; correct?  And that's the
10  custom and practice in medical charting, isn't
11  it?
12  A.  Yes.  Yeah.
13  Q.  And -- and the fact of the matter is, after the
14  5th, do you know what -- what happened to
15  Mr. Lynas?
16  A.  I think we've been talking about that.
17  Q.  Yeah.  You see no more suicide forms filled out;
18  correct?
19  A.  Correct.
20  Q.  You don't see any contact with any nurse after
21  that, until they respond to the code blue;
22  correct?
23  A.  Not that -- that's correct.
24  Q.  And there's no indication that he's seen by any
25  medical provider; correct?

76

1  A.  Correct.
2  Q.  There's no indication that he's seen by any
3  mental health provider, because that would be
4  you; correct?
5  A.  Correct.
6  Q.  There's no indication that anyone checked to see
7  if he was taking the drugs, or whether the drugs
8  were effective; correct?
9  A.  I don't know if that's accurate.
10  Q.  Well, I'm showing you Exhibit 11, which shows
11  the -- the prescription and -- and hydroxyzine,
12  and that he took three out of the pack; correct?
13  He may have had one from the stock thing to get
14  him going --
15  A.  Okay.
16  Q.  -- by -- according to Waagmeester or Thompson,
17  but it shows that he got three in the medical
18  administration record; correct?
19  A.  Hmm, yes.
20  Q.  There's no indication that they worked or didn't
21  work, is there?
22  A.  Well, there might not have been -- that doesn't
23  mean techs weren't talking and communicating
24  with him, or I don't know --
25  Q.  You realize that an institution, like Sherburne

77

1  County, has a -- has a constitutional duty to
2  provide adequate mental health and medical care;
3  correct?
4  A.  Yeah.
5  Q.  And you can't make the inmate responsible for
6  that, can you?
7  A.  No.
8  Q.  Okay.  So you didn't know that he'd only taken
9  three of the pills out of the pack?
10  A.  No.
11  Q.  Did you know he got in a fight, was moved to
12  special housing?
13     MR. HIVELEY:  I --
14     THE WITNESS:  I know --
15     MR. HIVELEY:  Hold on.
16  I object to form.
17     THE WITNESS:  I know there's something
18  that happened that moved him.
19  BY MR. BENNETT:
20  Q.  But you didn't know that before the 16th of
21  November, did you?
22  A.  No.
23  Q.  So there really wasn't any follow-up on his
24  mental health after the 5th, is there, other
25  than giving him three pills; right?

20 (Pages 74 to 77)

Doby Professional Reporting, Inc.
952-943-1587

78

1    A.    Well, I think there -- you mean, specific to
2          mental health, or medical, or --
3    Q.    Either.
4    A.    Yeah.  Because I thought they did respond.  He
5          was hospitalized, and there was a bunch of
6          things that happened.
7    Q.    At -- post hanging?
8    A.    Well, you're saying up to the 16th, so --
9    Q.    Well, okay.  Well, let's -- let's go back and
10         restrict that question --
11   A.    Sorry.
12   Q.    -- to the 9th; how about that?
13   A.    I was just trying to --
14   Q.    Between the 5th and the 9th, what was done to
15         him in any form or fashion by any medical
16         personnel or mental health provider?
17   A.    Correct.  There's no -- nothing more, except for
18         the watches that he was on.
19   Q.    Except for three pills?
20   A.    And three pills.
21   Q.    But we don't -- there's no notation whether he
22         found them helpful?
23   A.    I don't know how to --
24   Q.    Well --
25   A.    -- speak to that.

79

1    Q.    -- do you see any notation that he'd found the
2          pills helpful?
3    A.    I didn't see any notation --
4    Q.    Or --
5    A.    -- to indicate that.
6    Q.    Or unhelpful?
7    A.    Right.  I think the original question may have
8          thrown me because you asked if there was
9          monitoring or any kind of thing, and sometimes
10         I think we do get information from techs about,
11         "He doesn't like this med.  It's not making" --
12         you know, and they might come back and say
13         something, or, "He's not taking," or "He's
14         refusing," but there's no indication there.
15   Q.    No.  He didn't mark "Refused"; right?
16   A.    No.
17   Q.    Which you can do?
18   A.    True.  So...
19   Q.    And I know it's "as needed."  It's put "as
20         needed."  Is that what you want to do, if you
21         want to make sure he takes the medication?
22   A.    Well, I think some of these meds are -- when
23         they're PRN, as needed -- if it's helpful, it's
24         helpful.  But if the person doesn't feel like
25         it's helping them, they might not take it.

80

1    Q.    Well, it's also an artifice for not having to
2          say whether he refused or not?  Or for putting
3          the person's medical care into his own hands?
4                MS. NEARING:  Objection.
5                THE WITNESS:  I don't know how to
6          answer.
7                MS. NEARING:  Mischaracterizing the
8          record and testimony.
9    BY MR. BENNETT:
10   Q.    The Mayo Clinic dosage for adults, for anxiety,
11         is adults, 50 to 100 milligrams four times a
12         day; correct?
13   A.    That's what it says there, yeah.
14   Q.    That's the Mayo Clinic -- you recognize that
15         little logo, don't you?
16   A.    Uh-huh.
17   Q.    The Mayo Clinic logo?  That's off their website.
18         And he was ordered by MEnD to take one
19         tablet, at 50 milligrams, twice a day: right?
20   A.    (Nodding head.)
21   Q.    And they made the decision to do it as needed?
22   A.    Okay.
23   Q.    Is that what the record reflects?
24   A.    Yes.
25   Q.    Showing you Exhibit 11, that what I've said is

81

1          true?
2    A.    Yes.
3    Q.    Okay.  So you typically indicate when the date
4          you review something: is that true?
5    A.    When I see them, when he's referred and I'm
6          scheduling or there's a consult, what I
7          typically do is schedule based on time frame.
8    Q.    No.  But when you get a medical record to
9          review, and you go over that with the nurse --
10         because you have a Monday morning meeting, isn't
11         that what it is?  Do they come in and talk to
12         you, too?
13   A.    We go to the meeting --
14   Q.    And they would go over the --
15   A.    -- or --
16   Q.    Would they go over the urgent referrals and the
17         other referrals of that week?
18   A.    Yes.
19   Q.    And wouldn't you note that it was reviewed by
20         you on -- typically on 11/6, that Monday, if you
21         did it?
22   A.    We would typically, yes.
23   Q.    And so what's typically done, what you typically
24         do with regard to the record, didn't happen on
25         November 14th -- or on Exhibit 14?

21 (Pages 78 to 81)

Michael Robertson
6/20/2019

82

1  A.  No, I don't know if that's what I'm saying at
2      all.
3  Q.  There's no notation anywhere in the record that
4      you reviewed any --
5  A.  True.
6  Q.  -- anything on any particular day, is there?
7  A.  True.
8  Q.  And normally and typically there would be?
9  A.  When I meet with them, yes.  In the setting --
10     this has typically been a consult, that's
11     face to face, that the nurses are charting, and
12     I'm relying on that to suffice that they did
13     consult with me and I'm scheduling.
14 Q.  Okay.  Their note, not yours?
15 A.  Correct.
16 Q.  Okay.  Well, wouldn't you chart your decision
17     that, you know, "Patient A needs to be seen
18     today.  Patient B needs to be seen tomorrow.
19     Patient Lynas can be seen 11 days from now, and
20     for this reason"?
21 A.  It --
22 Q.  Okay.
23 A.  It would be scheduled in a schedule --
24 Q.  Yeah.
25 A.  -- and the nurses would be aware of that, or

83

1      could see that, and oftentimes they would go
2      back and check that schedule and see where the
3      person is on there.
4  Q.  But you didn't chart your reasoning for
5      scheduling on the 16th, rather than on days
6      prior to that, did you?
7  A.  Could you repeat that?
8  Q.  Well, you didn't say -- you didn't make a note
9      in the medical record that said, "I determined
10     that this guy could wait 11 days."  You didn't
11     do that?
12 A.  Correct.
13 Q.  And you didn't say, "I determined he could wait
14     11 days because of factors A, B, C and D"; you
15     didn't do that, did you?
16 A.  Correct.
17 Q.  Okay.  You didn't call the medical provider to
18     see how urgently the medical provider wanted him
19     to be seen?
20 A.  Correct.
21 Q.  And at least the medical provider said that she
22     told Pfeifer she wanted him seen urgently.
23 A.  That's what you showed me in her notes.
24 Q.  And "urgently" wouldn't mean 11 days later,
25     would it?

84

1  A.  I think that's probably true.  I don't know if I
2      had information to that effect at that time
3      anyways.
4  Q.  Well, if Pfeifer is so good, she would have told
5      you that; right?
6  A.  You would think so, but I don't know.
7  Q.  And there's no record that you ever looked at
8      the Beck Depression Inventory that was actually
9      done, to see if it was scored properly?
10 A.  No, it's used in my mind as a hurdle.  If
11     they're identifying a lot of symptoms, it's
12     concerning.  And then if they've met with them
13     and had some discussions and there's a lot of
14     things in place that appear to ensure they're
15     stabilized, it's a review of all of those
16     factors combined, not just a single item that
17     contributes to the decision.
18 Q.  Well, tell me, what was -- what were the factors
19     in place to make sure Lynas is stabilized?  I
20     fail to see one.
21 A.  Well, it looks as though he was cooperatively,
22     openly speaking with a nurse about his symptoms,
23     his feelings, his struggles.  About his plans,
24     his future plans, and that he was going to go to
25     treatment, he repeated that a number of times.

85

1      That he had these options available to go early
2      and maybe on a work release, if I'm recalling
3      these notes.  And then to not harm himself, and
4      also to report any concerns to staff.  And with
5      that in place, oftentimes patients come in and
6      they're in more acute distress; and when they
7      get sentenced, and have this clear plan of
8      what's happening, and are able to articulate
9      their own plan, they stabilize.  And he was
10     demonstrating a lot of things that suggest that
11     he was stabilized and --
12 Q.  Okay.
13 A.  -- doing --
14 Q.  Not coping?  That was -- is that a record of
15     stabilization?
16 A.  In relative terms, comparative to where he had
17     been --
18 Q.  Well, you --
19 A.  -- prior.
20 Q.  You went through your list of things that were
21     in that note, but "not coping" is --
22 A.  True.
23 Q.  -- is --
24 A.  From recall, after just seeing.  Yes, I think
25     "not coping" was one of the things he described.

22 (Pages 82 to 85)

Michael Robertson
6/20/2019

86

1   Q.   Uh-huh.  He referred to himself as crazy; right?
2   A.   Probably --
3          MS. NEARING:  That misstates the record.
4   BY MR. BENNETT:
5   Q.   He reports that his insomnia is maddening, his
6        mind is going crazy; do you remember that?
7   A.   I remember that, yes.
8   Q.   Thoughts going through him, with many emotions,
9        like frustration, irritation, and then
10       emotional?  That's in that note?
11  A.   Correct.
12  Q.   And he says, "Honestly," with regard to his
13       mental -- how he's coping with his mental
14       health, he states, quote, "Honestly, I'm
15       suffering and not coping with it."
16  A.   That sounds like what he said.
17  Q.   Plus he's on opiate withdrawal?
18  A.   I think at that point he might have been at
19       least part -- partway past that, and he was --
20       yes.
21  Q.   He got in on the 1st.  This is now the 5th.
22       He'd be partway past it?
23  A.   I don't know.  I didn't know the date that
24       you're -- I don't know when they took him off
25       the withdrawal protocol, because typically they

87

1        would have him in the booking area if he was
2        still on that.
3   Q.   He reports (as read), "definitely feeling
4        depressed, and my anxiety is going through the
5        roof."  That's in that same chart note, isn't
6        it?
7   A.   Right.  So she was probably writing down his
8        words and also talking to him and trying to get
9        clarification --
10  Q.   Uh-huh.
11  A.   -- so...
12  Q.   Okay.  Well, if she wrote that down on the 5th,
13       you think typically you'd note that on the 6th?
14  A.   If -- if the consult, through the consult, yes,
15       if she wrote that and we reviewed it.  Um --
16  Q.   Hmm.
17  A.   I don't know how that -- if it was part of that
18       referral packet, yes.
19  Q.   And it was, wasn't it?
20  A.   I think you looked for that other -- another
21       sheet.  I think it might have been a verbal
22       consult.
23  Q.   I think --
24  A.   I'm trying to --
25  Q.   I think your attorney helped -- helped us with

88

1        that.
2   A.   Yeah.  Whether that was -- whether I reviewed
3        that specific note, or she verbalized that at
4        the time, and then I signed the referral, I
5        don't know.
6          MR. BENNETT:  Do you need this
7   (referencing curriculum vitae)?  I can make
8   another copy.
9          MS. NEARING: (Gesturing.)
10         THE WITNESS:  I'm not trying to -- I'm
11  just -- I'm trying to be accurate.
12         MR. BENNETT:  Okay.
13  I don't have any further questions.
14         MS. NEARING:  I don't have any.
15         THE WITNESS:  Okay.
16         MR. HIVELEY:  No questions.
17         MS. NEARING:  We'll read and sign.
18         VIDEOGRAPHER:  This concludes the video
19  deposition.  It is 1:28 p.m.
20         MR. BENNETT:  Thank you.
21         THE WITNESS:  Thank you.
22         (Concluded at 1:28 p.m.)
23                * * *
24
25

89

1   STATE OF MINNESOTA  )
2                       :  ss  CERTIFICATE
    COUNTY OF WASHINGTON )
3       I, Janet D. Winberg, hereby certify that
    I reported the video deposition of MICHAEL T.
4   ROBERTSON, PsyD, LP, on the 20th day of June,
    2019, in Elk River, Minnesota, and that the
5   witness was, by me, first duly sworn to tell the
    truth:
6
    That the testimony was transcribed by me and is
7   a true record of the testimony of the witness:
    That I am not a relative, or employee, or
8   attorney, or counsel of any of the parties: or a
    relative or employee of such attorney or
9   counsel:
10
    That I am not financially interested in the
11  action and have no contract with the parties,
    attorneys or persons with an interest in the
12  action that affects or has a substantial
    tendency to affect my impartiality:
13
    That the right to read and sign the transcript
14  by the witness was reserved.
    WITNESS MY HAND AND SEAL THIS 25th day of June,
15  2019.
16
17
18
19         Janet D. Winberg
20
21  JANET D. WINBERG
    Registered Professional Reporter
22  Notary Public
    Washington County, Minnesota.
23
24
25

23 (Pages 86 to 89)

Doby Professional Reporting, Inc.
952-943-1587

**90**

1  STATE OF MINNESOTA )
            : SS CERTIFICATE
2  COUNTY OF WASHINGTON)
3      I, MICHAEL T. ROBERTSON, PsyD, LP, certify
4  that I have read and examined the typewritten
5  transcript of the video deposition taken of me
6  in the matter of Lynas vs. Linda S. Stang,
7  et al., on June 20, 2019, consisting of the
8  preceding pages, and find the same to be true
9  and correct (Except as follows):
10                        Reason
    Page Line Correction        for Change
11
12  _____ ____ _____ _____
13  _____ ____ _____ _____
14  _____ ____ _____ _____
15  _____ ____ _____ _____
16  _____ ____ _____ _____
17  _____ ____ _____ _____
18  _____ ____ _____ _____
19  _____ ____ _____ _____
20  _____ ____ _____ _____
21  _____ ____ _____ _____
22  _____ ____ _____ _____
23  Dated this_____day of_____
24
    _____
25      MICHAEL T. ROBERTSON, PsyD, LP

**91**

1          EXAMINATION INDEX
2
    By Mr. Bennett:  4-71, 74-88
3
4   By Ms. Nearing:  71-74
5   -------------------------------------------------------
6          EXHIBIT INDEX
7
    Exhibit 10
8   Beck Depression Inventory-II (BDI-II), pages 1 and 2
    Referenced............................23
9
10  Exhibit 11
    Hydroxyzine HCL 50 MG tab prescription
11  (photo of blister pack)
    Referenced............................76
12
13  Exhibit 13
    Email communications (various)
14  Referenced............................4
15
16  Exhibit 14
    MEnD Mental Health Referral Form, 11/5/17
    Referenced............................16
18  Exhibit 15
    MEnD Special Precautions/Management form, 11/5/17
19  Referenced............................19
20
21  Exhibit 16
    Pfeifer encounter/chart note, 11/5/17
22  Referenced............................19
23  Exhibit 17
    MEnD medical provider position description
24  Referenced............................27
25

**92**

1  Exhibit 20
    Suicide risk screening forms
2   Referenced............................55
3
    Exhibit 22
4   Flow Sheets - Chemical Withdrawal form, 7/6/17
    Referenced............................25
5
6   Exhibit 23
    Chemical withdrawal questionnaire form, 7/17
7   Referenced............................26
8
    Exhibit 24
9   Chemical withdrawal questionnaire, 11/1/17
    Referenced............................26
10
11  Exhibit 25
    Flow Sheet - Chemical Withdrawal form, 11/1/17
12  Referenced............................26
13
    Exhibit 26
14  Electronic charting forms
    Referenced............................26
15
16
17
18
19
20
21
22
23
24
25

24 (Pages 90 to 92)

Michael Robertson
6/20/2019

Page  93

**A**

a.m 1:12 3:6 18:3,6
Aaron 23:5
ability 64:10,13
able 35:17 85:8
accept 52:21
accompli 68:1
accurate 73:6 76:9 88:11
acronym 43:15
act 4:18 12:15 38:7 68:1
action 89:11,12
activities 74:12
actual 8:9 19:15 29:3
  36:11 55:24
acute 85:6
added 9:22 11:3
addiction 59:6
addition 9:21 74:16
addressed 21:13
adequate 77:2
administer 3:16 48:9
  49:16
administered 60:18
administration 7:17,24
  76:18
administrative 32:11
adolescents 43:16 49:25
adult 61:7
adults 80:10,11
advanced 28:12 54:8
advised 68:25
affect 89:12
affirmative 46:7 48:5
age 51:6
ago 20:23
agree 13:3,6 51:15 52:1
  57:17,20
Ah 10:23 18:18
ahead 10:8,15 69:9
al 1:6 90:7
alert 9:23 34:23 35:23
  38:21,22 39:1 68:12
alerts 30:3
Allison 50:6,8
allowed 65:6
alternative 42:11,25 43:18
Alyssa 29:23 50:7,8 51:15
  55:16 63:7 73:4 74:5
Alyssa's 55:17
and/or 32:10
Anoka 20:1
answer 10:15 36:1 60:18
  66:8 70:20 80:6
answering 68:13
anti- 66:19
anti-anxiety 61:2
antianxiety 30:24
antidepressant 30:20,23
antihistamine 60:23,24
anxiety 21:17 60:16 61:7
  65:18 66:20 80:10 87:4
anybody 34:6 37:8,22
  45:19 67:20,21
anymore 44:25
anyways 84:3
apart 9:4 45:2
apologize 48:8
appear 18:9 19:12 25:20
  25:21,24 26:3,6 73:2
  84:14
APPEARANCES 2:1
appearing 3:9,11
appetite 58:2
application 45:11
applied 14:10
approved 32:15

approximately 3:6
area 23:11 42:8 68:23 87:1
areas 54:7
Argosy 44:24
arrived 7:24
articulate 85:8
artifice 80:1
arts 42:4
asked 16:23 20:8,14 21:3
  45:21 53:22 71:19 74:3
  79:8
asking 63:16 74:21
asks 61:24
assessed 48:19
assessment 20:2,6,7
  27:13 31:5 55:25 74:4
assessments 50:1 55:20
assistant 28:16 43:25
  53:25 54:3
associated 9:25
assume 34:4 51:22,25
assure 63:22
attached 17:1,4
attempt 8:10 56:3
attempts 20:18 59:3
attention 4:16,24
attorney 2:3,8,12 3:7 39:9
  87:25 89:8,9
attorneys 89:11
Austin 43:23 44:13
automatically 23:1
available 20:15 55:8 85:1
Avenue 2:9
avenues 12:4
aware 5:6 13:9,9 15:6,8
  38:3,18 39:16 41:2,5
  45:17 54:17 58:12 71:5
  71:7 82:25

**B**

B 82:18 83:14
B- 22:15
bachelor 42:4
back 20:24 22:1,3 62:9
  78:9 79:12 83:2
banger 11:12,19
base 22:24 35:14
based 29:19 31:25 81:7
basis 56:18
BDI 6:1 13:18 20:4,8 22:14
  22:20,22 23:4,5,12
  34:14 34:17 54:21 73:24
BDI-II 91:8
Beck 13:10 14:3,8,16,22
  15:4 23:5 24:24 27:20
  48:9 84:8 91:8
began 46:25
beginning 5:17
behalf 2:2,7,11 3:10,12
behavior 8:13 50:4
behaviors 35:22,23
belief 24:7
believe 13:24 14:2,6 17:20
  34:14 37:25 39:20 45:6
  70:16
believed 52:19 55:11
bell 50:20
Benadryl 60:23
benefit 10:17
Bennett 2:3,3,23 3:9,9 4:2
  10:7 12:5,6 17:7,12,16
  17:19,24 18:1,7 57:16
  61:21,22 71:12 75:1
  77:19 80:9 86:4 88:6,12
  88:20 91:2
best 21:8 30:18 60:5,7

62:13
better 6:18,19 47:21 56:7
  64:10
beyond 9:5
big 61:15
bins 72:1
Birrell 2:3,23
bit 40:12
blister 91:11
Bloomington 2:9
blue 67:25 75:21
board 47:11
booking 64:8 87:1
box 72:1,2
Boys' 44:14
break 9:4 57:9 63:17
Brian 7:11,20 22:10 26:22
  29:21 32:13 33:3
briefly 12:8,9 33:15
broad 61:18
broader 47:17
brochures 43:1
bunch 42:16 56:25 78:5
business 1:15 44:25

**C**

C 1:4 3:1 83:14
calendar 74:11
California 49:11
call 8:5 12:17,18 41:11
  54:22 55:5 83:17
called 3:21 55:7 61:14
  68:19 71:6 74:6
care 12:15 42:15 45:23
  46:3,8 61:20 77:2 80:3
Carolin 2:12
Carr 32:13 33:5
Carrie 3:11 17:8
case 1:2 5:8,23 7:15 12:2
  35:12 39:3,10,24 62:8
  62:20 71:6 74:2
caseload 9:9 70:4
cases 8:1,8 56:6
ceased 46:25
cell 21:21 64:15 65:7
Center 1:15
certain 6:5 14:11,11 23:21
  61:10 63:6
certainly 12:3 23:3 31:22
  40:17 56:16
CERTIFICATE 89:1 90:1
certify 89:3 90:3
chance 50:22
change 58:2 64:2,18
  90:10
changes 58:25 66:8
chart 25:2 29:15 82:16
  83:4 87:5
charting 15:13 75:10
  82:11 92:14
charts 25:25 29:15
check 9:9 69:7 83:2
checked 64:22,24 68:5
  76:6
checks 9:7,10,20
chemical 20:1 26:2,5,8,8
  26:11 50:1 92:4,6,9,11
Chief 19:23 29:25
children 42:13 49:24
China 15:9,9
Chris 33:3
chronic 58:6
circled 18:13
circumstance 14:11
circumstances 47:6
clarification 7:20 87:9

clarified 53:24 63:8
clarify 8:17 17:18,18
  41:16 59:24,25 60:2
  62:5
clear 7:13 41:21 71:15
  85:7
clients 45:12
clinic 20:10 22:7 23:17
  33:25 36:19 39:25 40:4
  40:8 61:14 80:10,14,17
clinical 29:3 44:22 45:11
  50:3,4 60:6 73:7
Cloud 44:14
cnearing@larsonking.c...
  2:15
code 67:25 68:18 75:21
cognitive 23:7
combat 66:19
combined 84:16
come 24:12 65:9 70:18,21
  71:24 79:12 81:11 85:5
comes 34:25 37:5
coming 51:9 60:3
commit 37:22 52:17
committed 4:5,18 5:6 38:5
  69:2
committee 47:12
communicating 76:23
communications 91:13
community 43:16,17 44:4
comparative 85:16
Competency 49:24
Complaint 19:23 29:25
completely 20:3
computer 15:16,18 26:25
  38:21
concerned 51:19 69:3
concerning 84:12
concerns 35:23 56:18
  85:4
Concluded 88:22
concludes 88:18
conditions 50:23,25 59:21
Condon 2:8
conduct 11:21
conducted 40:13
confirming 12:23
confused 68:15
confusing 8:1,19 11:13
  41:15,17
connection 66:1,5 71:2,5
consider 40:15 49:1 52:24
  61:16
considered 28:19
consistent 14:2 25:16,17
consisting 90:7
consists 63:11
constitutes 13:7
constitutional 75:1
consult 4:12 16:2 29:19
  46:1,19 55:2,18 72:16
  72:20 73:15 81:6 82:10
  82:13 87:14,14,22
consulted 6:2,6 46:17
contact 46:9 75:20
contacted 39:9,12
contained 17:10
context 51:21 52:4 62:6
continued 20:24
continuum 12:1,3
contract 89:11
contributes 84:17
conversations 58:13,17
cooperatively 25:9 84:21
coping 12:14 21:3,5 85:14
  85:21,25 86:13,15

copy 88:8
correct 4:20 5:3,5 6:24,25
  7:3,9 9:8,9 10:11 11:6
  14:17,18,20 18:23 19:3
  19:5,7,9,9,17 22:20
  23:14 24:25 25:4,5 26:3
  29:5 31:3,7,12,13,17
  36:6 40:5 42:6 43:22
  44:2,11,17,23 47:1,4
  50:4,5,15 52:19 53:5,15
  53:17 54:5,10 58:10
  59:15,16 60:9,11 65:25
  67:9 69:20 71:11 72:14
  75:9,18,19,22,23,25
  76:1,4,5,8,12,18 77:3
  78:17 80:12 82:15 83:12
  83:16,20 86:11 90:9
correctional 13:15,17
  14:4 38:14,22 63:24,25
corrections 9:24,24
correlate 56:3
correlation 74:9
counsel 89:8,9
counseling 31:11 42:22
  44:4
country 53:18
County 1:2 4:7 3:14 4:5
  4:19 7:2,8 9:14 13:22
  23:17 32:1,4 33:13,17
  33:19 37:10 39:17 41:5
  42:10,24 45:15 58:14
  67:23 77:1 89:2,22 90:2
County's 10:5
couple 26:23 71:14 74:14
court 1:1,24 3:16 6:18
  21:6 35:13 39:20,23
crazy 21:23 86:1,6
created 53:10
crisis 72:24
cross-cultural 15:4
Crystal 28:5 55:10 62:21
  66:2
curiosity 49:17
current 22:1
currently 21:3
curriculum 42:3 88:7
custom 71:22 75:10
customarily 72:12 75:3
cut 38:1
CV 49:22
CW 20:8 28:5

**D**

D 1:24 3:1 83:14 89:3,21
daily 47:20
dash 6:11
data 4:11 12:23 72:23
  74:14
date 3:5 15:19,24 29:6,13
  29:17 57:3,4 70:17,21
  71:1,20 75:8 81:3 86:23
Dated 90:23
dates 5:16 12:24 56:20
daughter 22:4
daughter.' 20:17
Dave 32:13
David 1:3 2:2
day 16:9,10,15,16 21:19
  36:22 63:19 65:7,12
  70:19 72:7,9,10,10
  80:12,19 82:6 89:4,15
  90:23
days 21:8 24:14 29:12
  34:3,4 36:20 50:12 63:1
  63:15,20 73:24 82:19
  83:5,10,14,24

Doby Professional Reporting, Inc.
952-943-1587

Michael Robertson
6/20/2019

deal 21:2
December 4:16 5:1,2
decide 31:20 47:14
decided 35:4 44:15
decision 10:3 27:4 28:22
60:8 80:21 82:16 84:17
decision-making 58:20
61:17
decisions 36:10
Defendants 1:7 2:7,11
3:12,14
define 8:18
defines 23:23
defining 46:5
definitely 21:16 35:21
36:7 38:12 55:8 87:3
degree 6:24 42:19,22
44:21
delivered 2:23
delivering 68:10
demonstrating 85:10
denies 20:13,17
denotes 26:15
department 51:14
depend 36:21
dependency 50:2
Depending 62:2
depends 63:16,21
deposed 39:3,14
deposition 1:9 3:4 66:17
88:19 89:3 90:5
depressed 21:16 48:12
87:4
depression 13:6,8,10 14:3
14:16,22 15:5 22:23
23:13 24:8,13,24 25:12
27:20 48:9,14 84:8 91:8
describe 23:10 36:8 74:11
described 7:22 85:25
description 91:23
designed 34:22,22 48:18
detailed 48:20 51:3 73:13
details 68:4
detainee 15:14
determination 30:9
determine 62:12
determined 83:9,13
diagnosis 21:10 31:4
die 57:21
died 38:8 46:13
difference 7:21 45:10
different 11:17 13:1 36:4
48:16 49:7 53:11 55:5
direct 4:15
directed 32:2
directives 46:11
directly 57:20 72:16
disciplined 47:9,11
discovery 17:6
discrepancy 56:8
discussed 12:9 73:10
discussion 7:11 8:4 18:4
32:17,18,20
discussions 4:3 10:16
38:4 39:2 59:18 84:13
disorder 35:18 36:12
disorders 34:20 36:2
dissuade 24:6
distance 55:6
distress 24:11 65:19
73:22 85:6
distressed 57:17
distributed 38:25
DISTRICT 1:1
diversity 47:22
doctor 13:14 53:7 60:20

doctoral 44:21
doctors 62:15,18
document 15:13 17:5 52:6
75:4
doing 38:11,11 42:12,21
43:2 58:17 63:22 85:13
dosage 80:10
dose 47:20 61:6
doubled 9:10
doubt 15:7
Dr 3:4 4:3 39:4,7 52:14
53:6,7
Drive 1:15
drug 21:10 59:6,6,20
66:19,20
Exhibits 2:25
existed 32:19
exists 17:11
expect 36:5,5
expectation 63:14
expectations 61:25 62:15
expected 62:17,25 63:4
experiences 51:10
expert 40:15 61:16
explain 7:7 66:15
explained 56:9
explaining 63:10
explored 23:24
extravagant 35:22

DSM-V 31:4
dual 21:10
due 5:25 22:19
duly 3:21 89:5
duty 77:1
dynamic 50:1

**E**

E 3:1,1
earlier 5:7 24:14 39:17
early 72:24 85:1
East 2:13
effect 53:2 84:2
effective 60:14,19 76:8
effectuate 11:10
eight 36:22
Eighth 19:8
either 4:11 40:3 54:4 75:3
78:3
Electronic 92:14
elevate 9:9
Elk 1:15 89:4
else's 63:20
email 4:14,16 5:18 10:11
10:17 15:24 22:9 29:20
39:9 91:13
eMD 17:12 26:21 27:9
29:15,24 56:5 57:8
eMDs 17:4 26:14,14
emergency 51:13
emotional 21:25 86:10
emotions 21:24 86:8
employed 33:15 56:13
employee 89:8,9
enable 35:11
encounter/chart 91:21
ended 42:12
enforcement 49:17
English 10:10 20:3,3 42:4
42:19 48:7
Ensign 2:9
ensure 11:3 84:14
environment 43:16,17
51:9
environments 51:12
Envision 1:25
equipment 68:22
especially 73:17
essentially 9:10 74:11
established 72:23
et 1:6 90:7
evaluate 62:3
evaluated 62:11
eventually 36:13 42:16
43:2
eventuated 4:18
everybody 9:7
evidencing 67:6:4
exactly 66:9
EXAMINATION 4:1 71:16

74:25 91:1
examined 3:22 90:4
example 15:6 45:19 48:15
exception 46:1
excuse 20:20 21:20 27:14
32:8 50:8
exhibit 4:14,15 16:19,25
18:8 19:10,14 23:14
25:21,24 26:3,6,8,11,16
27:13,24 29:24 30:10
55:25 66:12 71:18 76:10
80:25 81:25 91:6,7,10
91:13,15,18,20,23 92:1
92:3,6,8,11,13

**F**

face 14:15 31:9,9 73:15,15
82:11,11
face-to-face 46:9
facilities 14:4 33:23 42:14
55:5
facility 9:24 70:25
fact 12:23 24:7 25:16
28:14 30:3 31:8 49:22
69:12 71:3,8,19 75:5,13
factor 46:23 57:18,22
58:10,25 59:4,12
factors 6:1 12:9,10 26:9
31:25 35:11,16 36:21
52:23 64:13 65:4 83:14
84:16,18
fail 84:20
fait 68:1
familiar 40:10 41:1
families 49:25
famous 61:20
far 17:2 31:9,17 37:12
69:14 71:10
fashion 78:15
February 47:3
feel 79:24
feeling 21:16,17 24:15
87:3
feelings 59:12 84:23
fell 43:3 45:2
felony 20:19
felt 20:19
field 6:10 40:15
fight 77:11
file 18:5 30:19 57:14 70:15
fill 31:3 55:22 56:1
filled 24:13 55:14 66:12,13
75:17
filling 63:8
financially 89:10
find 19:18 41:8 90:8
finish 10:15 36:14
first 3:21 21:1 35:11 40:5
43:18 52:15 65:9 71:7
89:5
fits 35:14
five 34:4 36:20

flow 25:25 26:12 92:4,11
fluctuating 56:11
fluent 20:3
FNP 20:8
focus 45:12
folks 38:20
follow-up 11:16 46:2,3
77:23
following 63:11
follows 3:22 90:9
for-profit 45:5
form 17:5 38:24,25 46:20
55:25 56:1,4,14 66:12
71:20 77:16 78:15 91:16
91:18 92:4,6,11
formal 56:17
forms 27:18 55:22,23,24
56:16,21 66:25 74:4
75:17 92:1,14
forthwith 39:21
forward 25:8 70:18,25
72:21
forward-looking 52:10
forwarded 7:16
foster 42:15
found 78:22 79:1
Foundation 10:6 11:23
four 21:6,9 24:14 80:11
frame 37:7 81:7
Frank 7:12 22:10 26:22
29:21 32:13 33:3
freedom 65:23
frequently 50:9,24
Friday 34:5
frustration 21:24 65:19
86:9
full 9:2 29:15
full-time 42:21 43:13
functioning 74:13
funding 45:3
further 23:23 48:18 55:18
74:25 88:13
future 22:2 84:24

**G**

G 3:1
gal 34:24
Gamma 21:19,19
Gaskins 2:3,23
gen 65:22
general 10:19,21 11:5
14:25 23:21 64:7
generally 13:6
Gerard 43:21
gesture 12:12
Gesturing 88:9
getting 20:23 22:1 24:15
30:23 42:22 72:21 73:19
gig 44:8
give 44:19 46:10 60:5
63:23 70:6 73:17
gives 14:13 17:21
giving 20:20 58:9 68:10
77:25
go 7:7 8:7 10:8,15 17:22
18:1 20:11 21:9 22:4
42:2 44:15 55:16 65:9
65:22 67:8 68:19 69:7,9
70:18,21 72:4 73:15
78:9 81:9,13,14,16 83:1
84:24 85:1
goal 22:1
goals 22:2
going 21:7,23,23 22:2
23:24 24:9,10,12 34:13
35:12 39:12 67:16 68:13

75:2 76:14 84:24 86:6,8
87:4
good 23:21 35:15 84:4
graduate 43:7 44:20
groups 8:13
Grove 44:11
guess 22:18 54:2 57:7
66:5
guns 20:21 58:9
guy 24:20 34:24 62:9
83:10
guys 70:4

**H**

Hamilton 48:17
Hamline 42:4 43:13
HAND 89:15
handled 75:3
hands 80:3
handwriting 18:9 19:12
25:21 27:15
handwritten 15:16
hanging 38:7 78:7
Hansen 33:3
happen 12:4 81:24
happened 40:2 42:23 52:8
70:15 75:14 77:18 78:6
happening 24:18 67:12,14
74:2 85:8
hard 8:17 51:11
harm 85:3
Hayes 40:13 52:14 53:7
HCL 91:10
head 5:19 11:12,18 22:21
80:20
heading 12:1
health 5:25 7:5,6,21 8:5
8:23,25 9:20,23,25
10:21 11:15 12:10,13,25
18:12 20:6 21:2,11,13
27:13,24 28:2,20 31:12
31:14,21,24 32:4,7
34:11 35:4 36:16 37:4,9
38:15 51:19 52:2 53:21
54:4,14,19 55:4,12,12
55:19 58:7 62:16 63:12
64:1,7 65:4,15 66:4,24
67:4,21,22 68:9 71:18
73:18 74:6,10,18 76:3
77:2,24 78:2,16 86:14
91:16
heard 39:24 41:7 61:13
68:21
hearing 62:8
Heather 33:4
hedging 35:24
Heights 44:11
held 18:4
help 21:10 24:17 73:6
74:12
helped 87:25,25
helpful 42:19 64:9 78:22
79:2,23,24
helping 79:25
helps 21:22
high 5:25 13:23 14:23
22:14,20 43:7 73:24
higher 13:19 34:7
highest 8:25,25
history 4:12 20:18 75:6
Hiveley 2:8 3:13,13 74:24
77:13,15 88:16
Hmm 42:8 76:19 87:16
Hold 77:15
Honestly 21:4 86:12,14
hopelessness 59:12

65:20
**horrible** 73:12
**hospital** 70:16,24
**hospitalized** 78:5
**hour** 65:7,12
**hours** 21:18 33:25 63:19
**housing** 64:2,8 65:23
77:12
**hundred** 13:25
**hung** 29:9,13 30:3,12 67:6
67:24 68:16 69:18,24
71:4
**hurdle** 35:11 84:10
**hurdles** 55:3
**hydroxyzine** 60:13,14,22
76:11 91:10
**hygiene** 58:2
**hypothetical** 11:24

**I**

**idea** 33:12 61:23 67:11
**ideation** 8:15
**ideations** 11:8,19
**identified** 10:18
**identify** 35:10
**identifying** 84:11
**II** 14:22
**immediate** 63:19
**immediately** 39:23 69:3
72:5
**impartiality** 89:12
**important** 13:2 58:23
66:18
**impressed** 51:6
**inbox** 72:13
**incarcerated** 39:23
**included** 10:17 46:6
**incomplete** 11:24
**inconsistent** 25:11,13
**increase** 65:14,17,17
**increased** 57:25
**increasing** 11:21
**INDEX** 91:1,6
**indicate** 18:18 23:3 52:16
79:5 81:3
**indicates** 22:22,24 23:13
24:20 27:23
**indication** 75:24 76:2,6,20
79:14
**indicator** 23:21
**indirectly** 57:21
**individual** 14:12 15:14
52:17,22 69:17
**individuals** 8:20 13:18
**info** 12:16
**inform** 73:6
**information** 7:12 12:17,23
14:13,14 20:9 41:1,15
41:18,20 46:24 58:18
62:9,12 63:23 65:12
68:3,11 73:10,23 79:10
84:2
**informed** 8:5 33:10 40:5,9
68:16
**initials** 18:13 53:23
**initiated** 31:24
**inmate** 15:14 20:1 31:20
52:17,21 69:24 77:5
**inmates** 12:10 37:20
**input** 56:16 60:5
**inquiry** 7:15
**insight** 34:16,20
**insomnia** 21:22 58:4,6
86:5
**institution** 65:24 76:25
**instrument** 48:13

**insured** 45:3
**intact** 64:23 68:7
**intended** 10:2 44:19
**intends** 52:18
**interacting** 64:14,16
**interactions** 34:18
**interest** 21:8 89:11
**interested** 89:10
**interesting** 49:10,14
**interrupted** 69:9
**interview** 25:3,10
**Inventory** 13:10 14:4,8,16
14:22 15:5 24:25 27:20
48:9 49:12 84:8
**Inventory-II** 91:8
**Inver** 44:11
**involve** 49:5 59:18
**involved** 5:23 34:4 34:25
56:12,15 73:9
**involvement** 31:25 45:23
**irritated** 21:25
**irritation** 86:9
**Isais** 32:14
**Isanti** 44:14
**isolated** 64:18
**isolation** 57:25
**issue** 8:18 21:15
**issues** 7:16 12:19 36:8
62:4,15 73:16
**it.'** 21:5
**item** 84:14
**Iverson** 2:8

**J**

**J** 2:12
**jail** 1:14 4:5,19 7:2,8,24
13:22 20:25 24:12 30:22
31:2,6,16 32:4 33:13,19
34:6 37:10 38:12 39:18
40:10,16 52:14 53:1,5
58:14 64:1 67:23 68:20
**jail's** 32:11
**jailing** 42:11,25
**jails** 33:14 43:18 53:14
55:9
**James** 1:4 4:4 13:10 15:23
19:25 30:21 31:1,5,8
38:5 45:14,24 46:11
58:12 60:11 66:3
**Janet** 1:24 89:3,21
**Jason** 2:8 3:13
**jasonh@irc-law.com** 2:10
**Jennie** 66:10
**job** 55:17
**jobs** 42:21
**JRT/KMM** 1:2
**judgment** 73:7
**June** 1:11 3:5 89:4,15 90:7
**juvenile** 42:13,14 43:18
**juveniles** 42:10,11,17,25
43:2,5

**K**

**keep** 23:16 40:24
**kept** 23:17
**kill** 20:15
**kind** 34:17,23 35:8,21 36:9
39:21 43:3 45:1,11,13
48:18,20 49:8,19 53:19
54:25 56:10 72:24 73:19
74:14 79:9
**kinds** 34:21 54:14 69:6
**king** 2:13 23:7
**knew** 69:15
**know** 6:22 8:12,12 11:7,11

11:25 13:2,20,25 14:1,5
15:15 16:7,16,17,22
17:7 18:15 23:9,9 24:19
24:21 25:8 26:23 28:7
28:14,17,19,23 29:2,16
29:16 31:17 32:9,9,16
32:19,24,25 33:8 34:10
35:12,14 36:1,2,5,6 37:6
37:12,13 38:1,14 39:8
39:15 40:8,9 46:5 49:1
50:11,18,19 51:2 52:5
52:20 53:20 54:2,12
55:4,7,13,15 58:10,24
62:0 14,17,18 61:6
62:5,12,19,25 63:3,10
63:23 64:2,6,9,12,18
65:3,13 66:6,6,7,8,18,23
67:7,11,17,19 68:1,3,3,6
70:7,13 73:3 75:14 76:9
76:24 77:8,11,14,17,20
78:23 79:12,19 80:5
82:1,17 84:1,6 86:23,23
86:24 87:17 88:5
**knowing** 52:8
**knowledge** 30:18
**known** 5:8 12:23 23:10
65:8 69:16 70:2
**knows** 54:23
**Korea** 15:5,9

**L**

**L.L.P** 2:3,23
**label** 33:11 52:4
**labeled** 54:12
**lack** 34:16
**Lacs** 33:17
**language** 20:2 36:7
**Larson** 2:13
**law** 2:3,8,12 49:17 54:17
**leave** 47:14
**leaving** 51:11
**left** 50:14 51:7
**legal** 7:16 12:19
**Leonard** 39:4,7
**let's** 16:19 78:9,9
**level** 59:19,19
**levels** 11:21 49:7
**license** 49:22
**licensed** 49:23
**life** 20:24 22:1,3
**liked** 48:25
**limited** 65:24
**Linda** 1:6 32:10 90:6
**Lindsay** 40:13 53:6
**LineCorrection** 90:10
**list** 49:22 69:20 70:17,22
71:1 85:20
**listed** 6:6 70:13
**listening** 58:16
**literature** 14:9 15:8
**little** 40:12 72:1 80:15
**lived** 55:6
**LLP** 2:13
**LMI** 44:15
**lockdown** 38:13
**locked** 21:18
**logo** 80:15,17
**long** 51:12
**longer** 51:3
**look** 5:13 16:19 19:10
23:14 30:12 54:3 56:6
59:25 62:11 73:16 75:6
70:1 84:7 87:20
**looking** 7:14 35:7

**looks** 17:3 24:10,10 56:23
57:4 60:12 66:15 74:1
84:21
**lost** 74:16
**lot** 13:14 14:15 35:2 36:21
47:19 48:16,17 50:24
60:16 73:2,11 84:11,13
85:10
**lots** 72:22
**loud** 30:5
**love** 43:3 47:15
**loved** 58:23
**LP** 1:3:20 89:4 90:3,25
**Lynas** 1:3,4 2:2 4:4,17 5:6
15:23 19:25 30:21 31:2
31:5,8 34:9 37:24 38:1,5
45:14,24 46:11 50:15
51:16 56:21 58:12 60:11
66:3 68:16 70:10 71:9
72:16 75:15 82:19 84:19
90:6
**Lynas'** 13:10 41:18

**M**

**M** 2:8
**maddening** 21:22 86:5
**magnifying** 24:17
**making** 79:11
**male** 19:25
**maltreatment** 49:25
**manager** 43:25
**mark** 19:15 79:15
**marked** 2:25
**master** 44:3
**master's** 42:22
**math** 37:3
**matter** 49:16 75:13 90:6
**Mayo** 43:10,11 61:14
80:10,14,17
**mean** 4:13 8:8 15:4 22:25
34:11 35:7,24 37:4 39:6
48:3 50:24 51:23 52:14
62:2 63:16 74:9 76:23
78:1 83:24
**meaning** 23:1
**means** 7:7 11:14 54:24
**meant** 53:23
**measuring** 56:10
**med** 30:24 61:5 79:11
**medical** 6:2,4,6,8,10,23,24
7:1 13:4,7 17:10 41:19
53:20 59:18,22 60:7,20
61:16,23 62:7,18 64:1
67:20,22 75:10,25 76:17
77:2 78:2,5 80:3 81:8
83:9,17,18,21 91:23
**medication** 30:20 66:2
72:21 79:21
**medicine** 61:8
**meds** 68:10,10 79:22
**meet** 20:8 73:14 82:9
**meeting** 33:7 81:10,13
**Memorial** 50:19
**MEnd** 2:11 3:12 33:14,23
41:3,6 47:1,3,9,14 50:14
54:21 55:5 56:13 80:18
91:16,18,23
**MEnd's** 31:19
**mental** 5:25 7:5,6,21 8:5
8:23,25,25 9:20,23,25
10:21 11:4 12:10,13,25
18:12 21:2,11,13 27:24
28:2,20 31:11,14,21,23
32:4,7 34:11 35:4 36:16
37:4,8 38:15 51:19 52:2
53:21 54:4,19 55:4,12

55:19 58:7 62:16 63:12
64:1,7 65:4,15 66:4,24
67:4,21,21 68:9 71:18
73:18 74:6,10,18 76:3
77:2,24 78:2,16 86:13
86:13 91:16
**mentioned** 35:25 74:3,6
**met** 6:1 24:1 28:17 63:7
84:12
**MG** 91:10
**MHW-15** 8:23 22:19
**Michael** 1:10 3:4,20 89:3
90:3,25
**mid-'90s** 14:17
**Mille** 33:17
**milligrams** 80:11,19
**mind** 21:23 57:9 64:13
84:10 86:6
**mindful** 34:23
**Minneapolis** 2:5
**Minnesota** 1:1 42:8 43:21
44:10 54:17 89:1,4,22
90:3,25
**minute** 16:22 35:20
**minutes** 9:7 68:5
**Mischaracterizing** 80:7
**misstates** 86:3
**MMPI** 49:8
**MN** 1:15 2:5,9,14
**model** 45:13 47:16
**moment** 62:13
**Monday** 34:5 71:24 72:13
81:10,20
**monitored** 64:24
**monitoring** 51:17 79:9
**months** 4:17 20:23 21:6,9
39:17
**mood** 58:5
**moods** 74:11
**morning** 81:10
**moved** 55:5 70:18 77:11
77:18
**multiaxial** 31:4
**multiple** 24:9

**N**

**N** 3:1
**name** 3:7 4:8 5:8 19:18
46:22 69:15,17,20 70:2
70:6,13
**national** 40:10 53:1
**Nearing** 2:12 3:11,11 10:6
11:23 17:9,14,17,20,25
61:18 71:14,17 74:22
80:4,7 86:3 88:9,14,17
91:4
**necessarily** 24:19 31:22
41:12 51:8 54:6 67:2
**need** 6:15 8:21 13:4,7
14:10 23:20 35:1 41:16
88:6
**needed** 79:19,20,23 80:21
**needs** 23:23 82:17,18
**NEO** 49:14
**neonatal** 50:17
**never** 28:17 31:14
**new** 12:25
**next-of-kin** 1:4
**Nineteen** 27:14
**Ninth** 19:8
**nod** 48:5
**Nodding** 5:19 22:21 80:20
**normally** 75:8,8 82:8
**North** 50:19
**Northwest** 1:15
**nose** 38:1 45:19

Michael Robertson
6/20/2019

**Notary** 89:22
**notation** 26:14 27:21
71:19 75:2 78:21 79:1,3
82:3
**note** 2:23,25 6:7 15:16,17
17:4 18:14 19:16 24:6
25:2,10,20 26:20 27:9
29:23 46:12,14 70:6
73:4 75:8 81:19 82:14
83:8 85:21 86:10 87:5
87:13 88:3 91:21
**noted** 15:18,22
**notes** 17:22 26:2,21,23
51:3 56:5,5 57:8 75:6
83:23 85:3
**notice** 70:11
**noticed** 45:20 70:12
**noticing** 2:23
**November** 16:12 19:1,4
29:7 30:13,21 31:2,6,15
34:3,6 37:10,23,23
45:16 71:21 77:21 81:25
**number** 4:10,11,13 13:21
23:21 31:25 33:2 34:14
35:10,25 36:4 42:12,15
69:21 84:25
**numbers** 47:20
**nurse** 28:12,13,15 46:17
46:18 54:22 67:24 68:9
68:11 75:20 81:9 84:22
**nurses** 31:9,11 35:9 51:8
54:8,9,14 68:19 72:19
82:11,25
**nursing** 6:1 38:19 50:17
**Nystrom** 21:11

**O**

**O** 3:1
**oath** 3:17 55:11
**object** 77:16
**Objection** 10:6 11:23
61:18 80:4
**observation** 9:1
**observe** 50:22
**obvious** 13:4
**obviously** 28:25 32:24
36:5
**occurred** 8:10,11 29:21
31:23 38:10 41:6 62:20
**October** 44:24
**offender** 50:1
**offenders** 50:1
**offer** 56:16
**office** 40:24
**officers** 38:14,23 63:24,25
68:8
**oftentimes** 4:7 31:23
46:20 48:23 58:24 62:3
70:22 73:23 83:1 85:2
**oh** 10:9 16:25 19:18 22:16
30:2 36:15 53:8 56:25
57:2 69:9
**okay** 4:23 7:6 9:23 11:18
12:5 13:9 15:3,21,25
16:21 17:3,19,24 19:10
24:22 25:18 27:11 28:19
30:7,10 34:11 39:2,16
42:1 43:15 44:18,21
46:7 49:19 50:10 53:4
54:3 59:3 61:11,21
63:13,22 64:4 65:2
66:14 68:15 69:25 71:7
74:22 76:15 77:8 78:9
80:22 81:3 82:14,16,22
83:17 85:12 87:12 88:12
88:15

**Olmsted** 42:9,24
**once** 37:5
**One's** 45:11
**ones** 43:20 48:14 58:23
72:4,9
**openly** 25:9 84:22
**opiate** 13:3 86:17
**opiates** 20:25
**opinion** 14:7
**opinions** 53:12
**opportunity** 20:14
**opposed** 6:11
**options** 85:1
**ordered** 80:18
**orders** 46:10
**ordinarily** 10:4
**organization** 44:13
**original** 2:23 79:7
**outfit** 61:13
**outside** 20:23 48:13
**Overly** 61:18
**overseeing** 44:12
**oversight** 47:12

**P**

**P** 3:1
**p.m** 5:4 57:12,15 88:19,22
**PA** 28:15 53:24
**PACE** 42:9 43:15
**pack** 76:12 77:9 91:11
**packet** 31:3 63:8 73:18
74:7,10,18 87:18
**page** 66:16 90:10
**pages** 17:8 90:8 91:8
**PAI** 49:13
**Pantzke** 32:10
**paragraph** 7:18 8:24 12:8
**parens** 5:22
**parenthesis** 8:2
**part** 10:16 17:14 19:23
21:14 24:3,18 48:25
54:25 68:22 70:20 86:19
87:17
**part-time** 42:20
**participating** 74:15
**particular** 5:9,12 29:2
46:19 82:6
**parties** 89:8,11
**partway** 86:19,22
**party** 2:23
**pass** 45:18
**passing** 45:15
**Pat** 32:13 33:4,5
**path** 48:19
**patient** 4:10 5:20,24 15:23
20:4,9,10,13,16,17 21:4
21:5,15,25 22:5 25:5
38:11 61:24 62:1,17
63:14 73:21 82:17,18,19
**patient's** 20:6
**patients** 4:7 34:13 48:10
64:14 85:5
**Paul** 2:14
**paying** 4:22
**peak** 72:6
**people** 8:14,19 9:24 33:2
35:6,8 36:19,22,23
38:21 47:20 53:11 58:22
59:20 64:15,15,16 68:6
68:12
**period** 16:17 33:16 37:23
38:6 45:25
**periods** 51:12
**person** 9:25 11:7 12:1
28:8 35:2,17 36:1,11
37:5 38:15 39:13,13,25

40:3 41:8,11 55:19 58:9
63:22 64:6 65:3,14
66:19,21 68:25 70:22,23
71:4 79:24 83:3
**person's** 11:3 58:17 64:21
67:8 80:3
**personality** 34:20 35:18
36:2,11 49:9,11,12
**personnel** 41:6 78:16
**persons** 89:11
**perspective** 25:11
**Pfeifer** 17:20 19:16 50:6,8
51:15 67:24 84:22 84:4
91:21
**Pfeifer's** 29:23 73:4 74:5
**Ph.D** 45:8
**pharmacological** 60:8
**phone** 58:13,17
**photo** 91:11
**PHQ-9** 48:16
**physical** 11:4
**physician's** 28:15 53:24
54:3
**PI** 49:14
**Pickett** 33:4
**pieces** 5:13 73:2,11
**pills** 77:9,25 78:19,20 79:2
**place** 12:10 50:17 63:21
72:25 73:2 75:6 84:14
84:19 85:5
**placed** 5:25 22:19 31:23
36:8 42:14 51:20
**places** 64:11
**placing** 12:25
**plain** 10:10
**Plaintiff** 1:5 2:2 3:10
**plan** 11:9,10,20 25:10 85:7
85:9
**plans** 20:18 25:8 84:23,24
**plea** 24:16
**please** 3:7,16 7:19 18:11
19:22 36:14
**Plus** 21:12 86:17
**point** 32:21 60:17 70:14
86:18
**Pointing** 52:6
**policy** 31:18,19 54:21
**poor** 12:19
**poorly** 12:14
**pop** 65:22
**population** 14:25 47:15
53:5 64:8
**populations** 15:2
**position** 91:23
**possibility** 21:7 22:24
**possible** 60:5
**possibly** 16:3 33:3 36:25
46:1
**post** 78:7
**potential** 65:5
**practice** 15:13 28:13,15
54:8 71:23 73:14 75:10
**practitioner** 28:12 45:13
**pre-employment** 49:17
**precaution** 55:23,24
**precautions** 9:2,19,19,22
38:25 56:19
**Precautions/Manageme...**
19:11 91:18
**preceding** 90:8
**precipitously** 67:9
**precisely** 7:13
**prescribe** 59:14
**prescription** 76:11 91:10
**present** 32:18
**presume** 16:8,15 32:16

34:10 69:8 72:20 74:1
**presuming** 73:5
**pretty** 35:10,15 41:1 50:9
56:17 61:15 63:9
**previous** 20:7 59:3
**previously** 8:3
**primary** 20:2
**prior** 10:17 26:18 33:8,9
33:15 36:1 44:6 73:24
83:6 85:19
**prisoner** 69:21
**PRN** 79:23
**proactive** 12:11 34:12,24
**probably** 13:12 15:2 22:18
26:23 27:12 29:18 32:13
33:3 38:9,9 42:9 50:12
55:18 65:8 68:22 72:22
84:1 86:2 87:7
**problem** 58:7
**problems** 41:22
**process** 31:21 63:10
71:23 73:19
**professional** 7:5 31:15
37:9 44:16 54:19 63:12
89:21
**professionals** 31:12
36:17
**program** 42:10 50:3
**programs** 42:17 44:10,13
**prompting** 39:10
**pronunciation** 33:9
**properly** 84:9
**Protecting** 43:15
**protocol** 86:25
**provide** 77:2
**provided** 17:15 30:20 31:1
**provider** 6:3,4,7,8,23 7:1
35:5 41:9 53:21 54:4,23
60:7 61:23 62:7 67:22
75:25 76:3 78:16 83:17
83:18,21 91:23
**providers** 55:4 59:18,22
62:19 64:2
**provides** 14:14
**provocative** 35:22
**provoke** 34:18
**PS** 12:21,22
**psychiatric** 54:9
**psychiatrists** 59:17
**psychological** 6:11 25:11
31:1
**psychologist** 49:23
**psychology** 44:22
**psychometric** 11:14
47:24
**psychotherapy** 30:25
**psychotic** 8:20 60:1
**PsyD** 1:10 3:20 45:7 89:4
90:3,25
**public** 54:14 89:22
**purpose** 58:16 64:20
74:18
**purview** 59:15 69:5
**put** 10:10 11:12,16 23:12
36:13,13 52:4 55:17
59:20 62:10 70:15 71:25
72:17 79:19
**putting** 22:3 80:2

**Q**

**qualifications** 53:20 54:7
**qualified** 31:11,14 35:4
36:16 54:4,18
**question** 9:3 14:5 30:11
45:21 60:19 62:7 78:10
79:7

**questioning** 51:22
**questionnaire** 26:5,9 92:6
92:9
**questions** 12:18 16:23
71:13 74:24 88:13,16
**quicker** 35:1
**quickly** 67:9
**quote** 7:25 51:17,20 57:22
86:14

**R**

**R** 3:1
**raised** 41:23
**Ranch** 44:14
**range** 51:10
**rated** 14:19
**rating** 14:23
**rbennett@gaskinsbenn...**
2:5
**reach** 33:21
**reaction** 68:24 69:12
**read** 5:11,22,23 7:18,20
12:7,9,22 18:11,12
19:16,21,25 20:13 22:19
25:2 30:1,8 40:18,18
49:24 73:4 87:3 88:17
89:13 90:4
**reading** 4:21 51:23
**ready** 16:23 40:25
**realize** 60:20 76:25
**realizing** 34:9 67:24
**really** 4:22 35:3 48:18 60:2
77:23
**reason** 31:19
**reason** 41:23 82:20 90:10
**reasoning** 72:15 83:4
**recall** 4:6 13:18 14:7,8
16:24 24:9 39:21 69:11
71:2 73:3 85:24
**recalling** 85:2
**receive** 72:16
**received** 17:6 44:3
**Recess** 57:13
**recognize** 80:14
**recollection** 39:19
**record** 3:8 7:19 17:10,12
17:15,23 18:1,2,4,6
19:21 26:25 57:11,15
67:4 76:18 80:8,23 81:8
81:24 82:3 83:9 84:7
85:14 86:3 89:7
**records** 29:24
**Recovery** 21:11
**refer** 8:24 62:3
**referenced** 2:25 91:8,11
91:14,16,19,21,24 92:2
92:4,7,9,12,14
**referencing** 55:15 88:7
**referral** 27:25 28:2,9,20
41:24 53:21 55:12 62:4
62:16 63:2 66:4,24 67:1
67:5 69:18,20 70:1,14
71:18,25 87:18 88:4
91:16
**referrals** 59:17,22 73:21
81:16,17
**referred** 4:13 16:14 41:8
69:5 81:5 86:1
**referring** 22:8 29:17 62:9
63:2
**refers** 61:24
**reflection** 13:1
**reflects** 80:23
**refused** 79:15 80:2
**refusing** 79:14
**regard** 15:22 51:16 53:4

Michael Robertson
6/20/2019

81:24 86:12
**regarding** 4:4 5:16 38:5
46:19 54:18
**regards** 5:12
**registered** 5:10,11 89:21
**regular** 33:25 56:18
**regularly** 9:7
**regulated** 12:14
**related** 8:19 12:14,19
47:18
**relative** 85:16 89:8,9
**relay** 12:17
**relayed** 5:24
**relaying** 68:22
**release** 85:2
**relevant** 46:23
**relying** 82:12
**remarkable** 45:4
**remember** 4:9 7:11 22:14
28:23 32:1 37:8 45:18
46:18 86:6,7
**repeat** 83:7
**repeated** 84:25
**report** 21:12 85:4
**reported** 14:3 89:3
**reporter** 1:24 3:16 6:18
89:21
**reports** 20:19,22,25 21:5
21:16,17,22 22:1,5 86:5
87:3
**represent** 71:21
**require** 9:6
**required** 54:22
**requirements** 11:1
**research** 40:11,13 53:11
**reserved** 89:14
**residential** 42:13,14,17
50:2
**resign** 47:7
**resource** 40:25
**respond** 67:7 75:21 78:4
**responded** 20:16 67:25
**responsible** 77:5
**restrict** 78:10
**restricted** 65:25
**retaliatory** 34:21
**returned** 20:4
**returning** 21:15
**Reuvers** 2:8
**review** 4:7 13:12 16:22
29:15 72:5 81:4,9 84:15
**reviewed** 15:15,19,22
16:1 19:1 20:6 26:18
27:4,21 81:19 82:4
87:15 88:2
**reviewing** 16:25 30:10,19
**right** 5:2,17 6:12 7:6 9:11
13:17 17:14 18:21 23:8
29:4,8,10,12 37:16 42:5
43:24 44:1,9,12,16,22
45:1,4,7,9 46:4 52:7
54:25 57:5 60:10 62:24
64:11 67:13 69:7,22
74:8 77:25 79:7,15
80:19 84:5 86:1 87:7
89:13
**ring** 50:20
**risk** 6:1 17:17 20:7 22:9,16
22:20 27:17 35:3,8,10
35:15 51:17 52:10 55:20
55:24 56:1,4,13,20
57:18,22 58:10,22,25
59:3,12 65:4 66:25 67:8
92:1
**risks** 9:25
**River** 1:15 89:4

**RNs** 56:13
**Robert** 2:3 3:9
**Robertson** 1:10 3:4,20 4:3
89:4 90:3,25
**Rochester** 42:8 43:10
61:11
**roof** 87:5
**roof.'** 21:17
**room** 51:14
**rotating** 50:11
**rough** 20:22
**routine** 18:19 48:13 63:9
68:8
**routinely** 75:5
**RPR** 1:24
**rule** 54:17
**rules** 9:6
**run** 50:11
**running** 42:16

**S**

**S** 1:6 3:1 90:6
**saw** 26:15 27:24 31:14
55:13
**saying** 11:7 29:14 58:12
78:8 82:1
**says** 17:4 19:1 52:20,21
52:22 66:16 80:13 86:12
**scaffolding** 63:21
**scale** 23:16,18
**scenario** 72:18
**schedule** 46:22 50:12
72:7,10 81:7 82:23 83:2
**scheduled** 18:12,16 29:1
29:3,6,19 30:15 46:7
46:16 69:1,13 70:2 71:3
71:8 72:5 82:23
**scheduling** 46:2 81:6
82:13 83:5
**school** 42:20 43:7 44:20
**science** 44:4 45:13
**score** 13:10,19 20:4 22:22
22:25 34:7 54:21
**scored** 20:5 84:9
**scores** 14:4,8
**scoring** 23:12,16,18
**screen** 35:13 55:17
**screened** 48:19
**screening** 27:17 48:17,20
56:1,4,14,20 66:12,25
92:1
**SEAL** 89:15
**second** 8:7 52:16
**see** 15:21 17:4 35:21
36:19 37:18 40:7 45:14
46:12 62:1 63:17 70:6
70:11 75:17,20 76:6
79:1,3 81:5 83:1,2,18
84:9,20
**seeing** 45:18 47:21 48:21
71:23 85:24
**seen** 20:10 26:23,24 27:5
31:8 39:25 40:3 62:4,17
63:1 67:19 69:1 70:4,22
70:24 71:4,9 75:24 76:2
82:17,18,19 83:19,22
**sees** 73:25
**self-injurious** 8:14
**self-injury** 11:11
**sense** 17:3 19 74:12
**sensitive** 15:9
**sensitivity** 14:20,23
**sent** 39:8 55:11
**sentence** 5:22 12:7,20
73:12
**sentenced** 85:7

**sergeants** 38:20
**serious** 13:4,7 34:15
**services** 24:17 44:16
**set** 47:18
**setting** 82:9
**Seventh** 2:4,13 19:6
**severe** 13:6,8 22:22 23:13
24:8,13 25:12 61:7
**severely** 57:17 65:24
**sex** 49:25 50:1
**share** 68:11
**shared** 12:24 13:1
**sharing** 74:15
**she'd** 50:16 51:4
**sheet** 26:12 70:14 87:21
92:11
**Sheets** 92:4
**shelters** 42:16
**Sherburne** 1:14 2:7 3:14
4:5,19 7:2,8 9:13 10:4
13:22 23:17 32:1,4
33:13,18 37:10 39:7
45:15 58:14 67:22 76:25
**sheriff** 32:15
**Sheriffs** 44:10
**shoot** 20:21 58:10
**short** 33:16
**short-term** 61:3
**shortly** 50:14
**show** 17:23 51:24 66:11
66:17 70:10
**showed** 46:21 83:23
**showing** 4:15 18:8 56:22
76:10 80:25
**shows** 76:10,17
**shut** 68:20
**sic** 40:21 50:3 56:23 63:3
**side** 44:17
**sign** 57:23 88:17 89:13
**signed** 29:1 88:4
**significant** 8:15 73:22
**simply** 12:22 23:1
**single** 84:16
**site** 62:8,11
**situation** 45:4 62:2 64:25
65:6
**skill** 47:18
**skills** 43:1
**skimmed** 29:22
**skip** 19:23
**sleeping** 58:6
**small** 42:16
**sober** 21:1
**social** 34:18 57:25
**sold** 20:20
**somebody** 23:22 39:19
63:16
**sooner** 31:24 63:1
**sorry** 4:21 6:17,22 30:10
36:15 39:15 48:2,4,4
57:19 63:3 68:15 78:11
**sort** 38:10 44:19 45:3 57:3
**sorting** 35:15
**sorts** 52:23
**Sotto** 42:1
**sounds** 40:6 86:16
**South** 2:4,9
**speak** 6:15 66:7 71:22
78:25
**speaking** 42:1 84:22
**special** 19:11 38:25 64:8
65:23 77:12 91:18
**specialty** 54:7,16
**specific** 10:24 11:1 15:10
26:20 53:4 78:1 88:3
**specifically** 4:6 16:4 73:3

**specificity** 14:20,23
**spoke** 39:15
**spot** 72:25
**spring** 44:4
**ss** 89:1 90:1
**St** 2:14 44:14
**stabilization** 85:15
**stabilize** 85:9
**stabilized** 72:21 73:17,25
84:15,19 85:11
**stable** 72:25 73:20
**staff** 16:2 25:9 32:2 34:23
38:9,19 64:1 67:20
68:21 70:3 85:4
**standard** 11:16 73:14
**stands** 72:6
**Stang** 1:6 90:6
**staple** 17:3 19:14,15
**start** 12:13 31:21 66:19
**started** 31:3
**starting** 12:8 29:25 66:1
**state** 1:1 3:7 43:19 44:5
56:10 89:1 90:1
**stated** 20:16,23 21:4
**statement** 12:12 52:12,16
**states** 1:1 15:10 86:14
**statistics** 14:3
**status** 9:1,13,18 11:22
72:3
**stay** 30:21 31:2,6,16 51:11
**Stearns** 33:16 41:5
**stock** 76:13
**stop** 8:7 55:2
**stopped** 47:3
**stopping** 47:6
**straight** 35:12
**Street** 2:4,13
**stress** 60:17
**stressed** 21:18
**stressful** 50:23,25 51:13
**struggles** 84:23
**struggling** 23:22
**student** 43:13
**studied** 53:10
**studies** 52:15 53:1,13
**study** 40:19,19
**submitted** 46:21
**subsequent** 12:11
**substantial** 89:12
**substantiated** 14:9
**Sudden** 58:25
**suffer** 59:9
**suffering** 21:4 86:15
**suffice** 12:16 82:12
**sufficiently** 30:8
**suggest** 85:10
**suggests** 15:8
**suicidal** 8:2 9:14,15,16,21
11:9,19,21 12:3 20:13
22:6 52:23
**suicide** 4:5,19 5:6 7:22,25
8:10,10 9:2,18,19 10:3
10:18 11:5,7,13 12:12
12:12 20:7,18 27:17
32:3 35:3 37:22 38:6
39:16 40:11 41:5 50:14
51:18 52:3,10,14,18
53:1 55:20 56:1,4,13,20
57:18,23 58:22 59:3,4
65:5 66:25 67:8 69:2
74:4 75:17 92:1
**suicides** 40:2,16
**Suite** 2:4,14
**Sunday** 71:22
**supervision** 50:3
**supplemental** 17:11

**supposed** 38:22 63:23,25
68:6
**supreme** 35:13
**sure** 7:20 9:12 10:25
13:25 22:12 25:1,1
27:16 29:13 36:3,3,10
54:20 57:10 64:20 65:21
67:11,15 73:10 79:21
84:19
**surfaced** 70:9
**surprised** 39:22 51:7
**suspect** 12:18 14:18
32:10
**sworn** 3:19,21 89:5
**symptom** 60:3
**symptoms** 8:20,21 13:3
24:17 34:14,15 59:24,25
60:1,6 84:11,22
**system** 23:12

**T**

**T** 1:10 3:20 89:3 90:3,25
**tab** 91:10
**tablet** 80:19
**take** 16:22 22:25 51:3
59:16 57:9 79:25 80:18
**taken** 12:15 57:13 70:14
77:8 90:5
**takes** 35:20 79:21
**talk** 28:5 62:21 81:11
**talked** 10:20 38:9 39:6
62:14,18 70:3 72:19
**talking** 4:9 39:25 36:3
47:23 57:20 75:16 76:23
87:8
**taped** 58:13
**team** 32:11
**techs** 68:10,12 76:23
79:10
**telemedicine** 55:9
**tell** 17:2 22:6 28:24 29:23
31:9,13,19 35:17 52:18
84:18 89:5
**telling** 24:23
**temper** 60:16
**ten** 29:12 72:2
**tendency** 89:2
**term** 7:25 10:19,22,24
11:15,17
**terminology** 32:3 63:18
**terms** 85:16
**test** 15:5
**testified** 3:22 17:21
**testifies** 51:16
**testify** 66:11
**testifying** 17:17
**testimony** 62:23 80:8 89:6
89:7
**testing** 14:19 47:18,23,24
48:24 49:2,4,7,9,9,11
50:2
**tests** 49:16
**text** 5:17
**Thank** 3:15 88:20,21
**therapeutic** 59:19 61:6
**therapist** 44:1,7
**therapy** 23:7
**thing** 22:5 45:2 56:11
76:13 79:9
**things** 8:16 10:20 24:9,15
34:21 35:2,25 36:4,6
42:2,15,24 47:17,19
48:25 52:25 64:9 68:13
69:6,7 78:6 84:14 85:10
85:20,25
**think** 4:7 5:15 8:18 10:14

Doby Professional Reporting, Inc.
952-943-1587

Michael Robertson
6/20/2019

10:16,19 14:10 16:19
23:20 24:1 27:1 29:17
32:9 33:2 35:5,9,16 37:5
37:14,14 39:8 41:25,25
42:23 43:17 45:20,22
46:14 47:15,16 48:12
50:16 51:8 52:2 53:2,22
55:13,14 56:9 60:16
63:6,7 64:16,17 65:8
68:9,18,20,21,24 69:15
70:12 71:12 73:9 74:13
74:16 75:16 78:1 79:7
79:10,22 84:1,6 85:24
86:18 87:13,20,21,23,25
**thinking** 25:8 62:6,7 72:22
**thinks** 21:8,14,14
**Thompson** 66:10 76:16
**thorough** 73:13
**thought** 12:16 48:24 51:2
51:4 53:8 74:17 78:4
**thoughts** 20:13 21:23
22:6 68:24 86:8
**thousands** 35:6
**three** 24:14 50:12 63:20
72:1 76:12,17 77:9,25
78:19,20
**threshold** 23:20 55:1
**throw** 13:20
**thrown** 79:8
**time** 3:5 5:10 6:5,15 7:8
13:13 14:12 16:2,17
20:22 21:1,12,20 26:22
29:2,18 32:12 37:7,9
38:6 39:6 42:20 43:3,19
45:15,24 48:21 51:12
63:9 68:19 69:16 70:9
70:12 71:7 73:8,20,25
81:7 84:2 88:4
**times** 14:21 44:9 48:11
80:11 84:25
**title** 7:4
**today** 26:18 73:4 82:18
**Today's** 3:5 20:1
**told** 83:22 84:4
**tomorrow** 82:18
**tool** 14:14 24:19,24 25:2
**tools** 14:10 48:18,21
49:14
**top** 72:2
**touch** 34:17
**train** 74:16
**trained** 35:10
**training** 56:12,15,17
**trait** 56:10
**transcribed** 89:6
**transcript** 1:9 2:23 89:13
90:5
**transferred** 65:11 70:23
**transmitted** 41:18
**treat** 46:8 60:4
**treatment** 21:9,12 22:2
45:24 46:4 50:2 58:7
84:25
**Tried** 38:10
**true** 11:18 14:24 30:19,25
31:4,7 61:1 67:15,18
73:6 79:18 81:1,4 82:5,7
84:1 85:22 89:7 90:8
**Trustee** 1:3
**truth** 89:5
**try** 56:6 59:24,24 60:2
62:12 74:13
**trying** 8:16 19:18 24:16
35:7,24 50:16 60:5
78:13 87:8,24 88:10,11
**Tuesday** 21:6

**turn** 48:7
**TV** 21:21
**twenty** 40:21 47:1
**twice** 37:6 80:19
**two** 40:2 50:12 63:15
**type** 6:24 47:12 49:2,4
59:25
**typewritten** 90:4
**typical** 15:12
**typically** 4:12 6:12 15:12
15:16,20 28:25 34:1
41:13 49:3,4 64:3 71:25
72:3,7,11 73:14 75:3
81:3,7,20,22,23,23 82:8
82:10 86:25 87:13

**U**

**uh-huh** 23:15,25 33:20
41:2 47:25 48:24 51:5
54:1 57:19 59:11,23
68:14 70:8 80:16 86:1
87:10
**Ultimately** 32:15
**um** 5:11 6:5 7:13 8:12
13:20,23 14:12 16:1,13
22:13,18 24:9,12 25:19
28:12,21,23 29:11,14,19
32:6,16 34:13 36:21,25
39:8,8 47:16 50:7 55:13
55:21 64:5 66:5,8 70:19
72:18,23 87:15
**unclear** 41:15,17
**understand** 9:3,6 14:5
28:2,10 31:18 39:11
50:10 56:7 60:22,25
62:23 70:20
**understanding** 7:23 10:9
16:1,11 48:5 60:3
**understood** 11:6 41:22
68:14
**unhelpful** 79:6
**unit** 21:19 65:10,11 72:20
**United** 1:1 15:10
**University** 44:24
**unparenthesis** 8:4
**unquote** 8:1
**unusually** 41:14
**urgency** 66:3
**urgent** 28:3,20,22 55:12
63:18 72:3,3,4,9 73:21
81:16
**urgently** 63:14,17 83:18
83:22,24
**use** 10:3 15:4 20:25 21:10
23:20 32:2,7 36:7 48:13
48:14 49:13
**usually** 48:22 63:9 74:13

**V**

**vague** 39:19
**validity** 14:15
**valuable** 65:12 66:22
**various** 3:19,21 11:25
**verbal** 46:20 87:21
**verbalized** 72:23 88:3
**versus** 10:18 37:5 56:10
64:17
**video** 1:9,25 3:3 6:19 18:2
57:11 88:18 89:3 90:5
**Videographer** 1:25 3:3,15
18:2,5 57:11,14 88:18
**view** 14:2 60:6
**viewed** 12:22
**visit** 20:1,7 29:3 30:16
**vitae** 42:3 88:7

**voce** 42:1
**vs** 1:5 90:6
**vulnerability** 12:15

**W**

**W** 1:3 2:2
**Waagmeester** 28:6 55:10
62:21 66:2 76:16
**wait** 4:21 83:10,13
**waiting** 72:15
**walks** 21:21
**want** 8:17 17:18,23,25
20:11 52:1 64:6 65:3
66:23,24 79:20,21
**wanted** 7:12,20,25 47:17
48:7 55:16 83:18,22
**wanting** 57:4
**wants** 73:21
**warning** 57:23
**Washington** 89:2,22 90:2
**wasn't** 4:21 5:9 7:13,13
24:15 28:22 40:5 46:23
67:5 77:23 87:19
**watch** 8:5 9:20,23 10:3,18
11:13,15 12:25 32:3,5,7
38:15,24 51:18,20 52:2
62:10 63:24 64:7,20
68:9 73:1
**watch'** 7:22
**Watch-15** 5:25 7:6 8:23
10:21
**watch,'** 7:22,25
**watches** 8:22 11:3 12:10
12:13 21:21 31:24 34:12
36:9 64:10,12,18 78:18
**watches.'** 8:6
**way** 40:6 44:19 64:17
**we'll** 4:7 88:17
**we're** 16:19 18:5 51:19
57:14
**we've** 75:16
**website** 80:17
**week** 16:16 29:9 30:15
34:3,5 36:20,24 37:5,6
37:20 46:12 50:12 81:17
**weeks** 74:14
**well-being** 9:6 11:4 64:21
68:7
**well-known** 61:19
**well-versed** 53:10
**went** 21:6,12 42:20 50:19
85:20
**weren't** 6:22 76:23
**when's** 39:6
**wide** 51:10
**Winberg** 1:24 89:3,21
**Winona** 44:5
**withdrawal** 13:3 20:2
24:11 26:2,5,9,11 59:6
60:15 86:17,25 92:4,6,9
92:11
**withdrawing** 24:16 60:12
**witness** 3:19,21 11:25
41:2 61:19 77:14,17
80:5 88:10,15,21 89:5,7
89:14,15
**word** 52:3
**worded** 53:3
**words** 87:8
**work** 13:15,17 33:14,21
42:13 43:2,4,5 45:11
46:25 47:7,17,22 49:20
50:6 51:13 76:21 85:2
**worked** 33:13,16 43:20
44:6,9 55:6 76:20
**workhouse** 21:7

**working** 16:8,15,18 33:18
42:9,10 45:12 46:25
47:3 49:24 66:20
**works** 6:18,19
**wouldn't** 5:8 11:12 15:7
20:21 35:17 46:22 66:18
66:23,24 72:8 81:19
82:16 83:24
**writer** 20:6,8,14
**writing** 19:1 42:24 43:1
46:2 87:7
**written** 29:11 57:4
**wrote** 4:25,25 8:3 73:5
87:12,15

**X**

**Y**

**yeah** 6:14 16:15 18:17
19:23,24 20:12 22:17,18
22:19 23:6,11,15,19
25:6,17 29:2 32:9,16
33:6,15 34:1,10 36:19
37:4,11,13,17,19,21
39:24 40:22 41:25 43:6
43:6,12,17 44:7 45:6,21
45:22 49:1 50:16,21,24
52:11 55:7,13 56:12
57:1,6 60:21 61:9,15,15
63:5 64:5,24,24 65:8,13
65:16,21 66:8,22,22
68:3 72:14 74:20 75:12
75:17 77:4 78:4 80:13
82:24 88:2
**year** 5:7 22:12 29:20
**years** 21:1 40:21
**Youth** 44:10

**Z**

**0**

**1**

**1** 20:5 91:8
**1.5** 20:23 21:1
**1:28** 88:19,22
**10** 4:16 5:1,2 23:14 91:7
**100** 80:11
**11** 29:12 63:1 76:10 80:25
82:19 83:10,14,24 91:10
**11/1/17** 57:2 92:9,11
**11/7** 56:23
**11/16/2017** 18:13
**11/7** 57:6
**11/5/17** 5:17 57:6 91:16,18
91:21
**11/6** 81:20
**11/9/17** 29:23
**11:00** 1:12 3:6
**11:20** 18:3
**11:30** 18:6
**12** 36:22
**12:30** 57:12
**12:46** 57:15
**12010** 4:10 5:20 15:23
**13** 4:14,15,17 16:20 91:13
**13880** 1:15
**14** 16:19 18:8 27:24 71:18
81:25 91:15
**14th** 81:25
**15** 19:10 68:5 91:18
**15-minute** 9:20 38:15
51:18 64:7 73:1
**16** 19:14 25:21 91:16,20

**16th** 27:5 29:7 37:23 69:1
69:13 70:10 71:9 72:17
77:20 78:8 83:5
**17** 27:13,14 56:24 91:23
**18-cv-2301** 1:2
**19** 19:19,21
**1986** 42:5
**1990** 40:19 44:5
**1st** 86:21

**2**

**2** 18:5 91:8
**20** 1:11 3:5 21:18 55:25
66:12 90:7 92:1
**2003** 44:24
**2006** 40:21
**2013** 20:19
**2016** 47:1
**2017** 30:21 31:2,6,15,15
34:3,7 37:10 40:3 45:16
71:21
**2018** 4:16 5:2
**2019** 1:11 3:5 47:4 89:4,15
90:7
**20th** 89:4
**22** 25:24 26:3 92:3
**23** 26:6 91:8 92:6
**24** 26:8 63:19 92:8
**25** 26:11 92:4,11
**25th** 89:15
**26** 26:16 29:24 92:7,9,12
92:13,14
**27** 91:24
**2800** 2:14
**29** 23:13

**3**

**3** 57:14
**30** 2:13 9:7 21:7
**3000** 2:4
**31-year-old** 19:25
**333** 2:4
**36** 55:1 66:16
**3rd** 66:13

**4**

**4** 91:14
**4-71** 91:2
**4:00** 34:2
**4:30** 36:20
**4:57** 5:4
**40** 36:23 37:18 54:22 55:1
**43** 13:11,19 20:4 22:22
34:7

**5**

**5** 71:21
**5:00** 34:2
**50** 80:11,19 91:10
**55** 92:2
**55101** 2:14
**55330** 1:15
**55402** 2:5
**55438** 2:9
**5th** 16:12 19:2 29:11 67:4
67:6,20,23 74:5 75:14
77:24 78:14 86:21 87:12

**6**

**60** 36:23 37:18
**63** 23:13
**6th** 19:4 87:13

**7**

Michael Robertson
6/20/2019

Page 99

**7/17** 92:6
**7/6/17** 92:4
**7:00** 34:1 36:20
**7:30** 34:1
**71-74** 91:4
**74-88** 91:2
**76** 91:11
**7th** 29:14

---
**8**

**81** 43:8

---
**9**

**9** 20:5
**9321** 2:9
**96** 14:17
**9th** 30:13 37:23 67:6,23
   78:12,14