# EXHIBIT 24

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

--------------------------------------------------------
                              Civ. No. 18-2301 (JRT/KMM)
David W. Lynas, as Trustee for the
next-of-kin of James C. Lynas,

          Plaintiff,

     vs.

Linda S. Stang, et al.,

          Defendants.

--------------------------------------------------

        VIDEOTAPED 30(b)(6) DEPOSITION OF

        MEnD CORRECTIONAL CARE, PLLC

        By: TODD LEONARD, its Designee

              October 28, 2019

                    at

        Gaskins, Bennett & Birrell, LLP
          333 South Seventh Street
            Minneapolis, MN 55402

        Reporter:  Jane T. Doby
        Registered Merit Reporter
        Doby Professional Reporting, Inc.
            DobyReporting.com
              952.943.1587

## 2

```
 1   APPEARANCES:
 2   On Behalf of Plaintiff David W. Lynas:
 3       Robert Bennett, Attorney at Law
         rbennett@gaskinsbennett.com
 4       Marc E. Belinsky, Attorney at Law
         mbelinsky@gaskinsbennett.com
 5   GASKINS, BENNETT & BIRRELL, LLP
     333 South Seventh Street
 6   Suite 3000
     Minneapolis, MN 55402
 7
     On Behalf of the Sherburne County Defendants:
 8
     Stephanie A. Angolkar, Attorney at Law
 9   stephanie@irc-law.com
     IVERSON REUVERS CONDON
10   9321 Ensign Avenue South
     Bloomington, MN 55438
11
     On Behalf of MEnD Defendants:
12
     Anthony J. Novak, Attorney at Law
13   tnovak@larsonking.com
     LARSON KING, LLP
14   30 East Seventh Street
     Suite 2800
15   St. Paul, MN 55101
16
     Also Present:  Jayme Hogan, Envision Video
17
     NOTE:  Pursuant to Minnesota Rule of Civil Procedure
18   30.06, the original transcript will be
     delivered to Gaskins, Bennett & Birrell,
19   LLP, the noticing party.
20   NOTE:  Exhibit Nos. 52 through 70 were marked for
     identification.
21
22
23
24
25
```

## 3

```
 1            P R O C E E D I N G S
 2            (The videotaped 30(b)(6) deposition of MEnD
 3   Correctional Care, PLLC, by TODD LEONARD, its
 4   Designee, was commenced at 9:35 a.m. as follows:)
 5            VIDEOGRAPHER:  This is the 30(b)(6)
 6   deposition of MEnD Correctional Care, testimony of
 7   Dr. Leonard.
 8            Today's date is October 28th, 2019, and the
 9   time is approximately 9:35 a.m.
10            Would each attorney please state their name
11   for the record.
12            MR. BENNETT:  Robert Bennett, appearing on
13   behalf of the plaintiff.
14            MR. BETINSKY:  Marc Betinsky, for the
15   plaintiff.
16            MS. ANGOLKAR:  Stephanie Angolkar for the
17   Sherburne County defendants.
18            MR. NOVAK:  Tony Novak for MEnD and the
19   witness.
20            VIDEOGRAPHER:  Thank you.
21            Would the court reporter please administer
22   the oath.
23            (Oath administered.)
24            THE WITNESS:  I do.
25
```

## 4

```
 1                     ***
 2            TODD LEONARD,
 3   called as a witness, being first duly sworn, was
 4   examined and testified as follows:
 5                 EXAMINATION
 6   BY MR. BENNETT:
 7       Q   Dr. Leonard, MEnD is a -- MEnD Correctional
 8   Care, LLCP, is that the --
 9       A   PLLC.
10       Q   Okay.
11            And the -- is that a member-managed LLC?
12       A   Sole proprietor.  I guess, I -- I'm not an
13   attorney, so I don't have the specific terms as -- as
14   down as you-all.  But registered as a PLLC.  I work
15   with my attorneys to ensure that we have proper
16   documentation and registration.
17       Q   But it's -- how many members are there?
18       A   One.
19       Q   So you manage it?
20       A   I manage it with my team.  But I own it.
21       Q   But the --
22       A   Hundred percent owner.
23       Q   But the -- in terms of the corporation
24   itself, it's a member-managed corporation.  Correct?
25       A   I'm a sole owner and president.  And, I
```

## 5

```
 1   guess, the best I can tell you is I work with my
 2   management team to run day-in/day-out business.
 3       Q   But I'm talking about the affairs of the
 4   corporation itself under the Minnesota law.  You
 5   don't -- you don't know what --
 6       A   Well, I -- I own the company and I'm
 7   responsible for ensuring that we are registered
 8   properly and maintain our licensure and...
 9            (Sotto voce remarks between plaintiff
10   counsel.)
11            (Exhibits 52 and 53 were marked for
12   identification.)
13   BY MR. BENNETT:
14       Q   I'm showing you Exhibit 52.  Can you
15   identify that for me, please?
16       A   Yeah.  MEnD Correctional Care's balance
17   sheet as of December 31st, 2017.
18       Q   Is that something you prepared, or that --
19   prepared to give us in this case, or is it something
20   that already existed?
21       A   I generated this paper report, but it's...
22       Q   Is it on -- is it in a QuickBooks program?
23       A   Accounting software.  Yeah.  Correct.
24       Q   And Exhibit 53, is that the profit and loss
25   statement from January through December of 2017?
```

6

1      A   Correct.
2      Q   The balance sheet, Exhibit 52, lists a
3   2016 -- is that a Toyota Tundra?
4      A   Correct.
5      Q   Who's the primary driver of that?
6      A   Myself and select people from my corporate
7   office team.
8      Q   Where is it garaged?
9      A   At our corporate office.
10      Q   Does it ever get garaged at your home?
11      A   No.
12      Q   So you drive from your home to the
13   corporate office and then use this vehicle?
14      A   Correct.  And most of the time it's my
15   corporate office team that will use the vehicle.
16      Q   Okay.
17         And you say "members equity."  There's only
18   one member, and that's you?
19      A   Correct.
20      Q   So, I guess, technically it would be
21   "member equity."  Correct?
22      A   If you want to call it that, that's fine.
23      Q   And "shareholder distribution," what was
24   that?
25      A   That's just a direct payment to me.  It's a

7

1   bit unusual.  Typically, monies are -- they flow from
2   MEnD Correctional Care to Dr. Todd Leonard
3   Consulting, and that's where I would draw shareholder
4   distributions.  Typically.  So this is an unusual
5   event.  But it was, I'm sure, something very
6   specific --
7      Q   Do you remember what?
8      A   -- in that year.
9         Specific to that number?  No.
10      Q   And with regard to Exhibit 53.
11      A   Okay.
12      Q   I'm going to go through this with you, kind
13   of up and down.
14      A   Sure.
15      Q   Fee-for-service income, is that the income
16   that's paid pursuant to the contracts with the
17   various counties?
18      A   It's -- it's -- it's all the revenue
19   generated from contracts that involve professional
20   services.
21      Q   Are there any that aren't derived from
22   counties in 2017's number?
23      A   It would be a tiny amount that could
24   potentially be from expert witness work.  There would
25   be a tiny amount that would be from nurses who didn't

8

1   work for MEnD Correctional Care that attended our
2   annual nursing conference.  But it's a very small
3   amount.
4      Q   That paid to do so?
5      A   That paid to attend our conference.
6      Q   Wouldn't that be nonmedical income?
7      A   Well, I'm -- I'm just saying, it's possible
8   that in -- it -- it -- if there's anything in
9   fee-for-service income that's non direct medical care
10   related, those would be the possibilities.  However,
11   most, if not all that, would be a nonmedical income.
12      Q   Okay.  So the vast majority of the
13   fee-for-service income is derived from the counties
14   that you have contracts with?  MEnD has --
15      A   Correct.
16      Q   -- contracts with?
17      A   Correct.
18      Q   Does MEnD Correctional Care, PLLC make any
19   payments to you directly, other than the
20   shareholder -- or other than a shareholder
21   distribution?
22      A   To me individually?
23      Q   Yeah.
24      A   No.  Just as you said, just this
25   shareholder distribution.  I don't recall exactly

9

1   what that incident was, but...
2         Again, by and large, money doesn't come to
3   me directly from MEnD.  It will go to Dr. Todd
4   Leonard Consulting.
5      Q   And let's just, for purposes of this
6   deposition, I'm going to call MEnD Correctional Care,
7   PLLC "MEnD."
8      A   Fine.
9      Q   Is that okay with you?
10      A   Absolutely.
11      Q   Does MEnD pay anything on these -- listed
12   on these expenses to any other entities controlled by
13   you?
14      A   Yes.  Dr. Todd Leonard Consulting.
15      Q   That's it?
16      A   And then halfway through this year, when we
17   moved into our new corporate location, MEnD
18   Correctional Care would pay rent expense to TL
19   Clearwater Properties, LLC, which owns that building
20   and land.  So MEnD pays rent payments monthly to that
21   LLC.
22      Q   What's the name of that one again?
23      A   TL Clearwater Properties.
24      Q   Okay.
25         What is the advertising and promotion

3 (Pages 6 to 9)

10

1  expense?  Who's that paid to?
2       A   By and large, it's -- most of our
3  advertising runs through our involvement in
4  conferences where it's germane that we are present to
5  market, advertise, try and sell our wares, if you
6  will, to our target audience.
7       Q   What kind of conferences?
8       A   So an example would be a jail
9  administrators conference held by the Minnesota
10  Sheriffs' Association.  We attend many conferences
11  such as that.
12       Q   Do you have a booth or something you --
13       A   Exactly.
14       Q   Okay.
15       A   Exactly.  And sponsor.
16       Q   You're a sponsor of those -- of that
17  conference?
18       A   Not sole sponsor, but we're one of the
19  sponsors.
20       Q   Major -- a major sponsor?
21       A   Depends on the conference and the level of
22  involvement we have.
23       Q   Which are the ones you're a major
24  conference -- a major supporter, promoter of?
25       A   I would say Minnesota Sheriffs' Association

11

1  conferences.  There's multiple per year.  We're a
2  significant sponsor and exhibitor on all of those.
3       We have significant participation in the
4  ISSDA, which is the similar organization in Iowa.
5       And we -- we have a little bit less
6  involvement with Wisconsin-based conferences.
7       Excuse me.
8       Q   Continuing education.  Who is that for?
9       A   It's a variety of sources.  We work with
10  the NCCHC closely in getting a wide number of our
11  employees personally certified with professional
12  certifications.
13       We have a large number of our nurses that
14  attend particular conferences.  One in particular is
15  the CHD conference that's -- is a division of the
16  Minnesota Sheriffs' Association that's put on for
17  correctional health care education.
18       We have leadership in our company attend
19  national NCCHC conferences.  So it's a wide variety
20  of educational opportunities that we provide for our
21  staff.
22       Q   And who would be included in the leadership
23  of your company that attends national NCCHC?
24       A   Nursing directors; medical providers; our
25  director-level staff at corporate.  Occasionally, we

12

1  have select supervisory nurses that will attend.
2  Myself.  That's the bulk of it.
3       Q   And your corporate offices are now where?
4       A   Sartell, Minnesota.
5       Q   TL ...
6       And TL Clearwater Properties owns -- LLC
7  owns that, that building?
8       A   That building, property.
9       Q   1908 Kruchten Court South?
10       A   Exactly.
11       Q   And that's -- you're the sole member of
12  that LLC as well?
13       A   Correct.
14       (Sotto voce remarks between plaintiff
15  counsel.)
16       (Exhibit 54 was marked for identification.)
17  BY MR. BENNETT:
18       Q   Exhibit 54.  This is the business record
19  detail for TL Clearwater Properties, LLC?
20       A   I believe this is the filings from
21  Secretary of State website.
22       Q   Okay.  You are the sole member of that
23  corporation?
24       A   Correct.
25       Q   And you -- MEnD pays rent to that entity?

13

1       A   Correct.
2       Q   And how much rent does it pay?
3       A   8,550 a month.
4       Q   And when in 2017 -- I see this was
5  original -- TL Clearwater Properties was set up in
6  July of 2016.  When did rent started to be -- did
7  MEnD start paying rent to TL Clearwater Properties?
8       A   June or July of 2017.
9       Q   Who owned the building you were previously
10  at?
11       A   The name of the company was Evergreen
12  Properties or Evergreen something.  It was -- I
13  guess, lack of a better word, a strip mall-type
14  facility in Waite Park, Minnesota.
15       Q   So the last half of the year in 2017, there
16  would be -- that would be the rental expense?
17       A   The rental expense is the entire year.
18       Q   Yeah.
19       A   But from either June or July of that year
20  to the end of the year, those payments would have
21  went to TL Clearwater Properties and not Evergreen
22  anymore.
23       Q   So seven or six months of 8,550.  Right?
24       A   Correct.
25       Q   And the balance of that 101,799.70 would

14

1 have been paid for the either five or six months of
2 rent to Evergreen?
3     A    Correct.
4     Q    How much rent did you pay them?
5     A    I don't recall specifically. I just don't
6 recall the exact amount.
7     Q    Back on the profit and loss statement. It
8 says "auto insurance." Is that for the Tacoma?
9     A    For the Tunrda.
10     Q    For the Tundra, rather.
11     A    Correct.
12     Q    What is the equipment rental for, that
13 line?
14     A    Equipment rental. I mean, literally, is
15 any piece of equipment that we have to rent. For
16 example, we have two printer fax -- or fax copiers in
17 our corporate office. That's a significant piece of
18 that.
19     Q    In your corporate office, how many people
20 work?
21     A    Regularly? Regularly, eight. But our
22 nursing directors can office there, so on varying
23 degrees of involvement can be 14.
24     Q    Are there any other physicians that are
25 officed at your corporate office?

15

1     A    Not regularly.
2     Q    Who's the janitorial expense paid to?
3     A    Just our cleaning company, and any other
4 services where we've had to have somebody come in and
5 clean or...
6     Q    That's not paid to TL Clearwater
7 Properties?
8     A    No.
9     Q    And it says "grounds maintenance" on
10 page 2. The $16,000. Who's that -- is that paid for
11 the grounds maintenance at the Evergreen location, or
12 is it strictly at the TL --
13     A    At Kruchten Court.
14     Q    So it is just the TL Clearwater Properties?
15     A    Correct.
16     Q    So is that paid to TL Properties?
17     A    No. At that time it was Behrendt
18 Contracting.
19     Q    Are there any other tenants of the Kruchten
20 Court property?
21     A    No.
22     Q    Does your other corporate -- limited
23 liability corporation, is that officed at the
24 Kruchten Court property as well?
25     A    No.

16

1     Q    Where is that officed?
2     A    Officed out of the apartment that I have in
3 St. Cloud.
4     Q    You have $129,000 in legal fees. Is that
5 right?
6     A    Correct.
7     Q    Any of those legal fees devoted to the
8 payment of a lawsuit, defense of lawsuits?
9     A    Some are.
10     Q    How much of that 129, would you say?
11     A    I don't recall exact dollar amounts.
12     Q    Most?
13     A    No.
14     Q    The majority?
15     A    No.
16     Q    Okay. Management --
17     A    Minority.
18     Q    Okay. Sorry. I didn't mean to -- I
19 thought you were done with the answer.
20     Management fees, who is that paid to?
21     A    That's all the funds that go to Dr. Todd
22 Leonard Consulting.
23     Q    So that's 421,837.40.
24     Has that increased since 2017?
25     A    Mildly. Mildly.

17

1     All taxes are taken from that amount. MEnD
2 is a disregarded entity, so for tax purposes all
3 taxes are paid out of those funds that are provided
4 to Dr. Todd Leonard Consulting.
5     Q    Just like they would be on any fund -- on
6 any income item, they'd be?
7     A    Well, there's federal tax deposits, there's
8 state tax deposits.
9     Total taxes in 2017 was approximately
10 200,000.
11     Q    For -- for MEnD?
12     A    MEnD's a disregarded entity, so it's
13 basically for me working with MEnD, Dr. Todd Leonard
14 Consulting, and personally.
15     Q    Subcontractor. Who is that payment made
16 to?
17     A    That's Dr. Steve Skurr. I don't -- I don't
18 recall --
19     Q    Steve? What's his last name?
20     A    Skurr. S-K-U-R-R.
21     I don't recall if there's any -- if there's
22 any other recipient of those funds, it would be a
23 minimal portion of it.
24     Q    So most of it is for the other physician
25 that MEnD has --

5 (Pages 14 to 17)

18

1      A   Dr. Skurr.
2      Q   Let me finish my question, please.
3          -- the other physician that MEnD had
4   working part-time in 2017?
5      A   Yes.  It's for the other physician that
6   works with us.  Correct.
7      Q   Do you know the hourly rate that that is
8   paid at?
9      A   It's a combination.  There is a -- an
10   agreement for a portion of his services at a flat
11   monthly stipend, and then there's a portion of his
12   service that is billed at an hourly rate.  The
13   portion that is billed at an hourly rate is at 100
14   per hour.
15      Q   Has that increased over the -- is he still
16   employed by you?
17      A   He's subcontracted by me.  Correct.
18      Q   So as a subcontractor, he would control
19   when and where he works?
20      A   He works with me in partnership, but,
21   ultimately, as a subcontractor.
22      Q   But he's not a partner?
23      A   No.
24      Q   And you've said -- what's his monthly
25   stipend?

19

1      A   So the portion that is set at a monthly
2   stipend is 2500 per month.
3      Q   That's times 12?
4      A   Correct.
5      Q   So, for example, the monthly stipend would
6   be 30,000 of the 37,775.  Right?
7      A   Yeah, sorry.  I have to find where you're
8   at.
9      Q   The subcontractor.
10      A   Got it.  Yep.  Correct.
11      Q   And then the 7,007 -- he worked 77 hours in
12   the course of a year or -- at the $100 rate?
13      A   Whatever the math comes to.  Correct.
14   That's what he would have worked.
15      Q   All right.  How many hours a week do you
16   work for MEnD Correctional Care?
17      A   It varies.  I mean, I'm -- I'm full time,
18   so I -- it varies per week.
19      Q   Well, you work for MEnD -- Dr. Todd Leonard
20   Consulting too.  How many hours a week do you work
21   for them?
22      A   Dr. Todd Leonard Consulting is simply
23   myself.  That's a small amount of my time.  A few
24   hours a week, maximum.
25          The vast, vast bulk of my time is working

20

1   directly with and for MEnD.
2      Q   So for a few hours a week you get
3   $421,837.40?  Is that right?
4      A   No.  That's not correct.
5      Q   Okay.
6      A   I --
7          MR. NOVAK:  You've answer the question.
8   Wait until there is another question.
9   BY MR. BENNETT:
10      Q   Well, how do you -- you -- you get that --
11   that management fee is paid to Dr. Todd Leonard
12   Consulting?
13      A   That is correct.
14      Q   Okay.  And that's for what kind of work?
15      A   That's for the work that I do for MEnD
16   Correctional Care.  I don't take a salary for MEnD
17   Correctional Care.
18      Q   Okay.
19      A   And as I stated earlier, that includes all
20   tax payments that need to be made.
21      Q   Well, that's sort of -- everybody's check
22   includes tax payments.  Right?
23      A   No.
24      Q   If you're an owner?
25      A   This is different.  It's -- MEnD is a

21

1   disregarded entity.  All of its tax payments flow
2   through my own business.
3      Q   Yeah.  So it goes to your personal return.
4      A   Ultimately.
5      Q   Yeah.
6      A   Correct.
7      Q   Is Dr. Todd Leonard Consulting also a
8   disregarded entity?
9      A   No.  It's an LLC.
10      Q   All right.
11          Relocation expense.  I assume that was the
12   move.  Right?
13      A   No.  That was money that we spent moving
14   one of our medical directors to join our company.
15      Q   Okay.
16          Cell phone expense.  Who's that?  Whose
17   phone is that?
18      A   That's all of our nursing director, office
19   manager, and other directors' cell phones, work cell
20   phones, in a package.
21      Q   So by "other directors," you mean who?
22      A   All of our nursing directors, mental health
23   director, human resources director, office manager,
24   myself.
25      Q   So -- and the travel expense, is that your

Doby Professional Reporting, Inc.
952-943-1587

22

1 travel expense?
2     **A**   **I -- you'd have to be more specific. I'm**
3 **sorry.**
4     Q   Well, it says, "Travel" -- I'm looking
5 under the traveling expense. How would you describe
6 those payments, then?
7     **A**   **There's a myriad of travel expenses with**
8 **our company. We have expenses for all of our**
9 **directors for all their travel. Medical providers,**
10 **when they need to travel. Myself, when I need to**
11 **travel. Anybody -- float nurses. Anybody in our**
12 **company that needs to have travel either**
13 **reimbursed -- hotel stays. All of it.**
14     Q   Where are the utilities paid? For what
15 property are the utilities paid?
16     **A**   **At Kruchten Court.**
17     Q   And that's in addition to the 8500 a month?
18     **A**   **Correct.**
19     Q   And the same would be true of the ground
20 maintenance, that's in addition?
21     **A**   **Correct.**
22     Q   What's miscellaneous income? And who --
23 who makes the miscellaneous income?
24     **A**   **Miscellaneous income is what we invoice our**
25 **customers for restocking emergency kit medications.**

23

1 **So we make no money on that. But technically, we**
2 **have to invoice them for it to be reimbursed.**
3     Q   Okay.
4     Has MEnD ever had any other members other
5 than you?
6     **A**   **No.**
7     **(Sotto voce remarks between plaintiff**
8 **counsel.)**
9     **(Exhibit 55 was marked for identification.)**
10 BY MR. BENNETT:
11     Q   This is the Secretary of State business
12 record details for Dr. Todd Leonard Consulting, LLC.
13 Correct?
14     **A**   **It appears so, yes.**
15     Q   And its registered office is not an
16 apartment in St. Cloud. Is it?
17     **A**   **No.**
18     Q   It's your home in Mahtomedi?
19     **A**   **Correct.**
20     Q   When MEnD consulting -- excuse me.
21 When MEnD was formed, how many employees
22 did it have?
23     **A**   **I don't recall, top of my head. It was a**
24 **very low number.**
25     Q   Under five?

24

1     **A**   **Likely.**
2     Q   How many today?
3     **A**   **Total, full- and part-time, approximately**
4 **180.**
5     Q   And of that 180, there's one full-time
6 medical doctor. Correct?
7     **A**   **Yes.**
8     Q   That's you?
9     **A**   **Correct.**
10     Q   And one part-time medical doctor?
11     **A**   **Correct.**
12     Q   In November of 2017, how many were there,
13 do you know?
14     **A**   **Any -- how many --**
15     Q   Employees.
16     **A**   **I don't -- I don't recall that detail.**
17     Q   And just to be clear, when you refer to
18 "director," you're not saying they're on the board of
19 directors?
20     **A**   **Nope. Nursing directors, mental health**
21 **director, director of nursing, training director.**
22 **Those directors --**
23     Q   And your title at MEnD is?
24     **A**   **President and chief medical officer.**
25     Q   And what is your title at Dr. Todd Leonard

25

1 Consulting?
2     **A**   **There's no particular title. I'm the**
3 **owner.**
4     Q   You talked to the reporters from the Duluth
5 News Tribune. Is that correct? In 2016? Do you
6 remember that?
7     **A**   **I don't recall when, but I recall speaking**
8 **with a reporter from that paper. Correct.**
9     Q   And you said that 10 percent of your time
10 will be clinical, and 90 percent will be -- or -- and
11 90 percent administrative. In 2016.
12     **A**   **What I meant by that was 10 percent would**
13 **be --**
14     Q   I didn't ask you what you meant. Is
15 that -- did you say that?
16     **A**   **I don't recall.**
17     MR. NOVAK: Didn't we cover this in his
18 individual deposition that you took for several
19 hours, Counsel?
20     MR. BENNETT: No.
21     MR. NOVAK: Okay. This is a corporate
22 30(b)(6) deposition.
23     MR. BENNETT: Well, I'm trying to figure
24 out what he does and -- I understand.
25     (Exhibit 56 was marked for identification.)

26

1   BY MR. BENNETT:
2       Q   Do you recall that article?
3       A   I do.
4       Q   And when you're talking about "in our
5   business model," you're talking about MEnD
6   Correctional Care. Correct?
7       A   Yes. Yes.
8       Q   And you're quoted as saying, "In our
9   business model, 10 percent of my time will be
10  clinical and 90 percent administrative, whereas when
11  we started, it was exactly the opposite."
12          Did you say that?
13      A   I did say that, if it's quoted. Yes.
14      Q   Now, it also says that MEnD got started
15  from -- in 2006 when you got a call from a childhood
16  friend who had grown up to be sheriff of Sherburne
17  County. Who was that person?
18      A   Well, that's not exactly how it was stated.
19  But it was an old friend of mine, Sheriff Bruce
20  Anderson at the time.
21      Q   Okay.
22          How old -- how much older is Anderson than
23  you?
24      A   I wouldn't know. I don't know his age.
25      Q   He was a childhood friend, though?

27

1       A   No. He was a friend of mine when I was a
2   child.
3       Q   Okay. He was older than you?
4       A   Correct.
5       Q   And this says in November 1st of 2016, it
6   says that at that time MEnD served 33 of the 80
7   Minnesota counties that have their own jails.
8       A   Okay.
9       Q   I'm reading. It's the second to last page
10  of the article. Is that true?
11      A   It -- yep. If I said that's what we were
12  doing at the time.
13      Q   And you estimated for this article that the
14  company cares for half of the state's county jail
15  inmates?
16      A   It was an estimate, but it was probably
17  pretty close.
18      Q   And the word "clinical" to you, as the
19  chief medical officer of MEnD, what does that mean?
20      A   In what context? I'm sorry.
21      Q   In the context you used it in -- in this
22  article, Exhibit 56.
23      A   Where I would be chiefly responsible for
24  the direct care of patients myself.
25      Q   It doesn't necessarily mean in the clinic,

28

1   in the jail?
2       A   It means exactly what I said. Where --
3   Where I am, you know, chiefly responsible for the
4   care of patients within a facility. I am the direct
5   person who's caring for those patients.
6       Q   Well, other than Dr. Skurr, isn't that true
7   all the time?
8       A   No. I have a team of medical providers
9   that work for me in all of our facilities.
10      Q   Physician is the -- is the top of the
11  medical provider pyramid. Correct?
12      A   Our medical providers, licensed, trained,
13  and very capable of providing day-to-day care. I
14  supervise that team.
15      Q   Well, you're responsible for the team.
16      A   I'm responsible for managing and overseeing
17  the team.
18      Q   What other physician, other than Dr. Skurr
19  and you, would be responsible for the care of the
20  inmates that you contract to provide medical care
21  for?
22      A   Well, our entire medical team is
23  responsible for the care of our inmates. And I am
24  responsible for the supervision, oversight of my
25  team.

29

1       Q   "Administrative" means what to you?
2       A   A whole host of tasks. It can be related
3   to the management, consultation, oversight of my
4   medical team. It could mean any corporate endeavor
5   that I have to pursue that, period of time. Any
6   other tasks that aren't related to my chief
7   responsibility of providing direct care to patients.
8       Q   That's your chief responsibility?
9       A   No. That's not what I said.
10      Q   Okay. What is your chief responsibility?
11      A   My chief responsibility is to -- a number
12  of things. To manage our team; to oversee medical
13  care provided by our team; and to provide other
14  administrative duties that are required to manage
15  this company.
16      Q   For MEnD Correctional Care, who gives
17  physician's orders?
18      A   If it's a physician order, it's me.
19      Q   Or Dr. Skurr?
20      A   Exactly.
21      Q   And if it isn't a physician's order, it
22  could be anybody else?
23      A   Any licensed medical provider, if they are
24  giving a medical provider order.
25      Q   Well, are there medical provider orders

30

1  that you don't have to approve?
2      A   Many.
3      Q   Are the medical -- are there orders that
4  you approve after the fact, as the administrator or
5  as the doctor?
6      A   No.  That's not a -- that's not a mandate.
7      Q   Well -- all right.
8          Are you ultimately responsible for sales?
9      A   A team effort.
10     Q   And I -- ultimately responsible.  You
11  the -- are you the person in charge of sales?
12     A   I certainly supervise sales.  Sure.
13     Q   Do you make them yourself?
14     A   What --
15     Q   Do you talk to the sheriffs and the county
16  boards yourself?
17     A   Many times.
18     Q   Uh-huh.  How often per year?
19     A   Depends on the year and the dynamics of the
20  business.
21     Q   Are you involved in the formation of every
22  contract with every county jail?
23     A   I'm always involved.  I'm always involved.
24  To some degree.
25     Q   Do you have to sign every one?

31

1      A   Correct.
2      Q   Okay.  Nobody else can sign it?
3      A   On my behalf, no.
4      Q   Well, on behalf of MEnD Correctional Care.
5      A   Well, I've chosen to sign them.  Does it
6  have to be me that signs them?  No.  I've chosen to
7  have myself sign them.
8      Q   So you just deal with all the contracts?
9      A   I am involved to some extent.  Obviously,
10  legal counsel is involved, other staff are involved.
11     Q   Have you ever had anybody other than
12  yourself make a presentation to a county board?
13     A   Yes.
14     Q   Who?
15     A   I've had my office manager and my director
16  of nursing do it.
17     Q   Have you been involved in every one that
18  they've been involved in, in making the presentation
19  to the county board?
20     A   I'm sure I had some degree of involvement;
21  I just can't recall specifically.
22     Q   Do you ever recall not being at a county
23  board meeting where your contract was being discussed
24  and one of those other people were there in your
25  stead?

32

1      A   Yeah.  I can recall that.
2      Q   How many?
3      A   A low number.  Two, maybe three.
4      Q   How many county board meetings have you
5  been to?
6      A   I don't know the number, offhand.  Probably
7  8 to 12.
8      Q   In your lifetime?
9      A   Yes.  Oftentimes, they don't require my
10  presence.
11     Q   With reference to a contract with a county,
12  do you always meet with the sheriff?
13     A   Not always.  Just depends on the county's
14  preference.
15     Q   Who handles your interface with -- MEnD's
16  interface with legal, lawyers?
17     A   A team effort.  Myself, my HR director, my
18  office manager, my director of nursing.
19  Occasionally, my mental health director.
20     Q   So we have -- I want to go through the
21  medical staff that MEnD Correctional Care has.
22         We know that in 2017 there was one
23  full-time physician and one part-time physician.
24  Correct?
25     A   Correct.

33

1      Q   How many psychologists did MEnD employ or
2  contract with in 2017?
3      A   I believe that particular credentialing,
4  one, in 2017.
5      Q   One full-time and one -- any part-time?
6      A   No.  We have other mental health
7  professionals, they're just not psychologists.
8  That's why -- that's a very particular educational
9  credentialing.
10         (Sotto voce remarks between plaintiff
11  counsel.)
12         MR. NOVAK:  Do you want to use the ones you
13  marked the last time you asked him questions?  Are
14  you going to remark them?
15         MR. BENNETT:  I don't think I -- did I --
16  did I mark them?  I didn't see they were marked as
17  exhibits.
18         MR. NOVAK:  I know there was -- I know we
19  talked about it for quite a while last time.
20         MR. BENNETT:  Well, I want to use the...
21         MR. NOVAK:  Bob, I need to use the
22  restroom.  Is this a good time?
23         MR. BENNETT:  Sure.
24         (Recess taken from 10:23 to 10:29 a.m.)
25         VIDEOGRAPHER:  This is file number two.  We

9 (Pages 30 to 33)

34

1   are on the record at 10:30 a.m.
2   BY MR. BENNETT:
3       Q   Page -- just -- I'm referring to -- to the
4   "qualified mental health professional" definition in
5   the NCCHC 2014 Standards for Health Services in
6   Jails.
7       A   Okay.
8       Q   And you're NCCHC certified.  Correct?
9       A   Personally certified.
10      Q   Personally.  Yeah.  And I want to get to
11  that.
12          Are any of the jails that MEnD does
13  correctional medical care for accredited with the
14  NCCHC?
15      A   We're pursuing it right now in Sherburne
16  County Jail.
17      Q   Okay.  The answer right now is no.  In 2017
18  none were.  Correct?
19      A   No.  Correct.
20      Q   And "none" would be the answer this -- at
21  this point in time that you and I sit here talking to
22  each other under oath today?
23      A   Correct.
24      Q   And the process of accreditation can take a
25  while.  Can't it?

35

1       A   Yeah.  I don't have it to that level of
2   detail.  But it can take months.  Correct.
3       Q   But despite the fact that -- you've been
4   NCCHC personally certified for how long?
5       A   Nine years.
6       Q   And in none of -- in those nine years, none
7   of the counties that you have contracted with have
8   been accredited by the NCCHC?
9       A   Correct.  None of them have.
10      Q   And in terms of the NCCH version of
11  "qualified mental health professionals" in 2017, did
12  MEnD employ, either part-time or full-time, any
13  psychiatrist?
14      A   We did not directly employ a psychiatrist
15  at that time.
16      Q   Well, did you indirectly employ a
17  psychiatrist?
18      A   No.  We would -- we would refer to
19  community providers when we felt like we needed them.
20  We just didn't have them in-house.
21      Q   Well, you -- you didn't -- you didn't have
22  that version of -- you didn't have psychiatrists
23  employed in 2017 or now?
24      A   We have a psychiatric provider employed
25  now.

36

1       Q   Okay.  When did that occur?
2       A   It occurred within the last three months.
3       Q   And in 2017 you had one psychologist.
4   Correct?
5       A   One psychologist and a team of other mental
6   health professionals.
7       Q   All right.  How many psychiatric social
8   workers did you have in 2017?
9       A   Psychiatric social workers.  I don't know
10  if -- I don't recall the specific licensure of each
11  mental health professional, so I just can't tell you
12  which ones may have had that credential versus LBCC
13  versus LMFT.  I just don't recall.
14      Q   Well, you know, as you sit here today, it
15  is true that you don't remember having any
16  psychiatric social worker employed by MEnD in 2017.
17  Correct?
18      A   I just don't know if we had someone with
19  those particular credentials in 2017.
20      Q   You can't recall any today?
21      A   I just don't know.
22      Q   Well, hold it.  Can you -- you can't give
23  me a name today.  Right?
24      A   From 2017?
25      Q   Yeah.

37

1       A   That's a psychiatric social worker?
2       Q   Correct.
3       A   I -- I just don't know.
4       Q   Okay.  I'll take that as a no.
5           How about psychiatric nurses?
6       A   No.
7       Q   How about --
8       A   And, sir, I don't know where you are on
9   here.
10      Q   You don't -- I'm just asking the question.
11      A   Okay.
12      Q   Did you have any other people you employed
13  who, by virtue of their education, credentials and
14  experience, were permitted by law to evaluate and
15  care for the mental health needs of patients?
16      A   Many.
17      Q   Oh, really?  Who?
18      A   I had a team of mental health
19  professionals, as I stated.  And --
20      Q   What -- hold on -- team.  Which -- what
21  team and what psychologist?
22      A   And -- 2017 I would have had seven or eight
23  other mental health professionals that all, by virtue
24  of their licensing, credentialing and education,
25  qualified as qualified mental health professionals.

Doby Professional Reporting, Inc.
952-943-1587

38

1      I also -- all of my medical providers, also
2   by virtue of their education and credentialing,
3   qualify as qualified mental health professionals.
4      So in total, I probably would have had
5   approximately 16 employed at that time.
6      Q   How many in Sherburne County?
7      A   In 2017, it would have been 1.5 FTE,
8   approximately, working there.
9      Q   Who was the other .5?
10      A   I don't remember the name.  We would have
11   had another mental health professional working in
12   there approximately two days a week.
13      Q   Who was that?
14      A   Again, I don't recall the name.
15      Q   Do you recall their qualifications?
16      A   It would have just -- it would have been
17   mental health professional, as I just laid out a
18   short while ago.  And then our mental health director
19   also worked in there at that time, varying degrees
20   each week.  Depended on workload and...
21      Q   While we're on the NCCHC -- well, let me
22   ask you this.  Did you ever do any review of suicides
23   at MEnD?
24      A   I've -- I've reviewed, any time we've had a
25   completed suicide.

39

1      Q   Well, you don't keep records of those, I
2   am -- I'm told.  Right?
3      A   I review each case on its own merits.  And
4   if there is substantive concern of mine, then I would
5   report that to jail administration.
6      Q   I thought -- I thought you were -- isn't
7   the NCCHC, didn't you say that was the best practice,
8   the standard you want to go by?
9      A   We -- we try to mirror our work to them.
10      Q   And have you represented to us that MEnD
11   does not maintain specific information regarding
12   facility death data?
13      MR. NOVAK:  Do you want to show him what
14   you're looking at?
15      MR. BENNETT:  Well, it's an unsigned --
16   the -- fine.
17      Mark this one too.
18      Did you bring the signed copy?
19      MR. NOVAK:  It's in the mail.  So on its
20   way to me.  I mean, I -- we -- I emailed your office
21   last week, or somebody emailed your office last week
22   about exactly where this is at.  So...
23      MR. BENNETT:  So what number is this?  57,
24   then?
25      (Exhibit 57 was marked for identification.)

40

1   BY MR. BENNETT:
2      Q   Have you seen Exhibit 57?
3      A   Yes.
4      Q   Did you sign it and date it and get it
5   notarized?
6      A   Yes.
7      Q   And do you see that it states in the middle
8   of answer to Interrogatory No. 13, "Notwithstanding
9   these objections and subject to them, MEnD does not
10   maintain specific information regarding facility
11   death data."
12      A   And the next sentence explains how --
13      Q   Well --
14      A   -- we changed our --
15      Q   -- I didn't ask you about the next
16   sentence.  I'll ask you about the next sentence
17   later.
18      You didn't -- this is -- that statement is
19   correct, in the middle?
20      A   Yeah.  And what -- what that statement
21   means is prior to us tracking deaths in 2017, I had
22   no death data in our documentation ongoing.
23      But in 2017, we began tracking in-custody
24   deaths, the data for each.  Whether it was suicide or
25   non-suicidal.

41

1      (Sotto voce remarks between plaintiff
2   counsel.)
3   BY MR. BENNETT:
4      Q   What data did you keep?
5      A   Just statistical data on where and when a
6   particular death occurred, and whether it was
7   suicidal versus non-suicidal.
8      Q   Anything else, other than that?
9      A   Ongoing, no.
10      Q   The NCCHC has a procedure that you were
11   supposed to follow in the event of an inmate death in
12   the same 2014 Standards for Health Services in Jails.
13   You're familiar with that?
14      A   You'll have to show me where you're at,
15   sir.
16      MR. BENNETT:  Be happy to.
17      (Exhibit 58 was marked for identification.)
18   BY MR. BENNETT:
19      Q   Showing you Exhibit 58.  Direct your
20   attention to the second page, which is standard
21   "J-A-10, important."
22      Do you see that?
23      A   Yes.
24      Q   And it says, the -- it sets forth National
25   Commission on Correctional Health Care's procedure in

11 (Pages 38 to 41)

42

1  the event of an inmate death.  Is that right?
2      A  Yes.  That's what it says.
3      Q  And it says that all deaths are reviewed to
4  determine the appropriateness of clinical care; to
5  ascertain whether changes to practices, procedures or
6  policies are warranted; and to identify issues that
7  require further study.
8      Do you see that?
9      A  I -- yes.
10     Q  And this was not a policy you followed in
11 2017.  Was it?
12     A  So I can explain what we do.  And what we
13 did in 2017 --
14     Q  Did you follow this policy in 2017?
15     MR. NOVAK:  Object to the form.  Asked and
16 answered.
17     Go ahead and answer again.
18     A  So what we did is in Sherburne County in
19 2017, if there was a death in the facility, the jail
20 administration conducted a death investigation.  We
21 would contribute any information that we could, that
22 would be helpful to their investigation.
23     I also would review the case, personally,
24 to ascertain if there's any substantive issues or
25 concerns that we had with our care for that

43

1  particular case.
2  BY MR. BENNETT:
3      Q  I don't see any record of your involvement
4  in the review that was completed by Sherburne County.
5  Did you have any input in that?
6      A  Indirectly.  I discussed, as it was going
7  on, with our nursing director, any information she
8  needed.  She acquired information that they
9  requested.  And anything that they request from us,
10 then we deliver it to them, typically through my
11 nursing director.
12     Q  Well, why don't you take a minute to look
13 at J-A-10 and tell me if MEnD Correctional Care
14 actually followed this policy in 2017.
15     You can just tell me a yes or no.  Can't
16 you?
17     A  Yeah.  So we wouldn't -- we did not follow
18 this to the letter of this standard because we were
19 not an accredited facility at the time.
20     Q  Well --
21     A  So once we have an accreditation.  Also,
22 this is an "important" but not "essential" standard.
23 So there will be some discretion of how far we follow
24 this once we get accredited.
25     Q  But it certainly is, as you stated in your

44

1  prior deposition, the NCCHC standard in -- for
2  correctional health care?
3      A  I believe the NCCHC is -- is the best
4  standards that I've found in correctional health
5  care.
6      Q  Well, didn't you actually testify, "In
7  correctional health care, we go by the best practice.
8  And by best practice, I go by the NCCHC"?  Top of
9  that.
10     A  Sure.  We -- and that's -- that's what we
11 try to follow in everything that we do.
12     Q  I haven't been provided any record, any
13 written evidence, that you -- that is MEnD -- did an
14 administrative review on its own of this.  Did they?
15     A  Well, as I just mentioned, the
16 administrative review for this case in Sherburne
17 County would have been supervised and led by jail
18 administration.  That's who conducts the jail death
19 investigation.
20     Q  And there are three kinds of reviews done
21 under this statute -- or under this standard.  Excuse
22 me.  Correct?
23     There's an administrative review.  Right?
24     A  Correct.
25     Q  Then there's a clinical mortality review?

45

1      A  Correct.
2      Q  And that's an assessment of the clinical
3  care provided and the circumstances leading up to a
4  death.  Its purpose is to identify areas of patient
5  care or system policies and procedures that can be
6  improved.
7      A  That's exactly what it says.  Correct.
8      Q  Were you part of any clinical mortality
9  review?
10     A  Yes.  In -- in --
11     Q  Where is that?  Have you got a document
12 that shows -- that verifies that?
13     A  Nope.  What I -- what I do is I review the
14 case with my team; gathering information.  And if I
15 find that there's substantive issues or changes that
16 are going to be made, then I will delineate that and
17 we will put in place whatever we need to put in place
18 to make those changes.
19     Q  This is all driven by you, then?
20     A  And my team.
21     Q  Okay.  But it says the standard -- first of
22 all, it says the intent of the standard is that
23 preventable deaths are avoided.  Do you see that?
24     A  I do see that, yes.
25     Q  And it says, "A clinical mortality review

Doby Professional Reporting, Inc.
952-943-1587

## 46

1   is conducted to determine the appropriateness of
2   clinical care provided and the effectiveness of the
3   facility's policies and procedures relevant to the
4   circumstances surrounding death."
5       Is that correct?
6   **A   That is exactly what it says.**
7   Q   And it also says:  Generally, a clinical
8   mortality review asks three key questions:  Could the
9   medical response at the time of death be improved?
10  Was an earlier intervention possible?  And
11  independent of the cause of death, is there any way
12  to improve patient care?
13      Do you see that?
14  **A   I see it.**
15  Q   Is there any document that MEnD possesses
16  that shows that, in the death of James Lynas or any
17  of the other five deaths in -- in 2017?
18  **A   So there's multiple questions there.  I'll**
19  **answer specifically to this case.**
20  **      I did my review, and I did not find**
21  **substantive changes that needed to be made in the way**
22  **care was handled.  And so there was no ongoing**
23  **written response regarding that review that I**
24  **determined that I needed to make, or substantive**
25  **changes that I had to put in place.**

## 47

1   Q   It says:  The clinical mortality review may
2   be conducted by a unit physician not involved in the
3   patient's treatment, a central office or corporate
4   physician, or an outside medical group, and results
5   of the review are to be communicated to the unit
6   staff involved.
7   **A   Uh-huh.**
8   Q   So did you do that?
9   **A   I simply told everyone that I spoke to that**
10  **I did not find substantive issues with the care of**
11  **this patient that I felt required changes moving**
12  **forward.**
13  Q   Well, you -- did you consider yourself to
14  be a unit physician not involved in the patient's
15  treatment?
16  **A   I don't know if I would pigeonhole myself**
17  **into that term.  No.  I wasn't involved in his care.**
18  **But as a corporate physician, I felt like I was well**
19  **versed in -- in conducting this review.**
20  Q   You didn't do any of that in writing,
21  though?
22  **A   I -- I would write it down if I felt like I**
23  **was finding issues that I needed to convey where**
24  **there would need to be substantive changes,**
25  **substantive concerns on my part with the care that**

## 48

1   was provided.
2   Q   So you were unconcerned about the care that
3   was provided?
4       MR. NOVAK:  Object to the form.
5   Argumentative, misstates the testimony.
6   **A   I've already said.  I didn't have**
7   **substantive concerns with the appropriateness of the**
8   **care.**
9   BY MR. BENNETT:
10  Q   Okay.
11      Did you do a psychological autopsy?
12  **A   I did not.**
13  **      We look at this as just a -- an all-around**
14  **review of the medical care of the case.  Certainly**
15  **services and performance by all staff members are**
16  **included in that.**
17  Q   Well, the -- so -- but a psychological
18  autopsy, if the death was -- and this death was by
19  suicide -- was not done in the James Lynas case.
20  Correct?
21  **A   As I was trying to say, it isn't -- it**
22  **isn't pigeonholed into a separate review.  We would**
23  **just do a complete clinical review of the case as a**
24  **team, as anyone who's involved in his care.**
25  Q   Did you seek input from other people?

## 49

1   **A   Well, I would look at the medical records**
2   **that were available.  And if I had any additional**
3   **questions just on substance, on performance, I would**
4   **ask anybody that I needed to ask for clarification.**
5   Q   So you didn't ask Dr. Robertson when he put
6   the note -- the note that Lynas could be seen on the
7   16th?
8   **A   I don't recall specific questions I asked**
9   **him, if I did.**
10  Q   Well, I think your testimony is you didn't
11  talk to him.  You didn't talk to him, did you?
12  **A   I don't recall if I asked him any questions**
13  **regarding the case whatsoever.**
14  Q   Okay.
15      Were you involved with the decision to take
16  down the grates that were used in two of the suicides
17  in Sherburne County Jail?
18  **A   I'm not sure I understand the question.**
19  Q   Well, are you aware that they removed any
20  grates from the cell?
21  **A   I don't recall if I knew that or not at the**
22  **time.**
23  Q   Were you involved in any discussion about
24  making the cells that they were housing 15-minute
25  mental health watch people in safer and less

50

1  available for suicide -- or amenable to suicide?
2      A   I just don't recall specific conversations
3  that I would have had with jail administrator
4  regarding that issue.
5      Q   Now, in the Exhibit 57, you reduced the
6  number of counties to 31 in Minnesota.  Is that
7  correct?
8      A   Reduced the number of counties.
9      Q   If you read the supplement.
10         MR. NOVAK:  What number are you at, Bob?
11  He's just --
12  BY MR. BENNETT:
13     Q   The supplement to Interrogatory No. 3.
14     A   So I'm not -- I don't understand the
15  question.  I'm sorry.
16     Q   Well, count the number of counties that was
17  in your original answer.
18     A   There's counties and there's facilities.
19  So Dakota has an adult and a juvenile center, and
20  Olmsted has an adult and a juvenile center.  So a
21  total of facilities is 33, and a total of counties is
22  31, then.
23     Q   Well, how many contracts are there?
24     A   33.
25     Q   Okay.  So contracts would be wrong in the

51

1  present supplement, then?
2      A   I'm not sure I'm following.
3      Q   It asks, you had contracts with the
4  following counties.  And you reduced it from 35 to
5  31.
6      A   I guess you can decide whether you feel
7  there's a separate contract that -- if a county is a
8  county or --
9      Q   Well, you have the contracts.  I assume you
10  looked at and counted them when you answered this
11  interrogatory.
12     A   Well, I -- I answered the question the way
13  I thought it should be answered.
14     Q   It says --
15     A   -- in terms of these are the counties.  And
16  I look at a contract with a county as encompassing
17  for that county.  If you look at it differently than
18  that, then you look at it differently than that.
19     Q   No.  I just said active Minnesota
20  contracts.
21     A   Yep.
22     Q   That's what the question says.
23     A   Okay.
24     Q   And you --
25     A   I answered in a different context than you

52

1  wanted, then.
2      Q   No.  You -- I -- this is your answer under
3  oath.  So --
4      A   I --
5      Q   -- you answered the question as it's
6  written.  Correct?
7      A   I answered as I understood it.
8      Q   What is the difference between the first --
9  35 and 31?  The first answer to No. 3 and the
10  supplement?
11     A   Well -- I'm sorry, I'm not following.
12     Q   What is the difference?  You took four out.
13     A   Because they're Minnesota.  The first part
14  was Minnesota.
15     Q   Yeah.
16     A   And then the second part is other states
17  involved.
18     Q   Which I didn't ask.  But I got that.
19     A   Okay.
20     Q   The -- but the counties in Minnesota --
21  count the number of counties in this one, count the
22  number of Minnesota counties in this one.
23     A   Oh, okay.
24         This was clarifying --
25     Q   Which one?

53

1      A   The supplement was clarifying previous
2  inaccuracy.  So the supplement is accurate.
3      Q   What was inaccurate about the first answer?
4      A   There was a couple of counties that we
5  hadn't contracted with yet.
6      Q   Well --
7      A   So we hadn't contracted with Jackson yet,
8  and -- I'd have to compare the two to tell you which
9  ones, you know.
10         (Exhibit 59 was marked for identification.)
11  BY MR. BENNETT:
12     Q   Let's -- Exhibit 59 is MEnD's own press
13  release.  Right?
14     A   Yes.
15     Q   Okay.
16         And you write in November 23rd, 2016 --
17  That's the date of this.  Correct?
18     A   Correct.
19     Q   -- that Story County, Iowa has become the
20  latest county to partner with MEnD Correctional Care.
21  Right?
22     A   Correct.
23     Q   And that says the collaboration has now
24  expanded your care model into three states.
25         (Sotto voce remarks between plaintiff

**54**

1     counsel.)
2     (Exhibit 60 was marked for identification.)
3 BY MR. BENNETT:
4     Q  So 59, if you go to the -- end of the
5 second -- end of the first paragraph. It says, "It
6 is with great pride that we now serve 37 county
7 facilities within Minnesota, Wisconsin, and now
8 Iowa."
9     Right?
10     **A  That's what it says.**
11     Q  So how many counties did you have in Iowa
12 in 2017? Or -- excuse me. Strike that question.
13     How many counties do you have in Wisconsin
14 as of this date?
15     **A  One.**
16     Q  And the 37th county was Story County, Iowa.
17 Right?
18     **A  This is inaccurate. The total on this**
19 **press release.**
20     MR. NOVAK: Just stick with him. Don't
21 worry about it. Just stick with him.
22     THE WITNESS: Okay.
23 BY MR. BENNETT:
24     Q  Well, it says, "We now serve 37 county
25 facilities within Minnesota, Wisconsin, and now

**55**

1 Iowa."
2     So that would be one in Iowa, one in
3 Wisconsin, and 35, as of November 23rd, 2016,
4 according to --
5     MR. NOVAK: Object to form.
6 BY MR. BENNETT:
7     Q  -- according to this. Right?
8     **A  Yes. If the 37 was correct, Story County**
9 **would be the 37th.**
10     Q  Okay.
11     Who writes this?
12     **A  I don't recall who -- which -- are we**
13 **talking 59?**
14     Q  Yeah. 59.
15     **A  I don't recall who wrote this. I just**
16 **don't recall.**
17     Q  How about 60?
18     **A  Same idea. I just --**
19     Q  Do you typically write these?
20     **A  No. Not typically.**
21     Q  Story was the first county you served in --
22 you served in Iowa. Correct?
23     **A  That's correct.**
24     Q  When did you sign up Rockford, Illinois?
25     **A  Rock Island?**

**56**

1     Q  Rock Island.
2     **A  Rock Island would have been very late in**
3 **2017.**
4     Q  Okay.
5     **A  And began services in earnest on**
6 **January 1st, 2018.**
7     Q  The contract was signed in 2017?
8     **A  It would have been technically signed in**
9 **2017 for full implementation in January 2018.**
10     (Exhibit 61 was marked for identification.)
11 BY MR. BENNETT:
12     Q  Exhibit 61 is a map of the counties that
13 you had contracted with in 2017. Correct? By 2017?
14     **A  I'd have to go through it county by county**
15 **to ensure accuracy.**
16     Q  Well, it's more accurate than the 12
17 counties you remembered in your prior deposition
18 which was under oath. Is that true?
19     **A  I have no idea.**
20     MR. NOVAK: Is that a question? Or just --
21     MR. BENNETT: Well, it's...
22     MR. NOVAK: Did your office create this,
23 or --
24     MR. BENNETT: Yes.
25

**57**

1 BY MR. BENNETT:
2     Q  I've never seen another map like this. But
3 this is -- according to your Interrogatory Answer
4 No. 3, submitted under oath, and I guess in --
5 consistent with Exhibits 59 and 60, this would be the
6 list of counties that had been contracted with within
7 2017. Is that right.
8     **A  No. This is incorrect.**
9     Q  What's incorrect about it?
10     **A  Just offhand, we weren't working at Rock**
11 **Island, Benton --**
12     Q  I didn't say -- I didn't say "working," did
13 I? The question didn't say "working." It said
14 "contracted." And I just asked you --
15     **A  Contract wasn't signed in Benton in 2017.**
16     Q  Okay. When was that signed?
17     **A  Early this year.**
18     Q  Okay. But -- so you take Benton out.
19     **A  Okay.**
20     Q  That's the only one that's not signed?
21     **A  This is why I'd have to review each county.**
22     Q  Well, we did them off of your --
23     **A  Yeah. There's counties circled here, sir.**
24 **If you want me to give you an accurate answer, I'd**
25 **have to go through each one and ensure that that**

58

1  particular county was contracted with in 2017.
2      Q   Well, that's what -- didn't you give us now
3  two answers under oath, plus your own -- your own
4  press releases?
5      A   I believe I gave you one answer under oath.
6      Q   Which one was that?
7      A   The one I gave you, sir.
8      Q   I know.
9          (Sotto voce remarks between plaintiff
10 counsel.)
11     A   I just would have to cross-reference the
12 circles to ensure accuracy, is what I'm saying.
13 BY MR. BENNETT:
14     Q   Why don't you do it. And we'll use your
15 Answers to Interrogatories.
16     A   Okay.
17     Q   Okay. Here's the one --
18     A   I'm using this right here.
19     Q   We still don't have a signed one, so I'm
20 going to use this one, which is consistent with
21 your -- with your press release in 2016.
22     A   I'm using the one that I have right in
23 front of me. That's --
24     Q   Well, look at the top one.
25     A   I already told you that this was a

59

1  correction of this.
2      Q   How do -- who did it? Did you look at the
3  actual contracts?
4      A   Yes.
5      Q   Did you look at the actual contracts when
6  you signed this one, your original answers, under
7  oath?
8      A   I don't know what 'this' is. I'm sorry.
9  You'd have to tell me what "this" is.
10         MR. BENNETT:  Mark this.
11         (Sotto voce remarks between plaintiff
12 counsel.)
13         (Exhibit 62 was marked for identification.)
14 BY MR. BENNETT:
15     Q   You signed those, right? Under oath?
16 Page 8?
17     A   I signed this. Correct.
18     Q   Okay.
19         Okay. Let's just go through it. I'll go
20 through it with you.
21         Akin County, Minnesota. Find that on
22 there? Is that circled?
23     A   Yes.
24     Q   Becker?
25     A   No. Becker is after 2017.

60

1      Q   Well, that's not what you signed in --
2  let's just go through it according to --
3      A   And this is why I was trying to explain to
4  you. This is a correction of --
5      Q   All right. Fine.
6          MR. NOVAK:  Counsel, the idea of a
7  supplemental discovery response is not -- can't be
8  new to you. So --
9          MR. BENNETT:  Well --
10         MR. NOVAK:  -- he's trying to get accurate
11 information. So --
12         MR. BENNETT:  It doesn't match up with his
13 own -- this is 35. If you use --
14         MR. NOVAK:  35 facilities or counties?
15         MR. BENNETT:  County.
16         THE WITNESS:  No. And I tried to explain,
17 there is an inaccuracy on the press release. I --
18 BY MR. BENNETT:
19     Q   Did you --
20         MR. NOVAK:  If you want him to match up a
21 map based on an answer that he's telling you he can
22 supplement to be more accurate, you should feel free
23 to do that.
24 BY MR. BENNETT:
25     Q   Did you look at the contract with Becker

61

1  County?
2      A   I did for this answer specifically.
3      Q   Which answer?
4      A   Supplemental response that I gave you. that
5  is 57.
6      Q   What did you look at to give me the one
7  under oath before? Since I can't see the contracts,
8  I gotta rely on you.
9      A   I looked at the list. And we made a
10 mistake and -- and answered the question incorrectly
11 in terms of using -- instead of using a snapshot in
12 time, we expanded. And what this answer is right
13 here is what you would have had a snapshot in time in
14 November 2017.
15         So I answered the question in the wrong
16 context previously. I've corrected it in my
17 supplement response.
18     Q   So what counties are not, as of 2017?
19     A   On the map?
20     Q   Yeah.
21     A   Okay.
22         Becker is incorrect. I already mentioned
23 Benton County, Iowa is incorrect.
24     Q   Okay.
25     A   Rock Island. Jackson. Watonwan. And

**62**

1    Pine.
2        Q    Okay. You serve them all now? Is this
3    correct as of today?
4        A    I don't know this is a complete list as of
5    today. I'd have to redo the exercise for today. But
6    I'm telling you for 2017, that is what's accurate.
7        Q    Okay.
8            On Exhibit 57, that's the -- you've got it.
9    The next page.
10           You stated that you didn't keep any records
11   of suicide -- deaths by suicide in facilities prior
12   to 2017. And it says: At this time, MEnD is aware
13   of four deaths of suicide between November of '14 and
14   27 -- and November of 2017.
15           How many deaths did -- suicide -- by
16   suicide, in hanging, did -- did MEnD experience in
17   2017?
18       A    I don't know if I can give you a specific
19   number.
20       Q    Do you remember their names?
21       A    Two that I remember offhand are Mr. Lynas
22   and Mr. Brenner.
23       Q    That's just covered -- those are the fall
24   suicides. Is there a summer suicide?
25       A    I believe the death in Beltrami County --

**63**

1        Q    Stephanie --
2        A    -- was 2007.
3        Q    Stephanie Bunker?
4        A    Correct.
5        Q    Okay.
6        A    And I don't recall if any of those suicides
7    were not by hanging.
8        Q    Do you have any recollection of any suicide
9    not being by hanging that MEnD was involved at, other
10   than Baxter-Jensen?
11       A    No. I don't recall any -- any other
12   suicide that wasn't by hanging, other than that one.
13       Q    Okay.
14       A    I can't say that 100 percent, but that's my
15   recollection.
16       Q    Okay. So when was the one in Nobles
17   County?
18       A    I don't recall the exact date.
19       Q    What was the person's name?
20       A    I don't recall.
21       Q    What was the name of the person in Crow
22   Wing County in 2015?
23       A    I don't recall.
24           (Sotto voce remarks between plaintiff
25   counsel.)

**64**

1    BY MR. BENNETT:
2        Q    You presently have contracts with Becker
3    County. Correct? MEnD does?
4        A    Correct.
5        Q    Watonwan County?
6        A    Correct.
7        Q    Rock Island?
8        A    Correct.
9        Q    And Jackson?
10       A    Correct.
11       Q    Was there another one you mentioned?
12       A    Benton County, Iowa.
13       Q    Okay.
14           Are there more than that? Because that
15   would be -- then this would encompass -- are there
16   any other counties in Minnesota or Wisconsin that
17   you've added?
18       A    We've added -- I'll have to go through the
19   map.
20           We've added a juvenile center in Clay
21   County.
22       Q    Well, you had a contract with Clay before.
23   Right?
24       A    Correct.
25       Q    Just added that to the contract?

**65**

1        A    Nope. It's a --
2        Q    Separate contract?
3        A    -- separate contract. It's a regional
4    juvenile center.
5        Q    Okay.
6        A    So you want to know as of today if there's
7    any other counties that we work with on this map?
8        Q    Yeah.
9        A    I want to make sure I'm answering this
10   correctly.
11       Q    Yeah.
12       A    Okay.
13           Just for complete accuracy, although it's
14   not signed yet, we will be signing a contract in the
15   next coming days with St. Croix County, Wisconsin.
16       Q    How big is that facility?
17       A    Average census is around 110.
18       Q    And how many at the regional juvenile
19   center?
20       A    It fluctuates greatly. Average, probably,
21   40, currently.
22       Q    And you still have -- the physician usage
23   is you and Dr. Skurr still. Correct?
24       A    Correct.
25       Q    Has Dr. Skurr's hours increased?

17 (Pages 62 to 65)

66

1    **A  Yes.**
2    Q  To what?
3    **A  It, again, fluctuates. On average, my**
4  **guestimate would be seven hours per week of direct**
5  **care.**
6    Q  Okay.
7    **And then --**
8    Q  All right.
9    **A  -- I wouldn't be able to quantify the**
10  **amount of time for consultation, discussion, and any**
11  **of that sort of thing. But --**
12    Q  His monthly stipend, has that gone up?
13    **A  The monthly stipend has not. But the**
14  **billable hours has.**
15    Q  How much?
16    **A  I don't have that number, off the top of my**
17  **head.**
18    Q  Okay.
19    So all of these county have -- county jails
20  have an improved capacity. Correct?
21    **A  I don't know if that's the term they use.**
22  **They have a maximum capacity that they're staffed**
23  **for. There's a maximum capacity that their facility**
24  **can hold, and a maximum capacity that they're allowed**
25  **by department of corrections to hold because of their**

67

1  **staffing model. Correctional staff.**
2    Q  And they all have average daily inmate
3  population figures. Right?
4    **A  Correct.**
5    (Sotto voce remarks between plaintiff
6  counsel.)
7    (Exhibits 63 and 64 were marked for
8  identification.)
9  BY MR. BENNETT:
10    Q  Exhibit 63 would marry up to your first
11  interrogatory. And Exhibit 64 would marry up, in
12  terms of Minnesota, with your second interrogatory,
13  your supplemental interrogatory. Is that correct?
14    **A  I'd have to look through to ensure that.**
15    Q  Well, I'll represent to you -- well, that's
16  how they were prepared. You can look through, if
17  you'd like.
18    Do the approved capacities and average
19  daily inmate population figures appear to be about
20  what you'd think they'd be?
21    **A  You know, approved capacity is --**
22    MR. NOVAK: I think he's just asking you
23  about whether the numbers are accurate.
24    **A  It's -- it's difficult for me to speak to**
25  **approved capacity because facilities have, as I was**

68

1  mentioning, a facility capacity, and then what the
2  DOC will allow them to hold per their staffing --
3  BY MR. BENNETT:
4    Q  What the DOC would approve?
5    **A  -- and those -- and those are -- those**
6  **change all the time, depending on staffing. So I'm**
7  **not equipped well to answer that part of the**
8  **question.**
9    **But in terms of average daily population, I**
10  **can go through quickly and --**
11    **This has got to be extremely close, if**
12  **not -- and again, you're trying to take snapshots**
13  **of --**
14    Q  Sure. But I -- the data was derived from
15  the reporting -- these counties report to the DOC.
16  You know that?
17    **A  Sure. Yeah. No, that's --**
18    Q  Does it appear to be in the --
19    **A  I mean --**
20    Q  -- realm of reason, as you understand it?
21    **A  Yes. Yes, I -- I agree.**
22    Q  Okay.
23    For the most part, would it be fair to say
24  that MEnD's contracts with the counties are generally
25  for a fixed price?

69

1    **A  I guess, it would depend on the context of**
2  **our services. Or what are you --**
3    Q  Your general contract -- I know there's
4  some things in the contract for which you -- if you
5  do extra you can charge extra. Correct?
6    **A  Correct.**
7    Q  But the base contract is essentially a
8  fixed-price contract?
9    **A  Yeah. There's -- there's base services,**
10  **and then if there's additional services that we and**
11  **our county partner agree are additionally necessary,**
12  **then we agree to -- to expand those.**
13    Q  And you can -- you can -- there's some
14  instances where you get to charge more. But mostly,
15  you charge what is the fixed price base contract?
16    **A  It -- it's exactly what I said. It --**
17  **there's base services. And if there's other services**
18  **that are deemed acceptable that we recommend that the**
19  **county sheriff's department, jail administration,**
20  **whoever makes the decision agrees upon, then we'll**
21  **add those as necessary.**
22    Q  Going back to the profit -- profit and loss
23  statement. Of the -- of the fee-for-service income
24  of 8,953,643.98, how much as a percentage would that
25  be for the base contract?

70

```
1        A   How much base services would be --
2        Q   In that almost $9 million.
3        A   I don't know if I can give you a perfect
4    answer to that.  Majority, certainly.
5        Q   By "majority," do you mean --
6        A   Large majority.
7        Q   -- something like 95 percent?  90 percent?
8        A   I -- I don't want to guess.  But certainly
9    large -- large majority, I think, is accurate.
10       Q   All right.  I mean, the purpose of your --
11   in fact, the selling point to your billing of these
12   counties is to give them essentially a fixed-price
13   contract.  Right?
14       A   It's to give them at least a large
15   percentage of that for budgetary purposes.  But,
16   again, it's -- we communicate frequently on trends,
17   issues, concerns.  So where we feel like we need to
18   add services, we request it.
19       Q   Do they always agree to it?
20       A   Not always.
21       Q   So you get some pushback?
22       A   I don't know if I'd call it pushback.  Just
23   they either agree or they don't agree.
24       Q   But would you consider the not agreeing to
25   be pushback?
```

71

```
1        A   I just consider they choose not to accept
2    it.  I would say the majority of the time they agree.
3        Q   Okay.
4        A   But not always.
5        Q   Who prepares the contracts?
6        A   It always depends on the county.
7        Q   Well, typically, is it -- is it a document
8    that they create or is it a document that you create?
9        A   It depends on the county, what their wishes
10   are.  Some are comfortable using a document created
11   by us that they review and revise.  Some wish to
12   have -- it's just the opposite.
13       Q   How many wish it the other -- to create
14   their own document?
15       A   I can't give you an exact number.
16       Q   Tell me the counties you remember that want
17   to do that.
18       A   Just off the top of my head?
19       Q   Uh-huh.
20       A   Sherburne, Dakota, and Crow Wing.  Those
21   are the ones I remember, just by memory.
22       Q   So something less than 90 -- something in
23   the 10 percent area, as opposed to the 50 percent
24   area?
25       A   Certainly not 50.  It's less than --
```

72

```
1    minority of contracts, certainly.
2        Q   You can only remember three?
3        A   Off the top of my head.
4        Q   Yeah.
5        A   Correct.
6        Q   What is -- Dr. Skurr, is he board certified
7    in a specialty?
8        A   Family medicine.  But he's a -- I believe
9    he's a -- technically, a D.O.
10       Q   Doctor of osteopathy?
11       A   Uh-huh.
12       Q   So he's actually not a medical doctor?
13       A   Just a medical doctor with a different
14   credential.
15       Q   Do D.O.'s get paid less or more than M.D.s?
16   Or the same?
17       A   I wouldn't know specifically.  But to the
18   best of my knowledge, they're very similar, if not
19   the same.
20       Q   So would a full-time family practice doctor
21   expect to make $150,000?
22       A   I can't tell you with certainty where that
23   number is right now.  My recollection is they would
24   expect to make more.
25       Q   So if MEnD -- and are MEnD's contracts for
```

73

```
1    multiple years or one year, or renewable
2    automatically?  Or how does it generally work?
3        A   Specific to each county.  They can state
4    multiple years with renewals.  Most, if not all, of
5    our contracts have a 90-day out without cause clause.
6        Q   So that -- is that standard in the
7    industry?
8        A   I would say now --
9        Q   Yeah.
10       A   -- it is much more standard in the
11   industry.  I don't know if I can speak to that from
12   years back.  But I can tell you now it seems to be
13   very standard.
14       Q   So family practice doctors cost -- would
15   expect to make more than psychologists?  In the
16   correctional setting?
17       A   I would imagine so.
18       Q   And as you go down the line through the,
19   you know, to physician's assistant, certified nurse
20   practitioner, all of those things that be -- kind
21   of -- there's a hierarchy of pay as there is with a
22   hierarchy of credentialing.  Correct?
23       A   I would say on average, P.A.s and nurse
24   practitioners make less than physicians.
25       Q   And R.N.s make less than certified nurse
```

Doby Professional Reporting, Inc.
952-943-1587

74

1  practitioners and P.A.s?
2  **A   Correct.**
3  Q   And L.P.N.s make less than R.N.s?
4  **A   Typically.**
5  Q   But if you hire more people, and the -- and
6  the contracts essentially remain the same, you just
7  take money off the bottom line for MEnD.  Correct?
8  **A   No.  If we have to make substantial changes**
9  **or hires, that sort of thing, that's when we discuss**
10 **that topic with our county client, with our jail**
11 **administrator, sheriff, whoever.**
12 Q   Well, if you hired another medical doctor,
13 where would you put him or her?
14 MR. NOVAK:  Object to the form.
15 **A   It would depend on the circumstance.  I**
16 **would need more specifics.**
17 BY MR. BENNETT:
18 Q   Well, would you -- would they -- would that
19 person be at the home office?  Could they do their
20 work remotely from their home?  Would they have to go
21 to a specific jail institution?  That's what I mean.
22 **A   Again, it would just depend on the**
23 **circumstances.**
24 Q   Well, if it was up to you, where would --
25 **A   The context of hiring that physician.**

75

1  Q   Well, if it was up to you, where would you
2  put them if you hired another one?
3  **A   Currently?**
4  Q   Yeah.  Or even made Dr. Skurr full time.
5  **A   I would -- I would have that person be**
6  **based from corporate, and provide some direct**
7  **services, some oversight services, adjunctive**
8  **services that a physician can assist with.**
9  Q   How many patients do you actually see --
10 inmates who are patients -- do you actually see in
11 any given year?
12 **A   In any given year?**
13 Q   Yeah.
14 **A   Are you talking now?  2017?**
15 Q   Yeah.
16 **A   Now?**
17 Q   Now.
18 **A   I wouldn't be able to give you an exact**
19 **total.**
20 Q   How many did you see last week?  In person.
21 So that you could --
22 **A   On-site?**
23 Q   Yeah.
24 **A   Approximately eight, 10.**
25 Q   Where?  What institutions?

76

1  **A   Last week I was working in Douglas County,**
2  **Wisconsin; Pine County, Minnesota; and Olmsted**
3  **County, Minnesota.**
4  Q   By "working," you mean you actually went to
5  those facilities?
6  **A   Correct.  I was training a new provider in**
7  **Douglas County and Pine County.**
8  Q   Did you see patients at Douglas County and
9  Pine County?
10 **A   Correct.**
11 Q   How much time did you spend seeing patients
12 versus training?
13 **A   I wouldn't be able to give you an exact**
14 **amount of time.  I guess I just don't calculate it**
15 **that way.**
16 Q   10 percent?
17 **A   10 percent which way?**
18 Q   Seeing patients doing clinical work.
19 **A   In that particular day?  I --**
20 Q   Last week.
21 **A   I -- I'm not following your question.  I'm**
22 **sorry.**
23 Q   Well, you said you -- well, all right.  You
24 went to -- did you go to Pine, Olmsted and Douglas
25 County in one day?

77

1  **A   No.  I did Douglas County and Pine in one**
2  **day, and then one morning in Olmsted County.**
3  Q   Are those the only facilities you were
4  actually physically in last week?
5  **A   No.  I had a meeting in Wright County as**
6  **well.**
7  Q   With whom?
8  **A   Jail administrative, jail commander.**
9  Q   Did you go to the medical clinic?
10 **A   Stopped by and said hello to the team**
11 **and -- well wishes, but wasn't involved in direct**
12 **patient care.**
13 Q   Okay.
14 So you had total revenue in 2017 from
15 contracts of about approximately $9 million.
16 Correct?
17 **A   Approximately.**
18 Q   Has that increased or decreased today?
19 **A   Increased.**
20 Q   Do you know what the annual contract income
21 would be --
22 **A   Well --**
23 Q   -- for services?
24 **A   -- it's -- it's dynamic because not every**
25 **client, you know, is initiated on January 1st.  So**

## 78

1  will be probably an equivalent of 10.9 million now.
2  As we stand today.
3     Q  Okay. How many times were you in Hubbard
4  County in 2017?
5     A  I -- I would not be able to tell you.
6     Q  This year?
7     A  Two times on-site. That's my best guess.
8     Q  Commander Carr testified he sees you about
9  once a quarter. About four times a year. On-site.
10  At Sherburne. Is that right?
11     A  No. It's more than that.
12     MR. NOVAK:  Are you talking about when he's
13  there or when the commander sees him?
14     MR. BENNETT:  Well, I asked how often he
15  was there. He's -- in his deposition.
16     MR. NOVAK:  And the commander told you how
17  many times he sees him. Right?
18     MR. BENNETT:  Uh-huh.
19     MR. NOVAK:  Okay. And there's a big gap in
20  that question.
21  BY MR. BENNETT:
22     Q  Well, how many times do you go there -- you
23  said it was more than four. Was it less than 10?
24     A  I don't know. I don't know if it's less
25  than 10 or not.

## 79

1     Q  Between four and 10?
2     A  I don't know if it's less than 10. So I --
3  I just don't know.
4     Q  Well --
5     A  Not every time that I go there I see
6  Commander Carr. However --
7     Q  And not --
8     A  -- I believe I seen him more than four
9  times. Just given duties and meetings and
10  presentations and such.
11     Q  And you go to Sherburne County and not do
12  patient care too. Correct?
13     A  Only if necessary. Only if there's cross
14  coverage necessary, something of that nature.
15     Q  I don't know who made -- that question and
16  answer didn't seem to marry up.
17     Every time you go to Sherburne County, do
18  you do clinical care of patients?
19     A  No.
20     Q  Okay.
21     A  No.
22     Q  Sometimes you do?
23     A  Correct.
24     Q  Okay. What is the determining factor in
25  when you do clinical care in Sherburne County and

## 80

1  when you don't?
2     A  Just based on needs of the facility; my
3  opinion on when I need to see a particular patient.
4  That's it.
5     Q  Did you have any meetings with Carr or
6  Frank or the sheriff about the two fall suicides in
7  2017?
8     A  I don't recall -- I don't remember having
9  any face-to-face meeting with them directly. I just
10  don't remember. I just don't recall.
11     Q  Did you ever see -- well, you never --
12  You never saw James Lynas. Correct?
13     A  To the best of my recollection, I have not
14  seen that patient.
15     Q  Dylan Brenner, did you see him?
16     A  No.
17     Q  Do you remember -- do you remember
18  Stephanie Bunker?
19     A  I remember Stephanie Bunker.
20     Q  What race was she?
21     A  I don't recall.
22     Q  How did she commit suicide?
23     A  I believe, but I'm not certain, I believe
24  it was hanging.
25     Q  Did you have a nurse at that time, Nurse

## 81

1  Keilwitz?
2     A  Who?
3     Q  It's Keilwitz? K-E-I --
4     A  Oh. Geoffrey.
5     Q  Yeah.
6     A  Correct. Yes.
7     Q  Did you --
8     A  I believe -- well, I don't recall whether
9  he was working at the time of Stephanie Bunker's
10  death. I don't recall.
11     Q  Did you do a mortality review of that case
12  on behalf of MEnD?
13     A  I would have done a clinical review of the
14  case.
15     Q  Did you -- was there any psychological
16  autopsy performed in that case?
17     A  Again, as I stated earlier, we would just
18  encompass that task.
19     Q  I don't know what you mean, "encompass."
20     A  We just did an overall clinical review of
21  the case.
22     Q  Was there any written review of that case
23  by you?
24     A  As I mentioned earlier, if I had to make
25  substantive changes to the systems and processes that

21 (Pages 78 to 81)

82

```
 1   we had in place at the time, I would have formulated
 2   that report.
 3       Q   When did you hire Keilwitz?
 4       A   I don't recall. I don't know.
 5       Q   How much before the death of Bunker in
 6   July?
 7       A   As I stated, I don't know if he was working
 8   at the time of her death, so I don't know exactly
 9   when he was hired. I just don't recall.
10       Q   Are you aware of any conditional imposition
11   on his license from the board of nursing?
12       A   I remember him having some sort of
13   punishment or something to his license in the past,
14   but I don't recall the specifics.
15       Q   Do you know who hired Keilwitz?
16       A   Who in particular at that time?
17       Q   Yeah.
18       A   I don't recall who. I would say that it
19   was probably a decision with our nursing director,
20   James Sweeney; our HR director, Danielle Lacina. And
21   I don't recall if anybody else had any involvement or
22   input into his hire.
23       Q   That's the one you referred to in -- as the
24   Beltrami one in --
25       A   Correct. The Stephanie Bunker?
```

83

```
 1       Q   Uh-huh.
 2       A   Correct.
 3       Q   The DOC findings, did you read those in the
 4   Bunker case?
 5       A   I don't recall if I remember -- read their
 6   report or not.
 7       Q   Did they find that everything was
 8   hunkey-dory, okay?
 9       A   I don't recall.
10       Q   If they did not, would that concern you?
11       A   I mean, it always concerns me. The DOC
12   generally writes their reports based on the
13   correctional performance and functions and such.
14   But, I mean, that still --
15       Q   They're not --
16       A   -- has bearing with us.
17       Q   They're not necessarily looking at the
18   medical issues. Correct?
19       A   Well, they don't have the expertise to do
20   so.
21       Q   Okay.
22           Nobles County. You mentioned that in your
23   supplemental answer. Who was that suicide?
24       A   I don't recall the name.
25       Q   Was it a male or a female?
```

84

```
 1       A   Male, is my recollection.
 2       Q   And was the suicide by hanging?
 3       A   My recollection is it's hanging. I can't
 4   say with 100 percent certainty, but that's my
 5   recollection.
 6       Q   Did MEnD conduct any investigation of that
 7   death?
 8       A   Again, we would have clinically reviewed
 9   the case.
10       Q   Who is "we"?
11       A   Myself and anybody else that I deemed
12   necessary to get information from.
13       Q   When did you start -- when did MEnD begin
14   being the health care provider to St. Louis County?
15       A   Oh. I don't recall the exact year. But I
16   believe it was around 2013.
17       Q   Okay.
18       A   I could be incorrect on that year. But
19   it's around that time.
20           (Sotto voce remarks between plaintiff
21   counsel.)
22           THE WITNESS: I am going to have to use the
23   restroom.
24           MR. BENNETT: Okay.
25           THE WITNESS: Soon. Whenever it works for
```

85

```
 1   you-all.
 2           MR. BENNETT: We'll see if lunch came.
 3   Maybe we can even do that.
 4           VIDEOGRAPHER: Off the video record at
 5   11:49 a.m.
 6           (Recess taken from 11:49 to 11:56 a.m.)
 7           VIDEOGRAPHER: This is file number three.
 8   We're on the record at 11:56 a.m.
 9           (Exhibit 65 was marked for identification.)
10   BY MR. BENNETT:
11       Q   I'm showing you what's been marked as
12   Exhibit 65, which is a -- it's from the Internet.
13   It's from WDIO. You're -- in 2015, you were
14   the -- you, as MEnD, were with the correctional care
15   provider at St. Louis County?
16       A   Correct.
17       Q   Does this refresh your recollection as to a
18   suicide that you did not mention in your supplemental
19   interrogatory?
20       A   Yeah, I don't recall this suicide.
21       Q   It was a hanging as well. Correct?
22       A   Correct. Well, it says "asphyxiation," but
23   I'm going to assume that means hanging.
24       Q   Yeah. You can't really choke yourself out,
25   right? I mean...
```

22 (Pages 82 to 85)

86

1      All right.
2      So Caleb Calton, that name doesn't ring a
3  bell?
4      **A   It doesn't ring a bell.**
5      Q   That's the person mentioned in Exhibit 65?
6      **A   Correct.**
7      **(Sotto voce remarks between plaintiff**
8  **counsel.)**
9      **(Exhibit 66 was marked for identification.)**
10  BY MR. BENNETT:
11      Q   Exhibit 66 is a -- is from Rochester
12  News-Talk, listing the information on the 2015 --
13  looks like June of 2015 death of -- suicide by
14  hanging of 55-year-old Sheila Baier.
15      Do you see that?
16      **A   Uh-huh.**
17      Q   That wasn't included in your answer either,
18  was it?
19      **A   No.  I don't believe we were the medical**
20  **provider at that time.**
21      Q   You weren't -- when did you become the
22  medical provider?
23      **A   I believe it was 2016, January.**
24      Q   When did you become the medical provider in
25  Dakota County?

87

1      **A   We began as nursing services.  I don't**
2  **recall the exact year.  And then took over medical**
3  **provider and director services last year.  And then**
4  **took over mental health services this year.**
5      Q   How about Stearns County?
6      **A   What about it?**
7      Q   You've been -- you've been there --
8      **A   We -- we provided our services from 2010 to**
9  **2017.**
10      Q   And they -- did they terminate MEnD?
11      **A   Yes.**
12      Q   Was that as a result of the Baxter-Knutson
13  suit?
14      **A   All I was told is that we were -- I believe**
15  **the term was "political collateral damage in town."**
16  **But they had no issues with our services, but --**
17      **(Sotto voce remarks between plaintiff**
18  **counsel.)**
19      **(Exhibit 67 was marked for identification.)**
20  BY MR. BENNETT:
21      Q   Exhibit 67.  August of 2014.  Jarod Jakel,
22  22, of Sauk Rapids, hung himself in Stearns County.
23  Correct?
24      **A   Yes.  This sounds familiar.**
25      Q   It's not on -- it's not listed in your

88

1  answer to interrogatory, though.  Is it?
2      **A   No.  I -- I just couldn't recall and I**
3  **couldn't determine, and I have no access to Stearns**
4  **County anymore.**
5      Q   So how many suicides did -- occurred in the
6  Stearns County jail while you were the medical
7  provider?  While MEnD was the medical provider?  In
8  other words, Baxter-Jensen, and we know now there was
9  Jarod Jakel.  Any others?
10      **A   Those are the only two that I'm aware of.**
11      Q   Was there a lawsuit involving Jarod Jakel?
12      **A   No.**
13      **Well, I shouldn't say that.  No lawsuit**
14  **against MEnD.  I don't know if there was any lawsuit**
15  **at all.  I don't know the answer to that.**
16      Q   Okay.
17      When were you the medical provider for
18  Mille Lacs County?
19      **A   I started 2007 or 2008.**
20      **(Sotto voce remarks between plaintiff**
21  **counsel.)**
22      **(Exhibit 68 was marked for identification.)**
23  BY MR. BENNETT:
24      Q   So there were two suicides there by
25  hanging.  One was Holscher, and the other was

89

1  Wildhirt.  And they both took care -- that was both
2  under the watch of the jail's for-profit medical
3  provider, MEnD Correctional Care of Waite Park,
4  Minnesota.  That's on page -- on the second to last
5  page.
6      Do you recall those?
7      **A   I recall Holscher quite well.**
8      **I -- I recognize Wildhirt, I just don't**
9  **remember the specifics of the case.**
10      **(Sotto voce remarks between plaintiff**
11  **counsel.)**
12      **(Exhibit 68 was marked for identification.)**
13  BY MR. BENNETT:
14      Q   Mille Lacs.  Do you still provide
15  medical --
16      **A   Correct.**
17      Q   -- correctional care for them?
18      **A   Yes.**
19      Q   What -- who was the person in Crow Wing
20  County who committed suicide?
21      **A   I don't recall the name.  My nursing**
22  **director alerted to me that we believe there was a**
23  **suicide between 2014 and 2017 in Crow Wing.**
24      Q   Were there any suicides involving inmates
25  under the correctional health care of MEnD in 2018?

23 (Pages 86 to 89)

90

```
 1      A   Yes.
 2      Q   How many?
 3      A   I believe -- I believe there was three.
 4      Q   All by hanging?
 5      A   Yes.
 6      Q   Was --
 7      A   And -- I apologize.  It may have been two.
 8  I may be getting confused on if one of those was a
 9  non-suicide death.
10      Q   What are you thinking of a non-suicide
11  death.  Is that the one in Beltrami County?
12      A   No.  What I'm saying is I'm just trying to
13  recall -- it's two or three.
14      Q   So what are the ones that you remember in
15  2018?
16      A   Oh.  I'm trying to remember in that
17  snapshot of time.  I don't typically think of these
18  in a snapshot of, you know, a calendar.
19      Q   Well, where were they?  Where are the ones
20  you're thinking of?  You --
21      A   I believe there was one in -- I have to
22  review my stats.  But I believe one was in Douglas
23  County, Wisconsin.  Sorry.
24      Q   Okay.
25      A   I'm trying to remember if there's any
```

91

```
 1  others, in that snapshot.
 2          I just -- I can't remember.
 3      Q   How about 2019?
 4      A   We've had a suicide in Crow Wing by
 5  hanging.  And I don't recall if there's been any
 6  other suicides this year.
 7          (Sotto voce remarks between plaintiff
 8  counsel.)
 9  BY MR. BENNETT:
10      Q   Do each of the facilities have a nurse that
11  is full time?
12      A   In regards to?
13      Q   Each jail, county, have a nurse full time?
14      A   It depends on the jail.  Depends on the
15  size of the jail.
16      Q   Well, I -- all right.  How many don't have
17  a full-time nurse?
18      A   I don't have the -- a specific number.  But
19  if a jail's population size doesn't warrant a
20  full-time nurse on site, then we'll staff that,
21  customized to their size and scope and needs.
22      Q   Well, is there always a nurse on call for a
23  particular jail?
24      A   Correct.
25      Q   Doesn't mean it's on-site?
```

92

```
 1      A   Correct.
 2      Q   How many have on-call versus on-site
 3  nurses?
 4      A   No.  It's the -- it's the same pool of
 5  nurses, it's just there's a rotating basis of
 6  on-call.  And then during weekdays, specific nurses
 7  are assigned to specific jails.  So even if they're
 8  not on site, if there's an issue that arises they'll
 9  call that specific nurse that's assigned to them.
10      Q   In 2017, how many physician's assistants
11  did you -- did MEnD employ?
12      A   What I remember is between physician's
13  assistants and nurse practitioners, we had eight on
14  staff, I believe.  That's a close approximation.
15          MR. BENNETT:  Why don't we break.
16          VIDEOGRAPHER:  Off the video record at
17  12:15 p.m.
18          (Lunch recess taken from 12:15 to 12:47
19  p.m.)
20          VIDEOGRAPHER:  This is file four.  We're on
21  the record at approximately 12:47 p.m.
22  BY MR. BENNETT:
23      Q   So in any of the suicides in which MEnD was
24  involved that -- either in -- either the ones you
25  list or the ones before that that I went over, or the
```

93

```
 1  ones in 2019 and 2018.  And when you did this review
 2  that you do, did you ever find anything that MEnD did
 3  wrong in any case?
 4      A   I guess, that's a difficult question for me
 5  to answer.  Are there things where I felt we could
 6  tweak or fine tune?  Yes.
 7      Q   That's --
 8      A   But I --
 9      Q   Did you ever find that you did anything
10  wrong?
11      A   Well, again, I -- I guess, that's not how I
12  approach them.  So what I look for is, is there
13  substantive systems or processes that we need to
14  change.
15      Q   Let's --
16      A   And -- and also keeping in mind that we're
17  frequently already reviewing our processes and -- on
18  an annual basis.  So...
19      Q   But with regard to this -- I mean, you've
20  never done a review in writing.  Right?
21      A   I don't recall.
22      Q   Well, do you recall doing one in writing?
23      A   I just -- I just don't recall if I've got
24  a -- a final written report from any --
25      Q   As you sit here today, --
```

24 (Pages 90 to 93)

94

1    A  -- review.
2    Q  -- can you name one written report?
3    A  I can't name one.
4    Q  And the clinical mortality review discussed
5  by NCCHC includes a review of the incident and
6  facility procedures used; training received by
7  involved staff; pertinent medical and mental health
8  services or reports involving the inmate; and
9  recommendations, if any, for a change in policy,
10  training, physical plant, medical or mental health
11  services, and operational procedures.
12        And for -- for deaths, a modified review
13  process that focuses on relevant clinical aspects of
14  the death and preceding treatment.  That follow.
15        Did you -- do you have any -- can you think
16  of any time that you, when in doing what you think
17  passes for that, that you found anything wrong that
18  you corrected, for MEnD?
19    A   Well, first of all, there's a big chunk of
20  what you're describing there that is the
21  responsibility of jail administration and their side
22  of things.  I'll offer any feedback, input that they
23  request.
24    Q   Well, that's the administrative review.
25  Right?

95

1    A  Yeah.
2    Q  And it's not what I'm saying is provided.
3  It's what the NCCHC says.  Right?  That's --
4  Exhibit 58, I just read from that paragraph.  That's
5  what they expect.
6    A  Yeah.  And I've already described my
7  clinical review that I undertake.  But, I guess, what
8  I'm trying to explain is, in particular to Sherburne
9  County, they have their own investigation that they
10  do.  And they ask for input and feedback information
11  how they deem fit in regards to that side of things.
12  I focus on a clinical review of our side of that
13  care.
14    Q  And that's what the NCCHC talks about.  A
15  clinical review.  A clinical mortality review.  Not
16  an administrative review.
17    A  I understand.
18    Q  The second of three reviews.
19        Whatever review you did, have you done
20  anything -- have you made any changes specifically as
21  a result of the review?
22    A  Of which review?  I'm sorry.
23    Q  Your review.
24    A  No.  Which case?
25    Q  A review of any of the cases.  In any case.

96

1    A  Well, I -- I can't remember every specific
2  case.
3    Q  Apparently, because it didn't get on the
4  answer.
5    A  But in terms of the Lynas case, we did not
6  find anything that we substantively changed.
7    Q  How about -- how about the Brenner case?
8    A  No.
9    Q  How about the -- how about the Bunker case?
10    A  I don't recall.
11    Q  How about the Holscher case?
12    A  One thing we found there that went into the
13  sheriff's department side of the investigation was
14  improving their prebooking questionnaire.  In other
15  words, the questionnaire that -- or the documentation
16  that the arresting officer, who brings the inmate
17  into the jail setting, that information that they
18  provide correctional staff.  That was one significant
19  change that came from that case.
20    Q  And that was whose -- whose information?
21  Information brought to you or information that you
22  gave to the --
23    A  Information brought from the outside
24  arresting officer to the jail when they processed
25  that patient in booking.

97

1    Q  So it didn't have anything to do with MEnD,
2  per se?
3    A  Nothing directly with our health care.
4    Q  How about the Baxter-Jensen suicide.  Did
5  you find anything in your review of that that was
6  wrong?
7    A  The only thing that we focused on after
8  that case was just doing a better job of taking
9  credit for our -- our work, in terms of documenting
10  refusals.  But substantive care, no.
11    Q  So was that one of the cases that made it
12  toxic, MEnD toxic, in Stearns County, though?
13    A  No.  We were never toxic in Stearns County.
14    Q  Well, what did you say?  I mean, I missed
15  your word, I guess.
16    A  Oh.  No.  I was just told that our company
17  ended up being political collateral damage.  And that
18  they were very satisfied with our services, but based
19  on politics in the county, they were going to have
20  the hospital system in St. Cloud, CentraCare, take
21  over services in the jail.
22    Q  Well, the Stearns County one, I don't -- I
23  only know about Baxter-Jensen.  But in that case, the
24  county had to pay $600,000, and MEnD -- and insurer
25  had to pay $850,000.  Were they happy about that?

Doby Professional Reporting, Inc.
952-943-1587

98

1    A   I can't speak for them, what they felt
2  about it.
3    Q   Okay.  Did they mention --
4    A   It was a settlement.
5    Q   -- that when they'd say you were collateral
6  damage?
7    A   They did not mention any issues with our
8  services in any way, shape, or form.
9    Q   But otherwise, you thought your care -- the
10  care that MEnD exhibited in that case,
11  Baxter-Jensen's suicide, was good?
12    A   Was reasonable.  Absolutely.
13    Q   Okay.
14        And Jerod Jakel, do you -- did you find
15  that MEnD's care of him was acceptable as well?
16    A   I don't recall the case in detail.  I -- I
17  would have to speculate on the events that led to his
18  suicide, and I don't want to give any kind of
19  erroneous information.
20    Q   How about Sheila Baier?  B-A-I-E-R.  Was
21  MEnD -- in Olmsted County, 2015.  Did you find MEnD's
22  care of her acceptable too?
23    A   We -- we were not providing medical care in
24  Olmsted at that time.
25    Q   How about Caleb Calton in St. Louis County

99

1  in 2015?
2    A   Again, I don't recall the details of the
3  case.
4    Q   Do you remember thinking:  Jeez, we did
5  something wrong there?
6    A   I don't recall saying that or thinking
7  that.
8    Q   The cases that we've discussed where MEnD
9  was the care provider, are you aware of any of them
10  being on actual suicide watch?
11    A   I -- I'm sorry.  I don't understand the
12  question.
13    Q   Were any of the inmates that hung
14  themselves on actual suicide watch at the time?
15    A   At the time of their death?
16    Q   Yeah.
17    A   I don't recall.
18    Q   How about on heightened mental health
19  watch, say?  Other than -- I mean, that would include
20  Lynas.  Right?  15-minute mental health watch?
21    A   Yeah, I was going to say, I don't recall
22  each individual situation.  But I -- I would expect
23  that during their incarceration, there were certainly
24  some of those people that were on heightened watches.
25    Q   Does MEnD have a policy and protocol

100

1  regarding an inmate suicide?
2    A   Regarding...
3    Q   An inmate's suicide.
4    A   In what context?
5    Q   Do you have any written policy or protocol?
6    A   Our policies and protocols are what they
7  are.  I mean, we have --
8    Q   Fine.  Do you have one involving suicide?
9    A   We have policies and protocols that revolve
10  around suicide prevention, about training.  So there
11  are some, yes.
12    Q   Are there any about investigation of a
13  suicide?
14    A   No formal protocol regarding that.  Just
15  that we'll review the case.
16    Q   And that just goes into your regular
17  duties, in addition to providing clinical care and
18  administrative duties for the company.  Correct?
19    A   They're my duties at this time.
20    Q   Well, they have been the entire time at --
21  from the formation in 2006?
22    A   Correct.
23    Q   Where does Dr. Skurr operate from?
24    A   Iowa.
25    Q   Where in Iowa?

101

1    A   I believe he lives in Marshalltown.
2    Q   Is that in one of the three counties you
3  serve?
4    A   No.  It's just -- it's a -- it's close.
5    Q   Does he provide clinical services at those
6  three counties?
7    A   Yes.
8    Q   Any other counties?
9    A   I know he also works for Marshall County.
10  I don't believe he works with any other county.
11    Q   Dose he provide clinical services for any
12  of the counties in Minnesota?
13    A   No.
14    Q   How about Illinois?
15    A   Not at this time.  He will be in the very
16  near future.
17    Q   How about Wisconsin?
18    A   No.
19    Q   Where does he see patients?
20    A   In what context?
21    Q   For MEnD Correctional Care.
22    A   In the respective jail facilities.
23    Q   How often is he at those county jails?
24    A   He is in Story and Hardin County weekly.
25    Q   Once weekly?

102

1      A   Once weekly, for direct on-site rounding.
2  He has on-call availability 24/7.  And then Benton
3  County --
4      Q   For what?
5      A   For on-call services.  For consultation,
6  questions.
7      Q   So he can consult in Pennington County?
8      A   Nope.  You said Iowa.  And that's -- Iowa
9  is where he's on call.
10     Q   Is he licensed in Minnesota?
11     A   No.
12     Q   Is he licensed in Illinois?
13     A   I believe he either is right now or is
14  about to be.
15     Q   So that he can see patients?
16     A   Correct.
17     Q   Is he licensed in Minnesota?
18     A   No.
19     Q   So for Minnesota, you're the only medical
20  doctor for however many counties there are at any
21  time?
22     A   No.  We have, again, as I mentioned
23  earlier, our team of medical providers shares on-call
24  responsibilities.
25     Q   I'm talking about a doctor.

103

1      A   I'm the physician who's in that group.
2      Q   Yeah.  The only one in Minnesota.
3      A   I'm the only physician, beyond all the
4  other medical providers that work with me, yes.
5      Q   But there's one physician and one
6  psychologist.  Correct?
7      A   Say that --
8      MR. NOVAK:  Asked and answered over the
9  course of a couple of days about 15 times now.
10     MR. BENNETT:  Well, I want to -- if he ever
11  gave a straight answer, you might be -- you know, you
12  might be able to ascertain that.  I'm trying to
13  figure this out.
14  BY MR. BENNETT:
15     Q   So the --
16     MR. NOVAK:  Bob, if you would read the
17  transcript, you'd see this question has been answered
18  15 ways from Sunday.
19     MR. BENNETT:  All right.
20  BY MR. BENNETT:
21     Q   So how many -- does the psychologist work
22  in all states, that you hire?
23     A   The psychologist that was working for us in
24  2017 worked solely in Sherburne County.  Rare
25  exception, might consult with another county.  But

104

1  that would be rare.
2      Q   Did Robertson ever see Brenner?
3      A   I don't believe so.  It -- it -- well, I
4  guess, I should qualify that answer.  I don't know if
5  Michael Robertson saw Mr. Brenner at any other
6  incarcerated time in that facility.  All I can recall
7  is that he didn't see him the last time.
8      Q   Okay.
9      A   But I don't know if he had seen him
10  previously.  I don't recall.
11     Q   Did he ever perform any services for
12  Stephanie Bunker?
13     A   That would be highly unlikely.
14     Q   Okay.
15         How many inmate patients would see a
16  physician on a typical day for MEnD?
17     A   You mean a medical provider?
18     Q   No.  Physician.  I'm -- that's not -- a
19  doctor.
20     A   Okay.  Well, I wasn't sure what you meant,
21  so...
22         I have -- would need some context.
23     Q   Typical day, inmate sits across from
24  provider and --
25     A   In any jail or anywhere we work, or a

105

1  specific jail or...
2      Q   No.  In any of the jails that you work, how
3  many would see an actual doctor on any given -- on
4  any given day?
5      A   Oh, my goodness.  I'd have to think this
6  through.
7         If you averaged it all out, a couple of
8  patients a day would see a physician.  And massive
9  multitude would see the rest of the medical
10  providers.
11     Q   Which I didn't ask you about.
12         How many would actually see a psychologist?
13     A   Well, in 2017, when Michael Robertson was
14  working at Sherburne County, he would have seen, I --
15  I'm guesstimating here.  I don't have the specific
16  numbers in front of me.  Approximately eight per day.
17     Q   Okay.  And he's supposed to be there five
18  days a week?
19     A   He was there on average five days a week.
20  And then also had two other days a week for another
21  mental health professional, worked in Sherburne to
22  assist him.  And then a varying degree of services
23  on-site from our mental health director as well.
24     Q   Is the mental health director a
25  psychologist?

106

1      A   No.  She is -- her credentials are LMFT.
2      Q   Which is?
3      A   Licensed Marriage and Family Therapy.
4   She's independently licensed.
5      Q   What is her name?
6      A   Linda Pansky.
7          (Sotto voce remarks between plaintiff
8   counsel.)
9   BY MR. BENNETT:
10     Q   So in any given nine-day period at
11  Sherburne County, would you expect that Robertson
12  would see at least 50 patients?
13     A   Have to do the math here.  Yeah, I mean, I
14  guess that -- that would be an expectation.
15     Q   Okay.
16     A   Yeah.
17         Well, I guess, you know, wait a minute.
18  Does nine days include business days, does nine days
19  include weekends.  I mean, so...
20         Nine working days, yes.
21     Q   Well, if it was eight per day, nine would
22  be 72.
23     A   Correct.
24     Q   That's what I was trying to --
25     A   Yep.

107

1      Q   -- get what your real expectations were.
2   In any nine-day period, you pretty much expect him to
3   see 50, wouldn't you?
4      A   I agree.  I agree.
5      Q   And I take it there weren't 50 inmates on
6   either suicide watch or 15-minute mental health
7   watches at Sherburne County?
8      A   I'm sorry.  Could you repeat that?
9      Q   There weren't 50 inmates on either suicide
10  watch or a 15-minute mental health watch during that
11  period, November 1 to November 9?
12     A   Yeah, I mean, I don't -- I don't know the
13  specific numbers.  But that would be -- that would be
14  very surprising to me if there was that many.
15     Q   Would you expect Robertson to be seeing the
16  people that were recognized as having risk for
17  suicide on -- more often than other patients?
18         MR. NOVAK:  Object to form.  Incomplete
19  hypothetical.
20     A   I mean, I would expect Mr. Robertson to
21  determine the timing and frequency of seeing patients
22  using his professional discretion.
23  BY MR. BENNETT:
24     Q   I don't think that answered my question.
25         MR. NOVAK:  Sure it did.

108

1   BY MR. BENNETT:
2      Q   Well, wouldn't you -- wouldn't you see
3   patients who were the sickest first, as a medical
4   doctor?
5          MR. NOVAK:  Form, incomplete hypothetical.
6      A   I mean, I -- you have to -- you have to
7   customize your plan depending on a number of factors.
8   And -- and I'm sure that's what Mr. Robertson does
9   every day he's seeing patients.  So he has to
10  determine, again, the timing and frequency of seeing
11  patients.
12  BY MR. BENNETT:
13     Q   Or never seeing them?
14     A   Determine --
15     Q   That's his --
16     A   It would be determined based on his
17  professional perspective.
18     Q   So apart from clinical work, what are the
19  things you do as head of this 180-person organization
20  on a given day, for example?
21         MR. NOVAK:  Asked and answered as to this
22  witness in his personal capacity during a prior
23  deposition.
24         This is a witness -- a deposition of MEnD
25  Correctional Care.

109

1          MR. BENNETT:  That's what I'm asking.  I
2   said aside from his clinical work, which he's already
3   testified to, the doctor stuff, what does he do.  As
4   the chief -- the president of MEnD.
5          MR. NOVAK:  Sure.  Covered that too today
6   already.  But go ahead and answer.
7      A   Okay.
8          I have involvement in both customer and
9   vendor relations.  I have involvement in sales.  I am
10  consulted regularly by my leadership team on matters
11  outside of direct medical care.
12         Those are just the things that come right
13  off the top of my head.  I participate in
14  bookkeeping.
15  BY MR. BENNETT:
16     Q   Check signing?
17     A   Basically.  Internet-based, but...  Online
18  banking is the majority of our banking.
19         I mean, it's not an all-inclusive list, but
20  those are just the first things that come to mind.
21     Q   Hiring and firing?
22     A   I don't have a lot of involvement in that,
23  unless it's directly with medical providers.  I am
24  always available for consultation, discussion
25  regarding other positions.

Doby Professional Reporting, Inc.
952-943-1587

110

1    Q    And I'm not sure which hat you had on, so
2  I'm trying to be mindful of Mr. Novak's point of view
3  here.
4        But I understand that some work was done
5  for NCCHC or some consulting?  What consulting work
6  did you do for them?
7    **A    I don't really do any consulting work for**
8  **NCCHC.**
9    Q    Okay.
10   **A    So I'm not sure which consulting you're**
11 **referencing.**
12   Q    Okay.  Have you ever been part of an NCCHC
13 audit committee or audit team?
14   **A    No.  Uh-uh.  No.  I've had -- I've just had**
15 **conversations and roundtable discussion at NCCHC**
16 **conferences that I have done.**
17       **(Exhibit 69 was marked for identification.)**
18 BY MR. BENNETT:
19   Q    What is Exhibit 69?
20   **A    It's verbiage that was taken from our**
21 **website.**
22   Q    It's got your MEnD logo on it?
23   **A    Correct.**
24   Q    Who wrote it?
25   **A    I don't recall.**

111

1    Q    Who typically writes these things for
2  MEnD's publications on their website?
3    **A    On the website, it -- it can vary.  It can**
4  **be administrative support team; it can be directors;**
5  **I can have involvement.  That's mainly it.**
6    Q    Do you have to approve it before it goes on
7  the website?
8    **A    Well, typically, I would.  It doesn't**
9  **always happen that way.**
10   Q    Did you approve this?
11   **A    I don't recall.**
12   Q    Okay.
13       And it says here that, "Across the nation
14 and here in the upper Midwest over the past three
15 decades, individuals with mental health issues are
16 increasingly being brought to jail as the number of
17 mental health facilities continues to dwindle.  This
18 can be an extremely difficult challenge for county
19 employees to handle, as mental health care is an
20 entirely different experience from physical health
21 care."
22       And then you go on to say, "At MEnD, we
23 provide local, affordable and highly effective mental
24 health care for your county jail system, bringing
25 qualified professionals to see inmates as often as is

112

1  needed."
2        Is that -- that's what you approved?
3    **A    I don't recall if I approved this or not.**
4  **But certainly that's what it says.**
5    Q    You don't disagree with it, do you?
6    **A    The -- I guess, the overall tone of it I**
7  **agree with.  Yeah.**
8    Q    Well, how about the words?
9    **A    I don't know if I would say it exactly this**
10 **way.  But, I guess, in -- in sum, I -- I agree with**
11 **the overall message.**
12   Q    And you say here:  Your jail has a duty to
13 provide mental health services and to prevent
14 patients from harm even from themselves.  This is a
15 basic right of any prisoner with a mental health or
16 addictive disorder, and requires extra vigilance to
17 properly identify, deal with, and ensure the transfer
18 process to or from the jail is handled with utmost
19 care.
20       Is that -- do you agree with that?
21   **A    Again, in general, yes.  That -- I can tell**
22 **you with certainty, I didn't write this section.  But**
23 **I agree with its overall tone.**
24   Q    Do you agree with the words?
25   **A    Yeah.  I agree.**

113

1    Q    Then it says, "Each patient receives custom
2  care.  A mental health care" --
3        It goes on, quote, "A mental health care
4  provider like MEnD will be able to provide each
5  patient the care they need in a timely manner to
6  prevent liability and to keep the inmate healthy."
7        Do you agree with that?
8    **A    Yeah.  I mean, again, the overall message,**
9  **yes.**
10   Q    Those words?
11   **A    Yeah.  Again, they're not my words, but**
12 **I -- I, again, agree with the tone.**
13   Q    You say that, "The medical professionals
14 with MEnD are extremely experienced in mental health
15 care."
16       Is that right?
17   **A    That's -- that's what we wrote, yes.**
18   Q    Now, do you know if any of the individuals
19 who are employed by MEnD ever considered them -- and
20 then saw Mr. Lynas, ever considered themselves to be
21 qualified mental health professionals?
22   **A    Sorry.  I have to unwrap that question a**
23 **bit.  Can you say it again?**
24   Q    Who saw -- you know that -- is it Jeanne
25 Thompson?

114

1      A   Jennie Thompson.
2      Q   Jennie Thompson, Alyssa Pfeifer, saw --
3  what was other one.
4      MR. BETINSKY:  Kretsch.
5  BY MR. BENNETT:
6      Q   Yeah.  Kretsch.  Saw -- actually saw
7  Mr. Lynas.  None of them consider themselves to be
8  qualified mental health professionals.  Would you
9  agree with their own self-assessment?
10     A   Yes.  And I believe that those staff
11 followed their processes and their protocols and saw
12 Mr. Lynas appropriately.
13     Q   And the P.A. in Brainerd didn't consider
14 herself to be a qualified mental health professional.
15 Do you agree with her?
16     A   No.  I believe she is absolutely a
17 qualified mental health professional.
18     Q   Despite her own testimony under oath?
19     A   I can't speak to her testimony.
20     Q   Okay.  You say your psychiatric team and
21 partnership with many area pharmacies will ensure all
22 inmates are treated with respect and medical
23 treatment -- and medical treatment they deserve.
24     There is no psychiatrist, is there?
25     A   Yeah, I don't know if I would have used the

115

1  word "psychiatric."
2      Q   But MEnD did.
3      A   Somebody from my team wrote that word.
4      Because I don't -- I don't look at it that
5  way.  I look at it as a mental health team in
6  general.  Everybody has a part to play.
7      Q   Well, you talk about tools and process
8  and -- is that what you set up for -- as -- as
9  constituting mental health care as indicated in -- on
10 this exhibit?
11     A   Well, it's always a team effort with our
12 company and our leadership.  So we all initiate,
13 implement, and review and revise all of our processes
14 and tools and systems related to providing mental
15 health care for our patients.
16     Q   Did you ever look at Lynas's BDI test in
17 your review?
18     A   I can't remember the specifics, but I --
19 I'm sure I would have reviewed that.
20     Q   And you've looked at BDI questionnaires
21 before?
22     A   Correct.
23     Q   Do you recall Lynas's BDI questionnaire and
24 that he checked yes to the following boxes:  "I am
25 sad all the time and can't snap out of it"?

116

1      A   I can't recall specific checkmarks, sir.
2      Q   Did you expect your staff, correctional
3  staff -- as the medical director, did you expect your
4  staff to understand the importance of a BDI score and
5  the significance of the score itself?
6      A   So which staff are we talking about?
7      Q   The ones at Sherburne County that --
8      A   I expect each individual to work within
9  their scope of work and understand what they need to
10 do with these tools and the results of these tools.
11     Q   Well, did you -- did you expect them to
12 understand what the scoring meant?
13     A   Again, I expected them to understand what
14 they needed to do with particular scores.
15     Q   So you expect them to understand on a
16 macro-medical level; that if it's above 40, they've
17 got to call somebody above their pay grade?
18     A   Correct.  They have to consult with a
19 mental health professional or medical provider --
20     Q   Okay.
21     A   -- if they receive of a BDI score that's
22 above 40.
23     Q   But you don't expect them to know what a
24 BDI score of above 40 means?
25     A   Oh, I -- I think they have some general

117

1  idea of what it means.  But what's most important is
2  that they know what they need to do with that result.
3      Q   If you look at Exhibit 20.
4      A   From here?
5      Q   Yes.  And this indicates that MEnD
6  copyrighted this in 2017.  This form.
7      A   Copyrighted the form.  Correct.
8      Q   So is it a form that MEnD developed itself?
9      A   I don't remember the specifics of its
10 origin.  I recall getting some of the information for
11 these questions from another source, but some of the
12 other details of the form are certainly ours
13 specifically.
14     Q   Did you expect -- is it Andrea Kretsch?
15     A   Andrea Kretsch.  Correct.
16     Q   -- or Jennie Thompson or Alyssa Pfeifer --
17 now, those are the three suicide risk screening form
18 filler-outers.  Did you expect that they would
19 understand, for example, the difference in feeling
20 low or bad and mild depression?
21     A   What I can tell you is that our staff are
22 trained specifically on this form.  And it would be
23 my expectation that they would have a working
24 knowledge of that difference.
25     Q   Well, what -- what would you expect them to

118

1  know between feeling low and bad and mild depression?
2      A   It depends on patient disclosure and what
3  they're willing to submit verbally to our staff.  If
4  they're willing to -- they literally go through these
5  questions with each inmate.
6      Q   What are they supposed to say?  "Are you
7  feeling low or bad?"
8      A   Have you been diagnosed with depression.
9  If so, is it mild depression.  They have their own
10  way of asking the questions, but that's what they're
11  trying to elicit from them.
12      Q   They're not trained in how to ask the
13  questions?
14      A   To an extent.  Correct.  Yes, they are.
15      Q   Tell me how it is you expect them to make a
16  quantitative decision, and qualitative decision,
17  about whether they get two points for feeling low or
18  blue, or six points for chronic depression, or eight
19  points for major depression, or eight points for
20  major depression with hopelessness?
21      A   So, first of all, this is not an
22  evaluation.  This is a screening tool.  So they use
23  the best information that they can get from the
24  patient, or if they happen to have other sources of
25  information that will improve their knowledge of

119

1  their case.
2      Q   Well, how are they supposed to make the
3  determination if they don't know the difference?
4      A   Determination of what?  I'm sorry.
5      Q   Whether they get two points for feeling low
6  and bad, or six points for chronic depression, eight
7  points for major depression, or eight points for
8  major depression with hopelessness?
9      A   So what they do is they do their best that
10  they can get of ascertaining this information.  They
11  score it appropriately.  And they submit either way
12  for review.  But if this number is 36 or higher, then
13  they have to immediately consult with somebody
14  regarding the case.
15      Q   But, I mean, the score is important, if
16  you're -- if you're going to give it that kind of --
17  if you're going to give it that kind of power.
18      A   It's one piece of what we do.  This goes
19  hand in hand with the BDI.  It goes hand in hand with
20  their observations, with information -- it's just one
21  piece of the entire collection of information that
22  they get --
23      Q   Well, what --
24      A   -- on any given day.
25      Q   But this is a person who -- you know, Lynas

120

1  was a person who said yes to:  I am sad all the time
2  and can't snap out of it.
3          He said yes to:  I feel the future is
4  hopeless and things cannot improve.
5          He said yes to:  As I look back on my life,
6  all I see is a lot of failures.
7          He said yes to:  I'm dissatisfied and bored
8  with everything.
9          He said yes to:  I feel guilty all the
10  time.
11          He said yes to:  I feel I'm being punished.
12          He said yes to:  I'm disgusted with myself.
13          He said yes to:  I blame myself for
14  killing -- for everything bad that happens to me.
15          He said yes to:  I've thought of killing
16  myself, but I would not carry that -- them out.
17          I said -- he said yes to:  I cry all the
18  time now.
19          He said yes to:  I'm quite annoyed and
20  irritated a great deal of time.
21          He said yes to:  I've lost most of my
22  interest in other people.
23          He said I have to punish myself -- yes to:
24  I have to push myself very hard to do anything.
25          He said yes to:  I wake up several hours

121

1  earlier than I used to and cannot get back to sleep.
2          He said yes to:  I get tired more easily
3  than I used to.
4          He said yes to:  My appetite -- excuse me.
5  He said I'm very -- yes to:  I'm very worried about
6  my physical problems and it's hard to think of
7  anything else.
8          So how would they -- if a person said that,
9  you know, how would you --
10      A   They go by what their --
11          MR. NOVAK:  Wait until the question is
12  done.
13  BY MR. BENNETT:
14      Q   How would you score it?
15      A   So when they're doing this piece, they're
16  using self-disclosure, but they also know what has
17  been written down on the BDI.  And that's why my
18  staff promptly referred this person to our mental
19  health professional.  Because it's not an either/or.
20  It can be any of the tools that are used when you
21  find those kind of responses and find that kind of
22  scoring.
23      Q   Well, but Andrea --
24      A   It's all it takes.
25      Q   -- Kretsch scored him as a two.

122

1          A   And that is what this person gave her that
2      day when she screened him.
3          However, our staff also understand that his
4      BDI score is what it is, and that may change things.
5          So again, this is one piece, one tool that
6      they use to help try and garner information from each
7      patient.
8          Q   Wouldn't withdrawal from drugs and alcohol
9      be an acute illness?
10         A   I don't know if you would consider it an
11     illness.  It's a medical issue that may need to be
12     addressed.
13         Q   So --
14         A   It all depends on the patient.
15         Q   If a person is actively in withdrawal --
16     well...
17         If you don't know the difference between
18     chronic depression, major depression, and major
19     depression with hopelessness, how are you going to
20     properly score this -- this screen?
21         A   No.  The issue -- I've been trying to
22     explain this.  This is self-disclosure.  They are
23     literally putting down on paper what they're
24     garnering from that patient.  But we have different
25     ways of garnering information from patients.  And

123

1      that's where a BDI comes in.  Sometimes they'll
2      answer differently on that and they'll answer
3      differently on this.  We try to find the most useful
4      information from these different sources of
5      information so that we can put this together for our
6      mental health professional.
7          Q   Well, that doesn't -- if you keep looking
8      at Exhibit 28, though, that doesn't make any sense.
9      If you look at the first one -- excuse me.  It's
10     Exhibit 20.
11         The reason these -- the box checked is
12     "altered mental status."  Right?
13         A   Okay.
14         Q   For information and from -- for screening.
15         And the next one is done by Jennie
16     Thompson.  And, again, this is "abnormal health
17     assessment screen" is checked.  Right?  And he gets a
18     16 that day.
19         A   Yep.
20         Q   On this form.  Is that true?
21         A   That's what she wrote on here.  Correct.
22         Q   And then the BDI score of 40, greater than
23     40, which indicates severe depression, as we've
24     discussed.  He actually got better.
25         A   I -- I'm sorry.  I don't know the exact

124

1      dates of --
2          Q   Well, he went down to 12.  The third page.
3      The one that was given four days before his attempted
4      hanging -- or his attempted suicide.  His suicide.
5          A   These can change.  These can change on a
6      day-by-day basis, based on what the patient is
7      telling us and what they are admitting to.
8          Q   Alyssa Pfeifer scored the BDI.  Right?
9          A   On the last one, you mean?
10         Q   Yeah.
11         A   Alyssa Pfeifer is the one that conducted
12     this screening.
13         Q   And she scored the BDI?
14         A   I don't recall.  I'm sorry.
15         Q   Okay.
16         A   I know one of the nurses scored it and
17     referred it to the mental health professional
18     promptly.
19         (Exhibit 70 was marked for identification.)
20     BY MR. BENNETT:
21         Q   Now, that form -- that's Exhibit 70?  What
22     is it?
23         That form does not have, obviously, a
24     copyright, because it's seven years before.  Where
25     did you get this form?

125

1          A   Well, we created this form.  And again, the
2      information from this table, I don't remember the
3      specifics.  But we got some of this information from
4      other sources, and then created the form specifically
5      for our needs.
6          Q   Well, the...
7          This has a -- Exhibit 70 has "Potential for
8      suicide/self-harm."  At the top.
9          A   Yep.  That's --
10         Q   And yours has --
11         A   Sorry.
12         Q   -- "Indication for screening."
13         So where did you get the table?
14         A   Again, I just don't recall specifically
15     where we got this information.  I just recall working
16     with my team on identifying helpful tools for us.
17     And I just don't remember where we got this from.
18         Q   Now, with regard to Lynas, did you happen
19     to notice in all three suicide risk screening forms
20     his mood was listed as "alert and oriented times
21     three"?  Right?
22         A   Okay.
23         Q   Is that true?
24         A   True.
25         Q   The other choices are:  Coherent,

126

1  intoxicated/hallucinating, distressed/hurtful [sic],
2  depressed/angry, and -- or paranoid and -- or -- and
3  delusional. Right?
4      How would somebody with a BDI score of 43
5  not be distressed or fearful [sic] or depressed or
6  angry, given the answers I've read for you?
7      A  Again, these staff members are not doing a
8  mental health evaluation on this patient. They're
9  putting their best observation that they're getting
10  from that patient at that time on that day.
11      Q  All right.
12      But we know what she -- he said on that day
13  at that time to Pfeifer.
14      MR. NOVAK: At what time?
15      MR. BENNETT: The same day she did the
16  suicide risk screening.
17      MR. NOVAK: The same time or the same day?
18      MR. BENNETT: I believe the same time.
19      THE WITNESS: Okay.
20  BY MR. BENNETT:
21      Q  If you look at Exhibit 26.
22      A  Okay.
23      Q  And if you go to the history of present
24  illness.
25      A  On the first page?

127

1      Q  No. On the 11/5 note from Pfeifer.
2      A  I very much apologize. I forgot my
3  readers.
4      Q  Well, even with the readers it's hard to
5  read. But...
6      Do you remember, he was asked how he was
7  currently coping. He said, "Honestly, I'm suffering
8  and not coping with it."
9      And reports that he's definitely depressed,
10  feeling -- "definitely feeling depressed and 'my
11  anxiety is through the roof.'" Reports that he --
12  his insomnia is maddening and his mind is going crazy
13  with -- with thoughts.
14      On that page?
15      A  I just want to make sure I'm on the right
16  one. Sorry.
17      MR. NOVAK: Is there an exhibit or Bates or
18  something, Bob?
19      A  I found it. I found it.
20  BY MR. BENNETT:
21      Q  What I'm getting at is how is that, that
22  note, consistent with the suicide screening form that
23  Pfeifer filled out?
24      A  I can't answer for why she filled this out
25  in this way versus her narrative here.

128

1      Q  They don't connect, do they?
2      A  I can go through it line by line and do
3  that, if you'd like. But what I can tell you is what
4  she did was she used this information that she
5  received from the patient in both contexts. She
6  consulted with our medical provider promptly, that
7  day. And our medical provider gave the orders that
8  they gave.
9      Q  And then nothing else happened. Right? He
10  was never given another suicide risk screening form,
11  never saw a medical provider. Right? That was what
12  your review as a --
13      A  I believe the next -- I don't remember the
14  date specifically, but I believe the next day is a
15  Monday. That referral was reviewed by our mental
16  health professional, and he determined when he was
17  going to see that patient.
18      Q  He never saw the patient.
19      A  But he had a plan of seeing the patient.
20      Q  That note -- well, we won't argue about
21  that again.
22      There was no notation about when that note
23  was made. Right?
24      A  We've already discussed this.
25      Q  Yeah.

129

1      A  I think I've answered that.
2      Q  But he didn't make a notation that day.
3  That's as simple as that.
4      A  I'm -- I'm sorry. I didn't --
5      Q  He didn't -- Robertson didn't note when he
6  put that note on the -- on the paper.
7      A  Again, I'm -- we've discussed this before.
8  I've answered this question.
9      Q  Yeah.
10      A  I fully expected that he reviewed this case
11  on Monday and made a determination of when he was
12  going to see the patient.
13      Q  Who determined that the level of 36 was the
14  point in which -- on the suicide risk screening form?
15  Why 36?
16      A  I don't remember the specifics of that
17  conversation. But I think part of it was what we had
18  found when we discovered this table. And then we
19  tried to, in essence, customize it for our uses and
20  we felt --
21      Q  So --
22      A  I don't remember the specifics of the
23  conversation.
24      Q  I'm not -- was it you who determined 36?
25      A  I was part of that conversation. I just

130

1   don't recall if 36 was set by the previous originator
2   of this table, or if we took their information and
3   customized it to this number. I just don't recall.
4      Q   I'd like to know who was the decider on 36.
5   Was that you?
6      A   Again, it was group effort. But I was
7   certainly a part of it.
8      Q   Who made the decision that goes on your
9   form and gets copyrighted that way?
10      MR. NOVAK:  Asked and answered.
11   BY MR. BENNETT:
12      Q   Well, does anybody else make a decision but
13   you?
14      A   In what way? I'm sorry.
15      Q   I mean, I -- I didn't ask about
16   conversations. I'm talking about decisions.
17      Did you decide that 36 was the number?
18      MR. NOVAK:  Asked and answered.
19      A   I've already said this. We -- we work as a
20   team and -- oftentimes in these kind of matters, and
21   we all agree on a course of action. I was certainly
22   a part of it. Absolutely.
23   BY MR. BENNETT:
24      Q   But it doesn't happen without you approving
25   it. Right?

131

1      A   I have the power of veto.
2      Q   All right.
3      Who is allowed by MEnD to fill out that
4   form?
5      A   Which form?
6      Q   Exhibit 20.
7      A   Suicide risk scoring form?
8      Q   Yeah.
9      A   Nurses or above.
10      Q   Okay.
11      Do you expect those nurses to actually know
12   the difference between these various things?
13      A   I expect them to have working knowledge. I
14   don't expect them to be mental health professionals
15   or to perform mental health evaluations on patients.
16      Q   So is this one of the things you do in a
17   timely manner to prevent liability? That you talk
18   about in this mental health care --
19      A   It's one piece. One piece of everything
20   that we do.
21      Q   Okay.
22      How about the flow sheet, where did you get
23   that?
24      A   I'm sorry. You have to let me know what
25   you're --

132

1      Q   Exhibit 22.
2      A   All right. Okay. And I'm sorry, what was
3   the question?
4      Q   Who developed -- what's the chemical
5   flow -- the flow sheet for chemical withdrawal?
6      A   That was a -- that was based on the CIWA,
7   revised CIWA that we used, and customized it a bit
8   for our -- our use.
9      Q   And again, you get a score. And if you get
10   a higher score, a score of 10 or more, you're
11   supposed to contact the doctor for further --
12      A   Medical provider.
13      Q   It says "M.D."
14      A   Then it's -- just hasn't been changed yet.
15   It's always "medical provider." And it even says the
16   next line, "medical provider contacted."
17      Q   I know. There's two lines. It says, "a
18   score of 10 or more, contact M.D. for further
19   orders." Right?
20      A   Well, it -- it's supposed to mean medical
21   provider because that's exactly what the next
22   question is. "Did you contact the medical provider."
23      Q   Well, that's what I mean. There's a
24   separate line for medical provider. Right?
25      A   No. It's all the same context and same

133

1   conversation that they have. And our staff
2   understand that.
3      Q   I'm reading the form, and I have a
4   reasonable amount of education. I can -- it says
5   "M.D." I couldn't -- I assume "M.D." means doctor.
6      A   So those letters just haven't been changed,
7   sir, from the beginning. It's "medical provider."
8   They all know that's who they contact. That's who
9   they contact. That's why they say -- ask -- they're
10   asked, the next line, if they're contacted.
11      Q   Is that one of the documents that you
12   provide to prevent liability?
13      MR. NOVAK:  Object to the form of the
14   question.
15      THE WITNESS:  Answer?
16      MR. NOVAK:  Go ahead and answer. Yeah.
17      A   Again, it's one of the multitude of pieces
18   of tools and systems process that we use.
19   BY MR. BENNETT:
20      Q   Has there been a problem with the eMDs
21   system where your signature has been electronically
22   affixed to the document without you having read it?
23      MR. NOVAK:  Hang on.
24      Can you show me where that's covered in the
25   30(b)(6) notice that you served on our office?

134

1 MR. BENNETT: It's a policy.
2 MR. NOVAK: How? Just because you say it
3 is, doesn't mean it is. If that was something you
4 wanted to cover with the witness, it should be on the
5 notice.
6 MR. BENNETT: Well, I think it's -- so
7 you're instructing him not to answer?
8 MR. NOVAK: I want an answer -- I want an
9 answer to my inquiry first.
10 MR. BENNETT: Okay.
11 BY MR. BENNETT:
12 Q Let me ask you a couple of preliminary
13 questions.
14 EMDs is one of the --
15 MR. NOVAK: Hang on. For what purpose?
16 MR. BENNETT: Well, I'm going to -- I'll
17 talk to you about --
18 MR. NOVAK: Yeah. No, I --
19 MR. BENNETT: I'll show you which ones it
20 falls under.
21 MR. NOVAK: Just explain to me which ones
22 it falls under.
23 MR. BENNETT: Well, I think it's -- I think
24 it falls under lawsuits, because it's -- he's
25 supposed to be knowledgable about lawsuits. It's

135

1 been -- it's been in another --
2 MR. NOVAK: All right. This isn't a word
3 game, stretch it as far as you can. If you wanted to
4 talk to him about that topic, all you had to do was
5 add it to the notice, and you didn't.
6 MR. BENNETT: Well, I think --
7 BY MR. BENNETT:
8 Q Is the eMD system one of the systems you
9 use to --
10 MR. NOVAK: Hang on. We're not --
11 MR. BENNETT:
12 Q -- to assess inmates' suicidality and
13 mental health problems?
14 MR. NOVAK: Bob, you and I are having a
15 conversation right now that relates to whether or not
16 this line is going to go forward or not.
17 MR. BENNETT: I think -- first -- I think
18 if he answers that question, the answer is it goes
19 forward.
20 MR. NOVAK: So now what you -- I think you
21 floated about three topics that you purported that
22 it's under. Can you pick one?
23 MR. BENNETT: Well, I think I --
24 MR. NOVAK: -- and tell me where you think
25 you get to ask these questions?

136

1 MR. BENNETT: I think it's number nine.
2 The eMDs deal is a -- their -- that's how he --
3 MR. NOVAK: They have an electronic medical
4 records system. Just like many, many other people
5 do. Where in the Schedule A that you served on our
6 office, that we were to present this witness to
7 testify on, is the electronic medical records system
8 covered as a topic? And it's not in the context of
9 other areas. You're about to ask him specifically
10 about the electronic medical record system. Show me
11 where that's on Schedule A.
12 MR. BENNETT: Well, I think it's -- I mean,
13 I don't think I have to use the word.
14 MR. NOVAK: This isn't hide the ball,
15 either. If you wanted to the ask him about this, all
16 you had to do was put it on the list. He's not
17 prepared to testify about the topic because it's not
18 on Schedule A.
19 MR. BENNETT: Well, we don't know if he's
20 not prepared to testify about the topic.
21 MR. NOVAK: Well, he's not here to testify
22 about it because you didn't designate it as a topic.
23 MR. BENNETT: Okay.
24 MR. NOVAK: So I don't -- I don't know
25 where that leaves us, but it's a topic that's not on

137

1 your list and you want to ask him about it. So I'm
2 not -- we're not here to present him on that topic.
3 MR. BENNETT: All right.
4 BY MR. BENNETT:
5 Q How many times has MEnD been sued?
6 A I don't have the exact number, offhand.
7 Q Isn't that one of the topics you were
8 supposed to be schooled on?
9 MR. NOVAK: Why don't you read topic six.
10 Ask him about from 2014 to the present.
11 BY MR. BENNETT:
12 Q From 2014 to the present, how many times
13 did you -- lawsuits have you been involved with?
14 A I don't have the exact number committed to
15 memory.
16 Q Did you -- did you look before today?
17 A Yes.
18 Q And could you --
19 A I just don't have the number committed to
20 memory. There's been several frivolous lawsuits over
21 the course of that time, from 2014 to now. But I
22 don't have the exact number, again, just committed to
23 memory.
24 Q Would a frivolous lawsuit be one that you
25 paid 850,000 bucks to settle?

138

```
 1        A   I would not consider that frivolous.
 2        Q   So you don't consider the Baxter-Knutson
 3   suit frivolous.  Do you?
 4        A   No.  As I understand it, that -- didn't
 5   that originate before 2014?
 6        Q   Not the lawsuit.
 7        A   Oh, okay.  My apologizes.  I didn't recall
 8   that.
 9        MR. NOVAK:  The topic is:  "Lawsuits naming
10   MEnD as a defendant in connection with the provision
11   of medical or mental health service care to inmates
12   from 2014 to the present."
13        Was Mr. Baxter-Jensen provided medical
14   services between 2014 and the present, Dr. Leonard?
15        THE WITNESS:  No, he was not.
16        MR. NOVAK:  Bob, we didn't draft the
17   notice.
18        MR. BENNETT:  All right.
19        All right.
20   BY MR. BENNETT:
21        Q   How does MEnD train its employees to
22   distinguish the items listed on your suicide risk
23   screening form?
24        A   I need to unpackage that again a little
25   bit.  I'm sorry.
```

139

```
 1        Q   How do you tell them how to make it so it's
 2   a two or a four or a six or an eight or a ten?
 3        A   Again, they're given general training on
 4   the nature of that form, on -- on just general
 5   knowledge about that form.  They are not trained to
 6   become mental health professionals and try to
 7   decipher what they are able to garner from the
 8   patient.  That is done specifically during their
 9   initial training, and any other trainings along the
10   way where this particular issue comes up.
11        Q   Well, how is this form helpful if it's not
12   completed accurately?
13        A   Well, you hope that it's completed as
14   accurate as possible.  But you're also dealing with
15   patients and subjective information.  You're dealing
16   with a soft science.
17        So they used the information the best that
18   they can.  But it's, again, one piece in all the
19   number of things that we use.
20        Q   What do you do with the piece, if it's a --
21   how many over 36 do you get, for example?
22        A   It's not uncommon.  I wouldn't say it's
23   common.  I wouldn't say it's rare.  It -- it's --
24   occasionally they come up that high.  Just depends on
25   the individual patient and case.
```

140

```
 1        Q   Well, did -- what was the highest score in
 2   Brenner?  I know what the highest score in -- what
 3   was the highest score that Brenner received, do you
 4   remember?
 5        A   You know, I -- I don't recall if and when
 6   he would have gotten a screen of this nature.  And
 7   I'm a little uncomfortable answering questions about
 8   a case that's an active lawsuit.
 9        MR. NOVAK:  If you know, you know.
10        THE WITNESS:  I don't recall a number.
11   BY MR. BENNETT:
12        Q   Have you changed your training with regard
13   to the scoring of this form?
14        A   Of the suicide risk scoring form?
15        Q   Uh-huh.
16        A   I believe there's been more emphasis on
17   particular questions that have been brought up over
18   the years from our staff.  This is just one of them.
19   I don't recall the specifics on how it changed.  But
20   it has evolved a bit.
21        Q   But you can't tell me how?
22        A   I just don't remember the -- the exact
23   details of how they've changed.
24        I mean, one of the things that was changed
25   was, as you've already noticed, was how the form is
```

141

```
 1   used.  That we put an emphasis on documenting our
 2   reasoning for using the form.  We've now changed to
 3   where every inmate that receives a health assessment
 4   automatically gets a suicide risk screen.  So there's
 5   been some changes over the years on -- on training on
 6   it.
 7        We are also, actually, reviewing this table
 8   as part of our review of our policies and protocols
 9   this year as well.
10        Q   Did you find that this form was an
11   effective or an ineffective guide to the actual risk
12   of suicide?
13        A   I would say what we're trying to do is
14   anything we can do to make things more useful, more
15   meaningful.  So we're always looking to do that with
16   all of our forms and policies and protocols, so --
17   and this is -- this year is no different.
18        Q   Well, did you find this form to be an
19   effective tool against suicidality for your company?
20        A   I feel like it's -- again, in -- in its own
21   context of being one piece of what we do, yes.
22        Q   Does the psychiatrist ever do the training
23   on this form?
24        A   Does a psychiatrist --
25        Q   Yeah.
```

36 (Pages 138 to 141)

142

```
 1        A  -- ever do training?
 2        Q  Do you ever bring in a psychiatrist?
 3        A  To do training on this form, no.
 4        Q  Psychologist?
 5        A  I don't recall if Michael was a part of any
 6   of our training related to this or not.  I just don't
 7   recall.
 8        Q  Who determined the questions to be asked on
 9   this form?
10        A  In what context?  In the table?
11        Q  Yeah.
12        A  Yeah, this is what I was answering
13   previously.  We -- we got this information from
14   another source.  I just don't recall the source.
15   It's been quite some time.
16        Q  Did the source -- was the magic number 36
17   in the source?
18        A  Again, I answered this.  I don't recall if
19   36 was the number specifically or if we changed that
20   number to better suit what we were trying to
21   accomplish.  I just don't remember.
22        Q  Who determined what scores would be
23   assigned to what answers?  Is that just you copy the
24   form?  Is that the answer?
25        A  I think by and large, yes.  I just don't
```

143

```
 1   recall if we made any tweaks or changes.
 2        Q  Well, why would a suicide method of carbon
 3   monoxide or gas be worth six points, and hanging or
 4   jumping would be worth ten points, or a gun -- or
 5   eight points, and -- or a gun for ten points?
 6   What -- how -- why that scoring differential?
 7        A  You know, again, we got this information
 8   from other sources.  And I don't think that is as
 9   much of a clinical issue from this form.  For us it's
10   more of this is a screen to try and determine their
11   level of risk in conjunction with all the other tools
12   and things that we use.  So...
13        Q  Yeah, but I just don't -- I'm having
14   trouble figuring out what -- why the difference is,
15   and what clinical difference it would make.  Do you
16   know as a medical doctor?
17        A  I can't give you -- I can't give you
18   specifics on every -- the difference of every box and
19   why they were initially placed that way.
20        Q  So you copyrighted it, but you don't know
21   really what it means either?
22        A  I didn't copyright the table.  I
23   copyrighted a form that goes with this.
24        Q  Well, it's in the four corners of the
25   copyrighted material.  Right?
```

144

```
 1        A  I understand that.
 2        Q  So --
 3        A  Again, I'm not an attorney.  The idea was
 4   to copyright the form.  The table can be used by
 5   anybody who discovers it themselves.  But -- and the
 6   idea was to have just some reasonable screening
 7   answers and scoring in this that can allow us to --
 8   at least assist us, with all the other things that we
 9   do, in determining patients' health.
10        Q  What are the other things that you do,
11   then?
12        A  We do BDI.  We do health assessment.  We do
13   observations.  We get information from all our
14   sources that we can; whether it's correctional staff,
15   attorneys, family, collateral records.  We have our
16   own MHP assessments and clinic visits.  Our own
17   medical provider visits.  There's just a number of
18   things that we use.
19        Q  But this, you really can't tell me what
20   this form really means or what any numbers actually
21   signify?
22        A  That's not what I said at all.
23        Q  Well, can you?
24        A  Yeah.  What I can tell you is we use this
25   form as a screening tool to try to determine high
```

145

```
 1   level of risk, and it is taken into context with
 2   everything else that we do.
 3        Q  Why do the categories jump by two-point
 4   intervals?
 5        A  I don't know originally why that was.
 6        Q  Why did they on your copyrighted form?
 7        A  We -- we did not change that scoring
 8   system.  What we tried to do is instead, how can we
 9   take the information from this in the best way
10   possible.
11        Q  But you don't know where you copied it
12   from, is that what I'm -- that's kind of what I'm --
13        A  I don't recall.  It's -- it's been a
14   significant amount of time.
15        Q  Did it have anything to do with suicide
16   risk screening?
17        A  Well, certainly.  Yeah.  That's what --
18   that's what the whole context of the table is about.
19   So...
20        Q  Well, I mean --
21        A  I just don't recall the source.
22        Q  In its original state, did it have anything
23   to do with suicide risk?
24        A  Sure.  Yes.
25        Q  How do you know if you don't know where
```

Doby Professional Reporting, Inc.
952-943-1587

1   it's from?
2     **A  Because we didn't change much of the form,**
3 **and that was the whole idea of this, was to score**
4 **suicidality.**
5     Q  Who determines the intervention/follow-up
6   plan?
7     **A  In what context?**
8     Q  Well --
9     **A  Oh. Okay.**
10     Q  It says, "Intervention/follow-up plan."
11     **A  So this is just their area for them, if --**
12 **if they don't have electronic medical record, that**
13 **they can document what they did with this**
14 **information, any additional notes or information they**
15 **want to share, and if there does need to be a**
16 **particular follow-up plan, especially if it's a 36 or**
17 **higher.**
18     Q  Did you seek any outside involvement in
19   creating this form in Exhibit 20?
20     **A  I just don't recall.**
21     Q  How about the chemical withdrawal
22   questionnaire, Exhibit 23. Did -- again, that's
23   MEnD's copyrighted form.
24     **A  No. I -- I -- other than using information**
25 **that was already published, this was just doing a**

---

147

1   **mild tweak to their revised CIWA scoring.**
2     Q  What's CIWA?
3     **A  Oh, goodness. I knew you were going to ask**
4 **me that. CIWA. I don't remember the exact words**
5 **that go with those letters. Just everybody knows it**
6 **and I just use CIWA. And there's a revised CIWA, and**
7 **this is -- we took the revised CIWA and just**
8 **customized it slightly for our purposes.**
9     Q  So you tried to make it look like it was
10   yours? Took a form from somebody else and tried to
11   make it look like it was MEnD's?
12     **A  No. We just tried to tweak the form so it**
13 **would be more useful for us.**
14     Q  What did you do?
15     **A  Just changed a little bit of the scoring.**
16     Q  That's the "Flow Sheet - Chemical
17   Withdrawal" on this one.
18     You say you changed the scoring a little
19   bit. So it doesn't look like a complete knockoff?
20     **A  No.**
21     MR. NOVAK: Object to the form.
22   Argumentative.
23     Go ahead and answer, if you can.
24     **A  I -- I -- it's the same answer. We -- we**
25 **revised it slightly so it would be more useful for**

---

148

1   **us.**
2   BY MR. BENNETT:
3     Q  Did the one you -- does the CIWA form say
4   "contact medical M.D. for further orders"?
5     **A  I don't recall those specifics.**
6     Q  Only an M.D. can give orders, though.
7   Right?
8     **A  That's incorrect.**
9     Q  Okay.
10     **A  All medical providers can give orders.**
11     Q  Exhibit -- okay.
12     Is there a version two or three for the
13   chemical withdrawal questionnaire?
14     **A  I don't recall specific to that form. We**
15 **review these every year, so I just don't recall if we**
16 **made any substantive changes since the 2017.**
17     MR. BENNETT: Why don't we take a short
18   break.
19     VIDEOGRAPHER: Off the video record at
20   2:12 p.m.
21     (Recess taken from 2:12 to 2:20 p.m.)
22     VIDEOGRAPHER: This is file number five.
23   We're on the record at approximately 2:20 p.m.
24   BY MR. BENNETT:
25     Q  Is the Sherburne County contract, is that

---

149

1   up this year?
2     **A  I believe we have annual renewals unless**
3 **they request changes.**
4     Q  Are they requiring the accreditation, NCCHC
5   accreditation?
6     **A  No. We -- we recommended it. They already**
7 **have ACA accreditation, and then they have -- I**
8 **always forget the name of the accreditation for their**
9 **road deputies. So they want to get --**
10     Q  The patrol?
11     **A  Yeah.**
12     Q  Okay.
13     **A  So now they've agreed to work with us on**
14 **getting NCCHC accredited.**
15     Q  To do that you had to do those three
16   reviews under that review policy. Correct? Actual
17   written reviews?
18     **A  I'm sure that will be a part of it. It's**
19 **an "important" standard, but I'm -- I'm sure it will**
20 **be a part of it.**
21     Q  Well, what are they, "essential" and
22   "important," and --
23     **A  I don't think there's anything other than**
24 **"essential" and "important."**
25     Q  All right.

150

1      Do you do most of your advertising, either
2  would be on the website or in the booths at the
3  conferences?  Do you do any other print advertising?
4      A   No.  We just have our brochures and flyers
5  and -- I mean, vast majority of advertising is all
6  done at conferences.  And, obviously, individual
7  meetings after that.
8      Q   I asked you about consulting with the
9  NCCHC.  But you mentioned that you -- in your
10 deposition that -- I just want to be sure.  You --
11     A   I'm not formerly hired by them.
12     Q   Okay.
13     A   Just --
14     Q   And you're not in one of their voluntary
15 auditor positions?
16     A   No.
17     Q   Have they ever done an audit of any of your
18 facilities?
19     A   They will be.  In Sherburne.
20     Q   They have not done it before, though?
21     A   No.  You have to apply for accreditation to
22 have --
23     MR. BENNETT:  That's all the questions I
24 have.
25     MS. ANGOLKAR:  I have no questions.

151

1      MR. NOVAK:  We will read and sign.
2      VIDEOGRAPHER:  This concludes the video
3  deposition.  It is 2:26 p.m.
4      (The deposition of TODD LEONARD was
5  concluded at 2:26 p.m.)

152

1
2      REPORTER'S CERTIFICATE
3
4      I, Jane T. Doby, Registered Merit Reporter, a
   Notary Public in and for the County of Hennepin,
5  State of Minnesota, certify that the foregoing is
   a true record of the testimony given by TODD LEONARD,
6  who was first duly sworn by me, having been taken on
   October 28, 2019, at Gaskins, Bennett & Birrell, LLP,
7  333 South Seventh Street, Suite 3000, Minneapolis,
   Minnesota, in my presence and reduced to writing in
8  accordance with my stenographic and computerized notes
   made at said time and place;
9
       I further certify that I am not a
10 relative or employee or attorney or counsel of any
   of the parties or a relative or employee of such
11 attorney or counsel:
       That I am not financially interested in
12 the action and have no contract with the parties,
   attorneys, or persons with an interest in the
13 action that affects or has a substantial tendency
   to affect my impartiality:
14     That the cost of the original has been
   charged to the party who noticed the deposition,
15 and that all parties who ordered copies have been
   charged at the same rate for such copies:
16
       That the witness DID request an opportunity to
17 review the transcript.
18
       WITNESS MY HAND AND SEAL this 29th day of
19 October, 2019.
20
21
22
       _____
23     Jane T. Doby
       Registered Merit Reporter
24     Notary Public
       Hennepin County, Minnesota
25

153

1
2      E R R A T A  S H E E T
3      I, TODD LEONARD, certify that I have read and
4  examined the typewritten transcript of the deposition
5  taken of me in the matter of David W. Lynas, as Trustee
6  for the next-of-kin of James C. Lynas vs. LINDA S.
7  STANG, ET AL., on October 28, 2019, consisting of the
8  preceding pages, and find the same to be true and
9  correct.
10     (Except as follows:)
11                    Reason
   Page  Line  Correction        for Change
12 _____  _____  _____  _____  _____
13 _____  _____  _____  _____  _____
14 _____  _____  _____  _____  _____
15 _____  _____  _____  _____  _____
16 _____  _____  _____  _____  _____
17 _____  _____  _____  _____  _____
18 _____  _____  _____  _____  _____
19 _____  _____  _____  _____  _____
20 _____  _____  _____  _____  _____
21 _____  _____  _____  _____  _____
22
23 Dated this _____ day of _____
24                    _____
       TODD LEONARD
25

Doby Professional Reporting, Inc.
952-943-1587

154

1    EXAMINATION INDEX
2  By Mr. Bennett:  3-150
3  ----------------------------------------------
4    EXHIBIT INDEX
5  Exhibit 20:   Suicide risk screening forms
       reviewed            116,121,123,129
6
7  Exhibit 22:   Flow Sheets - Chemical Withdrawal form,
       7/6/17
       reviewed            130,146
8
9  Exhibit 23:   Chemical withdrawal questionnaire form,
       7/17
       reviewed            145
10
11  Exhibit 26:   Electronic charting forms
       reviewed            125
12  Exhibit 27:   MEnD Beck Depression Inventory form
       reviewed            118
13
14  Exhibit 52:   MEnD Correctional Care, PLLC Balance
       Sheet as of December 31, 2017
       marked/reviewed         5
15
16  Exhibit 53:   MEnD Correctional Care, PLLC Profit &
       Loss, January through December 2017
       marked/reviewed      5,7,14,69
17
18  Exhibit 54:   TL Clearwater Properties, LLC business
       record details
       marked/reviewed         12
19
20  Exhibit 55:   Dr. Todd Leonard Consulting, LLC
       business record details
       marked/reviewed         23
21
22  Exhibit 56:   Duluth New Tribune article, "The Doctor
       is in (Jail): Minnesota doc's company
       provides medical are to inmates in
       St. Louis, Douglas Counties."
23
24  marked/reviewed         25
25

156

1  Exhibit 69:   "Mental Health Appraisals &
       Evaluations," from Mend website
2  marked/reviewed         109
3  Exhibit 70:   Suicide status form
   marked/reviewed         123
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

155

1  Exhibit 57:   The MEnD Defendants Supplemental Answers
       to Plaintiff's Interrogatories
2  marked/reviewed      39,50,61
3  Exhibit 58:   Standards for Health Services in Jails,
       2014 - NCCHC
4  marked/reviewed      41,93
5  Exhibit 59:   MEnD press release, 11/23/2016, "Now
       Serving 37 County Facilities in MN, WI
       and IA"
6
7  marked/reviewed         53
8  Exhibit 60:   MEnD press release, 11/23/2016, "We Are
       Now Serving Story County, Iowa"
   marked/reviewed         53
9
10  Exhibit 61:   Map of participant counties
   marked/reviewed         56
11  Exhibit 62:   Answers to Plaintiff's First Set of
       Interrogatories to The MEnD Defendants
12  marked/reviewed         59
13  Exhibit 63:   MEnD All Counties (per answer to
       Interrogatory #3 signed on 2/11/19)
14  marked/reviewed         66
15  Exhibit 64:   MEnD Minnesota Counties November 2017
       (per 10/14/19 email from MEnD's counsel)
16  marked/reviewed         66
17  Exhibit 65:   "Inmate Commits Suicide at St. Louis Co.
       Jail"
18  marked/reviewed         84
19  Exhibit 66:   Olmsted Jail Inmate Death Ruled Suicide"
   marked/reviewed         85
20
21  Exhibit 67:   "Man jailed for drug-related robbery
       hangs himself"
   marked/reviewed         86
22
23  Exhibit 68:   Mille Lacs County jail in spotlight over
       suicides
   marked/reviewed         87
24
25

**A**

a.m 3:4,9 33:24 34:1 85:5 85:6,8
able 66:9 75:18 76:13 78:5 103:12 113:4 139:7
abnormal 123:16
absolutely 9:10 98:12 114:16 130:22
ACA 149:7
accept 71:1
acceptable 69:18 98:15 98:22
access 88:3
accomplish 142:21
Accounting 5:23
accreditation 34:24 43:21 149:4,5,7,8 150:21
accredited 34:13 35:8 43:19,24 149:14
accuracy 56:15 58:12 65:13
accurate 5:3 56:16 57:24 60:10,22 62:6 67:23 70:9 139:14
accurately 139:12
acquired 43:8
action 130:21 152:12,13
active 51:19 140:8
actively 122:15
actual 59:3,5 99:10,14 105:3 141:11 149:16
acute 122:9
add 69:21 70:18 135:5
added 64:17,18,20,25
addictive 112:16
addition 22:17,20 100:17
additional 49:2 69:10 146:14
additionally 69:11
addressed 122:12
adjunctive 75:7
administer 3:21
administered 3:23
administration 39:5 42:20 44:18 69:19 94:21
administrative 25:11 26:10 29:1,14 44:14,16 44:23 77:8 94:24 95:16 100:18 111:4
administrator 30:4 50:3 74:11
administrators 10:9
admitting 124:7
adult 50:19,20
advertise 10:5
advertising 9:25 10:3 150:1,3,5
affairs 5:3
affect 152:14
affixed 133:22
affordable 111:23
age 26:24
ago 38:18
agree 68:21 69:11,12 70:19,23,23 71:2 107:4 107:4 112:7,10,20,23,24 112:25 113:7,12 114:9 114:15 130:21
agreed 149:13
agreeing 70:24
agreement 18:10
agrees 69:20
ahead 42:17 109:6 133:16 147:23
Akin 59:21
al 1:7 153:7

alcohol 122:8
alert 125:20
alerted 89:22
all-around 48:13
all-inclusive 109:19
allow 68:2 144:7
allowed 66:24 131:3
altered 123:12
Alyssa 114:2 117:16 124:8 124:11
amenable 50:1
amount 7:23,25 8:3 14:6 17:1 19:23 66:10 76:14 133:4 145:14
amounts 16:11
Anderson 26:20,22
Andrea 117:14,15 121:23
Angolkar 2:8 3:16,16 150:25
angry 126:6
annoyed 120:19
annual 8:2 77:20 93:18 149:23
answer 16:19 20:7 34:17 34:20 40:8 42:17 46:19 50:17 52:2,9 53:3 57:3 57:24 58:5 60:21 61:2,3 61:12 68:7 70:4 79:16 83:23 86:17 88:1,15 93:5 96:4 103:11 104:4 109:8 123:2,2 127:24 133:15,16 134:7,8,9 135:18 142:24 147:23 147:24 155:13
answered 42:16 51:10,12 51:13,25 52:5,7 61:10 61:15 103:8,17 107:24 108:21 129:1,8 130:10 130:18 142:18
answering 65:9 140:7 142:12
answers 58:3,15 59:6 126:6 135:18 142:23 144:7 155:1,11
Anthony 2:12
anxiety 127:11
anybody 22:11,11 29:22 31:11 49:4 82:21 84:11 130:12 144:5
anymore 13:22 88:4
apart 108:18
apartment 16:2 23:16
apologize 90:7 127:2
apologizes 138:7
Apparently 96:3
appear 67:19 68:18
APPEARANCES 2:1
appearing 3:12
appears 23:14
appetite 121:4
apply 150:21
Appraisals 156:1
approach 93:12
appropriately 114:12 119:11
appropriateness 42:4 46:1 48:7
approve 30:1,4 68:4 111:6 111:10
approved 67:18,21,25 112:2,3
approving 130:24
approximately 3:9 17:9 24:3 38:5,8,12 75:24 77:15,17 92:21 105:16 148:23

approximation 92:14
area 71:23,24 114:21 146:11
areas 45:4 136:9
argue 128:20
Argumentative 48:5 147:22
arises 92:8
arresting 96:16,24
article 26:2 27:10,13,22 154:21
ascertain 42:5,24 103:12
ascertaining 119:10
aside 109:2
asked 33:13 42:15 49:8,12 57:14 78:14 103:8 108:21 127:6 130:10,18 133:10 142:8 150:8
asking 37:10 67:22 109:1
asks 46:8 51:3
aspects 94:13
asphyxiation 85:22
assess 135:12
assessment 45:2 123:17 141:3 144:12
assessments 144:16
assigned 92:7,9 142:23
assist 75:8 105:22 144:8
assistant 73:19
assistants 92:10,13 11:16
Association 10:10,25 133:5
assume 21:11 51:9 85:23 133:5
attempted 124:3
attend 8:5 10:10 11:14,18 12:1
attended 8:1
attends 11:23
attention 41:20
attorney 2:3,4,8,12 3:10 4:13 144:3 152:10,11
attorneys 4:15 144:15 152:13
audience 10:6
audit 110:13,13 150:17
auditor 150:15
August 87:21
auto 14:8
automatically 73:2 141:4
autopsy 48:11,18 81:16
availability 102:2
available 49:2 50:1 109:24
Avenue 2:10
average 65:17,20 66:3 67:2,18 68:9 73:23 105:19
averaged 105:7
avoided 45:23
aware 49:19 62:12 82:10 88:10 99:9

**B**

B-A-I-E-R 98:20
back 14:7 69:22 73:12 120:5 121:1
bad 117:20 118:1,7 119:6 120:14
Baier 86:14 98:20
balance 5:16 6:2 13:25 154:13
ball 136:14
banking 109:18,18
base 69:7,9,15,17,25 70:1
based 60:21 75:6 80:2

83:12 97:18 108:16 124:6 132:6
basic 112:15
basically 17:13 109:17
basis 92:5 93:18 124:6
Bates 127:17
Baxter-Jensen 63:10 88:8 97:4,23 138:13
Baxter-Jensen's 98:11
Baxter-Knutson 87:12 138:2
BDI 115:16,20,23 116:4,21 116:24 119:19 121:17 122:4 123:1,22 124:8,13 126:4 144:12
bearing 83:16
Beck 154:12
Becker 59:24,25 60:25 61:22 64:2
began 40:23 56:5 87:1
beginning 133:7
behalf 2:2,7,11 3:13 31:3 31:4 81:12
Behrendt 15:17
believe 12:20 33:3 44:3 58:5 62:25 72:8 79:8 80:23,23 81:8 84:16 86:19,23 87:14 89:22 90:3,3,21,22 92:14 101:1,10 102:13 104:3 114:10,16 126:18 128:13,14 140:16 149:2
bell 86:3,4
Beltrami 62:25 82:24 90:11
Bennett 1:16 2:3,5,18 3:12 3:12 4:6 5:13 12:17 20:9 23:10 25:20,23 26:1 33:15,20,23 34:2 39:15 39:23 40:1 41:3,16,18 43:2 48:9 50:12 53:11 54:3,23 55:6 56:11,21 56:24 57:1 58:13 59:10 59:14 60:9,12,15,18,24 64:1 67:9 68:3 74:17 78:14,18,21 84:24 85:2 85:10 86:10 87:20 88:23 89:13 91:9 92:15,22 103:10,14,19,20 106:9 107:23 108:1,12 109:1 109:15 110:18 114:5 121:13 124:20 126:15 126:18,20 127:20 130:11,23 133:19 134:1 134:6,10,11,16,19,23 135:6,7,11,17,23 136:1 136:12,19,23 137:3,4,11 138:18,20 140:11 148:2 148:17,24 150:23 152:6 154:2
Benton 57:11,15,18 61:23 64:12 102:2
best 5:1 39:7 44:3,7,8 72:18 78:7 80:13 118:23 119:9 126:9 139:17 145:9
Betinsky 2:4 3:14,14 114:4
better 13:13 97:8 123:24 142:20
beyond 103:3
big 65:16 78:19 94:19
billable 66:14
billed 18:12,13
billing 70:11
Birrell 1:16 2:5,18 152:6

bit 7:1 11:5 113:23 132:7 138:25 140:20 147:15 147:19
blame 120:13
Bloomington 2:10
blue 118:18
board 24:18 31:12,19,23 32:4 72:6 82:11
boards 30:16
Bob 33:21 50:10 103:16 127:18 135:14 138:16
booking 96:25
bookkeeping 109:14
booth 10:12
booths 150:2
bored 120:7
bottom 74:7
box 123:11 143:18
boxes 115:24
Brainerd 114:13
break 92:15 148:18
Brenner 62:22 80:15 96:7 104:2,5 140:2,3
bring 39:18 142:2
bringing 111:24
brings 96:16
brochures 150:4
brought 96:21,23 111:16 140:17
Bruce 26:19
bucks 137:25
budgetary 70:15
building 9:19 12:7,8 13:9
bulk 12:2 19:25
Bunker 63:3 80:18,19 82:5 82:25 83:4 96:9 104:12
Bunker's 81:9
business 5:2 12:18 21:2 23:11 26:5,9 30:20 106:18 154:17,20

**C**

C 1:4 3:1 153:6
calculate 76:14
Caleb 86:2 98:25
calendar 90:18
call 6:22 9:6 26:15 70:22 91:22 92:9 102:9 116:17
called 4:3
Calton 86:2 98:25
capable 28:13
capacities 67:18
capacity 66:20,22,23,24 67:21,25 68:1 108:22
carbon 143:2
care 1:12 3:3,6 4:8 7:2 8:1 8:9,18 9:6,18 11:17 19:16 20:16,17 26:6 27:24 28:4,13,19,20,23 29:7,13,16 31:4 32:21 34:13 37:15 42:4,25 43:13 44:2,5,7 45:3,5 46:2,12,22 47:10,17,25 48:2,8,14,24 53:20,24 66:5 77:12 79:12,18,25 84:14 85:14 89:1,3,17 89:25 95:13 97:3,10 98:9,10,15,22,23 99:9 100:17 101:21 108:25 109:11 111:19,21,24 112:19 113:2,2,3,5,15 115:9,15 131:18 138:11 154:13,15
Care's 5:16 41:25
cares 27:14
caring 28:5

**Carr** 78:8 79:6 80:5
**carry** 120:16
**case** 5:19 39:3 42:23 43:1 44:16 45:14 46:19 48:14 48:19,23 49:13 81:11,14 81:16,21,22 83:4 84:9 89:9 93:3 95:24,25 96:2 96:5,7,9,11,19 97:8,23 98:10,16 99:3 100:15 119:1,14 129:10 139:25 140:8
**cases** 95:25 97:11 99:8
**categories** 145:3
**cause** 46:11 73:5
**cell** 21:16,19,19 49:20
**cells** 49:24
**census** 65:17
**center** 50:19,20 64:20 65:4,19
**CentraCare** 97:20
**central** 47:3
**certain** 80:23
**certainly** 30:12 43:25 48:14 70:4,8 71:25 72:1 99:23 112:4 117:12 130:7,21 145:17
**certainty** 72:22 84:4 112:22
**CERTIFICATE** 152:2
**certifications** 11:12
**certified** 11:11 34:8,9 35:4 72:6 73:19,25
**certify** 152:5,9 153:3
**challenge** 111:18
**change** 68:6 93:14 94:9 96:19 122:4 124:5,5 145:7 146:2 153:11
**changed** 40:14 96:6 132:14 133:6 140:12,19 140:23,24 141:2 142:19 147:15,18
**changes** 42:5 45:15,18 46:21,25 47:11,24 74:8 81:25 95:20 141:5 143:1 148:16 149:3
**charge** 30:11 69:5,14,15
**charged** 152:15,16
**charting** 154:10
**CHD** 11:15
**check** 20:21 109:16
**checked** 115:24 123:11,17
**checkmarks** 116:1
**chemical** 132:4,5 146:21 147:16 148:13 154:6,8
**chief** 24:24 27:19 29:6,8 29:10,11 109:4
**chiefly** 27:23 28:3
**child** 27:2
**childhood** 26:15,25
**choices** 125:25
**choke** 85:24
**choose** 71:1
**chosen** 31:5,6
**chronic** 118:18 119:6 122:18
**chunk** 94:19
**circled** 57:23 59:22
**circles** 58:12
**circumstance** 74:15
**circumstances** 45:3 46:4 74:23
**Civ** 1:3
**Civil** 2:17
**CIWA** 132:6,7 147:1,2,4,6 147:6,7 148:3
**clarification** 49:4

**clarifying** 52:24 53:1
**clause** 73:5
**Clay** 64:20,22
**clean** 15:5
**cleaning** 15:3
**clear** 24:17
**Clearwater** 9:19,23 12:6 12:19 13:5,7,21 15:6,14 154:17
**client** 74:10 77:25
**clinic** 27:25 77:9 144:16
**clinical** 25:10 26:10 27:18 42:4 44:25 45:2,8,25 46:2,7 47:1 48:23 76:18 79:18,25 81:13,20 94:4 94:13 95:7,12,15,15 100:17 101:5,11 108:18 109:2 143:9,15
**clinically** 84:8
**close** 27:17 68:11 92:14 101:4
**closely** 11:10
**Cloud** 16:3 23:16 97:20
**Coherent** 125:25
**collaboration** 53:23
**collateral** 87:15 97:17 98:5 144:15
**collection** 119:21
**combination** 18:9
**come** 9:2 15:4 109:12,20 139:24
**comes** 19:13 123:1 139:10
**comfortable** 71:10
**coming** 65:15
**commander** 77:8 78:8,13 78:16 79:6
**commenced** 3:4
**Commission** 41:25
**commit** 80:22
**Commits** 155:17
**committed** 89:20 137:14 137:19,22
**committee** 110:13
**common** 139:23
**communicate** 70:16
**communicated** 47:5
**community** 35:19
**company** 5:6 11:18,23 13:11 15:3 21:14 22:8 22:12 27:14 29:15 97:16 100:18 115:12 141:19 154:22
**compare** 53:8
**complete** 48:23 62:4 65:13 147:19
**completed** 38:25 43:4 139:12,13
**computerized** 152:8
**concern** 39:4 83:10
**concerns** 42:25 47:25 48:7 70:17 83:11
**concluded** 151:5
**concludes** 151:2
**conditional** 82:10
**CONDON** 2:9
**conduct** 84:6
**conducted** 42:20 46:1 47:2 124:11
**conducting** 47:19
**conducts** 44:18
**conference** 8:2,5 10:9,17 10:21,24 11:15
**conferences** 10:4,7,10 11:1,6,14,19 110:16 150:3,6
**confused** 90:8

**conjunction** 143:11
**connect** 128:1
**connection** 138:10
**consider** 47:13 70:24 71:1 114:7,13 122:10 138:1,2
**considered** 113:19,20
**consistent** 57:5 58:20 127:22
**consisting** 153:7
**constituting** 115:9
**consult** 102:7 103:25 116:18 119:13
**consultation** 29:3 66:10 102:5 109:24
**consulted** 109:10 128:6
**consulting** 7:3 9:4,14 16:22 17:4,14 19:20,22 20:12 21:7 23:12,20 25:1 110:5,5,7,10 150:8 154:19
**contact** 132:11,18,22 133:8,9 148:4
**contacted** 132:16 133:10
**context** 27:20,21 51:25 61:16 69:1 74:25 100:4 101:20 104:22 132:25 136:8 141:21 142:10 145:1,18 146:7
**contexts** 118:5
**continues** 111:17
**Continuing** 11:8
**contract** 28:20 30:22 31:23 32:11 33:2 51:7 51:16 56:7 57:15 60:25 64:22,25 65:2,3,14 69:3 69:4,7,8,15,25 70:13 77:20 148:25 152:12
**contracted** 35:7 53:5,7 56:13 57:6,14 58:1
**Contracting** 15:18
**contracts** 7:16,19 8:14,16 31:8 50:23,25 51:3,9,20 59:3,5 61:7 64:2 68:24 71:5 72:1,25 73:5 74:6 77:15
**contribute** 42:21
**control** 18:10
**controlled** 9:12
**conversation** 129:17,23 129:25 133:1 135:15
**conversations** 50:2 110:15 130:16
**convey** 47:23
**copied** 145:11
**copiers** 14:16
**copies** 152:16,16
**coping** 127:7,8
**copy** 39:18 142:23
**copyright** 124:24 143:22 144:4
**copyrighted** 117:6,7 130:9 143:20,23,25 145:6 146:23
**corners** 143:24
**corporate** 6:6,9,13,15 9:17 11:25 12:3 14:17 14:19,25 15:22 25:21 29:4 47:3,18 75:6
**corporation** 4:23,24 5:4 12:23 15:23
**correct** 4:24 5:23 6:1,4,14 6:19,21 8:15,17 12:13 12:24 13:1,24 14:3,11 15:15 16:6 18:6,17 19:4 19:10,13 20:4,13 21:6 22:18,21 23:13,19 24:6

24:9,11 25:5,8 26:6 27:4 28:11 31:1 32:24,25 34:8,18,19,23 35:2,9 36:4,17 37:2 40:19 44:22,24 45:1,7 46:5 48:20 50:7 52:6 53:17 53:18,22 55:8,22,23 56:13 59:17 62:13 63:4 64:3,4,6,8,10,24 65:23 65:24 66:20 67:4,13 69:5,6 72:5 73:22 74:2,7 76:6,10 77:16 79:12,23 80:12 81:6 82:25 83:2 83:18 85:16,21,22 86:6 87:23 89:16 91:24 92:1 100:18,22 102:16 103:6 106:23 110:23 115:22 116:18 117:7,15 118:14 123:21 149:16 153:9
**corrected** 61:16 94:18
**correction** 59:1 60:4 153:11
**correctional** 1:12 3:3,6 4:7 5:16 7:2 8:1,18 9:6 9:18 11:17 19:16 20:16 20:17 26:6 29:16 31:4 32:21 34:13 41:25 43:13 44:2,4,7 53:20 67:1 73:16 83:13 85:14 89:3 89:17,25 96:18 101:21 108:25 116:2 144:14 154:13,15
**corrections** 66:25
**correctly** 65:10
**cost** 73:14 152:15
**counsel** 5:10 12:15 23:8 25:19 31:10 33:11 41:2 54:1 58:10 59:12 60:6 63:25 67:6 84:21 86:8 87:18 88:21 89:11 91:8 106:8 152:10,11 155:15
**count** 50:16 52:21,21
**counted** 51:10
**counties** 7:17,22 8:13 27:7 35:7 50:6,8,16,18 50:21 51:4,15 52:20,21 52:22 53:4 54:11,15 56:12,17 57:6,23 60:14 61:18 64:16 65:7 68:15 68:24 70:12 71:16 101:2 101:6,8,12 102:20 154:23 155:9,13,15
**county** 2:7 3:17 26:17 27:14 30:15,22 31:12,19 31:22 32:4,11 34:16 38:6 42:18 43:4 44:17 49:17 51:7,8,16,17 53:19,20 54:6,16,16,24 55:8,21 56:14,14 57:21 58:1 59:21 60:15 61:1 61:23 62:25 63:17,22 64:3,5,12,21 65:15 66:19,19 69:11,19 71:6 73:9 73:13 74:10 76:1,2,3 76:7,7,8,9,25 77:1,2,5 78:4 79:11,17,25 83:22 84:14 85:15 86:25 87:5 87:22 88:4,6,18 89:20 90:11,23 91:13 95:9 97:12,13,19,22,24 98:21 98:25 101:9,10,23,24 102:3,7 103:24,25 105:14 106:11 107:7 111:18,24 116:7 148:25 152:4,24 155:5,8,22
**county's** 32:13

**couple** 53:4 103:9 105:7 134:12
**course** 19:12 103:9 130:21 137:21
**court** 1:1 3:21 12:9 15:13 15:20,24 22:16
**cover** 25:17 134:4
**coverage** 79:14
**covered** 62:23 109:5 133:24 136:8
**crazy** 127:12
**create** 56:22 71:8,8,13
**created** 71:10 125:1,4
**creating** 146:19
**credential** 36:12 72:14
**credentialing** 33:3,9 37:24 38:2 73:22
**credentials** 36:19 37:13 106:1
**credit** 97:9
**Croix** 65:15
**cross** 79:13
**cross-reference** 58:11
**Crow** 62:21 71:20 89:19 89:23 91:4
**cry** 120:17
**currently** 65:21 75:3 127:7
**custom** 113:1
**customer** 109:8
**customers** 22:25
**customize** 108:7 129:19
**customized** 91:21 130:3 132:7 147:8

---

**D**

**D** 3:1
**D.O** 72:9
**D.O.'s** 72:15
**daily** 67:2,19 68:9
**Dakota** 50:19 71:20 86:25
**damage** 87:15 97:17 98:6
**Danielle** 82:20
**data** 39:12 40:11,22,24 41:4,5 68:14
**date** 3:8 40:4 53:17 54:14 63:18 128:14
**Dated** 153:23
**dates** 124:1
**David** 1:4 2:2 153:5
**day** 76:19,25 77:2 104:16 104:23 105:4,8,16 106:21 108:9,20 119:24 122:2 123:18 126:10,12 126:15,17 128:7,14 129:2 152:19 153:23
**day-by-day** 124:6
**day-in/day-out** 5:2
**day-to-day** 28:13
**days** 38:12 65:15 103:9 105:18,19,20 106:18,18 106:18,20 124:3
**deal** 31:8 112:17 120:20 136:2
**dealing** 139:14,15
**death** 39:12 40:11,22 41:6 41:11 42:1,19,20 44:18 45:4 46:4,9,11,16 48:18 48:18 62:25 81:10 82:5 82:8 84:7 86:13 90:9,11 94:14 99:15 155:19
**deaths** 40:21,24 42:3 45:23 46:12 62:11,13,15 94:12
**decades** 111:15
**December** 5:17,25 154:14 154:16

decide 51:6 130:17
decider 130:4
decipher 139:7
decision 49:15 69:20
82:19 118:16,16 130:8
130:12
decisions 130:16
decreased 77:18
deem 95:11
deemed 69:18 84:11
defendant 138:10
defendants 1:8 2:7,11
3:17 155:1,11
defense 16:8
definitely 127:9,10
definition 34:4
degree 30:24 31:20
105:22
degrees 14:23 38:19
delineate 45:16
deliver 43:10
delivered 2:18
delusional 126:3
department 66:25 69:19
96:13
depend 69:1 74:15,22
Depended 38:20
depending 68:6 108:7
depends 10:21 30:19
32:13 71:6,9 91:14,14
118:2 122:14 139:24
deposition 1:10 3:2,6 9:6
25:18,22 44:1 56:17
78:15 108:23,24 150:10
151:3,4 152:15 153:4
deposits 17:7,8
depressed 126:5 127:9,10
depressed/angry 126:2
depression 117:20 118:1
118:8,9,18,19,20 119:6
119:7,8 122:18,18,19
123:23 154:12
deputies 149:9
derived 7:21 8:13 68:14
describe 22:5
described 95:6
describing 94:20
deserve 114:23
designate 136:22
Designee 1:13 3:4
despite 35:3 114:18
detail 12:19 24:16 35:2
98:16
details 23:12 99:2 117:12
140:23 154:18,20
determination 119:3,4
129:11
determine 42:4 46:1 88:3
107:21 108:10,14
143:10 144:25
determined 46:24 108:16
128:16 129:13,24 142:8
142:22
determines 146:5
determining 79:24 144:9
developed 117:8 132:4
devoted 16:7
diagnosed 118:8
difference 52:8,12 117:19
117:24 119:3 122:17
131:12 143:14,15,18
different 20:25 51:25
72:13 111:20 122:24
123:4 141:17
differential 143:6
differently 51:17,18 123:2

123:3
difficult 67:24 93:4 111:18
direct 6:25 8:9 27:24 28:4
29:7 41:19 66:4 75:6
77:11 102:1 109:11
directly 8:19 9:3 20:1
35:14 80:9 97:3 109:23
director 21:18,23,23 24:18
24:21,21,21 31:15 32:17
32:18,19 38:18 43:7,11
82:19,20 87:3 89:22
105:23,24 116:3
director-level 11:25
directors 11:24 14:22
21:14,21,22 22:9 24:19
24:20,22 111:4
directors' 21:19
disagree 112:5
disclosure 118:2
discovered 129:18
discovers 144:5
discovery 60:7
discretion 43:23 107:22
discuss 74:9
discussed 31:23 43:6
94:4 99:8 123:24 128:24
129:7
discussion 49:23 66:10
109:24 110:15
disgusted 120:12
disorder 112:16
disregarded 17:2,12 21:1
21:8
dissatisfied 120:7
distinguish 138:22
distressed 126:5
distressed/hurtful 126:1
DISTRICT 1:1,1
division 11:15
Doby 1:22,23 152:4,22
DobyReporting.com 1:23
DOC 68:2,4,15 83:3,11
doc's 154:22
doctor 24:6,10 30:5 72:10
72:12,13,20 74:12
102:20,25 104:19 105:3
108:4 109:3 132:11
133:5 143:16 154:21
doctors 73:14
document 45:11 46:15
71:7,8,10,14 133:22
146:13
documentation 4:16
40:22 96:15
documenting 97:9 141:1
documents 133:11
doing 27:12 76:18 93:22
94:16 97:8 121:15 126:7
146:25
dollar 16:11
Dose 101:11
Douglas 76:1,7,8,24 77:1
90:22 154:23
Dr 3:7 4:7 7:2 9:3,14 16:21
17:4,13,17 18:1 19:19
19:22 20:11 21:7 23:12
24:25 28:6,18 29:19
49:5 65:23,25 72:6 75:4
100:23 138:14 154:19
draft 138:16
draw 7:3
drive 6:12
driven 45:19
driver 6:5

drug-related 155:20
drugs 122:8
Duluth 25:4 154:21
duly 4:3 152:6
duties 29:14 79:9 100:17
100:18,19
duty 112:12
dwindle 111:17
Dylan 80:15
dynamic 77:24
dynamics 30:19

**E**

E 2:4 3:1,1 153:2,2,2
earlier 20:19 46:10 81:17
81:24 102:23 121:1
Early 57:17
earnest 56:5
easily 121:2
East 2:14
education 11:8,17 37:13
37:24 38:2 133:4
educational 11:20 33:8
effective 111:23 141:11
141:19
effectiveness 46:2
effort 30:9 32:17 115:11
130:6
eight 14:21 37:22 75:24
92:13 105:16 106:21
118:18,19 119:6,7 139:2
143:5
either 13:19 14:1 22:12
35:12 70:23 86:17 92:24
92:24 102:13 107:6,9
119:11 136:15 143:21
150:1
either/or 121:19
electronic 136:3,7,10
146:12 154:10
electronically 133:21
elicit 118:11
email 155:15
emailed 39:20,21
eMD 135:8
eMDs 133:20 134:14
136:2
emergency 22:25
emphasis 140:16 141:1
employ 33:1 35:12,14,16
92:12
employed 18:16 35:23,24
36:16 37:12 38:5 113:19
employee 152:10,10
employees 11:11 23:21
24:15 111:19 138:21
encompass 64:15 81:18
81:19
encompassing 51:16
endeavor 29:4
ended 97:17
Ensign 2:10
ensure 4:15 56:15 57:25
58:12 67:14 112:17
114:21
ensuring 5:7
entire 13:17 28:22 100:20
119:21
entirely 111:20
entities 9:12
entity 12:25 17:2,12 21:1
21:8
Envision 2:16
equipment 14:12,14,15
equipped 68:7
equity 6:17,21

equivalent 78:1
erroneous 98:19
especially 146:16
essence 129:19
essential 43:22 149:21,24
essentially 69:7 70:12
74:6
estimate 27:16
estimated 27:13
et 1:7 153:7
evaluate 37:14
evaluation 118:22 126:8
evaluations 131:15 156:1
event 7:5 41:11 42:1
events 98:17
Evergreen 13:11,12,21
14:2 15:11
everybody 115:6 147:5
everybody's 20:21
evidence 44:13
evolved 140:20
exact 14:6 16:11 63:18
71:15 75:18 76:13 84:15
87:2 123:25 137:6,14,22
140:22 147:4
exactly 8:25 10:13,15
12:10 26:11,18 28:2
29:20 39:22 45:7 46:6
69:16 82:8 112:9 132:21
EXAMINATION 4:5 154:1
examined 4:4 153:4
example 103:14 116 19:5
108:20 117:19 139:21
exception 103:25
excuse 11:7 23:20 44:21
54:12 121:4 123:9
exercise 62:5
exhibit 2:20 5:14,24 6:2
7:10 12:16,18 23:9
25:25 27:22 39:25 40:2
41:17,19 50:5 53:10,12
54:2 56:10,12 59:13
62:8 67:10,11 85:9,12
86:5,9,11 87:19,21
88:22 89:12 95:4 110:17
110:19 115:10 117:3
123:8,10 124:19,21
125:7 126:21 127:17
131:6 132:1 146:19,22
148:11 154:4,5,6,8,10
154:12,13,15,17,19,21
155:1,3,5,7,9,11,13,15
155:17,19,20,22 156:1,3
exhibited 98:10
exhibitor 11:2
exhibits 5:11 33:17 57:5
67:7
existed 5:20
expand 69:12
expanded 53:24 61:12
expect 72:21,24 73:15
95:5 99:22 106:11 107:2
107:15,20 116:2,3,8,11
116:15,23 117:14,18,25
118:15 131:11,13,14
expectation 106:14
117:23
expectations 107:1
expected 116:13 129:10
expense 9:18 10:1 13:16
13:17 15:2 21:11,16,25
22:1,5
expenses 9:12 22:7,8
experience 37:14 62:16
111:20
experienced 113:14

expert 7:24
expertise 83:19
explain 42:12 60:3,16 95:8
122:22 134:21
explains 40:12
extent 31:9 118:14
extra 69:5,5 112:16
extremely 68:11 111:18
113:14

**F**

face-to-face 80:9
facilities 28:9 50:18,21
54:7,25 60:14 62:11
67:25 76:5 77:3 91:10
101:22 111:17 150:18
155:5
facility 13:14 28:4 39:12
40:10 42:19 43:19 65:16
66:23 68:1 80:2 94:6
104:6
facility's 46:3
fact 30:4 35:3 70:11
factor 79:24
factors 108:7
failures 120:6
fair 68:23
fall 62:23 80:6
falls 134:20,22,24
familiar 41:13 87:24
far 43:23 135:3
fax 14:16,16
fearful 126:5
federal 17:7
fee 20:11
fee-for-service 7:15 8:9
8:13 69:23
feedback 94:22 95:10
feel 51:6 60:22 70:17
120:3,9,11 141:20
feeling 117:19 118:1,7,17
119:5 127:10,10
fees 16:4,7,20
felt 35:19 47:11,18,22 93:5
98:1 129:20
female 83:25
figure 25:23 103:13
figures 67:3,19
figuring 143:14
file 33:25 85:7 92:20
148:22
filings 12:20
fill 131:3
filled 127:23,24
filler-outers 117:18
final 93:24
financially 152:12
find 19:7 45:15 46:20
47:10 59:21 83:7 93:2,9
96:6 97:5 98:14,21
121:21,21 123:3 141:10
141:18 153:8
finding 47:23
findings 83:3
fine 6:22 9:8 39:16 60:5
93:6 100:8
finish 18:2
firing 109:21
first 4:3 45:21 52:8,9,13
53:3 54:5 55:21 67:10
94:19 108:3 109:20
118:21 123:9 126:25
134:9 135:17 152:6
155:11

fit 95:11
five 14:1 23:25 46:17
　105:17,19 148:22
fixed 68:25 69:15
fixed-price 69:8 70:12
flat 18:10
float 22:11
floated 135:21
flow 7:1 21:1 131:22 132:5
　132:5 147:16 154:6
fluctuates 65:20 66:3
flyers 150:4
focus 95:12
focused 97:7
focuses 94:13
follow 41:11 42:14 43:17
　43:23 44:11 94:14
follow-up 146:16
followed 42:10 43:14
　114:11
following 51:2,4 52:11
　76:21 115:24
follows 3:4 4:4 153:10
for-profit 89:2
foregoing 152:5
forget 149:8
forgot 127:2
form 42:15 48:4 55:5
　74:14 98:8 107:18 108:5
　117:6,7,8,12,17,22
　123:20 124:21,23,25
　125:1,4 127:22 128:10
　129:14 130:9 131:4,5,7
　133:3,13 138:23 139:4,5
　139:11 140:13,14,25
　141:2,10,18,23 142:3,9
　142:24 143:9,23 144:4
　144:20,25 145:6 146:2
　146:19,23 147:10,12,21
　148:3,14 154:6,8,12
　156:3
formal 100:14
formation 30:21 100:21
formed 23:21
formerly 150:11
forms 125:19 141:16
formulated 82:1
forth 41:24
forward 47:12 135:16,19
　127:19,19 129:18
found 44:4 94:17 96:12
　127:19,19 129:18
four 52:12 62:13 78:9,23
　79:1,8 92:20 124:3
　139:2 143:24
Frank 80:6
free 60:22
frequency 107:21 108:10
frequently 70:16 93:17
friend 26:16,19,25 27:1
frivolous 137:20,24 138:1
　138:3
front 58:23 105:16
FTE 38:7
full 19:17 56:9 75:4 91:11
　91:13
full- 24:3
full-time 24:5 32:23 33:5
　35:12 72:20 91:17,20
fully 129:10
functions 83:13
fund 17:5
funds 16:21 17:3,22
further 42:7 132:11,18
　148:4 152:9
future 101:16 120:3

**G**

G 3:1
game 135:3
gap 78:19
garaged 6:8,10
garner 122:6 139:7
garnering 122:24,25
gas 143:3
Gaskins 1:16 2:5,18 152:6
gathering 45:14
general 69:3 112:21 115:6
　116:25 139:3,4
generally 46:7 68:24 73:2
　83:12
generated 5:21 7:19
Geoffrey 81:4
germane 10:4
getting 11:10 90:8 117:10
　126:9 127:21 149:14
give 5:19 36:22 57:24 58:2
　61:6 62:18 70:3,12,14
　71:15 75:18 76:13 98:18
　119:16,17 143:17,17
　148:6,10
given 75:11,12 79:9 105:3
　105:4 106:10 108:20
　119:24 124:3 126:6
　128:10 139:3 152:5
gives 29:16
giving 29:24
go 7:12 9:3 16:21 32:20
　39:8 42:17 44:7,8 54:4
　56:14 57:25 59:19,19
　61:14 64:18 68:10 73:18
　74:20 76:24 77:9 78:22
　79:5,11,17 109:6 111:22
　118:4 121:10 126:23
　128:2 133:16 135:16
　147:5,23
goes 21:3 100:16 111:6
　113:3 119:18,19 130:8
　135:18 143:23
going 7:12 9:6 33:14 43:6
　45:16 58:20 69:22 84:22
　85:23 97:19 99:21
　119:16,17 122:19
　127:12 128:17 129:12
　134:16 135:16 147:3
good 33:22 98:11
goodness 105:5 147:3
gotta 61:8
gotten 140:6
grade 116:17
grates 49:16,20
great 54:6 120:20
greater 123:22
greatly 65:20
ground 22:19
grounds 15:9,11
group 47:4 103:1 130:6
grown 26:16
guess 4:12 5:1 6:20 13:13
　51:6 57:4 69:1 70:8
　76:14 78:7 93:4,11 95:7
　97:15 104:4 106:14,17
　112:6,10
guesstimating 105:15
guestimate 66:4
guide 141:11
guilty 120:4
gun 143:4,5

**H**

H 153:2
half 13:15 27:14

halfway 9:16
hand 119:19,19,19,19
　152:19
handle 111:19
handled 46:22 112:18
handles 32:15
Hang 133:23 134:15
　135:10
hanging 62:16 63:7,9,12
　80:24 84:2,3 85:21,23
　86:14 88:25 90:4 91:5
　124:4 143:3
hangs 155:21
happen 111:9 118:24
　125:18 130:24
happened 128:9
happens 120:14
happy 41:16 97:25
hard 120:24 121:6 127:4
Hardin 101:24
harm 112:14
hat 110:1
head 23:23 66:17 71:18
　72:3 108:19 109:13
health 11:17 21:22 24:20
　32:19 33:6 34:4,5 35:11
　36:6,11 37:15,18,23,25
　38:3,11,17,18 41:12,25
　44:2,4,7 49:25 84:14
　87:4 89:25 94:7,10 97:3
　99:18,20 105:21,23,24
　107:6,10 111:15,17,19
　111:20,24 112:13,15
　113:2,3,14,21 114:8,14
　114:17 115:5,9,15
　116:19 121:19 123:6,16
　124:17 126:8 128:16
　131:14,15,18 135:13
　138:11 139:6 141:3
　144:9,12 155:3 156:1
healthy 113:6
heightened 99:18,24
held 10:9
hello 77:10
help 122:6
helpful 42:22 125:16
Hennepin 152:4,24
hide 136:14
hierarchy 73:21,22
high 139:24 144:25
higher 119:12 132:10
　146:17
highest 140:1,2,3
highly 104:13 111:23
hire 74:5 82:3,22 103:22
hired 74:12 75:2 82:9,15
　150:11
hires 74:9
hiring 74:25 109:21
history 126:23
Hogan 2:16
hold 36:22 37:20 66:24,25
　68:2
Holscher 88:25 89:7 96:11
home 6:10,12 23:18 74:19
　74:20
Honestly 127:7
hope 139:13
hopeless 120:4
hopelessness 118:20
　119:8 122:19 79:20
hospital 97:20
host 29:2
hotel 22:13
hour 18:14

hourly 18:7,12,13
hours 19:11,15,20,24 20:2
　25:19 65:25 66:4,14
　120:25
housing 49:24
HR 32:17 82:20
Hubbard 78:3
human 21:23
Hundred 4:22
hung 87:22 99:13
hunkey-dory 83:6
hypothetical 107:19 108:5

**I**

IA 155:6
idea 55:18 56:19 60:6
　117:1 144:3,6 146:3
identification 2:20 5:12
　12:16 23:9 25:25 39:25
　41:17 53:10 54:2 56:10
　59:13 67:8 85:9 86:9
　87:19 88:22 89:12
　110:17 124:19
identify 5:15 42:6 45:4
　112:17
identifying 125:16
Illinois 55:24 101:14
　102:12
illness 122:9,11 126:24
imagine 73:17
immediately 119:13
impartiality 152:14
implement 115:13
implementation 56:9
importance 116:4
important 41:21 43:22
　117:1 119:15 149:19,22
　149:24
imposition 82:10
improve 46:12 118:25
　120:4
improved 45:6 46:9 66:20
improving 96:14
in-custody 40:23
in-house 35:20
inaccuracy 53:2 60:17
inaccurate 53:3 54:18
incarcerated 104:6
incarceration 99:23
incident 9:1 94:5
include 99:19 106:18,19
included 11:22 48:16
　86:17
includes 20:19,22 94:5
income 7:15,15 8:6,9,11
　8:13 17:6 22:22,23,24
　69:23 77:20
incomplete 107:18 108:5
incorrect 57:8,9 61:22,23
　84:18 148:8
incorrectly 61:10
increased 16:24 18:15
　65:25 77:18,19
increasingly 111:16
independent 46:11
independently 106:4
INDEX 154:1,4
indicated 115:9
indicates 117:5 123:23
Indication 125:12
indirectly 35:16 43:6
individual 25:18 99:22
　116:8 139:25 150:6
individually 8:22
individuals 111:15 113:18
industry 73:7,11

ineffective 141:11
information 39:11 40:10
　42:21 43:7,8 45:14
　60:11 84:12 86:12 95:10
　96:17,20,21,21,23 98:19
　117:10 118:23,25
　119:10,20,21 122:6,25
　123:4,5,14 125:2,3,15
　128:4 130:2 139:15,17
　142:13 143:7 144:13
　145:9 146:14,14,24
initial 139:9
initially 143:19
initiate 115:12
initiated 77:25
inmate 41:11 42:1 67:2,19
　94:8 96:16 100:1 104:15
　104:23 113:6 118:5
　141:3 155:17,19
inmate's 100:3
inmates 27:15 28:20,23
　75:10 89:24 99:13 107:5
　107:9 111:25 114:22
　138:11 154:22
inmates' 135:12
input 43:5 48:25 82:22
　94:22 95:10
inquiry 134:9
insomnia 127:12
instances 69:14
institution 74:21
institutions 75:25
instructing 134:7
insurance 14:8
insurer 97:24
intent 45:22
interest 102:22 152:13
interested 152:12
interface 32:15,16
Internet 85:12
Internet-based 109:17
Interrogatories 58:15
　155:1,11
interrogatory 40:8 50:13
　51:11 57:3 67:11,12,13
　85:19 88:1 155:13
intervals 145:1
intervention 46:10
intervention/follow-up
　146:5,10
intoxicated/hallucinating
　126:1
Inventory 154:12
investigation 42:20,22
　44:19 84:6 95:9 96:13
　100:12
invoice 22:24 23:2
involve 7:19
involved 30:21,23,23 31:9
　31:10,10,17,18 47:2,6
　47:14,17 48:24 49:15,23
　52:17 63:9 77:11 92:24
　94:7 137:13
involvement 10:3,22 11:6
　14:23 31:20 43:3 82:21
　109:8,9,22 111:5 146:18
involving 88:11 89:24
　94:8 100:8
Iowa 11:4 53:19 54:8,11
　54:16 55:1,2,22 61:23
　64:12 100:24,25 102:8,8
　155:8
irritated 120:20
Island 55:25 56:1,2 57:11
　61:25 64:7
ISSDA 11:4

issue 50:4 92:8 122:11,21
  139:10 143:9
issues 42:6,24 45:15
  47:10,23 70:17 83:18
  87:16 98:7 111:15
item 17:6
items 138:22
IVERSON 2:9

**J**

J 2:12
J-A-10 41:21 43:13
Jackson 53:7 61:25 64:9
jail 10:8 27:14 28:1 30:22
  34:16 39:5 42:19 44:17
  44:18 49:17 50:3 69:19
  74:10,21 77:8,8 88:6
  91:13,14,15,23 94:21
  96:17,24 97:21 101:22
  104:25 105:1 111:16,24
  112:12,18 154:22
  155:17,19,22
jail's 89:2 91:19
jailed 155:20
jails 27:7 34:6,12 41:12
  66:19 92:7 101:23 105:2
  155:3
Jakel 87:21 88:9,11 98:14
James 1:4 46:16 48:19
  80:12 82:20 153:6
Jane 1:22 152:4,22
janitorial 15:2
January 5:25 56:6,9 77:25
  86:23 154:16
Jarod 87:21 88:9,11
Jayme 2:16
Jeanne 113:24
Jeez 99:4
Jennie 114:1,2 117:16
  123:15
Jerod 98:14
job 97:8
join 21:14
JRT/KMM 1:3
July 13:6,8,19 82:6
jump 145:3
jumping 143:4
June 13:8,19 86:13
juvenile 50:19,20 64:20
  65:4,18

**K**

K-E-I 81:3
keep 39:1 41:4 62:10
  113:6 123:7
keeping 93:16
Keilwitz 81:1,3 82:3,15
key 46:8
killing 120:14,15
kind 7:12 10:7 20:14 73:20
  98:18 119:16,17 121:21
  121:21 130:20 145:12
kinds 44:20
KING 2:13
kit 22:25
knew 49:21 147:3
knockoff 140:14
know 5:5 18:7 24:13 26:24
  26:24 28:3 32:6,22
  33:18,18 36:9,14,18,21
  37:3,8 47:16 53:9 58:8
  59:8 62:4,18 65:6 66:21
  67:21 68:16 69:3 70:3
  70:22 72:17 73:11,19
  77:20,25 78:24,24 79:2

79:3,15 81:19 82:4,7,8
  82:15 88:8,14,15 90:18
  97:23 101:9 103:11
  104:4,9 106:17 107:12
  112:9 113:18,24 114:25
  116:23 117:2 118:1
  119:3,25 121:9,16
  122:10,17 123:25
  124:16 126:12 130:4
  131:11,24 132:17 133:8
  136:19,24 140:2,5,9,9
  143:7,16,20 145:5,11,25
  145:25
knowledgable 134:25
knowledge 72:18 117:24
  118:25 131:13 139:5
knows 147:5
Kretsch 114:4,6 117:14,15
  121:25
Kruchten 12:9 15:13,19
  15:24 22:16

**L**

L.P.N.s 74:3
Lacina 82:20
lack 13:13
Lacs 88:18 89:14 155:22
laid 38:17
land 9:10
large 9:2 10:2 11:13 70:6
  70:9,9,14 142:25
LARSON 2:13
late 56:2
latest 53:20
law 2:3,4,8,12 5:4 37:14
lawsuit 16:8 88:11,13,14
  137:24 138:6 140:8
lawsuits 16:18 134:24,25
  137:13,20 138:9
lawyers 32:16
LBCC 36:12
leadership 11:18,22
  109:10 115:12
leading 45:3
leaves 136:25
led 44:17 98:17
legal 16:4,7 31:10 32:16
Leonard 1:13 3:3,7 4:2,7
  7:2 9:4,14 16:22 17:4,13
  19:19,22 20:11 21:7
  23:12 24:25 138:14
  151:4 152:5 153:3,24
  154:19
let's 9:5 53:12 59:19 60:2
  93:15
letter 43:18
letters 133:6 147:5
level 10:21 35:1 116:16
  129:13 143:11 145:1
liability 15:23 113:6
  131:17 133:12
license 82:11,13
licensed 28:12 29:23
  102:10,12,17 106:3,4
licensing 37:24
licensure 5:8 36:10
life 120:5
lifetime 32:8
limited 15:22
Linda 1:7 106:6 153:6
line 14:13 73:18 74:7
  128:2,2 132:16,24
  133:10 135:16 153:11
lines 132:17
list 57:6 61:9 62:4 92:25
  109:19 136:16 137:1

listed 9:11 87:25 125:20
  138:22
listing 86:12
lists 6:2
literally 14:14 118:4
  122:23
little 11:5 138:24 140:7
  147:15,18
lives 101:1
LLC 4:11 9:19,21 12:6,12
  12:19 21:9 23:12 154:17
  154:19
LLCP 4:8
LLP 1:16 2:5,13,19 152:6
LMFT 36:13 106:1
local 111:23
location 9:17 15:11
logo 110:22
long 35:4
look 43:12 48:13 49:1
  51:16,17,18 58:24 59:2
  59:5 60:25 61:6 67:14
  67:16 93:12 115:4,5,16
  117:3 120:15 123:9
  126:21 137:16 147:9,11
  147:19
looked 51:10 61:9 115:20
looking 22:4 39:14 83:17
  123:7 141:15
looks 86:13
loss 5:24 14:7 69:22
  154:16
lost 120:21
lot 109:22 120:6
Louis 84:14 85:15 98:25
  154:23 155:17
low 23:24 32:3 117:20
  118:1,7,17 119:5
lunch 85:2 92:18
Lynas 1:4,4 2:2 46:16
  48:19 49:6 62:21 80:12
  96:5 99:20 113:20 114:7
  114:12 119:25 125:18
  153:5,6
Lynas's 115:16,23

**M**

M.D 132:13,18 133:5,5
  148:4,6
M.D.s 72:15
macro-medical 116:16
maddening 127:12
magic 142:16
Mahtomedi 23:18
mail 39:19
maintain 5:8 39:11 40:10
maintenance 15:9,11
  22:20
major 10:20,20,23,24
  118:19,20 119:7,8
  122:18,18
majority 8:12 16:14 70:4,5
  70:6,9 71:2 109:18
  150:5
making 31:18 49:24
male 83:25 84:1
mall-type 13:13
Man 155:20
manage 4:19,20 29:12,14
management 5:2 16:16,20
  20:11 29:3
manager 21:19,23 31:15
  32:18
managing 28:16
mandate 30:6
manner 113:5 131:17

map 56:12 57:2 60:21
  61:19 64:19 65:7 155:9
Marc 2:4 3:14
mark 33:16 39:17 59:10
marked 2:20 5:11 12:16
  23:9 25:25 33:13,16
  39:25 41:17 53:10 54:2
  56:10 59:13 67:7 85:9
  85:11 86:9 87:19 88:22
  89:12 110:17 124:19
marked/reviewed 154:14
  154:16,18,20,23 155:2,4
  155:6,8,10,12,14,16,18
  155:19,21,23 156:2,3
market 10:5
Marriage 106:3
marry 67:10,11 79:16
Marshall 101:9
Marshalltown 101:1
massive 105:1
match 60:12,20
material 143:25
math 19:13 106:13
matter 153:5
matters 109:10 130:20
maximum 19:24 66:22,23
  66:24
mbetinsky@gaskinsbe...
  2:4
mean 14:14 16:18 19:17
  21:21 27:19,25 29:4
  39:20 68:19 70:5,10
  74:21 76:4 81:19 83:11
  83:14 85:25 91:25 93:19
  97:14 99:19 100:7
  104:17 106:13,19
  107:12,20 108:6 109:19
  113:8 119:15 124:9
  130:15 132:20,23 134:3
  136:12 140:24 145:20
  150:5
meaningful 141:15
means 28:2 29:1 40:21
  85:23 116:24 117:1
  133:5 143:21 144:20
meant 25:12,14 104:20
  116:12
medical 8:9 11:24 21:14
  22:9 24:6,10,24 27:19
  28:8,11,12,20,22 29:4
  29:12,23,24,25 30:3
  32:21 34:13 38:1 46:9
  47:4 48:14 49:1 72:12
  72:13 74:12 77:9 83:18
  86:19,22,24 87:2 88:6,7
  88:17 89:2,15 94:7 90
  98:23 102:19,23 103:4
  104:17 105:9 108:3
  109:11,23 113:13
  114:22,23 116:3,19
  122:11 128:6,7,11
  132:12,15,16,20,22,24
  133:7 136:3,7,10 138:11
  138:13 143:16 144:17
  146:12 148:4,10 154:24
medications 22:25
medicine 72:8
meet 32:12
meeting 31:23 77:5 80:9
meetings 32:4 79:9 80:5
  150:7
member 6:18,21 12:11,22
  4:24
member-managed 4:11
  4:24
members 4:17 6:17 23:4
  48:15 126:7

memory 71:21 137:15,20
  137:23
MEnD 1:12 2:11 3:2,6,18
  4:7,7 5:16 7:2 8:1,14,18
  9:3,6,7,11,17,20 12:25
  13:7 17:1,11,13,25 18:3
  19:16,19 20:1,15,16,25
  23:4,20,21 24:23 26:5
  26:14 27:6,19 29:16
  31:4 32:21 33:1 34:12
  35:12 36:16 38:23 39:10
  40:9 43:13 44:13 46:15
  53:20 62:12,16 63:9
  64:3 72:25 74:7 81:12
  84:6,13 85:14 87:10
  88:7,14 89:3,25 92:11
  92:23 93:2 94:18 97:1
  97:12,24 98:10,21 99:8
  99:25 101:21 104:16
  108:24 109:4 110:22
  111:22 113:4,14,19
  115:2 117:5,8 131:3
  137:5 138:10,21 154:12
  154:13,15 155:1,5,7,11
  155:13,15 156:1
MEnD's 17:12 32:15 53:12
  68:24 72:25 98:15,21
  111:2 146:23 147:11
  155:15
mental 21:22 24:20 32:19
  33:6 34:4 35:11 36:5,11
  37:15,18,23,25 38:3,11
  38:17,18 49:25 87:4
  94:7,10 99:18,20 105:21
  105:23,24 107:6,10
  111:15,17,19,23 112:13
  112:15 113:2,3,14,21
  114:8,14,17 115:5,9,14
  116:19 121:18 123:6,12
  124:17 126:8 128:15
  131:14,15,18 135:13
  138:11 139:6 156:1
mention 85:18 98:3,7
mentioned 44:15 61:22
  64:11 81:24 83:22 86:5
  102:22 150:9
mentioning 68:1
Merit 1:22 152:4,23
merits 39:3
message 112:11 113:8
method 143:2
MHP 144:16
Michael 104:5 105:13
  142:5
middle 40:7,19
Midwest 111:14
mild 117:20 118:1,9 147:1
Mildly 16:25,25
Mille 88:18 89:14 155:22
million 70:2 77:15 78:1
mind 93:16 109:20 127:12
mindful 110:2
mine 26:19 27:1 39:4
minimal 17:23
Minneapolis 1:17 2:6
  152:7
Minnesota 1:1 2:17 5:4
  10:9,25 11:16 12:4
  13:14 27:7 50:6 51:19
  52:13,14,20,22 54:7,25
  59:21 64:16 67:12 76:2
  76:3 89:4 101:12 102:10
  102:17,19 103:2 152:5,7
  152:24 154:22 155:15
minority 16:17 72:1
minute 43:12 106:17

mirror 39:9
miscellaneous 22:22,23
22:24
missed 97:14
misstates 48:5
mistake 61:10
MN 1:17 2:6,10,15 155:5
model 26:5,9 53:24 67:1
modified 94:12
Monday 128:15 129:11
money 9:2 21:13 23:1
74:7
monies 7:1
monoxide 143:3
month 13:3 19:2 22:17
monthly 9:20 18:11,24
19:1,5 66:12,13
months 23:13 14:1 35:2
36:2
mood 125:20
morning 77:2
mortality 44:25 45:8,25
46:8 47:1 81:11 94:4
95:15
move 21:12
moved 9:17
moving 21:13 47:11
multiple 11:1 46:18 73:1,4
multitude 105:9 133:17
myriad 22:7

**N**

N 3:1
name 3:10 9:22 13:11
17:19 36:23 38:10,14
63:19,21 83:24 86:2
89:21 94:2,3 106:5
149:8
names 62:20
naming 138:9
narrative 127:25
national 111:13
national 11:19,23 41:24
nature 79:14 139:4 140:6
NCCH 35:10
NCCHC 11:10,19,23 34:5
34:8,14 35:4,8 38:21
39:7 41:10 44:1,3,8 94:5
95:3,14 110:5,8,12,15
149:4,14 150:9 155:3
near 101:16
necessarily 27:25 83:17
necessary 69:11,21 79:13
79:14 84:12
need 20:20 22:10,10 33:21
45:17 47:24 70:17 74:16
80:3 93:13 104:22 113:5
116:9 117:2 122:11
138:24 146:15
needed 35:19 43:8 46:21
46:24 47:23 49:4 112:1
116:14
needs 22:12 37:15 80:2
91:21 125:5
never 57:2 80:11,12 93:20
97:13 108:13 128:10,11
128:18
new 9:17 60:8 76:6 154:21
News 25:5
News-Talk 86:12
next-of-kin 14:4 153:6
nine 35:5,6 106:18,18,20
106:21 136:1
nine-day 106:10 107:2
Nobles 63:16 83:22
non 8:9

non-suicidal 40:25 41:7
non-suicide 90:9,10
nonmedical 8:6,11
Nope 24:20 45:13 65:1
102:8
Nos 2:20
notarized 45:14
Notary 152:4,23
notation 128:22 129:2
note 2:17,20 49:6,6 127:1
127:22 128:20,22 129:5
129:6
notes 146:14 152:8
notice 125:19 133:25
134:5 135:5 138:17
noticed 140:25 152:15
noticing 2:19
Notwithstanding 40:8
Novak 2:12 3:18,18 20:7
25:17,21 33:12,18,21
39:13,19 42:15 48:4
50:10 54:20 55:5 56:20
56:22 60:6,10,14,20
67:22 74:14 78:12,16,19
103:8,16 107:18,25
108:5,21 109:5 121:11
126:14,17 127:17
130:10,18 133:13,16,23
134:2,8,15,18,21 135:3
135:10,14,20,24 136:3
136:14,21,24 137:9
138:9,16 140:9 147:21
151:1
Novak's 110:2
November 24:12 27:5
53:16 55:3 61:14 62:13
62:14 107:11,11 155:15
number 7:9,22 11:10,13
23:24 29:11 32:3,6
33:25 39:23 50:6,8,10
50:16 62:21,22 62:19
66:16 71:15 72:23 85:7
91:18 108:7 111:16
119:12 130:3,17 136:1
137:6,14,19,22 139:19
140:10 142:16,19,20
144:17 148:22
numbers 67:23 105:16
107:13 144:20
nurse 73:19,23,25 80:25
80:25 91:10,13,17,20,22
92:9,13
nurses 7:25 11:13 12:1
22:11 37:5 92:3,5,6
124:16 131:9,11
nursing 8:2 11:24 14:22
21:18,22 24:20,21 31:16
32:18 43:7,11 82:11,19
87:1 89:21

**O**

O 3:1
oath 3:22,23 34:22 52:3
56:18 57:4 58:3,5 59:7
59:15 61:7 114:18
Object 42:15 48:4 55:5
74:14 107:18 133:13
147:21
objections 40:9
observation 126:9
observations 119:20
144:13
obviously 31:9 124:23
150:6
occasionally 11:25 32:19
139:24

occur 36:1
occurred 36:2 41:6 88:5
October 1:14 3:8 152:6,20
153:7
offer 94:22
offhand 32:6 57:10 62:21
137:6
office 6:7,9,13,15 14:17
14:19,22,25 21:18,23
23:15 31:15 32:18 39:20
39:21 47:3 56:22 74:19
133:25 136:6
officed 14:25 15:23 16:1,2
officer 24:24 27:19 96:16
96:24
offices 12:3
oftentimes 32:9 130:20
Oh 37:17 52:23 81:4 84:15
90:16 97:16 105:5
116:25 138:7 146:9
147:3
okay 4:10 6:16 7:11 8:12
9:9,24 10:14 12:12
16:16,18 20:5,14,18
21:15 23:3 25:21 26:21
27:3,8 29:10 31:2 34:7
34:17 36:1 37:4,11
45:21 48:10 49:14 50:25
51:23 52:19,23 53:15
54:22 55:10 56:4 57:16
57:18,19 58:16,17 59:18
59:19 61:21,24 62:2,7
63:5,13,16 64:13 65:5
65:12 66:6,18 68:22
71:3 77:13 78:3,19
79:20,24 83:8,21 84:17
84:24 88:16 90:24 98:3
98:13 104:8,14,20
105:17 106:15 109:7
110:9,12 111:12 114:20
116:20 123:13 124:15
125:22 126:19,22
131:10,21 132:2 134:10
136:23 138:7 146:9
148:9,11 149:12 150:12
old 26:19,22
older 26:22 27:3
Olmsted 50:20 76:2,24
77:2 98:21,24 155:19
on-call 92:2,6 102:2,5,23
on-site 75:22 78:7,9 91:25
92:2 102:1 105:23
once 43:21,24 78:9 101:25
102:1
ones 10:23 33:12 36:12
53:9 71:21 90:14,19
92:24,25 93:1 116:7
134:19,21
ongoing 40:22 41:9 46:22
Online 109:17
operate 100:23
operational 94:11
opinion 80:3
opportunities 11:20
opportunity 152:18
opposed 71:23
opposite 26:11 71:12
order 29:18,21,24
ordered 152:16
orders 29:17,25 30:3
128:7 132:19 148:4,6,10
organization 11:4 108:19
oriented 125:20
origin 117:10
original 2:18 13:5 50:17
59:6 145:22 152:15

originally 145:5
originate 138:5
originator 130:1
osteopathy 72:10
outside 47:4 96:23 109:11
113:8
overall 81:20 112:6,11,23
113:8
oversee 29:12
overseeing 28:16
oversight 28:24 29:3 75:7
owned 13:9
owner 4:22,25 20:24 25:3
owns 9:19 12:6,7

**P**

P 3:1
P.A 114:13
P.As 73:23 74:1
p.m 92:17,19,21 148:20,21
148:23 151:3,5
package 21:20
page 15:10 27:9 34:3
41:20 59:16 62:9 89:4,5
124:2 126:25 127:14
153:11
pages 153:8
paid 7:16 8:4,5 10:1 14:1
15:2,6,10,16 16:20 17:3
18:8 20:11 22:14,15
72:15 137:25
Pansky 106:6
paper 5:21 25:8 122:23
129:6
paragraph 54:5 95:4
paranoid 126:2
Park 13:14 89:3
part 45:8 47:25 52:13,16
68:7,23 110:12 115:6
129:17,25 130:7,22
141:8 142:5 149:18,20
part-time 18:4 24:3,10
32:23 33:5 35:12
participant 155:9
participate 109:13
participation 11:3
particular 11:14,14 25:2
33:3,8 36:19 41:6 43:1
58:1 76:19 80:3 82:16
91:23 95:8 116:14
139:10 140:17 146:16
parties 152:10,12,16
partner 18:22 53:20 69:11
partnership 18:20 114:21
party 2:19 152:15
passes 94:17
patient 45:4 46:12 47:11
77:12 79:12 80:3,14
96:25 113:1,5 118:2,24
122:7,14,24 124:6 126:8
126:10 128:5,17,18,19
129:12 139:8,25
patient's 47:3,14
patients 27:24 28:4,5 29:7
37:15 75:9,10 76:8,11
76:18 79:18 101:19
102:10 114:15 105:8
106:12 107:17,21 108:3
108:3,11 112:14 115:15
122:25 131:15 139:15
patients' 144:9
patrol 149:10
Paul 2:15
pay 9:11,18 13:2 14:4
73:21 97:24,25 116:17
paying 13:7

payment 6:25 16:8 17:15
payments 8:19 9:20 13:20
20:20,22 21:1 22:6
pays 9:20 12:25
Pennington 102:7
people 6:6 14:19 31:24
37:12 48:25 49:25 74:5
99:24 107:16 120:22
136:4
percent 4:22 25:9,10,11
25:12 26:9,10 63:14
70:7,7 71:23,23 76:16
76:17 84:4
percentage 69:24 70:15
perfect 70:3
perform 104:11 131:15
performance 48:15 49:3
83:13
performed 81:16
period 29:5 106:10 107:2
107:11
permitted 37:14
person 26:17 28:5 30:11
63:21 74:19 75:5,20
86:5 89:19 119:25 120:1
121:8,18 122:1,15
person's 63:19
personal 21:3 108:22
personally 11:11 17:14
34:9,10 35:4 42:23
persons 152:13
perspective 108:17
pertinent 94:7
Pfeifer 114:2 117:16 124:8
124:11 126:13 127:1,23
pharmacies 114:21
phone 21:16,17
phones 21:19,20
physical 94:10 111:20
121:6
physically 77:4
physician 17:24 18:3,5
28:10,18 29:18 32:23,23
47:2,4,14,18 65:22
74:25 75:8 103:1,3,5
104:16,18 105:8
physician's 29:17,21
73:19 92:10,12
physicians 14:24 73:24
pick 135:22
piece 14:15,17 119:18,21
121:15 122:5 131:19,19
139:18,20 141:21
pieces 133:17
pigeonhole 47:16
pigeonholed 48:22
Pine 62:1 76:2,7,9,24 77:1
place 45:17,17 46:25 82:1
152:8
placed 143:19
plaintiff 1:5 2:2 3:13,15
5:9 12:14 23:7 33:10
41:1 53:25 58:9 59:11
63:24 67:5 84:20 86:7
87:17 88:20 89:10 91:7
106:7
Plaintiff's 155:1,11
plan 108:7 128:19 146:6
146:10,16
plant 64:12
play 115:6
please 3:10,21 5:15 18:2
PLLC 1:12 3:3 4:9,14 8:18
9:7 154:13,15
plus 58:3
point 34:21 70:11 110:2

129:14
**points** 118:17,18,19,19
119:5,6,7,7 143:3,4,5,5
**policies** 42:6 45:5 46:3
100:6,9 141:8,16
**policy** 42:10,14 43:14 94:9
99:25 100:5 134:1
149:16
**political** 87:15 97:17
**politics** 97:19
**pool** 92:4
**population** 67:3,19 68:9
91:19
**portion** 17:23 18:10,11,13
19:1
**positions** 109:25 150:15
**possesses** 46:15
**possibilities** 8:10
**possible** 8:7 46:10 139:14
145:10
**Potential** 125:7
**potentially** 7:24
**power** 119:17 131:1
**practice** 39:7 44:7,8 72:20
73:14
**practices** 42:5
**practitioner** 73:20
**practitioners** 73:24 74:1
92:13
**prebooking** 96:14
**preceding** 94:14 153:8
**preference** 32:14
**preliminary** 134:12
**prepared** 5:18,19 67:16
136:17,20
**prepares** 71:5
**presence** 32:10 152:7
**present** 2:16 10:4 51:1
126:23 136:6 137:2,10
137:12 138:12,14
**presentation** 31:12,18
**presentations** 79:10
**presently** 64:2
**president** 4:25 24:24
109:4
**press** 53:12 54:19 58:4,21
60:17 155:5,7
**pretty** 27:17 107:2
**prevent** 112:13 113:6
131:17 133:12
**preventable** 45:23
**prevention** 100:10
**previous** 53:1 130:1
**previously** 13:9 61:16
104:10 142:13
**pride** 54:6
**primary** 6:5
**print** 150:3
**printer** 14:16
**prior** 40:21 44:1 56:17
62:11 108:22
**prisoner** 112:15
**probably** 27:16 32:6 38:4
65:20 78:1 82:19
**problem** 133:20
**problems** 121:6 135:13
**procedure** 2:17 41:10,25
**procedures** 42:5 45:5
46:3 94:6,11
**process** 34:24 94:13
112:18 115:17 133:18
**processed** 96:24
**processes** 81:25 93:13,17
114:11 115:13
**professional** 1:23 7:19

11:11 34:4 36:11 38:11
38:17 105:21 107:22
108:17 114:14,17
116:19 121:19 123:6
124:17 128:16
**professionals** 33:7 35:11
36:6 37:19,23,25 38:3
111:25 113:13,21 114:8
131:14 139:6
**profit** 5:24 14:7 69:22,22
154:15
**program** 5:22
**promoter** 10:24
**promotion** 9:25
**promptly** 121:18 124:18
128:6
**proper** 4:15
**properly** 5:8 112:17
122:20
**Properties** 9:19,23 12:6
12:19 13:5,7,12,21 15:7
15:14,16 154:17
**property** 12:8 15:20,24
22:15
**proprietor** 4:12
**protocol** 99:25 100:5,14
**protocols** 100:6,9 114:11
141:8,16
**provide** 11:20 28:20 29:13
75:6 89:14 96:18 101:5
101:11 111:23 112:13
113:4 133:12
**provided** 17:3 29:13 44:12
45:3 46:2 48:1,3 87:8
95:2 138:13
**provider** 28:11 29:23,24
29:25 35:24 76:6 84:14
85:15 86:20,22,24 87:3
88:7,7,17 89:3 99:9
104:17,24 113:4 116:19
128:6,7,11 132:12,15,16
132:21,22,24 133:7
144:17
**providers** 11:24 22:9 28:8
28:12 35:19 38:1 102:23
103:4 105:10 109:23
148:10
**provides** 154:22
**providing** 28:13 29:7
98:23 100:17 115:14
**provision** 138:10
**psychiatric** 35:24 36:7,9
36:16 37:1,5 114:20
115:1
**psychiatrist** 35:13,14,17
114:24 141:22,24 142:2
**psychiatrists** 35:22
**psychological** 48:11,17
81:15
**psychologist** 36:3,5 37:21
103:6,21,23 105:12,25
142:4
**psychologists** 33:1,7
73:15
**Public** 152:4,23
**publications** 111:2
**published** 146:25
**punish** 120:23
**punished** 120:11
**punishment** 82:13
**purported** 135:21
**purpose** 45:4 70:10
134:15
**purposes** 9:5 17:2 70:15
147:8
**pursuant** 2:17 7:16

**pursue** 29:5
**pursuing** 34:15
**push** 120:24
**pushback** 70:21,22,25
**put** 11:16 45:17,17 46:25
49:5 74:13 75:2 123:5
129:6 136:16 141:1
**putting** 122:23 126:9
**pyramid** 28:11

---

## Q

**qualifications** 38:15
**qualified** 34:4 35:11 37:25
37:25 38:3 111:25
113:21 114:8,14,17
**qualify** 38:3 104:4
**qualitative** 118:16
**quantify** 66:9
**quantitative** 118:16
**quarter** 78:9
**question** 18:2 20:7,8
37:10 49:18 50:15 51:12
51:22 52:5 54:12 56:20
57:13 61:10,15 68:8
76:21 78:20 79:15 93:4
99:12 103:17 107:24
113:22 121:11 129:8
132:3,22 133:14 135:18
**questionnaire** 96:14,15
115:23 146:22 148:13
154:8
**questionnaires** 115:20
**questions** 33:13 46:8,18
49:3,8,12 102:6 117:11
118:5,10,13 134:13
135:25 140:7,17 142:8
150:23,25
**QuickBooks** 5:22
**quickly** 68:10
**quite** 33:19 89:7 120:19
142:15
**quote** 113:3
**quoted** 26:8,13

---

## R

**R** 3:1 153:2,2
**R.N.s** 73:25 74:3
**race** 80:20
**Rapids** 87:22
**rare** 103:24 104:1 139:23
**rate** 18:7,12,13 19:12
152:16
**rbennett@gaskinsbenn...**
2:3
**read** 50:9 83:3,5 95:4
103:16 126:6 127:5
133:22 137:9 151:1
152:13
**readers** 127:3,4
**reading** 27:9 133:3
**real** 107:1
**really** 37:17 85:24 110:7
143:21 144:19,20
**realm** 68:20
**reason** 68:20 123:11
153:11
**reasonable** 98:12 133:4
144:6
**reasoning** 141:2
**recall** 8:25 14:5,6 16:11
17:18,21 23:23 24:16
25:7,7,16 26:2 31:21,22
32:1 36:10,13,20 38:14
38:15 49:8,12,21 50:2
55:12,15,16 63:6,11,18

63:20,23 80:8,10,21
81:8,10 82:4,9,14,18,21
83:5,9,24 84:15 85:20
87:2 88:2 89:6,7,21
90:13 91:5 93:21,22,23
96:10 98:16 99:2,6,17
99:25 104:6,10 110:25
111:11 112:3 115:23
116:1 117:10 124:14
125:14,15 130:1,3 138:7
140:5,10,19 142:5,7,14
142:18 143:1 145:13,21
146:20 148:5,14,15
**receive** 116:21
**received** 94:6 128:5 140:3
**receives** 111:3 141:3
**recess** 33:24 85:6 92:18
148:21
**recipient** 17:22
**recognize** 89:8
**recognized** 107:16
**recollection** 63:8,15 72:23
80:13 84:1,3,5 85:17
**recommend** 69:18
**recommendations** 94:9
**recommended** 149:6
**record** 3:11 12:18 23:12
34:1 43:3 44:12 85:4,8
92:16,21 136:10 146:12
148:19,23 152:5 154:18
154:20
**records** 39:1 49:1 62:10
136:4,7 144:15
**redo** 62:5
**reduced** 50:5,8 51:4 152:7
**refer** 24:17 35:18
**reference** 32:11
**referencing** 110:11
**referral** 128:15
**referred** 82:23 121:18
124:17
**referring** 34:3
**refresh** 85:17
**refusals** 97:10
**regard** 7:10 93:19 125:18
140:12
**regarding** 39:11 40:10
46:23 49:13 50:4 100:1
100:2,14 109:25 119:14
**regards** 91:12 95:11
**regional** 65:3,18
**registered** 12:2 4:14 5:7
23:15 152:4,23
**registration** 4:16
**regular** 100:16
**regularly** 14:21,21 15:1
109:10
**reimbursed** 22:13 23:2
**related** 8:10 29:2,6 115:14
142:6
**relates** 135:15
**relations** 109:9
**relative** 152:10,10
**release** 53:13 54:19 58:21
60:17 155:5,7
**releases** 58:4
**relevant** 46:3 94:13
**Relocation** 21:11
**rely** 61:8
**remain** 74:6
**remark** 33:14
**remarks** 5:9 12:14 23:7
33:10 41:1 53:25 58:9
59:11 63:24 67:5 84:20
86:7 87:17 88:20 89:10
91:7 106:7

**remember** 7:7 25:6 36:15
34:10 62:20,21 71:16,21
72:2 80:8,10,17,17,19
82:12 83:5 89:9 90:14
90:16,25 91:2 92:12
96:1 99:4 115:18 117:9
125:2,17 127:6 128:13
129:16,22 140:4,22
142:21 147:4
**remembered** 56:17
**remotely** 74:20
**removed** 49:19
**renewable** 73:1
**renewals** 73:4 149:2
**rent** 9:18,20 12:25 13:2,6
13:7 14:2,4,15
**rental** 13:16,17 14:12,14
**repeat** 107:8
**report** 5:21 39:5 68:15
82:2 83:6 93:24 94:2
**reporter** 1:22,22 3:21 25:8
152:4,23
**REPORTER'S** 152:2
**reporters** 25:4
**reporting** 1:23 68:15
**reports** 83:12 94:8 127:9
127:11
**represent** 67:15
**represented** 39:10
**request** 43:9 70:18 94:23
149:3 152:18
**requested** 43:9
**require** 32:9 42:7
**required** 29:14 47:11
**requires** 112:16
**requiring** 149:4
**resources** 21:23
**respect** 114:22
**respective** 101:22
**response** 46:9,23 60:7
61:4,17
**responses** 121:21
**responsibilities** 102:24
**responsibility** 29:7,8,10
29:11 94:21
**responsible** 5:7 27:23
28:3,15,16,19,23,24
30:8,10
**rest** 105:9
**restocking** 22:25
**restroom** 33:22 84:23
**result** 87:12 95:21 117:2
**results** 47:4 116:10
**return** 21:3
**REUVERS** 2:9
**revenue** 7:18 77:14
**review** 38:22 39:3 42:23
43:4 44:14,16,23,25
45:9,13,25 46:8,20,23
47:1,5,19 48:14,22,23
57:21 71:11 81:11,13,20
81:22 90:22 93:1,20
94:1,4,5,12,24 95:7,12
95:15,15,16,19,21,22,23
95:25 97:5 100:15
115:13,17 119:12
128:12 141:8 148:15
149:16 152:18
**reviewed** 38:24 42:3 84:8
115:19 128:15 129:10
154:5,7,9,11,12
**reviewing** 93:17 141:7
**reviews** 44:20 95:18
149:16,17
**revise** 71:11 115:13
**revised** 132:7 147:1,6,7

147:25
**revolve** 100:9
**right** 13:23 16:5 19:6,15
20:3,22 21:10,12 30:7
34:15,17 36:7,23 39:2
42:1 44:23 53:13,21
54:9,17 55:7 57:7 58:18
58:22 59:15 60:5 61:12
64:23 66:8 67:3 70:10
70:13 72:23 76:23 78:10
78:17 85:25 86:1 91:16
93:20 94:25 95:3 99:20
102:13 103:19 109:12
112:15 113:16 123:12
123:17 124:8 125:21
126:3,11 127:15 128:9
128:11,23 130:25 131:2
132:2,19,24 135:2,15
137:3 138:18,19 143:25
148:7 149:25
**ring** 86:2,4
**risk** 107:16 117:17 125:19
126:16 128:10 129:14
131:7 138:22 140:14
141:4,11 143:11 145:1
145:16,23 154:5
**road** 149:9
**robbery** 155:20
**Robert** 2:3 3:12
**Robertson** 49:5 104:2,5
105:13 106:11 107:15
107:20 108:8 129:5
**Rochester** 86:11
**Rock** 55:25 56:1,2 57:10
61:25 64:7
**Rockford** 55:24
**roof.'** 127:11
**rotating** 92:5
**rounding** 102:1
**roundtable** 110:15
**Rule** 2:17
**Ruled** 155:19
**run** 5:2
**runs** 10:3

---

**S**

**S** 1:7 3:1 153:2,6
**S-K-U-R-R** 17:20
**sad** 115:25 120:1
**safer** 49:25
**salary** 20:16
**sales** 30:8,11,12 109:9
**Sartell** 12:4
**satisfied** 97:18
**Sauk** 87:22
**saw** 80:12 104:5 113:20
113:24 114:2,6,6,11
128:11,18
**saying** 8:7 24:18 26:8
58:12 90:12 95:2 99:6
**says** 14:8 15:9 22:4 26:14
27:5,6 41:24 42:2,3 45:7
45:21,22,25 46:6,7 47:1
51:14,22 53:23 54:5,10
54:24 62:12 85:22 95:3
111:13 112:4 113:1
132:13,15,17 133:4
146:10
**Schedule** 136:5,11,18
**schooled** 137:8
**science** 139:16
**scope** 91:21 116:9
**score** 116:4,5,21,24
119:11,15 121:14 122:4
122:20 123:22 126:4
132:9,10,10,18 140:1,2

140:3 146:3
**scored** 121:25 124:8,13
124:16
**scores** 116:14 142:22
**scoring** 116:12 121:22
131:7 140:13,14 143:6
144:7 145:7 147:1,15,18
**screen** 122:20 123:17
140:6 141:4 143:10
**screened** 122:2
**screening** 117:17 118:22
123:14 124:12 125:12
125:19 126:16 127:22
128:10 129:14 138:23
144:6,25 145:16 154:5
**se** 97:2
**SEAL** 152:19
**second** 27:9 41:20 52:16
54:5 67:12 89:4 95:18
**Secretary** 12:21 23:11
**section** 112:22
**see** 13:4 33:16 40:7 41:22
42:8 43:3 45:23,24
46:13,14 61:7 75:9,10
75:20 76:8 79:5 80:3,11
80:15 85:2 86:15 101:19
102:15 103:17 104:2,7
104:15 105:3,8,9,12
106:12 107:3 108:2
111:25 120:6 128:17
129:12
**seeing** 76:11,18 107:15,21
108:9,10,13 128:19
**seek** 48:25 146:18
**seen** 40:2 49:6 57:2 79:8
80:14 104:9 105:14
**sees** 78:8,13,17
**select** 6:6 12:1
**self-assessment** 114:9
**self-disclosure** 121:16
**sell** 10:5
**selling** 70:11
**sense** 123:8
**sentence** 40:12,16,16
**separate** 48:22 51:7 65:2
65:3 132:24
**serve** 54:6,24 62:2 101:3
**served** 27:6 55:21,22
133:25 136:5
**service** 18:12 138:11
**services** 7:20 15:4 18:10
34:5 41:12 48:15 56:5
69:2,9,10,17,17 70:1,18
75:7,7,8 77:23 87:1,3,4
87:8,16 94:8,11 97:18
97:21 98:8 101:5,11
102:5 104:11 105:22
112:13 138:14 155:3
**Serving** 155:5,8
**set** 13:5 19:1 115:8 130:1
155:11
**sets** 41:24
**setting** 73:16 96:17
**settle** 137:25
**settlement** 98:4
**seven** 13:23 37:22 66:4
124:24
**Seventh** 1:16 2:5,14 152:7
**severe** 123:23
**shape** 98:8
**share** 146:15
**shareholder** 6:23 7:3 8:20
8:20,25
**shares** 102:23
**sheet** 5:17 6:2 131:22

132:5 147:16 154:14
**Sheets** 154:6
**Sheila** 86:14 98:20
**Sherburne** 2:7 3:17 26:16
34:15 38:6 42:18 43:4
44:16 49:17 71:20 78:10
79:11,17,25 95:8 103:24
105:14,21 106:11 107:7
116:7 148:25 150:19
**sheriff** 26:16,19 32:12
74:11 80:6
**sheriff's** 69:19 96:13
**sheriffs** 30:15
**Sheriffs'** 10:10,25 11:16
**short** 38:18 148:17
**show** 39:13 41:14 133:24
134:19 136:10
**showing** 5:14 41:19 85:11
**shows** 45:12 46:16
**sic** 126:1,5
**sickest** 108:3
**side** 94:21 95:11,12 96:13
**sign** 30:25 31:2,5,7 40:4
55:24 151:1
**signature** 133:21
**signed** 39:18 56:7,8 57:15
57:16,20 58:19 59:6,15
59:17 60:1 65:14 155:13
**significance** 116:5
**significant** 11:2,3 14:17
96:18 145:14
**signify** 144:21
**signing** 65:14 109:16
**signs** 31:6
**similar** 11:4 72:18
**simple** 129:3
**simply** 19:22 47:9
**sir** 37:8 41:15 57:23 58:7
116:1 133:7
**sit** 34:21 36:14 93:25
**site** 91:20 92:8
**sits** 104:23
**situation** 99:22
**six** 13:23 14:1 118:18
119:6 137:9 139:2 143:3
**size** 91:15,19,21
**Skurr** 17:17,20 18:1 28:6
18:21 29:19 65:23 72:6
75:4 100:23
**Skurr's** 65:25
**sleep** 121:1
**slightly** 147:8,25
**small** 8:2 19:23
**snap** 115:25 120:2
**snapshot** 61:11,13 90:17
90:18 91:1
**snapshots** 68:12
**social** 36:7,9,16 37:1
**soft** 139:16
**software** 5:23
**sole** 4:12,25 10:18 12:11
12:22
**solely** 103:24
**somebody** 15:4 39:21
115:3 116:17 119:13
126:4 147:10
**Soon** 84:25
**sorry** 16:18 19:7 22:3
27:20 50:15 52:11 59:8
76:22 90:23 95:22 99:11
107:8 113:22 119:4
123:25 124:14 125:11
127:16 129:4 130:14
131:24 132:2 138:25
**sort** 20:21 66:11 74:9
82:12

**Sotto** 5:9 12:14 23:7 33:10
41:1 53:25 58:9 59:11
63:24 67:5 84:20 86:7
87:17 88:20 89:10 91:7
106:7
**sounds** 87:24
**source** 117:11 142:14,14
142:16,17 145:21
**sources** 11:9 118:24
123:4 125:4 143:8
144:14
**South** 1:16 2:5,10 12:9
152:7
**speak** 67:24 73:11 98:1
114:19
**speaking** 25:7
**specialty** 72:7
**specific** 4:13 7:6,9 22:2
36:10 39:11 40:10 49:8
50:2 62:18 73:3 74:21
91:18 92:6,7,9 96:1
105:1,15 107:13 116:1
148:14
**specifically** 14:5 31:21
46:19 61:2 72:17 95:20
117:13,22 125:4,14
128:14 136:9 139:8
142:19
**specifics** 74:16 82:14 89:9
115:18 117:9 125:3
129:16,22 140:19
143:18 148:5
**speculate** 98:17
**spend** 76:11
**spent** 21:13
**spoke** 47:9
**sponsor** 10:15,16,18,20
11:2
**sponsors** 10:19
**spotlight** 155:22
**Sr** 2:15 16:3 23:16 65:15
84:14 85:15 97:20 98:25
154:23 155:17
**staff** 11:21,25 31:10 32:21
47:6 48:15 67:1 91:20
92:14 94:7 96:18 114:10
116:2,3,4,6 117:21
126:7 133:1 140:18
144:14
**staffed** 66:22
**staffing** 67:1 68:2,6
**stand** 78:2
**standard** 39:8 41:20 43:18
43:22 44:1,21 45:21,22
73:6,10,13 149:19
**standards** 34:5 41:12 44:4
155:3
**Stang** 1:7 153:7
**start** 13:7 84:13
**started** 13:6 26:11,14
88:19
**state** 3:10 12:21 17:8
23:11 73:3 145:22 152:5
**state's** 27:14
**stated** 20:19 26:18 37:19
43:25 62:10 81:17 82:7
**statement** 5:25 14:7 40:18
40:20 69:23
**states** 1:1 40:7 52:16
53:24 103:22
**statistical** 41:5
**stats** 90:22
**status** 123:12 156:3
**statute** 44:21
**stays** 22:13

**stead** 31:25
**Stearns** 87:5,22 88:3,6
97:12,13,22
**stenographic** 152:8
**Stephanie** 2:8 3:16 63:1,3
80:18,19 81:9 82:25
104:12
**stephanie@irc-law.com**
2:9
**Steve** 17:17,19
**stick** 54:20,21
**stipend** 18:11,25 19:2,5
66:12,13
**Stopped** 77:10
**Story** 53:19 54:16 55:8,21
101:24 155:8
**straight** 103:11
**Street** 1:16 2:5,14 152:7
**stretch** 135:3
**strictly** 15:12
**Strike** 54:12
**strip** 13:13
**study** 42:7
**stuff** 109:3
**subcontracted** 18:17
**subcontractor** 17:15
18:18,21 19:9
**subject** 40:9
**subjective** 139:15
**submit** 118:3 119:11
**submitted** 57:4
**substance** 49:3
**substantial** 74:8 152:13
**substantive** 39:4 42:24
45:15 46:21,24 47:10,24
47:25 48:7 81:25 93:13
97:10 148:16
**substantively** 96:6
**sued** 137:5
**suffering** 127:7
**suicidal** 41:7
**suicidality** 135:12 141:19
146:4
**suicide** 38:25 40:24 48:19
50:1,1 62:11,11,13,15
62:16,24 63:8,12 80:22
83:23 84:2 85:18,20
86:13 89:20,23 91:4
97:4 98:11,18 99:10,14
100:1,3,8,10,13 107:6,9
107:17 117:17 124:4,4
125:19 126:16 127:22
128:10 129:14 131:7
138:22 140:14 141:4,12
143:2 145:15,23 154:5
**suicide/self-harm** 125:8
**suicides** 38:22 49:16
62:24 63:6 80:6 88:5,24
89:24 91:6 92:23 155:23
**suit** 87:13 138:3 142:20
**Suite** 2:6,14 152:7
**sum** 112:10
**summer** 62:24
**Sunday** 103:18
**supervise** 28:14 30:12
**supervised** 44:17
**supervision** 28:24
**supervisory** 12:1
**supplement** 50:9,13 51:1
52:10 53:1,2 60:22
61:17
**supplemental** 60:7 61:4
67:13 83:23 85:18 155:1
**support** 111:4
**supporter** 10:24

**supposed** 41:11 105:17
118:6 119:2 132:11,20
134:25 137:8
**sure** 7:5,14 30:12 31:20
33:23 44:10 49:18 51:2
65:9 68:14,17 104:20
107:25 108:8 109:5
110:1,10 115:19 127:15
145:24 149:18,19
150:10
**surprising** 107:14
**surrounding** 46:4
**Sweeney** 82:20
**sworn** 4:3 152:6
**system** 45:5 97:20 111:24
133:21 135:8 136:4,7,10
145:8
**systems** 81:25 93:13
115:14 133:18 135:8

---

**T**

**T** 1:22 152:4,22 153:2,2
**table** 125:2,13 129:18
130:2 141:7 142:10
143:22 144:4 145:18
**Tacoma** 14:8
**take** 20:16 34:24 35:2 37:4
43:12 49:15 57:18 68:12
74:7 97:20 107:5 145:9
148:17
**taken** 17:1 33:24 85:6
92:18 110:20 145:1
148:21 152:6 153:5
**takes** 121:24
**talk** 30:15 49:11,11 115:7
131:17 134:17 135:4
**talked** 25:4 33:19
**talking** 5:3 26:4,5 34:21
55:13 75:14 78:12
102:25 116:6 130:16
**talks** 95:14
**target** 10:6
**task** 81:18
**tasks** 29:2,6
**tax** 17:2,7,8 20:20,22 21:1
**taxes** 17:1,3,9
**team** 4:20 5:2 6:7,15 28:8
28:14,15,17,22,25 29:4
29:12,13 30:9 32:17
36:5 37:18,20,21 45:14
45:20 48:24 77:10
102:23 109:10 110:13
111:4 114:20 115:3,5,11
125:16 130:20
**technically** 6:20 23:1 56:8
72:9
**tell** 5:1 36:11 43:13,15
53:8 59:9 71:16 72:22
73:12 78:5 112:21
117:21 118:15 128:3
135:24 139:1 140:21
144:19,24
**telling** 60:21 62:6 124:7
**ten** 139:2 143:4,5
**tenants** 15:19
**tendency** 152:13
**term** 47:17 66:21 87:15
**terminate** 87:10
**terms** 4:13,23 35:10 51:15
61:11 67:12 68:9 96:5
97:9
**test** 115:16
**testified** 4:4 78:8 109:3
**testify** 44:6 136:7,17,20
136:21
**testimony** 3:6 48:5 49:10

**114:18,19 152:5**
**Thank** 3:20
**Therapy** 106:3
**they'd** 17:6 67:20 98:5
**thing** 66:11 74:9 96:12
97:7
**things** 29:12 69:4 73:20
93:5 94:22 95:11 108:19
109:12,20 111:1 120:4
122:4 131:12,16 139:19
140:24 141:14 143:12
144:8,10,18
**think** 33:15 49:10 67:20
67:22 70:9 90:17 94:15
94:16 105:5 107:24
116:25 121:6 129:11,17
134:6,23,23 135:6,17,17
135:20,23,24 136:1,12
136:13 142:25 143:8
149:23
**thinking** 90:10,20 99:4,6
**third** 124:2
**this'** 59:8
**Thompson** 113:25 114:1
114:2 117:16 123:16
**thought** 16:19 39:6,6
51:13 98:9 120:15
**thoughts** 127:13
**three** 32:3 36:2 44:20 46:8
53:24 72:2 85:7 90:3,13
95:18 101:2,6 111:14
117:17 125:19,21
135:21 148:12 149:15
**time** 3:9 6:14 15:17 19:17
19:23,25 25:9 26:9,20
27:6,12 28:7 29:5 33:13
33:19,22 34:21 35:15
38:5,19,24 43:19 46:9
49:22 61:12,13 62:12
66:10 68:6 71:2 75:4
76:11,14 79:5,17 80:25
81:9 82:1,8,16 84:19
86:20 90:17 91:11,13
94:16 98:24 99:14,15
100:19,20 101:15
102:21 104:6,7 115:25
120:1,10,18,20 126:13
126:13,14,17,18 137:21
142:15 145:14 152:8
**timely** 113:5 131:17
**times** 34:10 37 78:3,7,9
78:17,22 79:9 103:9
125:20 137:5,12
**timing** 107:21 108:10
**tiny** 7:23,25
**tired** 121:2
**title** 24:23,25 25:2
**TL** 9:18,23 12:5,6,19 13:5
13:7,21 15:6,12,14,16
154:17
**tnovak@larsonking.com**
2:13
**today** 24:2 34:22 36:14,20
36:23 62:3,5,5 65:6
77:18 78:2 93:25 109:5
137:16
**Today's** 3:8
**Todd** 1:13 3:3 4:2 7:2 9:3
9:14 16:21 17:4,13
19:19,22 20:11 21:7
23:12 24:25 151:4 152:5
153:3,24 154:19
**told** 39:2 47:9 58:25 78:16
87:14 97:16
**tone** 112:6,23 113:12
**Tony** 3:18

**tool** 118:22 122:5 141:19
144:25
**tools** 115:7,14 116:10,10
121:20 125:16 133:18
143:11
**top** 23:23 28:10 44:8
58:24 66:16 71:18 72:3
109:13 125:8
**topic** 74:10 135:4 136:8
136:17,20,22,25 137:2,9
138:9
**topics** 135:21 137:7
**total** 17:9 24:3 38:4 50:21
50:21 54:18 75:19 77:14
**town** 87:15
**toxic** 97:12,12,13
**Toyota** 6:3
**tracking** 40:21,23
**train** 138:21
**trained** 28:12 117:22
118:12 139:5
**training** 24:7 76:6,12
94:6,10 100:10 139:3,9
140:12 141:15,22 142:1,3
142:6
**trainings** 139:9
**transcript** 2:18 103:17
152:18 153:4
**transfer** 112:17
**travel** 21:25 22:1,4,7,9,10
22:11,12
**traveling** 22:5
**treated** 114:22
**treatment** 47:3,15 94:14
114:23,23
**trends** 70:16
**Tribune** 25:5 154:21
**tried** 60:16 129:19 145:8
147:9,10,12
**trouble** 143:14
**true** 22:19 27:10 28:6
36:15 56:18 123:20
125:23,24 152:5 153:8
**Trustee** 1:4 153:5
**try** 10:5 39:9 44:11 122:6
123:3 139:6 143:10
144:25
**trying** 25:23 48:21 60:3,10
68:12 90:12,16,25 95:8
103:12 106:24 110:2
118:11 122:21 141:13
142:20
**Tundra** 6:3 14:10
**tune** 93:6
**Tunrda** 14:9
**tweak** 93:6 147:1,12
**tweaks** 143:1
**two** 14:16 32:3 33:25
38:12 49:16 53:8 58:3
62:21 78:7 80:6 88:10
88:24 90:7,13 105:20
118:17 119:5 121:25
132:17 139:2 148:12
**two-point** 145:3
**typewritten** 153:4
**typical** 104:16,23
**typically** 7:1,4 43:10 55:19
55:20 71:7 74:4 90:17
111:1,8

---

**U**

**Uh-huh** 30:18 47:7 71:19
72:11 78:18 83:1 86:16
140:15
**Uh-uh** 110:14
**ultimately** 18:21 21:4 30:8

30:10
**uncomfortable** 140:7
**uncommon** 139:22
**unconcerned** 48:2
**understand** 25:24 49:18
50:14 68:20 95:17 99:11
110:4 116:4,9,12,13,15
117:19 122:3 133:22
138:4 144:1
**understood** 52:7
**undertake** 95:7
**unit** 47:2,5,14
**UNITED** 1:1
**unpackage** 138:24
**unsigned** 39:15
**unusual** 71:4
**unwrap** 113:22
**upper** 111:14
**usage** 65:22
**use** 6:13,15 33:12,20,21
58:14,20 60:13 66:21
84:22 118:22 122:6
132:8 133:18 135:9
136:13 139:19 143:12
144:18,24 147:6
**useful** 123:3 141:14
147:13,25
**uses** 129:19
**utilities** 22:14,15
**utmost** 112:18

---

**V**

**varies** 19:17,18
**varies** 11:9,19
**various** 7:17 131:12
**vary** 111:3
**varying** 14:22 38:19
105:22
**vast** 8:12 19:25,25 150:5
**vehicle** 6:13,15
**vendor** 109:9
**verbally** 118:3
**verbiage** 110:20
**verifies** 45:12
**versed** 47:19
**version** 35:10,22 148:12
**versus** 36:12,13 41:7
76:12 92:2 127:25
**veto** 131:1
**video** 2:16 85:4 92:16
148:19 151:2
**VIDEOGRAPHER** 3:5,20
33:25 85:4,7 92:16,20
148:19,22 151:2
**videotaped** 1:10 3:2
**view** 110:2
**vigilance** 112:16
**virtue** 37:13,23 38:2
**visits** 144:16,17
**voce** 5:9 12:14 23:7 33:10
41:1 53:25 58:9 59:11
63:24 67:5 84:20 86:7
87:17 88:20 89:10 91:7
106:7
**voluntary** 150:14
**vs** 1:6 153:6

---

**W**

**W** 1:4 2:2 153:5
**wait** 20:8 106:17 121:11
**Waite** 13:14 89:3
**wake** 120:25
**want** 6:22 32:20 33:12,20
34:10 39:8,13 57:24
60:20 65:6,9 70:8 71:16

98:18 103:10 127:15
134:8,8 137:1 146:15
149:9 150:10
**wanted** 52:1 134:4 135:3
136:15
**wares** 10:5
**warrant** 91:19
**warranted** 42:6
**wasn't** 47:17 57:15 63:12
77:11 86:17 104:20
**watch** 49:25 89:2 99:10,14
99:19,20 107:6,10,10
**watches** 99:24 107:7
**Watonwan** 61:25 64:5
**way** 39:20 46:11,21 51:12
76:15,17 98:8 111:9
112:10 115:5 118:10
119:11 127:25 130:9,14
139:10 143:19 145:9
**ways** 103:18 122:25
**WDIO** 85:13
**we'll** 58:14 69:20 85:2
91:20 100:15
**we're** 10:18 11:1 34:15
38:21 85:8 92:20 93:16
135:10 137:2 141:13,15
148:23
**we've** 15:4 38:24 64:18,20
91:4 99:8 123:23 128:24
129:7 141:2
**website** 12:21 110:21
111:2,3,7 150:2 156:1
**week** 19:15,18,20,24 20:2
38:12,20 39:21,21 66:4
75:20 76:1,20 77:4
105:18,19,20
**weekdays** 92:6
**weekends** 106:19
**weekly** 101:24,25 102:1
**went** 13:21 76:4,24 92:25
96:12 124:2
**weren't** 57:10 86:21 107:5
107:9
**whatsoever** 49:13
**WI** 155:5
**wide** 11:10,19
**Wildhirt** 89:1,8
**willing** 118:3,4
**Wing** 63:22 71:20 89:19
89:23 91:4
**Wisconsin** 54:7,13,25
55:3 64:16 65:15 76:2
90:23 101:17
**Wisconsin-based** 11:6
**wish** 71:11,13
**wishes** 71:9 77:11
**withdrawal** 122:8,15
132:5 146:21 147:17
148:13 154:6,8
**witness** 3:19,24 4:3 7:24
54:22 60:16 84:22,25
108:22,24 126:19
133:15 134:4 136:6
138:15 140:10 152:18
152:19
**word** 13:13 27:18 97:15
115:1,3 135:2 136:13
**words** 88:8 96:15 112:8
112:24 113:10,11 147:4
**work** 4:14 5:1 7:24 8:1
11:9 14:20 19:16,19,20
20:14,15 21:19 28:9
39:9 65:7 73:2 74:20
76:18 97:9 103:4,21
104:25 105:2 108:18
109:2 110:4,5,7 116:8,9

130:19 149:13
**worked** 19:11,14 38:19
103:24 105:21
**worker** 36:16 37:1
**workers** 36:8,9
**working** 17:13 18:4 19:25
38:8,11 57:10,12,13
76:1,4 81:9 82:7 103:23
105:14 106:20 117:23
125:15 131:13
**workload** 38:20
**works** 18:6,19,20 84:25
101:9,10
**worried** 121:5
**worry** 54:21
**worth** 143:3,4
**wouldn't** 8:6 26:24 43:17
66:9 72:17 75:18 76:13
107:3 108:2,2 122:8
139:22,23
**Wright** 77:5
**write** 47:22 53:16 55:19
112:22
**writes** 55:11 83:12 111:1
**writing** 47:20 93:20,22
152:7
**written** 44:13 46:23 52:6
81:22 93:24 94:2 100:5
121:17 149:17
**wrong** 50:25 61:15 93:3
93:10 94:17 97:6 99:5
**wrote** 55:15 110:24
113:17 115:3 123:21

**X**

**Y**

**Yeah** 5:16,23 8:23 13:18
19:7 21:3,5 32:1 34:10
35:1 36:25 40:20 43:17
52:15 55:14 57:23 61:20
65:8,11 68:17 69:9 72:4
73:9 75:4,13,15,23 81:5
82:17 85:20,24 95:1,6
99:16,21 103:2 106:13
106:16 107:12 112:7,25
113:8,11 114:6,25
124:10 128:25 129:9
131:8 133:16 134:18
141:25 142:11,12
143:13 144:24 145:17
149:11
**year** 7:8 9:16 11:1 13:15
13:17,19,20 19:12 30:18
30:19 57:17 73:1 75:11
75:12 78:6,9 84:15,18
87:2,3,4 91:6 141:9,17
148:15 149:1
**years** 35:5,6 73:1,4,12
124:24 140:18 141:5
**yep** 19:10 27:11 51:21
106:25 123:19 125:9
**you-all** 4:14 85:1

**Z**

**0**

**1**

**1** 107:11
**1.5** 38:7
**10** 25:9,12 26:9 71:23
75:24 76:16,17 78:23,25
79:1,2 132:10,18

**10.9** 78:1
**10/14/19** 155:15
**10:23** 33:24
**10:29** 33:24
**10:30** 34:1
**100** 18:13 19:12 63:14
84:4
**101,799.70** 13:25
**109** 156:2
**11/23/2016** 155:5,7
**11/5** 127:1
**11:49** 85:5,6
**11:56** 85:6,8
**110** 65:17
**116,121,123,129** 154:5
**118** 154:12
**12** 19:3 32:7 56:16 124:2
154:18
**12:15** 92:17,18
**12:47** 92:18,21
**123** 156:3
**125** 154:11
**129** 16:10
**129,000** 16:4
**13** 40:8
**130,146** 154:7
**14** 14:23 62:13
**145** 154:9
**15** 103:9,18
**15-minute** 49:24 99:20
107:6,10
**150,000** 72:21
**16** 38:5 123:18
**16,000** 15:10
**16th** 49:7
**18-2301** 1:3
**180** 24:4,5
**180-person** 108:19
**1908** 12:9
**1st** 27:5 56:6 77:25

**2**

**2** 15:10
**2/11/19** 155:13
**2:12** 148:20,21
**2:20** 148:21,23
**2:26** 151:3,5
**20** 117:3 123:10 131:6
146:19 154:5
**200,000** 17:10
**2006** 26:15 100:21
**2007** 63:2 88:19
**2008** 88:19
**2010** 87:8
**2013** 84:16
**2014** 34:5 41:12 87:21
89:23 137:10,12,21
138:5,12,14 155:3
**2015** 63:22 85:13 86:12,13
98:21 99:1
**2016** 6:3 13:6 25:5,11 27:5
53:16 55:3 58:21 86:23
**2017** 5:17,25 13:4,8,15
16:24 17:9 18:4 24:12
32:22 33:2,4 34:17
35:11,23 36:3,8,16,19
36:24 37:22 38:7 40:21
40:23 42:11,13,14,19
43:14 46:17 54:12 56:3
56:7,9,13,13 57:7,15
58:1 59:25 61:14,18
62:6,12,14,17 75:14
77:14 78:4 80:7 87:9
89:23 92:10 103:24
105:13 117:6 148:16
154:14,16 155:15

**2017's** 7:22
**2018** 56:6,9 89:25 90:15
93:1
**2019** 1:14 3:8 91:3 93:1
152:6,20 153:7
**22** 87:22 132:1 154:6
**23** 146:22 154:8,20
**23rd** 53:16 55:3
**24/7** 102:2
**25** 154:23
**2500** 19:2
**26** 126:21 154:10
**27** 62:14 154:12
**28** 1:14 123:8 152:6 153:7
**2800** 2:14
**28th** 3:8
**29th** 152:19

**3**

**3** 50:13 52:9 57:4 155:13
**3-150** 154:2
**30** 2:14
**30(b)(6)** 1:10 3:2,5 25:22
133:25
**30,000** 19:6
**300** 26:18
**3000** 2:6 152:7
**31** 50:6,22 51:5 52:9
154:14
**31st** 5:17
**33** 27:6 50:21,24
**333** 1:16 2:5 152:7
**35** 51:4 52:9 55:3 60:13,14
**36** 119:12 129:13,15,24
130:1,4,17 139:21
142:16,19 146:16
**37** 54:6,24 55:8 155:5
**37,775** 19:6
**37th** 54:16 55:9
**39,50,61** 155:2

**4**

**40** 65:21 116:16,22,24
123:22,23
**41,93** 155:4
**421,837.40** 16:23 20:3
**43** 126:4

**5**

**5** 38:9 154:14
**5,7,14,69** 154:16
**50** 71:23,25 106:12 107:3
107:5,9
**52** 2:20 5:11,14 6:2 154:13
**53** 5:11,24 7:10 154:15
155:6,8
**54** 12:16,18 154:17
**55** 23:9 154:19
**55-year-old** 86:14
**55101** 2:15
**55402** 1:17 2:6
**55438** 2:10
**56** 25:25 27:22 154:21
155:10
**57** 39:23,25 40:2 50:5 61:5
62:8 155:1
**58** 41:17,19 95:4 155:3
**59** 53:10,12 54:4 55:13,14
57:5 155:5,12

**6**

**60** 54:2 55:17 57:5 155:7
**600,000** 97:24
**61** 56:10,12 155:9

**62** 59:13 155:11
**63** 67:7,10 155:13
**64** 67:7,11 155:15
**65** 85:9,12 86:5 155:17
**66** 86:9,11 155:14,16,19
**67** 80:19 121:23 155:20
**68** 88:22 89:12 155:22
**69** 110:17,19 156:1

**7**

**7,007** 19:11
**7/17** 154:9
**7/6/17** 154:7
**70** 2:20 124:19,21 125:7
156:3
**72** 106:22
**77** 19:11

**8**

**8** 32:7 59:16
**8,550** 13:3,23
**8,953,643.98** 69:24
**80** 27:6
**84** 155:18
**85** 155:19
**850,000** 97:25 137:25
**8500** 22:17
**86** 155:21
**87** 155:23

**9**

**9** 70:2 77:15 107:11
**9:35** 3:4,9
**90** 25:10,11 26:10 70:7
71:22
**90-day** 73:5
**9321** 2:10
**95** 70:7
**952.943.1587** 1:24