# EXHIBIT 25

1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

--------------------------------------------------------

CIV. NO. 18-2301 (JRT/KMM)

David W. Lynas, as Trustee for the
next-of-kin of James C. Lynas,

          Plaintiff,

      vs.

Linda S. Stang, et al.,

          Defendants.

---------------------------------------------------

VIDEO DEPOSITION TRANSCRIPT OF

TODD LEONARD

May 31, 2019

at

Caribou Coffee, St. Cloud West
4135 West Division Street
St. Cloud, MN 56301

Reporter:  Jane T. Doby
Registered Merit Reporter
Doby Professional Reporting, Inc.
DobyReporting.com
952.943.1587

## 2

1    APPEARANCES:
2    On Behalf of Plaintiff David W. Lynas:
3      Robert Bennett, Attorney at Law
      rbennett@gaskinsbennett.com
      Kathryn H. Bennett, Attorney at Law
4      kbennett@gaskinsbennett.com
5    GASKINS, BENNETT & BIRRELL, LLP
      333 South Seventh Street
6      Suite 3000
      Minneapolis, MN 55402
7
      On Behalf of the Sherburne County Defendants:
8
      Jason M. Hiveley, Attorney at Law
9      jasonh@rc-law.com
      IVERSON REUVERS CONDON
10     9321 Ensign Avenue South
      Bloomington, MN 55438
11
      On Behalf of MEnD Defendants:
12
      Anthony J. Novak, Attorney at Law
13     tnovak@larsonking.com
      LARSON KING, LLP
14     30 East Seventh Street
      Suite 2800
15     St. Paul, MN 55101
16
      Also Present: Jayme Hogan, Envision Video
17
18    NOTE: Pursuant to Minnesota Rule of Civil Procedure
      30.06, the original transcript will be
      delivered to Gaskins, Bennett & Birrell,
19     LLP, the noticing party.
20    NOTE: Exhibit No. 28 was were marked for
      identification.
21
22
23
24
25

## 3

1         P R O C E E D I N G S
2      (The video deposition of TODD LEONARD was
3   commenced at 9:03 a.m. as follows:)
4         TODD LEONARD,
5   called as a witness, being first duly sworn, was
6   examined and testified as follows:
7      VIDEOGRAPHER: This is the video deposition
8   to Dr. Todd Leonard. Today's date is May 31st, 2019,
9   and the time is approximately 9:03 a.m.
10      Would each attorney please state their name
11   for the record.
12      MR. BENNETT: Robert Bennett, appearing on
13   behalf of the plaintiff.
14      MS. BENNETT: Kathryn Bennett, for the
15   plaintiff.
16      MR. NOVAK: Tony Novak, for the witness.
17      MR. HIVELEY: Jason Hiveley, for the
18   Sherburne County Defendants.
19      VIDEOGRAPHER: Thank you.
20      Would the court reporter please administer
21   the oath.
22      (Oath administered.)
23      THE WITNESS: I do.
24         TODD LEONARD,
25   called as a witness, being first duly sworn, was

## 4

1   examined and testified as follows:
2           ***
3        EXAMINATION
4   BY MR. BENNETT:
5     Q   Would you state your full name for the
6   record, please.
7     A   Todd Arthur Leonard.
8     Q   And what is your present occupation?
9     A   President and chief medical officer for
10   MEnD Correctional Care.
11     Q   And was that true in -- from the period
12   November 1 to November 9, 2017?
13     A   Yes.
14     Q   In addition, did you have other -- and by
15   "medical director," you mean you were in charge of
16   all -- over all medical care that MEnD provides?
17     A   I supervise, either directly or indirectly,
18   all clinical staff.
19     Q   But the buck stops with you. Right?
20   That's the Harry Truman --
21     A   I don't know how to answer that. I -- I'm
22   responsible for supervising my clinical staff.
23     Q   And you understand that you provide
24   correctional medical care. Correct?
25     A   Correct.

## 5

1     Q   And correctional Medicare -- medical care
2   is -- is just a little different from regular medical
3   care in that it's constitutionally mandated. Isn't
4   that right?
5     A   I would say there's differences between
6   correctional health care and community health care in
7   a variety of ways. I'm not an attorney, so I -- I --
8   I don't know if I would be able to answer that
9   specific question.
10     Q   So you -- you don't know that the inmates
11   are mandated, that -- to have adequate medical and
12   mental health care and treatment by the United States
13   Constitution and the case law surrounding that?
14   You're unaware of that? Is that what you're telling
15   me?
16     A   I have some -- some idea of the fact that
17   inmates, detainees, are provided, by rights, to have
18   adequate medical care while incarcerated. That I do
19   know.
20     Q   Okay.
21     A   I'm just not an attorney when it comes to
22   particulars.
23     Q   But you've heard of the United States
24   Constitution?
25     A   Yes. I have heard of the Constitution.

**6**

1    Q  And you understand that we all have these
2  rights that are set forth in the Bill of Rights.
3  You've heard of that too.  Right?
4    **A  Correct.**
5    Q  And you know they have these various
6  amendments to the Bill of Rights.  Like the Fourth
7  Amendment is search and seizure.  You know that?
8    **A  I'm aware of it.**
9    Q  Eighth Amendment is cruel and unusual
10  punishment.  And the Fourteenth Amendment is
11  substantive due process.
12       And it's the Eighth and the Fourteenth
13  Amendments that govern correctional medical care.
14  Isn't that right?
15    **A  Again, I'm aware that they have involvement**
16  **in correctional health care.  But I'm -- I'm not an**
17  **attorney to --**
18    Q  Are you aware of anywhere else in -- in
19  medical care that there's a constitutional mandate
20  for it?
21    **A  Am I aware -- can you repeat that?**
22    Q  Are you aware of any other area of medical
23  care where there's a constitutional mandate for it,
24  other than in the prison or jail setting?
25    **A  I don't know the answer to that.**

**7**

1    Q  Okay.
2       You have certain qualifications that you've
3  listed on your CV.  Is that right?
4    **A  Yes.**
5    Q  You're board certified in family medicine
6  is that right?
7    **A  Correct.**
8    Q  And you've had to re-up that, what, twice
9  now?
10    **A  I recertified in 2006 and 2016.**
11    Q  And you have a CCHP certification?
12    **A  Yes.**
13    Q  And that's -- tell us what that is.
14    **A  Certified Correctional Health Care**
15  **Professional.**
16    Q  And what is a CCHP-P certification?
17    **A  That's an advanced certification from the**
18  **NCCHC, National Commission on Correctional Health**
19  **Care, which is Certified Correctional Health Care**
20  **Professional Physician.**
21    Q  Okay.  And you have active medical
22  licensure in Minnesota, Illinois and Wisconsin?
23    **A  Correct.**
24    Q  In November of 2017, were you the
25  medical...

**8**

1       What -- what's -- what's the difference
2  between responsible health authority and medical
3  director, if any?
4    **A  It depends on the facility.  Responsible**
5  **health authority can be a person, it can be an**
6  **entity.  Medical director is definitely a person.**
7    Q  Okay.
8    **A  That's the biggest difference.**
9    Q  Is there -- are there other differences
10  that you're aware of?
11    **A  I suppose you could -- you could suggest**
12  **that there's some different responsibilities**
13  **associated with each.  As an overall perspective.**
14    Q  You've had -- with which county have you
15  had the longest association as a medical director?
16    **A  Should be Sherburne.**
17    Q  And Sherburne County is a large facility.
18  Isn't that correct?
19    **A  I want to correct my last answer.**
20  **I don't know if "longest" is correct.  But**
21  **the most time spent with as medical director.  I**
22  **don't know if that's a difference, but...**
23    Q  Okay.
24       How -- when were you medical director at
25  Sherburne County Jail?

**9**

1    **A  From late 2006 until sometime in 2013.  I**
2  **don't have that -- exact dates.  And then at some**
3  **point in 2014 until present.**
4    Q  Why did it end in 2013?
5    **A  I ended the contract with them.**
6    Q  Why?
7    **A  At the time, all the nursing and clinical**
8  **support staff worked for the sheriff's department,**
9  **and I was the medical director overseeing the clinic.**
10  **And I felt that it wasn't as ideal having the**
11  **clinical staff work for another entity.  I felt it**
12  **was a bit disjointed.**
13    Q  And then you came back on board, is that
14  right, at Sherburne County?
15    **A  Yes.  They asked me to consider coming back**
16  **and, kind of, managing the whole clinic staff,**
17  **including the medical directorship, and take those**
18  **clinical staff members that worked for the sheriff's**
19  **department and take that and put it under the**
20  **umbrella of MEnD Correctional Care.**
21    Q  So when you worked from 2006 to 2013 at the
22  Sherburne County Jail, did you do so under the
23  auspices of the MEnD company?
24    **A  Part of it no, part of it yes.**
25    Q  But you were the only MEnD employee at

## 10

1   Sherburne County Jail during that period?
2       A   No.  That's not correct.
3       Q   Okay.  So what other MEnD employees were at
4   the Sherburne County Jail during the period 2006 to
5   2013?
6       A   I -- I can't tell you at this moment I know
7   every name that would have worked there.  But I can
8   tell you one name for certain was Marty Langenfeld.
9       Q   Okay.  And Marty, what was his position?
10      A   He was a physician's assistant, medical
11  provider.
12      Q   Okay.  So you had some other medical
13  providers during that time period that you employed
14  that worked at the Sherburne County Jail?
15      A   Correct.
16      Q   Did you employ any mental health providers?
17      A   During that time?  I don't believe so.
18      Q   Did you employ any nurses?
19      A   At Sherburne County Jail?
20      Q   Correct.
21      A   I don't believe so.
22      Q   Were there other medical directors [sic]
23  that you employed?
24      A   I have to -- can you rephrase that?
25      Q   Other than Langenfeld.

## 11

1       A   At Sherburne County Jail?
2       Q   Medical provider.  Excuse me.
3       A   I -- I don't recall if there was more than
4   him.
5       Q   Langenfeld is the only one that comes to
6   mind as you sit here today?
7       A   Correct.
8       Q   All right.
9           Then, as I understand it, the sheriff and
10  Sherburne County decided to get rid of ACH?
11      A   I believe that's who was working there
12  during the year that I was away.
13      Q   And you entered into an initial interim
14  contract prior to entering a, basically, a -- I would
15  call a full or more fulsome contract in -- that --
16  it's been marked as Exhibit 5, I think.  That's
17  the -- Exhibit 5 is the larger contract.  The one
18  that was in effect at the time of the death of James
19  Lynas.  Correct?
20      A   The more fulsome, as you call it, --
21      Q   Yeah.
22      A   -- contract?  Yeah, that would have been in
23  effect in 2017.
24      Q   And I didn't mean to characterize it.  It
25  just seems like it governed more people, you provided

## 12

1   more things, and they paid you more money.
2       A   I -- there -- I'm sure there's differences,
3   I just wouldn't know what they are offhand.  But...
4       Q   Okay.  But the idea was, you came in as
5   sort of a stopgap measure until you could work out
6   this other contract?
7       A   I think that's a good characterization.
8   Yeah.
9       Q   Okay.
10          And when -- in -- in November, from
11  November 1 to November 9 of 2017, the dates that
12  James Lynas was in the facility the last time, were
13  you the medical director at that time?
14      A   Yes.
15      Q   Okay.
16      A   Of Sherburne County Jail.  Yes.
17      Q   Can you tell me if you were at the
18  Sherburne County Jail, actually physically present,
19  from November 1 to November 9, 2017, at the Sherburne
20  County Jail?
21      A   I don't recall.
22      Q   Would you have records that would indicate
23  whether you were or not?
24      A   I don't know.
25      Q   We know that you never saw James Lynas; at

## 13

1   least, it doesn't show that you did in the record.
2   Would you agree with that?
3       A   Yeah.  I did not see Mr. Lynas in person.
4       Q   And nor was Mr. Lynas seen, according to
5   the record, by any mental health professional or any
6   qualified mental health professional during those
7   nine days?
8       A   He was not seen face-to-face.  There was,
9   from my review of the records, there was at least two
10  instances where nursing staff consulted with our
11  mental health professional.  But I don't believe any
12  medical provider or mental health professional saw
13  him face-to-face during that time.
14      Q   Well, who was the -- who were the mental
15  health professionals, by name, from November 1 to
16  November 9 of 2017?
17      A   The one I know for certain is Michael
18  Robertson.
19      Q   And Michael Robertson has indicated he
20  didn't see him.  Correct?  He had no involvement with
21  him.
22      A   I -- I don't know what Michael Robertson
23  has said, personally.  I just know what my review of
24  the record.
25      Q   Okay.

14

1         (Sotto voce communication between
2 plaintiff's counsel.)
3 BY MR. BENNETT:
4      Q   I'm showing you what's been marked as
5 Exhibit 13.
6      A   Okay.
7      Q   And if you don't mind, I -- it's -- not all
8 of it is particularly important.  But I'm going to
9 direct your attention to an email from Michael
10 Robertson sent Monday, December 10th, 2018.
11      A   Okay.
12      Q   Is that right?
13      A   Yep.  At 4:57.
14      Q   He's responding to a call from Brian Frank.
15 Correct?
16      A   If that's what the subject says, correct.
17      Q   And who is Brian Frank, just for --
18      A   I believe his title is jail administrator
19 at Sherburne County Jail.
20      Q   And the next page, it goes on.  And James
21 Lynas, I can -- I can tell you, is patient number
22 12010.  You'd agree with me, based on the record?
23      A   Well, I'm going by what you're saying,
24 but...
25      Q   Well, I don't want you to do that.

15

1         Your record --
2      A   Correct.
3      Q   -- indicate he's patient number --
4      A   That's his ID number.
5      Q   -- 12010?
6      A   Correct.
7      Q   So we know we're talking about Mr. Lynas?
8      A   Correct.
9      Q   And what does he say there?
10      A   "It was not a case I was ever involved in,
11 but relayed that the patient was placed on MHW15 due
12 to high BDI and risk factors when nursing met with
13 him about this and consulted with medical provider."
14      Q   And "medical provider" was not him.
15 Correct?
16      A   No.  He was not the medical provider.
17      Q   Medical provider was somebody who had never
18 been to the Sherburne County Jail.  Correct?
19      A   I don't know that fact.
20      Q   Well, that's what she testified to.  If
21 you --
22      A   Okay.  I just don't know.
23      Q   Do you remember her ever -- Crystal
24 Waagmeester -- ever being at Sherburne County Jail?
25      A   I just don't know.

16

1      Q   Okay.  But her recollection about where --
2 if she was or she wasn't, you'd -- you'd have no
3 reason to question her, would you?
4      A   No.
5      Q   Okay.
6         So at least the record indicates that
7 Mr. Robertson, himself, denies having any involvement
8 with James Lynas, patient 12010?
9      A   I don't want to speak for Michael
10 Robertson.  But when I review the medical records, it
11 distinctly says that he has been consulted about this
12 particular patient at least on two occasions.  By
13 nursing staff.
14      Q   This is -- does his...
15         What records are you referring to?
16      A   The medical records of Mr. Lynas.
17      Q   What specific medical records?
18      A   I -- I can show you, if you'd like.
19      Q   Okay.
20      A   I don't have his record in front of me, but
21 I certainly can show you.
22      Q   All right.  We have marked -- let me ask
23 you:  Does the record ever mention Mr. Robertson by
24 name?
25      A   I'd have to look through it to see if they

17

1 say him by name.  I -- I don't know.
2      Q   Okay.  Crystal Waagmeester is not a
3 qualified mental health professional.  Correct?
4      A   I believe she is, definitely, a qualified
5 mental health professional.
6      Q   If she testified she is not, you'd disagree
7 with her?
8      A   I would disagree with that statement.
9      Q   Okay.  Do you know what a qualified mental
10 health professional is?
11      A   I do.
12      Q   Okay.  And what is it?
13      A   It's someone, based on their training,
14 experience, and we go by the definition used at -- by
15 the NCCHC, because we feel that's best practice,
16 that -- and I don't have the definition all in front
17 of me from them.  But based on my experience and work
18 with the NCCHC I think she definitely qualifies as a
19 qualified mental health professional.
20      Q   And this -- if she says she does not, you
21 can't explain that?
22      A   I don't know what she said or testified to.
23 I'm just telling you what I know.
24      Q   That's also a matter of not only -- it's a
25 matter of state law, isn't it?

Doby Professional Reporting, Inc.
952-943-1587

18

```
 1        A   In correctional health care we go by best
 2    practice.  And by best practice, I go by the NCCHC.
 3        Q   Well, and in Minnesota, you have to follow
 4    the Minnesota law?
 5        A   I agree.
 6            MR. NOVAK:  Form.
 7    BY MR. BENNETT:
 8        Q   I mean, correct?
 9        A   There's laws that apply to us, laws that
10    don't apply to us.  Again, I'm not an attorney, but
11    I...
12        Q   But -- but you're in Minnesota.  You're
13    operating in Minnesota, in Sherburne County.
14    Correct?
15        A   Correct.
16        Q   All right.
17            And in your contract that you signed with
18    Sherburne County, you state that Minnesota law
19    applies.  Correct?
20        A   I'd have to read it to tell you what it
21    exactly says.  But...
22        Q   Well, the governing law in the agreement is
23    Minnesota.  Correct?  Article 5.8?
24        A   Sure.  And that's what -- exactly what it
25    says on 5.8.
```

19

```
 1        Q   And you're required under the contract to
 2    follow all applicable state and federal laws in terms
 3    of the contract.  Correct?
 4        A   I would agree.
 5        Q   Okay.
 6            And the NCCHC defines "qualified mental
 7    health professional" as psychiatrists, psychologists,
 8    psychiatric social worker, psychiatric nurses and
 9    others who by virtue of their education, credentials
10    and experience are permitted by law to evaluate and
11    care of mental health needs of patients.
12            That's J-E-05 of the NCCHC regulations.
13        A   Yeah, I mean, I -- I'd have to read it
14    to -- but if you're reading it verbatim, then I agree
15    that's what it says.
16            MR. BENNETT:  Well, we can mark it.
17            (Exhibit 28 was marked for identification.)
18            THE WITNESS:  Thank you.
19            (Sotto voce communication between
20    plaintiff's counsel.)
21    BY MR. BENNETT:
22        Q   Page 81.
23        A   Okay.
24        Q   The third paragraph down.  I believe I read
25    it verbatim.
```

20

```
 1        A   Yep.
 2            And in my consultation with the NCCHC over
 3    the years --
 4        Q   No.  No.  Let's just talk about the
 5    regulation.  Okay?
 6        A   Well, I'm telling you my consultation with
 7    them, they have agreed that prescribing --
 8            MR. NOVAK:  Dr. Leonard, don't worry about
 9    it.
10            THE WITNESS:  Okay.
11            MR. NOVAK:  If he doesn't want to hear
12    about it, he doesn't want to hear about it.
13            THE WITNESS:  Right.
14    BY MR. BENNETT:
15        Q   Well, this is -- I read the -- first of
16    all, I want to -- we'll get to that.  Okay?
17        A   Okay.
18        Q   Did I read the -- did I read the
19    definitional paragraph of the NCCHC?
20        A   I agree.
21        Q   So you apparently claim to have had some
22    conversations with someone connected with NCCHC that
23    changes this?  Is this right?  Or expands it?
24    Lessens it?
25        A   I don't think it changes it at all.  It
```

21

```
 1    just clarifies it.
 2        Q   What about this needs clarification?
 3        A   "Who by virtue of their education,
 4    credentials and experience are permitted by law to
 5    evaluate and care for the mental health needs of
 6    patients."
 7        Q   What law?  Minnesota law?
 8        A   That's -- that's what I was trying to
 9    determine with them.  And what I determined was
10    prescribing medical providers are allowed to evaluate
11    and treat mental health patients, and by that virtue
12    are included in this definition.
13        Q   Well, she was a urologic PA, physician's
14    assistant.  That was her -- that's how she came --
15    what her resume' portrayed.  Crystal Waagmeester?
16        A   I wouldn't call her a urological PA I know
17    she's worked in urology.
18        Q   Okay.  What -- what education had she had
19    in terms of psychiatric interactions?
20        A   So as we sit here today, I can't -- I can't
21    relay all of the aspects of her training before I met
22    Crystal.  All I know is Crystal was a certified
23    physician's assistant, and by that virtue had
24    training in mental health care.  And then as she
25    worked with us, she had attained additional training
```

6 (Pages 18 to 21)

## 22

1  with us and additional experience.  And was very
2  comfortable in evaluating and training mental health
3  patients.
4      Q   Well, interesting.  She used the word
5  "comfortable" about that too.  Only she said she was
6  not comfortable and did not view her -- with
7  psychiatric matters, and did not view herself as a
8  qualified mental health professional.
9          So if she testified to that, you'd disagree
10  with her?
11     A   If -- I would disagree with that statement.
12     Q   All right.
13         In fact, your own personnel file for her
14  shows that she had one four-week rotation in a --
15  at -- in psychiatry.  Are you aware of that?
16     A   I don't remember that.
17     Q   Now, Sherburne County houses federal
18  detainees.  Correct?
19     A   Yes.  They'll house U.S. marshal inmates,
20  immigration inmates, I believe BIA inmates, and
21  rarely a BOP patient.  And actually, BIA patients are
22  rare as well.
23     Q   So because of that, the Federal
24  Performance-Based Detention Standards, the 2011
25  version, utilized by the U.S. Marshal Services --

## 23

1  you're aware of those, aren't you?
2      A   I'm aware of the U.S. marshal standards,
3  correct.
4      Q   And they're -- the Federal
5  Performance-Based Detention Standards are based on
6  the American Correctional Association Standards.
7  You know that?
8      A   I don't recall this verbatim.
9      Q   It -- but those are designed for
10  implementation of policies and procedures in
11  nonfederal facilities that house federal detainees.
12  You have to fulfill the federal standards as well.
13  Correct?
14     A   I know the -- the jail has federal
15  standards.  I don't know which federal standards it
16  can depend on, which version they operate under, what
17  their agreements.  But I know they -- they have to
18  operate under certain federal standards.
19     Q   The suicide prevention section is required.
20  Isn't it?  Of the Federal Performance-Based Detention
21  Standards?
22     A   I'd have to review it to -- to know
23  detailed language.
24     Q   Well, do you know the regulations?
25     A   I don't have them committed to memory.  No.

## 24

1      Q   Would you agree that the federal
2  standards -- in the federal standards, the facility
3  medical director is to ensure a suicide prevention
4  program -- that there is a suicide prevention program
5  in place?
6      A   I'm sure the standards speak to that.  I
7  just don't know exactly what they say.
8      Q   And the staff of those federally -- the
9  subject of these regulations are regularly trained --
10  supposed to be regularly trained to recognize the
11  signs and situations that indicate a potential
12  suicide risk.  Would you agree with that?
13     A   Do you mind repeating that?
14     Q   The facility director is required, under
15  the federal standards, to see that the staff are
16  regularly trained to recognize the signs and
17  situations that indicate a potential suicide risk?
18     A   I -- I agree that -- you're reading that
19  from something, and I...
20     Q   It's B-6 of the suicide prevention
21  standard.
22         Would you agree -- well, let --
23     A   I'm not a jail administrator, so I don't --
24  don't speak to these --
25     Q   I'm talking about the medical staff.

## 25

1      A   Okay.  What about the medical staff?  I'm
2  sorry.
3      Q   Well, the medical staff is supposed to have
4  a sufficient number of qualified mental health
5  professionals available to perform timely assessments
6  of a detainee's risk of assessment.
7      A   If that's what that standard says, then
8  that's what it says.
9      Q   But do you agree that's -- that's the
10  standard you're bound by?
11     A   Again, I don't know what standards you're
12  referencing, and I don't know if those are the
13  standards that Sherburne County Jail has to operate
14  under specifically.
15     Q   Is that something you're supposed to do to
16  provide a constitutionally required medical care?
17     A   Do what?  I'm sorry.
18     Q   To have a sufficient number of qualified
19  mental health professionals available to perform
20  timely assessments of a detainee's risk of suicide.
21     A   I agree with that statement.
22     Q   Okay.
23         Do you agree that potentially suicidal
24  detainees should be monitored through direct
25  supervision at the assessed level of need?

Doby Professional Reporting, Inc.
952-943-1587

26

1    **A**  If you don't mind, please repeat that.
2    **Q**  Do you agree that potentially suicidal
3  detainees are monitored through direct supervision at
4  the assessed level of need?
5    **A**  I guess, in essence, I agree with that. I
6  **think there's more to it than that, but...**
7    **Q**  That detain -- do you agree that detainees
8  who exhibit suicidal symptoms should receive medical
9  and mental health care, housing and supervision?
10   **A**  Yes.
11   **Q**  Now, you agree that Michael Robertson never
12  actually saw James Lynas?
13   **A  Face-to-face, I don't believe he did.**
14   **Q**  That's how you see somebody, face-to-face.
15  Like you and I are looking at each other right now.
16  That's how -- that's what I mean by "see them."
17   **A  -- I'm just telling you, I don't think he**
18  **saw him face-to-face.**
19   **Q**  Okay. And, at least, he indicates he had
20  no involvement. That's what he -- he writes himself.
21   **A  I'm not going to speak to what he wrote in**
22  **an email. I -- I -- I don't know what he meant**
23  **particularly by that statement.**
24   **Q**  Well, it -- do you -- do you find this
25  statement regarding Inmate 12012, James Lynas, quote:

27

1  It was not a case I was ever involved in, end quote.
2       Do you find that ambiguous or un -- is that
3  hard to understand?
4    **A  I guess here's how I find it. I find it**
5  **that he had a phone call a month later, may or may**
6  **not remember the case well off the top of his head.**
7  **Made a comment, an email back to somebody. And I**
8  **agree that he didn't see this patient face-to-face,**
9  **but I absolutely believe he was consulted at least**
10  **twice by nursing staff on this case.**
11   **Q**  There's no record of any -- anything he
12  said or did in the medical record. Is there?
13   **A  Yes. There is, actually.**
14   **Q**  What is it? What's the -- what's the --
15   **A  I can show you, if you'd like.**
16   **Q**  Okay. Show me.
17   **A  I don't have the medical records. Sorry.**
18   **Q**  Well, are you able to -- to tell me where
19  in the medical records you think it shows that he
20  was? What -- what documents?
21   **A  Yes. There should be a -- I mean, I -- I'd**
22  **like to look through the whole thing. But there's at**
23  **least two instances where -- one is where Mr. Lynas**
24  **receives his health assessment from Nurse Thompson,**
25  **and she documents that she consulted with the mental**

28

1  **health professional.**
2       **And then on the mental health referral,**
3  **Mr. Robertson signed off on that he reviewed it and**
4  **he's scheduling the patient for, I believe, 11/16.**
5    **Q**  Some -- some seven days after he hung
6  himself, and four days after he died.
7    **A  What -- I'm sorry. I don't know the**
8  **question.**
9    **Q**  So there's a mark on the file. It's --
10  it's undated, isn't it?
11   **A  I believe this was on --**
12   **Q**  Exhibit 4 -- we're referring to Exhibit 14.
13   **A  Yeah.**
14       **I believe this was on Monday, at --**
15  **November 6. The referral is put into him in the**
16  **evening of November 5th, that he review this**
17  **referral, and that he's scheduling --**
18   **Q**  He didn't say that, did he?
19       MR. NOVAK:  Hang on, Counsel. Let him
20  finish his answer.
21  BY MR. BENNETT:
22   **Q**  Well, what is the -- read the note.
23       MR. NOVAK:  Hang on. Counsel, he's
24  finishing his answer.
25       MR. BENNETT:  All right. Go ahead.

29

1    **A  So he reviews the referral, like he always**
2  **does. And he makes a determination that he's**
3  **scheduling to see this patient with him on 11/16.**
4  **And that's his, Michael Robertson.**
5  BY MR. BENNETT:
6    **Q**  All right. You don't know when he wrote
7  that on there. Correct?
8    **A  I believe he wrote that on Monday,**
9  **November 6.**
10   **Q**  It's not dated, is it?
11   **A  Nope.**
12   **Q**  And have you had any conversations with him
13  about that?
14   **A  I have not.**
15   **Q**  So you have no foundation to say that he
16  reviewed it on any particular day. Do you?
17   **A  I have a foundation of typical operating**
18  **procedure, his pattern, my opinion of his expertise**
19  **and prompt -- prompt -- whatever the word is.**
20  **Timeliness. It would be very typical for him to get**
21  **this referral from the night before and review it the**
22  **next day.**
23   **Q**  And you have no idea if that occurred on
24  this particular -- at this particular time or not.
25  Do you?

30

```
 1        A  I have a good idea.  I just can't tell you
 2   that that's dated.  But I have every indication from
 3   my experience with Michael Robertson that he reviewed
 4   this on November 6th.
 5        Q  All right.
 6           Well, then he scheduled it for ten days
 7   later?
 8        A  Correct.
 9        Q  The guy had a -- Mr. Lynas had a BDI score
10   of 43.  Correct?
11        A  Correct.
12        Q  That indicates severe depression.  Correct?
13        A  Correct.
14        Q  That's a serious medical need.  Correct?
15        A  That's a serious medical matter.
16        Q  And were you aware that the medical
17   provider who was consulted expected that he would be
18   seen within 24 or 48 hours?  In other words, before
19   he hung himself.
20        A  From -- from my review of the medical
21   records, I -- I believe that Crystal Waagmeester
22   referred this patient to Michael Robertson; that he
23   would review this case promptly, as soon as possible.
24        Q  No.  She had the expectation he would be
25   seen within 29 to -- 24 to 48 hours.
```

31

```
 1        A  I don't know that.
 2        Q  Well, if he's so timely, wouldn't that be
 3   the case?
 4        A  "Timeliness" is him reviewing this the next
 5   day and making a clinical decision based on his
 6   expertise and --
 7        Q  Well, again, we don't know that he -- when
 8   he reviewed it.  We'll have to ask Mr. Robertson if
 9   he remembers.  Right?  Because he didn't put the date
10   on there.
11        A  Yeah.  I'm just telling you, I expect that
12   he reviewed this on November 6th.
13        Q  Okay.  But you haven't talked to him, so
14   you --
15        A  I have not spoken to Mr. Robertson about
16   this.
17        Q  You didn't drop a dime on him and call him
18   on the phone and say, you know:  Mike, did you see
19   this piece of paper on November 6th?
20        A  I have not spoken to Mr. Robertson about
21   this.
22        Q  Okay.  So there's no -- you don't know of
23   your own personal knowledge when he did it.  And the
24   only date that he put on there is a -- is 11/16/17.
25   Correct?
```

32

```
 1        A  Yeah.  He's scheduling the patient to see
 2   him on 11/16/17.
 3        Q  Typically, you like to see your patients
 4   before they hang themselves?  If they're a suicide
 5   risk?
 6        A  We don't want anybody hanging themselves,
 7   sir.
 8        Q  Typically, you -- you do it before they
 9   die?
10        A  Typically we want to follow all of our
11   processes and procedures and make our best clinical
12   judgments when we should see patients.
13        Q  Uh-huh.  Okay.
14           Severe depression is a serious medical
15   need?
16        A  I agree.
17        Q  Not coping with your mental health
18   situation is a serious medical need?
19        A  I agree.
20        Q  Not sleeping because of anxiety is a
21   serious medical need?
22        A  Yes.  I -- I agree if you're not sleeping,
23   it's a --
24        Q  Do you know how much Mr. Lynas slept
25   between November 1 and November 9th, when he hung
```

33

```
 1   himself?
 2        A  I don't know the answer to that.
 3        Q  You reviewed the medical records.  Didn't
 4   it consistently indicate that he was not sleeping
 5   well and he had insomnia?
 6        A  I know in the medical records it references
 7   him stating that.
 8        Q  Okay.
 9        A  I don't know if that's fact.
10        Q  The reason Crystal Waagmeester was called
11   was because of the BDI score that indicated severe
12   depression.  Correct?
13        A  She was consulted by Nurse Pfeifer because
14   she -- I -- I believe she received a BDI back; it had
15   a score of 43.  And by process, she is supposed to
16   consult with medical provider, mental health
17   professional.
18        Q  And you think Alyssa Pfeifer and Nurse
19   Thompson are qualified to make accurate and effective
20   suicide risk assessments?
21        A  I think they're very well trained and
22   experienced to follow our processes and protocols.
23        Q  Well, that's not what I asked you.
24           I mean, I don't --
25        A  That's -- that's my best answer I can give
```

**34**

1     you.
2       Q   Well --
3       A   Is that's what they're asked to do.
4       Q   I'm asking you specifically about suicide
5     risk assessments.
6        And do you believe they are -- do you
7     believe Alyssa Pfeifer is qualified to do a competent
8     and accurate suicide risk screening of an individual
9     patient?
10       A   I think she's able to use exactly the tools
11     we give her to and follow the process, which she did.
12       Q   That's not really what I asked.
13        I mean, is she able to accurately determine
14     suicide risk?
15       A   In conjunction with her team, absolutely.
16     That's why she has the process she has in place.
17       Q   Now, how many -- how many suicides has MEnD
18     been the medical provider for?
19        MR. NOVAK:   Form.
20       A   That's a broad question.
21     BY MR. BENNETT:
22       Q   The person who committed suicide.
23       A   Broad question. I mean, what are you --
24       Q   Well, I --
25       A   -- referring to?

**35**

1       Q   How many deaths of inmates that MEnD took
2     care of and supposedly provided adequate mental
3     health care to committed suicide? Simple question.
4        MR. NOVAK:   Form. Argumentative.
5       A   I -- I still need some more particulars,
6     what you're asking. Ever? At Sherburne County?
7     BY MR. BENNETT:
8       Q   Well, I -- let's start with Minnesota.
9       A   Okay.
10       Q   Ever in Minnesota.
11       A   Since our inception?
12       Q   Yeah.
13       A   I don't -- I don't have the number
14     memorized verbatim. It's not many.
15       Q   How many times have you been sued for
16     not -- involving care rendered during suicides? You
17     and MEnD.
18       A   Three times. That I'm aware of.
19       Q   Well, how many times has Brandon Vaughn
20     sued you?
21       A   Who?
22       Q   Brandon Vaughn at Robins Kaplan.
23       A   I don't recognize the name. I'm sorry.
24       Q   How --
25       A   I -- I don't recognize the name.

**36**

1       Q   Do you remember a suicide that he sued you
2     about in Stearns County?
3       A   I don't believe I've ever been sued by that
4     law firm for a suicide in Stearns County. I don't
5     recall that at all.
6       Q   In any other county?
7       A   What do you -- what's the question? I'm
8     sorry.
9       Q   How many times have you been sued by Robins
10     Kaplan in -- for suicides occurring in Minnesota?
11       A   To the best of my knowledge, never.
12       Q   Okay. How many times have we sued you?
13       A   This is the second, I believe.
14       Q   Okay. The -- in the prior one -- do you
15     remember we took your deposition on the Kyle
16     Baxter-Jensen case?
17       A   I remember that.
18       Q   Now, that was the person who slit his
19     throat once, and then after that they did a bunch of
20     suicide risk assessments on him. Right?
21       A   They did some suicide risk assessments. I
22     don't recall the number.
23       Q   And he was sitting in front of the assessor
24     with bandages from cutting his throat from ear to
25     ear, and staples all across his neck. And they gave

**37**

1     him suicide risk assessments that are approximately
2     the -- the numbers that were obtained in the Lynas
3     case. Isn't that right?
4       A   Again, I -- I can't speak to details of
5     that case now, but...
6       Q   Well --
7       A   I know they did some suicide risk scoring
8     assessments with that patient on that case. I do
9     recall that.
10       Q   And none of them indicated that he was at
11     risk.
12       A   I don't -- I don't believe that's what that
13     tool says.
14       Q   Okay. What do you think -- what does the
15     tool do?
16       A   It gives us a -- another piece of our
17     assessment of a patient. It gives us another angle
18     at viewing their level of risk. It just provides
19     another tool that we use.
20       Q   So are you telling me -- let me understand
21     this.
22        You're telling me that the suicide risk
23     screening that you do is not supposed to alert you
24     for the actual risk of suicide. There's no judgment
25     to it at all?

**38**

1    A    There's no patient that has zero risk.  So
2  what I look at that tool as, it can give us -- it can
3  give us some background, some more information.  It
4  can alert to -- us to if we can see obvious high risk
5  of a patient.  It gives us a lot of information, and
6  it's a piece of the a number of things that we use in
7  assessing these patients and treating them.
8    Q    Suicidal ideation is a serious medical need
9  too.  Isn't it?
10    A    It can be.  Suicidal ideation alone may or
11  may not be a serious issue.  It just depends on the
12  patient situation.
13    Q    Opioid withdrawal is a serious medical
14  need.  Isn't it?
15    A    It can be.  It depends on, again, on the
16  case and situation.
17    Q    Same is true with withdrawal from
18  methamphetamine?
19    A    Withdrawal from methamphetamine tends to be
20  less of a medical issue.  But just depends on the
21  situation.
22    Q    If it's -- if -- and -- and how about
23  withdrawal from benzodiazepine.  Is that a serious
24  medical need?
25    A    Again, it depends on the situation.  It can

**39**

1  be.  Sometimes it's not.
2    Q    How about if you're on all three and
3  you're -- and you're suffering withdrawal?  You're on
4  opioids, you're on -- like heroin -- you're on
5  methamphetamine, and you're on benzodiazepine?
6    A    Again, it depends on the particular
7  clinical situation.
8    Q    Does MEnD have Skype capabilities?
9    A    We have Secure Telehealth.  It's a secured
10  version of telemedicine capability.
11    Q    That was not utilized in Mr. Lynas's case.
12  Was it?
13    A    I don't believe so.
14    Q    In fact, Crystal Waagmeester testified she
15  couldn't even look at his medical record and didn't
16  have that available to her in Brainerd, where she
17  lived and received the call.
18    A    I believe she was able to work with the
19  nurse that's on-site to review anything she needed
20  from the medical chart.
21    Q    How would she review it if she -- how --
22  she testified she couldn't review it.  How is it that
23  she would review it?
24    A    Just ask questions of the nursing staff.
25  Get information through them, that's readily

**40**

1  available to them.
2    Q    So you're not talking about -- I just -- I
3  want to understand.  You're not talking about review
4  all the paper record and review the eMD record?
5    A    She can review whatever she would like with
6  the nurse on-site.
7    Q    If she cares to?
8    A    Whatever she feels necessary at that time.
9    Q    But, again, let's focus on the question.
10    A    Okay.
11    Q    I'm talking about, did she have the
12  capability in Brainerd to access and visualize his
13  medical record like you have looked at his medical
14  record before you came here today?
15    A    I would need more particular what you mean
16  by that question.
17    Q    Well, like --
18    A    Like she -- I don't know if she reviewed
19  his medical records for her deposition.
20    Q    I'm not asking you that.  I'm asking:  Do
21  you know a way she had access to it, where she could
22  review it if she wanted to?
23    A    When are you talking about?  I'm sorry.
24    Q    November 6th, when she was called.
25    A    Or November 5th.

**41**

1    Q    November 5th when she was called.
2    A    I don't know if she would have had access
3  to look at it through her eyes.  She would --
4    Q    That's --
5    A    Yeah.  She would have to review it with our
6  medical staff on-site.
7    Q    So her intel is only as good as what the
8  nurse gives her, then.  That would be true?
9    A    It depends on what she asks and what she
10  feels is necessary.
11    Q    Now --
12    A    She has access to anybody at the facility.
13    Q    The records indicate that MEnD was -- been
14  sued nine times in Minnesota.  Any of those not
15  relate to suicide?
16    A    Most are not related to suicide.
17    Q    Okay.
18        You're aware of the system called Epic?
19    A    Yes.
20        You're talking about that electronic
21  medical record?
22    Q    Yes.
23    A    Yes.  I'm aware of it.
24    Q    Do you use Epic?
25    A    We do not.

## 42

1  Q   So if you have a system like Epic -- I
2  mean, there's a lot -- there's different systems that
3  are used.  Right?
4      **A   There 's a variety of electronic medical**
5  **records.**
6      Q   Yeah.  If you have a system like Epic, one
7  doctor, who's not in the same physical location as
8  the patient, can look at the patient's entire medical
9  record.  Isn't that right?
10     **A   That's one of the things you can use Epic**
11 **for, sure.**
12     Q   Do you have any policy that indicates if
13 they -- if there's a suspect -- if people suspect a
14 potential for suicide, where you can have the calls
15 of that inmate monitored on a realtime basis?
16     **A   Can you repeat that?  I'm --**
17     Q   Well, can -- you know the jail has --
18 records calls for -- for of all the inmates?
19     **A   I'm aware of that.  I -- I wouldn't -- I**
20 **wouldn't know if they record all calls, but I know**
21 **they record many calls.**
22     Q   Well, there's certain --
23         How about all nonlegal calls with an
24 attorney?
25     **A   I -- I can't tell you that with certainty.**

## 43

1  Q   Okay.
2      **A   I -- I just -- all I know is they -- they**
3  **can record many phone calls.**
4      Q   Okay.
5          So that at -- you've shown us Exhibit 14.
6  You claim there's another one that shows that
7  Mr. Robertson was consulted by somebody about Patient
8  12010, Mr. Lynas?
9      **A   Yeah.  There's an entry into the eMDs**
10 **system from Jennifer Thompson documenting the fact**
11 **that she performed a health assessment.  And in that**
12 **documentation.**
13     Q   Is it in Exhibit 26?  I believe that's the
14 eMD record.
15     **A   Yeah.  "Reviewed health assessment with**
16 **mental health provider."  On November 3rd, by Jennie**
17 **Thompson, when she performed his health assessment**
18 **and chemical withdrawal assessment.**
19     Q   There's no indication that the medical --
20 there was any response whatsoever from the medical
21 provider on the record.  Correct?
22     **A   Oh, I'm sorry.  I -- I didn't follow that.**
23     Q   Well, it says -- it says what?  Read it.
24     **A   "Reviewed health assessment with mental**
25 **health provider."**

## 44

1  Q   Period?
2      **A   Period.**
3      Q   So there's no -- there's no -- there's
4  memorialization of anything the mental health
5  provider said about it?
6      **A   I don't know what the mental health**
7  **provider said to her during this review.**
8      Q   She didn't write anything down about it?
9      **A   No.  What -- what I see here is that if**
10 **there was going to be a change, she would have**
11 **documented that there should be a change.  The fact**
12 **that she didn't document any changes, there's nothing**
13 **to be changed with this gentleman.**
14     Q   Well, it doesn't record any response.  It
15 doesn't say the mental health provider says to do
16 nothing, says that status quo is fine.  There's
17 nothing that says that.  Is there?
18     **A   No.  I just know that because she didn't**
19 **document any changes, that I don't believe the mental**
20 **health professional wanted any changes.**
21     Q   And, of course, the mental health
22 professional was Mr. Robertson, who said he had no
23 involvement in the case?
24     **A   It's -- it's Michael Robertson that she**
25 **would have reviewed this with on that day.**

## 45

1  Q   Okay.
2      **A   That's my understanding.  So...**
3      Q   She didn't say "Mr. Robertson," did she?
4      **A   In this note?**
5      Q   Yeah.
6      **A   She didn't say him by name.**
7      Q   And she doesn't record any response that
8  anybody's said about the review?
9      **A   Again, I -- I can only answer to what I've**
10 **told you.  That by her not documenting any changes**
11 **that are to be done, that tells me that she reviewed**
12 **this with the mental health provider and no changes**
13 **were to be made.**
14     Q   And there's no note from Mr. Robertson, who
15 you say is timely and competent and effective and all
16 that stuff.  But he doesn't ever say he made any
17 decision about it whatsoever; even to leave it alone?
18     **A   There's not a note directly from him.**
19     Q   There's not a note in the entire record
20 from Mr. Robertson.  Is there?
21     **A   Yes, there is.  I've shown you that before,**
22 **today.**
23     Q   Oh.  The one that said he was supposed to
24 be seen on the 16th?
25     **A   Correct.**

46

1    Q    Was Robertson a MEnD employee in November
2  of 2017?
3    A    Yes.
4    Q    And he's not anymore.  Right?
5    A    No.
6    Q    Where did go?
7    A    I believe he opened his own practice.  I'm
8  fairly certain of it.
9    Q    Do you know what the therapeutic dose of
10  hydroxyzine is?
11    A    Therapy dose would depend on your use of
12  it, what you're trying to achieve.
13    Q    Do you know what the therapeutic dose of
14  hydroxyzine is?
15    A    Again, that's my answer, is it depends on
16  what you're trying to achieve with the medication
17  and -- and how you're using it, and what patient.
18    Q    Well --
19    A    In my opinion, there's no one set dose.
20    Q    Okay.
21        I'm showing you Exhibit 12.  He was --
22  Mr. Lynas was prescribed hydroxyzine, oral route.
23  Correct?
24    A    Correct.
25    Q    And I'm showing you the Mayo

47

1  Clinic's -- you see that?
2    A    Sure.  Sure.
3    Q    And they say, like you just said, that the
4  dose of the medicine will be different for different
5  patients.  That's -- that's what you said.  Correct?
6    A    Yeah.  You -- you can use it in a variety
7  of ways.
8    Q    Okay.  They were using it to control
9  anxiety and tension.  Correct?
10    A    Again, I'm not going to speak for
11  Ms. Waagmeester.
12    Q    That's what the record reflects.  Correct?
13    A    But my review of the record says that they
14  were using it for anxiolytic properties.
15    Q    And that's anxiety and tension?
16    A    Yeah.  Tension, I -- you know, I don't know
17  how to speak to that.  But certainly they were using
18  it to -- to help anxiety.
19    Q    And --
20    A    A stopgap measure.
21    Q    -- the Mayo Clinic says the -- for oral --
22  for oral dosage form, capsules, which is -- or --
23  or -- or suspension, to help control anxiety, adults
24  are 50 to 100 milligrams, four times a day.  Do you
25  see that?

48

1    A    I see that.
2    Q    Disagree with that at all?
3    A    To an extent, yes.
4    Q    Okay.
5    A    Again, it's used -- in my experience, I've
6  seen many patients in correctional health care where
7  it's used anywhere from once a day, twice a day, four
8  times a day, 50 milligrams, 100 milligrams.  And it's
9  used effectively in all ways and forms.
10    Q    It -- exhibit indicates that he was
11  prescribed one tablet orally twice daily, in the
12  morning and at bedtime, for a period of ten days.
13  Correct?
14        (Witness reads the document in a sotto voce
15  manner.)
16    A    Yeah.  Correct.
17  BY MR. BENNETT:
18    Q    And it's written in your prescribing
19  authority, pursuant to Crystal Waagmeester?
20    A    Yeah.  I don't know why they put my name on
21  the prescription.  I can't speak to that.  But it
22  was -- my review of the records, it was ordered by
23  Crystal Waagmeester in this way.
24    Q    Yeah.  And, at least, that differs by half
25  from the dose that apparently the Mayo Clinic seems

49

1  appropriate?
2    A    I -- I'm just telling you --
3    Q    For adults to control anxiety and tension.
4    A    You're citing one source's recommendations.
5  I've seen people use medication extensively for years
6  and years in all different ways effectively for all
7  different kinds of patients.
8    Q    Well, it shows that he -- how many pills
9  did he actually take?
10    A    Out of this blister pack?  It looks like he
11  took three of them.
12    Q    There's -- there's no other -- the medical
13  record doesn't contain any other record of any other
14  hydroxyzine, does it?
15    A    I -- I can't answer to that.  All I can
16  tell you is the picture of this blister pack show
17  there's three missing.  I'd have to review his MAR to
18  tell you how many he took in total.
19    Q    Well, we got that.
20    A    Okay.
21    Q    Oddly enough, it matches the blister pack.
22        Shows that he took three?
23    A    Correct.
24    Q    Okay.
25        And how many should he have taken, assuming

50

1  the prescription was prescribed on the 6th, I think,
2  it actually went in, until the time he hung himself
3  on the 9th? Even according to this prescription.
4       A   It's however many that he feels that he
5  needs to take. It's an as-needed medication. It's
6  not scheduled. So it's however he feels that he
7  wants to use it. If he feel like he needs it, it's
8  available to him.
9       Q   How do we know that?
10      A   Because it says, "as needed."
11      Q   Okay. What does it say on the prescription
12  itself?
13      A   "As needed."
14      Q   Yeah. And it says once in the morning,
15  once --
16          Do you think he was having less anxiety in
17  the days leading up to his hanging himself?
18      A   I don't know.
19      Q   Because nobody saw him?
20      A   I can't speak to that.
21      Q   When does the record show he was last seen
22  by anybody at MEnD?
23      A   I'd have to review the record.
24      Q   You did already.
25      A   Yeah. I -- I'd have to review it right now

51

1  in front of you.
2       Q   I don't think it's after the 7th. I don't
3  think it's after the 6th. Is it?
4       A   Wait. Is this it?
5       Q   Well, that's --
6       A   Is this the total of --
7       Q   That's the -- the --
8       A   Because I don't think this is everything.
9       Q   Well --
10      A   Medical record.
11      Q   The other exhibit -- we don't have any
12  record of him being seen after the 6th. And we
13  have --
14      A   I just don't want to misspeak. That's all.
15      Q   Oh. Other than the code blue on the 9th.
16  I mean prehanging visits.
17      A   Well, I don't believe this is the full
18  medical record here. But --
19      Q   Take a look at all the other exhibits.
20      A   That's fine.
21          He's corresponded with on November 8th.
22  Not seen face-to-face.
23      Q   What's the correspondence say, shown in
24  that?
25      A   He wrote a sick call note to the clinic

52

1  saying, "My sister to drop my glasses off."
2       Q   Okay.
3       A   And then Jen Thompson, our nurse, responded
4  to Mr. Lynas, "Please have your sister drop off your
5  glasses."
6       Q   Okay. But it doesn't show that he's seen
7  on the 8th?
8       A   I don't believe he's seen on the 8th
9  face-to-face, no.
10      Q   Or the 7th. Right?
11      A   I'd have to look.
12      Q   And other than --
13      A   There's a lot of things in here other than
14  the medical chart, so...
15      Q   Do you -- do you have it with you?
16      A   The what?
17      Q   His medical chart. Did you bring it
18  yourself?
19      A   I don't have it personally. I don't know
20  if you have a copy with you. I -- I did not bring a
21  copy with me. Sorry.
22      Q   Do you recall him being seen after the 6th?
23  Other than the posthanging code blue?
24      A   I'm just looking to make sure, sir.
25      Q   Okay.

53

1          (Sotto voce communication between
2  plaintiff's counsel.)
3       A   I don't believe he was seen face-to-face
4  after that.
5  BY MR. BENNETT:
6       Q   And he had no ability to see him other than
7  face-to-face? There's no way to visualize him? In
8  other words, you didn't have a TV screen they could
9  look at and see him?
10      A   From our medical staff, you mean?
11      Q   Yeah.
12      A   They would just see him face-to-face if
13  they were going to see him.
14      Q   All right.
15      A   Yeah.
16      Q   Okay.
17          So other than those three hydroxyzine
18  tablets and some Maalox, was he treated by MEnD
19  personnel at all?
20      A   With medication, or --
21      Q   In any way. Counseled...
22      A   Well, all -- all of the visits that he had
23  with our staff, all involved interaction, assessment,
24  observation, discussion, some therapeutic guidance
25  with him.

**54**

1     Q  Where does it indicate that it's
2 therapeutic guidance?
3     A  It -- it's what our nursing staff always
4 do.
5     Medication uses what's on the MAR.
6     Q  There's no record of any visit with any --
7 with any mental health specialist?
8     A  Face-to-face, no.
9     Q  Any other way?
10     A  Again, I'd just repeat what I've said
11 earlier.  That our mental health professional was
12 consulted regarding this case at least two times, by
13 my review of the records.
14     Q  But the mental health -- you'd agree with
15 me the mental health specialist never spoke or saw
16 Mr. Lynas?  Spoke to --
17     A  Directly with him, no.
18     Q  Okay.
19     There was a previous suicide in Sherburne
20 County not too far away from this.  Correct?
21     A  I don't know the exact date.  But it was
22 around that time.
23     Q  Yeah.
24     Did you do anything to -- and it -- was
25 that by hanging?

**55**

1     A  I don't recall the method offhand.  I'm
2 sorry.
3     Q  Well, those are -- are those big events,
4 where you get people together and go over best
5 practices and that sort of thing?
6     A  I review the cases for, you know, medical
7 care and the merits of that care soon after an event
8 like that, yes.  I just don't want to misspeak.
9     Q  Did you talk to Crystal Waagmeester about
10 this?
11     A  I don't recall if I ever spoke to her
12 directly after or not.
13     Q  Do you recall --
14     A  My review -- my review of her decision
15 making on this case I thought was good and competent.
16 So I wouldn't have had issue with what she did.
17     Q  And you -- did you understand that her
18 expectation was that he would be seen by a mental
19 health professional the next day?
20     A  My understanding of her expectation is that
21 this would be a prompt referral to the mental health
22 professional, and it is their clinical decision
23 making of how they're going to proceed with this
24 case.  That's my understanding of it.
25     Q  That's not what she said in her deposition,

**56**

1 though.  Were you -- would you be surprised --
2     A  I can't speak to her deposition.
3     Q  -- that she expected that he'd be seen by
4 the mental health specialist that next day?
5     A  I'm just telling you, standard operating
6 procedure and what I would expect in this case is
7 exactly what I told you.  That if I make a prompt
8 referral to a mental health professional, that that
9 mental health professional has to decide on their own
10 clinic decision making how they're going to proceed
11 with that case.
12     Q  What does a score of 43 on the Beck
13 Depression Inventory mean to you?
14     A  It means that it's above a threshold where
15 I want our nursing staff to consult with a medical
16 provider or mental health professional on where that
17 case should go at that time.
18     Q  Well, the Beck Depression Inventory has
19 been around since 1996.  Correct?
20     A  I don't know exactly when it came into
21 being.  But I know it's been around for a long time.
22     Q  About as long as you.
23     A  Well, I'm a bit older than that.
24     Q  As a doctor.
25     A  Oh, as a physician.  Correct.  Yes.  Yes.

**57**

1     Q  Okay.  So they've been using it, basically,
2 your whole career?
3     A  To some extent, yes.  I've used it in
4 varying capacities.
5     Q  And tests like that, psychometric tests,
6 have sensitivity and specificity ratings.  Correct?
7     A  Correct.
8     Q  Do you know what the Beck Depression
9 Inventory-II's sensitivity rating and specificity
10 rating --
11     A  I don't have it committed to memory.
12     Q  Showing you Exhibit 10.  Would that -- does
13 that appear to indicate that it's sensitivity rating
14 is 81 percent and specificity is 92 percent?
15     A  That's what this says.  I can't speak to if
16 that's accurate or not, but...
17     Q  What does it say on -- and that's clearly
18 referring to the Beck Depression Inventory?
19     A  Uh-huh.
20     Q  Is that right?
21     A  Yeah.  Beck Depression Inventory-II.
22 Correct.
23     Q  Now -- then, how to score the BDI.  It
24 says -- this is a scale you have in your clinic.
25 Isn't it?

15 (Pages 54 to 57)

## 58

1  A  We use a modified version of this scale.
2  Q  Well, you --
3  A  That helps our nurses.
4  Q  That -- the scores from 29 to 63 indicate
5  severe depression?
6  A  Oh, I agree.  I agree with that.
7  Q  Okay.
8      And hydroxyzine is not an antidepressant.
9  Is it?
10  A  Correct.
11  Q  He received no antidepressant?
12  A  During that time frame?  No.
13  Q  And as far as -- there wasn't anything done
14  to treat his depression in any way from November 1 to
15  November 9.  Correct?
16  A  No.  I think they were following all
17  processes that we use.  That we're initiating his
18  care, getting the referral made.  It's a process that
19  we go through.  And whether he would have been on an
20  antidepressant when that would have happened, that
21  all goes through with our process in working with our
22  mental health professional and...
23  Q  I'm just asking you if he got any care and
24  treatment for his depression.  Did he get any
25  counseling for his anti -- for his depression?  Did

## 59

1  he get any -- any psychotropic drugs for his
2  depression?
3  A  He got no antidepressant medication during
4  this time.  But what I'm telling you is, he's having
5  these visits with our nursing staff.  They're
6  consulting with our mental health professional.  He's
7  making clinic decisions on when it's best for him to
8  see that patient.  And then based on that, that's
9  when we would decide on a full treatment plan for
10  this patient.
11  Q  All right.  And my question is simply:
12  Between November 1, when he got to the institution,
13  and November 9th, when he hung himself, did he
14  receive any care and treatment for the severe
15  depression?
16      MR. NOVAK:  Asked and answered.
17  A  He did not receive any antidepressant
18  medication during that time.
19  BY MR. BENNETT:
20  Q  Did he receive any psychotherapy from any
21  psych -- licensed psychologist?
22  A  No formal psychotherapy.
23  Q  All right.
24      Mr. -- or I guess it is Dr.  Is it -- is he
25  a PsyD?

## 60

1  A  Yeah.  He's psychologist.  Doctor of --
2  Q  He's a -- Dr. Robertson.
3  A  Dr. Robertson.  Correct.
4  Q  I want to correct -- be the right...
5      He didn't receive any psychotherapy from
6  him.  Correct?
7  A  Not during this time frame, no.
8  Q  And he didn't have any DSM-5 multiaxial
9  diagnose -- diagnosis or assessment.  Correct?
10  A  Not yet.
11  Q  It's harder to do after they kill
12  themselves.  Isn't it?
13      MR. NOVAK:  Form.  Argumentative.
14      MR. BENNETT:  Strike it.  That's fine.  I
15  don't need an answer.
16      MR. NOVAK:  Just for fun.  Right, Bob?
17      MR. BENNETT:  Yep.
18      MR. NOVAK:  Great.
19      Go on.
20  BY MR. BENNETT:
21  Q  Well, I mean, it doesn't do any good to --
22  to not provide care to somebody.  That's sort of the
23  essence of deliberate indifference.  Do you
24  understand that?
25      MR. NOVAK:  Form.  It's --

## 61

1  BY MR. BENNETT:
2  Q  You know --
3  A  What's the question?  I'm sorry.
4  Q  -- the standard -- the legal standard
5  you're -- that you're being held to here is whether
6  there was deliberate indifference to a serious
7  medical need.  Isn't that -- do you understand that's
8  what --
9  A  I understand the essence of deliberate
10  indifference.  Correct.
11  Q  And a conscious decision to do nothing
12  would be evidence of deliberate indifference.
13  Wouldn't it?
14  A  I'm not an attorney, sir.  I -- I can't
15  answer that.  I am not an expert in law.
16  Q  Well, the Beck Depression Inventory with
17  its sensitivity and specificity is indicative of a --
18  of severe depression, as you indicated.  Correct?
19  A  It's -- it's another tool that we use in
20  our assessment of patients.
21  Q  And when did he take that test, according
22  to the medical records?
23  A  I'd have to look to give you the exact time
24  when he --
25  Q  It's the 5th, isn't it?

## 62

1    A  It's when he returned it.  I just don't --
2    Q  Okay.
3    A  I don't know the exact time when he
4  received it.
5    Q  Okay.  See if we can find it.
6       Exhibit 27.
7    A  So this was reviewed on November 5th by
8  Nurse Pfeifer.
9    Q  And Exhibit 19 -- I've got to find
10  Exhibit 19.  I think it's in the middle pile here.
11       Do you see 19?
12    A  I don't yet.
13    Q  Maybe I've got it here.
14       19 or 20?
15       Okay.  We'll just take a second here and
16  find it.
17       Why don't we go off the record for five
18  minutes.
19       VIDEOGRAPHER:  Off the record at 10:13 a.m.
20  (Recess taken.)
21       VIDEOGRAPHER:  This is File 2.  We're on
22  the record at 10:25 a.m.
23  BY MR. BENNETT:
24    Q  I think this is the exhibit that shows that
25  it was given and scored on the 5th.  If you look at

## 63

1  the test to it, it marries up that way.
2    A  Yeah.  It may have been -- wait one second.
3       Oh.  It was given on the 3rd.
4    Q  Well, when was it scored?
5    A  It was scored on the 5th.  So he returned
6  it on the 5th.
7    Q  And Crystal Waagmeester was called on the
8  5th?
9    A  Correct.
10    Q  Immediately after getting that?  That same
11  day?
12    A  Yeah.  Probably.  Yeah.
13    Q  Yeah.
14    A  I don't -- yeah.
15    Q  Probably?
16    A  Uh-huh.
17    Q  And so between the 5th, the mental health
18  specialist, Dr. Robertson, decided that he could go
19  between the 5th and the 16th without being seen?
20    A  Ah...
21    Q  Due to your process and protocols, that
22  sort of thing?
23    A  I believe Dr. Robertson reviewed this case
24  on Monday the 6th, and made a determination that he
25  was going to see the patient on the 16th.

## 64

1    Q  And there's nothing that indicates that he
2  reviewed it on the 6th, including -- he hasn't orally
3  told you that, and there's nothing in writing that
4  shows that it was done on the 6th.  Correct?
5    A  I believe that he did it on the 6th, based
6  on all of my experience working with Dr. Robertson;
7  based on the way they hand off these cases in this
8  clinic.  He would have arrived on Monday morning.  He
9  would have had this referral waiting for him.  I'm
10  quite certain he reviewed this promptly that day.
11  And -- reviewed this case.  I don't know who he spoke
12  to.  And he would have made a determination then that
13  he would see this patient on the 16th.
14    Q  Well, Trump believes windmills cause
15  cancer.
16       But there's nothing in the record that
17  shows that he reviewed it on the 6th.  Is there?
18    A  Again, that's all I can tell you, is I
19  believe that he reviewed it on the 6th.  Based on
20  when I see this referral going to him, knowing that
21  he would be there on Monday, and his typical
22  operating procedure and our expectations in the
23  clinic.  So...
24    Q  Yeah.  But please answer my question.
25  There's nothing in the medical record that shows that

## 65

1  he saw -- that he reviewed it on the 6th?
2    A  It's not documented that it says
3  November 6th on it.  I agree.
4    Q  And if he did, he ignored him for ten days?
5    A  I don't believe he ignored this patient at
6  all.
7    Q  Okay.  Yeah.
8       He doesn't believe he had any involvement
9  with the patient at all.  According to his own
10  writing I showed you.  Isn't that right?
11    A  I can't speak for Dr. Robertson's email a
12  month later.
13    Q  Well, what do you base your belief on?
14    A  My experience with him and the medical
15  records that I see.
16    Q  Well, the medical records don't indicate
17  anything from Dr. Robertson, other than he scheduled
18  him for appointment ten days after you believe he
19  looked at the record, and 11 days after he scored a
20  43 on the BDI.  Correct?
21    A  What I see is that Dr. Robertson was
22  consulted on this patient at least twice by our
23  staff; reviewed the referral and the records
24  available, and determined that he was going to see
25  this patient on the 16th.

Doby Professional Reporting, Inc.
952-943-1587

66

1    Q   Again, there's nothing -- you don't --
2  you've never asked him about it?
3        A   Dr. Robertson?
4        Q   Yeah.
5        A   I don't know if I've every spoke to him
6  about this patient or not.  I don't recall.
7        Q   Well, you indicated you hadn't spoken to --
8        A   No, you asked me if I had -- I don't
9  remember the exact words.  If I had call and given
10  him the something about this case.  And I haven't
11  done anything of the sort.  I just don't recall if I
12  ever had any conversation with him shortly after
13  Mr. Lynas' death or not.
14        Q   But not recalling could -- could be from
15  two things.  One:  You did it and you don't remember.
16  The second is you didn't do it at all.  Right?
17        A   I'm just telling you I, don't recall if I
18  had a direct conversation with Dr. Robertson shortly
19  after.
20        Q   But the record reflects, from
21  Dr. Robertson, that he had no involvement in it.
22  Correct?
23        A   No.  The medical records don't say that.
24        Q   Well, the only thing that -- isn't that
25  what Dr. Robertson wrote?

67

1        A   Dr. Robertson sent an email to someone a
2  month after this case saying whatever Dr. Robertson
3  said in his email.  I'm just telling you, my review
4  of this case tells me that he was consulted on the
5  case at least twice.
6        Q   Well, but the -- the actual --
7            From Dr. Robertson there are two things in
8  the record.  One:  That handwritten note, say he's
9  scheduled to see him on the -- on 11/16/17.
10        A   Correct.
11        Q   And the second is the email.  Right?
12  That's the only two things authored by Dr. Robertson.
13  Am I correct?
14        A   Authored by Dr. Robertson.  I agree with
15  that.
16        Q   Okay.
17        A   And again, I don't know -- I'm not going to
18  speak for what Dr. Robertson was saying in his email.
19        Q   Well, the reason you write emails is to
20  communicate facts to people, among other things.
21  Correct?
22        A   There's a lot of reasons for writing
23  emails.  I just -- I just can't speak to what he
24  remembered at that time or not.  I --
25        Q   But he can.

68

1        A   He can speak for that.  I just -- I can't
2  speak for him.  That's all.
3        Q   You believe that untreated severe
4  depression can lead to suicide.  Don't you?
5        A   It's possible.  Yes.
6        Q   In fact, that's what happened in this case.
7  Isn't it?
8        A   No.  I don't believe that's what happened
9  in this case.  I believe this patient made a
10  conscious decision to complete a suicide.  I can't
11  tell you what was in his head.
12        Q   Well, one of the things -- you have in the
13  medical record reports of interviews by Alyssa
14  Pfeifer.  Right?
15        A   Correct.
16        Q   And the Beck Depression Inventory.  Right?
17  These are the tools.  Right?
18        A   Correct.
19        Q   And then you have these sort of discordant
20  suicide risk screening things that are low?
21        A   I don't agree there's discordant, but --
22  that's your word.
23        Q   Well, are screening -- are the suicide risk
24  screening numbers discordant with a BDI of 43?
25        A   I don't believe they have to be one in the

69

1  same.  I don't believe they have to give the same
2  numbers.  They are what they are.  They're
3  independent tools that you use.
4        Q   And one is a tool that's been used for
5  essentially the entirety of your medical career --
6        A   Correct.
7        Q   -- and is -- is a consistently utilized
8  psychometric test device used by psychologists and
9  psychiatrists the world over?
10        A   I can't speak to how pervasive it's used
11  worldwide.  I can tell you it's used commonly in our
12  operations, day in and day out.
13        Q   Okay.
14            Have you ever listened to the phone calls
15  from James Lynas, patient or inmate number 12010?
16        A   I don't believe so.
17        Q   Had any -- read any reports of those?
18        A   I don't believe so.
19        Q   Okay.
20            Now, there's a -- there's a policy imposed
21  on you guys, the MEnD people, by Sherburne County
22  Sheriff's Department, as I understand it, about the
23  use of the term "suicide watch" not being something
24  that they want to have utilized.  Right?
25        A   I'm not aware of such policy.

70

1    Q   Not at all?
2    A   I'm not aware of any policy of that nature.
3  Our -- our staff commonly used the term "suicide
4  watch."
5    Q   And that's --
6    A   They may choose not to use that. I don't
7  know.
8    Q   Who is "they"?
9    A   Sherburne County staff. I don't know.
10   Q   Well, you were the medical director there
11 in November 2017. Right?
12   A   Correct.
13   Q   What was their policy in 2017?
14   A   I don't have their policy from '17
15 committed to memory. I'm sorry. I don't know what
16 it specifically says.
17   Q   But do you know what it generally said with
18 regard to the use of the term "suicide watch"?
19   A   I don't recall that terminology.
20      It was well understood between correctional
21 staff and medical staff, whatever the term used, what
22 it meant.
23   Q   Well, you are the -- you were the medical
24 director. You don't know what terms that they wanted
25 you to use?

71

1    A   No. I know the terms that we used and they
2  accepted them and they understood them.
3    Q   Okay. Maybe I have it wrong, then. Did
4  you have a policy, did MEnD have a policy, to not use
5  the term "suicide watch"?
6    A   No.
7    Q   You're perfectly comfortable with the use
8  of the term "suicide watch"?
9    A   I am.
10   Q   And as far as you know, sitting here today,
11 under oath, there was no restriction on the use of
12 the term "suicide watch" at Sherburne County Jail in
13 November of 2017?
14   A   I'm not aware of that, if that was in
15 place.
16   Q   Okay. As I understand it, it's your job to
17 know what's going on in the facilities you're the
18 medical director at, if you're part of the suicide
19 prevention plan. Correct?
20   A   I -- I am well aware of many things that
21 were happening in Sherburne, and -- and I should know
22 that. Yes.
23   Q   Did -- are you the person responsible for
24 the development of Exhibit 17, the suicide prevention
25 policy?

72

1    A   This is a job description.
2       I'm sorry. What was the question?
3       Isn't it? Or did I misread it? Sorry.
4    Q   No, excuse me. I had -- maybe I handed you
5  the wrong one.
6       Oh, this is the job description for medical
7  provider. You're responsible for the contents of
8  that?
9    A   I'm one of the people responsible for
10 putting this together.
11   Q   As the CEO, you're ultimately the person in
12 charge?
13   A   Of my staff? I'm responsible for
14 supervising my staff, correct.
15   Q   And supervising the policies that govern
16 your staff?
17   A   Correct.
18   Q   Implemented by MEnD.
19      (Reporter's note: No answer was provided.)
20 BY MR. BENNETT:
21   Q   Now, you know that many, many of the
22 inmates do not have regular mental -- or medical or
23 mental health care. Correct?
24   A   You'd would have to be more specific. I'm
25 sorry.

73

1    Q   Well, a lot of the inmates at Sherburne
2  County do not have medical insurance. Would agree
3  with that?
4    A   I'm still not totally following your
5  question.
6    Q   Is it -- what don't you follow?
7    A   When you're incarcerated, you have no
8  insurance. Are you talking about prior to
9  incarceration?
10   Q   Yeah, prior to incarceration.
11   A   No. I would say most patients have
12 insurance; just how many have MA versus private
13 insurance. There's certainly some that do not have
14 any insurance. But I would say, in recent years,
15 because of legislation and such, we -- we have more
16 people coming to the jail who are actively on
17 insurance.
18   Q   You have a number of people that are
19 obviously self-medicating for mental health problems?
20 Like Mr. Lynas?
21   A   I -- again, I don't know the reasoning for
22 drug abuse with this particular patient. But we
23 certainly have a significant number of patients that
24 come to us that abuse drugs for a variety reasons and
25 circumstances. It's a significant problem.

Doby Professional Reporting, Inc.
952-943-1587

74

1  Q   Does MEnD's mental health -- does MEnD's
2  medical record of James Lynas, regarding James Lynas,
3  indicate the fact that he was self-medicating with
4  drugs to cover or mask his mental health?
5  A   I'd have to review the records to give you
6  that level of detail.  I know it documents that he's
7  been abusing drugs.
8  Q   And do you remember...
9  (Sotto voce communication between
10 plaintiff's counsel.)
11 BY MR. BENNETT:
12 Q   The history of the present illness in the
13 medical record indicates that, doesn't it?  That he
14 was self-medicating, and had come to that realization
15 here in prison -- or in jail, rather?
16 A   I don't see where he -- he claims that he's
17 using drugs to -- the term "used," I don't see that.
18 Unless I missed it.
19 Q   Read the sentence that after "reports."
20 Out loud.
21 A   "Reports now being in jail"?  That one?
22 Q   Uh-huh.
23 A   "Reports now being in jail is the first
24 time in one and a half years he's been sober and is
25 having to deal with his mental health.  When asked

75

1  how he's currently coping with it, patient stated,
2  'Honestly, I'm suffering and not coping with it.'"
3  Do you want me to continue?
4  Q   Yeah.
5  A   "Patient reports he went to court on
6  Tuesday and got four months, but possibility of going
7  to workhouse after 30 days, but thinks it's in his
8  best interest to do the four months and then go to
9  treatment that does dual diagnosis to get help with
10 drug use and mental health, like at Nystrom or
11 Recovery Plus.  Reports the last time he went to
12 treatment, his mental health was not addressed, and
13 he thinks that was part of the issue of returning to
14 drugs.  Patient reports definitely feeling depressed
15 and, 'My anxiety is through the roof.'"
16 Keep going, or...
17 Q   Sure.
18 A   "Reports feeling very stressed about being
19 locked in for 20 hours a day while in Gamma, but when
20 he has time out, his -- of his cell, he watches TV or
21 walks, which helps.  Reports his insomnia is
22 maddening, his mind is going crazy with thoughts, and
23 going through many emotions, like frustration,
24 irritated, and then emotional.  Patient reports
25 having current goal of getting life back together and

76

1  future goals of going to treatment, and putting his
2  life back together for his daughter so he [sic]
3  doesn't have to go through the same thing he did.
4  Reports --
5  Q   So she doesn't have to go through.  Right?
6  She doesn't have to?
7  A   For his -- oh, I'm sorry.  "For his
8  daughter so she doesn't have to go through the same
9  thing he did.  Patient reports if he did have
10 suicidal thoughts he would tell the correctional
11 officer or clinic."
12 Q   And you and I have been through that
13 before.  In fact, it's well-known the denial of
14 suicide thoughts or the saying you would report it is
15 not a reliable -- is not to be relied on by medical
16 or mental --
17 A   We --
18 Q   -- health professionals.
19 A   We don't rely on that in and of itself.  We
20 try to take all the different aspects of a case that
21 we can, and make the best clinical decision we can
22 make.
23 Q   And in response to that, what he got was
24 the hydroxyzine -- hydroxyzine prescription.
25 Correct?

77

1  A   And a referral to a mental health
2  professional.
3  Q   And that was written on what date?
4  A   This is on 11/5.
5  Q   So the referral was to occur, per the note
6  of Dr. Robertson, 11 days after that?
7  A   No.  The referral was made --
8  Q   Or the -- the --
9  A   -- promptly.
10 Q   He was supposed to see him 11 days after
11 that?
12 A   Dr. Robertson determined from the referral
13 that he would see him on the 16th.
14 Q   Uh-huh.  Okay.
15 Now, the contract refers to "crisis
16 intervention services."  What are they?
17 A   Well, typically, crisis intervention is,
18 depending what jail you're in, is a mobile crisis
19 unit that you can use when you feel necessary.
20 Typically, if someone is on suicide watch and they're
21 about to be released, occasionally we'll reach out to
22 mobile crisis to assess a patient on the spot prior
23 to release; especially, if there's any concerns with
24 having a road deputy put an emergency hold on a
25 patient and take him to the ER themselves.

Doby Professional Reporting, Inc.
952-943-1587

78

```
1        Q   The contract calls for mental health
2   specialists to be at the institution, in April of
3   2014, three days a week, but by 2017, it was five
4   days a week.  Right?
5        A   It was a minimum of five days, and I
6   believe there was actually even some days where if
7   Dr. Robertson requested, we would have additional
8   staff assist him.
9        Q   Yeah.  Did you have a -- any other people
10  commit suicide during the first 16 days of November
11  at the Sherburne County Jail?
12       A   I don't believe so.
13       Q   Okay.
14       A   I don't -- I don't know the date of the
15  other suicide.
16       Q   So, Mr. Lynas was the only person desperate
17  enough to commit suicide during that time period.  Is
18  that right?
19       A   I'm not going to characterize.  I'm just
20  going to say that he is the only person that I'm
21  aware of that committed suicide in Sherburne County
22  Jail in the time frame you just provided.
23       Q   And that he made a plan, fashioned a noose,
24  fastened the noose to a -- a secure point in the
25  cell, and hung himself.  Correct?
```

79

```
1        A   I can't speak to what was going through his
2   head directly before he completed his suicide.
3        Q   No.  But that's -- that's what he did.  I
4   didn't say anything about -- that was -- that was not
5   a question about his -- about his mental condition.
6   It was a question about the acts he took to
7   complete -- to make a plan and complete the plan.
8   Right?
9        A   I'm aware of the fact that he used some
10  sort of linen or sheet, or something of that nature,
11  and hung himself in his cell.  That's the extent of
12  what I recall of the actual act of completing
13  suicide.
14       Q   But -- so you have to figure out a way to
15  commit suicide.  That's the plan, right?
16       A   Yeah.  I mean, I -- that plan can happen in
17  30 seconds; it can happen in ten seconds.  It --
18  that's what I mean.  I don't know --
19       Q   Well, it can't, really, can it?  I mean, it
20  takes longer to hang yourself than that, doesn't it?
21       A   To plan a suicide in a jail?  No, it does
22  not take very long at all.
23       Q   Well, the other one we had, that you and I
24  know of, I mean, the guy had to get a razor from --
25  secure a razor.  Right?
```

80

```
1        A   Yeah.  I'd really prefer not to talk about
2   another patient's care or circumstances.
3        Q   He's dead and is long past caring.
4        The other person actually --
5        A   Well, I care.
6        Q   Okay.
7        A   I'm uncomfortable talking about --
8        Q   Okay.
9        A   -- another patient's care and situation
10  than this case.
11       Q   Well, we'll --
12       But the other -- the Stearns County one,
13  the person had to secure a razor from a roommate;
14  disassemble the razor, the shaving razor; and utilize
15  a razor to cut himself from ear to ear, severing his
16  jugular vein.  Remember that?  And carotid artery?
17       A   Again, I -- I'm uncomfortable talking about
18  another patient's situation.  I really am.
19       Q   Well, I think you have to answer the
20  questions.  I don't think you -- you can -- you're --
21       A   Well, I've got privacy issues as a
22  physician that I --
23       I don't even -- I'm not an attorney.  I
24  don't know --
25       Q   Well, that's our client.  So I'm -- I mean,
```

81

```
1   I know -- I know what I can do.  So your attorney did
2   not tender an objection.  Okay?
3        A   Okay.
4        Q   So answer the question.
5        A   Okay.  What is the question, sir?
6        Q   Well, the question is:  These -- in the two
7   suicides that you and I have been involved so far,
8   the first inmate had to secure a razor that he wasn't
9   supposed to have from the third party; disassemble
10  the razor; get into an area where he could be
11  private; and then take the disassembled razor and use
12  it to cut his throat.  Right?
13       A   Yeah, I mean, my recollection of that event
14  is that this patient stole a razor from his cellmate.
15  I don't know exactly what he did with that razor.
16  And he went to the shower area, if I remember
17  correctly, and completed a suicide in that manner.
18       Q   Well, you -- you can't use it in the -- you
19  can't use the razor if it's in the form of a shaving
20  razor.  You have to get the blade out to cut that
21  deeply.  Don't you?
22       A   Yeah, I'm just saying.  I don't know
23  exactly how he did that.  I'm just saying that's
24  what -- that's my recollection of what happened.
25       Q   Okay.  And in this case, the person had to
```

Doby Professional Reporting, Inc.
952-943-1587

## 82

1  get -- use materials in the cell to end his life in
2  the cell by fashioning a noose, fastening the noose
3  to a secure point in the cell, and then hanging
4  himself. Correct?
5  **A    That -- that is, in this particular case,**
6  **that's how I understand this happened. And that can**
7  **happen very quickly. It just depends on the person's**
8  **actions. And I'm just saying, there's no particular**
9  **timeline. Could have done it quickly. I don't know.**
10  Q    Okay. Do you have any understanding as a
11  physician how long it takes to kill yourself by use
12  of a fashioned ligature, like a sheet or a --
13  **A    A hanging?**
14  Q    Yes.
15  **A    I mean, we always talk about 12 minutes.**
16  **After 12 minutes, the risk of death is high from**
17  **hanging.**
18  Q    Have you seen the video of Mr. Lynas
19  hanging himself?
20  **A    I have not.**
21  Q    You agree that despite what the contract
22  seems to say, that MEnD was to supply the mental
23  health and substance abuse services at the Sherburne
24  County Jail?
25  **A    I -- I'm not sure what you're specifying to**

## 83

1  **what's in the contract. My understanding is that we**
2  **were to provide mental health services, and they had**
3  **another vendor on site that dove into if someone was**
4  **there long enough into substance abuse therapy and**
5  **on-site treatment.**
6  Q    And just so we're clear, if I -- reviewing
7  the...
8       Looking at the contract, you were to
9  provide administrative assistance that deal with the
10  medical records. Is that correct?
11  **A    Correct.**
12  Q    Nursing director --
13  **A    Amongst other task.**
14  Q    Nursing director. Correct?
15  **A    Correct.**
16  Q    And who was the nursing director in
17  November of 2017?
18  **A    I believe it was Diana VanDerBeek.**
19  Q    Okay.
20  **A    I can't swear to that. But I believe**
21  **that's who it was at -- around this time in 2017.**
22  Q    The mental health specialist was
23  Dr. Robertson?
24  **A    Dr. Robertson was the main mental health**
25  **specialist on site. And then he would have**

## 84

1  **assistance when he needed from our mental health**
2  **director, or if the mental health director directed**
3  **another mental health specialist to come on site when**
4  **he needed them.**
5  Q    And as I understand your testimony, and
6  correct me if I'm wrong, you were the medical
7  provider, actually, in November of 2017?
8  **A    No. That's incorrect.**
9  Q    Okay. Who was?
10  **A    Janell Mehlhoff.**
11  Q    Is that her name now?
12  **A    No. It's Janell Hussein.**
13  Q    Is there any indication that Janell Hussein
14  saw Mr. Lynas in the medical record that you
15  reviewed?
16  **A    In -- in the November incarceration, I**
17  **don't believe there's anything in my review of the**
18  **records that says that she saw him face-to-face.**
19  Q    How about the nursing director?
20  **A    Saw this patient face-to-face?**
21  Q    Yeah.
22  **A    I don't believe so.**
23  Q    Okay. So it would have been the nurses
24  that saw him face-to-face. Just plain RNs. Correct?
25  **A    Registered nurses who -- trained and**

## 85

1  **experienced from us, in consultation with the medical**
2  **provider and our mental health specialist.**
3  Q    Yeah. But they're -- the only people that
4  saw him, visualized him, talked to him, were nurses?
5  **A    From our staff -- well, and then our -- our**
6  **health technicians would have saw him face-to-face.**
7  Q    For the three times for the medical and --
8  **A    I don't know how many times they would have**
9  **seen him face-to-face. I know, based on the MAR, he**
10  **took hydroxyzine three times. I don't know what**
11  **other medications he took during that time.**
12  Q    Does MAR -- the MAR indicate he took
13  anything else?
14  **A    I'll have to look at it again.**
15  Q    Maalox.
16  **A    Yeah, he had Maalox available to him.**
17  Q    How did they give that? They don't chart
18  that the way they do a prescription. Do they?
19  **A    I would -- it's charted in the medical**
20  **records that it was put in place for him. And should**
21  **say in the MAR when he took it. Because that would**
22  **have been as needed as well.**
23  Q    Okay. Let's see if we can find that.
24       He -- so he took it on the 3rd twice.
25  Right?

86

1    **A**  Yep.
2    Q  And on the 5th twice?
3    **A**  Yep.
4    Q  And that's it?
5    **A**  So our health technicians would have seen
6  him at least these times, and these times. And then
7  I don't know if he ever took over-the-counter
8  medications. Those are not on the MAR. That would
9  be something he would request: I want some Tylenol,
10  or I want something...
11    Q  Is Maalox a prescription?
12    **A**  No.
13    Q  I mean, that is over the counter, isn't it?
14    **A**  Yep. But this is specifically put in place
15  by our staff.
16    Q  Okay.
17    **A**  That's why it goes on the MAR.
18    Q  And it looks like he had one pill,
19  according to the MAR, of hydroxyzine 50 milligram, on
20  the -- is that on the 6th and two on the 7th?
21    **A**  Correct.
22    Q  All right.
23    And there's no notation on any -- on the
24  MAR that he refused any drug?
25    **A**  It -- it wouldn't be a case of refusal

87

1  because these are as needed. It's -- it's up to him
2  whether he wants to take them or not.
3    Q  Well, wouldn't it still be -- wouldn't you
4  chart the refusal?
5    **A**  There's no refusal, so there's no refusal
6  to chart. If it's as needed, it's up to him. If he
7  feels as though he needs them, all he has to do is
8  ask for the medication. It's available. And he
9  would have known that.
10    Q  Okay.
11    The nurses refer to Crystal Waagmeester as
12  a nurse practitioner throughout the record. Correct?
13    **A**  I don't know that. I'm not sure. She's a
14  physician assistant.
15    Q  I know that.
16    **A**  Okay. I -- I don't know if they're
17  referring to that or not.
18    And either way, they would have referred to
19  it as a medical provider. That's what's important
20  for nursing staff.
21    Q  So it doesn't -- okay.
22    So that wouldn't concern you, if they
23  did -- can I have those?
24    **A**  Oh. Sorry.
25    Q  Do you know if any of these nurses has ever

88

1  met Crystal Waagmeester?
2    **A**  I'm not sure. It's possible, but I don't
3  know.
4    **(Sotto voce communication between**
5  plaintiff's counsel.)
6  BY MR. BENNETT:
7    Q  The terms of Exhibit 5 --
8    That's the contract. Well, I'll show you
9  the --
10    -- defines a "mid-level practitioner" as,
11  "An advanced registered nurse practitioner or
12  physician assistant who has completed an advanced
13  training program. A mid-level practitioner will be
14  duly licensed to practice medicine in the appropriate
15  state."
16    Is that right?
17    **A**  That's what it says in -- in this document.
18  Yes.
19    Q  And that's a document that you signed.
20  Isn't it?
21    **A**  I'm assuming I did. I'd have to see,
22  but...
23    Correct.
24    Q  What was your schedule at the jail? When
25  were you supposed to be there, if at all?

89

1    **A**  I'd have to have more of a specific --
2  when -- when do you mean?
3    Q  The Sherburne County Jail. When were --
4    **A**  In November 2017?
5    Q  Yeah. Good for starters.
6    **A**  I would have been on site for a variety of
7  reasons: For cross coverage; if medical providers on
8  site needed my assistance face-to-face with patients;
9  if I were there for particular meetings; if I was
10  there for case review with anyone. Oh, my goodness.
11  There's a lot of different reasons I could be on
12  site.
13    Q  So how many -- in November of 2017, how
14  many jails did MEnD contract to provide such services
15  at?
16    **A**  I don't have that number to memory at that
17  moment.
18    Q  What's your best estimate?
19    **A**  I don't know if I have a best estimate. I
20  don't want to speculate.
21    Q  Well, tell me the counties you remember.
22    **A**  I -- I can remember St. Louis County,
23  Beltrami County, Crow Wing County, Stearns County,
24  Benton County, Mille Lacs County. This is off the
25  top of my head.

23 (Pages 86 to 89)

## 90

1    Q    Sherburne County?
2    A    Sherburne, of course.
3    Q    Todd?
4    A    No.
5    Q    Becker?
6    A    No.
7          Dakota County, we had some services there.
8    I believe Olmsted County. I believe Kandiyohi
9    County. I believe Nobles County.
10         Beyond that, I would be really speculating
11   when particular customers came aboard.
12   Q    Any other states in 2017?
13   A    2017? I believe we were with Douglas
14   County, Wisconsin. And I don't recall if we were
15   anywhere else.
16   Q    Iowa?
17   A    We had -- I don't know in 2017 if we had
18   any services there. I don't recall.
19   Q    How many of those were you the medical
20   director at in November of 2017?
21   A    The ones in Minnesota and Douglas County,
22   Wisconsin.
23   Q    And how many prisoners were you the medical
24   director for in 2017?
25   A    I -- I don't know the number.

## 91

1    Q    Thousands?
2    A    On any given day? I wouldn't be able to
3    give you an exact answer.
4    Q    Well, Sherburne County is how many on -- at
5    a typical day?
6    A    In November 2017, it was probably, my best
7    guess, is around 500 inmates. That's my best guess.
8          So, I mean, to answer your question, I know
9    it would be over a thousand.
10   Q    Would it be over 5,000?
11   A    I don't believe so. I don't believe so.
12   Q    How many in -- in Dakota?
13   A    At that time, I'm not sure. And I -- I
14   wouldn't have been -- I don't believe I was the
15   medical director in Dakota at that time because we
16   only had nursing services then.
17   Q    Are you now?
18   A    We are now. Yep.
19   Q    Are you the medical director now?
20   A    Yes.
21   Q    How many employees did you have in 2017?
22   A    I wouldn't be able to give you a specific
23   answer.
24   Q    Hundreds?
25   A    No.

## 92

1    Q    A thousand?
2    A    Potentially over a hundred.
3    Q    Are the nurses independent contractors
4    versus employees?
5    A    No. They're employees.
6    Q    Okay. So all of the nurses, all of the --
7    A    Any employee that works for me would have
8    been an employee at that time.
9    Q    Okay.
10   A    I just don't have exact number, you know,
11   from that far back.
12   Q    How many MDs did you employ then?
13   A    Subcontracted one.
14   Q    So the only medical doctors in all of --
15   for all of the counties you described, and any others
16   that you can't remember, there was one subcontracted
17   doctor and you?
18   A    Yep. And then we had nine medical
19   providers at this time. And in 2017, I don't recall
20   if it was less than that or not.
21   Q    And by "medical providers," you're talking
22   about PAs?
23   A    Or NPs.
24   Q    Or what?
25   A    NPs. Nurse practitioners.

## 93

1    Q    Okay.
2    A    Yeah.
3    Q    But in terms of doctors, medical doctors.
4    And did you employ other doctors of -- either PsyDs
5    or licensed clinical practitioners or masters in
6    social work?
7    A    Oh, we had -- I mean, we had several
8    master's level or higher mental health specialists.
9    Dr. Robertson, of course, would have been
10   psychologist.
11   Q    How many?
12   A    How many what?
13   Q    Mental health specialists.
14   A    At that time?
15   Q    Uh-huh.
16   A    I don't know the exact number.
17   Q    Well, give me -- tell me the people you can
18   remember.
19   A    I don't know if --
20   Q    I mean, is it a handful or is it 50, or...
21   A    I would say it's somewhere around six.
22   Q    Okay.
23   A    It's between six and ten, somewhere in
24   there. That's my --
25   Q    How many do you have now?

**94**

```
 1        A    -- educated guess.
 2            I can tell you, if you give me a second.
 3            I believe we have ten.
 4        Q    How many doctors do you have now?
 5        A    Medical doctors or --
 6        Q    Medical doctors.
 7        A    Myself and our subcontracted physician.
 8        Q    And who is the subcontracted one?
 9        A    Steve Scurr.
10        Q    And how long has he been subcontracted?
11        A    I don't know the exact time frame.  It's
12   been a while.
13        Q    How many hours does he work in a given
14   week, for you?
15        A    It varies.  I guess, it could be up to
16   eight to 12.  That would be speculating, though.
17   I -- it varies week to week.
18            MR. BENNETT:  Okay.
19            Why don't we take five.
20            VIDEOGRAPHER:  Off the record at 11:10 a.m.
21            (Recess taken.)
22            VIDEOGRAPHER:  This is File 3.  We're on
23   the record at 11:22 a.m.
24            MR. BENNETT:  I have no further questions.
25            MR. HIVELEY:  No questions.
```

**95**

```
 1            MR. NOVAK:  We will read and sign.
 2            VIDEOGRAPHER:  This concludes the video
 3   deposition.  It is 11:23 a.m.
 4            (The video deposition of TODD LEONARD was
 5   concluded at 11:23 a.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**96**

```
 1
 2            REPORTER'S CERTIFICATE
 3
 4        I, Jane T. Doby, Registered Merit Reporter, a
      Notary Public in and for the County of Hennepin,
      State of Minnesota, certify that the foregoing is
      a true record of the testimony given by TODD LEONARD,
 6   who was first duly sworn by me, having been taken on
      May 31, 2019, at Caribou Coffee, St. Cloud West, 4135
 7   West Division Street, St. Cloud, Minnesota, in my
      presence and reduced to writing in accordance with my
 8   stenographic and computerized notes made at said time
      and place:
 9
          I further certify that I am not a
10   relative or employee or attorney or counsel of any
      of the parties or a relative or employee of such
11   attorney or counsel
          That I am not financially interested in
12   the action and have no contract with the parties,
      attorneys, or persons with an interest in the
13   action that affects or has a substantial tendency
      to affect my impartiality:
14        That the cost of the original has been
15   charged to the party who noticed the deposition,
      and that all parties who ordered copies have been
16   charged at the same rate for such copies:
17        That the witness DID request an opportunity to
18   review the transcript.
19        WITNESS MY HAND AND SEAL this 5th day of
20   June, 2019.
21
22
23   Jane T. Doby
      Registered Merit Reporter
24   Notary Public
      Hennepin County, Minnesota
25
```

**97**

```
 1            E R R A T A   S H E E T
 2        I, TODD LEONARD, certify that I have read and
 3   examined the typewritten transcript of the deposition
 4   taken of me in the matter of David W. Lynas, Trustee
 5   for the next-of-kin of James C. Lynas vs. LINDA S.
 6   STANG, ET AL., on May 31, 2019, consisting of the
 7   preceding pages, and find the same to be true and
 8   correct.
 9        (Except as follows):
10                    Reason
      Page  Line  Correction          for Change
11
12   _____ _____ _____ _____
13   _____ _____ _____ _____
14   _____ _____ _____ _____
15   _____ _____ _____ _____
16   _____ _____ _____ _____
17   _____ _____ _____ _____
18   _____ _____ _____ _____
19   _____ _____ _____ _____
20   _____ _____ _____ _____
21   _____ _____ _____ _____
22
23   Dated this _____ day of _____
24   _____
      TODD LEONARD
25
```

Doby Professional Reporting, Inc.
952-943-1587

98

1        EXAMINATION INDEX
2  By Mr. Bennett: 4-94
3  ------------------------------------------------------
4        EXHIBIT INDEX
5  Exhibit 5:  Agreement for the Provision of
          Inmate/Detainee Health Services -
6         Sherburne County
    reviewed           11,88
7

    Exhibit 10:  Beck Depression Inventory-II (BDI-II)
8          Pages 1 and 2
    reviewed          57
9
    Exhibit 12:  Hydroxyzine (Oral Route), Description
10        and Brand Names (Mayo Clinic)
    reviewed          46
11
    Exhibit 13:  Email communications (various)
12  reviewed          14
13  Exhibit 14:  MEnD Mental Health Referral form, 11/5/17
    reviewed          28,43
14
    Exhibit 19:  MEnD Health Assessment form, 11/3/17
15  reviewed          62
16  Exhibit 26:  Electronic charting forms
    reviewed          43
17
    Exhibit 27:  MEnD Beck Depression Inventory form
18  reviewed          62
19  Exhibit 28:  Standards for Health Services in Jails,
         2014
20  reviewed          19
21
22
23
24
25

Doby Professional Reporting, Inc.
952-943-1587

**A**

a.m 3:3,9 62:19,22 94:20
  94:23 95:3,5
ability 53:6
able 5:8 27:18 34:10,13
  39:18 91:2,22
aboard 90:11
absolutely 9:7 34:15
abuse 73:22,24 82:23 83:4
abusing 74:7
accepted 71:2
access 40:12,21 41:2,12
accurate 33:19 34:8 57:16
accurately 34:13
ACH 11:10
achieve 46:12,16
act 79:12
action 96:12,13
actions 82:8
active 7:21
actively 73:16
acts 79:6
actual 37:24 67:6 79:12
addition 4:14
additional 21:25 22:1 78:7
addressed 75:12
adequate 5:11,18 35:2
administer 3:20
administered 3:22
administrative 83:9
administrator 14:18 24:23
adults 47:23 49:3
advanced 7:17 88:11,12
affect 96:14
agree 13:2 14:22 18:5
  19:4,14 20:20 24:1,12
  24:18,22 25:9,21,23
  26:2,5,7,11 27:8 32:16
  32:19,22 54:14 58:6,6
  65:3 67:14 68:21 73:2
  82:21
agreed 20:7
agreement 18:22 98:5
agreements 23:17
Ah 63:20
ahead 28:25
al 1:8 97:6
alert 37:23 38:4
allowed 21:10
Alyssa 33:18 34:7 68:13
ambiguous 27:2
Amendment 6:7,9,10
amendments 6:6,13
American 23:6
angle 37:17
answer 4:21 5:8 6:25 8:19
  28:20,24 33:2,25 45:9
  46:15 49:15 60:15 61:15
  64:24 72:19 80:19 81:4
  91:3,8,23
answered 59:16
Anthony 2:12
anti 58:25
antidepressant 58:8,11
  58:20 59:3,17
anxiety 32:20 47:9,15,18
  47:23 49:3 50:16 75:15
anxiolytic 47:14
anybody 32:6 41:12 50:22
anybody's 45:8
anymore 46:4
apparently 20:21 48:25
appear 57:13
APPEARANCES 2:1
appearing 3:12
applicable 19:2

applies 18:19
apply 18:9,10
appointment 65:18
appropriate 49:1 88:14
approximately 3:9 37:1
April 78:2
area 6:22 81:10,16
Argumentative 35:4 60:13
arrived 64:8
artery 80:16
Arthur 4:7
Article 18:23
as-needed 50:5
asked 9:15 33:23 34:3,12
  59:16 66:2,8 74:25
asking 34:4 35:6 40:20,20
  58:23
asks 41:9
aspects 21:21 76:20
assess 77:22
assessed 25:25 26:4
assessing 38:7
assessment 27:24 37:17
  43:11,15,17,18,24 53:23
  60:9 61:20 98:14
assessments 25:5,20
  33:20 34:5 36:20,21
  37:1,8
assessor 36:21
assist 78:8
assistance 83:9 84:1 89:8
assistant 10:10 21:14,23
  87:14 88:12
associated 8:13
association 8:15 23:6
assuming 49:25 88:21
attained 21:25
attention 14:9
attorney 2:3,4,8,12 3:10
  5:7,21 6:17 18:10 42:24
  61:14 80:23 81:1 96:10
  96:11
attorneys 96:13
auspices 9:23
authored 67:12,14
authority 8:2,5 48:19
available 25:5,19 39:16
  40:1 50:8 65:24 85:16
  87:8
Avenue 2:10
aware 6:8,15,18,21,22
  8:10 22:15 23:1,2 30:16
  35:18 41:18,23 42:19
  69:25 70:21 71:14,20
  78:21 79:9

**B**

B-6 24:20
back 9:13,15 27:7 33:14
  75:25 76:2 92:11
background 38:3
bandages 36:24
base 65:13
based 14:22 17:13,17 23:5
  31:5 59:8 64:5,7,19 85:9
basically 11:14 57:1
basis 42:15
Baxter-Jensen 36:16
BDI 15:12 30:9 33:11,14
  57:23 65:20 68:24
BDI-II 98:7
Beck 56:17,18 57:8,18,21
  61:16 68:16 98:7,17
Becker 90:5
bedtime 48:12
behalf 2:2,7,11 3:13

belief 65:13
believe 10:17,21 11:11
  13:11 14:18 17:4 19:24
  22:20 26:13 27:9 28:4
  28:11,14 29:8 30:21
  33:14 34:6,7 36:3,13
  37:12 39:13,18 43:13
  44:19 46:7 51:17 52:8
  53:3 63:23 64:5,19 65:5
  65:8,18 68:3,8,9,25 69:1
  69:16,18 78:6,12 83:18
  83:20 84:17,22 90:8,8,9
  90:13 91:11,11,14 94:3
believes 64:14
Beltrami 89:23
Bennett 2:3,4,5,18 3:12,12
  3:14,14 4:4 14:3 18:7
  19:16,21 20:14 28:21,25
  29:5 34:21 35:7 48:17
  53:5 59:19 60:14,17,20
  61:1 62:23 72:20 74:11
  88:6 94:18,24 98:2
Benton 89:24
benzodiazepine 38:23
  39:5
best 17:15 18:1,2 32:11
  33:25 36:11 55:4 59:7
  75:8 76:21 89:18,19
  91:6,7
Beyond 90:10
BIA 22:20,21
big 55:3
biggest 8:8
Bill 6:2,6
Birrell 2:5,18
bit 9:12 56:23
blade 81:20
blister 49:10,16,21
Bloomington 2:10
blue 51:15 52:23
board 7:5 9:13
Bob 60:16
BOP 22:21
bound 25:10
Brainerd 39:16 40:12
Brand 98:10
Brandon 35:19,22
Brian 14:14,17
bring 52:17,20
broad 34:20,23
buck 4:19
bunch 36:19

**C**

C 1:5 3:1 97:5
call 11:15,20 14:14 21:16
  27:5 31:17 39:17 51:25
  66:9
called 3:5,25 33:10 40:24
  41:1,18 63:7
calls 42:14,18,20,21,23
  43:3 69:14 78:1
cancer 64:15
capabilities 39:8
capability 39:10 40:12
capacities 57:4
capsules 47:22
care 4:10,16,24 5:1,3,6,6
  5:12,18 6:13,16,19,23
  7:14,19,19 9:20 18:1
  19:11 21:5,24 25:16
  26:9 35:2,3,16 48:6 55:7
  55:7 58:18,23 59:14
  60:22 72:23 80:2,5,9
career 57:2 69:5
cares 40:7

Caribou 1:16 96:6
caring 80:3
carotid 80:16
case 5:13 15:10 27:1,6,10
  30:23 31:3 36:16 37:3,5
  37:8 38:16 39:11 44:23
  54:12 55:15,24 56:6,11
  56:17 63:23 64:11 66:10
  67:2,4,5 68:6,9 76:20
  80:10 81:25 82:5 86:25
  89:10
cases 55:6 64:7
cause 64:14
CCHP 7:11
CCHP-P 7:16
cell 75:20 78:25 79:11
  82:1,2,3
cellmate 81:14
CEO 72:11
certain 7:2 10:8 13:17
  23:18 42:22 46:8 64:10
certainly 16:21 47:17
  73:13,23
certainty 42:25
CERTIFICATE 96:2
certification 7:11,16,17
certified 7:5,16,19 21:22
certify 96:5,9 97:2
change 44:10,11 97:10
changed 44:13
changes 20:23,25 44:12
  44:19,20 45:10,12
characterization 12:7
characterize 11:24 78:19
charge 4:15 72:12
charged 96:15,16
chart 39:20 52:14,17
  85:17 87:4,6
charted 85:19
charting 98:16
chemical 43:18
chief 4:9
choose 70:6
circumstances 73:25 80:2
citing 49:4
CIV 1:4
Civil 2:17
claim 20:21 43:6
claims 74:16
clarification 21:2
clarifies 21:1
clear 83:6
clearly 57:17
client 80:25
clinic 9:9,16 47:21 48:25
  51:25 56:10 57:24 59:7
  64:8,23 76:11 98:10
Clinic's 47:1
clinical 4:18,22 9:7,11,18
  31:5 32:11 39:7 55:22
  76:21 93:5
Cloud 1:16,17 96:6,7
code 51:15 52:23
Coffee 1:16 96:6
come 73:24 74:14 84:3
comes 5:21 11:5
comfortable 22:2,5,6 71:7
coming 9:15 73:16
commenced 3:3
comment 27:7
Commission 7:18
commit 78:10,17 79:15
committed 23:25 34:22
  35:3 57:11 70:15 78:21
commonly 69:11 70:3
communicate 67:20

communication 14:1
  19:19 53:1 74:9 88:4
communications 98:11
community 5:6
company 9:23
competent 34:7 45:15
  55:15
complete 68:10 79:7,7
completed 79:2 81:17
  88:12
completing 79:12
computerized 96:8
concern 87:22
concerns 77:23
concluded 95:5
concludes 95:2
condition 79:5
CONDON 2:7
conjunction 34:15
connected 20:22
conscious 61:11 68:10
consider 9:15
consistently 33:4 69:7
consisting 97:6
Constitution 5:13,24,25
constitutional 6:19,23
constitutionally 5:3 25:16
consult 33:16 56:15
consultation 20:2,6 85:1
consulted 13:10 15:13
  16:11 27:9,25 30:17
  33:13 43:7 54:12 65:22
  67:4
consulting 59:6
contain 49:13
contents 72:7
continue 75:3
contract 9:5 11:14,15,17
  11:22 12:6 18:17 19:1,3
  77:15 78:1 82:21 83:1,8
  88:8 89:14 96:12
contractors 92:3
control 47:8,23 49:3
conversation 66:12,18
conversations 20:22
  29:12
copies 96:16,16
coping 32:17 75:1,2
copy 52:20,21
correct 4:24,25 6:4 7:7,23
  8:18,19,20 10:2,15,20
  11:7,19 13:20 14:15,16
  15:2,6,8,15,18 17:3 18:8
  18:14,15,19,23 19:3
  22:18 23:13,19 29:7 30:8
  30:10,11,12,13,14 31:25
  33:12 43:21 45:25 46:23
  46:24 47:5,9,12 48:13
  48:16 49:23 54:20 56:19
  56:25 57:6,7,22 58:10
  58:15 60:3,4,6,9 61:10
  61:18 63:9 64:4 65:20
  66:22 67:10,13,21 68:15
  68:18 69:6 70:12 71:19
  72:14,17,23 76:25 78:25
  82:4 83:10,11,14,15
  84:6,24 86:21 87:12
  88:23 97:8
Correction 97:10
correctional 4:10,24 5:1,6
  6:13,16 7:14,18,19 9:20
  18:1 23:6 48:6 70:20
  76:10
correctly 81:17
corresponded 51:21
correspondence 51:23

cost 96:15
counsel 14:2 19:20 28:19 28:23 53:2 74:10 88:5 96:10,11
Counseled 53:21
counseling 58:25
counter 86:13
counties 89:21 92:15
county 2:7 3:18 8:14,17 8:25 9:14,22 10:1,4,14 10:19 11:1,10 12:16,18 12:20 14:19 15:18,24 18:13,18 22:17 25:13 35:6 36:2,4,6 54:20 69:21 70:9 71:12 73:2 78:11,21 80:12 82:24 89:3,22,23,23,23,24,24 90:1,7,8,9,9,14,21 91:4 96:4,24 98:6
course 44:21 90:2 93:9
court 1:1 3:20 75:5
cover 74:4
coverage 89:7
crazy 75:22
credentials 19:9 21:4
crisis 77:15,17,18,22
cross 89:7
Crow 89:23
cruel 6:9
Crystal 15:23 17:2 21:15 21:22,22 30:21 33:10 39:14 48:19,23 55:9 63:7 87:11 88:1
current 75:25
currently 75:1
customers 90:11
cut 80:15 81:12,20
cutting 36:24
CV 7:3

**D**

D 3:1
daily 48:11
Dakota 90:7 91:12,15
date 3:8 31:9,24 54:21 77:3 78:14
dated 29:10 30:2 97:23
dates 9:2 12:11
daughter 76:2,8
David 1:5 2:2 97:4
day 29:16,22 31:5 44:25 47:24 48:7,7,8 55:19 56:4 63:11 64:10 69:12 69:12 75:19 91:2,5 96:19 97:23
days 13:7 28:5,6 30:6 48:12 50:17 65:4,18,19 75:7 77:6,10 78:3,4,5,6 78:10
dead 80:3
deal 74:25 83:9
death 11:18 66:13 82:16
deaths 35:1
December 14:10
decide 56:9 59:9
decided 11:10 63:18
decision 31:5 45:17 55:14 55:22 56:10 61:11 68:10 76:21
decisions 59:7
deeply 81:21
Defendants 1:9 2:7,11 3:18
defines 43:11
definitely 8:6 17:4,18 75:14

definition 17:14,16 21:12
definitional 20:19
deliberate 60:23 61:6,9,12
delivered 2:18
denial 76:13
denies 16:7
department 9:8,19 69:22
depend 23:16 46:11
depending 77:18
depends 8:4 38:11,15,20 38:25 39:6 41:9 46:15 82:7
deposition 1:11 3:2,7 36:15 40:19 55:25 56:2 95:3,4 96:15 97:3
depressed 76:14
depression 30:12 32:14 33:12 56:13,18 57:8,18 57:21 58:5,14,24,25 59:2,15 61:16,18 68:4 68:16 98:7,17
deputy 77:24
described 92:15
description 72:1,6 98:9
designed 23:9
desperate 78:16
despite 82:21
detail 74:6
detailed 23:23
details 37:4
detain 26:7
detainee's 25:6,20
detainees 5:17 22:18 23:11 25:24 26:3,7
Detention 22:24 23:5,20 64:12
determination 29:2 63:24 64:12
determine 21:9 34:13
determined 21:9 65:24 77:12
development 71:24
device 69:8
diagnose 60:9
diagnosis 60:9 75:9
Diana 83:18
die 32:9
died 28:6
difference 8:1,8,22
differences 5:5 8:9 12:2
different 5:2 8:12 42:2 47:4,4 49:6,7 76:20 89:11
differs 48:24
dime 31:17
direct 14:9 25:24 26:3 66:18
directed 84:2
directly 4:17 45:18 54:17 55:12 79:2
director 4:15 8:3,6,15,21 8:24 9:9 12:13 24:3,14 70:10,24 71:18 83:12,14 83:16 84:2,2,19 90:20 90:24 91:15,19
directors 10:22
directorship 9:17
disagree 17:6,8 22:9,11 48:2
disassemble 80:14 81:9
disassembled 81:11
discordant 68:19,21,24
discussion 53:24
disjointed 9:12
distinctly 16:11
DISTRICT 1:1,2
Division 1:16 96:7

Doby 1:22,23 96:4,22
DobyReporting.com 1:23
doctor 42:7 56:24 60:1 92:17
doctors 92:14 93:3,3,4 94:4,5,6
document 44:12,19 48:14 88:17,19
documentation 43:12
documented 44:11 65:2
documenting 43:10 45:10
documents 27:20,25 74:6
dosage 47:22
dose 46:9,11,13,19 47:4 48:25
Douglas 90:13,21
dove 83:3
Dr 3:8 20:8 59:24 60:2,3 63:18,23 64:6 65:11,17 65:21 66:3,18,21,25 67:1,2,7,12,14,18 77:6 77:12 78:7 83:23,24 93:9
drop 31:17 52:1,4
drug 73:22 75:10 86:24
drugs 59:1 73:24 74:4,7 74:17 75:14
DSM-5 60:8
dual 75:9
due 6:11 15:11 63:21
duly 3:5,25 88:14 96:6

**E**

E 3:1,1 97:1,1,1
ear 36:24,25 80:15,15
earlier 54:11
East 2:14
educated 94:1
education 19:9 21:3,18
effect 11:18,23
effective 33:19 45:15
effectively 48:9 49:6
eight 94:16
Eighth 6:9,12
either 4:17 87:18 93:4
electronic 41:20 42:4 98:16
email 14:9 26:22 27:7 65:11 67:1,3,11,18 98:11
emails 67:19,23
eMD 40:4 43:14
eMDs 43:9
emergency 77:24
emotional 75:24
emotions 75:23
employ 10:16,18 92:12 93:4
employed 10:13,23
employee 9:25 46:1 92:7 92:8 96:10,10
employees 10:3 91:21 92:4,5
ended 9:5
Ensign 2:10
ensure 24:3
entered 11:13
entering 11:14
entire 42:8 45:19
entirety 69:5
entity 8:6 9:11
entry 43:9
Envision 2:16
Epic 41:18,24 42:1,6,10
ER 77:25
especially 77:23

essence 26:5 60:23 61:9
essentially 69:5
estimate 89:18,19
et 1:8 97:6
evaluate 19:10 21:5,10
evaluating 22:2
evening 28:16
event 55:7 81:13
events 55:3
evidence 61:12
exact 9:2 54:21 61:23 62:3 66:9 91:3 92:10 93:16 94:11
exactly 18:21,24 24:7 34:10 56:7,20 81:15,23
EXAMINATION 4:3 98:1
examined 3:6 4:1 97:3
excuse 11:12 72:4
exhibit 2:20 11:16,17 14:5 19:17 26:8 28:12,12 43:5,13 46:21 48:10 51:11 57:12 62:6,9,10 62:24 71:24 88:7 98:4,5 98:7,9,11,13,14,16,17 98:19
exhibits 51:19
expands 20:23
expect 31:11 56:6
expectation 30:24 55:18 55:20
expectations 64:22
expected 30:17 56:3
experience 17:14,17 19:10 21:4,22 30:3 48:5 64:6 65:14
experienced 33:22 85:1
expert 61:15
expertise 29:18 31:6
explain 17:21
extensively 49:5
extent 48:3 57:3 79:11
eyes 41:3

**F**

face-to-face 13:8,13 26:13 26:14,18 27:8 51:22 52:9 53:3,7,12 54:8 84:18,20,24 85:6,9 89:8
facilities 23:11 71:17
facility 8:4,17 12:12 24:2 24:14 41:12
fact 5:16 15:19 22:13 33:9 39:14 43:10 44:11 68:6 74:3 76:13 79:9
factors 15:12
facts 67:20
fairly 46:8
family 7:5
far 54:20 58:13 71:10 81:7 92:11
fashioned 78:23 82:12
fashioning 82:2
fastened 78:24
fastening 82:2
federal 19:2 22:17,23 23:4 23:11,12,14,15,18,20 24:1,2,15
federally 24:8
feel 17:15 50:7 77:19
feeling 75:14,18
feels 40:8 41:10 50:4,6 87:7
felt 9:10,11
figure 79:14
file 22:13 28:9 62:21 94:22
financially 96:12

find 26:24 27:2,4,4 62:5,9 62:16 85:23 97:7
fine 44:16 51:20 60:14
finish 28:20
finishing 28:24
firm 36:4
first 3:5,25 20:15 74:23 78:10 81:8 96:6
five 62:17 78:3,5 94:19
focus 40:9
follow 18:3 19:2 32:10 33:22 34:11 43:22 73:6
following 58:16 73:4
follows 3:3,6 4:1 97:9
foregoing 96:5
form 18:6 34:19 35:4 47:22 60:13,25 81:19 98:13,14,17
formal 59:22
forms 48:9 98:16
forth 6:2
foundation 29:15,17
four 26:8 47:24 48:7 75:6 75:8
four-week 22:14
Fourteenth 6:10,12
Fourth 6:6
frame 58:12 60:7 78:22 94:11
Frank 14:14,17
front 16:20 17:16 36:23 51:1
frustration 75:23
fulfill 23:12
full 4:5 11:15 51:17 59:9
fulsome 11:15,20
fun 60:16
further 94:24 96:9
future 76:1

**G**

G 3:1
Gamma 75:19
Gaskins 2:5,18
generally 70:17
gentleman 44:13
getting 58:18 63:10 75:25
give 33:25 34:11 38:2,3 61:23 69:1 74:5 85:17 91:3,22 93:17 94:2
given 62:25 63:3 66:9 91:2 94:13 96:5
gives 37:16,17 38:5 41:8
glasses 52:1,5
go 17:14 18:1,2 28:25 46:6 55:4 56:17 58:19 60:19 62:17 63:18 75:8 76:3,5 76:8
goal 75:25
goals 76:1
goes 14:20 58:21 86:17
going 14:8,23 26:21 44:10 47:10 53:13 55:23 56:10 63:25 64:20 65:24 67:17 71:17 75:6,12,22,23 76:1 78:19,20 79:1
good 12:7 30:1 41:7 55:15 60:21 89:5
goodness 89:10
govern 6:13 72:15
governed 11:25
governing 18:22
Great 60:18
guess 26:5 27:4 59:24 91:7,7 94:1,15
guidance 53:24 54:2

guy 30:9 79:24
guys 69:21

**H**

H 2:4 97:1
half 48:24 74:24
hand 64:7 96:19
handed 72:4
handful 93:20
handwritten 67:8
hang 28:19,23 32:4 79:20
hanging 32:6 50:17 54:25
82:3,13,17,19
happen 79:16,17 82:7
happened 58:20 68:6,8
81:24 82:6
happening 71:21
hard 27:3
harder 60:11
Harry 4:20
head 27:6 68:11 79:2
89:25
health 5:6,6,12 6:16 7:14
7:18,19 8:2,5 10:16 13:5
13:6,11,12,15 17:3,5,10
17:19 18:1 19:7,11 21:5
21:11,24 22:2,8 25:4,19
26:9 27:24 28:1,2 32:17
33:16 35:3 43:11,15,16
43:17,24,25 44:4,6,15
44:20,21 45:12 48:6
54:7,11,14,15 55:19,21
56:4,8,9,16 58:22 59:6
63:17 72:23 73:19 74:1
74:4,25 75:10,12 76:18
77:1 78:1 82:23 83:2,22
83:24 84:1,2,3 85:2,6
86:5 93:8,13 98:5,13,14
98:19
hear 20:11,12
heard 5:23,25 6:3
held 61:5
help 47:18,23 75:9
helps 58:3 75:21
Hennepin 96:4,24
heroin 39:4
high 15:12 38:4 82:16
higher 93:8
history 74:12
Hively 2:8 3:17,17 94:25
Hogan 2:16
hold 77:24
Honestly 75:2
hours 30:18,25 75:19
94:13
house 22:19 23:11
houses 22:17
housing 26:9
hundred 92:2
Hundreds 91:24
hung 28:5 30:19 32:25
50:2 59:13 78:25 79:11
Hussein 84:12,13
hydroxyzine 46:10,14,22
49:14 53:17 58:8 76:24
76:24 85:10 86:19 98:9

**I**

ID 15:4
idea 5:16 12:4 29:23 30:1
ideal 9:10
ideation 38:8,10
identification 2:20 19:17
ignored 65:4,5
Illinois 7:22

illness 74:12
Immediately 63:10
immigration 22:20
impartiality 96:14
implementation 23:10
Implemented 72:18
important 14:8 87:19
imposed 69:20
incarcerated 5:18 73:7
incarceration 73:9,10
84:16
inception 35:11
included 21:12
including 9:17 64:2
incorrect 84:8
independent 69:3 92:3
INDEX 98:1,4
indicate 12:22 15:3 24:11
24:17 33:4 41:13 54:1
57:13 58:4 65:16 74:3
85:12
indicated 13:19 33:11
37:10 61:18 66:7
indicates 16:6 26:19
30:12 42:12 48:10 64:1
74:13
indication 30:2 43:19
84:13
indicative 61:17
indifference 60:23 61:6
61:10,12
indirectly 4:17
individual 34:8
information 38:3,5 39:25
initial 11:13
initiating 58:17
inmate 26:25 42:15 69:15
81:8
Inmate/Detainee 98:5
inmates 5:10,17 22:19,20
22:20 35:1 42:18 72:22
73:1 91:7
insomnia 33:5 75:21
instances 13:10 27:23
institution 59:12 78:2
insurance 73:2,8,12,13,14
73:17
intel 41:7
interaction 53:23
interactions 21:19
interest 75:8 96:13
interested 96:12
interesting 22:4
interim 11:13
intervention 77:16,17
interviews 68:13
Inventory 56:13,18 57:18
61:16 68:16 98:17
Inventory-II 57:21 98:7
Inventory-II's 57:9
involved 15:10 27:1 53:23
81:7
involvement 6:15 13:20
16:7 26:20 44:23 65:8
66:21
involving 35:16
Iowa 90:16
irritated 75:24
issue 38:11,20 55:16
75:13
issues 80:21
it.' 75:2
IVERSON 2:9

**J**

J 2:12

J-E-05 19:12
jail 6:24 8:25 9:22 10:1,4
10:14,19 11:1 12:16,18
12:20 14:18,19 15:18,24
23:14 24:23 25:13 42:17
71:12 73:16 74:15,21,23
77:18 78:11,22 79:21
82:24 88:24 89:3
jails 89:14 98:19
James 1:5 11:18 12:12,25
14:20 16:8 26:12,25
69:15 74:2,2 97:5
Jane 1:22 96:4,22
Janell 84:10,12,13
Jason 2:8 3:17
jasonh@irc-law.com 2:9
Jayme 2:16
Jen 52:3
Jennie 43:16
Jennifer 43:10
job 71:16 72:1,6
JRT/KMM 1:4
judgment 37:24
judgments 32:12
jugular 80:16
June 96:20

**K**

Kandiyohi 90:8
Kaplan 35:22 36:10
Kathryn 2:4 3:14
kbennett @gaskinsben...
2:4
Keep 75:16
kill 60:11 82:11
kind 9:16
kinds 49:7
KING 2:13
know 4:21 5:8,10,19 6:5,7
6:25 8:20,22 10:6 12:3
12:24,25 13:17,22,23
15:7,19,22,25 17:1,9,22
17:23 21:16,22 23:7,14
23:15,17,22,24 24:7
25:11,12 26:22 28:7
29:6 31:1,7,18,22 32:24
33:2,6,9 37:7 40:18,21
41:2 42:17,20,20 43:2
44:6,18 46:9,13 47:16
47:16 48:20 50:9,18
52:19 54:21 55:6 56:20
56:21 57:8 61:2 62:3
64:11 66:5 67:17 70:7,9
70:15,17,24 71:1,10,17
71:21 72:21 73:21 74:6
78:14 79:18,24 80:24
81:1,1,15,22 82:9 85:8,9
85:10 86:7 87:13,15,16
87:25 88:3 89:19 90:17
90:25 91:8 92:10 93:16
93:19 94:11
knowing 64:20
knowledge 31:23 36:11
known 87:9
Kyle 36:15

**L**

Lacs 89:24
Langenfeld 10:8,25 11:5
language 23:23
large 8:17
larger 1:17
LARSON 2:13
late 9:1
law 2:3,4,8,12 5:13 17:25

18:4,18,22 19:10 21:4,7
21:7 36:4 61:15
laws 18:9,9 19:2
lead 68:4
leading 50:17
leave 45:17
legal 61:4
legislation 73:15
Leonard 1:13 3:2,4,8,24
4:7 20:8 95:4 96:5 97:2
97:24
Lessens 20:24
let's 20:4 35:8 40:9 85:23
level 25:25 26:4 37:18
74:6 93:8
licensed 59:21 88:14 93:5
licensure 7:22
life 75:25 76:2 82:1
ligature 82:12
Linda 1:8 97:5
Line 97:10
linen 79:10
listed 7:3
listened 69:14
little 5:2
lived 39:17
LLP 2:5,13,19
location 42:7
locked 75:19
long 56:21,22 79:22 80:3
82:11 83:4 94:10
longer 79:20
longest 8:15,20
look 16:25 27:22 38:2
39:15 41:3 42:8 51:19
52:11 53:9 61:23 62:25
85:14
looked 40:13 65:19
looking 26:15 52:24 83:8
looks 49:10 86:18
lot 38:5 42:2 52:13 67:22
73:1 89:11
loud 74:20
Louis 89:22
low 68:20
Lynas 1:5,5 2:2 11:19
12:12,25 13:3,4 14:21
15:7 16:8,16 26:12,25
27:23 30:9 32:24 37:2
43:8 46:22 52:4 54:16
69:15 73:20 74:2,2
78:16 82:18 84:14 97:4
97:5
Lynas' 66:13
Lynas's 39:11

**M**

M 2:8
MA 73:12
Maalox 53:18 85:15,16
86:10
maddening 75:22
main 83:24
making 31:5 55:15,23
56:10 59:7
managing 9:16
mandate 6:19,23
mandated 5:3,11
manner 48:15 81:17
MAR 49:17 54:5 85:9,12
85:12,21 86:8,17,19,24
mark 19:16 28:19
marked 2:20 11:16 14:4
16:22 19:17
marries 63:1
marshal 22:19,25 23:2

Marty 10:8,9
mask 74:4
master's 93:8
masters 93:5
matches 49:21
materials 82:1
matter 17:24,25 30:15
97:4
matters 2:7
Mayo 46:25 47:21 48:25
98:10
MDs 92:12
mean 4:15 11:24 18:8
19:13 26:16 27:21 33:24
34:13,23 40:15 42:2
51:16 53:10 56:13 60:21
79:16,18,19,24 80:25
81:13 82:15 86:13 89:2
91:8 93:7,20
means 56:19
meant 26:22 70:22
measure 12:5 47:20
medical 4:9,15,16,24 5:1,2
5:11,18 6:13,19,22 7:21
7:25 8:2,6,15,21,24 9:9
9:17 10:10,12,22 11:2
12:13 13:12 15:13,14,16
15:17 16:10,16,17 21:10
24:3,25 25:1,3,16 26:8
27:12,17,19 30:14,15,16
40:13,19 41:6,21 42:4,8
43:19,20 49:12 51:10,18
52:14,17 53:10 55:6
56:15 61:7,22 64:25
65:14,16 66:23 68:13
69:5 70:10,21,23 71:18
72:6,22 73:2 74:2,13
76:15 83:10 84:6,14
85:1,7,19 87:19 89:7
90:19,23 91:15,19 92:14
92:18,21 93:3 94:5,6
Medicare 5:1
medication 46:16 49:5
50:5 53:20 54:5 59:3,18
87:8
medications 85:11 86:8
medicine 7:5 47:4 88:14
meetings 89:9
Mehlhoff 84:10
members 9:18
memorialization 44:4
memorized 35:14
memory 23:25 57:11
70:15 89:16
MEnD 2:11 4:10,16 9:20
9:23,25 10:3 34:17 35:1
35:17 39:8 41:13 46:1
50:22 53:18 69:21 71:4
72:18 82:22 89:14 98:13
98:14,17
MEnD's 74:1,1
mental 5:12 10:16 13:5,6
13:11,12,14 17:3,5,9,19
19:6,11 21:5,11,24 22:2
22:8 25:4,19 26:9 27:25
28:2 32:17 33:16 35:2
43:16,24 44:4,6,15,19
44:21 45:12 54:7,11,14
54:15 55:18,21 56:4,8,9
56:16 58:22 59:6 63:17
72:22,23 73:19 74:1,4
74:25 75:10,12 76:16
77:1 78:1 79:5 82:22

83:2,22,24 84:1,2,3 85:2
93:8,13 98:13
**mention** 16:23
**Merit** 1:22 96:4,23
**merits** 55:7
**met** 15:12 21:21 88:1
**methamphetamine** 38:18
38:19 39:5
**method** 55:1
**MHW15** 15:11
**Michael** 13:17,19,22 14:9
16:9 26:11 29:4 30:3,22
44:24
**mid-level** 88:10,13
**middle** 62:10
**Mike** 31:18
**Mille** 89:24
**milligram** 86:19
**milligrams** 47:24 48:8,8
**mind** 11:6 14:7 24:13 26:1
75:22
**minimum** 78:5
**Minneapolis** 2:6
**Minnesota** 1:2 2:17 7:22
18:3,4,12,13,18,23 21:7
35:8,10 36:10 41:14
90:21 96:5,7,24
**minutes** 62:18 82:15,16
**misread** 72:3
**missed** 74:18
**missing** 49:17
**misspeak** 51:14 55:8
**MN** 1:17 2:6,10,15
**mobile** 77:18,22
**modified** 58:1
**moment** 10:6 89:17
**Monday** 14:10 28:14 29:8
63:24 64:8,21
**money** 12:1
**monitored** 25:24 26:3
42:15
**month** 27:5 65:12 67:2
**months** 75:6,8
**morning** 48:12 50:14 64:8
**multiaxial** 60:8

**N**

**N** 3:1
**name** 3:10 4:5 10:7,8
13:15 16:24 17:1 35:23
35:25 45:6 48:20 84:11
**Names** 98:10
**National** 7:18
**nature** 70:2 79:10
**NCCHC** 7:18 17:15,18
18:2 19:6,12 20:2,19,22
**necessary** 40:8 41:10
77:19
**neck** 36:25
**need** 25:25 26:4 30:14
32:15,18,21 35:5 38:8
38:14,24 40:15 60:15
61:7
**needed** 39:19 50:10,13
84:1,4 85:22 87:1,6 89:8
**needs** 19:11 21:2,5 50:5,7
87:7
**never** 12:25 15:17 26:11
36:11 54:15 66:2
**next-of-kin** 1:5 97:5
**night** 29:21
**nine** 31:4 41:14 92:18
**Nobles** 90:9
**nonfederal** 23:11
**nonlegal** 42:23
**noose** 78:23,24 82:2,2

**Nope** 29:11
**Notary** 96:4,23
**notation** 86:23
**note** 2:17,20 28:22 45:4
45:14,18,19 51:25 67:8
72:19 77:5
**notes** 96:8
**noticed** 96:15
**noticing** 2:19
**Novak** 2:12 3:16,16 18:6
20:8,11 28:19,23 34:19
35:4 59:16 60:13,16,18
60:25 95:1
**November** 4:12,12 7:24
12:10,11,11,19,19 13:15
13:16 28:15,16 29:9
30:4 31:12,19 32:25,25
40:24,25 41:1 43:16
46:1 51:21 58:14,15
59:12,13 62:7 65:3
70:11 71:13 78:10 83:17
84:7,16 89:4,13 90:20
91:6
**NPs** 92:23,25
**number** 14:21 15:3 25:4
25:18 35:13 36:22 38:6
69:15 73:18,23 89:16
90:25 92:10 93:16
**numbers** 37:2 68:24 69:2
**nurse** 27:24 33:13,18
39:19 40:6 41:8 52:3
62:8 87:12 88:11 92:25
**nurses** 10:18 19:8 58:3
84:23,25 85:4 87:11,25
92:3,6
**nursing** 9:7 13:10 15:12
16:13 27:10 39:24 54:3
56:15 59:5 83:12,14,16
84:19 87:20 91:16
**Nystrom** 75:10

**O**

**O** 3:1
**oath** 3:21,22 71:11
**objection** 81:2
**observation** 53:24
**obtained** 37:2
**obvious** 38:4
**obviously** 73:19
**occasionally** 77:21
**occasions** 16:12
**occupation** 4:8
**occur** 77:5
**occurred** 29:23
**occurring** 36:10
**Oddly** 49:21
**offhand** 12:3 55:1
**officer** 4:9 76:11
**oh** 43:22 45:23 51:15
56:25 58:6 63:3 72:6
76:7 87:24 89:10 93:7
**okay** 5:20 7:1,21 8:7,23
10:3,9,12 12:4,9,15
13:25 14:6,11 15:22
16:1,5,19 17:2,9,12 19:5
19:23 20:5,10,16,17
21:15 25:1,22 26:19
27:16 31:13,22 32:13
33:8 35:9 36:12,14
37:14 40:10 41:17 43:1
43:4 45:1 46:20 47:8
48:4 49:20,24 50:11
52:2,6,25 53:16 54:18
57:1 58:7 62:2,5,15 65:7
67:16 69:13,19 71:3,16
77:14 78:13 80:6,8 81:2

81:3,5,25 82:10 83:19
84:9,23 85:23 86:16
87:10,16,21 92:6,9 93:1
93:22 94:18
**older** 56:23
**Olmsted** 90:8
**on-site** 39:19 40:6 41:6
83:5
**once** 36:19 48:7 50:14,15
**ones** 90:21
**opened** 46:7
**operate** 23:16,18 25:13
**operating** 18:13 29:17
56:5 64:22
**operations** 69:12
**opinion** 29:18 46:19
**Opioid** 38:13
**opioids** 39:4
**opportunity** 96:18
**oral** 46:22 47:21,22 98:9
**orally** 48:11 64:2
**ordered** 48:22 96:16
**original** 2:18 96:15
**over-the-counter** 86:7
**overall** 8:13
**overseeing** 9:9

**P**

**P** 3:1
**PA** 21:13,16
**pack** 49:10,16,21
**page** 14:20 19:22 97:10
**pages** 97:7 98:8
**paid** 12:1
**paper** 31:19 40:4
**paragraph** 19:24 20:19
**part** 9:24,24 71:18 75:13
**particular** 16:12 29:16,24
29:24 39:6 40:15 73:22
82:5,8 89:9 90:11
**particularly** 14:8 26:23
**particulars** 5:22 35:5
**parties** 96:10,12,16
**party** 2:19 81:9 96:15
**PAs** 92:22
**patient** 14:21 15:3,11 16:8
16:12 22:21 27:8 28:4
29:3 30:22 32:1 34:9
37:8,17 38:1,5,12 42:8
43:7 46:17 59:8,10
63:25 64:13 65:5,9,22
65:25 66:6 68:9 69:15
73:22 75:1,5,14,24 76:9
77:22,25 81:14 84:20
**patient's** 42:8 80:2,9,18
**patients** 19:11 21:6,11
22:3,21 32:3,12 38:7
47:5 48:6 49:7 61:20
73:11,23 89:8
**pattern** 29:18
**Paul** 2:15
**people** 11:25 42:13 49:5
55:4 67:20 69:21 72:9
73:16,18 78:9 85:3
93:17
**percent** 57:14,14
**perfectly** 71:7
**perform** 25:5,19
**Performance-Based**
22:24 23:5,20
**performed** 43:11,17
**period** 4:11 10:1,4,13 44:1
44:2 48:12 78:17
**permitted** 19:10 21:4
**person** 8:5,6 13:3 34:22
36:18 71:23 72:11 78:16

78:20 80:4,13 81:25
**person's** 82:7
**personal** 31:23
**personally** 13:23 52:19
**personnel** 22:13 53:19
**persons** 96:13
**perspective** 8:13
**pervasive** 69:10
**Pfeifer** 33:13,18 34:7 62:8
68:14
**phone** 27:5 31:18 43:3
69:14
**physical** 42:7
**physically** 12:18
**physician** 7:20 56:25
82:22 82:11 87:14 88:12
94:7
**physician's** 10:10 21:13
21:23
**picture** 49:6
**piece** 31:19 37:16 38:6
**pile** 62:10
**pill** 86:18
**pills** 49:8
**place** 24:5 34:16 71:15
85:20 86:14 96:8
**placed** 15:11
**plain** 84:24
**plaintiff** 1:6 2:2 3:13,15
**plaintiff's** 14:2 19:20 53:2
74:10 88:5
**plan** 59:9 71:19 78:23 79:7
79:7,15,16,21
**please** 3:10,20 4:6 26:1
52:4 64:24
**Plus** 75:11
**point** 9:3 78:24 82:3
**policies** 23:10 72:15
**policy** 42:12 69:20,25 70:2
70:13,14 71:4,4,25
**portrayed** 21:15
**position** 10:9
**possibility** 75:6
**possible** 30:23 68:5 88:2
**posthanging** 52:21
**potential** 24:11,17 42:14
**potentially** 25:23 26:2
92:2
**practice** 17:15 18:2,2 46:7
88:14
**practices** 55:5
**practitioner** 87:12 88:10
88:11,13
**practitioners** 22:25 93:5
**preceding** 97:7
**prefer** 80:1
**prehanging** 51:16
**prescribed** 46:22 48:11
50:1
**prescribing** 20:7 21:10
48:18
**prescription** 48:21 50:1,3
50:11 76:24 85:18 86:11
**presence** 96:7
**present** 2:16 4:8 9:3 12:18
74:12
**President** 4:9
**prevention** 23:19 24:3,4
24:20 71:19,24
**previous** 54:19
**prior** 11:14 36:14 73:8,10
77:22
**prison** 6:24 74:15
**prisoners** 90:23
**privacy** 80:21
**private** 73:12 81:11

**probably** 63:12,15 91:6
**problem** 73:25
**problems** 73:19
**procedure** 2:17 29:18
56:6 64:22
**proceeds** 23:10 32:11
**proceed** 55:23 56:10
**process** 6:11 13:15 34:11
34:16 58:18,21 63:21
**processes** 32:11 33:22
58:17
**professional** 1:23 7:15,20
13:5,6,11,12 17:3,5,10
17:19 19:7 22:8 28:1
33:17 44:20,22 54:11
55:19,22 56:8,9,16
58:22 59:6 77:2
**professionals** 13:15 25:5
25:19 76:18
**program** 24:4,4 88:13
**prompt** 29:19,19 55:21
56:7
**promptly** 30:23 64:10
77:9
**properties** 47:14
**protocols** 33:22 63:21
**provide** 4:23 25:16 60:22
83:2,9 89:14
**provided** 5:17 11:25 35:2
72:19 78:22
**providers** 10:13,16 21:10
89:7 92:19,21
**provides** 4:16 37:18
**Provision** 98:5
**psych** 59:21
**psychiatric** 19:8,8 21:19
22:7
**psychiatrists** 19:7 69:9
**psychiatry** 22:15
**psychologist** 59:21 60:1
93:10
**psychologists** 19:7 69:8
**psychometric** 57:5 69:8
**psychotherapy** 59:20,22
60:5
**psychotropic** 59:1
**PsyD** 59:25
**PsyDs** 93:4
**Public** 96:4,23
**punishment** 6:10
**pursuant** 2:17 48:19
**put** 9:19 28:15 31:9,24
48:20 77:24 85:20 86:14
**putting** 72:10 76:1

**Q**

**qualifications** 7:2
**qualified** 13:6 17:3,4,9,19
19:6 22:8 25:4,18 33:19
34:7
**qualifies** 17:18
**question** 5:9 16:3 28:8
34:20,23 35:3 36:7 40:9
40:16 59:11 61:3 64:24
72:2 73:5 79:5,6 81:4,5
81:6 91:8
**questions** 39:24 80:20
94:24,25
**quickly** 82:7,9
**quite** 64:10
**quo** 44:16

quote 26:25 27:1

**R**

R 3:1 97:1,1
rare 22:22
rarely 22:21
rate 96:16
rating 57:9,10,13
ratings 57:6
razor 79:24,25 80:13,14
  80:14,15 81:8,10,11,14
  81:15,19,20
rbennett@gaskinsbenn...
  2:3
re-up 7:8
reach 77:21
read 18:20 19:13,24 20:15
  20:18,18 28:22 43:23
  69:17 74:19 95:1 97:2
readily 39:25
reading 19:14 24:18
reads 48:14
realization 74:14
really 34:12 79:19 80:1,18
  90:10
realtime 42:15
reason 16:3 33:10 67:19
  97:10
reasoning 73:21
reasons 67:22 73:24 89:7
  89:11
recall 11:3 12:21 23:8 36:5
  36:22 37:9 52:22 55:1
  55:11,13 66:6,11,17
  70:19 79:12 90:14,18
  92:19
recalling 66:14
receive 26:8 59:14,17,20
  60:5
received 33:14 39:17
  58:11 62:4
receives 27:24
recertified 7:10
Recess 62:20 94:21
recognize 24:10,16 35:23
  35:25
recollection 16:1 81:13,24
recommendations 49:4
record 3:11 4:6 13:1,5,24
  14:22 15:1 16:6,20,23
  27:11,12 39:15 40:4,4
  40:13,14 41:21 42:20
  42:21 43:3,14,21 44:14
  45:7,19 47:12,13 49:13
  49:13 50:21,23 51:10,12
  51:18 54:6 62:17,19,22
  64:16,25 65:19 66:20
  67:8 68:13 74:2,13
  84:14 87:12 94:20,23
  96:5
records 12:22 13:9 16:10
  16:15,16,17 27:17,19
  30:21 33:3,6 40:19
  41:13 42:5,18 48:22
  54:13 61:22 65:15,16,23
  66:23 74:5 83:10 84:18
  85:25
Recovery 75:11
reduced 96:7
refer 87:11
references 33:6
referencing 25:12
referral 28:2,15,17 29:1,21
  55:21 56:8 58:18 64:9
  64:20 65:23 77:1,5,7,12
  98:13

referred 30:22 87:18
referring 16:15 28:12
  34:25 57:18 87:17
refers 77:15
reflects 47:12 66:20
refusal 86:25 87:4,5,5
refused 86:24
regard 70:18
regarding 26:25 54:12
  74:2
registered 1:22 84:25
  88:11 96:4,23
regular 5:2 72:22
regularly 24:9,10,16
regulation 20:5
regulations 19:12 23:24
  24:9
relate 41:15
related 41:16
relative 96:10,10
relay 21:21
relayed 15:11
release 77:23
released 77:21
reliable 76:15
relied 76:15
rely 76:19
remember 15:23 22:16
  27:6 36:1,15,17 66:9,15
  74:8 80:16 81:16 89:21
  89:22 92:16 93:18
remembered 67:24
remembers 31:9
rendered 35:16
repeat 6:21 26:1 42:16
  54:10
repeating 24:13
rephrase 10:24
report 76:14
reporter 1:22,22 3:20 96:4
  96:23
Reporter's 72:19 96:2
Reporting 1:23
reports 68:13 69:17 74:19
  74:21,23 75:5,11,14,18
  75:21,24 76:4,9
request 86:9 96:18
requested 78:7
required 19:1 23:19 24:14
  25:16
responded 52:3
responding 14:14
response 43:20 44:14
  45:7 76:23
responsibilities 8:12
responsible 4:22 8:2,4
  71:23 72:7,9,13
restriction 71:11
resume' 21:15
returned 62:1 63:5
returning 75:13
REUVERS 2:9
review 13:9,23 16:10
  23:22 28:16 29:21 30:20
  30:23 39:19,21,22,23
  40:3,4,5,22 41:5 44:7
  45:8 47:13 48:22 49:17
  50:23,25 54:13 55:6,14
  55:14 67:3 74:5 84:17
  89:10 96:18
reviewed 28:3 29:16 30:3
  31:8,12 33:3 40:18
  43:15,24 44:25 45:11
  62:7 63:23 64:2,10,11
  64:17,19 65:1,23 84:15
  98:6,8,10,12,13,15,16

98:18,20
reviewing 31:4 83:6
reviews 29:1
rid 11:10
right 4:19 5:4 6:3,14 7:3,6
  9:14 11:8 14:12 16:22
  18:16 20:13,23 22:12
  26:15 28:25 29:6 30:5
  31:9 36:20 37:3 42:3,9
  46:4 50:25 52:10 53:14
  57:20 59:11,23 60:4,16
  65:10 66:16 67:11 68:14
  68:16,17 69:24 70:11
  76:5 78:4,18 79:8,15,25
  81:12 85:25 86:22 88:16
rights 5:17 6:2,2,6
risk 15:12 24:12,17 25:6
  25:20 32:5 33:20 34:5,8
  34:14 36:20,21 37:1,7
  37:11,18,22,24 38:1,4
  68:20,23 82:16
RNs 84:24
road 77:24
Robert 2:3 3:12
Robertson 13:18,19,22
  14:10 16:7,10,23 26:11
  28:3 29:4 30:3,22 31:8
  31:15,20 43:7 44:22,24
  45:3,14,20 46:1 60:2,3
  63:18,23 64:6 65:17,21
  66:3,18,21,25 67:1,2,7
  67:12,14,18 77:6,12
  78:7 83:23,24 93:9
Robertson's 65:11
Robins 35:22 36:9
roof.' 75:15
roommate 80:13
rotation 22:14
route 46:22 98:9
Rule 2:17

**S**

s 1:8 3:1 42:4 97:1,5
saw 12:25 13:12 26:12,18
  50:19 54:15 65:1 84:14
  84:18,20,24 85:4,6
saying 14:23 52:1 67:2,18
  76:14 81:22,23 82:8
says 14:16 16:11 17:20
  18:21,25 19:15 25:7,8
  37:13 43:23,23 44:15,16
  44:17 47:13,21 50:10,14
  57:15,24 65:2 70:16
  84:18 88:17
scale 57:24 58:1
schedule 88:24
scheduled 30:6 50:6
  65:17 67:9
scheduling 28:4,17 29:3
  32:1
score 30:9 33:11,15 56:12
  57:23
scored 62:25 63:4,5 65:19
scores 58:4
scoring 37:7
screen 53:8
screening 34:8 37:23
  68:20,23,24
Scurr 94:9
SEAL 96:19
search 6:7
second 36:13 62:15 63:2
  66:16 67:11 94:2
seconds 79:17,17
section 23:19
secure 39:9 78:24 79:25

80:13 81:8 82:3
secured 39:9
see 13:3,20 16:25 24:15
  26:14,16 27:8 29:3
  31:18 32:1,3,12 38:4
  43:19 47:1,25 48:1 53:6,9
  53:12,13 59:8 62:5,11
  63:25 64:13,20 65:15,21
  65:24 67:9 74:16,17
  77:10,13 85:23 88:21
seen 13:4,8 30:18,25
  45:24 48:6 49:5 50:21
  51:12,22 52:6,8,22 53:3
  55:18 56:3 63:19 82:18
  85:9 86:5
seizure 6:7
self-medicating 73:19
  74:3,14
sensitivity 57:6,9,13
  61:17
sent 14:10 67:1
sentence 74:19
serious 30:14,15 32:14,18
  32:21 38:8,11,13,23
  61:6
services 22:25 77:16
  82:23 83:2 89:14 90:7
  90:18 91:16 98:5,19
set 6:2 46:19
setting 6:24
seven 28:5
Seventh 2:5,14
severe 30:12 32:14 33:11
  58:5 59:14 61:18 68:3
severing 80:15
shaving 80:14 81:19
sheet 79:10 82:12
Sherburne 2:7 3:18 8:16
  8:17,25 9:14,22 10:1,4
  10:14,19 11:1,10 12:16
  12:18,19 14:19 15:18,24
  18:13,18 22:17 25:13
  35:6 54:19 69:21 70:9
  71:12,21 73:1 78:11,21
  82:23 89:3 90:1,2 91:4
  98:6
sheriff 11:9
sheriff's 9:8,18 69:22
shortly 66:12,18
show 13:1 16:18,21 27:15
  27:16 49:16 50:21 52:6
  88:8
showed 65:10
shower 81:16
showing 14:4 46:21,25
  57:12
shown 43:5 45:21 51:23
shows 22:14 27:19 43:6
  49:8,22 62:24 64:4,17
  64:25
sic 10:22 76:2
sick 51:25
sign 95:1
signed 18:17 28:3 88:19
significant 73:23,25
signs 24:11,16
Simple 35:3
simply 59:11
sir 32:7 52:24 61:14 81:5
sister 52:1,4
sit 11:6 21:20
site 83:3,25 84:3 89:6,8,12
sitting 36:23 71:10
situation 32:18 38:12,16
  38:21,25 39:7 80:9,18
situations 24:11,17

six 93:21,23
Skype 39:8
sleeping 32:20,22 33:4
slept 32:24
slit 36:18
sober 74:24
social 19:8 93:9
somebody 15:17 26:14
  27:7 43:7 60:22
soon 30:23 55:7
sorry 25:2,17 27:17 28:7
  35:23 36:8 40:23 43:22
  52:25 55:2 61:3 70:15
  72:2,3,25 76:7 87:24
sort 12:5 55:5 60:22 63:22
  66:11 68:19 79:10
sotto 14:1 19:19 48:14
  53:1 74:9 88:4
source's 49:4
South 2:5,10
speak 16:9 24:6,24 26:21
  37:4 47:10,17 48:21
  50:20 56:2 57:15 65:11
  67:18,23 68:1,2 69:10
  79:1
specialist 54:7,15 56:4
  63:18 83:22,25 84:3
  85:2
specialists 78:2 93:8,13
specific 5:9 16:17 72:24
  89:1 91:22
specifically 25:14 34:4
  70:16 86:14
specificity 57:6,9,14
  61:17
specifying 82:25
speculate 89:20
speculating 90:10 94:16
spent 8:21
spoke 54:15,16 55:11
  64:11 66:5
spoken 31:15,20 66:7
spot 77:22
St 1:16,17 2:15 89:22 96:6
  96:7
staff 4:18,22 9:8,11,16,18
  13:10 16:13 24:8,15,25
  25:1,3 27:10 39:24 41:6
  53:10,23 54:3 56:15
  59:5 65:23 70:3,9,21,21
  72:13,14,16 78:8 85:5
  86:15 87:20
standard 24:21 25:7,10
  56:5 61:4,4
standards 22:24 23:2,5,6
  23:12,15,18,21 24:2
  24:2,6,15 25:11,13
  98:19
Stang 1:8 97:6
staples 36:25
start 35:8
starters 89:5
state 3:10 4:5 17:25 18:18
  19:2 88:15 96:5
stated 75:1
statement 17:8 22:11
  25:21 26:23,25
states 1:1 5:12,23 90:12
stating 33:7
status 44:16
Stearns 36:2,4 80:12
  89:23
stenographic 96:8
Steve 94:9
stole 81:14
stopgap 12:5 47:20

stops 4:19
Street 1:16 2:5,14 96:7
stressed 75:18
Strike 60:14
stuff 45:16
subcontracted 92:13,16
94:7,8,10
subject 14:16 24:9
substance 82:23 83:4
substantial 96:13
substantive 6:11
sued 35:15,20 36:1,3,9,12
41:14
suffering 39:3 75:2
sufficient 25:4,18
suggest 8:11
suicidal 25:23 26:2,8 38:8
38:10 76:10
suicide 23:19 24:3,4,12,17
24:20 25:6,20 32:4
33:20 34:4,8,14,22 35:3
36:1,4,20,21 37:1,7,22
37:24 41:15,16 42:14
54:19 68:4,10,20,23
69:23 70:3,18 71:5,8,12
71:18,24 76:14 77:20
78:10,15,17,21 79:2,13
79:15,21 81:17
suicides 34:17 35:16
36:10 81:7
Suite 2:6,14
supervise 4:17
supervising 4:22 72:14,15
supervision 25:25 26:3,9
supply 82:22
support 9:8
suppose 8:11
supposed 24:10 25:3,15
33:15 37:23 45:23 77:10
81:9 88:25
supposedly 35:2
sure 12:2 18:24 24:6
42:11 47:2,2 52:24
75:17 82:25 87:13 88:2
91:13
surprised 56:1
surrounding 5:13
suspect 42:13,13
suspension 47:23
swear 83:20
sworn 3:5,25 96:6
symptoms 26:8
system 41:18 42:1,6 43:10
systems 42:2

---
**T**
---

T 1:22 96:4,22 97:1,1
tablet 48:11
tablets 53:18
take 9:17,19 49:9 50:5
51:19 61:21 62:15 76:20
77:25 79:22 81:11 87:2
94:19
taken 49:25 62:20 94:21
96:6 97:4
takes 79:20 82:11
talk 20:4 55:9 80:1 82:15
talked 31:13 85:4
talking 15:7 24:25 40:2,3
40:11,23 41:20 73:8
80:7,17 92:21
task 83:13
team 34:15
technicians 85:6 86:5
Telehealth 39:9
telemedicine 39:10

tell 7:13 10:6,8 12:17
14:21 18:20 27:18 30:1
42:25 49:16,18 64:18
68:11 69:11 76:10 89:21
93:17 94:2
telling 5:14 17:23 20:6
26:17 31:11 37:20,22
49:2 56:5 59:4 66:17
67:3
tells 45:11 67:4
ten 30:6 48:12 65:4,18
79:17 93:23 94:3
tendency 96:13
tender 81:2
tends 38:19
tension 47:9,15,16 49:3
term 69:23 70:3,18,21
71:5,8,12 74:17
terminology 70:19
terms 19:2 21:19 70:24
71:1 88:7 93:3
test 61:21 63:1 69:8
testified 3:6 4:1 15:20
17:6,22 22:9 39:14,22
testimony 84:5 96:5
tests 57:5,5
Thank 3:19 19:18
therapeutic 46:9,13 53:24
54:2
therapy 46:11 83:4
thing 27:22 55:5 63:22
66:24 76:3,9
things 12:1 38:6 42:10
52:13 66:15 67:7,12,20
68:12,20 71:20
think 11:16 12:7 17:18
20:25 26:6,17 27:19
33:18,21 34:10 37:14
50:1,16 51:2,3,8 58:16
62:10,24 80:19,20
thinks 75:7,13
third 19:24 81:9
Thompson 27:24 33:19
43:10,17 52:3
thought 55:15
thoughts 75:22 76:10,14
thousand 91:9 92:1
Thousands 91:1
three 35:18 39:2 49:11,17
49:22 53:17 78:3 85:7
85:10
threshold 56:14
throat 36:19,24 81:12
time 3:9 8:21 9:7 10:13,17
11:18 12:12,13 13:13
29:24 40:8 50:2 54:22
56:17,21 58:12 59:4,18
60:7 61:23 62:3 67:24
74:24 75:11,20 78:17,22
83:21 85:11 91:13,15
92:8,19 93:14 94:11
96:8
timeline 82:9
Timeliness 29:20 31:4
timely 25:5,20 31:2 45:15
times 35:15,18,19 36:9,12
41:14 47:24 48:8 54:12
85:7,8,10 86:6,6
title 14:18
tnovak@larsonking.com
2:13
today 11:6 21:20 40:14
45:22 71:10
Today's 3:8
Todd 1:13 3:2,4,8,24 4:7
90:3 95:4 96:5 97:2,24

told 45:10 56:7 64:3
Tony 3:16
tool 37:13,15,19 38:2
61:19 69:4
tools 34:10 68:17 69:3
top 27:6 89:25
total 49:18 51:6
totally 73:4
trained 24:9,10,16 33:21
84:25
training 17:13 21:21,24,25
22:2 88:13
transcript 1:11 2:18 96:18
97:3
treat 21:11 58:14
treated 53:18
treating 38:7
treatment 5:12 58:24 59:9
59:14 75:9,12 76:1 83:5
true 4:11 38:17 41:8 96:5
97:7
Truman 4:20
try 76:20
Trustee 1:5 97:4
try 76:20
trying 21:8 46:12,16
Tuesday 75:1
TV 53:8 75:20
twice 7:8 27:10 48:7,11
65:22 67:5 85:24 86:2
two 13:9 16:12 27:23
54:12 66:15 67:7,12
81:6 86:20
Tylenol 86:9
typewritten 97:3
typical 29:17,20 64:21
91:5
typically 32:3,8,10 77:17
77:20

---
**U**
---

U.S 22:19,25 23:2
Uh-huh 32:13 57:19 63:16
74:22 77:14 93:15
ultimately 72:11
umbrella 9:20
un 27:2
unaware 5:14
uncomfortable 80:7,17
undated 28:10
understand 4:23 6:1 11:9
27:3 37:20 40:3 55:17
60:24 61:7,9 69:22
71:16 82:6 84:5
understanding 45:2 55:20
55:24 82:10 83:1
understood 70:20 71:2
unit 77:19
United 1:1 5:12,23
untreated 68:3
unusual 6:9
urologic 21:13
urological 21:16
urology 21:17
use 34:10 37:19 38:6
41:24 42:10 46:11 47:6
49:5 50:7 58:1,17 61:19
69:3,23 70:6,18,25 71:4
71:7,11 75:10 77:19
81:11,18,19 82:1,11
uses 54:5
utilize 80:14
utilized 22:25 39:11 69:7
69:24

---
**V**
---

VanDerBeek 83:18
varies 94:15,17
variety 5:7 42:4 47:6
73:24 89:6
various 6:5 98:11
varying 57:4
Vaughn 35:19,22
vein 80:16
vendor 83:3
verbatim 19:14,25 23:8
35:14
version 22:25 23:16 39:10
58:1
versus 73:12 92:4
video 1:11 2:16 3:2,7
82:18 95:2,4
VIDEOGRAPHER 3:7,19
62:19,21 94:20,22 95:2
view 22:6,7
viewing 37:18
virtue 19:9 21:3,11,23
visit 54:6
visits 51:16 53:22 59:5
visualize 40:12 53:7
visualized 85:4
voce 14:1 19:19 48:14
53:1 74:9 88:4
vs 1:7 97:5

---
**W**
---

W 1:5 2:9 97:4
Waagmeester 15:24 17:2
21:15 30:21 33:10 39:14
47:11 48:19,23 55:9
63:7 87:11 88:1
wait 51:4 63:2
waiting 64:9
walks 75:21
want 8:19 14:25 16:9
20:11,12,16 32:6,10
40:3 51:14 55:8 56:15
60:4 69:24 75:3 86:9,10
89:20
wanted 40:22 44:20 70:24
wants 50:7 87:2
wasn't 9:10 16:2 58:13
81:8
watch 69:23 70:4,18 71:5
71:8,12 77:20
watches 75:20
way 40:21 48:23 53:7,21
54:9 58:14 63:1 64:7
79:14 85:18 87:18
ways 5:7 47:7 48:9 49:6
we'll 20:16 31:8 62:15
77:21 80:11
we're 15:7 28:12 58:17
62:21 83:6 94:22
week 78:3,4 94:14,17,17
well-known 76:13
went 50:2 75:5,11 81:16
West 1:16,16 96:6,7
whatsoever 43:20 45:17
windmills 64:14
Wing 89:23
Wisconsin 7:22 90:14,22
withdrawal 38:13,17,19
38:23 39:3 43:18
witness 3:5,16,23,25
19:18 20:10,13 48:14
96:18,19
word 22:4 29:19 68:22
words 30:18 53:8 66:9
work 9:11 12:5 17:17

39:18 93:6 94:13
worked 9:8,18,21 10:7,14
21:17,25
worker 19:8
workhouse 75:7
working 11:11 58:21 64:6
works 92:7
world 69:9
worldwide 69:11
worry 20:8
wouldn't 12:3 21:16 31:2
42:19,20 55:16 61:13
86:25 87:3,3,22 91:2,14
91:22
write 44:8 67:19
writes 26:20
writing 64:3 65:10 67:22
96:7
written 48:18 77:3
wrong 71:3 72:5 84:2
wrote 26:21 29:6,8 51:25
66:25

---
**X**
---

---
**Y**
---

yeah 11:21,22 12:8 13:3
19:13 28:13 31:11 32:1
35:12 41:5 42:6 43:9,15
45:5 47:6,16 48:16,20
48:24 50:14,25 53:11,15
54:23 57:21 60:1 63:2
63:12,12,13,14 64:24
65:7 66:4 73:10 75:4
78:9 79:16 80:1 81:13
81:22 84:21 85:3,16
89:5 93:2
year 11:12
years 20:3 49:5,6 73:14
74:24
Yep 14:13 20:1 60:17 86:1
86:3,14 91:18 92:18

---
**Z**
---

zero 38:1

---
**0**
---

---
**1**
---

1 4:12 12:11,19 13:15
32:25 58:14 59:12 98:8
10 57:12 98:7
10:13 62:19
10:25 62:22
100 47:24 48:8
10th 14:10
11 65:19 77:6,10
11,88 98:6
11/16 28:4 29:3
11/16/17 31:24 32:2 67:9
11/3/17 98:14
11/5 77:4
11/5/17 98:13
11:10 94:20
11:22 94:23
11:23 95:3,5
12 46:21 82:15,16 94:16
98:9
12010 14:22 15:5 16:8
43:8 69:15
12012 26:25
13 14:5 98:11
14 28:12 43:5 98:12,13
16 78:10

**16th** 45:24 63:19,25 64:13
    65:25 77:13
**17** 70:14 71:24
**18-2301** 1:4
**19** 62:9,10,11,14 98:14,20
**1996** 56:19

---
**2**
---

**2** 62:21 98:8
**20** 62:14 75:19
**2006** 7:10 9:1,21 10:4
**2011** 22:24
**2013** 9:1,4,21 10:5
**2014** 9:3 78:3 98:19
**2016** 7:10
**2017** 4:12 7:24 11:23
    12:11,19 13:16 46:2
    70:11,13 71:13 78:3
    83:17,21 84:7 89:4,13
    90:12,13,17,20,24 91:6
    91:21 92:19
**2018** 14:10
**2019** 1:14 3:8 96:6,20 97:6
**24** 30:18,25
**26** 43:13 98:16
**27** 62:6 98:17
**28** 2:20 19:17 98:19
**28,43** 98:13
**2800** 2:14
**29** 30:25 58:4

---
**3**
---

**3** 94:22
**30** 2:14 75:7 79:17
**30.06** 2:18
**3000** 2:6
**31** 1:14 96:6 97:6
**31st** 3:8
**333** 2:5
**3rd** 43:16 63:3 85:24

---
**4**
---

**4** 28:12
**4-94** 98:2
**4:57** 14:13
**4135** 1:16 96:6
**43** 30:10 33:15 56:12
    65:20 68:24 98:16
**46** 98:10
**48** 30:18,25

---
**5**
---

**5** 11:16,17 88:7 98:5
**5,000** 91:10
**5.8** 18:23,25
**50** 47:24 48:8 86:19 93:20
**500** 91:7
**55101** 2:15
**55402** 2:6
**55438** 2:10
**56301** 1:17
**57** 98:8
**5th** 28:16 40:25 41:1 61:25
    62:7,25 63:5,6,8,17,19
    86:2 96:19

---
**6**
---

**6** 28:15 29:9
**62** 98:15,18
**63** 58:4
**6th** 30:4 31:12,19 40:24
    50:1 51:3,12 52:22
    63:24 64:2,4,5,17,19
    65:1,3 86:20

---
**7**
---

**7th** 51:2 52:10 86:20

---
**8**
---

**81** 19:22 57:14
**8th** 51:21 52:7,8

---
**9**
---

**9** 4:12 12:11,19 13:16
    58:15
**9:03** 3:3,9
**92** 57:14
**9321** 2:10
**952.943.1587** 1:24
**9th** 32:25 50:3 51:15 59:13