# EXHIBIT 27

1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---------------------------------------------------------

CIV. NO. 18-2301 (JRT/KMM)

David W. Lynas, as Trustee for the
next-of-kin of James C. Lynas,

      Plaintiff,

    vs.

Linda S. Stang, et al.,

      Defendants.

----------------------------------------------------

VIDEO DEPOSITION TRANSCRIPT OF

ANDREA KRETSCH

May 29, 2019

at

Caribou Coffee, St. Cloud West
4135 West Division Street
St. Cloud, MN 56301

Reporter:  Jane T. Doby
Registered Merit Reporter
Doby Professional Reporting, Inc.
DobyReporting.com
952.943.1587

Andrea Kretsch
5/29/2019

**2**

```
1   APPEARANCES:
2   On Behalf of Plaintiff David W. Lynas:
3       Robert Bennett, Attorney at Law
        rbennett@gaskinsbennett.com
4       Kathryn H. Bennett, Attorney at Law
        kbennett@gaskinsbennett.com
5   GASKINS, BENNETT & BIRRELL, LLP
    333 South Seventh Street
6   Suite 3000
    Minneapolis, MN 55402
7
    On Behalf of the Sherburne County Defendants:
8
    Jason M. Hiveley, Attorney at Law
9   jasonh@irc-law.com
    IVERSON REUVERS CONDON
10  9321 Ensign Avenue South
    Bloomington, MN 55438
11
    On Behalf of MEnD Defendants:
12
    Carolin J. Nearing, Attorney at Law
13  cnearing@larsonking.com
    LARSON KING, LLP
14  30 East Seventh Street
    Suite 2800
15  St. Paul, MN 55101
16
    Also Present:  Jayme Hogan, Envision Video
17
    NOTE:  Pursuant to Minnesota Rule of Civil Procedure
18  30.06, the original transcript will be
    delivered to Gaskins, Bennett & Birrell,
19  LLP, the noticing party.
20  NOTE:  Exhibit Nos. 21 through 26 were marked
    for identification.
21
22
23
24
25
```

**3**

```
1           P R O C E E D I N G S
2       (The video deposition of ANDREA KRETSCH was
3   commenced at 1:50 p.m. as follows:)
4           ANDREA KRETSCH,
5   called as a witness, being first duly sworn, was
6   examined and testified as follows:
7               ***
8       VIDEOGRAPHER:  This is the video deposition
9   of Andrea Kretsch.
10      Today's date is May 29th, 2019.  The time
11  is approximately 1:50 p.m.
12      Would each attorney please state their name
13  for the record.
14      MS. BENNETT:  Kathryn Bennett, for the
15  plaintiff.
16      MR. BENNETT:  Robert Bennett, on behalf of
17  the plaintiff as well.
18      MS. NEARING:  Carrie Nearing, on behalf of
19  the MEnD Defendants.
20      MR. HIVELEY:  Jason Hiveley, for the
21  Sherburne County Defendants.
22      VIDEOGRAPHER:  Thank you.
23      Would the court reporter please administer
24  the oath.
25      (Oath administered.)
```

**4**

```
1           THE WITNESS:  I do.
2               ANDREA KRETSCH,
3   called as a witness, being first duly sworn, was
4   examined and testified as follows:
5               ***
6               EXAMINATION
7   BY MS. BENNETT:
8       Q   Ms. Kretsch, where do you currently live?
9       A   Big Lake, Minnesota.
10      Q   Where did you grow up?
11      A   Sauk Centre.
12      Q   Did you go to high school at Sauk Centre?
13      A   I did.
14      Q   When did you graduate?
15      A   In 2002.
16      Q   Did you receive any post-high school
17  education?
18      A   I got my associate's degree in nursing at
19  Rasmussen College here, across the road.
20      Q   And when did you graduate?
21      A   In 2016.  And I took my boards in January
22  of 2017.
23      Q   And you received your RN license, then, in
24  January of 2017?
25      A   Correct.
```

**5**

```
1       Q   Have you ever had any restrictions on your
2   license?
3       A   Zero.  None.
4       Q   Have you been involved in any disciplinary
5   hearings?
6       A   Zero.  None.
7       Q   Throughout your education, did you receive
8   any training or -- in a jail setting?
9       A   We had clinicals.  We had clinicals at
10  various different places.  Kind of a wide range of,
11  you know, different -- there's all sorts of different
12  places you can work as a nurse.  So I did do -- I was
13  two days at Shakopee women's prison.
14      Q   And nothing beyond that in the jail
15  setting?
16      A   Correct.
17      Q   Did you have any education or training in
18  detoxification?
19      A   I guess not with school, particularly.  But
20  training with MEnD.  They're fantastic with training.
21      Q   Can you describe that training?
22      A   I'm sorry?
23      Q   Can you describe that training?
24      A   Yeah.  When you first start working there,
25  you, I guess, quote/unquote, you follow somebody.
```

2 (Pages 2 to 5)

Andrea Kretsch
5/29/2019

**6**

1  You see, you know, how the policies, protocols, how
2  everything is carried out.
3      You are also given all of the written
4  policies and protocols to refer back to.
5      As far as length of training, that can be
6  however long the nurses feel uncomfortable.  If you
7  feel like you need more training, they're fantastic
8  with -- with making sure that you're feeling
9  comfortable.  Always okay to ask questions; always
10  okay to get help.
11   Q   And can you describe the detoxification
12  protocol?
13   A   Yeah.  You -- when we get people that are
14  booked in, they get a packet that the patients
15  themselves fill out.  Which would be for their
16  tuberculosis screening, diet, allergies.  Things like
17  that.
18      And then the bookers will go through and do
19  all of their medical and mental health screening
20  questions.
21      If they do report any previous drug use or
22  current drug use, that's where we would get a urine
23  sample.
24      And the questioning with that would be, you
25  know, if there's any withdrawal symptoms; if there's

**7**

1  seizure history; if they're currently having any
2  symptoms now.
3      We get their vitals, and just check and see
4  how stable they are.  And check their urine to see
5  what is in it.
6   Q   And if they are presenting with drug use
7  and then withdrawals, what's the protocol?
8   A   It depends on what -- what substance they
9  are positive for.
10      Things like, you know, opiate use, alcohol,
11  those are big ones that we can do, like, an Ativan
12  taper just to help them ease out.  Because,
13  obviously, that can be pretty hard on your -- on your
14  physical health.
15      We keep them -- if we are concerned about
16  them, we put them on a 15-minute watch.  So they
17  would be checked on every 15 minutes.  They certainly
18  can, at any point, request to see any of the health
19  staff.
20      They are also seen in the clinic by a nurse
21  every single day, at least once, if not more, if we
22  need to, and assess from there.  Everyone is
23  different with what they need.
24   Q   And that's for individuals who are on a
25  withdrawal protocol?

**8**

1   A   Correct.
2   Q   And what did you do between 2002 and 2016?
3   A   Well, I waitressed for a while.  I worked
4  at several different restaurants.
5      And then I worked at Luther Honda,
6  St. Cloud.  In 2011, I believe, I started there.
7  Two -- through 2014.
8      And then from '14 to '16, I was in school.
9   Q   And so all of your training regarding
10  detoxification withdrawal came through MEnD?
11   A   Uh-huh.
12   Q   And what about --
13      MR. BENNETT:  Is that a yes?
14   A   Yes.  I'm sorry, yes.
15  BY MS. BENNETT:
16   Q   It makes her life easier.
17   A   Yes.  I'm sorry.  Yes.
18   Q   Can you describe if you've had any training
19  in mental health?
20   A   There, again, with MEnD training,
21  they're -- you know, unfortunately, our clientele,
22  our patient population that we see, we have a
23  tremendous amount of mental health patients.  So
24  there again, training.  If we have questions, there's
25  always a psychologist that's there.

**9**

1   Q   The psychologist is at the jail?
2   A   Uh-huh.  Correct.
3   Q   Each day?
4   A   Yes.  Monday through Friday.  Not -- not on
5  the weekends.
6   Q   In November of 2017, who was that
7  psychologist?
8   A   That would have been Michael Robertson.
9   Q   Throughout your education, did you have any
10  experience in giving suicide risk assessments?
11   A   Throughout my experience at MEnD?
12   Q   In your education.
13   A   No.  Nope.
14   Q   So I take it you had some experience with
15  suicide risk assessments through MEnD?
16   A   Through MEnD.  Yes.
17   Q   Was that only through MEnD that you were
18  exposed to those?
19   A   Correct.
20   Q   And were you trained in those?
21   A   Correct.
22   Q   Can you describe the training?
23   A   Yep.  The policies there, any time we do
24  any sort of watch, whether it be mental health or a
25  chemical watch, we always do a suicide risk

3 (Pages 6 to 9)

Andrea Kretsch
5/29/2019

---

**10**

1  screening.  Or if they request to see a mental health
2  provider, we do a suicide risk screening form.
3          Go through, you know, ask questions
4  regarding their history.  Or -- and current.  Do you
5  have any history of suicidal thoughts, attempts.  Any
6  current -- you know, do you have a plan.  Do you have
7  a method.  Do you have a time.  Those are all
8  questions.
9          Ask about chemical use.  Ask about their
10 support system on the outside.  Check their
11 orientation.  See if they're oriented; capable to
12 answer the questions.
13     Q   Are you also taking your own
14 observations --
15     A   Absolutely.
16     Q   -- of the patient?
17     A   Absolutely.  That's a huge part of it.
18     Q   And I think you said this, but just to be
19 clear.  You do suicide risk screening forms at the
20 jail for both mental health watch and chemical?
21     A   Yep.  As well as when we do a health
22 assessment for every single patient.  We do health
23 assessments, and those also get a suicide risk
24 screening form, regardless of whether they had one
25 early or not.

---

**11**

1          MR. BENNETT:  You should try to let her
2  finish her question before you begin your answer.
3          THE WITNESS:  Okay.  I'm sorry.
4          MS. BENNETT:  Just makes her life easier
5  taking down the record.
6          COURT REPORTER:  Thank you.
7  BY MS. BENNETT:
8      Q   When were you hired by MEnD?
9      A   That was in March.
10     Q   So just a few months after you received
11 your nursing license?
12     A   Correct.
13     Q   How did you hear about MEnD?
14     A   I went to a job fair, actually, at
15 Rasmussen school.  And they were there.  And I
16 enjoyed my prison clinical a lot.  So I put an
17 application in and got an interview and was hired
18 that same day.
19     Q   And what is your current position with
20 MEnD?
21     A   An RN.
22     Q   Was that the same position you were hired
23 as?
24     A   Correct.
25     Q   And the same as November of 2017?

---

**12**

1      A   Correct.
2      Q   Can you describe your job duties as an RN
3  with MEnD?
4      A   Yeah.  Absolutely.  There is assessments of
5  each patient; head-to-toe assessments, if need be.
6          There is lots of wound care.  We get a lot
7  of people that come in with either previous or new
8  wounds.  Lots of chemical assessments.  Any time
9  anyone has an issue, whether it be their mental
10 health or physical health, they can place a sick
11 call, is what we call them.  You know, we're their
12 primary clinic.  So any time they have an issue with
13 anything, they send them in.  We receive their sick
14 calls and go through them three times a shift, and
15 triage them accordingly.
16     Q   If they put in for their own sick call?
17     A   Correct.
18     Q   In what facilities do you work in 20 --
19 in November of 2017?
20     A   Just Sherburne.
21     Q   How many hours per week were you there?
22     A   40.  I was hired as a full-time.
23     Q   Do you work at any other facilities,
24 currently?
25     A   No, ma'am.

---

**13**

1      Q   Still at Sherburne?
2      A   Correct.
3      Q   And then I want to walk through the
4  structure at Sherburne County then.
5          Who was the medical director?
6      A   That's going to be Todd.
7      Q   Leonard?
8      A   Yes.
9      Q   And then who was the medical provider at
10 Sherburne?
11     A   That's Todd Leonard.
12     Q   So he's both the director and the provider?
13     A   Oh, now I'm unsure of the director.
14         Oh, that's -- I'm sorry.  I apologize.
15         Diana VanDerBeek is the director.
16         Todd Leonard is the acting medical
17 provider.
18     Q   And how many times a week was Dr. Leonard
19 in the jail in November of 2017?
20     A   Oh.  That would be a tough one.  I'm not
21 sure.  He comes, I guess, as often as he's needed.  I
22 really can't say how many times that month he was
23 there.  Like I said, he comes as often as he needs to
24 be there.
25     Q   And what would be a time when is he needed

---

4 (Pages 10 to 13)

Andrea Kretsch
5/29/2019

14

1   at the jail?
2       A   Any time.  Whether we're -- you know, if
3   our provider is unable to be there, or if there's
4   meetings.  Or if he needs to, you know, help with any
5   of the medical providers' load, workload, he would
6   come in.
7       Q   Was he the primary treating provider for
8   the inmates there?
9       A   Yes.  Everything that we do.  All of our
10  assessments, all of our notes, our visits.  After we
11  put them in the computer, then our nurse practitioner
12  reviews them, signs off on them, and then Dr. Todd
13  also would review.
14      Q   And who was the nurse practitioner in
15  November of 2017?
16      A   Janell Hussein.
17      Q   And you talked about the mental health
18  provider being Mr. Robertson, or Dr. Robertson?
19      A   Correct.
20      Q   And is Diana VanDerBeek, the nursing
21  director --
22      A   Yes.
23      Q   -- not just the -- the medical director?
24      A   Yes.  I'm sorry.
25          I misunderstood that question.  I

15

1   apologize.
2           MS. NEARING:  So to clarify, she is not the
3   medical director?
4           THE WITNESS:  Correct.  Yes.  I apologize.
5           MR. BENNETT:  So who is?
6   BY MS. BENNETT:
7       Q   Then who is the medical director?
8       A   You know, I can't, offhand, think of it.
9   I'm not sure.  And I don't want to give you a wrong
10  answer.  So I'm not sure.
11          Todd Leonard is the acting medical
12  provider.  And she is -- Diana -- I'm sorry, I
13  apologize -- is the nursing director.
14      Q   Do they use the term "responsible health
15  authority"?
16      A   Yes.  And I don't know who that is, I
17  guess.  Again, I don't want to tell you the wrong
18  information.
19      Q   And Dr. Leonard was the acting medical
20  provider in November of 2017?
21      A   Correct.
22      Q   And, then, was there a nursing supervisor?
23      A   That would be Jen.
24      Q   Is that Thompson?
25      A   Correct.

16

1       Q   And then I take it there's a bunch of RNs
2   that are also working there alongside you?
3       A   Correct.
4       Q   And are you staffed at the same time as
5   them?  Or how many are typically on a shift?
6       A   Yep.  There's anywhere from three to five
7   nursing staff on per shift.  There's always at least
8   two.  But it's typically three to five.
9       Q   And then the medical provider, Dr. Leonard,
10  is there as needed?
11      A   Uh-huh.  Yep.  And Janell Hussein, the
12  acting nurse practitioner, she's there Monday through
13  Friday.
14      Q   And then are there also health pass and med
15  passers?
16      A   Correct.
17      Q   And you're not a psychiatric nurse.  Are
18  you?
19      A   Correct.
20      Q   And you're not a qualified mental health
21  professional?
22      A   I did not get my degree in mental health.
23  No.  I got my degree in nursing.
24      Q   And you're familiar with the MEnD policies?
25  You stated that you've been given them and review

17

1   them.
2       A   Yep.  Every year we get new ones, because
3   they update -- you know, every year they go through
4   and assess if anything does need to be changed,
5   updated, improved.
6           And then at that time we do get a new copy.
7   So every single nurse has their own copy.
8       Q   And are you retrained annually or --
9       A   Every year we have training, yep.
10  Actually, our training is coming up June, I think,
11  18th it is.  It's a two-day course.
12      Q   Is it always in June?
13      A   Correct.  Well, at least since I've been
14  there, it has been.
15      Q   And under the policy, is the goal to
16  provide quality medical care to inmates from the time
17  of admission to the time of their discharge?
18      A   Correct.
19      Q   And the medical provider -- so that being
20  Todd Leonard in November of 2017 -- was supposed to
21  review and sign all health assessments?
22      A   Which first Janell does.  After the nursing
23  staff completes them, enters them, then Janell goes
24  through and signs them.  Everything that she does,
25  Dr. Todd also oversees.  So, in turn, he does see

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

---

18

1    everything we do as well.
2        Q   And you're supposed to make reasonable
3    attempts to discover mental instability of inmates?
4        A   Correct.
5            If we are concerned of anything, you know,
6    we dig into it right away.
7        Q   And then if you are -- if you detect a
8    mental health issue in an inmate, they're to be
9    referred to medical staff as soon as possible?
10       A   Yep.  If we detect any -- any sort of
11   issues -- mental health, if they feel like -- seem
12   like they're in trouble -- we meet with them.  We go
13   through those suicide risk screening questions.  We
14   go through their history.  You know, check how stable
15   they are.  Check to see, you know, if they would --
16   were to have thoughts of harming themself.  Those are
17   all questions that we would go through.
18           And then if we are concerned, then we would
19   place a mental health referral.  And depending on if
20   it's urgent or not, we can mark "urgent" on there.
21   Sometimes the mental health provider can see them
22   right away.
23       Q   And if it is an urgent mental health
24   referral, when would you expect that patient to be
25   seen?

---

19

1        A   It's usually within the next day.  Usually.
2            She -- so, like I said, sometimes she is
3    able to see them that same day.  And if it is urgent,
4    they are placed on a 15-minute mental health watch.
5            And with those watches, whether it be a
6    15-minute or 30, emails would go out to our
7    classifications, to our sergeants, to our admin, as
8    well as the nursing staff, so everyone is on the same
9    page; everyone knows what's going on with them.
10       Q   So if someone is placed on a 15-minute
11   mental health watch, it is an urgent mental health --
12       A   Uh-huh.
13       Q   -- issue?
14       A   Absolutely.
15       Q   And you were saying "she," I think, in
16   reference to the mental health provider.
17       A   Yeah.
18       Q   I thought that was Michael Robertson.
19       A   Michael Robertson is no longer with us.  So
20   now it's -- it is Barb.  I think her last name is
21   like Weinsky (phonetic) or Wanesee (phonetic).
22       Q   But it was not Barb Weinsky --
23       A   No.
24       Q   -- in November of 2017.  Correct?
25       A   Correct.

---

20

1        Q   And you can also refer them to the jail
2    medical provider, the mental health professional, or
3    both?
4        A   Absolutely.  Yes.
5        Q   But it would be a mental health referral if
6    it was an urgent issue?
7        A   Uh-huh.  Yep.  And she would meet with them
8    first.
9            A lot of times mental health and medical
10   provider, you know, work in correlation.  Because,
11   you know, do -- do they need to have medications
12   onboard.  You know, are there other issues that their
13   physical health is affecting their mental health.  So
14   they work hand-in-hand.
15       Q   And do you know if Dr. Robertson was able
16   to prescribe?
17       A   He cannot prescribe.  No.  No.  He's a
18   psychologist.
19       Q   And you can also refer out, if an inmate
20   poses issues that are beyond the capabilities of
21   those staffed in the jail.  Is that right?
22       A   As far as mental health or physical health
23   or --
24       Q   Both.
25       A   -- both?  Yep.  That happens quite a bit.

---

21

1    If they're, you know -- we are capable and very well
2    able to care for most.  But there are some things
3    that we just simply cannot give them the best care.
4    In those times, then, yes, they would be sent out.
5        Q   In what instances have you seen an inmate
6    referred out?
7        A   Well, chemical-wise, it happens often if we
8    get an inmate in that is extremely agitated, won't
9    allow nursing staff to assess, can't get any vitals,
10   can't get a urine.
11           If we're concerned that they have ingested
12   anything, or if they're just acting so out of the
13   blue, then we would -- for their safety, we would
14   send them out so they could be better evaluated to
15   make sure that there is nothing else on board.
16           We cannot force inmates to give us a urine.
17   We cannot force them to allow us to do blood
18   pressures.  So it's better to make sure that they
19   have the best care, and send them out if we cannot
20   obtain those things.
21       Q   And it sounds like that's for the safety of
22   the inmate?
23       A   Uh-huh.  Yep.
24       Q   Is it also within the MEnD training and
25   policies that you've received that any perceived

---

6 (Pages 18 to 21)

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

22

1  risks of suicide should be treated as a valid threat?
2      A   Absolutely.  Yes.  We don't play around
3  with that at all.
4      It's -- it happens often where we'll get a
5  call from a housing officer saying either another
6  patient overheard someone saying something about
7  harming themselves.  Or if the patient themself goes
8  to the officer and reports something.  We -- you
9  know, we take that extremely seriously.
10     At that time, they would have to go into
11 the full precautions.  Kevlar gown, urgent mental
12 health referral, nurse would meet with them as well
13 as mental health.
14     Q   So you, as a nurse in the jail, would try
15 and obtain a full picture of what every person is
16 seeing of particular inmates.  Is that what I hear
17 you saying there?
18     A   Say that again?  I'm sorry.
19     Q   So you would be interested in what other
20 inmates are hearing about a particular inmate?  COs,
21 what they're observing and --
22     A   Yep.  That's all plays a toll in it.
23 Because we can only -- we can only help so much
24 because we can't -- we don't have eyes on -- once
25 they're in housing, you know, they're no longer in

23

1  the clinic.
2      So if an officer -- you know, they're
3  around them almost 24 hours a day.  So they, you
4  know, sometimes see or hear things that the clinic
5  does not know of.  So they report it right away.
6      Q   And along that same line, do you review,
7  like, the eMDs and other written documentation about
8  inmates as you're treating them?
9      A   Uh-huh.  Absolutely.  Yep.
10     Because you can see what their history is
11 then.  If there's been a history of other issues like
12 that, then it kind of gives us a little bit of a
13 picture in how best we can help them.
14     Q   And how is it that you can review, you
15 know, the eMDs or other written documentation about
16 the inmate at the jail?
17     A   All the electronic documents, we all have
18 access to eMDs.  Which you would just have to type in
19 their name, and then it would pull up their whole
20 electronic chart.  As well as we have their paper
21 chart that has all of their written documents as
22 well.
23     Q   So -- and the eMDs chart, that's the
24 electronic version?
25     A   Uh-huh.  Yeah.  I'm sorry.  Yes.

24

1      Q   So those, it looks like, through what we've
2  obtained in this case, those are, like, a narrative
3  version.  Is that fair?
4      A   Yeah.  Yep.  That would also have their
5  assessment as well.  If they -- you know, their
6  mental health; if they weren't making eye contact;
7  if, you know, they were very fidgety; if they were
8  taking a long time to respond to questions.  Their
9  vitals would be in there.  Any drug screening would
10 be in there as well.
11     Q   And do you also have access to the booking
12 information obtained by correctional officers?
13     A   Correct.  Yep.  Every time someone gets
14 booked in, those packets, both.  We have a system
15 called ProPhoenix that would have their electronic
16 information and questioning.
17     And then we also get their paper booking
18 sheet in the clinic as well.
19     Q   Does MEnD train booking, or the COs who do
20 book in inmates, as to how they should go about
21 filling out those forms?
22     A   MEnD -- MEnD does not, no.  No.
23     We do work close, hand-in-hand, though.
24     Q   Is there a high percentage of individuals
25 coming into the jail, with, you know, substance abuse

25

1  issues?
2      A   Unfortunately, yes.  A larger portion of
3  our population are either currently or have a history
4  of substance abuse; whether that be drug or alcohol.
5      Q   Do you find that there's a large percentage
6  of inmates who have been self-medicating on the
7  outside?
8      A   Yeah.  Well, they report -- yes.  There's a
9  lot of people that, you know, would report that for
10 them, quote/unquote, it would be easier to
11 self-medicate than to go see a doctor.  For example,
12 you know, every so often get reevaluated.  So that
13 does happen.  Yes.
14     Q   Is it true, then, that there's a large
15 percentage of inmates who come in who don't have, you
16 know, a regular treating provider on the outside?
17     A   I can say that would be fair.
18     Q   And withdrawal symptoms from, you know,
19 drugs can be painful?
20     A   Uh-huh.
21     Q   Correct?
22     A   Absolutely.  Yep.
23     Q   And I take it you've probably seen some of
24 that firsthand?
25     A   Yeah.  Yep.

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

---

26

1    Q   And they can be dangerous as well, right?
2    A   Very much so.
3    Q   And even life-threatening?
4    A   Very much so.  And that is why we monitor
5 very closely.  That is where those 15-minute watches
6 would come in.
7    Q   Have you been trained that the withdrawal
8 symptoms can lead to suicides?
9    A   Well, yes.  That's -- that's part of the
10 training, what they, you know, go through.  When
11 you're not, you know, thinking clearly, you're not in
12 your right mind, sometimes you will do things that
13 you wouldn't normally do.
14        So their mental health and physical health
15 is definitely something that we monitor; especially
16 when drugs or any substances are on board.
17    Q   And both of those areas, --
18    A   Absolutely.
19    Q   -- mental and physical, are important?
20    A   Yes.  Absolutely.
21    Q   Are the severe withdrawal cases supposed to
22 be referred out?
23    A   Depends on a factor, a number of things.
24        It would depend on, you know, how their
25 vitals are.  Do they have a history of seizures.

---

27

1 Were there -- if they were alcohol intoxicated, where
2 that PBT, or how high they're blowing.  If it's --
3 usually, if it's anything for .40 or higher, we
4 usually refer out.
5        But all of those -- we get those cases in,
6 we would be calling our medical provider.
7    Q   And where would those cases be referred out
8 to?
9    A   There is a few different hospitals.  We go
10 to Mercy quite a bit.  But there's a few different
11 hospitals that we do send patients to.
12    Q   Would an inmate who has reported that the
13 pain is so bad that they are having thoughts of
14 self-harm be considered a severe withdrawal case?
15        MS. NEARING:  Objection.  Lacking in
16 foundation, calls for speculation.
17        You can go ahead and answer.  If you have
18 an answer.
19    A   Okay.  Can you repeat the question?
20 BY MS. BENNETT:
21    Q   Yes.
22        So if an individual is complaining of pain
23 that's so bad from withdrawals, and they're
24 considering self-harm, would that be a severe
25 withdrawal case?

---

28

1    A   That would be something that I would be
2 getting on the phone with my provider right away to
3 get further -- further action, further...
4    Q   So it's above what you would be comfortable
5 dealing with on your own?
6    A   Depending on what it is.  I mean, we have
7 to keep them safe.  We have to keep -- their safety
8 is our number one.
9        So if we are unsure, ask my providers.
10 They go to school a lot longer then we do.  So...
11 It's never a bad thing to call if you're ever unsure.
12    Q   Are the chemical withdrawal questionnaires
13 given to each inmate?
14    A   No.  They are given to them if they have
15 reported a drug use, or if they're just acting kind
16 of off.
17        At that time, we would get a urine.  And if
18 they were positive for something, then one would be
19 initiated at that time.
20    Q   So it's a urine test first, and then the
21 chemical withdrawal questionnaire?
22    A   Because we need to know what's on board
23 first.  What substance.
24    Q   And then if there's both a positive urine
25 test, and then they reported chemical use, do -- do

---

29

1 the flow sheets then begin?
2    A   The chemical withdrawal flow sheets?
3    Q   Yes.
4    A   Yes.  Correct.  And that's where we would
5 get the questions how -- you know, how are they
6 feeling.  Are they vomiting.  Do they have a tremor.
7 Are they oriented.  You know, what do their vitals
8 look like.  How do they appear to you.  Are they
9 sweating.  Are they shaky, agitated.
10    Q   And from those answers, an inmate is given
11 a score?
12    A   Correct.
13    Q   And who is giving that score?
14    A   The nursing staff.
15    Q   And if they're below 10 points for three
16 days, are those flow sheets discontinued?
17    A   Discontinued.  Correct.
18    Q   And if -- likewise, if the score is below
19 10, no medical provider is consulted?
20    A   Correct.  Unless whoever is assessing them
21 is concerned of anything else.
22        Just because they are below 10 does not
23 necessarily mean that the provider is not called.  It
24 just depends how the patient presents.
25    Q   Are individuals who are on chemical

---

8 (Pages 26 to 29)

Andrea Kretsch
5/29/2019

30

1  withdrawal watch also given suicide risk screening
2  forms?
3      A  Absolutely.  Yes.
4      Q  And are they also -- are the suicide risk
5  screening forms also given to individuals who need to
6  be monitored for other mental health issues outside
7  of just chemical withdrawal?
8      A  If they're reporting or if we have gotten
9  word that there is a mental health issue, then, yes,
10  a suicide risk screening form would be completed.
11      Q  So there's two ways that suicide risk
12  screening forms can be initiated?
13      A  That, as well as with our health
14  assessments.  With each person's health assessment we
15  do one as well, regardless if -- whether or not they
16  have had one or not.
17      Q  So basically, each inmate will get one
18  suicide risk screening form --
19      A  Correct.
20      Q  -- completed?
21      When are Beck Depression Inventories given
22  to inmates?
23      A  That is when -- we get a lot of people that
24  come in, that haven't been able to meet with a mental
25  health provider, that requests to speak to the mental

31

1  health provider.
2      We get the patients to the clinic.  We talk
3  about them.  We do those suicide risk screening
4  forms.  Kind of see, you know, where they're at.
5  Assess how they're appearing, how they're responding,
6  how they're talking to you answering questions.
7      And then if there's no concerns of
8  self-harm, then they would start on the Beck
9  depression packet.  So there's a two-step packet for
10  the mental health process.
11      Q  And what are the two steps?
12      A  That first one is the Beck Depression
13  Inventory.  And they complete that there in the
14  clinic.
15      And then we give them what's called a
16  14-day tracking form.  And again, those are given if
17  there's no concern of self-harm to where, you know,
18  we feel that no harm will come to the patient and
19  it's good to complete this form.
20      That form goes through -- they're looking
21  for how is the patient sleeping, what kind of
22  activities they're doing, what kind of thoughts are
23  they having throughout the day.
24      So they need to, each day, go through and
25  write things down in those categories.  And then

32

1  we -- when they're completed, then we put in a mental
2  health referral.
3      Q  And so just backtracking for a second here.
4  So the Beck Depression Inventory is completed by the
5  inmate themselves in the clinic?
6      A  Correct.
7      Q  And then the scoring is completed by who?
8      A  The nursing staff.
9      Q  And are there instances when the inmate
10  does not have to complete the second step, and
11  they're just fast-tracked to a mental health
12  referral?
13      A  There is, yes.
14      When -- when there is concern of self-harm,
15  a -- if a mental health provider is not there, then
16  an urgent referral would be put in.
17      Otherwise, if she is there, then we would
18  talk with her.
19      If there's no -- no risk of self-harm and
20  we -- we're not concerned that they are going to do
21  anything, then we don't need to put them in the gown.
22      But that does happen, to where she does
23  need to meet with them before that 14 days.
24      A lot of times it is good if they're not in
25  the gown for them to still complete it.  It's just

33

1  kind of therapeutic to get thoughts down on paper.
2      Q  And a score of greater than 40 indicates
3  what on a Beck Depression Inventory?
4      A  That is something that we would be calling
5  the provider.  That's in our protocol.  We would have
6  to call right away and review it with them to see,
7  you know, is this patient, you know, a threat to
8  himself or others.  Does this patient need to be on
9  full precautions.  And review it with the provider.
10      And then whoever is making the phone call,
11  one of the nursing staff, would go through with the
12  provider, you know, how long they've been there.  You
13  know, jail, it's hard.  You know, people come in from
14  the streets.  Sometimes when they first get there
15  it's really, really tough for them.  So that's when
16  we would review with the provider.
17      Q  And would a score of greater than 40
18  indicate severe depression?
19      A  I guess I can't answer that.  I'm not a
20  psychologist.  I wouldn't...
21      Q  But you're --
22      A  But --
23      Q  -- part of the nursing staff.  Right?
24      A  Yes.
25      Q  And you're part of the people that will be

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

34

1  scoring these BDIs?
2      A  Absolutely.  Which is why it's over 40,
3  then I would be contacting my provider.
4      Q  So you just know that the threshold of
5  anything above 40, you need to go higher up on --
6      A  Uh-huh.
7      Q  -- the rank?
8      A  And then an urgent mental health referral
9  would also be placed if it's over 40.
10     Or, again, if, when you're laying eyes on
11  the patient if you're concerned.  If there's any red
12  flags that would be concerning.
13     Q  And by "red flags," would, like, giving
14  away personal belongings be a red flag?
15     A  Absolutely.  Lack of eye contact.  Very
16  flat appearances.  Being emotional.  Verbalizing, you
17  know, how they're feeling.  If it's self-harming or
18  if they feel like they're going to harm other people.
19     Q  What about a change in behavior or becoming
20  more agitated?
21     A  Yep.  Absolutely.  Those are all things
22  that we would be watching for.
23     Q  Would you try and look into what their
24  sentence would be or look like?
25     A  That can play a role.  Absolutely.  I mean,

35

1  that's sometimes the questions that we ask.  You
2  know, have you received any -- any personal phone
3  calls lately.  You know, did you recently have court.
4  You know.  Did it not go so well.
5      That, you know, that can -- that can be
6  pretty hard for people, when they get bad news and
7  they're in jail.
8      Q  And you mentioned phone calls.  Do you ever
9  review phone calls of inmates?
10     A  No.  I do not.
11     Q  Have you ever directed any correctional
12  officers to review phone calls of inmates?
13     A  That is their side.  We don't have anything
14  to do with phone calls.
15     Q  Would a report of not sleeping for days on
16  end also be another red flag?
17     A  Yeah.  That would be something that we
18  would be talking to them.  You know, what is going
19  on.  You know, what's your thought process.  Where is
20  your head at.  You know, are you having self-harming
21  thoughts.  Are you just having a hard time turning
22  off your thoughts.  That's one thing that we would
23  also dig into.
24     And if we were concerned, again, we would
25  review with the mental health provider.

36

1      Q  Can an inmate's mental health issue be
2  compounded by the fact that they're going through
3  withdrawals at the same time?
4      A  I believe so, yes.
5      Q  Is there a suicide prevention plan in place
6  at Sherburne County?
7      A  There is.
8      Q  Can you describe that?
9      A  Do you have a copy of it?  I'd like to look
10  at it, if you do.
11     (Exhibit 21 was marked for identification.)
12     THE WITNESS:  Thank you.
13  BY MS. BENNETT:
14     Q  Showing you what has been marked as
15  Exhibit 21.
16     Does that -- is that the suicide prevention
17  plan --
18     A  Correct.
19     Q  -- that you've been trained on?
20     A  Correct.  And the evaluation.
21     Q  Can you walk us through what the
22  expectations are under this policy?
23     A  Well, it's kind of -- kind of laid out
24  here.  Again, this is why it's good for our staff
25  here to have copies of this at all times.  If there's

37

1  new employees that aren't very -- or as familiar,
2  then that's why we have these protocols.
3      If they're -- again, if there is word or
4  the inmate themselves say anything about self-harming
5  thoughts, feelings, about harming other people, then
6  we would get them to the clinic.  We would talk with
7  them; see where their mental health is at; do that
8  suicide risk screening form; determine, you know,
9  appropriate housing, where they should be at.
10     If it's an urgent referral, mental health
11  needs to speak with them right away.
12     We would also determine, too, if we thought
13  that -- even if they had been there for some time --
14  if we thought that there was chemicals on board and
15  if we would -- or were thinking that, we would get a
16  urine as well.
17     Q  And so aside from the policies on there,
18  there seems to be a protocol index through MEnD that
19  kind of helps you put the plan -- or the policy into
20  action.  Is that fair?
21     A  Correct.  It would be a step-by-step plan.
22     Q  And so if an individual has been put on
23  suicide precaution or management, would that mean
24  that they're an at-risk inmate?
25     A  Correct.

10 (Pages 34 to 37)

Andrea Kretsch
5/29/2019

---

38

1  Q   And that means at risk for suicide.
2  Correct?
3     A   Correct.
4     Q   I'm going to have you look at -- we've
5  already marked some exhibits here.  I'm going to pull
6  out Exhibit 11.
7     A   Okay.
8     Q   And this is for -- you know what brings us
9  here today.  Right?
10    A   I do.  Correct.
11    Q   You recall James Lynas being at the
12 Sherburne County jail?
13    A   I do.
14    Q   So this is a prescription for James Lynas.
15 And then attached to that, you know, is an actual
16 physical prescription and the pills.
17       And then his medical administration record
18 is the third page of Exhibit 11.
19       Do you see that?
20    A   Correct.
21    Q   All right.  And can you -- or do you
22 recognize any of the initials on the medical
23 administration record?
24    A   I do not.  No.  I -- I'm not sure whose
25 initials these are.

---

39

1     Q   Does your handwriting appear at all on the
2  medical administration record?
3     A   No.  It is not.  Not on the MAR.
4     Q   Can you tell us -- I mean, do you read
5  medical administration records?
6     A   Yes.
7     Q   Can you tell us what these records mean to
8  you?
9     A   This -- excuse me.  This is like a track
10 record of any medication the inmate may be on.  This
11 way we can see -- and for safety reasons too.  When
12 health techs are passing meds, it lists very
13 clearly -- you know, they always look at their name,
14 SPN, date of birth, dosing.  When they would be given
15 throughout the day, if it's in the morning, afternoon
16 at night; or if it's just one time a day, that would
17 be on there as well.
18    Q   And it looks like there's two identical
19 prescriptions for hydroxyzine noted on this medical
20 administration record.  Correct?
21    A   Yep.  So it looks like the middle one had a
22 stop date of 11/16.  Or excuse me.  A start date of
23 11/6 and a stop date of 11/16.  So it would be for
24 that ten days.
25    Q   And then the second one would be a start

---

40

1  date of 11/7, and a stop date of 11/17/17?
2     A   17.  Yep.
3        So then also, you can see here, the middle
4  one, there's a "DC."  That means that middle
5  prescription was discontinued.
6     Q   Can you tell when that occurred?
7     A   I guess, on here, I can't.  Usually,
8  they're -- they're highlighted on the actual physical
9  MAR at the clinic.
10       If anything is discontinued, the whole
11 block is highlighted so people don't give double
12 prescriptions.
13    Q   Can you tell what was given to James Lynas,
14 from this sheet?
15    A   Yep.  When a medication is administered,
16 that is when the health tech would put their initials
17 there on that date.
18       So he got one dose -- one tablet of
19 50 milligrams hydroxyzine on the 8th, as well as the
20 night of the 7th, and the night of the 8th.
21    Q   And then so he received, from this sheet,
22 zero of the first hydroxyzine prescription?
23    A   Correct.
24    Q   And then just three tablets --
25    A   Correct.

---

41

1     Q   -- the second.
2        And you did have interaction with James
3  Lynas prior to his death.  Correct?
4     A   Excuse me.  My interaction was very brief.
5  I saw him the night of booking, when he was first
6  booked in.  I saw him that evening.
7        He had reported some --
8        MS. NEARING:  Let her ask the questions.
9        THE WITNESS:  Okay.
10       MS. NEARING:  You answered beyond what she
11 asked.
12       THE WITNESS:  Okay.
13 BY MS. BENNETT:
14    Q   Do you recall when your first interaction
15 with Mr. Lynas was before November of 2017?
16    A   I do not.
17    Q   And going back to Exhibit 11 real quick.
18       Does anything on the medication
19 administration record indicate James Lynas refused
20 any medication?
21    A   I do not believe so.
22       There -- when a patient does refuse a
23 medication, the health tech would put an R in red and
24 circle it.
25       I can't say 100 percent if any of these

---

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

42

1  are, or if this is just all initials.
2      But that is, when patients refuse, that is
3  how they are marked.
4      Q   And do the med techs try and make it clear
5  when an inmate has refused medication?
6      A   That's why it's marked in red.  Everything
7  anything else is black.
8      Q   And as far as the hydroxyzine goes, there's
9  three markings for three pills?
10     A   Correct.
11     Q   And none of those appear to you to be just
12  an R, as a refusal?
13     A   I don't believe so.  But without the actual
14  MAR in front of me, without seeing any of that red,
15  it doesn't appear that way.  But without seeing the
16  actual MAR...
17     (Exhibit 22 was marked for identification.)
18  BY MS. BENNETT:
19     Q   Showing you what has been marked as
20  Exhibit 22.  And this is the July chemical withdrawal
21  flow sheet for James Lynas.
22      Do you see that?
23     A   Yep.
24     Q   And your handwriting appears on this.
25  Correct?

43

1      A   Correct.
2      Q   And can you read us through your follow-up
3  plan note?
4      A   I can.
5      Let's see.  RN to follow up -- RN to follow
6  up with clinic as needed.  So when I saw him that night on the
7  there, but that's -- yes.  "RN to follow up with
8  clinic as needed," is what I put.
9      When we do flow sheets like this, as you
10  discussed earlier, they do have to have at least
11  three scores.  So when I saw him that night on the
12  15th, I did his initial, it looks like, started the
13  flow sheet.  I would have started that watch, because
14  he was positive for several things.  And that is why
15  he would have been seen the very next day as well.
16     Q   And he also described some symptoms of
17  withdrawal to you?
18     A   Let's see.
19     It looks like he reported to me nausea,
20  tremors and cold sweats.  And he denied any seizure
21  or stroke history.
22     Q   And as you sit here today, do you have any
23  independent recollection of seeing James Lynas on
24  this day?
25     A   I -- I do not.

44

1      (Exhibit 23 was marked for identification.)
2  BY MS. BENNETT:
3      Q   Showing you what has been marked as
4  Exhibit 23, which is the chemical withdrawal
5  questionnaire for James Lynas in July of 2017.
6      Does your handwriting appear on this sheet?
7      A   Correct.
8      Q   Okay.  It just isn't signed by anyone.
9  Correct?
10     A   Correct.
11     Q   But you filled this sheet out for him?
12     A   That is my handwriting.  Yes.
13     Q   And it -- is this what he reported to you
14  about his chemical use?
15     A   Correct.
16     Q   And so that would be opiate usage, one gram
17  per day, daily, for one year?
18     A   Correct.
19     Q   And then he last used on 7/4 of 2017?
20     A   Correct.
21     Q   And then would that be the history
22  withdrawal symptoms that he's previously had, or the
23  ones that you wrote down that he was currently
24  having?
25     A   That is what he reported to me as his

45

1  history of withdrawal symptoms.
2      Q   And then Exhibit 22, the flow sheet, marked
3  what he was actually experiencing that day when you
4  saw him?
5      A   That's when I assessed him.  Yes.
6      Q   And the first step in this process would
7  have been the urine screen, which you had the results
8  of already.  Is that right?
9      A   Correct.
10     Q   I'm going to show you what has been marked
11  as Exhibit 13.  I think it's the first email in that
12  packet which is -- it's from you, on Wednesday,
13  July 5th, of 2017.  Do you see that?
14     A   I do.
15     Q   And you noted that a 30-minute chemical
16  withdrawal was initiated for James Lynas.  Is that
17  right?
18     A   Correct.
19     Q   And that's what the subject "JL 12010"
20  means?
21     A   Yep.  Those are his initials, as well as
22  his SPN number, an identification number.
23     Q   And you're emailing this out to who,
24  exactly?
25     A   This goes to all of our classification, our

12 (Pages 42 to 45)

Andrea Kretsch
5/29/2019

46

1 administration, our sergeant -- sergeants, as well as
2 our nursing staff.
3 Q   And what's the purpose of sending such an
4 email?
5 A   Then everybody is on the same page.
6 Everybody knows what's going on with him.
7 Q   And what's the significance of a 30-minute
8 chemical withdrawal?  Because my understanding is,
9 basically, the checks are all -- even in gen pop --
10 people not on watches are done in 30-minute
11 intervals.
12 A   The significance of that versus a 15, or
13 just in general?
14 Q   Just in general.
15 A   Just to -- just to keep an eye on them.
16 You know, if we're concerned of any sort of
17 withdrawals.  Because he did -- he was positive for
18 those substances.
19     Those can be things that, you know, you can
20 start to physically run into trouble with.  So that
21 is why we put them on those 30-minute watches.
22 Q   So are you expecting that once this email
23 goes out, more thorough checks are done at those
24 30-minute intervals?
25 A   I guess, what the officers do as far as

47

1 their normal everyday 30-minute checks, or if it's
2 different with the 30-minute chem checks, that I
3 can't say because I didn't do any of their training.
4     But we need to know that they are being
5 checked on every 30 minutes to make sure that they
6 are not symptomatic.
7 Q   And that's a check on their well-being and
8 safety?
9 A   Correct.
10 Q   And did you contact a medical provider in
11 July of 2017 to put him on the 30-minute chemical
12 withdrawal?
13 A   I did not.  There was no reason for me to
14 contact the medical provider.
15 Q   Because his scores on the withdrawal flow
16 sheet weren't greater than 10?
17 A   And he was not concerning.
18     (Discussion held off the record.)
19     (Exhibit 24 was marked for identification.)
20 BY MS. BENNETT:
21 Q   Showing you what has been marked as
22 Exhibit 24.  Is this, again, a chemical withdrawal
23 questionnaire for James Lynas?
24 A   Correct.
25 Q   Filled out by you?

48

1 A   Correct.
2 Q   This time it's for October -- or November
3 of 2017.  Right?
4 A   Correct.
5 Q   And a urine drug screen was already done
6 for Mr. Lynas.  Right?
7 A   Correct.
8 Q   And what was he positive for?
9 A   He was positive for methamphetamines,
10 amphetamines and benzos.
11 Q   And he had reported to you using heroin,
12 half -- half to one gram daily, for a year.  Last use
13 was 10/31/17?
14 A   Correct.
15 Q   And then meth, one gram per week, weekly,
16 for one year.  Last use of 10/30/17.  Is that
17 correct?
18 A   Correct.
19 Q   So his drug use had increased since the
20 last time you saw him, at least?
21 A   From what he reported to me.
22 Q   But there's a bit of a change in his urine
23 screen results?
24 A   It looks like...
25 Q   This one's set up -- he turned to the

49

1 benzos instead of the opioid?
2 A   Okay.  So on October -- let's see down
3 here.
4 Q   There's no date.
5 A   On July, he was positive for Oxy, opioids,
6 methamphetamine and amphetamine.
7     And on November he was positive for
8 methamphetamines, amphetamines, and benzos.
9 Q   And then due to the chemical withdrawal
10 questionnaire, was a flow sheet initiated for James
11 Lynas?
12 A   Correct.
13     (Exhibit 25 was marked for identification.)
14 BY MS. BENNETT:
15 Q   Showing you what has been marked as
16 Exhibit 25.  Is that the November flow sheet for
17 James Lynas?
18 A   Correct.
19 Q   And your writing appears on this sheet for
20 the 11/1/17 scoring.  Is that right?
21 A   Correct.
22 Q   And can you walk us through the results of
23 your interaction with him regarding this sheet?
24 A   Yes.  When I met with him, again, we go
25 through all of the questions.  You know, how -- how

13 (Pages 46 to 49)

Andrea Kretsch
5/29/2019

50

1    are you sleeping, how are you eating.
2        He denied to me any sleeping or eating
3    disturbances.  He reported having cold sweats or
4    withdrawal symptoms, but denied any history of
5    seizure.
6        At that time he was oriented, times three.
7    He had dry and natural-colored skin.  No
8    sweating noted.  No tremor noted with hands or tongue
9    extended.
10       And then RN to see patient tomorrow.
11   Q    And that's just to continue the flow sheet?
12   A    To assess him.  To check on him, see how
13   he's doing.  Yes.
14   Q    Was he put on a 30-minute chemical
15   withdrawal?
16   A    Correct.
17   Q    And how -- do you know that from the sheet?
18   A    Because he was positive for those benzos,
19   and he was positive for amphetamines and
20   methamphetamines, then a 30-minute chem watch would
21   be initiated.
22   Q    So his urine drug screening automatically
23   would trigger that 30-minute --
24   A    For substances of that nature.  Yes.
25   Q    And who was the medical provider that would

51

1    have been contacted if you deemed it necessary to do?
2    A    That would have been Janell Hussein.
3    Q    Showing you what has been marked as
4    Exhibit 20.  There's three pages in that.  But your
5    writing appears on the first page of that exhibit.
6    Right?
7    A    Correct.
8    Q    And that's a suicide risk screening form
9    for James Lynas?
10   A    Correct.
11   Q    And why was this initiated for him at this
12   time?
13   A    Because of his positive drug screen.
14   Q    And is that what the box checked "altered
15   mental status" means?
16   A    Correct.
17   Q    And he reported to you feeling low or blue?
18   A    Yeah.  He didn't report anything else to
19   me.  So just the "low and blue."  Which I can see.
20   You're in jail; most people aren't the happiest.
21   Q    As you sit here today, do you remember this
22   November 1st, 2017, meeting that you had with Lynas?
23   A    I do not.
24   Q    You just know what you marked on the sheet?
25   A    Correct.

52

1        (Exhibit 26 was marked for identification.)
2    BY MS. BENNETT:
3    Q    And is Exhibit 26 the eMDs form for -- that
4    was used by Sherburne County, MEnD in Sherburne
5    County?
6    A    Correct.  This is going to be our
7    electronic charting.
8    Q    Does it look the same when it's printed out
9    as it does on the screen?
10   A    Yeah.
11   Q    And then if you turn to Sherburne -- it's
12   in the lower right -- oh.  That's a different one.
13       Okay.  So it's a note from -- the encounter
14   date is November 2nd, 2017.
15   A    November 2nd?
16   Q    Yes.
17   A    Okay.  Okay.
18   Q    So it looks like you also had some
19   interaction with James Lynas on the 2nd.  Is that
20   correct?
21   A    That is not correct.  I saw him on the 1st,
22   in the evening, at, looks like, 2300 hours, or 11:00
23   at night.
24       When I entered in his vitals, it was 1:00
25   in the morning.  So it had changed to the 2nd.

53

1    Q    Okay.  So your shift just happened to roll
2    into the 2nd, and that's when you did your charting
3    for him?
4    A    Correct.
5    Q    And then why was it signed by you on the
6    11th?
7    A    That is something that typically does not
8    happen.  That night I completed all of my paper
9    charting.  Signed it, completed all of my eMDs, my
10   electronic charting.  I can't say exactly why I
11   didn't sign it same day, but it was entered in
12   that night, hours after I saw Lynas.
13   Q    And how do you know that?
14   A    That I put it in?
15   Q    Yes.
16   A    Because it shows the encounter date when it
17   was started, as well as when I put in my vitals.
18   Q    So the encounter date isn't just something
19   that you type in to describe which encounter you're
20   going to be writing about.  It's something that,
21   actually, automatically transpires when you're
22   initiating the eMD sheet for whatever note you're
23   writing?
24   A    Correct.  When you start a new note, it
25   auto populates the date and time.

14 (Pages 50 to 53)

Andrea Kretsch
5/29/2019

54

1   Q   Do you know why Dr. Leonard signed it on
2   November 13th?
3   A   I don't know, exactly. I -- I know that he
4   can't sign off until I sign off or until the nurses
5   sign off. Then he is not able to sign off.
6   Q   Do you know that both of you signed after
7   James Lynas had already died?
8   A   I do.
9   Q   Do you know if Michael Robertson ever saw
10  James Lynas?
11  A   I guess, I -- I do not. No. I'm not sure.
12  Q   Do you know if he ever assessed James
13  Lynas, even if it wasn't in a face-to-face meeting?
14  A   I -- I don't know. No.
15  Q   Have you reviewed any documentation that
16  Dr. Robertson drafted in regards to James Lynas?
17  A   I have not.
18  Q   Do you know if any exist?
19  A   I -- I have -- do not. No.
20  Q   Do you know why there would be three
21  different booking sheets for James Lynas regarding
22  his November 2017 stay at the jail?
23  A   There was three different booking sheets
24  from November? Or during that month?
25  Q   From his stay starting on November 1st.

55

1   A   Typically, when you are released, and if
2   you do, unfortunately, come back, then you would be
3   rebooked in. I guess that would be the only reason
4   of what I would know. We don't handle the booking
5   sheets.
6   Q   But you review them as part of the record
7   that's available to you when you're treating an
8   inmate?
9   A   Correct.
10  Q   You just don't know why there would be
11  different versions floating around?
12  A   That, I don't know. Like I said, when they
13  leave and come back, then they are rebooked.
14  Therefore, a new booking sheet would be created.
15  But, I guess, I don't know. We don't handle the
16  booking sheets.
17  Q   What if they never left and came back?
18  A   Typically, not. But again, we don't handle
19  the booking sheets. We don't enter them. We don't
20  do anything with them except for review them when
21  they are completed.
22  Q   And in regards to the booking that's
23  performed by the COs, is there a jail medical
24  screening form and then a CMS medical report?
25  A   A CMS?

56

1   Q   Yes.
2   A   There is -- the bookers, what they do, they
3   do a medical screening, as well as a mental health
4   screening.
5   Q   And they're different forms?
6   A   They are two separate questionnaires. Yes.
7   Q   Do they overlap in some ways?
8   A   I guess, perhaps some questions could be
9   similar. But they -- one portion pertains to their
10  medical history; the other portion pertains to their
11  mental health history.
12  Q   Did you ever discuss James Lynas with
13  Dr. Leonard?
14  A   I do not believe so. I know I did not need
15  to contact him on these two dates because there was
16  no need to contact him. There was nothing
17  concerning.
18  Q   Did you have any discussions with any MEnD
19  personnel regarding James Lynas after he died?
20  A   I did not.
21  Q   How is it that you came to know that James
22  Lynas committed suicide?
23  A   Because everyone needs to make sure that
24  the employees that were there are okay. There's a
25  debriefing, you know, because it's a very sad event.

57

1   So, by way of that I found out. But there were no
2   discussions about it. I was not there.
3   Q   Who -- sorry. I didn't mean to interrupt
4   you.
5   A   That's okay.
6   Q   Who conducts that debriefing?
7   A   You know what, I don't know. I've never
8   been to one. I've never had to. So I don't know.
9   That's for the people that were involved.
10  Q   So you weren't at that debriefing?
11  A   Correct.
12  Q   So then how did you find out that he --
13  A   By way of word that gets sent, or said,
14  rather, that if anybody needs to talk about anything
15  or if they're having a hard time, to go to that
16  debriefing. But I did not need to go.
17  MS. BENNETT: Let's take just a five-minute
18  break.
19  VIDEOGRAPHER: Off the video record at
20  2:58 p.m.
21  (Recess taken.)
22  VIDEOGRAPHER: This is File 2. We're on
23  the record at 3:02 p.m.
24  BY MS. BENNETT:
25  Q   Did you have any discussions with any

15 (Pages 54 to 57)

Andrea Kretsch
5/29/2019

58

1  correctional officers regarding James Lynas and his
2  suicide?
3      A   No.  Not that I can recall.  No.
4      Q   Do you know any of the correctional
5  officers that are defendants in this case?
6      A   I don't even know who they are.  So, no.
7      Q   Do you know how it is that Alyssa Pfeifer
8  left MEnD?
9      A   Why she left?
10     Q   Yeah.
11     A   I think she was just trying to go another
12 avenue.  Why do people leave any job?  They want to
13 try another avenue, I guess.
14     Q   And what's your understanding as to how
15 James Lynas committed suicide?
16     A   What's my understanding of it?
17     Q   Yes.
18     A   I guess, I -- I really, honestly, I don't
19 know.  It's sad.  It's tragic.  It's very awful.  But
20 I don't know what led up to it.  I don't know -- I
21 don't know.
22     Q   Do you know where it occurred?
23     A   I think special housing.  I'm not exactly
24 sure.
25     Q   Do you know why he was in special housing?

59

1      A   I don't.
2      Q   Can being in a single cell or special
3  housing be a concern for someone with mental health
4  issues?
5      MS. NEARING:  Objection.  Foundation and
6  lacking in specificity.
7      Go ahead.
8      A   I guess it's good and bad.  If you're a
9  threat to yourself, if you're -- you know, feel like
10 you're going to bring harm to yourself, then it's
11 best to have you be by yourself, to where you don't
12 have access to anything that you could bring harm to
13 yourself.  Yes, that -- I mean, it would be hard for
14 anybody to -- to be by yourself.
15     However, if you are a threat to yourself,
16 or if you are very aggressive, if you're a threat to
17 others, the safety and security of the jail, that --
18 that has to happen.
19     MS. BENNETT:  I have no further questions.
20     MR. HIVELEY:  No questions.
21     MS. NEARING:  Nor do I.
22     So we'll read and sign.
23     VIDEOGRAPHER:  This concludes the
24 deposition.  It is 3:04 p.m.
25     (The video deposition of ANDREA KRETSCH was

60

1  concluded at 3:04 p.m.)

61

REPORTER'S CERTIFICATE

I, Jane T. Doby, Registered Merit Reporter, a
Notary Public in and for the County of Hennepin,
State of Minnesota, certify that the foregoing is
a true record of the testimony given by ANDREA KRETSCH,
who was first duly sworn by me, having been taken on
May 29, 2019, at Caribou Coffee, St. Cloud West, 4135
West Division Street, St. Cloud, Minnesota, in my
presence and reduced to writing in accordance with my
stenographic and computerized notes made at said time
and place:

I further certify that I am not a
relative or employee or attorney or counsel of any
of the parties or a relative or employee of such
attorney or counsel.
That I am not financially interested in
the action and have no contract with the parties,
attorneys, or persons with an interest in the
action that affects or has a substantial tendency
to affect my impartiality:
That the cost of the original has been
charged to the party who noticed the deposition,
and that all parties who ordered copies have been
charged at the same rate for such copies:

That the witness DID request an opportunity to
review the transcript.

WITNESS MY HAND AND SEAL this 5th day of
June, 2019.

Jane T. Doby
Registered Merit Reporter
Notary Public
Hennepin County, Minnesota

Andrea Kretsch
5/29/2019

62

1        E R R A T A  S H E E T
2           I, ANDREA KRETSCH, certify that I have read
3    and examined the typewritten transcript of the
4    deposition taken of me in the matter of David W. Lynas,
5    Trustee for the next-of-kin of James C. Lynas vs. LINDA
6    S. STANG, ET AL., on May 29, 2019, consisting of the
7    preceding pages, and find the same to be true and
8    correct.
9           (Except as follows):
10                                    Reason
     Page  Line  Correction          for Change
11
12   _____ _____ _____ _____
13   _____ _____ _____ _____
14   _____ _____ _____ _____
15   _____ _____ _____ _____
16   _____ _____ _____ _____
17   _____ _____ _____ _____
18   _____ _____ _____ _____
19   _____ _____ _____ _____
20   _____ _____ _____ _____
21   _____ _____ _____ _____
22
23   Dated this _____ day of _____
24       _____
         ANDREA KRETSCH
25

63

1           EXAMINATION INDEX
2    By Ms. Bennett:  4-59
3    ------------------------------------------------
4           EXHIBIT INDEX
5    Exhibit 11:  Hydroxyzine HCL 50 MG tab prescription
             (photo of blister pack)
6    reviewed                        38,41

7    Exhibit 13:  Email communications (various)
     reviewed                        45
8    Exhibit 20:  Suicide Risk Screening forms
     reviewed                        51
9
10   Exhibit 21:  Nursing Policy/Procedure:  Suicide
             Prevention/Evaluation
11   reviewed                        36

12   Exhibit 22:  Flow Sheets - Chemical Withdrawal form,
             7/16/17
13   reviewed                        42,45

14   Exhibit 23:  Chemical Withdrawal Questionnaire, 7/17
     reviewed                        44
15   Exhibit 24:  Chemical Withdrawal Questionnaire, 11/1/17
     reviewed                        47
16
17   Exhibit 25:  Flow Sheet - Chemical Withdrawal form,
             11/1/17
     reviewed                        49
18
19   Exhibit 26:  Electronic charting forms
20   reviewed                        52
21
22
23
24
25

17 (Pages 62 to 63)

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

**A**

able 19:3 20:15 21:2 30:24 54:5
Absolutely 10:15,17 12:4 19:14 20:4 22:2 23:9 25:22 26:18,20 30:3 34:2,15,21,25
abuse 24:25 25:4
access 23:18 24:11 59:12
acting 13:16 15:11,19 16:12 21:12 28:15
action 28:3 37:20 61:12 61:13
activities 31:22
actual 38:15 40:8 42:13,16
admin 19:7
administer 3:23
administered 3:25 40:15
administration 38:17,23 39:2,5,20 41:19 46:1
admission 17:17
affect 61:14
afternoon 39:15
aggressive 59:16
agitated 21:8 29:9 34:20
ahead 27:17 59:7
al 1:8 62:6
alcohol 7:10 25:4 27:1
allergies 6:16
allow 21:9,17
alongside 16:2
altered 51:14
Alyssa 58:7
amount 8:23
amphetamine 49:6
amphetamines 48:10 49:8 50:19
Andrea 1:13 3:2,4,9 4:2 59:25 61:5 62:2,24
annually 11:7
answer 10:12 11:2 15:10 27:17,18 33:19
answered 41:10
answering 31:6
answers 29:10
anybody 57:14 59:14
apologize 13:14 15:1,4,13 44:6
appear 29:8 39:1 42:11,15 44:6
appearances 2:1 34:16
appearing 31:5
appears 42:24 49:19 51:5
application 11:17
appropriate 37:9
approximately 3:11
areas 26:17
aside 37:17
asked 41:11
assess 7:22 17:4 21:9 31:5 50:12
assessed 45:5 54:12
assessing 29:20
assessment 10:22 24:5 30:14
assessments 9:10,15 10:23 12:4,5,8 14:10 17:21 30:14
associate's 4:18
at-risk 37:24
Ativan 7:11
attached 38:15
attempts 10:5 18:3
attorney 2:3,4,8,12 3:12 61:10,11
attorneys 61:13
authority 15:15

**B**

auto 53:25
automatically 50:22 53:21
available 55:7
avenue 2:10 58:12,13
awful 58:19

**B**

back 6:4 41:17 55:2,13,17
backtracking 32:3
bad 27:13,23 28:11 35:6 59:8
Barb 19:20,22
basically 30:17 46:9
BDIs 34:1
Beck 30:21 31:8,12 32:4 33:3
becoming 34:19
behalf 2:2,7,11 3:16,18
behavior 34:19
believe 8:6 36:4 41:21 42:13 56:14
belongings 34:14
Bennett 2:3,4,5,18 3:14,14 3:16,16 4:7 8:13,15 11:1 11:4,7 15:5,6 27:20 36:13 41:13 42:18 44:2 47:20 49:14 52:2 57:17 57:24 59:19 63:2
benzos 48:10 49:1,8 50:18
best 21:3,19 23:13 59:11
better 21:14,18
beyond 5:14 20:20 41:10
big 4:9 7:11
Birrell 2:5,18
birth 39:14
bit 20:25 23:12 27:10 48:22
black 42:7
blister 63:5
block 40:11
blood 21:17
Bloomington 2:10
blowing 27:2
blue 21:13 51:17,19
board 21:15 26:16 28:22 37:14
boards 4:21
book 24:20
booked 6:14 24:14 41:6
bookers 6:18 56:2
booking 24:11,17,19 41:5 54:21,23 55:4,14,16,19 55:23
box 51:14
break 57:18
brief 41:4
bring 59:10,12
brings 38:8
bunch 16:1

**C**

C 1:5 3:1 62:5
call 12:11,11,16 22:5 28:11 33:6,10
called 3:5 4:3 24:15 29:23 31:15
calling 27:6 33:4
calls 12:14 27:16 35:3,8,9 35:12,14
capabilities 20:20
capable 10:11 21:1
care 12:6 17:16 21:2,3,19
Caribou 1:16 61:6
Carolin 2:12

**C**

Carrie 3:18
carried 6:2
case 24:2 27:14,25 58:5
cases 26:21 27:5,7
categories 31:25
cell 59:2
Centre 4:11,12
certainly 7:17
CERTIFICATE 61:2
certify 61:5,9 62:2
change 34:19 48:22 62:10
changed 17:4 52:25
charged 61:15,16
chart 23:20,21,23
charting 52:7 53:2,9,10 63:18
check 7:3,4 10:10 18:14 18:15 47:7 50:12
checked 7:17 47:5 51:14
checks 46:9,23 47:1,2
chem 47:2 50:20
chemical 9:25 10:9,20 12:5 28:12,21,25 29:2 29:25 30:7 42:20 44:4 44:14 45:15 46:8 47:11 47:22 49:9 50:14 63:11 63:13,15,16
chemical-wise 21:7
chemicals 37:14
circle 41:24
CIV 1:4
Civil 2:17
clarify 15:2
classification 45:25
classifications 19:7
clear 10:19 42:4
clearly 26:11 39:13
clientele 8:21
clinic 7:20 12:12 23:1,4 24:18 31:2,14 32:5 37:6 40:9 43:6,8
clinical 11:16
clinicals 5:9,9
close 24:23
closely 26:5
Cloud 1:16,17 8:6 61:6,7
CMS 55:24,25
cnearing@larsonking.c... 2:13
Coffee 1:16 61:6
cold 43:20 50:3
College 4:19
come 12:7 14:6 25:15 26:6 30:24 31:18 33:3 55:2 55:13
comes 13:21,23
comfortable 6:9 28:4
coming 17:10 24:25
commenced 3:3
committed 56:22 58:15
communications 63:6
complaining 27:22
complete 31:13,19 32:10 32:25
completed 30:10,20 32:1 32:4,7 53:8,9 55:21
completes 17:23
compounded 36:2
computer 14:11
computerized 61:8
concern 31:17 32:14 59:3
concerned 7:15 18:5,18 21:11 29:21 32:20 34:11 35:24 46:16
concerning 34:12 47:17 56:17

**D**

concerns 31:7
concluded 60:1
concludes 59:23
CONDON 2:9
conducts 57:6
considered 27:14
considering 27:24
consisting 62:6
consulted 29:19
contact 24:6 34:15 47:10 47:14 56:15,16
contacted 51:1
contacting 34:3
continue 50:11
contract 61:12
copies 36:25 61:16,16
copy 17:6,7 36:9
correct 4:25 5:16 8:1 9:2 9:19,21 11:12,24 12:1 12:17 13:2 14:19 15:4 15:21,25 16:3,16,19 17:13,18 18:4 19:24,25 24:13 25:21 29:4,12,17 29:20 30:19 32:6 36:18 36:20 37:21,25 38:2,3 38:10,20 39:20 40:23,25 41:3 42:10,25 43:1 44:7 44:9,10,15,18,20 45:9 45:18 47:9,24 48:1,4,7 48:14,17,18 49:12,18,21 50:16 51:7,10,16,25 52:6,20,21 53:4,24 55:9 57:11 62:8
Correction 62:10
correctional 24:12 35:11 58:1,4
correlation 20:10
COs 22:20 24:19 55:23
cost 61:15
counsel 61:10,11
County 2:7 3:21 13:4 36:6 38:12 52:4,5 61:4,24
course 17:11
court 1:3 3:23 11:6 35:3
created 55:14
current 6:22 10:4,6 11:19
currently 4:8 7:1 12:24 25:3 44:23

**D**

D 3:1
daily 44:17 48:12
dangerous 26:1
date 3:10 39:14,22,22,23 40:1,1,17 49:4 52:14 53:16,18,25
Dated 62:23
dates 56:15
David 1:5 2:2 62:4
day 7:21 9:3 11:18 19:1,3 23:3 31:23,24 39:15,16 43:15,24 44:17 45:3 53:11 61:19 62:23
days 5:13 29:16 32:23 35:15 39:24
DC 40:4
dealing 28:5
death 41:3
debriefing 56:25 57:6,10 57:16
deemed 51:1
defendants 1:9 2:7,11 3:19,21 58:5
definitely 26:15
degree 4:18 16:22,23
delivered 2:18

**D** (continued)

denied 43:20 50:2,4
depend 26:24
depending 18:19 28:6
depends 7:8 26:23 29:24 59:24,25 61:15 62:4
deposition 1:11 3:2,8 59:24,25 61:15 62:4
depression 30:21 31:9,12 32:4 33:3,18
describe 5:21,23 6:11 8:18 9:22 12:2 36:8 53:19
described 43:16
detect 18:7,10
determine 37:8,12
detoxification 5:18 6:11 8:10
Diana 13:15 14:20 15:12
died 54:7 56:19
diet 6:16
different 5:10,11,11 7:23 8:4 27:9,10 47:2 52:12 54:21,23 55:11 56:5
dig 18:6 35:23
directed 35:11
director 13:5,12,13,15 14:21,23 15:3,7,13
discharge 17:17
disciplinary 5:4
discontinued 29:16,17 40:5,10
discover 18:3
discuss 56:12
discussed 43:10
Discussion 47:18
discussions 56:18 57:2 57:25
DISTRICT 1:1,2
disturbances 50:3
Division 1:16 61:7
Doby 1:22,23 61:4,22
DobyReporting.com 1:23
doctor 25:11
documentation 23:7,15 54:15
documents 23:17,21
doing 31:22 50:13
dose 40:18
dosing 39:14
double 40:11
Dr 13:18 14:12,18 15:19 16:9 17:25 20:15 54:1 54:16 56:13
drafted 54:16
drug 6:21,22 7:6 24:9 25:4 28:15 48:5,19 50:22 51:13
drugs 25:19 26:16
dry 50:7
due 49:9
duly 3:5 4:3 61:6
duties 12:2

**E**

E 3:1,1 62:1,1,1
earlier 43:10
early 10:25
ease 7:12
easier 8:16 11:4 25:10
East 2:14
eating 50:1,2
education 4:17 5:7,17 9:9 9:12
either 12:7 22:5 25:3
electronic 23:17,20,24 24:15 52:7 53:10 63:18
email 45:11 46:4,22 63:6

---

Andrea Kretsch
5/29/2019

Page 65

emailing 45:23
emails 19:6
eMD 53:22
eMDs 23:7,15,18,23 52:3
53:9
emotional 34:16
employee 61:10,10
employees 37:1 56:24
encounter 52:13 53:16,18
53:19
enjoyed 11:16
Ensign 2:10
enter 55:19
entered 52:24 53:11
enters 17:23
Envision 2:16
especially 26:15
et 1:8 62:6
evaluated 21:14
evaluation 36:20
evening 41:6 52:22
event 56:25
everybody 46:5,6
everyday 47:1
exactly 45:24 53:10 54:3
58:23
EXAMINATION 4:6 63:1
examined 3:6 4:4 62:3
example 25:11
excuse 39:9,22 41:4
exhibit 2:20 36:11,15 38:6
38:18 41:17 42:17,20
44:1,4 45:2,11 47:19,22
49:13,16 51:4,5 52:1,3
63:3,4,6,8,9,11,13,15,16
63:18
exhibits 38:5
exist 54:18
expect 18:24
expectations 36:22
expecting 46:22
experience 9:10,11,14
experiencing 45:3
exposed 9:18
extended 50:9
extremely 21:8 22:9
eye 24:6 34:15 46:15
eyes 22:24 34:10

**F**

face-to-face 54:13
facilities 12:18,23
fact 36:2
factor 26:23
fair 11:14 24:3 25:17
37:20
familiar 16:24 37:1
fantastic 5:20 6:7
far 6:5 20:22 42:8 46:25
fast-tracked 32:11
feel 6:6,7 18:11 31:18
34:18 59:9
feeling 6:8 29:6 34:17
51:17
feelings 37:5
fidgety 24:7
File 57:22
fill 6:15
filled 44:11 47:25
filling 24:21
financially 61:12
find 25:5 57:12 62:7
finish 11:2
first 3:5 4:3 5:24 17:22
20:8 28:20,23 31:12
33:14 40:22 41:5,14

45:6,11 51:5 61:6
firsthand 25:24
five 16:6,8
five-minute 57:17
flag 34:14 35:16
flags 34:12,13
flat 34:16
floating 55:11
flow 29:1,2,16 42:21 43:9
43:13 45:2 47:15 49:10
49:16 50:11 63:11,16
follow 5:25 43:5,5,7
follow-up 43:2
follows 3:3,6 4:4 62:9
force 21:16,17
foregoing 61:5
form 10:2,24 30:10,18
31:16,19,20 37:8 51:8
52:3 55:24 63:11,16
forms 10:19 24:21 30:2,5
30:12 31:4 56:5 63:8,18
found 57:1
foundation 27:16 59:5
Friday 9:4 16:13
front 42:14
full 22:11,15 33:9
full-time 12:12
further 28:3,3,3 59:19
61:9

**G**

G 3:1
Gaskins 2:5,18
gen 46:9
general 46:13,14
getting 28:2
give 15:9 21:3,16 31:15
40:11
given 6:3 16:25 28:13,14
29:10 30:1,5,21 31:16
39:14 40:13 61:5
gives 23:12
giving 9:10 29:13 34:13
go 4:12 6:18 10:3 12:14
17:3 18:12,14,17 19:6
22:10 24:20 25:11 26:10
27:9,17 28:10 31:24
33:11 34:5 35:4 49:24
57:15,16 58:11 59:7
goal 17:15
goes 17:23 22:7 31:20
42:8 45:25 46:23
going 13:6 19:9 32:20
34:18 35:18 36:2 38:4,5
41:17 45:10 46:6 52:6
53:20 59:10
good 31:19 32:24 36:24
gotten 30:8
gown 22:11 32:21,25
graduate 4:14,20
gram 44:16 48:12,15
greater 33:2,17 47:16
grow 4:10
guess 5:19,25 13:21 15:17
33:19 40:7 46:25 54:11
55:3,15 56:8 58:13,18
59:8

**H**

H 2:4 62:1
half 48:12,12
HAND 61:19
hand-in-hand 20:14 24:23
handle 55:4,15,18

hands 50:8
handwriting 39:1 42:24
44:6,12
happen 25:13 32:22 53:8
59:18
happened 53:1
happens 20:25 21:7 22:4
happiest 51:20
hard 7:13 33:13 35:6,21
57:15 59:13
harm 31:18 34:18 59:10
59:12
harming 18:16 22:7 37:5
HCL 63:4
head 35:20
head-to-toe 12:5
health 6:19 7:14,18 8:19
8:23 9:24 10:1,20,21,22
12:10,10 14:17 15:14
16:14,20,22 17:21 18:8
18:11,19,21,23 19:4,11
19:11,16 20:2,5,9,13,13
20:22,22,22 12:12,13 24:6
26:14,14 30:6,9,13,14
30:25 31:1,10 32:2,11
32:15 34:8 35:25 36:1
37:7,10 39:12 40:16
41:23 56:3,11 59:3
hear 11:13 22:16 23:4
hearing 22:20
hearings 5:5
held 47:18
help 6:10 7:12 14:4 22:23
23:13
helps 37:19
Hennepin 61:4,24
heroin 48:11
high 4:12 24:24 27:2
higher 27:3 34:5
highlighted 40:8,11
hired 11:8,17,22 12:22
history 7:1 10:4,5 18:14
23:10,11 25:3 26:25
43:21 44:21 45:1 50:4
56:10,11
Hively 2:8 3:20,20 59:20
Hogan 2:16
Honda 8:5
honestly 58:18
hospitals 27:9,11
hours 12:21 23:3 52:22
53:12
housing 22:5,25 37:9
58:23,25 59:3
huge 10:17
Hussein 14:16 16:11 51:2
hydroxyzine 39:19 40:19
40:22 42:8 63:4

**I**

identical 39:18
identification 2:20 36:11
42:17 44:1 45:22 47:19
49:13 52:1
impartiality 61:14
important 26:19
improved 17:5
increased 48:19
independent 43:23
index 37:18 63:1,3
indicate 33:18 41:19
indicates 33:2
individual 27:22 37:22
individuals 7:24 24:24
29:25 30:5
information 15:18 24:12

24:16
ingested 21:11
initial 43:12
initials 38:22,25 40:16
42:1 45:21
initiated 28:19 30:12
45:16 49:10 50:21 51:11
initiating 53:22
inmate 18:8 20:19 21:5,8
21:22 22:20 23:16 27:12
28:13 29:10 30:17 32:5
32:9 37:4,24 39:10 42:5
55:8
inmate's 36:1
inmates 14:8 17:16 18:3
21:16 22:16,20 23:8
24:20 25:6,15 30:22
35:9,12
instability 18:3
instances 21:5 32:9
interaction 41:2,4,14
49:23 52:19
interest 61:13
interested 22:19 61:12
interrupt 57:3
intervals 46:11,24
interview 11:17
intoxicated 27:1
Inventories 30:21
Inventory 31:13 32:4 33:3
involved 5:4 57:9
issue 12:9,12 18:8 19:13
20:6 30:9 36:1
issues 18:11 20:12,20
23:11 25:1 30:6 59:4
IVERSON 2:9

**J**

J 2:12
jail 5:8,14 9:1 10:20 13:19
14:1 20:1,21 22:14
23:16 24:25 33:13 35:7
38:12 51:20 54:22 55:23
59:17
James 1:5 38:11,14 40:13
41:2,19 42:21 43:23
44:5 45:16 47:23 49:10
49:17 51:9 52:19 54:7
54:10,12,16,21 56:12,19
56:21 58:1,15 62:5
Jane 1:22 61:4,22
Janell 14:16 16:11 17:22
17:23 51:2
January 4:21,24
Jason 2:8 3:20
jasonh@irc-law.com 2:9
Jayme 2:16
Jen 15:23
JL 45:19
job 11:14 12:2 58:12
JRT/KMM 1:4
July 42:20 44:5 45:13
47:11 49:5
June 17:10,12 61:20

**K**

Kathryn 2:4 3:14
kbennett@gaskinsben...
2:4
keep 7:15 28:7,7 46:15
Kevlar 22:11
kind 5:10 23:12 28:15 31:4
31:21,22 33:1 36:23,23
37:19
KING 2:13

know 5:11 6:1,25 7:10
8:21 10:3,6 12:11 14:2,4
15:8,16 17:3 18:5,14,15
20:10,11,12,15 21:1
22:9,25 23:2,4,5,15 24:5
24:7,25 25:9,12,16,18
26:10,11,24 28:22 29:5
29:7 31:4,17 33:7,7,12
33:13,13 34:4,17 35:2,3
35:4,5,18,19,20 37:8
38:8,15 39:13 46:16,19
47:4 49:25 50:17 51:24
53:13 54:1,3,3,6,9,12,14
56:12 55:4,10,12,15
56:14,21,25 57:7,7,8
58:4,6,7,19,20,20,21,22
58:25 59:9
knows 19:9 46:6
Kretsch 1:13 3:2,4,9 4:2,8
59:25 61:5 62:2,24

**L**

Lack 34:15
lacking 27:15 59:6
laid 36:23
Lake 4:9
large 25:5,14
larger 25:2
LARSON 2:13
lately 35:3
Law 2:3,4,8,12
laying 34:10
lead 26:8
leave 55:13 58:12
led 58:20
left 55:17 58:8,9
length 6:5
Leonard 13:7,11,16,18
15:11,19 16:9 17:20
54:1 56:13
let's 43:5,18 49:2 57:17
license 4:23 5:2 11:11
life 8:16 11:4
life-threatening 26:3
likewise 29:18
Linda 1:8 62:5
line 23:6 62:10
lists 39:12
little 23:12
live 4:8
LLP 2:5,13,19
load 14:5
long 6:6 24:8 33:12
longer 19:19 22:25 28:10
look 29:8 34:23,23 36:9
38:4 39:13 52:8
looking 31:20
looks 24:1 39:18,21 43:12
43:19 48:24 52:18,22
lot 11:16 12:6 20:9 25:9
28:10 30:23 32:24
lots 12:6,8
low 51:17,19
lower 52:12
Luther 8:5
Lynas 1:5,5 2:2 38:11,14
40:13 41:3,15,19 42:21
43:23 44:5 45:16 47:23
48:6 49:11,17 51:9,22
52:19 53:12 54:7,10,13
54:16,21 56:12,19,22
58:1,15 62:4,5

**M**

M 2:8

Doby Professional Reporting, Inc.
952-943-1587

Andrea Kretsch
5/29/2019

ma'am 12:25
making 6:8 24:6 33:10
management 37:23
MAR 39:3 40:9 42:14,16
March 11:9
mark 18:20
marked 2:20 36:11,14
  38:5 42:3,6,17,19 44:1,3
  45:2,10 47:19,21 49:13
  49:15 51:3,24 52:1
markings 42:9
matter 62:4
mean 28:6 29:23 34:25
  37:23 39:4,7 57:3 59:13
means 38:1 40:4 45:20
  51:15
meant 43:6
med 16:14 42:4
medical 6:19 13:5,9,16
  14:5,23 15:3,7,11,19
  16:9 17:16,19 18:9 20:2
  20:9 27:6 29:19 38:17
  38:22 39:2,5,19 47:10
  47:14 50:25 55:23,24
  56:3,10
medication 39:10 40:15
  41:18,20,23 42:5
medications 20:11
meds 39:12
meet 18:12 20:7 22:12
  30:24 32:23
meeting 51:22 54:13
meetings 14:4
MEnD 2:11 3:19 5:20 8:10
  8:20 9:11,15,16,17 11:8
  11:13,20 12:3 16:24
  21:24 24:19,22,22 37:18
  52:4 56:18 58:8
mental 6:19 8:19,23 9:24
  10:1,20 12:9 14:17
  16:20,22 18:3,8,11,19
  18:21,23 19:4,11,11,16
  20:2,5,9,13,22 22:11,13
  24:6 26:14,19 30:6,9,24
  30:25 31:10 32:1,11,15
  34:8 35:25 36:1 37:7,10
  51:15 56:3,11 59:3
mentioned 35:8
Mercy 27:10
Merit 1:22 61:4,23
met 49:24
meth 48:15
methamphetamine 49:6
methamphetamines 48:9
  49:8 50:20
method 10:7
MG 63:4
Michael 9:8 19:18,19 54:9
middle 39:21 40:3,4
milligrams 40:19
mind 26:12
Minneapolis 2:6
Minnesota 1:2 2:17 4:9
  61:5,7,24
minutes 7:17 47:5
misunderstood 14:25
MN 1:17 2:6,10,15
Monday 9:4 16:12
monitor 26:4,15
monitored 30:6
month 13:22 54:24
months 11:10
morning 39:15 52:25

**N**

N 3:1

name 3:12 19:20 23:19
  39:13
narrative 24:2
natural-colored 50:7
nature 50:24
nausea 43:19
Nearing 2:12 3:18,18 15:2
  27:15 41:8,10 59:5,21
necessarily 29:23
necessary 51:1
need 6:7 7:22,23 12:5 17:4
  20:11 28:22 30:5 31:24
  32:21,23 33:8 34:5 47:4
  56:14,16 57:16
needed 13:21,25 16:10
  43:6,8
needs 13:23 14:4 37:11
  56:23 57:14
never 28:11 55:17 57:7,8
new 12:7 17:2,6 37:1
  53:24 55:14
news 35:6
next-of-kin 1:5 62:5
night 39:16 40:20,20 41:5
  43:11 52:23 53:8,12
Nope 9:13
normal 47:1
normally 26:13
Nos 2:20
Notary 61:4,23
note 2:17,20 43:3 52:13
  53:22,24
noted 39:19 45:15 50:8,8
notes 14:10 61:8
noticed 61:15
noticing 2:19
November 9:6 11:25
  12:19 13:19 14:15 15:20
  17:20 19:24 41:15 48:2
  49:7,16 51:22 52:14,15
  54:2,22,24,25
number 26:23 28:8 45:22
  45:22
nurse 5:12 7:20 14:11,14
  16:12,17 17:7 22:12,14
nurses 6:6 54:4
nursing 4:18 11:11 14:20
  15:13,22 16:7,23 17:22
  19:8 21:9 29:14 32:8
  33:11,23 46:2 63:9

**O**

O 3:1
oath 3:24,25
Objection 27:15 59:5
observations 10:14
observing 22:21
obtain 21:20 22:15
obtained 24:2,12
obviously 7:13
occurred 40:6 58:22
October 48:2 49:2
offhand 15:8
officer 22:5,8 23:2
officers 24:12 35:12 46:25
  58:1,5
oh 13:13,14,20 52:12
okay 6:9,10 11:3 27:19
  38:7 41:9,12 44:8 49:2
  52:13,17,17 53:1 56:24
  57:5
onboard 20:12
once 7:21 22:24 46:22
one's 48:25
ones 7:11 17:2 44:23
opiate 7:10 44:16

opioid 49:1
opioids 49:5
opportunity 61:18
ordered 61:16
orientation 10:11
oriented 10:11 29:7 50:6
original 2:18 61:15
outside 10:10 25:7,16
  30:6
overheard 22:6
overlap 56:7
oversees 17:25
Oxy 49:5

**P**

P 3:1
p.m 3:3,11 57:20,23 59:24
  60:1
pack 63:5
packet 6:14 31:9,9 45:12
packets 24:14
page 19:9 38:18 46:5 51:5
  62:10
pages 51:4 62:7
pain 27:13,22
painful 25:19
paper 23:20 24:17 33:1
  53:8
part 10:17 26:9 33:23,25
  55:6
particular 22:16,20
particularly 5:19
parties 61:10,12,16
party 2:19 61:15
pass 16:14
passers 16:15
passing 39:12
patient 8:22 10:16,22 12:5
  18:24 22:6,7 29:24
  31:18,21 33:7,8 34:11
  41:22 43:6 50:10
patients 6:14 8:23 27:11
  31:2 42:2
Paul 2:15
PBT 27:2
people 6:13 12:7 25:9
  30:23 33:13,25 34:18
  35:6 37:5 40:11 46:10
  51:20 57:9 58:12
perceived 21:25
percent 41:25
percentage 24:24 25:5,15
performed 55:23
person 22:15
person's 30:14
personal 34:14 35:2
personnel 56:19
persons 61:13
pertains 56:9,10
Pfeifer 58:7
phone 28:2 33:10 35:2,8,9
  35:12,14
phonetic 19:21,21
photo 63:5
physical 7:14 12:10 20:13
  20:22 26:14,19 38:16
  40:8
physically 46:20
picture 22:15 23:13
pills 38:16 42:9
place 12:10 18:19 36:5
  61:8
placed 19:4,10 34:9
places 5:10,12
plaintiff 1:6 2:2 3:15,17
plan 10:6 36:5,17 37:19,21

43:3
play 22:2 34:25
plays 22:22
please 3:12,23
point 7:18
points 29:15
policies 6:1,4 9:23 16:24
  21:25 37:17
policy 17:15 36:22 37:19
Policy/Procedure 63:9
pop 46:9
populates 53:25
population 8:22 25:3
portion 25:2 56:9,10
poses 20:20
position 11:19,22
positive 7:9 28:18,24
  43:14 46:17 48:8,9 49:5
  49:7 50:18,19 51:13
possible 18:9
post-high 4:16
practitioner 14:11,14
  16:12
precaution 37:23
precautions 22:11 33:9
preceding 62:7
prescribe 20:16,17
prescription 38:14,16
  40:5,22 63:4
prescriptions 39:19 40:12
presence 61:7
Present 2:16
presenting 7:6
presents 29:24
pressures 21:18
pretty 7:13 35:6
prevention 36:5,16
Prevention/Evaluation
  63:10
previous 6:21 12:7
previously 44:22
primary 12:12 14:7
printed 52:8
prior 41:3
prison 5:13 11:16
probably 25:23
Procedure 2:17
process 31:10 35:19 45:6
professional 1:23 56:11
  20:2
ProPhoenix 24:15
protocol 6:12 7:7,25 33:5
  37:18
protocols 6:1,4 37:2
provide 17:16
provider 10:2 13:9,12,17
  14:3,7,18 15:12,20 16:9
  17:19 18:21 19:16 20:2
  20:10 25:16 27:6 28:2
  29:19,23 30:25 31:1
  32:15 33:5,9,12,16 34:3
  35:25 47:10,14 50:25
providers 28:9
providers' 14:5
psychiatric 16:17
psychologist 8:25 9:1,7
  20:18 33:20
Public 61:4,23
pull 23:19 38:5
purpose 46:3
Pursuant 2:17
put 7:16 11:16 12:16
  13:22,12,16,21 37:19
  37:22 40:16 41:23 43:6
  43:8 46:21 47:11 50:14
  53:14,17

**Q**

qualified 16:20
quality 17:16
question 11:2 14:25 27:19
questioning 6:24 24:16
questionnaire 28:21 44:5
  47:23 49:10 63:13,15
questionnaires 28:12
  56:6
questions 6:9,20 8:24
  10:3,8,12 18:5,13,17 24:8
  29:5 31:6 35:1 41:8
  49:25 56:8 59:19,20
quick 41:17
quite 20:25 27:10
quote/unquote 5:25 25:10

**R**

R 3:1 41:23 42:12 62:1,1
range 5:10
rank 34:7
Rasmussen 4:19 11:15
rate 61:16
rbennett@gaskinsbenn...
  2:3
read 39:4 43:2 59:22 62:2
real 41:17
really 13:22 33:15,15
  58:18
reason 47:13 55:3 62:10
reasonable 18:2
reasons 39:11
rebooked 55:3,13
recall 38:11 41:14 58:3
receive 4:16 5:7 12:13
received 4:23 11:10 21:25
  35:2 40:21
Recess 57:22
recognize 38:22
recollection 43:23
record 3:13 11:5 38:17,23
  39:2,10,20 41:19 47:18
  55:6 57:19,23 61:5
records 39:5,7
red 34:11,13,14 35:16
  41:23 42:6,14
reduced 61:7
reevaluated 25:12
refer 6:4 20:1,19 27:4
reference 19:16
referral 18:19,24 20:5
  22:12 32:2,12,16 34:8
  37:10
referred 18:9 21:6 26:22
  27:7
refusal 42:12
refuse 41:22 42:2
refused 41:19 42:5
regarding 8:9 10:4 49:23
  54:1 56:19 58:1
regardless 10:24 30:15
regards 54:16 55:22
Registered 1:22 61:4,23
regular 25:16
relative 61:10,10
released 55:1
remember 51:21
repeat 27:19
report 6:21 23:5 25:8,9
  35:15 51:18 55:24
reported 27:12 28:15,25
  41:7 43:19 44:13,25
  48:11,21 50:3 51:17
reporter 1:22,22 3:23 11:6
  61:4,23

Andrea Kretsch
5/29/2019

Page 67

**REPORTER'S** 61:2
**reporting** 1:23 30:8
**reports** 22:8
**request** 7:18 10:1 61:18
**requests** 30:25
**respond** 24:8
**responding** 31:5
**responsible** 15:14
**restaurants** 8:4
**restrictions** 5:1
**results** 45:7 48:23 49:22
**retrained** 17:8
**REUVERS** 2:9
**review** 14:13 16:25 17:21
  23:6,14 33:6,9,16 35:9
  35:12,25 55:6,20 61:18
**reviewed** 54:15 63:5,7,8
  63:10,12,14,15,17,19
**reviews** 14:12
**right** 18:6,22 20:21 23:5
  26:1,12 28:2 33:6,23
  37:11 38:9,21 45:8,17
  48:3,6 49:20 51:6 52:12
**risk** 9:10,15,25 10:2,19,23
  18:13 30:1,4,10,11,18
  31:3 32:19 37:8 38:1
  51:8 63:8
**risks** 22:1
**RN** 4:23 11:21 12:2 43:5,5
  43:7 50:10
**RNs** 16:1
**road** 4:19
**Robert** 2:3 3:16
**Robertson** 9:8 14:18,18
  19:18,19 20:15 54:9,16
**role** 34:25
**roll** 53:1
**Rule** 2:17
**run** 46:20

**S**

**S** 1:8 3:1 62:1,6
**sad** 56:25 58:19
**safe** 28:7
**safety** 21:13,21 28:7 39:11
  47:8 59:17
**sample** 6:23
**Sauk** 4:11,12
**saw** 41:5,6 43:11 45:4
  48:20 52:21 53:12 54:9
**saying** 19:15 22:5,6,17
**school** 4:12,16 5:19 8:8
  11:15 28:10
**score** 29:11,13,18 33:2,17
**scores** 43:11 47:15
**scoring** 32:7 34:1 49:20
**screen** 45:7 48:5,23 51:13
  52:9
**screening** 6:16,19 10:1,2
  10:19,24 18:13 24:9
  30:1,5,10,12,18 31:3
  37:8 50:22 51:8 55:24
  56:3,4 63:8
**SEAL** 61:19
**second** 32:3,10 39:25
  41:1
**security** 59:17
**see** 6:1 7:3,4,18 8:22 10:1
  10:11 17:25 18:15,21
  19:3 23:4,10 25:11 31:4
  33:6 37:7 38:19 39:11
  40:3 42:22 43:5,18
  45:13 49:2 50:10,12
  51:19
**seeing** 22:16 42:14,15
  43:23

**seen** 7:20 18:25 21:5
  25:23 43:15
**seizure** 7:1 43:20 50:5
**seizures** 26:25
**self-harm** 27:14,24 31:8
  31:17 32:14,19
**self-harming** 34:17 35:20
  37:4
**self-medicate** 25:11
**self-medicating** 25:6
**send** 12:13 21:14,19 27:11
**sending** 46:3
**sent** 21:4 57:13
**sentence** 34:24
**separate** 56:6
**sergeant** 46:1
**sergeants** 19:7 46:1
**seriously** 22:9
**set** 48:25
**setting** 5:8,15
**Seventh** 2:5,14
**severe** 26:21 27:14,24
  33:18
**Shakopee** 5:13
**shaky** 29:9
**sheet** 24:18 40:14,21
  42:21 43:13 44:6,11
  45:2 47:16 49:10,16,19
  49:23 50:11,17 51:24
  53:22 55:14 63:16
**sheets** 29:1,2,16 43:9
  54:21,23 55:5,16,19
  63:11
**Sherburne** 2:7 3:21 12:20
  13:1,4,10 36:6 38:12
  52:4,4,11
**shift** 12:14 16:5,7 53:1
**show** 45:10
**Showing** 36:14 42:19 44:3
  47:21 49:15 51:3
**shows** 53:16
**sick** 12:10,13,16
**side** 35:13
**sign** 17:21 53:11 54:4,4,5
  54:5 59:22
**signed** 44:8 53:5,9 54:1,6
**significance** 46:7,12
**signs** 14:12 17:24
**similar** 56:9
**simply** 21:3
**single** 7:21 10:22 17:7
  59:2
**sit** 43:22 51:21
**skin** 50:7
**sleeping** 31:21 35:15 50:1
  50:2
**somebody** 5:25
**soon** 18:9
**sorry** 5:22 8:14,17 11:3
  13:14 14:24 15:12 22:18
  23:25 57:3
**sort** 9:24 18:10 46:16
**sorts** 5:11
**sounds** 21:21
**South** 2:5,10
**speak** 30:25 37:11
**special** 58:23,25 59:2
**specificity** 59:6
**speculation** 27:16
**SPN** 39:14 45:22
**St** 1:16,17 2:15 8:6 61:6,7
**stable** 7:4 18:14
**staff** 7:19 16:7 17:23 18:9
  19:8 21:9 29:14 32:8
  33:11,23 36:24 46:2
**staffed** 16:4 20:21

**Stang** 1:8 62:6
**start** 5:24 31:8 39:22,25
  46:20 53:24
**started** 8:6 43:12,13 53:17
**starting** 54:25
**state** 3:12 61:5
**stated** 16:25
**STATES** 1:1
**status** 51:15
**stay** 54:22,25
**stenographic** 61:8
**step** 32:10 45:6
**step-by-step** 37:21
**steps** 31:11
**stop** 39:22,23 40:1
**Street** 1:16 2:5,14 61:7
**streets** 33:14
**stroke** 43:21
**structure** 13:4
**subject** 45:19
**substance** 7:8 24:25 25:4
  28:23
**substances** 26:16 46:18
  50:24
**substantial** 61:13
**suicidal** 10:5
**suicide** 9:10,15,25 10:2,19
  10:23 18:13 22:1 30:1,4
  30:10,11,18 31:3 36:5
  36:16 37:8,23 38:1 51:8
  56:22 58:2,15 63:8,9
**suicides** 26:8
**Suite** 2:6,14
**supervisor** 15:22
**support** 10:10
**supposed** 17:20 18:2
  26:21
**sure** 6:8 13:21 15:9,10
  21:15,18 38:24 47:5
  54:11 56:23 58:24
**sweating** 29:9 50:8
**sweats** 43:20 50:3
**sworn** 3:5 4:3 61:6
**symptomatic** 47:6
**symptoms** 6:25 7:2 25:18
  26:8 43:16 44:22 45:1
  50:4
**system** 10:10 24:14

**T**

**T** 1:22 61:4,22 62:1,1
**tab** 63:4
**tablet** 40:18
**tablets** 40:24
**take** 9:14 16:1 22:9 25:23
  57:17
**taken** 57:21 61:6 62:4
**talk** 31:2 32:18 37:6 57:14
**talked** 14:17
**talking** 31:6 35:18
**taper** 7:12
**tech** 40:16 41:23
**techs** 39:12 42:4
**tell** 15:17 39:4,7 40:6,13
**ten** 39:24
**tendency** 61:13
**term** 15:14
**test** 28:20,25
**testified** 3:6 4:4
**testimony** 61:5
**Thank** 3:22 11:6 36:12
**themself** 18:16 22:7
**therapeutic** 33:1
**thing** 28:11 35:22
**things** 6:16 7:10 21:2,20
  23:4 26:12,23 31:25

**than** 34:21 43:14 46:19
**think** 10:18 15:8 17:10
  19:15,20 45:11 58:11,23
**thinking** 26:11 37:15
**third** 38:18
**Thompson** 15:24
**thorough** 46:23
**thought** 19:18 35:19
  37:12,14
**thoughts** 10:5 18:16
  27:13 31:22 33:1 35:21
  35:22 37:5
**threat** 22:1 33:7 59:9,15
  59:16
**three** 12:14 16:6,8 29:15
  40:24 42:9,9 43:11 50:6
  51:4 54:20,23
**threshold** 34:4
**time** 3:10 9:23 10:7 12:8
  12:12 13:25 14:2 16:4
  17:6,16,17 22:10 24:8
  24:13 28:17,19 35:21
  36:3 37:13 39:16 48:2
  48:20 50:6 51:12 53:25
  57:15 61:8
**times** 12:14 13:18,22 20:9
  21:4 32:24 36:25 50:6
**today** 38:9 43:22 51:21
**Today's** 3:10
**Todd** 13:6,11,16 14:12
  15:11 17:20,25
**toll** 22:22
**tomorrow** 50:10
**tongue** 50:8
**tough** 13:20 33:15
**track** 39:9
**tracking** 31:16
**tragic** 58:19
**train** 24:19
**trained** 9:20 26:7 36:19
**training** 5:8,17,20,20,21
  5:23 6:5,7 8:9,18,20,24
  9:22 17:9,10 21:24
  26:10 47:3
**transcript** 1:11 2:18 61:18
  62:3
**transpires** 53:21
**treated** 22:1
**treating** 14:7 23:8 25:16
  55:7
**tremendous** 8:23
**tremor** 29:6 50:8
**tremors** 43:20
**triage** 12:15
**trigger** 50:23
**trouble** 18:12 46:20
**true** 25:14 61:5 62:7
**Trustee** 1:5 62:5
**try** 11:1 22:14 34:23 42:4
  58:13
**trying** 58:11
**tuberculosis** 6:16
**turn** 17:25 52:11
**turned** 48:25
**turning** 35:21
**two** 5:13 8:7 16:8 30:11
  31:11 39:18 56:6,15
**two-day** 17:11
**two-step** 31:9
**type** 23:18 53:19
**typewritten** 62:3
**typically** 16:5,8 53:7 55:1
  55:18

**U**

**Uh-huh** 8:11 9:2 16:11

19:12 20:7 21:23 23:9
  23:25 25:20 34:6
**unable** 14:3
**uncomfortable** 6:6
**understanding** 46:8 58:14
  58:16
**unfortunately** 8:21 25:2
  55:2
**UNITED** 1:1
**unsure** 13:13 28:9,11
**update** 17:3
**updated** 17:5
**urgent** 18:20,20,23 19:3
  19:11 20:6 22:11 32:16
  34:8 37:10
**urine** 6:22 7:4 21:10,16
  28:17,20,24 37:16 45:7
  48:5,22 50:22
**usage** 44:16
**use** 6:21,22 7:6,10 10:9
  15:14 28:15,25 44:14
  48:12,16,19
**usually** 19:1,1 27:3,4 40:7

**V**

**valid** 22:1
**VanDerBeek** 13:15 14:20
**various** 5:10 63:6
**Verbalizing** 36:7
**version** 23:24 24:3
**versions** 55:11
**versus** 46:12
**video** 1:11 2:16 3:2,8
  57:19 59:25
**VIDEOGRAPHER** 3:8,22
  57:19,22 59:23
**visits** 14:10
**vitals** 7:3 21:9 24:9 26:25
  29:7 52:24 53:17
**vomiting** 29:6
**vs** 1:7 62:5

**W**

**W** 1:5 2:2 62:4
**waitressed** 8:3
**walk** 13:3 36:21 49:22
**Wanese** 19:21
**want** 13:3 15:9,17 58:12
**wasn't** 54:13
**watch** 7:16 9:24,25 10:20
  19:4,11 30:1 43:13
  50:20
**watches** 19:5 26:5 46:10
  46:21
**watching** 34:22
**way** 39:11 42:15 57:1,13
**ways** 30:11 56:7
**we'll** 22:4 59:22
**we're** 12:11 14:2 21:11
  32:20 46:16 57:22
**we've** 24:1 38:4
**Wednesday** 45:12
**week** 12:21 13:18 48:15
**weekends** 9:5
**weekly** 48:15
**Weinsky** 19:21,22
**well-being** 47:7
**went** 11:14
**weren't** 24:6 47:16 57:10
**West** 1:16,16 61:6,7
**wide** 5:10
**withdrawal** 6:25 7:25 8:10
  25:18 26:1,21 27:14,25
  28:12,21 29:2 30:1,7
  42:20 43:17 44:4,22

Andrea Kretsch
5/29/2019

45:1,16 46:8 47:12,15
  47:22 49:9 50:4,15
  63:11,13,15,16
**withdrawals** 7:7 27:23
  36:3 46:17
**witness** 3:5 4:1,3 11:3
  15:4 36:12 41:9,12
  61:18,19
**women's** 5:13
**word** 30:9 37:3 57:13
**work** 5:12 12:18,23 20:10
  20:14 24:23
**worked** 8:3,5
**working** 5:24 16:2
**workload** 14:5
**wouldn't** 26:13 33:20
**wound** 12:6
**wounds** 12:8
**write** 31:25
**writing** 49:19 51:5 53:20
  53:23 61:7
**written** 6:3 23:7,15,21
**wrong** 15:9,17
**wrote** 44:23

---
**X**
---

---
**Y**
---

**Yeah** 5:24 6:13 12:4 19:17
  23:25 24:4 25:8,25
  35:17 51:18 52:10 58:10
**year** 17:2,3,9 44:17 48:12
  48:16
**yep** 9:23 10:21 16:6,11
  17:2,9 18:10 20:7,25
  21:23 22:22 23:9 24:4
  24:13 25:22,25 34:21
  39:21 40:2,15 42:23
  45:21

---
**Z**
---

**zero** 5:3,6 40:22

---
**0**
---

---
**1**
---

**1:00** 52:24
**1:50** 3:3,11
**10** 29:15,19,22 47:16
**10/30/17** 48:16
**10/31/17** 48:13
**100** 41:25
**11** 38:6,18 41:17 63:4
**11/1/17** 49:20 63:15,17
**11/16** 39:22,23
**11/17/17** 40:1
**11/6** 39:23
**11/7** 40:1
**11:00** 52:22
**11th** 53:6
**12010** 45:19
**13** 45:11 63:6
**13th** 54:2
**14** 8:8 32:23
**14-day** 31:16
**15** 7:17 46:12
**15-minute** 7:16 19:4,6,10
  26:5
**15th** 43:12
**16** 8:8
**17** 40:2
**18-2301** 1:4
**18th** 17:11
**1st** 51:22 52:21 54:25

---
**2**
---

**2** 57:22
**2:58** 57:20
**20** 12:18 51:4 63:8
**2002** 4:15 8:2
**2011** 8:6
**2014** 8:7
**2016** 4:21 8:2
**2017** 4:22,24 9:6 11:25
  12:19 13:19 14:15 15:20
  17:20 19:24 41:15 44:5
  44:19 45:13 47:11 48:3
  51:22 52:14 54:22
**2019** 1:14 3:10 61:6,20
  62:6
**21** 2:20 36:11,15 63:9
**22** 42:17,20 45:2 63:11
**23** 44:1,4 63:13
**2300** 52:22
**24** 23:3 47:19,22 63:15
**25** 49:13,16 63:16
**26** 2:20 52:1,3 63:18
**2800** 2:14
**29** 1:14 61:6 62:6
**29th** 3:10
**2nd** 52:14,15,19,25 53:2

---
**3**
---

**3:02** 57:23
**3:04** 59:24 60:1
**30** 2:14 19:6 47:5
**30-minute** 45:15 46:7,10
  46:21,24 47:1,2,11
  50:14,20,23
**30.06** 2:18
**3000** 2:6
**333** 2:5
**36** 63:10
**38,41** 63:5

---
**4**
---

**4-59** 63:2
**40** 12:22 27:3 33:2,17 34:2
  34:5,9
**4135** 1:16 61:6
**42,45** 63:12
**44** 63:14
**45** 63:7
**47** 63:15
**49** 63:17

---
**5**
---

**50** 40:19 63:4
**51** 63:8
**52** 63:19
**55101** 2:15
**55402** 2:6
**55438** 2:10
**56301** 1:17
**5th** 45:13 61:19

---
**6**
---

---
**7**
---

**7/16/17** 63:12
**7/17** 63:13
**7/4** 44:19
**7th** 40:20

---
**8**
---

**8th** 40:19,20

---
**9**
---

**9321** 2:10
**952.943.1587** 1:24

---