**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

DAVID W. LYNAS, *as Trustee for the next-of-kin of James C. Lynas*,

Plaintiff,

v.

LINDA S. STANG, *in her individual capacity*; MICHAEL D. WISE, *in his individual capacity*; ALYSSA PFEIFER, *in her individual capacity;* JENNIE THOMPSON, in her individual capacity; TODD LEONARD, i*n his individual and official capacities*; MEND CORRECTIONAL CARE, PLLC; JOHN DOES 1-2; *in their individual capacities;* SHERBURNE COUNTY, and MICHAEL ROBERTSON, *in his individual capacity*,

Defendants.

No. 18-2301 (JRT-KMM)

**MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN PART**

---

Robert Bennett and Kathryn Bennett, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for plaintiff.

Stephanie Angolkar, **IVERSON REUVERS CONDON**, 9321 Ensign Avenue S., Bloomington, MN 55438, for the Sherburne County Defendants.

Anthony Novak, **LARSON KING, LLP,** 30 E. 7th Street, Suite 2800, St. Paul, MN 55101, for MEnD Defendants.

James Lynas died by suicide after spending nine days in the Sherburne County Jail.

His father, David Lynas, as trustee for Lynas, brought this action alleging a variety of claims

against Sherburne County Jail staff, the County itself, and the Jail's medical providers.

1

Defendants brought Motions for Summary Judgment, seeking dismissal of all claims. Because a genuine dispute of material fact remains as to the claims against Linda Stang, Michael Wise, and Sherburne County (the "Sherburne County Defendants"), the Court will deny their Motion for Summary Judgment. As to the claims against Alyssa Pfeifer, Jennie Thompson, Todd Leonard, Michael Robertson, and MEnD Correctional Care, PLLC ("MEnD") (collectively, the "MEnD Defendants") the Court will grant in part and deny in part their Motion for Summary Judgment. Because a genuine dispute of material fact remains as to the claims against MEnD and Robertson, the Court will deny the Motion to the extent it relates to them. However, because no genuine dispute of material fact remains as to deliberate indifference on the part of Pfeifer, Thompson, and Leonard, the Court will grant their Motion for Summary Judgment.

## BACKGROUND

On October 31, 2017, James Lynas was arrested for driving under the influence, which was a probation violation. (Aff. Of Brian Frank in Support of Sherburne Defendants' Mot. for Summary J. ("Frank Aff."), Ex. 10 at 1, Jan. 21, 2020, Docket No. 71.) He was taken to Sherburne County Jail on November 1, 2017. (*Id.*, Ex 1.) He hung himself in his cell on November 9, 2017, and never regained consciousness. (*Id.*, Ex. 12 at 2, Aff. Of Robert Bennet in Opp'n to Motions for Summary J. ("Bennet Aff."), Ex. 50 at 9, March 27, 2020, Docket No. 94.) His family withdrew life support and Lynas died on November 12, 2017. (Bennet Aff., Ex. 50 at 9.)

## I.     THE JAIL AND MEND

Defendant Sherburne County operates Sherburne County Jail, a correctional facility with beds for 732 inmates.   (*See* co.sherburne.mn.us/310/Corrections-Jail.) Sherburne County employs Defendants Wise and Stang as correctional officers.  (Bennet Aff., Ex. 15 at 3, Ex. 46 at 3–4.)  Sherburne County also contracts with Defendant MEnD Correctional Care to provide medical and mental health services.  (*Id.*, Ex. 20–21, Docket No. 93.)

MEnD is owned by Defendant Todd Leonard, a family practice physician, who is the President and Chief Medical Officer of MEnD, and was also the Medical Director at Sherburne County Jail during the time period at issue in this case.  *(Id.*, Ex. 25 at 3–5.)  In November 2017, Leonard was the only full-time physician for all of the correctional institutions served by MEnD, in at least 37 counties and several states.  (*Id.*, Ex 23 at 3, Ex. 24 at 10.)  Leonard is the supervisor for all of MEnD's staff, of which there are approximately 180.  (*Id.*, Ex. 24 at 8, Ex. 25 at 3.)  Leonard estimated he spent 10% of his time on patients, and 90% of his time on administrative work.  (*Id.*, Ex. 26 at 2–3.)  Leonard also helped put together the suicide prevention policy at the Sherburne County Jail.  (*Id.*, Ex. 25 at 20.)

## II.     LYNAS'S INITIAL WITHDRAWAL ISSUES

On November 1, Lynas's urine tested positive for numerous drugs, and he reported regular drug use, including heroin and methamphetamine use the previous day.  (*Id.*, Ex. 37.)  Andrea Kretsch, a nurse, filled out a MEnD Chemical Withdrawal Flow Sheet, and

scored Lynas at a 2, where 0 indicates no symptoms, and 10 requires the nurse to contact a physician. (*Id.*, Ex. 38.) Lynas was also given a MEnD Suicide Risk Screening Form because he had an "Altered Mental Status." (*Id.*, Ex. 40, Docket No. 94.) The nurse rated him a 2 out of a possible 100 points on MEnD's propriety form, where 0 is the lowest risk, and 36 points "require[] intervention." (*Id.* at 2)

The Suicide Risk Screening Form, like the Chemical Withdrawal Flow Sheet, is a MEnD proprietary form. (*Id.*, Ex. 24 at 33-35, 37-38.) Although Leonard and MEnD developed the forms, Leonard was unable to explain the rationale behind the different boxes, or why the scoring threshold on the Suicide Risk form was set at 36. (*See id.* at 34-35, 37-38.) Leonard noted that although nurses are trained on the form, "they are not trained to become mental health professionals and try to decipher what they are able to garner from the patient." (*Id.* at 37.)

On November 2, 2017, Lynas saw MEnD nursing supervisor Jennie Thompson, a defendant in this case. Thompson filled out the Chemical Withdrawal Flow Sheet and noted that Lynas was reporting more symptoms of withdrawal, but still scored him at a 7. (*Id.*, Ex. 38.)

On November 3, 2017, Thompson completed Lynas's Initial Health Assessment. (*Id.*, Ex 39.) She noted that he had previously been diagnosed with depression, anxiety, and ADD. (*Id.* at 3.) Thompson noted that Lynas also reported that he had been in "a lot of pain" the previous night and that he "had thoughts of self harm because of his

stomach." (*Id.*) She checked the box "yes" for "suicidal ideation." (*Id.*) Thompson also noted that Lynas "denies any thoughts of self harm now." (*Id.*) Thompson prescribed Maalox for Lynas's stomach pain. (*Id.*) There is conflicting evidence about whether Thompson reviewed Lynas's Initial Health Assessment with Defendant Michael Robertson, the Jail's psychologist. Her notes and testimony, as well as Leonard's testimony indicate that Robertson was involved. (*Id.*, Ex. 28 at 10, Ex. 25 at 9.) However, Robertson wrote in an email that he was never involved in Lynas's case, and his notes do not indicate any review at that time.[1] (*Id.*, Ex. 6 at 5-6, Ex. 7 at 6-7.)

Thompson then filled out a Suicide Risk Screening Form, and scored Lynas at 16. (*Id.*, Ex. 40 at 3.) Thompson also asked Lynas if he wanted to start MEnD's "mental health process" and fill out a Beck Depression Inventory ("BDI") which is a standard (not a MEnD proprietary) tool for measuring depression and its severity. (*Id.*, Ex. 28 at 9, Ex. 39.) Finally, she completed the Withdrawal Flow Sheet and scored Lynas at 6. Leonard reviewed this information. (*Id.*, Ex. 42 at 10.)

On November 4, 2017, another nurse completed the Withdrawal Flow Sheet and scored Lynas at 4. (*Id.*, Ex. 38.) She noted that Lynas had reported being unable to sleep for longer than 20 min at a time. (*Id.*) The nurse explained she was discontinuing the withdrawal protocol because Lynas had received a score under 10 four times in four days. (*Id.*)

---

[1] Robertson testified that he presumed he reviewed these materials. (*Id.*, Ex. 7 at 6.)

### III.   LYNAS SCORES HIGH ON THE "BECK DEPRESSION INVENTORY" AND 15-MINUTE WATCH STARTED

On November 5, 2017, Defendant Alyssa Pfeifer, a nurse with MEnD, scored Lynas's BDI form, rating him at 43 points.  (*Id.*, Ex. 43 at 3.)  In about one-third of the categories, Lynas gave himself a 3, the maximum score, including that he felt the future was hopeless.  (*Id.* at 2.)  He also gave himself a 1 or 2 (indicating at least some level of sadness or difficulty) in all but two of the categories.  (*Id.* 2–3.)  Among others, he checked that "I have thoughts of killing myself, but I would not carry them out."  (*Id.* at 2.)  Scores over 28 points on the BDI indicate "severe depression."  (*Id.*, Ex. 44 at 3.)  Pfeifer was not able to make any diagnosis, but knew that MEnD's policy was to call a medical provider as soon as feasibly possible for a BDI score over 40.  (*Id.*, Ex. 5 at 13–14.)  Such a score "is indicative of a patient who needs mental health help." (*Id.* at 14.)  Pfeifer also completed a Suicide Risk Screening Form for Lynas, and scored him at a 12.  (*Id.*, Ex. 40 at 4.)

Pfeiffer contacted the on-call medical provider – a physician assistant named Crystal Waagmeester.  Waagmeester requested more information, and Pfeiffer reported back that Lynas "denies suicidal thoughts" and that when she asked him if he would kill himself, he stated that, "No, I couldn't do that to my daughter."  (*Id.*, Ex 42. at 14.)  She wrote that Lynas denied a history of suicide attempts or plans.  (*Id.*)  However, she also noted that Lynas "reports in 2013 when he got his felony he felt like giving up and he sold all of his guns so he wouldn't shoot himself." (*Id.*)  Her notes state that this "is the first time in 1.5 years he's been sober and is having to deal with his mental health; when asked

6

how's he's currently copping [sic] with it pt stated 'honestly I'm suffering and not coping with it.'" (*Id.*)

Pfeiffer also reported that Lynas "reports 'definitely' feeling depressed and 'my anxiety is through the roof.'"  (*Id.*)  She noted that Lynas said that "his insomnia is maddening, his mind is going crazy with thoughts, and going through many emotions like frustration, irritation and then emotional."  (*Id.*)  Finally, she noted that Lynas reported "having current goal of getting his life back together and future goals of going to treatment, and putting his life back together for his daughter so she doesn't have to go through the same thing he did" and that "if he did have suicidal thoughts he would tell the CO or clinic."  (*Id.*)

After receiving this information, Waagmeester (1) put Lynas on a 15-minute mental health watch; (2) prescribed Hydroxyzine as needed for his anxiety, and (3) ordered a mental-health referral.  (*Id.* at 15.)  Waagmeester explained that this was an "urgent mental health referral."  (*Id.*, Ex 29. at 11.)  She explained what when inmates score under 40 on the BDI, inmates generally spend another two weeks collecting a packet of their symptoms to discuss with a mental health provider.  (*Id.*)  Here, however, she felt that Lynas did not need to wait two weeks, and that he should see a mental health provider urgently.  (*Id.*)  Waagmeester said "urgently" means the next day that a provider is at the jail.  (*Id.*)

Pfeiffer sent the referral, and also noted in a "Special Precautions/Management" form that because of Lynas's high BDI score, he was not permitted access to razors.  (*Id.*, Ex 11.)  Pfeiffer did not check the box for "suicide watch" or "close observation/MH watch" but instead chose "Miscellaneous" and wrote in "15 min watch for mental health." (*Id.*)  Besides Lynas, there were ten other inmates at Sherburne County Jail who were on a 15-minute mental health watch.  (*Id.*, Ex. 18 at 2-10.)

Pfeiffer explained that Sherburne County Jail did not use the "suicide watch" or "close observation" watches, and instead that providers were instructed to write in a mental health watch categorization.  (*Id.*, Ex. 5 at 18.)  Several other individuals echoed this statement, including Sherburne County Sherriff Brott, (*id.*, Ex. 4 at 5) (explaining that "we don't call it 'suicide watch'") and Defendant Dr. Robertson, (*id.*, Ex. 7 at 5) (explaining that he was no longer certain which administrator instructed staff to use "mental health watch" instead of "suicide watch").  Defendants Stang and Wise, on the other hand, stated that there was no categorical ban on using the term "suicide watch."  (*Id.*, Ex. 15 at 6, Ex. 46 at 5.)

Leonard reviewed the information submitted by Pfeiffer on November 6, 2017. (*Id.*, Ex. 42 at 14.)  Otherwise, on November 6 and 7, 2017, it appears nothing happened. At some point after Waagmeester urgently referred Lynas to a mental health provider, Defendant Robertson scheduled Lynas for an appointment for November 16, 2017.  (*Id.*, Ex. 7 at 7.)  However, there is no date accompanying this note, so it is not clear when

Robertson set that appointment. (*Id.*) Robertson made no other notations, and did not recall any of his actions on those days, but did state that the information he received was clear. (*Id.* at 7, 12.) Lynas had no appointments or any contact with medical professionals.

### IV.   LYNAS IS TRANSFERRED TO SEGREGATED HOUSING

On November 8, 2017, Lynas was given a written disciplinary warning for an infraction, and became upset, yelling "[j]ust send me up to Gamma![2]  I'll give you a reason!" (*Id.*, Ex. 18 at 28.) The Correctional Officer ("CO") on duty had not planned to send Lynas to Gamma, but took Lynas's statement as a "veiled threat." (*Id.*) The CO asked why he wanted to be sent to Gamma and Lynas said, "fuck you," and began kicking his cell door very hard. (*Id.*) The CO asked why again, and Lynas "stated something like send me to Gamma." (*Id.*) Later that evening, Lynas was moved from his general population cell and cellmates to segregated housing, not Gamma. (*Id.* at 25.)

In segregated housing, inmates are confined to their cells 23 hours per day; they are allowed out for one hour to shower, exercise, and use the phone. (*Id.*, Ex. 2 at 5. Sherburne County Jail's policy states that, "[m]edical personnel shall . . . be informed immediately when an inmate is placed in Segregation and provide assessment and review as indicated by the protocols established by the medical provider." (*Id*. at 4.) Defendant Dr. Robertson testified that moving from general population to segregated housing can

---

[2] Gamma is a disciplinary cell block that is more restrictive than the general population but less restrictive that segregated housing. (*Id.*, Ex 13. at 8.)

exacerbate an inmate's risk of suicide.  (*Id.* Ex 7 at 18.)  There is no evidence that medical staff were notified of Lynas's move.

Lynas was housed in cell S52 of pod S5, which consisted of four cells and a day room that could be divided in half with a lockable door.  (*Id.*, Ex. 15 at 13; *see also* Frank Aff., Ex. 9.)  The doors of the cells have clear windows allowing a view of the cells' interiors.  (Frank Aff., Ex. 9.)  Unlike in the rest of Sherburne County Jail, COs can also perform inmate checks from catwalks which run behind the cells.  (*See, e.g.*, Bennet Aff., Ex. 15 at 11–12.)  These catwalks are long dark hallways that contain plumbing, but which also have a small window which looks into an inmate's cell.  (*Id.*)

A CO's view is into the cell from the catwalk window is limited – for example, the CO cannot see the wall being looked through.  (*Id.*, Ex. 4 at 6; Ex. 16 at 12–13.)  The windows are small, and are set deep in a thick concrete wall.  (Stipulation to Photos, Photo 2, May 20, 2020, Docket No. 105-2.)  Additionally, the small window is covered with reflective film, and is partially covered by a grate.  (*Id.*, Photos 3–4, Docket Nos. 105-3, 105-4.)  It was Sherburne County Jail's policy to permit inmate checks via catwalk in segregated housing.  (Bennett Aff., Ex. 4 at 6.)

## V.    LYNAS DIES BY SUICIDE

On November 9, 2017, Defendants correctional officers Wise and Stang came on shift and learned from the departing COs that Lynas was on a 15-minute mental health watch.  (*Id.*, Ex. 13 at 4; Ex. 14 at 4.)  The pass-on information from the departing COs also explained the Lynas was not permitted to have a razor.  (*Id.*, Ex. 14 at 5.)  Wise and Stang

10

testified that because the 15-minute watch includes suicidal inmates, COs need to be concerned about suicide risk for all inmates on a 15-minute watch.[3]  (*Id.*, Ex. 13 at 9, Ex. 14 at 5.)

On each check, Sherburne County Sherriff Joel Brott explained that COs look to make sure the inmate is ok, that they are alive and breathing.  (*Id.*, Ex. 4 at 4.)  In particular, a CO needs to actually see or hear the inmate to verify that he is alive; not guess what the inmate is doing.  (*Id.* at 24.)  The Jail had issues with the pace of these checks during this time period; the Minnesota DOC found in a 2016–2018 Facility Inspection Report that "video footage showed a number of well-being checks that were completed at too fast a pace." (*Id.*, Ex. 17 at 3.)  The Report noted that "Staff members need to slow down and be more deliberate and thorough at each cell."  (*Id.*)  By the time the Report issued in 2018, however, it noted that "[f]acility administration has already taken steps to address this issue." (*Id.*)

At 9:01 a.m., Wise performed a 15-minute check of Lynas from the catwalk.  (*Id.*, Ex. 15 at 15.)  Lynas was lying on the floor underneath the bottom bunk in his cell.  (*Id.*)  Wise went out into the dayroom.  (*Id.*)  From there, he explained to Lynas that Lynas could not sleep under the bunk because the COs "have to have eyes on him the whole time."

---

[3] The Sherburne County Sheriff, Joel Brott, testified that suicidal inmates should not be placed in segregated housing, they should be kept in booking, and with a Kevlar gown and other suicide prevention measures.  (*Id.*, Ex 4 at 5.)

(*Id.*)  Sheriff Brott testified that if a CO could not visualize an inmate from the catwalk, they should do additional work to make sure the inmate was ok.  (*Id.*, Ex. 4 at 24.)

After talking with Wise and before the next 15-minute check, Lynas took a white sheet off of his bed.  (Frank Aff., Ex. 9.)  He took the sheet and hid it and himself under a dark-colored blanket, and moved around underneath the blanket for a few minutes.  (*Id.*)  At 9:10 a.m., Lynas uncovered himself and walked, with the sheet, to the back of the cell.  (*Id.*)  He attached the sheet, now a noose, to the grate, and hanged himself.  All movement in the cell stopped just before 9:14 a.m.  (*Id.*)

Wise did the next 15-minute check on Lynas, from the catwalk, between 9:16 and 9:17 a.m.  (Bennett Aff., Ex. 15 at 16.)  Wise testified that he saw the side of Lynas's face, and that he saw his head move, but that he did not see him hanging, and did not see a noose.  (*Id.*)

At 9:35, Stang performed a check on Lynas.  For Stang, the catwalk windows were particularly challenging; because of her height, she needs to use a stool to see through the window, and even then she can only see through the bottom two circles on the window grate.  (*Id.*, Ex. 46 at 11.)  Stang also testified that she generally takes 30-35 seconds to check on the four cells on a catwalk, or approximately 8 seconds per each cell, including the time to walk between them and get on a stool.  (*Id.* at 14.)

Stang testified that she saw the top of Lynas's head, but she did not confirm whether he was breathing.  (*Id.* at 13–14.)  She could not see straight down or to the side,

because it is a flat wall.  (*Id.*, Ex. 48 at 3.)  Stang suggested in her deposition that she

thought Lynas might have been using the toilet, although the photos of the room suggest

that the window was in between Lynas and the toilet.  (*Id.*, Ex. 46 at 13; Stipulation to

Photos, Photo 3.)

Stang performed the next 15-minute check at 9:47 a.m.  (Bennett Aff., Ex. 46 at

14.)  Noticing that Lynas's head was in the same position, she looked further into the cell.

(*Id.* at 15.)  At this point, she could see the reflection from the glass front of Lynas's cell,

and she could see the reflection of the white sheet.  (*Id.*)  Stang communicated with Wise

and another CO, who went into the day room, put the inmate using the day room back in

his cell, and entered Lynas's cell.  (*Id.* at 15.)  Lynas was hanging from a sheet tied onto

the grate on the back wall of his cell.  (*Id.*, Ex. 15 at 18.)  Although paramedics were

eventually able to find a pulse, Lynas never regained consciousness, and his family

withdrew life support on November 12, 2017.  (Frank Aff., Ex. 12 at 2; Bennett Aff., Ex. 50

at 9.)

## PROCEDURAL HISTORY

David Lynas, as trustee for Lynas, brought an initial Complaint in August 2018,

alleging that Defendants had violated the Eighth and Fourteenth Amendments.  (Aug. 7,

2018, Docket No. 1.)  Lynas filed an Amended Complaint on July 18, 2019.  (Docket No.

40.)  On January 21, 2020, the Sherburne County Defendants filed a Motion for Summary

Judgment.  (Docket No. 60.)  On January 28, 2020, the MEnD Defendants also filed a

Motion for Summary Judgment.  (Docket No. 75.)

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material

fact and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court

considering a motion for summary judgment must view the facts in the light most

favorable to the non-moving party and give that party the benefit of all reasonable

inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations

or denials but must show through the presentation of admissible evidence that specific

facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256.

### II.    QUALIFIED IMMUNITY (STANG AND WISE)

Officers Stang and Wise argue that they are entitled to qualified immunity because

Lynas did not demonstrate that they violated a clearly established constitutional right.

Qualified immunity shields government officials from liability if "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  The Court

considers whether the facts alleged, "construed most favorably to the plaintiff[]," (1) establish a violation of a constitutional right and (2) demonstrate that the "right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Small v. McCrystal,* 708 F.3d 997, 1003 (8th Cir. 2013). "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Correctional Med. Servs.,* 583 F.3d 522, 528 (8th Cir. 2009). Courts may exercise discretion in determining the sequence in which it addresses the questions. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A. Clearly Established

First, it is clearly established "that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs" and it is also clearly established "that a risk of suicide by an inmate is a serious medical need." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). Accordingly, this element is met.

### B. Constitutional Violation

Next, the Court must consider whether the facts, when viewed in the light most favorable to Lynas, show that the officers' conduct violated a constitutional right. *McCrystal,* 708 F.3d at 1003. To demonstrate deliberate indifference in violation of the Eighth Amendment, Lynas must show that (1) he had an objectively serious medical need,

(2) that the defendants actually knew of this need, and (3) deliberately disregarded such need. *See, e.g., Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009).

### 1. Objectively Serious Medical Need

First, Stang and Wise dispute whether Lynas had an objectively serious medical need.

As noted, an inmate's risk of suicide is a serious medical need. *Gregoire*, 236 F.3d at 417. However, the question is not whether in hindsight Lynas was at risk for suicide, but rather whether his condition at the time was either so obvious that a layperson would have recognized it or that it was "supported by medical evidence, like a physician's diagnosis." *Grayson v. Ross*, 454 F.3d 802, 809 (8th Cir. 2006) (quoting *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995)).

In determining whether an inmate was objectively at risk of suicide, the Eighth Circuit has found that "something more than an inmate's gloomy affect is required to trigger a duty to inquire whether he is feeling suicidal." *Hott v. Hennepin Cty.*, Minnesota, 260 F.3d 901, 906 (8th Cir. 2001). On the other hand, "exhibit[ing] a suicide gesture" can create an objective serious medical need. *White v. Crow Ghost*, 456 F. Supp. 2d 1096, 1102, 1105 (D.N.D. 2006). The Court has also found that being diagnosed with depressive disorder and being prescribed medication to treat that disorder may be a serious medical need. *See Jackson v. Reid,* No. CV 16-2405 (JRT/BRT), 2017 WL 9274891, at *3 (D. Minn. Nov. 7, 2017), *report and recommendation adopted,* No. CV 16-2405 (JRT/BRT), 2018 WL

550797 (D. Minn. Jan. 25, 2018), *aff'd*, 731 F. App'x 567 (8th Cir. 2018) (finding that diagnosed depressive disorder along with a treating prescription raises "[a]t minimum … genuine issues of material fact as to whether these conditions are objectively serious.")

Here, Lynas had expressed suicidal thoughts shortly after he arrived at Sherburne County Jail.  He reported to a nurse that he had been in so much pain from withdrawal that he'd considered self-harm, although by the time he reported to the nurse he was no longer considering suicide.  Then Lynas scored 43 points on the BDI – a standard test, where scores over 28 points indicate severe depression.  On the BDI Lynas again reported that he had thoughts of killing himself (although did not intend to do so).  The high score and responses led the on-duty nurse to call a medical provider, who then referred Lynas for urgent treatment as soon as possible and prescribed him anti-anxiety medication in the meantime.

Given these facts, the Court finds that Lynas had an objectively serious medical need that would be recognized by the layperson and also that was supported by medical evidence, including the on-duty nurse's prescription for anti-anxiety medication and urgent referral for further treatment.  *See Grayson*, 454 F.3d at 809; *cf. Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) ("A serious medical need is one that has been diagnosed by a physician as requiring treatment.").

## 2.   Stang's and Wise's Actual Knowledge

Lynas must also demonstrate that Wise and Stang actually knew Lynas was at risk of suicide. *Gray*, 557 F.3d at 908. The Court may infer such knowledge from circumstantial evidence, and may find that if a risk is obvious, if an official has been exposed to the relevant information, and thus "must have known" about it, the official did know. *Farmer v. Brennan*, 511 U.S. 825, 842–43, (1994). However, "it is not enough merely to find that a reasonable person would have known, or that the defendant should have known." *Id.* at 843, n. 8.

Wise and Stang were aware that Lynas was on a 15-minute mental health watch. Only 10 other inmates in the entire jail were on a 15-minute watch, which was the highest level of watch available in the Jail. A number of individuals testified that Sherburne County Jail did not use the term "suicide watch," and instead used the term 15-minute mental health watch as the equivalent. In their depositions, Stang and Wise both agreed that COs needed to be aware of suicide risk potential for everyone with a 15-minute mental health watch. The purpose of checking on the inmate every 15 minutes is to ensure the inmate is alive and breathing.

Wise and Stang were also aware that Lynas was not permitted to have a razor. At oral argument, counsel for Sherburne County explained that none of the 11 inmates on the special 15-minute mental health watch was permitted to have a razor. However, the fact is noteworthy here, because Lynas was already in segregated housing, alone in his

cell.  There was no risk that Lynas could harm another inmate.  The razor restriction, for Lynas, appears to be entirely to prevent harm to himself.

Stang and Wise argue that they did not know the underlying reasons for the 15-minute watch.  They also argue that suicidal inmates are housed elsewhere, and in Kevlar gowns; essentially, their argument is that because there could be inmates more obviously suicidal, Lynas's suicide risk was not obvious.  However, the fact that other inmates could be at higher risk of suicide, or more obviously at risk, does not negate the fact that Wise and Stang knew that Lynas was one of 11 inmates on special 15-minute mental health watch and, despite already being segregated from other prisoners, was not permitted access to a razor.

These facts, when taken together and viewed in the light most favorable to Lynas, create a genuine issue of material fact as to whether Wise and Stang knew of his suicide risk.

### 3.  Deliberate Indifference

Even though Lynas has shown an objectively serious medical need and created a genuine dispute of material fact as to Wise and Stang's actual knowledge of that need, he must still show that Wise and Stang acted with deliberate indifference towards that need.  To meet this high threshold, Lynas must show the "equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the

inmate." *Schaub v. VonWald*, 638 F.3d 905, 914–15 (8th Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  Essentially, Lynas must show that Stang and Wise knew that "their conduct was inappropriate" in light of Lynas's suicide risk.   *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009).

Whether a failure to conduct adequate checks on an inmate constitutes reckless indifference depends on the specific factual circumstances.   *Compare Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001) ("failing to determine what was going on in [the] cell" for five hours, after the inmate had covered his cell window with toilet paper "could easily be considered egregious enough to rise to the level of deliberate indifference"), *with Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (affirming qualified immunity finding when guard checked on inmate every 17 minutes instead of 15 and failed to notice exposed electrical conduit).[4]

Here, at 9:01, Wise did a catwalk check, and, determining that he could only see part of Lynas under the bed, went into the day room and explained to Lynas that Wise needed to see him at all times.  However, at the next 15-minute check, although Wise could again only see part of Lynas's body (this time part of his head) and could not see

---

[4] *See also Williams v. Kelso*, 201 F.3d 1060, 1065 (8th Cir. 2000) (on orders to check an inmate's vital signs every four to six hours, failing to check for seven hours is negligent but not deliberately indifferent."); *Gray v. Tunica Cty., Mississippi*, 100 F. App'x 281, 282 (5th Cir. 2004) (finding that when CO knew inmate was on suicide watch, and "observed Bell unclothed and in a 'frog-like' position," but did not enter the cell because he and a nurse concluded the inmate was sleeping was negligent but not deliberately indifferent.); *Frary v. Cty. of Marin*, 81 F. Supp. 3d 811, 837 (N.D. Cal. 2015) ("a reasonable jury could conclude that failure to provide regular monitoring was evidence of the County's deliberate indifference to substantial risks to inmate" when officers instead used a more indirect form of monitoring.)

what he was doing, he did nothing and continued on to check the next cell.  Wise testified

that he saw Lynas's head move, but the video suggests that all movement in the cell had

ceased several minutes prior.  Wise did not go back into the dayroom to speak to Lynas

or otherwise check on him as he had done previously.[5]  Thus, Wise confirmed that Lynas

was in the cell, but not that Lynas was alive and breathing as he had done previously, and

which was the main purpose of the 15-minute mental health check.

Similarly, when Strang did the next 15-minute check, she could see only a part of

Lynas's head.  She could not see whether he was breathing or if he was otherwise fine.

She did not adjust her view to look farther into the cell.  Nor did she go into the dayroom

to speak to or check on Lynas.  She, like Wise, merely confirmed that Lynas body was

present in the cell, nothing more.  Not until Stang's second 15-minute check, when she

noticed Lynas's head in the same position, did she bother to look farther into the cell.

There, visible in the reflection of the window on the door, was the sheet with which Lynas

had hung himself.

Despite knowing that the main purpose of the 15-minute check was to confirm life,

and doing precisely that during the 9:00 a.m. check when Lynas was not sufficiently

visible, both Stang and Wise proceeded to do "checks" that confirmed nothing more than

that Lynas's body was present in the cell.  Confirmation of the presence of a body is

certainly a necessary component of a proper 15-minute check, but it is not sufficient, and

---

[5] Lynas suggests that the COs' hesitation to enter the day room may have been due to their reluctance to interrupt an inmate who was using the room for his daily hour out of his cell.

both Wise and Stang knew this to be the case.  Unlike in *Liebe*, where a CO checked on an inmate every 17 minutes when they ought to have checked every 15 minutes, Stang's and Wise's checks were essentially nullities, and amounted to no check at all.  As illustrated by Stang's later discovery of Lynas, a more thorough check, even from the obstructed viewing position in the catwalk, would have revealed the reflection of the white sheet used as a noose.  Certainly, had the officers gone into the dayroom to follow up as Wise had done previously, they would have seen Lynas hanging through the clear door of the cell.  Instead, knowing that Lynas was at risk of suicide, they disregarded their obligations and moved onto the next cell.

Viewing the facts in the light most favorable to Lynas, the Court cannot find as a matter of law the officers did not act with deliberate indifference.

Accordingly, because a reasonable factfinder could answer in the affirmative both prongs of the qualified immunity inquiry, *see Nelson*, 583 F.3d at 528, the Court will deny Sherburne County's Motion for Summary Judgment as to Wise and Stang.

### III.    SECTION 1983 CLAIMS (THOMPSON, LEONARD, PFEIFER AND ROBERTSON)

42 U.S.C. 1983 "imposes liability for certain actions taken 'under color of 'law that deprive a person 'of a right secured by the Constitution and laws of the United States.' '' *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir.2005) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982)).  Therefore, Lynas must demonstrate the violation of a

Constitutional right, and must show that the violation was committed by a person acting under color of law.[6]

The individual MEnD Defendants do not claim qualified immunity, but instead move for summary judgment arguing that Lynas has not demonstrated an Eighth Amendment violation.  As above, to demonstrate an Eighth Amendment violation in this context, Lynas must show that (1) he had an objectively serious medical need, and (2) that the defendants actually knew of the need, but (3) deliberately disregarded such need. *See, e.g., Vaughn*, 557 F.3d at 908.

### A.     Objectively Serious Medical Need

As discussed above, Lynas has sufficiently demonstrated an objectively serious medical need.

### B.     Individual MEnD Defendants' Actual Knowledge

The Individual MEnD Defendants argue that Lynas has not shown that they subjectively knew about Lynas's suicide risk.

#### 1.     Thompson

Thompson interacted with Lynas on November 2-3, 2017.  On November 2, she scored Lynas's Chemical Withdrawal Flow Sheet at 7 and was aware that Lynas was going

---

[6] The individual MEnD Defendants do not dispute that they were acting under color of law.

through withdrawal.  On November 3, while completing Lynas's Initial Health Assessment, Thompson learned that Lynas had previously been diagnosed with depression and anxiety.  She also learned that Lynas had thoughts of self-harm the night of November 2, because his withdrawal stomach pain was so intense, and she checked the box for suicidal ideation.  Thompson then filled out a Suicide Risk Screening form, scoring him at 16 (below the MEnD threshold for action) and asked Lynas whether he wanted to begin the mental health process and fill out the BDI.

Although Thompson argues that she reasonably believed Lynas not to be at risk, Lynas has demonstrated that Thompson was aware of his suicidal ideation, that she thought it necessary to give a suicide risk assessment, and that she offered Lynas the BDI. Taking these facts in the light most favorable to Lynas, a genuine dispute of material fact remains as to Thompson's subjective knowledge.

## 2.  Pfeifer

Pfeifer interacted with Lynas on November 5, when she scored Lynas's BDI form at 43.  The form included Lynas's view that the future was hopeless, and also that Lynas had thoughts of killing himself, but did not intend to carry them out.  Pfeifer called the on-call PA, because Lynas's score was high enough to warrant further mental health treatment. Pfeifer also completed a Suicide Risk Screening Form for Lynas, and scored him at a 12. At the request of the Physician Assistant, Pfeifer asked Lynas for more detail, and learned that Lynas denied suicidal thoughts at that time.  She also learned that in 2013, he had previously sold all his guns so that he would not shoot himself.  Lynas explained that he

was suffering and not coping with it.  At the PA's request, Pfeifer submitted an urgent referral for a mental health appointment for Lynas.  She also put Lynas on a 15-minute mental health watch and denied him access to razors.

Pfeifer argues that she reasonably believed Lynas was not at risk because, among other reasons, he explicitly stated that he was not currently suicidal and that he would tell a CO if he considered suicide.  Lynas has demonstrated that Pfeifer was aware of his suicidal ideation, his urgent referral to mental health, his 15-minute mental health watch, and his razor restriction.  Considered in the light most favorable to Lynas, a genuine dispute of material fact remains as to Pfeifer's subjective knowledge.

### 3.  Robertson

The details are sparse for Robertson, but he testified at his deposition that he reviewed Lynas's information, collected by Thompson and Pfeifer, on November 5.  He stated that he had a clear understanding of the information transmitted by the staff, although there is no documentation of his review.  However, because Robertson testified that he reviewed the information that Thompson and Pfeifer had collected, he also knew of Lynas's repeated suicidal ideation.  Accordingly, a genuine dispute of material fact remains as to Robertson's subjective knowledge.

### 4.  Leonard

Electronic records indicate that Leonard reviewed Lynas's Initial Health Assessment on November 3, and his BDI and follow-on paperwork relating to the 15-

25

minute watch on November 6.  Like Robertson, Leonard never personally interacted with Lynas but had the same information that Thompson and Pfeifer had.   Accordingly, Leonard is in a similar position to Robertson, having received (secondhand) the information collected by Thompson and Pfeifer.  As such, a genuine dispute of material fact remains as to Leonard's subjective knowledge.

### C.   Individual MEnD Defendants' Deliberate Indifference

The Individual MEnD Defendants also argue that Lynas has not shown that they were deliberately indifferent.

In the prison medical context, "the failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (quoting *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).  Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).[7]  Instead, an inmate "must demonstrate that a prison doctor's actions were 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014) (quoting *Dulany*, 132 F.3d at 1240–41.)

---

[7] *See also Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016).

In the context of inmate suicide specifically, "[t]he inadequate medical care analysis focuses on the particular risk of suicide posed by the specific prisoner, rather than on the generalized threat of suicide among the population of prisoners as a whole." *Hott v. Hennepin Cty., Minn.*, 260 F.3d 901, 905 (8th Cir. 2001). "[T]he fact that a suicide occurred does not answer the relevant question: Were the preventive measures taken 'so inadequate as to be deliberately indifferent to the risk'?" *Liebe*, 157 F.3d at 578 (quoting *Rellergert by Rellergert v. Cape Girardeau Cty., Mo.*, 924 F.2d 794, 796 (8th Cir. 1991)).

### 1.  Thompson

After Thompson learned that Lynas had considered self-harm, she completed MEnD's Suicide Risk Screening form, and found that he scored a 16—significantly below MEnD's 36-point threshold for action.  Furthermore, Lynas told Thompson that he was no longer considering self-harm.  She asked Lynas whether he wanted to start the MEnD mental health process, and gave Lynas the Beck Depression Inventory.

Once Lynas expressed suicidal ideation, Thompson used her judgment as a nurse to screen Lynas for suicide using MEnD's proprietary tool.  Having found that, per MEnD's Suicide Risk Screening Form that Lynas's score did not call for action, Thompson used her judgment to inquire whether Lynas wanted to start on MEnD's mental health process.  Put simply, Thompson acted reasonably under the circumstances in providing Lynas' care.  Accordingly, even in the light most favorable to Lynas, no genuine dispute of material fact

remains as to Thompson's deliberate indifference.  As a result, the Court will grant Thompson's Motion for Summary Judgment.

2.  Pfeifer

After Pfeifer learned that Lynas scored 43 on the BDI, that Lynas viewed the future as hopeless, and had thoughts of killing himself, Pfeifer called the on-call medical provider.  After relaying additional information, including that Lynas denied suicidal thoughts at that time, and that he had previously experienced suicidal thoughts, Pfeifer followed the physician assistant instructions and moved Lynas to a 15-minute watch, a razor restriction, obtained prescription for as-needed anti-anxiety medication, and sent in a mental health referral.

As with Thompson, once Lynas expressed suicidal ideation to Pfeiffer, she immediately followed up and continued to provide care.  Pfeiffer contacted a medical provider, obtained and communicated additional information, set Lynas on a higher level of watch, and coordinated his prescription and mental health referral.  Accordingly, even when viewing the facts in a light most favorable to Lynas, no genuine dispute of fact remains as to Pfeiffer's deliberate indifference.  As a result, the Court will grant Pfeiffer's Motion for Summary Judgment.

3.  Robertson

After Robertson learned the information collected by Thompson and Pfeifer on November 5, he did not schedule an urgent appointment for Lynas.  Instead, at some point on or after November 5, he scheduled Lynas for an appointment on November 16.

28

Robertson was the only mental-health provider at Sherburne County Jail.  He made no notation or explanation in his notes about why he did not intend to see Lynas sooner.

Lynas received no care from Robertson, and no explanation as to why the urgent referral was discarded.  *See Jackson*, 756 F.3d at 1065–66 ("a refusal to provide essential care" can rise to the level of deliberate indifference.)  It is true that medical malpractice and other negligence, on its own, does not rise to the level of deliberate indifference.  *See, e.g., A.H. v. St. Louis County, Missouri*, 891 F.3d 721, 727 (8th Cir. 2018) (finding no deliberate indifference where a psychologist interviewed an inmate and, despite that inmate's arguable suicide risk, found that in his professional judgment the inmate was not suicidal and released him from the infirmary.)  Here, however, Robertson never interviewed or spoke to Lynas and broke from his normal documentation practices, making no contemporary notes or records of why he did not schedule an "urgent" mental health appointment as requested by the on-call medical provider.

When viewing these facts in the light most favorable to Lynas, a reasonable jury could conclude that Robertson knew that Lynas had repeatedly expressed suicidal ideation and that Robertson refused to provide essential care by scheduling an appointment so far out as to be useless to an inmate in crisis.  As such, a dispute of material fact remains as to whether Robertson was deliberately indifferent.

Accordingly, the Court will deny Robertson's Motion for Summary Judgment.

### 4. Leonard (personal capacity)

As with Robertson, Leonard never met with Lynas.  He reviewed the information collected by Thompson and Pfeifer, and took no action.  Unlike Robertson, who received a direct referral for mental health services for Lynas and was presented with clear options for treatment, it is not clear what Leonard's role should have been, or whether Leonard was aware that Robertson had scheduled Lynas's appointment so far out.  Lynas suggests that Leonard could have taken action and seen Lynas himself.  This is certainly true.  However, the question before the Court is not, with the benefit of hindsight, whether an individual took the ideal actions.  Instead, the question is whether Leonard's inaction rose to the high level of deliberate indifference.  Here, Lynas has not shown that this is the case.

Accordingly, the Court will grant Leonard's Motion for Summary Judgment as to the § 1983 violation in his personal capacity.

## IV.    SUPERVISOR LIABILITY (LEONARD)

Leonard also argues that Lynas failed to demonstrate an Eighth Amendment violation in the context of supervisor liability.

"In the section 1983 context, supervisor liability is limited" and the theory of respondeat superior is not available.  *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).  "Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation."  *Id.*  "The supervisor

must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he or she might see." *Id.* (cleaned up.)  Lynas has demonstrated a material question of fact as to whether there was an underlying Constitutional violation by Robertson.  Thus for Leonard to be liable as Robertson's supervisor, Lynas must show Leonard was deliberately indifferent to Robertson's actions.

Although Leonard reviewed the medical records entered by the two nurses, Robertson did not make any notes regarding Lynas for Leonard to review, and it is not at all clear whether Leonard even knew Robertson had scheduled Lynas's appointment when he did.  Although Lynas has plausibly demonstrated negligent supervision of Robertson, he has not demonstrated that Leonard's inaction as Robertson's supervisor constitutes deliberate indifference towards Robertson's actions.

Accordingly, the Court will grant Leonard's Motion for Summary Judgment as to Supervisor Liability.

## V.    *MONELL* LIABILITY (MEND)

MEnD argues that Lynas failed to demonstrate a policy or custom causing a constitutional violation, and that as a result, his *Monell* claims against MEnD should be dismissed.

For a governmental entity to be liable under *Monell v. Dep't of Soc. Servs. of City of New York*, a plaintiff must show that their injury was caused by "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  436 U.S. 658, 694 (1978).  The same

rule applies to private entities performing state functions, including providing medical care to inmate.  *See, e.g., Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997).  *Monell* liability attaches: "(1) where a particular municipal policy or custom[8] itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences."  *Moyle v. Anderson*, 571 F.3d 814, 817–18 (8th Cir. 2009).

"[A] municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom."  *Webb v. City of Maplewood*, 889 F.3d 483, 486 (8th Cir. 2018). Furthermore, "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation."  *Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 986 (8th Cir. 2002).  That said, "there must be an unconstitutional act" by an employee even if that employee is not liable in their individual capacity.  *Webb*, 889 F.3d at 487 (citations omitted).  As noted above, Lynas has demonstrated a material question of fact as to whether a MEnD employee violated Lynas' constitutional rights.

---

[8] While an official policy "involves a deliberate choice to follow a course of action" by an official with final authority, a custom can be demonstrated by "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" and "[d]eliberate indifference to or tacit authorization of such conduct" by authorities having notice of the misconduct. *Ware v. Jackson Cty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (cleaned up).

Lynas's argument, essentially, is that MEnD had a policy or custom of inadequate staffing, the efficacy of which was further diminished by the use of proprietary screening forms with seemingly arbitrary scoring and thresholds for intervention.

MEnD's medical oversight consisted of one part-time osteopath and one 10%-time medical doctor (Leonard) for the entire MEnD organization across 30+ institutions in several states; one mental health provider (Robertson) at Sherburne County Jail, although the institution has over 730 beds; and a reliance on less-qualified caregivers like nurses and physician assistants. MEnD also used its own copyrighted forms to assess an inmate's risk of suicide, but could not explain how the form was modified from existing diagnostic tests, the particulars of scoring the form, or why the thresholds for intervention were set at particular scores.

While there may not be a constitutional requirement that only a licensed physician or psychiatrist perform a suicide evaluation,[9] there is certainly a constitutional right to adequate medical care. To be adequate, medical care must involve sufficiently trained providers, with sufficiently valid tools at their disposal. *See, e.g., Shadrick v. Hopkins Cty., Ky*., 805 F.3d 724, 738–40 (6th Cir. 2015) (holding that a reasonable jury could find that a jail medical contractor was deliberately indifferent when its training and supervision

---

[9] *See Ernst v. Creek Cty. Pub. Facilities Auth*., 697 F. App'x 931, 934 (10th Cir. 2017) ("Absent a constitutional requirement that only licensed physicians or psychiatrists may conduct suicide evaluations, it cannot be said that the jail was deliberately indifferent to the risk of Ernst's suicide by permitting LPNs and LPCs to determine whether he belonged on suicide watch.").

resulted in "nurses who lack the essential knowledge, tools, preparation, and authority to respond to the recurring medical needs of prisoners in the jail setting.")[10]

Here, MEnD's understaffing and lack of meaningful physician supervision, coupled with reliance on MEnD's proprietary forms, colored every interaction Lynas had with the medical system and could allow a reasonable jury to conclude that MEnD was deliberately indifferent to risk of Lynas's suicide. Although Lynas failed to demonstrate that Thompson might be personally liable, the failure was in part because Thompson relied on MEnD's forms. She is not a mental health professional, but was instead trained to use the MEnD form and score it as best she could. She was also instructed by the form that scores under a specific threshold do not require additional escalation. Similarly, Pfeifer relied on MEnD's forms, which did not indicate a need for escalation. However, because Lynas's score on the standard issue BDI was so high, she did seek additional medical advice in the form of an off-site, on-call physician assistant.[11]

Robertson was the only psychologist for the Sherburne County Jail. It's not clear whether Robertson provided any meaningful supervision to the nursing staff, or whether he even reviewed the records they submitted. Nor is it clear that Leonard provided much

---

[10] See also Buckley v. Rogerson, 133 F.3d 1125, 1130–31 (8th Cir. 1998) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (holding that "systemic deficiencies" such as inadequate staffing and/or training of medical staff "can provide the basis for a finding of deliberate indifference"); Burke v. Regalado, 935 F.3d 960, 1000 (10th Cir. 2019) (holding that understaffing and inadequate training of medical staff was a policy or custom that caused inmate's death, and that the Sherriff was deliberately indifferent to the harm such understaffing and poor training could cause.)

[11] It is not clear whether Pfeifer had access to an on-call physician or mental health professional, even off-site.

or any supervision for Robertson, or whether he was even aware of Robertson's scheduling, given Robertson's lack of notes.   Leonard did review the medical notes submitted by Thompson and Pfeifer, but given the oversight required for all more than thirty institutions MEnD contracts with, it is reasonable to infer that the review was likely cursory.

A reasonable jury could find that minimal physician oversight, coupled with arbitrary thresholds on proprietary forms, render staff unable to meet the constitutional health needs of the jail population.

Accordingly, the Court finds that a genuine dispute of material fact remain as to whether MEnD's policy or custom of understaffing and use of arbitrary forms is deliberately indifferent, and will deny MEnD's Motion for Summary Judgment.

## VI.   *MONELL* LIABILITY (SHERBURNE COUNTY)

Finally, Sherburne Country argues that Lynas has not demonstrated a material question of fact as to his *Monell* claims against the County.

As to the County, Lynas argues that Sherburne County Jail has a policy or custom of failing to ensure the safety of suicidal inmates.  Lynas argues that Sherburne County Jail (1) prohibited the term "suicide watch," which makes inmate status more confusing and impedes suicide prevention; (2) permitted ineffective checks for at-risk inmates by allowing catwalk checks and otherwise performing the checks too quickly; (3) housed potentially suicidal prisoners in cells which are not suicide-resistant; (4) failed to have

sufficient anti-suicide policies, and did not follow the policies they did have; and (5) contracted with MEnD which provided inadequate treatment.

First, a genuine dispute of fact remains as to whether Sherburne County prohibited the term "suicide watch."  A reasonable jury could find that grouping suicidal inmates together with anyone else in need of "mental health watch" would make it more difficult to know which inmates were potentially suicidal, and that withholding that information from COs and others is deliberately indifferent.  For instance, without the ability to sort prisoners according to suicide risk, it seems much more likely that inmates might be held in cells that are not suicide-resistant, or otherwise fail to care for suicidal inmates appropriately.

Second, the County does not dispute that catwalk checks were permitted as a policy, but argues that although visibility from catwalk checks may be limited, such checks are used when an inmate is on his hour out in the day room.  It is not clear, however, that catwalk checks are limited only to those times, and even if it were, each pod has four cells and each inmate has an hour out per day.  Accordingly, for at least four hours each day, the Sherburne County Jail has a policy of doing only limited inmate checks, including on those at-risk inmates housed in the pods.  Sherburne County Jail's physical plant may have limitations, but a reasonable jury could find that a policy endorsing catwalk checks, knowing their limited visibility into cells, is deliberately indifferent to the safety of inmates.

As to whether there was a policy of performing checks too quickly, the evidence is less clear.  Stang performed her checks extremely quickly, and the DOC cited Sherburne County Jail about nine months after Lynas's suicide for performing checks too quickly (although the DOC also noted that Sherburne County Jail had taken steps to rectify the issue).  One CO doing an overly fast check does not indicate that Sherburne County Jail had a policy of such checks; while the DOC report may have provided notice of such a policy, any notice came months after Lynas's death.  Here, although it seems that some officers, including Stang, may well have been performing inmate checks too quickly, Lynas has not demonstrated a policy or custom of such overly fast checks.

As to jail policies, Lynas's argument is a little more difficult to follow.  He argues that the jail has some policies but (1) they are not followed and (2) they are insufficient.  For instance, Lynas acknowledges that Sherburne County Jail has a policy wherein any inmate making suicidal comments must be treated as a high suicide risk, a Jail sergeant notified, and a mental-health assessment performed, as well as a policy that medical staff be notified when an inmate is placed in segregated housing.  It is clear that none of these policies were followed in Lynas's case.  However, Lynas has not demonstrated that Sherburne County Jail's disregard of these written policies was itself a policy or custom.  A single instance, while having terrible consequences for Lynas, does not demonstrate a continuing, widespread, persistent pattern.  *See Ware*, 150 F.3d at 880.

Finally, Lynas argues that by contracting with MEnD, which Lynas argues was deliberately indifferent, the County is similarly liable.  However, merely contracting with MEnD is not sufficient to demonstrate deliberate indifference; at the very least, Lynas must demonstrate that Sherburne County knew that MEnD was deliberately indifferent in its practices.  While Lynas has shown sufficient facts about MEnD's deliberate indifference, he has not demonstrated that Sherburne County was aware of MEnD's issues (for instance, the particular staffing ratios or the issues with arbitrary proprietary diagnostic forms).

In sum, when viewing the facts in the light most favorable to Lynas, a reasonable jury could find that Sherburne County Jail had a policy or custom of prohibiting the term "suicide watch" and of allowing ineffective catwalk checks for at-risk inmates.  A reasonable jury could also conclude that, by the nature of these policies, Sherburn County was deliberately indifferent to the safety of its suicidal inmates, including Lynas.

Accordingly, the Court will deny Sherburne County's Motion for Summary Judgment as to the *Monell* claims.[12]

**CONCLUSION**

---

[12]  To the extent the County argues that it did not have notice of the issue, suicide is a "highly predictable consequence" of policies that allow ineffective inmate checks or that prevent sufficient notice of inmates at risk for suicide.  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).  Accordingly, the County "does not get a 'one free suicide' pass" to learn that a predictable consequence might happen. *Woodward v. Corr. Med. Servs. of Illinois, Inc.,* 368 F.3d 917, 929 (7th Cir. 2004).

Because a reasonable jury could find that Wise and Stang violated a clearly established constitutional right, the Court will deny their Motion for Summary Judgment. Furthermore, because a reasonable jury could find that Sherburne County Jail had policies or customs which resulted in deliberate indifference to the safety of suicidal inmates, including Lynas, the Court will deny its Motion for Summary Judgment.

Because a reasonable jury could find that Robertson refused to provide essential care by scheduling Lynas's appointment so far out as to be useless, the Court will deny his Motion for Summary Judgment.  Furthermore, because a reasonable jury could find that MEnD had policies or customs which resulted in deliberate indifference to the safety of suicidal inmates, the Court will deny its Motion for Summary Judgment.  However, even when viewing the facts in a light most favorable to Lynas, no genuine dispute of fact remains as to Pfeiffer, Thompson, or Leonard's deliberate indifference.  As a result, the Court will grant their Motion for Summary Judgment.

**ORDER**

 Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  The Sherburne County Defendants' Motion for Summary Judgment [Docket No. 60] is **DENIED**, and

2.  The MEnD Defendants' Motion for Summary Judgment [Docket No. 75] is **GRANTED in part and DENIED in part** as follows:

a. **GRANTED** as to Lynas's claims against Defendants Pfeifer and Thompson in their individual capacities, and Defendant Leonard in his official and individual capacities.  These claims are dismissed with prejudice.

b. **DENIED** as to Lynas's claims against Defendant Robertson and MEnD Correctional Care, PLLC.


DATED: August 19, 2020
at Minneapolis, Minnesota

_____

JOHN R. TUNHEIM
Chief Judge
United States District Court